ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 27, 2023

BRIEF FOR APPELLEE

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 23-3045

———————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

LARRY RENDALL BROCK,                    Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

MATTHEW M. GRAVES
United States Attorney

APRIL AYERS-PEREZ
DOUGLAS MEISEL
BARRY DISNEY
Trial Attorneys (detailees)

CHRISELLEN R. KOLB
*  ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorneys
*  Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
Cr. No. 21-140 (JDB)          (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for appellant.

## Rulings Under Review

References to the ruling at issue appear in the brief for appellant.

## Related Cases

This case has not previously been before this Court. At least one other case pending before this Court raises some of the same issues: *United States v. Robertson*, No. 22-3062 (argued May 11, 2023).

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the attached Addendum.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

COUNTERSTATEMENT OF THE CASE.......................................... 3

    The Trial ............................................................................4

        The Government's Evidence .......................................................4

        The Defense Evidence...............................................................12

        District Court's Verdict ............................................................12

SUMMARY OF ARGUMENT.....................................................18

ARGUMENT .......................................................................20

    I.   Brock's Conviction for Obstruction of an Official Proceeding Is Sound. ................................................20

        A.   Statute at Issue and Standards of Review.........................20

        B.   *Fischer* Rejects Brock's Interpretation of § 1512(c)(2)'s Actus Reus....................................................................22

        C.   The District Court Correctly Concluded that Brock Acted "Corruptly" for Purposes of § 1512(c)(2)..................24

            1.   Brock Waived or Forfeited Any Objection to the District Court's Definition of "Corruptly."..................24

            2.   The District Court's Verdict Reflects the Correct Definition of "Corruptly."...........................................27

            3.   The Evidence Sufficiently Established that Brock Acted "Corruptly." ......................................................29

                 a.   The Evidence Sufficed Under the Broad Definition of "Corruptly."......................................29

                 b.   The Evidence Sufficed Under the Narrow Definition of "Corruptly."......................................35

II.  The District Court Appropriately Enhanced Brock's
     Guidelines Range Under § 2J1.2(b)(2). ....................................38

     A.  Guideline at Issue and Standard of Review........................38

     B.  Additional Background........................................................39

     C.  The Certification of the Electoral College Vote Involved
         the "Administration of Justice" as Defined Broadly in
         the Guidelines. ....................................................................41

     D.  Brock's Reliance on *United States v. Seefried* Is
         Misplaced. ............................................................................52

CONCLUSION ......................................................................................61

# Table of Authorities*

\* *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) .................. 28

*DePierre v. United States*, 564 U.S. 70 (2011) ........................................ 58

*Hughes v. United States*, 138 S. Ct. 1765 (2018) .................................... 46

*In re Kendall*, 712 F.3d 814 (3d Cir. 2013) ............................................. 43

*In re McConnell*, 370 U.S. 230 (1962) .................................................... 43

*In re Sealed Case*, 573 F.3d 844 (D.C. Cir. 2009) .................................. 21

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................ 21

*Powerex Corp. v. Reliant Energy Servs.*, Inc., 551 U.S. 224 (2007) ........ 50

*Rosner v. United States*, 10 F.2d 675 (2d Cir. 1926) ............................... 43

*Stinson v. United States*, 508 U.S. 36 (1993) .......................................... 49

*United States v. Aguilar*, 515 U.S. 593 (1995) ........................................ 43

*United States v. Ali*, 864 F.3d 573 (7th Cir. 2017) .................................. 50

*United States v. Amer*, 110 F.3d 873 (2d Cir. 1997) ......................... 48, 55

*United States v. Atlantic States Cast Iron Pipe Co.*,
    627 F. Supp. 2d 180 (D.N.J. 2009) ...................................................... 50

*United States v. Booker*, 543 U.S. 220 (2005) ........................................ 46

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Boyd*, 803 F.3d 690 (D.C. Cir. 2015) ............................21

*United States v. Brock*, No. 23-3045 (D.C. Cir. May 25, 2023)......... 23, 25

*United States v. Bryant*, 117 F.3d 1464 (D.C. Cir. 1997) ................ 22, 30

*United States v. Caldwell*, 581 F. Supp. 3d 1 (D.D.C. 2021) .................61

*United States v. Castleman*, 572 U.S. 157 (2014) ...................................45

*United States v. Chansley*, No. 21-cr-003 (Lamberth, J.) ......................51

*United States v. Clark*, 184 F.3d 858 (D.C. Cir. 1999) ...........................22

*United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.) ......................51

* *United States v. Fischer*, 64 F.4th 329
    (D.C. Cir. 2023)...................................................... 18, 21, 23, 25, 36, 37

*United States v. Harrington*, 82 F.3d 83 (5th Cir. 1996).......................57

*United States v. Hodgkins*, No. 21-cr-188 (Moss, J.) ............................51

*United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021) ...........................27

*United States v. Miller*, No. 21-cr-075 (Moss, J.)...................................51

*United States v. Nordean*, 579 F. Supp. 3d 28 (D.D.C. 2021)................60

* *United States v. North*, 910 F.2d 843 (D.C. Cir.),
    *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940
    (D.C. Cir. 1990)...................................................................................28

*United States v. Partin*, 552 F.2d 621 (5th Cir. 1977)...........................43

*United States v. Pasha*, 797 F.3d 1122 (D.C. Cir. 2015).......................21

* *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ...................28

*United States v. Pruitt*, No. 21-cr-23 (Kelly, J.) ...................................... 51

*United States v. Puma*, 596 F. Supp. 3d 90 (D.D.C. 2022) .............. 14, 15

*United States v. Reffitt*, No. 21-cr-032 ................................................... 51

*United States v. Reynoso*, 38 F.4th 1083 (D.C. Cir. 2022) ..................... 21

*United States v. Robertson*, 588 F. Supp. 3d 114 (D.D.C. 2022) ............ 61

*United States v. Robertson*, No. 22-3062
  (argued May 11, 2023) ............................................................. 18, 24, 28

*United States v. Rubenacker*, No. 21-cr-193 (ECF 70) ............... 40, 47, 51

*United States v. Saani*, 650 F.3d 761 (D.C. Cir. 2011) ........................... 25

*United States v. Seefried*, No. 21-CR-287 (TNM),
  2022 WL 16528415 (D.D.C. Oct. 29, 2022) ..52, 53, 54, 55, 56, 57, 58, 59

*United States v. Vega*, 826 F.3d 514 (D.C. Cir. 2016) ............................. 31

*United States v. Weissman*, 22 F. Supp. 2d 187 (S.D.N.Y. 1998) ........... 51

*United States v. Wilson*, No. 21-cr-345 (Lamberth, J.) ........................... 51

*United States v. Winstead*, 890 F.3d 1082(D.C. Cir. 2018) ................... 54

*United States v. Young*, 811 F.3d 592 (2d Cir. 2016) ............................. 50

## Other Authorities

3 U.S.C. § 15 ................................................................. 51, 60

3 U.S.C. § 16 ..................................................................... 60

3 U.S.C. § 18 ..................................................................... 51

18 U.S.C. § 2 ....................................................................... 3

18 U.S.C. § 2(a) ................................................................. 20

18 U.S.C. § 551 ................................................................. 44

18 U.S.C. § 665(c) ............................................................. 44

18 U.S.C. § 922(g)(9) ........................................................ 45

18 U.S.C. § 1503 .......................................................... 43, 58

18 U.S.C. § 1505 .......................................................... 44, 59

18 U.S.C. § 1512 ............................................................... 44

18 U.S.C. § 1512(c)(2) ......... 3, 18, 19, 20, 22, 23, 24, 25, 27, 28, 29, 39, 40

18 U.S.C. § 1515(a)(1)(B) .................................................. 44

18 U.S.C. § 1516 ............................................................... 44

18 U.S.C. § 1519 ............................................................... 45

18 U.S.C. § 1752(a)(1) ......................................................... 3

18 U.S.C. § 1752(a)(2) ......................................................... 3

26 U.S.C. § 7212 ............................................................... 45

40 U.S.C. § 5104(e)(2)(A) ................................................................ 3

40 U.S.C. § 5104(e)(2)(D) ............................................................... 3

40 U.S.C. § 5104(e)(2)(G) ............................................................... 3

Fed. App. R. 28(a)(8)(A) ............................................................... 25

U.S. Const. art. II, § 1, cl. 3 ....................................................... 51

U.S.S.G. § 2J1.2 ............... 42, 44, 45, 47, 48, 49, 50, 51, 52, 54, 56, 58, 59

U.S.S.G. § 2J1.2(b)(1)(B) .................................... 45, 46, 47, 49, 50, 52, 60

U.S.S.G. § 2J1.2(b)(2) . 19, 38, 39, 41, 42, 45, 46, 47, 48, 49, 50, 51, 52, 60

U.S.S.G. § 2J1.2(b)(3) ............................................................... 47

Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).......................................................... 55

*Ballentine's Law Dictionary* 696 (3d ed. 1969) ...................................... 43

*Black's Law Dictionary* (11th ed. 2019) ......................................... 43, 53

ix

# ISSUES PRESENTED

I.    Whether the evidence, considered in the light most favorable to the jury's guilty verdict, established that Brock corruptly obstructed the certification of the Electoral College vote on January 6, 2021, in violation of 18 U.S.C. § 1512(c)(2).

II.    Whether the district court erred in enhancing Brock's sentence pursuant to U.S.S.G. § 2J1.2(b)(2) on the ground that his criminal conduct obstructed the "administration of justice."

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 23-3045

_____

UNITED STATES OF AMERICA,                    Appellee,

v.

LARRY RENDALL BROCK,                    Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR APPELLEE

_____

## INTRODUCTION

In the weeks leading up to January 6, 2021, appellant Larry Brock—a retired Air Force lieutenant colonel—vowed "rebel[lion]" and "Insurrection" to "keep the rightful President in power" (Joint Appendix (A) 293; A302; A319). He advised followers, "[M]ake sure your AR-15s are sighted. Your clips are loaded. Your body armor checked." (A300.) He even wrote a detailed, military-like "plan of action" to take control of

government, including plans to "[s]eize all democratic politicians and Biden key staff and select Republicans (Thune and McConnell)" and "interrogat[e]" them "using measures we used on Al Qaeda"; "[e]liminate" leading media figures; "[e]stablish provisional government in rebellious states"; and enact "rules of engagement," like not killing law enforcement "unless necessary" (A309-11). He proclaimed that January 6 was the day to "ensure" that "Biden won't be inaugurated," and would be the beginning of "[o]ur second American Revolution" (A323-24).

On January 6, Brock joined rioters in invading the Capitol Building and stopping the electoral certification. He made his way onto the Senate Floor, wearing body armor and a military-style helmet that he had brought from Texas, and openly carrying flex-cuffs in his hand. He repeatedly attempted to open a locked door labeled "United States Senate," using keys of unclear origin. And he warned fellow rioters not to take actions (like assaulting officers or sitting in the Vice President's seat) that would lose the "information operations war"—that is, actions that would turn the public against the rioters' attempt to block the electoral certification and the peaceful transfer of power. Brock's conviction and sentence should be affirmed.

2

# Counterstatement of the Case

After the January 6, 2021, attack on the United States Capitol, Brock was indicted for Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)) (including aiding and abetting liability under 18 U.S.C. § 2) (Count 1); Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)) (Count 3); Entering and Remaining on the Floor of Congress (40 U.S.C. § 5104(e)(2)(A)) (Count 4); Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)) (Count 5); and Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)) (Count 6) (A18-20). Brock waived his right to a jury trial (A66). Following a three-day bench trial before the Honorable John D. Bates, Brock was convicted on all six charges (A12; A451-77). On March 17, 2023, Judge Bates sentenced Brock to concurrent terms of imprisonment of 24 months for Count 1, 12 months for Counts 2 and 3, and six months for Counts 4-6, followed by 24 months of supervised release (A15; A598-605; A716-20). Brock timely appealed on March 28 (A606).

# The Trial

## *The Government's Evidence*

### *Brock's Conduct Leading Up to January 6*

Brock had graduated from the United States Air Force Academy and rose to the rank of lieutenant colonel before retiring (A252). He had flown several hundred combat missions while in the Air Force (A330).

Brock's fiery Facebook missives began days after the November 3, 2020, election. Brock decried the "stolen" and "rigged" election, claiming "theft" and "fraud" (see, e.g., A276; A279; A289; A294; A326). He glorified a coming rebellion, vowing to resist the transfer of power by force:

- "A revolution every now and then is a good thing; it is time." (A274-75.)

- "If the President calls, I will answer #oathkeeper." (A276.)

- "When we get to the bottom of this conspiracy, we need to execute the traitors that are trying to steal the election, and that includes the leaders of the media and social media aiding and abetting the coup plotters." (A279.)

- "Storm the Castle." (A281.)

- "Either SCOTUS stops the steal or we must emulate the patriots from Athens in 1946"—a reference to World War II veterans who stole weapons from an armory in Athens, Tennessee, then fired on election authorities in order to seize ballot boxes in what was perceived as an illegitimate election. (A289-91.)

- "Trump won the election. If necessary I aim to misbehave." (A292.)

- "If SCOTUS doesn't act we have two choices. We can either live in a Communist country or we can rebel, keep the rightful President in power and demand free and fair elections #civilwar2021." (A293.)

- "We need to restore the Constitution and the best and shortest way is to go offensive on the Communists that stole it, aka the Democratic party." (A294.)

- "It appears as if SCOTUS is going to duck. If so then it will be game on soon. We need ROE [rules of engagement], a clear chain of command ending with President Trump and a master target list." (A300.)

- "It is a good weekend to make sure your AR-15s are sighted. Your clips are loaded. Your body armor checked." (A300.)

- "If Biden steals it, I do not recognize the [U.S. government] as being legitimate. . . . I want to actively rebel." (A302.)

- "My prediction is occupation of Capitol abs [sic] capture of some assets is easy." (A315-16.)

- "I prefer outright Insurrection at this point." (A319.)

- "'We are now under occupation by a hostile governing force. That may seem ludicrous to some, but I see no distinction between a group of Americans seizing power and governing with complete disregard for the Constitution and an invading force of Chinese Communists accomplishing the same objective.' Against all enemies foreign and domestic #oathkeeper #2A #III percent." (A323.)

In private exchanges on Christmas Eve with a former special forces officer (see A295), Brock proposed a military-like "[p]lan of action if

Congress fails to act on 6 January" (A308-17; A408; see also A488; A710).

Among the "main tasks" Brock identified:

- "Seize all Democratic politicians and Biden key staff and select Republicans (Thune and McConnell). Begin interrogations using measures we used on Al Qaeda to gain evidence on the coup."

- "Seize national media assets and key personnel. Zuck [Mark Zuckerberg], Jack [Jack Dorsey], CNN lead and talking heads, seize WAPO, seize NYT editors. Eliminate them."

- "Present slate for clean elections to existing Congress and make sure they sign."

- "Let the Democratic cities burn. Cut off power and food to all who oppose us."

- "Establish provisional government in rebellious states and representatives we can count on."

- "General pardon for all crimes up to and including murder of those restoring the Constitution and putting down the Democratic Insurrection."

Among the "ROE" (rules of engagement) Brock proposed was: "Do not kill LEO [law-enforcement officers] unless necessary. Gas would assist in this if we can get it." (A312.)

In addition, Brock repeatedly discussed winning the "IO [information operations] war"—that is, the use of information to shape the battle (A287-90; see also A296; A302; A304; A320). His friend, for example, warned Brock of "[a] possible IO loss if a cop got hurt" (A304).

6

By January, Brock was specifically focused on the January 6 election certification in Congress:

- "Help is on the way. 6 Jan 2021 #MAGA #Stormthecastle." (A323.)

- "Biden won't be inaugurated. We will ensure that on the 6th." (A324.)

- "Our second American Revolution begins in less than two days." (A324) (posted on January 5).

Brock's preparation went beyond social-media exchanges. He purchased body armor (a plate carrier) in mid-December (A302-03). And he booked a D.C. hotel and flights for January 5-7 (A256; A319).

*The January 6, 2021, Attack on the Capitol*

On January 6, the Capitol building was closed to the public and secured because of COVID-19 protocols and because then-Vice President Pence (who was protected by the Secret Service) had come to the Capitol to oversee the certification of the 2020 presidential election, which would officially declare President Biden as the winner (A124-28). In preparation for the January 6 certification vote, the Capitol Police established a protective perimeter on the Capitol grounds, including interconnected bicycle racks, snow fencing, and signs giving notice that the area was closed (A128-32). Everything inside the barricades (including the entire

Capitol building) was restricted, with members of the public prohibited inside (*id.*).

On January 6, the first rioters breached the security perimeter around the Capitol a little before 1:00 p.m. in the West Front by Peace Circle (A133-35; A141-47). Police attempted to form a new line to protect the building, but rioters outflanked the officers (A135-37). Rioters tore down fences, threw batteries at officers, and sprayed them with bear spray (A141-47). At approximately 2:12 p.m., rioters breached the Senate Wing Door after breaking in a nearby window, gaining entrance to the Capitol building (A137-39; A147-48; A156; A195-96). Rioters later breached other entrances into the building (see A148-50).

While the mob massed outside the Capitol, the Joint Session of Congress assembled for the count of the Electoral College votes at 1:00 p.m., with Vice President Pence presiding (A98-100). After the mob breached the building, the Capitol Police ordered the Senate Chambers secured, requiring that doors be locked and Members shelter in place (A216-19). That order also cut the television feed into the Chambers, and it stopped all legislative business (A219-20). The Secret Service invoked its emergency action plan and relocated Vice President Pence and his

family to a secure location (A100-08; A221-22). Capitol Police guided Senators to another location (A221-23). The presence of any unauthorized person inside of the Capitol building—and the risk that such persons carried weapons—represented a significant danger, forcing Congress into lockdown and halting all legislative business (A102; A105; A108; A139-40; A148; A232).

Over the next several hours, officers sought to reclaim the Capitol from the mob, as well as to retrieve legislative staff who were sheltering in place (A230). The certification proceedings did not end until the early morning hours of January 7 (A98; A230).

## Brock's Conduct on January 6

Brock attended then-President Trump's rally on the morning of January 6 (see A153-54). He then made his way to the Upper West Terrace, entering the Capitol through the Senate Wing Door at 2:24 p.m., approximately 12 minutes after the initial breach there, and five minutes before the House went into recess (A154-57; A373-74). As Brock entered through the door, other rioters climbed through adjacent broken windows (A389-91; A398-99; A426). Brock was wearing a military-style helmet and body armor (A170; A262)—equipment that concerned a Capitol

Police sergeant, who had never seen that type of gear on Capitol grounds and had expected a peaceful protest (A229).

Video captured Brock throughout the building, including passing smashed-out windows and standing outside Speaker Nancy Pelosi's private offices (A158-70; A195; A199-200; A384; A399; A409-19). At one point, he came across a bunch of flex-cuffs on the floor and picked up a handful, which he carried around with him for the rest of his time in the Capitol (A170; A176-77; A201-05).

As Brock approached the Senate, Sergeant Nairobi Timberlake and another officer were trying to lock the Senate Gallery doors (A221-25). But they were confronted by a group of protestors, who hit Sergeant Timberlake in the back of the head and started shoving the vastly outnumbered police (A224-25). Brock intervened, displaying a "command presence" and telling the rioters, "[C]alm down, that's not what we're here for" (A227-28; A233). Brock offered no help in securing the doors, however, and Sergeant Timberlake abandoned the task, concluding it was better to first ensure the Senators' safety and then return with more manpower (A225; A228). Brock then spent a few minutes in the (unsecured) Senate Gallery, telling other rioters not to damage anything

there, once more commanding their attention in a way that appeared to make them listen (A167-71; A176; A384; A401).

Next, Brock went downstairs to the Vice President Doors, through which Vice President Pence had been evacuated 21 minutes earlier (A170-75). Those Doors gave access to the Senate Lobby (and, in turn, the Senate Floor) (*id.*). There, Brock produced a set of keys, then repeatedly tried to unlock the secured door labeled "United States Senate" that "obviously" gave "access to some part of United States Senate" (A172; A402). But his unlocking attempts failed (*id.*).

Still, Brock soon managed to find his way to the Senate Floor, continuing to openly carry his flex-cuffs and wear his helmet and body armor (A176-80; A266; A403). The Senate Floor is a "highly restricted area," limited to Senators, Senate officers, and their guests and staff (A179). It contains the Senators' desks (*id.*). Brock walked around the Senate Floor for approximately eight minutes, looking at paperwork on desks (A380; A445-46). Brock proclaimed, "This is our House," while on the Floor (A384; A403). He also told another rioter to get out of the Vice President's chair and not to be "disrespectful," explaining, "this is an IO war" and "[w]e can't lose the IO war" (A384; A403; A434; A436).

11

On his way out of the building, Brock went down a staircase that was otherwise being used by police officers, and he did not respond when civil disturbance unit officers instructed him to go another way (A245-49). He exited with a crowd of rioters who pushed out of the building, then observed the rioters' celebration outside (A184-85). In total, Brock was inside the Capitol building for approximately 37 minutes (A155; A185; A409).

The search of Brock's home after his arrest on January 10 recovered cell phones linking him to the events of January 6 (A261-73). But federal agents never found the keys he had used in trying to unlock the Vice President Door, or the helmet and vest he wore inside of the Capitol (A257). His gun safe was also empty (A327).

### *The Defense Evidence*

The defense entered a photograph and magazine article into evidence (A336; A355; A392-95).

### *District Court's Verdict*

The district court convicted Brock on all six counts. The court noted that "[t]here's little dispute as to what Mr. Brock said and what he did

12

on January 6th," so the factual disputes turned more on "questions of his intent and whether he acted knowingly in certain contexts" (A451). Broadly, the court "reject[ed]" "the innocent interpretations offered by the defense" (A452). The court then discussed each count, element by element (see A455-77).

As to Count 1—the obstruction count at issue on appeal—the court found all four elements beyond a reasonable doubt (see A455-64). First, Brock "attempted to or did obstruct or impede an official proceeding" by being "part of the greater mob that breached the Capitol, which caused the [election-certification] proceedings to be adjourned and not to be continued in the short term," "because it was no longer safe for members of Congress to be in the Capitol" (A456; see also A471). Further, after breaching the Capitol, Brock "remained in the building for approximately 37 minutes, during which time his presence, along with the presence of many others, continued to obstruct the proceeding by preventing Congress from reconvening" (A456-57). Indeed, "Brock was on the floor of the Senate where the proceedings should have been occurring had the crowd not breached and entered the Capitol" (A457).

Second, "Brock acted with the intent to obstruct or impede the election certification when he breached the Capitol building" (A458). That intent was demonstrated by his many Facebook messages, with the court highlighting "[s]ome of the more probative messages" (A458-60). Also probative of intent was "Brock's choice to outfit himself in tactical gear and a helmet [which] shows that he expected that events might get violent" (A460). The court rejected Brock's suggestion that he wore tactical gear to protect himself from counter-protesters, or that he came simply to support objecting members of Congress (A460-61).

Third, "Brock acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding" (A461). The court followed the inference that "a person intends the natural and probable consequences of their actions," which here made it reasonable to conclude that Brock "was aware that his actions in entering the Capitol would have the probable effect of obstructing the election certification that day" (A461-62).

Fourth, "Brock acted corruptly" (A462; see also A475). Judge Bates followed *United States v. Puma*, 596 F. Supp. 3d 90, 103 (D.D.C. 2022), which had explained that courts "in this district have construed

14

'corruptly' to require a showing of dishonesty, an improper purpose, [or] consciousness of wrongdoing" (A462) (alteration in original).[1] Here, Judge Bates found, "Brock's Facebook messages support that he knew obstructing the election certification on January 6th was improper":

> Mr. Brock's Facebook posts leading up to January 6th suggest that he was prepared to break the law to achieve his goals—saying, for example, "If necessary I aim to misbehave," or that he thinks it may be necessary to "restore the Republic through force of arms." Mr. Brock knew that some actions he contemplated were illegal—describing a plan to have "several hundred[ ] thousand Patriots descend[ ] on dc refusing to let Biden be inaugurated," which his friend acknowledged would amount to "load[ing] up our trucks and go[ing] to DC and hop[ing] we don't get arrested." Specifically, in reference to January 6th, he used the hashtag #StormtheCastle, indicating that he knew any attempts to enter the Capitol would require "storming" it, which would, of course, be illegal. The messages also refer to Mr. Brock's desire to engage in "insurrection" and "rebel[lion]," and also allude to taking violent action, such as "going offensive" on Democrats, "seiz[ing]" Democratic politicians, and even killing law enforcement officers "if necessary." Mr. Brock also refers to action by Congress or the Supreme Court as the "last two peaceful options" in response to what he perceived to be fraudulent election results. Moreover, as discussed above, Mr. Brock's outfit of tactical gear tends to show that he believed violence was a possibility at the Capitol on January 6th. (A462-63 (alterations in original) (citations omitted).)

---

[1] *Puma*'s definition also includes "conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" 596 F. Supp. 3d at 103.

While Brock likely did not intend to do everything that he said in his Facebook posts, "there's enough in there to indicate that he clearly intended to take very purposeful actions to interfere with any certification of the election, and even to take actions that bordered on violent conduct and improper steps to impede the Congressional action of certification of the election" (A463).

While discussing other counts, Judge Bates made some additional findings relevant here. In finding that Brock knowingly entered or remained in a restricted area, the court explained that "as he proceeded to the Capitol, there's no question that he would have observed those breached perimeters, including snow fences, bike racks, and the like" (A465). Further, "once Mr. Brock reached the Capitol building, he entered through doors that had been forced open, that were flanked by windows that had been broken, broken out completely in some instances, and there were other demonstrators entering through the broken glass windows on either side of him" (A465-66). He "would have observed rioters entering through those broken glass windows as he ascended to the Senate Wing Doors" (A466). And he "remained in the Capitol for some time after seeing officers guarding the East Rotunda doors," which "included broken

windows and he observed rioters attempting to break through to enter with police standing there to try to prevent them from doing so" (A466).

Next, in finding that Brock acted "knowingly, and with the intent to impede or disrupt the orderly conduct of government business or official functions," Judge Bates explained that "Brock could look around and realize that he was part of a mob" (A469). Further, the evidence showed that "he knew that Congress was certifying the election that day, a proceeding which would not be open to the public, and that he was not allowed on the Senate floor—for example, at one point he tried to use keys, we don't know where the keys came from, but he tried to use keys to open a locked door labeled 'United States Senate'" (A469). And although Brock tried to calm rioters involved in an altercation with Sergeant Timberlake, afterwards "he nevertheless continued to walk through the Capitol with full knowledge that law enforcement and the protesters were clashing at various points" (A470). Impeding Congress's electoral certification "was his clear purpose as indicated in both his pre-January 6th statements and his conduct on January 6th" (A474-75).

Last, in finding that Brock acted "willfully" in entering and remaining on the Senate Floor without authorization, Judge Bates

concluded that Brock acted with "the intent to do something that the law forbids, that is, to disobey or disregard the law" (A472). Brock bypassed police while walking through the Capitol (A472-73). "[O]n the Senate floor, he yelled about the group's mission in coming to the Capitol: To stop the alleged stealing of the 2020 election, a mission he indicated in his Facebook messages he knew may have to happen with force and illegally" (A473). And he "use[d] keys to try to gain entry to a locked door clearly leading to the Senate floor" (A473). "Given the context of January 6th and the scenes he walked by . . . , it is unfathomable that Brock believed that he was authorized to be on the Senate floor" (A473).

## SUMMARY OF ARGUMENT

Brock primarily seeks to preserve for potential Supreme Court review the argument that his conduct fails to rise to "obstruction" for purposes of § 1512(c)(2). But this Court already rejected that argument in *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023). Brock also seeks to benefit from a potential ruling in *United States v. Robertson*, No. 22-3062 (argued May 11, 2023), on the meaning of "corruptly" under § 1512(c). But he waived that argument below, and he fails to sufficiently raise it here. In any event, his narrow construction of "corruptly" fails.

18

Alternatively, Brock contends that the evidence was insufficient to establish that he acted "corruptly" under § 1512(c), even under the government's preferred definition of that term. But Judge Bates had sufficient evidence to find that element met. Indeed, Brock's prior statements make unusually clear that he was acting with an unlawful purpose, and that he was conscious of his own wrongdoing in obstructing the electoral certification.

Finally, Brock's sentencing challenge—again mirroring an argument pending in the *Robertson* appeal—likewise fails. The district correctly enhanced Brock's § 1512(c)(2) conviction under U.S.S.G. § 2J1.2(b)(2), because his conduct "resulted in substantial interference with the administration of justice." Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the Guideline.

## ARGUMENT

## I.   Brock's Conviction for Obstruction of an Official Proceeding Is Sound.

### A.   Statute at Issue and Standards of Review

Section 1512(c) provides:

(c) Whoever corruptly—

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

Brock was also charged with aiding and abetting liability for his § 1512(c) violation, as "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

Brock seeks to challenge both the district court's definitions of various § 1512(c)(2) elements and the sufficiency of the evidence supporting that conviction. As to "the district court's interpretation of § 1512(c)(2)—a question of law"—this Court reviews de novo where the defendant has preserved an objection in the district court (for example,

20

by moving to dismiss the charge on that ground). *Fischer*, 64 F.4th at 335. But if the defendant did not raise the objection below, this Court reviews "only for plain error." *United States v. Pasha*, 797 F.3d 1122, 1131 (D.C. Cir. 2015). Under the plain-error standard, a "defendant must show that the error occurred, that it was 'plain,' and that it affected his substantial rights. If these three elements are met," the Court reverses only if "the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *In re Sealed Case*, 573 F.3d 844, 847 (D.C. Cir. 2009) (citation omitted).

This Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022). The question is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). That inquiry draws "no distinctions between direct and circumstantial evidence" and gives "full play to the right of the [factfinder] to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Clark*,

184 F.3d 858, 863 (D.C. Cir. 1999) (citation omitted). "The governing standard for reviewing the sufficiency of the evidence in non-jury cases is the same as that applied in jury cases . . . ." *United States v. Bryant*, 117 F.3d 1464, 1467 (D.C. Cir. 1997) (citation omitted).

## B.    *Fischer* Rejects Brock's Interpretation of § 1512(c)(2)'s Actus Reus.

Brock contends—as he argued below in moving to dismiss Count 1 (A22)—that § 1512(c)(2) is limited to evidence impairment or document destruction, and it does not apply more broadly to obstructive efforts to stop Congress from certifying the results of the 2020 presidential election (see Appellant's Brief (Br.) 10-13). But Brock acknowledges that this Court already rejected that argument in *Fischer*, and he makes the argument now only to preserve it for potential en banc or Supreme Court review (Br. 5-6, 10-12).[2]

As *Fischer*'s binding ruling explains, the statute is most naturally read to "essentially say[ ], 'Whoever corruptly (1) tampers with a document, record, or object to interfere with its use in an official

---

[2] Petitions for a writ of certiorari from *Fischer* are currently pending in the Supreme Court in *Edward Lang v. United States*, No. 23-32, and *Garret Miller v. United States*, No. 23-94.

proceeding; or (2) in a different manner obstructs, influences, or impedes any official proceeding, shall be fined or imprisoned.'" 64 F.4th at 336. That "broad interpretation" is made "unambiguous" by closer scrutiny of the word "otherwise" and by prior interpretations of the terms "obstruct," "influence," and "impede" in neighboring statutes. *Id.* at 336-37. That interpretation is also consistent with precedent. *See id.* at 337-39. By contrast, the narrower interpretation that Brock proposes is "unpersuasive." *Id.* at 343-50.

In a paragraph, Brock argues that the evidence was insufficient under an evidence-impairment interpretation of § 1512(c) advocated by the *Fischer* dissent and rejected by the *Fischer* majority (Br. 13). But *Fischer*'s majority opinion remains binding law, and Brock does not dispute that the actus reus evidence is sufficient under *Fischer*. *See also* A456-58 (district court's verdict). Moreover, it is not clear that even the *Fischer* dissent's interpretation of § 1512(c) would justify vacating Brock's conviction, as Judge Millett explained in her concurrence to the denial of Brock's motion for bail pending appeal. *See United States v. Brock*, No. 23-3045 (D.C. Cir. May 25, 2023) (Millett, J., concurring). That is because Brock's conduct in participating in the January 6 riot and

appearing on the Senate Floor "necessarily obstructed the handling, submission, processing, and congressional consideration of the evidence of each State's electoral votes. It did so just as much as if Brock had grabbed a pile of state certificates and run away with them." *Id.* at 2-3.

## C. The District Court Correctly Concluded that Brock Acted "Corruptly" for Purposes of § 1512(c)(2).

Brock also challenges his § 1512(c)(2) conviction based on the "corruptly" element, seeking to argue that the district court applied the wrong legal definition of "corruptly" and that the evidence on this element was insufficient under any possible definition of that term. Brock, however, has not preserved this issue for appeal. Even if it were preserved, the government maintains its arguments from *United States v. Robertson*, No. 22-3062 (argued May 11, 2023), about the correct definition of "corruptly." And there is sufficient evidence as to that element to support Brock's conviction.

### 1. Brock Waived or Forfeited Any Objection to the District Court's Definition of "Corruptly."

Brock asks this Court to follow Judge Walker's concurrence in *Fischer*, quoting Judge Walker's definition: "'I would give "corruptly" its

24

long-standing meaning. It requires a defendant to act "with an intent to procure an unlawful benefit either for himself or for some other person.'"" Br. 15 (quoting 64 F.4th at 352). But Brock offers no legal reasoning in support of his request aside from "the reasons stated by Judge Walker in *Fischer*" (Br. 14). That reasoning-free request fails to adequately present the issue for appellate decision. *See United States v. Saani*, 650 F.3d 761, 763 n.* (D.C. Cir. 2011) ("'It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work'") (citation omitted); *see also* Fed. App. R. 28(a)(8)(A) (argument section in brief must contain appellant's contentions "and the reasons for them"). Indeed, this Court warned Brock about that very pitfall just a few months ago: "Appellant should raise all issues and arguments in the opening brief. The court ordinarily will not consider issues and arguments raised for the first time in the reply brief." *Brock*, No. 23-3045, slip op. at 2 (D.C. Cir. May 25, 2023) (per curiam).

Nor did Brock preserve the argument below. In the district court, Brock never suggested that "corruptly" requires an intent to procure an unlawful benefit. Before trial, he moved to dismiss the § 1512(c)(2) count based on the actus reus issue discussed in Part I.B (see A22; A40-43), but

25

he never challenged the prevailing definition of "corruptly." Nor did he object to the government's proposed jury instructions and trial brief defining "corruptly": "To act 'corruptly,' the defendant must use unlawful means or act with an unlawful purpose, or both. The defendant must also act with 'consciousness of wrongdoing.' 'Consciousness of wrongdoing' means with an understanding or awareness that what the person is doing is wrong." (ECF 65 at 24-25; ECF 68 at 7-8.) Brock also did not object at trial, when the district court explained (quoting *Puma*): "'[Courts] in this district have construed 'corruptly' to require a showing of dishonesty, an improper purpose, [or] consciousness of wrongdoing'" (A462) (second alteration in original). To the contrary, Brock himself proposed a similar definition in his closing argument:

> Mr. Brock had to know that his conduct was corrupt, meaning wrongful. So he doesn't have to know he was violating 1512, but he had to have the specific intent to act in a wrongful way and we submit that all the evidence shows that, misguided though other people may think he was, he absolutely believed that he was acting in an upright way in accordance with the law and in accordance with patriotism, out of respect for law enforcement. (A441.)

*See also* A430 (arguing "whatever he was thinking, it wasn't wrongful, it wasn't corrupt"); A432 (referring to "a wrongful or contrary intention, corrupt intention").

By deliberately arguing to the district court that "corruptly" meant "wrongfully," with no suggestion that it required an intent to procure an unlawful benefit, Brock invited the definition of that term that the district court used, waiving the legal argument he now makes on appeal. *See United States v. Long*, 997 F.3d 342, 353-54 (D.C. Cir. 2021). At the very least, he forfeited the challenge below, limiting review on appeal to plain error.

2.    **The District Court's Verdict Reflects the Correct Definition of "Corruptly."**

In any event, Brock fails to establish any error in the district court's application of "corruptly." Although the issue may well be resolved in the pending *Robertson* case by the time of oral argument in this appeal, to the extent it remains a live issue and is preserved by Brock's reference to *Fischer*, we will rely on the government's opening and supplemental briefs in *Robertson* for purposes of this appeal.

In short, a defendant acts "corruptly" for purposes of § 1512(c)(2) if he (1) uses unlawful means, or acts with an unlawful purpose, or both, and (2) acts with "consciousness of wrongdoing," which means with an understanding or awareness that what the person is doing is wrong. That

understanding of corruptly flows from decisions by the Supreme Court and this Court interpreting the term "corruptly" in neighboring statutes. *See* U.S. Br. 22-28, *Robertson*, No. 22-3062 (discussing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir.) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *id.* at 942-44 (Silberman, J., concurring in part and dissenting in part)). And this definition of "corruptly" is consistent with—indeed, more demanding than—the definitions of "corruptly" required by other circuits interpreting § 1512(c). *See id.* at 28-30 (collecting cases). "Corruptly" does not require the mens rea proposed by the *Fischer* concurrence (an intent to procure an unlawful benefit for oneself or another). *See id.* at 35-39. And, as Brock acknowledges (see Br. 14), the *Fischer* concurrence's interpretation of "corruptly" does not bind future panels. *See* U.S. Supp. Br., *Robertson*, No. 22-3062.

Brock does not (and could not) dispute that the district court concluded that his conduct satisfied that definition of "corruptly" here. True, the district court imprecisely stated (without objection) that

"corruptly" "require[s] a showing of dishonesty, an improper purpose, *[or]* consciousness of wrongdoing'" (A462) (second alteration in original) (emphasis added). But the court found that Brock acted with an improper purpose *and* consciousness of wrongdoing. *See, e.g.*, A462-63 ("Brock's Facebook messages support that he knew obstructing the election certification on January 6th was improper"); A475 (Brock acted with "the intent to do something that the law forbids, that is, to disobey or disregard the law"). Because the district court found that Brock acted with an unlawful purpose and with consciousness of wrongdoing, it properly concluded that he acted "corruptly."

### 3. The Evidence Sufficiently Established that Brock Acted "Corruptly."

#### a. The Evidence Sufficed Under the Broad Definition of "Corruptly."

Under the correct legal standard, the evidence easily sufficed to establish that Brock acted "corruptly" for purposes of § 1512(c) (cf. Br. 16-18). Viewed in the light most favorable to the district court's verdict, the evidence established that Brock (1) used unlawful means and acted with an unlawful purpose in seeking to obstruct the electoral

certification, and (2) was conscious of his wrongdoing.[3] Notably, while Brock disputes the finding of "corruption," he does not challenge the district court's conclusion that Brock "acted with the intent to obstruct or impede the election certification when he breached the Capitol building" (A458).

The evidence establishing Brock's mental state is unusually strong here. "In most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite mens rea through direct evidence, and therefore proof must be inferred from circumstantial

---

[3] Brock notes that the *Puma* decision cited by the district court "also allows for a finding of corruptness based on 'conduct that is independently criminal, inherently malign, and committed with intent to obstruct an official proceeding' but the district court did not rely on that part of the definition" (Br. 16-17). Brock seems to suggest that this Court therefore cannot consider it either. But he does not dispute that the district court *could have* found corruptness under that theory of liability. And the court's seeming failure to consider a viable basis for liability does not exclude its consideration from sufficiency review on appeal, or entitle Brock to an acquittal on Count 1. Even after a bench trial, sufficiency review hinges on whether "*a reasonable mind could* . . . find guilt beyond a reasonable doubt" on the evidence, not the theory for liability that the district court actually employed. *Bryant*, 117 F.3d at 1467 (emphasis added). Given that Brock does not dispute that this was a viable theory of liability, should this Court find the evidence insufficient on the other theories of liability, it should remand for consideration of whether Brock acted "corruptly" because his conduct was also independently criminal, inherently malign, and committed with the intent to obstruct.

evidence instead." *United States v. Vega*, 826 F.3d 514, 523 (D.C. Cir. 2016) (quotation marks omitted). Here, however, Brock's Facebook messages directly establish that he knew that he was acting in an unlawful manner and with an unlawful purpose, aware that he was acting illegally, as the district court explained (A462-63; A475; A711).

Brock said he "prefer[red] outright Insurrection at this point" (A319); "want[ed] to actively rebel" (A302); and if necessary "aim[ed] to misbehave" (A292). He celebrated the coming "revolution" (A274-75) that would keep the then-President in power through "civilwar2021" (A293). He called to "execute the traitors that are trying to steal the election" (A279), declaring that "[w]e are now under occupation by a hostile governing force" no different from "an invading force of Chinese Communists" (A323). He advised: "It is a good weekend to make sure your AR-15s are sighted. Your clips are loaded. Your body armor checked." (A300.) And he proposed a detailed, military-like operation to seize opposing politicians and interrogate them like terrorists, "eliminate" leading media figures, "[e]stablish provisional government in rebellious states and representatives we can count on," and kill law-enforcement officers if "necessary" (A308-17).

31

As to the events of January 6 specifically, Brock crowed the day would mark the beginning of "[o]ur second American Revolution" (A324). He vowed: "We will ensure that on the 6th" that "Biden won't be inaugurated" (A324). He repeatedly called to "storm" the building (A281; A323), which the district court explained showed "that he knew any attempts to enter the Capitol would require 'storming' it, which would, of course, be illegal" (A462-63). Brock even called to "emulate the patriots from Athens in 1946," who had attacked election authorities using stolen weapons to seize ballot boxes in a disputed election (A289-91).

On top of that, Brock's actions allowed the district court to infer that he was using unlawful means, acting with an unlawful purpose, and conscious of his wrongdoing. He bought "tactical gear" in preparation for January 6, which "tends to show that he believed violence was a possibility at the Capitol" (A463). He persisted in entering the Capitol despite innumerable signs that his presence there was illegal and wrongful—signs such as the breached perimeters outside, the masses of rioters causing chaos in the Upper West Terrace, the unscreened entry into a secure building (while other rioters entered via windows), the broken window glass, and the rioters' clashes with and assaults on police

32

(see A465-66; A470). He even collected flex-cuffs while inside, which he carried around the Capitol. In the chaos, Brock tried to open a locked door labeled "United States Senate," using a set of keys of unclear origin (see A469). And he eventually made his way to the Senate Floor—the very place that Senators were supposed to be having proceedings on the electoral certification—where he saw the signs of the Senators' recent flight (see A473).

In response, Brock counters that he had a "genuine (not feigned) concern over the Presidential election" (Br. 17). But that is a non sequitur. The question here is whether Brock acted corruptly *in obstructing Congress's proceedings*. Whatever his ultimate concerns about the election, the evidence makes clear that Brock knew that it was unlawful to respond to those concerns by obstructing the election certification on January 6.

Next, Brock emphasizes (Br. 17-18) that he did not confront police or destroy property, he admonished one rioter on the Senate Floor to get out of the Vice President's chair, he instructed others not to break anything, and he intervened to defuse confrontations between rioters and law enforcement. Of course, participation in additional crimes would

33

have prompted additional charges. In any event, these attempts to avoid additional violence and disrespect were not inconsistent with Brock's attempt to obstruct the election certification. As the district court explained, Brock recognized that "those kinds of confrontations and injuries to law enforcement would interfere with the IO war that he was trying to successfully complete" (A433-34; see, e.g., A287-90; A296; A302; A304; A320). In other words, Brock feared that violent confrontations between rioters and law enforcement would turn the public against his cause to overturn the election. Indeed, in telling the rioter to get out of the Vice President's chair, Brock himself explained, "this is an IO war" and "[w]e can't lose the IO war" (A384; A403; A434; A436). Similarly, in intervening in the Sergeant Timberlake confrontation, Brock told the assaulting rioter, "that's not what we're here for" (A227-28; A233). These actions were not inconsistent with a finding that Brock acted corruptly in obstructing Congress's proceedings.

Finally, Brock contends in one sentence that he was at the Capitol "to support objecting congressmen and senators," citing a late December statement expressing "[h]ope[ ]" that Congress will "do[ ] what is right" (Br. 18) (citing A319). But the district court considered and rejected this

account as "implausible," explaining that it was "not consistent with his communications in advance of January 6th" (A460-61). Indeed, even the portion of the record Brock that cites does not support his account. Just before expressing that "hope," Brock said, "I prefer outright Insurrection at this point" (A319). And just after, he told his friend that January 6 "could be a clown show and an IO loss or an outright rebellion" (A320). Nor could Brock's "actions of breaching the Capitol building, which caused the proceedings to stop, meaning no Congress members could object because the proceeding had ceased, . . . reasonably be construed to be just in aid of Congress" (A461). Brock's former service as a senior military officer (cf. Br. 17), and his detailed knowledge of Congress (such as identifying the Vice President's chair), render that naïve account even less plausible (see A713). The evidence sufficed to establish that Brock acted "corruptly" in endeavoring to obstruct Congress's certification of the 2020 election.

### b. The Evidence Sufficed Under the Narrow Definition of "Corruptly."

Finally, the evidence was sufficient to find Brock guilty even under the narrower definition of "corruptly" proposed by the *Fischer*

35

concurrence (cf. Br. 15-16), requiring "'an intent to procure an unlawful benefit either for himself or for some other person.'" 64 F.4th at 352 (Walker, J., concurring); *see also id.* at 357 ("that benefit may be unlawful either because the benefit itself is not allowed by law, or because it was obtained by unlawful means"). Despite Brock's appeals to Aquinas (Br. 15), it is clear that "an attempt to help Donald Trump unlawfully secure a professional advantage—the presidency"—would qualify as "corrupt" under even the narrowest definition. *Fischer*, 64 F.4th at 356 n.5 (Walker, J., concurring). Retaining the office of the presidency is the sort of "tangible material benefit" that even Brock concedes (Br. 15) should satisfy the statute. *See also Fischer*, 64 F.4th at 356 n.5 (Walker, J., concurring) (doubting, in any event, that improper-benefit test for corruption would be limited to unlawful financial, professional, or exculpatory advantage).

Brock notes that the government never argued (and the district court never found) that he intended to procure an unlawful benefit for then-President Trump (Br. 15). But that is because Brock never suggested at trial that such a finding was required to establish "corruption." Still, there was sufficient evidence in the record for a

reasonable factfinder to conclude that Brock indeed acted with such an intent here. He lamented the "stolen" election—the "theft" of the presidency from Donald Trump (see, e.g., A276; A279; A289; A294; A326). He proclaimed that "[i]f the President calls, I will answer #oathkeeper" (A276). He called for a "rebel[lion]" to "keep the rightful President in power and demand free and fair elections #civilwar2021" (A293). He "aim[ed] to misbehave" "[i]f necessary," given that "Trump won the election" (A292). He called for rules of engagement with "a clear chain of command ending with President Trump" (A300). And he declared that "w[e] will ensure" "on the 6th" that "Biden won't be inaugurated" (A324)—which, of course, meant that then-President Trump would remain in office. There was, in short, ample evidence for a factfinder to find that Brock engaged in obstruction in order to help then-President Trump retain the presidency, and not merely "because he was angry at the nation's elites" or "to display his bravado," thereby meeting even the narrow definition of "corruptly." *Fischer*, 64 F.4th at 358 (Walker, J., concurring).

## II. The District Court Appropriately Enhanced Brock's Guidelines Range Under § 2J1.2(b)(2).

Brock's challenge to his three-level sentencing enhancement under U.S. Sentencing Guideline (U.S.S.G.) § 2J1.2(b)(2) once again revives an argument from *Robertson*. This time, though, Brock preserved the argument below and fully raises it on appeal, meaning that it is properly presented to this Court for review (if *Robertson* does not resolve it first). Our analysis below tracks the government's *Robertson* brief.

### A. Guideline at Issue and Standard of Review

Everyone below agreed (see A504; A565; A567; A620) that the Guideline applicable to Brock's felony conviction was § 2J1.2 (Obstruction of Justice). It provides for a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). The commentary adds: "'Substantial interference with the administration of justice' includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2 cmt. n.1.

38

This Court "review[s] de novo the district court's interpretation of the Sentencing Guidelines in calculating a defendant's Sentencing Guidelines range." *United States v. Turner*, 21 F.4th 862, 865 (D.C. Cir. 2022).

## B.    Additional Background

The district court (A666-68) applied the § 2J1.2(b)(2) enhancement for "substantial interference with the administration of justice" to the Guidelines calculation for Brock's § 1512(c)(2) conviction, agreeing with the government (A504 & n.17; A647-51) and the Probation Office (A621; A666), and overruling Brock's objection that the phrase "administration of justice" is limited to judicial proceedings (A567; A659-61).[4]

Judge Bates concurred with the "overwhelming view of the judges in this court" that "the 'administration of justice' encompasses an official proceeding of Congress and that defendants convicted under 1512 should

---

[4] Although the sentencing transcript appears in the sealed joint appendix here, it is not actually under seal. While the transcript will not be available through PACER until September 28, 2023, it is still publicly available: it "may be viewed at the courthouse at a public terminal or purchased from the court reporter" (ECF 112 docket entry). Further, it transcribes a public hearing, which was not placed under seal. The government—like Brock (see Br. 4-5)—therefore will not redact its discussion of the sentencing hearing.

receive that enhancement based on facts similar to what we have here" (A666-67; see also A648-49; A659). The court "adopt[ed]" Judge Howell's decision in *United States v. Rubenacker*, No. 21-cr-193 (ECF 70), noting that it would be "odd" to interpret "'administration of justice' so narrowly as to be limited to judicial proceedings when all of the statutes referred to and relevant to this provision of the guidelines go well beyond that" (A660; A667). In addition, the court found that Brock's participation in the mob caused "substantial interference" given the "unnecessary expenditure of substantial government resources" to control the mob and render the Senate safe to continue its business (A667). Brock does not challenge that finding on appeal.

After resolving other objections to the Guidelines calculation, the district court concluded that Brock's Guidelines range for his § 1512(c)(2) conviction was 24 to 30 months of incarceration (A670-72). In imposing sentence, the court noted that various factors here—"most importantly," Brock's military service—would "[n]ormally" lead the court "to vary downward from the bottom of the guideline range" (A712-13). But the court rejected a variance in light of Brock's "rhetoric" and "intent" (A713). Even among the January 6 defendants, Brock's rhetoric was "on the far

end of how extreme it is" (A683). And "it's especially reprehensible and, quite frankly, unbelievable coming from a former senior military officer" (A713). The "kind of conduct that is contemplated and communicated in those detailed, repetitive posts" was "persistent," "consistent," and "very troubling" (A708; A713). "[I]t's both astounding and atrocious" (A713). Nor could it be dismissed as idle talk, especially when "coupled with the fact that he bought and then wore to the Capitol on January 6th a helmet and a tactical vest" (A708; A713). "This is chilling stuff, and it does reflect a purpose: To stop the certification of the election, particularly if the Congress and the Supreme Court don't act in the way that Mr. Brock believed would be appropriate" (A711). The court therefore declined Brock's request to vary downward from the Guidelines range and imposed a sentence of 24 months of imprisonment (A713).

## C. The Certification of the Electoral College Vote Involved the "Administration of Justice" as Defined Broadly in the Guidelines.

Brock's sole challenge to his sentencing on appeal is that he thinks § 2J1.2(b)(2)'s enhancement for "substantial interference *with the administration of justice*" is limited to substantial interference with

41

judicial proceedings, and does not extend to Congress's certification of the election (Br. 18-21). But § 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the Guideline.

Part J of Chapter 2 of the Guidelines covers "Offenses *Involving the Administration of Justice*." Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under Section 1512 and 11 other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. In addition to providing a three-level increase for "substantial interference with the administration of justice" in § 2J1.2(b)(2), the Guideline also provides an eight-level increase for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice" in § 2J1.2(b)(1)(B).

"Administration of justice," in its broadest sense, refers to the proper administration of law by all three branches of government. *Black's Law Dictionary* defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as

"[i]nterference with the orderly administration of law and justice."
*Black's Law Dictionary* (11th ed. 2019); *see Ballentine's Law Dictionary*
696 (3d ed. 1969) (defining justice to include "exact conformity to some
obligatory law"). When defining "contempt" to include "[c]onduct that
defies the authority or dignity of a court *or legislature*," *Black's Law
Dictionary* observes that "such conduct interferes with the
administration of justice." *Black's Law Dictionary* (11th ed. 2019)
(emphasis added). And courts have defined "administration of justice" to
mean "the performance of acts or duties required by the law," *Rosner v.
United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation marks omitted),
or "the performance of acts required by law in the discharge of duties,"
*United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly
used in a narrower sense to refer to "interference with the pendency of
some sort of judicial proceeding." *In re Kendall*, 712 F.3d 814, 828 (3d Cir.
2013) (quotation marks omitted); *see In re McConnell*, 370 U.S. 230, 234,
236 (1962) (defining the term in the contempt context as relating to "the
performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593, 599
(1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which

criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons to conclude that "administration of justice" has a broader meaning in § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including many that do *not* involve the "administration of justice" in the narrow sense (*i.e.*, relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). In addition to obstruction of an "official proceeding" under 18 U.S.C. § 1512 (which includes a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B)), the Guideline also applies to concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency

investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the Guideline, the enhancements under both § 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes. That itself is a sufficient reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background commentary further indicates that the Sentencing Commission intended the enhancements to reach the type of dangerous and violent conduct that occurred on January 6. The background commentary explains that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand-jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in Section 2J1.2 to cover the

45

most egregious *conduct* that might occur during an obstruction offense, with full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018) (internal quotation marks omitted). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for example, that "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher

offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. As Judge Howell explained in another case arising out of the January 6, 2021, attack on the Capitol, "There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense." Sentencing Tr. (ECF No. 70) at 69, *United States v. Rubenacker*, No. 21-cr-193 (D.D.C.).

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of Section 1001 and Section 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsections (b)(1)(B)

47

and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to address conduct in a wide variety of obstruction offenses covered by § 2J1.2. By contrast, reading the term "administration of justice" more broadly eliminates this gap in the Guideline.

Second, § 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). "The term 'includes' clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if similarly or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. *See id.* (applying enhancement where defendant unlawfully abducted his children from the

48

United States; "[a]lthough the abduction did not interfere with an ongoing proceeding, this act prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice"). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative. *See Stinson v. United States*, 508 U.S. 36, 38 (1993).

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-level enhancement in subsection 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in subsection 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[ ]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in subsection 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources."

49

U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same Guideline. *See Powerex Corp. v. Reliant Energy Servs.*, Inc., 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."); *United States v. Young*, 811 F.3d 592, 603 (2d Cir. 2016) (same for Guidelines).

That conclusion is also consistent with judicial application of the "administration of justice" enhancements in Section 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings beyond judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA

investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-99 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed document from a congressional subcommittee).[5]

For these reasons, obstruction of the Electoral College certification vote on January 6 falls comfortably within the meaning of "administration of justice" as used in Section 2J1.2 because it involved Congress's performance of duties required by law. Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes. *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18. The district court did not

---

[5] Several district court judges have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested. *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003 (Lamberth, J.); *United States v. Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (Howell, C.J.) (contested); *United States v. Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt*, No. 21-cr-23 (Kelly, J.).

err in enhancing Brock's sentences based upon subsections (b)(1)(B) and (b)(2).

### D. Brock's Reliance on *United States v. Seefried* Is Misplaced.

Brock relies (Br. 19-21) on *United States v. Seefried*, No. 21-CR-287 (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022), in which the district court judge in that case concluded that the term "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations" and therefore excludes the certification proceeding. *Id.* at *1. The reasoning in *Seefried* is unpersuasive.

*Seefried* first discussed *Black's Law Dictionary*'s definitions of "administration of justice" and "due administration of justice," which, the court there concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, 2022 WL 16528415, at *2. *Seefried* also found that the dictionary's definition of "obstructing" and "interfering with" the administration of justice "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing." *Id.* at *3. But *Seefried* did not consider the broader definitions of "justice" and "obstruction of justice"

52

discussed above, which relate to the orderly administration of the law more generally. Indeed, *Black's Law Dictionary* recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . interferes with the administration of justice." *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

Nor does *Seefried*'s corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987 in the Corpus of Caselaw Access Project database, which compiles the text of federal and state court decisions (see https://lncl8.lawcorpus.byu.edu/), *Seefried* found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally." 2022 WL 16528415, at *6-7. But the simple fact that "obstruction of justice" *usually* occurs in a judicial context does not mean that it *must*, particularly where, as here, the Guideline's context, purpose, and commentary point in a different direction and where, as here, the January 6 attack on Congress to prevent the Electoral Certification has no historical analogue. Like all words, legal terms often

53

bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of this term in other contexts is no reason to reject a broader meaning of "administration of justice" that gives full effect to the Guideline and corresponds with the commentary's definition.

*Seefried* was also incorrect in its analysis of § 2J1.2's commentary. *See* 2022 WL 16528415, at *7-9. As an initial matter, *Seefried* questioned whether the commentary was even "authoritative," pointing out that this Court "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at *7-8 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)). But *Winstead* involved a very different situation, in which the Guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline." 890 F.3d at 1090. This Court held that "[b]y purporting to add

attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the Guideline and was not authoritative under *Stinson*. *Id.* at 1091. Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was *Seefried* correct that § 2J1.2's commentary—even if it were binding—supports only "a narrower interpretation of the 'administration of justice.'" 2022 WL 16528415, at *8. Although the commentary's definition "includes" things such as "investigations, verdicts, and judicial determinations," that fact does not mean that the definition excludes congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012); *see also Amer*, 110 F.3d at 885. And other parts of the definition go well beyond judicial proceedings: "premature or improper termination of a felony investigation" includes executive-branch investigations that are not yet before a grand jury or court, and "the unnecessary

expenditure of substantial governmental or court resources" includes governmental resources of all types.

Reading the commentary's use of the term "'Governmental . . . resources'" to include congressional resources would not, as *Seefried* concluded, "render[ ] the phrase 'or court' superfluous." 2022 WL 16528415, at *9. Although a "broad definition" of "'Governmental'" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "'Governmental'" did not exclude courts. And the purported superfluity could be avoided by reading "'Governmental . . . resources'" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, *Seefried*'s interpretation of the commentary runs into its own superfluity problem. If, as *Seefried* concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at *1, then the word "governmental" is itself superfluous.

56

*Seefried*'s concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced. 2022 WL 16528415, at *8. The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditure of [government] resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, 2022 WL 16528415, at *8, then even under *Seefried*'s reading, the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial

"court" and "prosecutorial" resources. *Seefried*'s conclusion that "governmental" should be read to exclude Congress simply does not follow from its concerns about excessive application of the enhancements.

*Seefried* was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See* 2022 WL 16528415, at *3 (observing that the government had not charged any January 6 defendants under Section 1503); *id.* at *10-11 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental or court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may

58

favor a narrower reading of the catchall provision for interference with the "due administration of justice." And third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

*Seefried*'s reading of § 2J1.2 also creates difficult line-drawing problems. Under its reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, 2022 WL 16528415, at *2. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id*. at *1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id*. at *1-2, yet it does not involve the "possibility of punishment by the state," *id*. at *2. A broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under that reading, a

sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

In any event, even under a narrower reading of administration of justice, the Electoral College certification fits within the definition because it has quasi-judicial features. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." 3 U.S.C. § 16. Indeed, for these reasons, several judges—including the district court in this case—have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114,

121-22 (D.D.C. 2022) (concluding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (concluding that the certification was "an 'adjudicatory' proceeding").

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

APRIL AYERS-PEREZ
DOUGLAS MEISEL
BARRY DISNEY
Trial Attorneys (detailees)

CHRISELLEN R. KOLB
Assistant United States Attorneys

_____/s/_____
ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
(202) 252-6829

61

## Certificate of Compliance with Rule 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,152 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

_____/s/_____
Eric Hansford
Assistant United States Attorney

## Certificate of Service

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Charles Burnham, Esq., on this 7th day of August, 2023.

_____/s/_____
Eric Hansford
Assistant United States Attorney

# ADDENDUM

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 73. Obstruction of Justice (Refs & Annos)

18 U.S.C.A. § 1512

§ 1512. Tampering with a witness, victim, or an informant

Effective: January 7, 2008
Currentness

**(a)(1)** Whoever kills or attempts to kill another person, with intent to--

**(A)** prevent the attendance or testimony of any person in an official proceeding;

**(B)** prevent the production of a record, document, or other object, in an official proceeding; or

**(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(2)** Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to--

**(A)** influence, delay, or prevent the testimony of any person in an official proceeding;

**(B)** cause or induce any person to--

**(i)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

**(ii)** alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

**(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(iv)** be absent from an official proceeding to which that person has been summoned by legal process; or

**(C)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(3)** The punishment for an offense under this subsection is--

**(A)** in the case of a killing, the punishment provided in sections 1111 and 1112;

**(B)** in the case of--

**(i)** an attempt to murder; or

**(ii)** the use or attempted use of physical force against any person;

imprisonment for not more than 30 years; and

**(C)** in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

**(b)** Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--

**(1)** influence, delay, or prevent the testimony of any person in an official proceeding;

**(2)** cause or induce any person to--

**(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

**(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

**(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(D)** be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,, [2] parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly--

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,, [2] parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

(e) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

(f) For the purposes of this section--

(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and

(2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

USCA Case #23-3045    Document #2011237    Filed: 08/07/2023    Page 78 of 82

**(g)** In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance--

**(1)** that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

**(2)** that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

**(h)** There is extraterritorial Federal jurisdiction over an offense under this section.

**(i)** A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

**(j)** If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

**(k)** Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## CREDIT(S)

(Added Pub.L. 97-291, § 4(a), Oct. 12, 1982, 96 Stat. 1249; amended Pub.L. 99-646, § 61, Nov. 10, 1986, 100 Stat. 3614; Pub.L. 100-690, Title VII, § 7029(a), (c), Nov. 18, 1988, 102 Stat. 4397, 4398; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 103-322, Title VI, § 60018, Title XXXIII, § 330016(1)(O), (U), Sept. 13, 1994, 108 Stat. 1975, 2148; Pub.L. 104-214, § 1(2), Oct. 1, 1996, 110 Stat. 3017; Pub.L. 104-294, Title VI, § 604(b)(31), Oct. 11, 1996, 110 Stat. 3508; Pub.L. 107-204, Title XI, § 1102, July 30, 2002, 116 Stat. 807; Pub.L. 107-273, Div. B, Title III, § 3001(a), (c)(1), Nov. 2, 2002, 116 Stat. 1803, 1804; Pub.L. 110-177, Title II, § 205, Jan. 7, 2008, 121 Stat. 2537.)

## Footnotes

1      So in original. A comma probably should appear.

2      So in original. The second comma probably should not appear.

18 U.S.C.A. § 1512, 18 USCA § 1512
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                4

# PART J — OFFENSES INVOLVING THE ADMINISTRATION OF JUSTICE

## §2J1.1.    Contempt

Apply §2X5.1 (Other Offenses).

**Commentary**

**Statutory Provisions:** 18 U.S.C. §§ 401, 228. For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

1.    **In General.**—Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense. In certain cases, the offense conduct will be sufficiently analogous to §2J1.2 (Obstruction of Justice) for that guideline to apply.

2.    **Willful Failure to Pay Court-Ordered Child Support.**—For offenses involving the willful failure to pay court-ordered child support (violations of 18 U.S.C. § 228), the most analogous guideline is §2B1.1 (Theft, Property Destruction, and Fraud). The amount of the loss is the amount of child support that the defendant willfully failed to pay. In such a case, do not apply §2B1.1(b)(9)(C) (pertaining to a violation of a prior, specific judicial order). *Note*: This guideline applies to second and subsequent offenses under 18 U.S.C. § 228(a)(1) and to any offense under 18 U.S.C. § 228(a)(2) and (3). A first offense under 18 U.S.C. § 228(a)(1) is not covered by this guideline because it is a Class B misdemeanor.

3.    **Violation of Judicial Order Enjoining Fraudulent Behavior.**—In a case involving a violation of a judicial order enjoining fraudulent behavior, the most analogous guideline is §2B1.1. In such a case, §2B1.1(b)(9)(C) (pertaining to a violation of a prior, specific judicial order) ordinarily would apply.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendments 170 and 171); November 1, 1993 (amendment 496); November 1, 1998 (amendment 588); November 1, 2001 (amendment 617); November 1, 2003 (amendment 653); November 1, 2009 (amendment 736); November 1, 2011 (amendments 752 and 760). |

## §2J1.2.    Obstruction of Justice

(a)    Base Offense Level: **14**

    (b)   Specific Offense Characteristics

        (1)   (Apply the greatest):

            (A)   If the (i) defendant was convicted under 18 U.S.C. § 1001; and (ii) statutory maximum term of eight years' imprisonment applies because the matter relates to sex offenses under 18 U.S.C. § 1591 or chapters 109A, 109B, 110, or 117 of title 18, United States Code, increase by **4** levels.

            (B)   If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by **8** levels.

            (C)   If the (i) defendant was convicted under 18 U.S.C. § 1001 or § 1505; and (ii) statutory maximum term of eight years' imprisonment applies because the matter relates to international terrorism or domestic terrorism, increase by **12** levels.

        (2)   If the offense resulted in substantial interference with the administration of justice, increase by **3** levels.

        (3)   If the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by **2** levels.

    (c)   Cross Reference

        (1)   If the offense involved obstructing the investigation or prosecution of a criminal offense, apply §2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

### Commentary

**Statutory Provisions:** 18 U.S.C. §§ 1001 (when the statutory maximum term of eight years' imprisonment applies because the matter relates to international terrorism or domestic terrorism, or to sex offenses under 18 U.S.C. § 1591 or chapters 109A, 109B, 110, or 117 of title 18, United States Code), 1503, 1505–1513, 1516, 1519. For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

1.   **Definitions.**—For purposes of this guideline:

    "***Domestic terrorism***" has the meaning given that term in 18 U.S.C. § 2331(5).

    "***International terrorism***" has the meaning given that term in 18 U.S.C. § 2331(1).

"***Records, documents, or tangible objects***" includes (A) records, documents, or tangible objects that are stored on, or that are, magnetic, optical, digital, other electronic, or other storage mediums or devices; and (B) wire or electronic communications.

"***Substantial interference with the administration of justice***" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

2.    **Chapter Three Adjustments.**—

(A)    **Inapplicability of §3C1.1.**—For offenses covered under this section, §3C1.1 (Obstructing or Impeding the Administration of Justice) does not apply, unless the defendant obstructed the investigation, prosecution, or sentencing of the obstruction of justice count.

(B)    **Interaction with Terrorism Adjustment.**—If §3A1.4 (Terrorism) applies, do not apply subsection (b)(1)(C).

3.    **Convictions for the Underlying Offense.**—In the event that the defendant is convicted of an offense sentenced under this section as well as for the underlying offense (*i.e.*, the offense that is the object of the obstruction), *see* the Commentary to Chapter Three, Part C (Obstruction and Related Adjustments), and to §3D1.2(c) (Groups of Closely Related Counts).

4.    **Upward Departure Considerations.**—If a weapon was used, or bodily injury or significant property damage resulted, an upward departure may be warranted. *See* Chapter Five, Part K (Departures). In a case involving an act of extreme violence (for example, retaliating against a government witness by throwing acid in the witness's face) or a particularly serious sex offense, an upward departure would be warranted.

5.    **Subsection (b)(1)(B).**—The inclusion of "property damage" under subsection (b)(1)(B) is designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation (*e.g.*, to intimidate a witness from, or retaliate against a witness for, testifying). Subsection (b)(1)(B) is not intended to apply, for example, where the offense consisted of destroying a ledger containing an incriminating entry.

**Background:** This section addresses offenses involving the obstruction of justice generally prosecuted under the above-referenced statutory provisions. Numerous offenses of varying seriousness may constitute obstruction of justice: using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.

The specific offense characteristics reflect the more serious forms of obstruction. Because the conduct covered by this guideline is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross reference to §2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendments 172–174); November 1, 1991 (amendment 401); January 25, 2003 (amendment 647); November 1, 2003 (amendment 653); October 24, 2005 (amendment 676); November 1, 2006 (amendment 690); November 1, 2007 (amendment 701); November 1, 2011 (amendment 758); November 1, 2013 (amendment 777). |

## §2J1.3.    Perjury or Subornation of Perjury; Bribery of Witness

    (a)   Base Offense Level: **14**

    (b)   Specific Offense Characteristics

        (1)   If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to suborn perjury, increase by **8** levels.

        (2)   If the perjury, subornation of perjury, or witness bribery resulted in substantial interference with the administration of justice, increase by **3** levels.

    (c)   Cross Reference

        (1)   If the offense involved perjury, subornation of perjury, or witness bribery in respect to a criminal offense, apply §2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

    (d)   Special Instruction

        (1)   In the case of counts of perjury or subornation of perjury arising from testimony given, or to be given, in separate proceedings, do not group the counts together under §3D1.2 (Groups of Closely Related Counts).

### Commentary

**Statutory Provisions:** 18 U.S.C. §§ 201(b)(3), (4), 1621–1623. For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

1.   "***Substantial interference with the administration of justice***" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

2.   For offenses covered under this section, §3C1.1 (Obstructing or Impeding the Administration of Justice) does not apply, unless the defendant obstructed the investigation or trial of the perjury count.