# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued September 27, 2023         Decided March 1, 2024

No. 23-3045

UNITED STATES OF AMERICA,
APPELLEE

v.

LARRY RENDALL BROCK,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00140-1)

————

*Charles Burnham* argued the cause and filed the briefs for appellant.

*Eric Hansford*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *Chrisellen R. Kolb*, Assistant U.S. Attorney.

Before: MILLETT and PILLARD, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

2

MILLETT, *Circuit Judge*:  Larry Brock participated in the violent January 6th riot at the United States Capitol that forced the evacuation of members of Congress and their staff and prevented Congress's certification of the 2020 presidential election until the next day.  After a bench trial, the court convicted Brock of six crimes, including corruptly obstructing Congress's certification of the electoral count under 18 U.S.C. § 1512(c)(2).  At sentencing, the district court applied a three-level sentencing enhancement to Brock's Section 1512(c)(2) conviction on the ground that Brock's conduct resulted in "substantial interference with the administration of justice[.]" U.S.S.G. § 2J1.2(b)(2).

Brock challenges both the district court's interpretation of Section 1512(c)(2)'s elements and the sufficiency of the evidence to support that conviction.  He also challenges the district court's application of the three-level sentencing enhancement for interfering with the "administration of justice."  Because the law and the record in this case foreclose Brock's legal and sufficiency challenges, we affirm Brock's Section 1512(c)(2) conviction.  As for Brock's sentence, we hold that the "administration of justice" enhancement does not apply to interference with the legislative process of certifying electoral votes.  For that reason, we vacate Brock's sentence for his Section 1512(c)(2) conviction and remand to the district court for resentencing.

**I**

**A**

In early January 2021, Brock traveled from his home in Texas to Washington, D.C., where he participated in the January 6th riot at the United States Capitol.  In the months leading up to January 6th, Brock made a series of Facebook

3

posts and exchanges regarding what he referred to as the "stolen" and "fraud[ulent]" 2020 presidential election. J.A. 276, 279, 289. For example, Brock warned that, absent intervention by the Supreme Court or Congress to overturn the election, there would be "revolution[,]" "rebel[lion,]" "[i]nsurrection[,]" "civil war[,]" and "blood." J.A. 275, 293, 297, 302, 319, 487. In a private Facebook exchange with an Army special forces veteran, Brock proposed a "[p]lan of action if Congress fail[ed] to act on 6 January" that included "[s]eiz[ing]" political leaders, "national media assets[,]" and "key personnel"; "using [interrogation] measures we used on Al Qaeda to gain evidence on the coup"; "[e]stablish[ing] provisional government in rebellious states"; and granting a "[g]eneral pardon for all crimes up to and including murder [for] those restoring the Constitution and putting down the Democratic Insurrection." J.A. 309−311. Brock also outlined "[r]ules of engagement[,]" including avoiding killing law enforcement officers "unless necessary[,]" "[a]ttempt[ing] to capture Democrats with knowledge of [the] coup[,]" and "[s]hoot[ing] and destroy[ing] enemy communication nodes and key personnel." J.A. 311–312. Throughout these posts and exchanges, Brock made repeated references to winning the "IO war," a reference to the use of information operations "to shape the battlefield[.]" J.A. 289–290.

Brock attended then-President Trump's "Stop the Steal Rally" on the morning of January 6th, and then marched with others to the United States Capitol. When he arrived, Brock ascended the Upper West Terrace and entered the building through the door to the Senate Wing. He entered the Capitol at 2:24 p.m.—approximately twelve minutes after the Senate recessed, but five minutes before the House recessed. Once inside, Brock—wearing a military-style helmet and tactical vest—headed toward the Senate gallery doors, picking up a pair of discarded flex-cuffs along the way. As Brock

4

approached the Senate gallery, he encountered a group of rioters interfering with Capitol Police officers' attempts to lock the Senate gallery doors, with at least one of the rioters striking an officer. Brock told the group to "calm down," adding "that's not what we're here for[.]" J.A. 227–228. Brock briefly entered the Senate gallery. After exiting, he attempted to open a set of secured doors marked "U.S. Senate" with an unidentified set of keys. Brock ultimately reached the Senate floor, where he spent approximately eight minutes walking around and looking at paperwork on desks. During this time, Brock told others not to sit in the Vice President's chair or to be disrespectful, explaining that the rioters could not afford to "lose the IO war." J.A. 403.

Brock left the Capitol at 3:02 p.m. On his way out, he deescalated an altercation between another rioter and Capitol Police officers and guided the rioter out of the Capitol. In total, Brock spent approximately 38 minutes inside the building.

**B**

A federal grand jury indicted Brock on six counts: felony obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)) (including aiding and abetting liability under 18 U.S.C. § 2); misdemeanor entering and remaining in a restricted building or grounds (18 U.S.C. § 1752(a)(1)); misdemeanor disorderly and disruptive conduct in a restricted building or grounds (18 U.S.C. § 1752(a)(2)); misdemeanor entering and remaining on the floor of Congress (40 U.S.C. § 5104(e)(2)(A)); misdemeanor disorderly conduct in a Capitol building (40 U.S.C. § 5104(e)(2)(D)); and misdemeanor parading, demonstrating, or picketing in a Capitol building (40 U.S.C. § 5104(e)(2)(G)). Brock waived his right to a jury trial.

5

Following a three-day bench trial, the district court convicted Brock on all six charges. The district court noted that there was "little dispute as to what * * * Brock said and what he did on January 6th," and that the questions before the court "[we]re largely questions of [Brock's] intent and whether he acted knowingly in certain contexts." J.A. 451. The district court then proceeded to conduct an element-by-element analysis of each count.

The only count of conviction relevant to this appeal is Count One, obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2). For that offense, the district court found four elements proved beyond a reasonable doubt.

First, the district court found that Brock "attempted to or did obstruct or impede an official proceeding" because he "obstructed Congress' election certification." J.A. 456. The district court noted that Brock "was part of the large crowd of demonstrators who breached the Capitol on January 6th during the election certification proceedings[,]" and that "this breach caused Congress to adjourn its session because it was no longer safe for members of Congress to be in the Capitol." J.A. 456. The court noted that the Senate—but not the House—had recessed before Brock entered the Capitol. The district court then found that Brock was "part of the greater mob that breached the Capitol, which caused the proceedings to be adjourned and not to be continued in the short term[,]" J.A. 456, and that Brock's presence in the Capitol "continued to obstruct the proceeding by preventing Congress from reconvening[,]" J.A. 457.

Second, the district court found that Brock "acted with the intent to obstruct or impede the election certification when he breached the Capitol building." J.A. 458. In particular, the district court found that Brock's "Facebook messages show

6

that he intended to obstruct proceedings at the Capitol on January 6th." J.A. 458. The district court further found that "Brock's choice to outfit himself in tactical gear and a helmet shows that he expected that events might get violent inside or outside the Capitol on January 6th[,]" and that "there [wa]s no evidence in the record that * * * Brock wore this gear to protect himself from counter-protestors." J.A. 460. The district court also found it "implausible that * * * Brock's intent was simply to support Congress members in objecting to the election results[,]" as such a purpose was not consistent with Brock's Facebook communications leading up to January 6th or with his actions in breaching the Capitol, which prevented members of Congress from objecting to or certifying the electoral votes. J.A. 460–461. The district court added that "the law permits the factfinder to infer that a person intends the natural and probable consequences of their actions[,]" and that it "[wa]s reasonable that * * * Brock would have expected that breaching the Capitol during the election certification proceedings would cause those proceedings to halt[.]" J.A. 461 (formatting modified).

Third, the district court found that Brock "acted knowingly"—that is, "with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding." J.A. 461. Referring back to its intent analysis, the court ruled that "it [wa]s reasonable to conclude that * * * Brock was aware that his actions in entering the Capitol would have the probable effect of obstructing the election certification that day." J.A. 461–462.

Fourth, the district court found that Brock "acted corruptly." J.A. 462. The district court explained that "corruptly" "require[s] a showing of dishonesty, an improper purpose, or consciousness of wrongdoing." J.A. 462 (brackets omitted) (quoting *United States v. Puma*, 596 F. Supp. 3d 90,

7

103 (D.D.C. 2022)).  The district court concluded that "Brock's Facebook messages support that he knew obstructing the election certification on January 6th was improper[,]" "he was prepared to break the law to achieve his goals[,]" and he "knew that some actions he contemplated were illegal[.]"  J.A. 462. The district court further noted that "Brock's outfit of tactical gear tend[ed] to show that he believed violence was a possibility at the Capitol on January 6th."  J.A. 463.  While finding it "unlikely" that Brock intended to take all of the actions referenced in his Facebook posts, the district court found that Brock's posts offered sufficient evidence "to indicate that he clearly intended to take very purposeful actions to interfere with any certification of the election, and even to take actions that bordered on violent conduct and improper steps to impede the Congressional action of certification of the election."  J.A. 463.

Finally, with respect to a related element of another count, the district court found that Brock acted "with the intent to impede or disrupt the orderly conduct of government business or official functions."  J.A. 470.  In support of that finding, the district court concluded that "Brock could look around and realize that he was part of a mob[,]" and that "he knew that Congress was certifying the election that day, a proceeding which would not be open to the public, and that he was not allowed on the Senate floor[.]"  J.A. 469.  The district court further found that, although Brock was not himself involved in any altercations, "and in fact the evidence show[ed] that he tried to calm the protestors[,] he nevertheless continued to walk through the Capitol with full knowledge that law enforcement and the protesters were clashing at various points."  J.A. 470. On that basis, the district court concluded that Brock acted with "full awareness" that his actions would disrupt the electoral certification process.  J.A. 471.

8

## C

At sentencing, the parties agreed that Section 2J1.2 of the U.S. Sentencing Guidelines applied to Brock's Section 1512(c)(2) conviction.[1]  Over Brock's objection, however, the district court added a three-level enhancement under Section 2J1.2(b)(2) for "substantial interference with the administration of justice[.]"  U.S.S.G. § 2J1.2(b)(2) (2021).[2]  The district court noted that the application comments to Section 2J1.2 define "substantial interference with the administration of justice" to include "the unnecessary expenditure of substantial government resources."  J.A. 666; *see* U.S.S.G. § 2J1.2 cmt. n.1.  The court concluded that "only a general causal tie is necessary between the defendant's actions and the unnecessary expenditures by the government[,]" and so "the government only has to show a causal line from the [January 6th] mob * * * [to the] unnecessary expenditure of substantial government resources."  J.A. 667.  The district court then applied the enhancement on the basis that Brock was both "convicted of obstructing an official proceeding" and "was part of the mob that caused substantial damage at the Capitol and large expenditure of government resources[.]"  J.A. 668.

The district court rejected Brock's argument that the phrase "administration of justice" refers only to judicial proceedings.  The district court suggested that it would be "odd" to interpret "'administration of justice' so narrowly as to

---

[1] Although the sentencing transcript appears in the parties' sealed joint appendix, the transcript is publicly available and is not under seal.

[2] The U.S. Sentencing Commission issued a new Guidelines Manual in 2023.  All citations in this opinion are to the 2021 Guidelines Manual in effect at the time of Brock's sentencing.

9

be limited to judicial proceedings when all of the statutes referred to and relevant to this provision of the guidelines go well beyond that[.]" J.A. 660. Agreeing with the "overwhelming view of the judges in [the district]" regarding the applicability of Section 2J1.2(b)(2), J.A. 666, the district court applied a three-level enhancement to Brock's Section 1512(c)(2) sentence.

The district court subsequently sentenced Brock to concurrent terms of imprisonment of twenty-four months for his Section 1512(c)(2) conviction and six to twelve months for each of his misdemeanor convictions, followed by twenty-four months of supervised release.

## II

The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

In general, we review questions of law *de novo*. *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). But in criminal cases, we review objections raised for the first time on appeal only for plain error. *United States v. Pasha*, 797 F.3d 1122, 1131 (D.C. Cir. 2015); *see* FED. R. CRIM. P. 52(b). We review challenges to the sufficiency of the evidence *de novo*, asking whether, viewing the evidence in the light most favorable to the verdict, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see United States v. Bryant*, 117 F.3d 1464, 1467 (D.C. Cir. 1997) (noting that this standard is the same for both jury and non-jury cases). We also "review *de novo* [a] district court's interpretation of the Sentencing Guidelines in calculating a

10

defendant's Sentencing Guidelines range." *United States v. Brown*, 892 F.3d 385, 401 (D.C. Cir. 2018) (per curiam).

## III

Brock challenges both the district court's interpretation of Section 1512(c)(2)'s *actus reus* and "corruptly" elements, and the sufficiency of the evidence supporting his conviction under that statute. He separately argues that the district court improperly applied a three-level enhancement to his Section 1512(c)(2) conviction under Section 2J1.2(b)(2) of the U.S. Sentencing Guidelines.

While the law and the record in this case foreclose Brock's legal and sufficiency challenges to his Section 1512(c)(2) conviction, the district court erred in treating Brock's obstruction of the electoral certification process as interfering with the "administration of justice."

## A

## 1

Brock first challenges the district court's interpretation of Section 1512(c)(2)'s *actus reus* element. To violate Section 1512(c), a defendant must be found to have either (1) "alter[ed], destroy[ed], mutilate[d], or conceal[ed] a record, document, or other object, or attempt[ed] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding[,]" or (2) "otherwise obstruct[ed], influence[d], or impede[d] any official proceeding, or attempt[ed] to do so[.]" 18 U.S.C. § 1512(c).

Brock argues that subsection (c)(2) applies only to "obstructive acts [that] resulted in 'evidence impairment[,]'" or

11

actions taken "with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." Brock Opening Br. 7 (quotation marks omitted); *see* Brock Opening Br. 9–12.

Circuit precedent says otherwise. This court has already held that Section 1512(c)(2) is not limited to evidence-related acts. In *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 2023 WL 8605748 (2023), we held that Section 1512(c)(2) prohibits "all forms of corrupt obstruction of an official proceeding" that are not already captured by Section 1512(c)(1)'s prohibition against "'corruptly' tampering with 'a record, document, or other object' to impair or prevent its use in an official proceeding[.]" *Id.* at 336 (quoting 18 U.S.C. § 1512(c)(1)); *see id.* at 336–337; *United States v. Robertson*, 86 F.4th 355, 374–375 (D.C. Cir. 2023). Under *Fischer*, then, Section 1512(c)(2) serves as a "catch-all" provision "that covers otherwise obstructive behavior that might not constitute a more specific offense involving documents, records, or objects under [Section] 1512(c)(1)." *Fischer*, 64 F.4th at 337 (formatting modified).[3]

*Fischer* binds this panel and forecloses Brock's proposed evidence-impairment standard. *See New York-New York, LLC v. NLRB*, 676 F.3d 193, 194–195 (D.C. Cir. 2012) ("We are of course bound by our prior panel decision[.]"). Brock himself acknowledges as much, contending that he "advance[s] the argument for an alternative definition of *actus reus*" in order "to preserve the point for possible Supreme Court or *en banc* review[.]" Brock Opening Br. 10–11. Because Brock does not

---

[3] After oral argument in this case, the Supreme Court granted certiorari in *Fischer* to determine whether Section 1512(c)(2) prohibits obstructive acts unrelated to investigations and evidence. *See Fischer v. United States*, No. 23-5572, 2023 WL 8605748 (Dec. 13, 2023) (mem.).

12

contest that the district court applied the interpretation of Section 1512(c)(2)'s *actus reus* element set forth in *Fischer*, and agrees that *Fischer* governs our review, *see* Brock Opening Br. 8, 10–11, we reject this legal challenge.

**2**

Brock next argues that there was insufficient evidence to show that his conduct resulted in evidence impairment. We need not decide that question because, as we just explained, circuit precedent holds that Section 1512(c)(2) encompasses more conduct than just evidence impairment. Brock cannot sidestep our precedent by repackaging his argument as a sufficiency-of-the-evidence claim. In *United States v. Reynoso*, 38 F.4th 1083 (D.C. Cir. 2022), we held that "a defendant cannot make out a sufficiency challenge as to offense elements that the government had no requirement to prove at trial under then-prevailing law." *Id.* at 1091. That holding is equally true as to elements that the law at the time of appeal does not require the government to prove. *See Musacchio v. United States*, 577 U.S. 237, 243–244 (2016). Under *Fischer*, the government satisfied the *actus reus* element by proving that Brock was part of the mob that breached the Capitol on January 6th and caused Congress to adjourn its electoral certification proceedings, which the district court found beyond a reasonable doubt.[4]

---

[4] The evidence of record may also satisfy Brock's evidence-impairment reading of Section 1512(c)(2). Central to Congress's electoral certification process "is the receipt, processing, and verification of evidence"—that is, "the States' certificates of the votes cast for President by their respective electors." *United States v. Brock*, No. 23-3045, 2023 WL 3671002, at *2 (D.C. Cir. May 25, 2023) (Millett, J., concurring). Brock's participation in the January 6th riot caused Congress to adjourn this evidentiary process and

13

**B**

**1**

Brock also argues that the district court applied the incorrect legal standard for Section 1512(c)(2)'s requirement that a defendant act "corruptly" because it did not require the government to prove that Brock acted with an intent to procure an unlawful benefit for himself or another. *See* Brock Opening Br. 13–14.

Brock forfeited this unlawful-benefit argument by failing to raise it before the district court. "A criminal defendant who wishes a court of appeals to consider a claim that a ruling of a trial court was in error must first make his objection known to the trial-court judge." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 764 (2020); *see also* FED. R. CRIM. P. 51(b). That is not an onerous task. "[A]ll a defendant need do to preserve a claim of error is inform the district court and opposing counsel of the ruling he wants the court to make and the ground for so doing." *United States v. Tate*, 630 F.3d 194, 197 (D.C. Cir. 2011) (formatting modified); *see United States v. Obuszewski*, 334 F. App'x 330, 331 (D.C. Cir. 2009) (applying Federal Rule of Criminal Procedure 51(b) in appeal following a bench trial).

---

prevented members of Congress from accessing and reviewing the certificates. As such, "Brock's conduct necessarily obstructed the handling, submission, processing, and congressional consideration of the evidence of each State's electoral votes. It did so just as much as if Brock had grabbed a pile of state certificates and run away with them." *Id.* at *3. "In that way, Brock's actions 'impair[ed] the * * * availability' of the physical evidence of electoral votes 'for use in an official [congressional] proceeding[.]'" *Id.* (modifications in original) (quoting 18 U.S.C. § 1512(c)(1)).

14

Whether Brock acted corruptly as required by Section 1512(c)(2) was a key issue at trial.  Yet at no point did Brock proffer the definition of "corruptly" for which he now advocates.  Quite the opposite, in his closing statement, Brock's counsel argued that the statute required Brock "to know that his conduct was corrupt, meaning wrongful."  J.A. 441; *see* J.A. 441 (further explaining that Brock "d[id]n't have to know he was violating 1512, but he had to have the specific intent to act in a wrongful way").  That definition of "corruptly" is consistent with the standard that the district court applied in denying Brock's motion for judgment of acquittal.  *See* J.A. 462 ("Courts in this district have construed 'corruptly' to require a showing of dishonesty, an improper purpose, or consciousness of wrongdoing.") (brackets omitted) (quoting *Puma*, 596 F. Supp. 3d at 103).

Having himself argued for the same definition that he now claims was error and having failed to raise before the district court any objection to the district court's interpretation of the element, Brock has, at a minimum, forfeited his argument that Section 1512(c)(2) requires a showing of unlawful benefit.  *See Salazar v. District of Columbia*, 602 F.3d 431, 436–437 (D.C. Cir. 2010).

If a party does not properly preserve an error for review in a criminal case, "appellate-court authority to remedy the error * * * is strictly circumscribed."  *Puckett v. United States*, 556 U.S. 129, 134 (2009).  Errors "not brought to the court's attention" are subject to review only if they are "plain[.]"  FED. R. CRIM. P. 52(b).

Under the "difficult" plain-error standard, this court will reverse the district court only if that court committed a "clear or obvious" error that affected a defendant's substantial rights

15

and "seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (formatting modified). An error is not "clear or obvious" if it is "subject to reasonable dispute." *Id.* We evaluate the plainness of an alleged error at the time of appellate review. *See United States v. Long*, 997 F.3d 342, 359 (D.C. Cir. 2021) (citing *Henderson v. United States*, 568 U.S. 266, 279 (2013)).

Brock's forfeited unlawful-benefit argument fails at the first step of plain-error review because the district court's definition of "corruptly" did not constitute a "clear or obvious" error. *Puckett*, 556 U.S. at 135. Recently, in *United States v. Robertson*, 86 F.4th 355 (D.C. Cir. 2023), we held that "there are multiple ways to prove that a defendant acted 'corruptly[,]'" *id.* at 368, including by "establishing that the defendant acted with a corrupt purpose[,]" *id.* at 367, or acted with "consciousness of wrongdoing[,]" *id.* at 368 (quotation marks omitted). While we noted in *Robertson* that proof a defendant intended to procure a benefit for himself or another may be sufficient to establish that he acted "corruptly," we held that such proof is not necessary to satisfy Section 1512(c)'s "corruptly" requirement. *See id.* at 371–374.

Given *Robertson*, and the lack of any contrary authority in this circuit or from the Supreme Court, the district court's application of the "corruptly" requirement survives plain-error review. The district court stated that "corruptly" "require[s] a showing of dishonesty, an improper purpose, or consciousness of wrongdoing." J.A. 462 (brackets omitted) (quoting *Puma*, 596 F. Supp. 3d at 103). Because each of these showings may be sufficient to establish that Brock acted "corruptly" under Section 1512(c), *see Robertson*, 86 F.4th at 373 n.8 (dishonesty); *id.* at 367 (corrupt purpose); *id.* at 369 n.5 (consciousness of wrongdoing), the district court's

16

interpretation was not plainly erroneous, *see Puckett*, 556 U.S. at 135.

**2**

Brock also raises two sufficiency challenges—one under his proposed unlawful-benefit standard for "corruptly" and one under the standard the district court applied. *See* Brock Br. 14–18. The unlawful-benefit challenge is not preserved, and Brock's repackaging of the same argument as a sufficiency-of-the-evidence argument fails because the government was not required to prove at trial (under either then- or now-prevailing law) that Brock acted to procure an unlawful benefit for himself or another. *See Musacchio*, 577 U.S. at 243–244.

As for Brock's argument that there was not sufficient evidence to satisfy the district court's definition of "corruptly," the evidence shows otherwise. Specifically, the evidence in this case and the fact findings by the district court establish that Brock acted with both an improper purpose and consciousness of wrongdoing. The evidence showed that Brock participated in a riot that sought to overturn the 2020 presidential election by force, and that he was himself prepared to take violent action to achieve that goal. In his social media communications leading up to January 6th, Brock warned that there would be "revolution[,]" "rebel[lion,]" "[i]nsurrection[,]" "civil war[,]" and "blood[,]" J.A. 275, 293, 297, 319, 487, if the Supreme Court or Congress did not take action to address the "rigged" election, J.A. 294. He stated that he "want[ed] to actively rebel[,]" J.A. 302, encouraged others to prepare their weapons and body armor, J.A. 300, and proposed a military-like "[p]lan of action if Congress fail[ed] to act on 6 January[,]" J.A. 309. That plan included "[s]eiz[ing]" political leaders, "national media assets[,]" and "key personnel"; "using [interrogation] measures we used on Al Qaeda to gain evidence on the coup";

17

"[e]stablish[ing] provisional government in rebellious states"; and granting a "[g]eneral pardon for all crimes up to and including murder [for] those restoring the Constitution and putting down the Democratic Insurrection." J.A. 309−311.  He outlined "[r]ules of engagement[,]" including avoiding killing law enforcement officers "unless necessary[,]" "[a]ttempt[ing] to capture Democrats with knowledge of [the] coup[,]" and "[s]hoot[ing] and destroy[ing] enemy communication nodes and key personnel." J.A. 311–312.  Brock's actions on January 6th also confirm that "he expected that events might get violent[.]"  J.A. 460.  Specifically, while inside the Capitol, Brock wore a military-style helmet and tactical vest, and he picked up and carried a pair of flex-cuffs throughout the building.

The evidence further shows that Brock entered without permission an area that he knew was closed off to the public in an effort to halt the electoral count.  The district court found that Brock's social media posts established that "he knew any attempts to enter the Capitol would require 'storming' it, which would, of course, be illegal." J.A. 463.  To that same point, the district court found that there was "no question" that Brock "would have observed the toppled barricades, including snow fences, bike racks, and the broken police lines that were protecting the perimeter of the Capitol grounds on January 6th as he approached the building." J.A. 465 (discussing 18 U.S.C. § 1752(a)(1) count).  The district court further found that, once Brock "reached the Capitol building, he entered through doors that had been forced open," that "there were other demonstrators entering through the broken glass windows on either side of him as he entered through the door that had also been broken open[,]" and that police officers were attempting to prevent entry.  J.A. 465–466 (discussing 18 U.S.C. § 1752(a)(1) count).  Also, once inside, Brock attempted to open a set of secured doors marked "U.S. Senate" with an

18

unidentified set of keys.  Finally, the district court determined that, although Brock was not himself involved in any altercations, "he nevertheless continued to walk through the Capitol with full knowledge that law enforcement and the protesters were clashing at various points."    J.A. 470 (discussing 18 U.S.C. § 1752(a)(2) count).

That evidence suffices to show that Brock acted with both an improper purpose and consciousness of wrongdoing.  While merely attempting to "imped[e]" or "obstruct[]" an official proceeding does not necessarily "proceed from corrupt motives[,]" *Robertson*, 86 F.4th at 368 (quoting *United States v. North*, 910 F.2d 843, 883 (D.C. Cir. 1990)); *see id.* at 370–371, such an attempt may be corrupt if it is done with a "depraved, evil, or wrongful" purpose, *id.* at 367 (quoting *North*, 910 F.2d at 942 (Silberman, J., concurring in part and dissenting in part)).  On January 6th, Brock participated in a riot that sought to overturn the result of the 2020 presidential election by force.  His social media communications leading up to that day and actions while in the Capitol "indicate that he clearly intended to take very purposeful actions to interfere with any certification of the election, and even to take actions that bordered on violent conduct and improper steps to impede the Congressional action of certification of the election."  J.A. 463.    "Using force to obstruct, influence, or impede a congressional proceeding is plainly wrongful and therefore corrupt."  *Robertson*, 86 F.4th at 370.  Where a defendant announces his intent to use violence to obstruct a congressional proceeding, comes equipped for violence, and then actually obstructs that proceeding, the evidence supports a finding that he acted with an impermissible purpose or knowledge of the wrongfulness of his actions.  That finding suffices to establish that Brock acted corruptly under *Robertson*.

19

**C**

Apart from those challenges to his conviction, Brock argues that the district court improperly applied a three-level enhancement under the Sentencing Guidelines to his Section 1512(c)(2) conviction for "substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2); *see* Brock Opening Br. 18–21. More specifically, Brock argues that "substantial interference with the administration of justice" as used in Section 2J1.2(b)(2) is limited to "judicial type proceedings" and does not encompass the legislative electoral certification process he was convicted of obstructing. Brock Opening Br. 19; *see* Brock Opening Br. 18–19. The government responds that "'administration of justice' * * * refers to the proper administration of law by all three branches of government." Gov't Br. 42; *see* Gov't Br. 51 ("[O]bstruction of the Electoral College certification vote on January 6 falls comfortably within the meaning of 'administration of justice' as used in Section 2J1.2 because it involved Congress's performance of duties required by law.").

Several of our district courts have agreed with the government's view. *See United States v. Wright*, No. 21-cr-341, 2023 WL 2387816, at *1 (D.D.C. March 4, 2023) (stating that "the vast majority of judges in the United States District Court for the District of Columbia" have held that "the phrase 'administration of justice' in [Section 2J1.2] includes the Electoral College certification"); *id.* at *7 (collecting cases). *But see United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022) (holding that Section 2J1.2 "d[id] not apply because the electoral certification does not involve the 'administration of justice'").

With great respect to our district court colleagues' thoughtfully reasoned efforts to apply this Guideline, we hold

20

that, for purposes of Sentencing Guideline 2J1.2, the phrase "administration of justice" does not encompass Congress's role in the electoral certification process. Instead, Section 2J1.2's text, context, and commentary show that "administration of justice" refers to judicial, quasi-judicial, and adjunct investigative proceedings, but does not extend to the unique congressional function of certifying electoral college votes.

**1**

The plain, natural, and ordinary meaning of the phrase "administration of justice" is the governmental process of investigating, determining, and enforcing the legal rights of persons.

For nearly a quarter of a century, *Black's Law Dictionary* has consistently defined the phrase "administration of justice" as "[t]he maintenance of right within a political community by means of the physical force of the state" or "the state's application of the sanction of force to the rule of right." *Administration of Justice*, BLACK'S LAW DICTIONARY 45 (7th ed. 1999); *Administration of Justice*, BLACK'S LAW DICTIONARY 47 (8th ed. 2004); *Administration of Justice*, BLACK'S LAW DICTIONARY 50 (9th ed. 2009); *Administration of Justice*, BLACK'S LAW DICTIONARY 53 (10th ed. 2014); *Administration of Justice*, BLACK'S LAW DICTIONARY 54 (11th ed. 2019). And it further defines "due administration of justice" as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." *Due Administration of Justice*, BLACK'S LAW DICTIONARY 54 (11th ed. 2019).

*Black's Law Dictionary* similarly defines "obstructing the administration of justice" and "interfering with the administration of justice as "[t]he skewing of the disposition

21

of *legal proceedings*, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge[.]" *Perverting the Course of Justice*, BLACK'S LAW DICTIONARY 1383 (11th ed. 2019) (emphasis added); *see id.* (cross-referencing these phrases). In fact, definitions for "obstructing justice" and "obstruction of justice" have long focused on the disruption of judicial and quasi-judicial administrative processes. *See Obstructing Justice*, BLACK'S LAW DICTIONARY 1228 (4th ed. 1968) ("Impeding or obstructing those who seek justice in a court, or those who have duties or powers of administering justice therein."); *Obstruction of Justice*, BLACK'S LAW DICTIONARY 1105 (7th ed. 1999) ("Interference with the orderly administration of law and justice, as by giving false information to or withholding evidence from a police officer or prosecutor, or by harming or intimidating a witness or juror."); *Obstruction of Justice*, BLACK'S LAW DICTIONARY 1107 (8th ed. 2004) (same); *Obstruction of Justice*, BLACK'S LAW DICTIONARY 1183 (9th ed. 2009) (same); *Obstruction of Justice*, BLACK'S LAW DICTIONARY 1246 (10th ed. 2014) (same); *Obstruction of Justice*, BLACK'S LAW DICTIONARY 1296 (11th ed. 2019) (same); *see also Obstruction of Justice*, MERRIAM-WEBSTER'S DICTIONARY OF LAW 337 (1996) (defining "obstruction of justice" as "the crime or act of willfully interfering with the process of justice and law[,] esp[ecially] by influencing, threatening, harming, or impeding a witness, potential witness, juror, or judicial or legal officer or by furnishing false information in *or otherwise impeding an investigation or legal process*") (emphasis added); *Obstructing Justice*, BLACK'S LAW DICTIONARY 972 (5th ed. 1979) ("Impeding or obstructing those who seek justice in a court, or those who have duties or powers of administering justice therein. The act by which one or more persons attempt to prevent, or do prevent, the execution of lawful process. The term applies also to obstructing the administration of justice in any way—as by

22

hindering witnesses from appearing, assaulting process
server[s], influencing jurors, obstructing court orders or
criminal investigations. Any act, conduct, or directing agency
pertaining to pending proceedings, intended to play on human
frailty and to deflect and deter [a] court from performance of
its duty and drive it into compromise with its own unfettered
judgment by placing it, through medium of knowingly false
assertion, in wrong position before public, constitutes an
obstruction to administration of justice."); *Obstructing Justice*,
BLACK'S LAW DICTIONARY 1077 (6th ed. 1990) (same).

Those definitions show that the "administration of justice"
commonly involves the operations of a judicial or quasi-
judicial tribunal that applies the force of the state to determine
the legal rights of individuals and entities, as well as to related
investigations conducted by government officials.

The commentary to Section 2J1.2 underscores that
"administration of justice" refers to judicial, quasi-judicial, and
adjunct investigative proceedings that apply the force of the
state to determine or maintain the legal rights of individuals and
entities. The commentary explains that "'[s]ubstantial
interference with the administration of justice' includes a
premature or improper termination of a felony investigation; an
indictment, verdict, or any judicial determination based upon
perjury, false testimony, or other false evidence; or the
unnecessary expenditure of substantial governmental or court
resources." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis omitted).
Each of these examples centers the Guideline on judicial,
quasi-judicial, or related investigatory proceedings—
proceedings that apply the force of the state to determine or to
maintain individual legal rights. "And the commentary to the
Guidelines, unless it is inconsistent with the Guidelines' plain

23

text (which no one argues here), is authoritative." *Long*, 997
F.3d at 355.

Other provisions of the Guidelines' commentary bolster
this interpretation. Section 3C1.1—entitled "Obstructing or
Impeding the Administration of Justice"—applies to
defendants who "willfully obstruct[] or impede[], or attempt[]
to obstruct or impede, the administration of justice with respect
to the *investigation, prosecution, or sentencing* of the * * *
offense of conviction" when "the obstructive conduct related
to (A) the defendant's offense of conviction and any relevant
conduct; or (B) a closely related offense[.]" U.S.S.G. § 3C1.1
(emphasis added). Every example in the commentary to
Section 3C1.1 involves conduct that obstructs a judicial or
related investigative proceeding. *See* U.S.S.G. § 3C1.1 cmt.
n.4. Other uses of the term throughout the Guidelines are
similarly cabined to judicial, quasi-judicial, and investigative
proceedings. *See, e.g.*, *id.* § 2J1.3 ("Perjury or Subornation of
Perjury; Bribery of Witness"); *id.* § 2J1.5 ("Failure to Appear
by Material Witness").

Courts too have adopted that same natural understanding
of "administration of justice" when applying other legal
provisions. *See Pugin v. Garland*, 599 U.S. 600, 620 (2023)
(Sotomayor, J., dissenting) ("'[A]dministration of justice,'
both historically and currently, refers to court proceedings.");
*id.* at 603–607 (majority opinion) (concluding that a provision
of the Immigration and Nationality Act regarding crimes
"relating to obstruction of justice" can apply in the absence of
a *pending* investigation or proceeding, as long as it has "a
connection with" investigative and adjudicatory matters).

For example, Section 1503 of Title 18 prohibits certain
acts that "influence[], obstruct[], or impede[], or endeavor[] to
influence, obstruct, or impede, the due administration of

24

justice[.]"  18 U.S.C. § 1503(a).  The Supreme Court has held
that, to violate Section 1503, "[t]he action taken by the accused
must be with an intent to influence judicial or grand jury
proceedings[,]" evidenced by "a relationship in time, causation,
or logic with the judicial proceedings."  *United States v.
Aguilar*, 515 U.S. 593, 599 (1995).  "In other words," the
Supreme Court has explained, "the endeavor must have the
natural and probable effect of interfering with the due
administration of justice."  *Id.* (quotation marks omitted).  In
interpreting this provision, the Fifth Circuit has similarly held
that "obstructing the due administration of justice means
'interfering with the procedure of a judicial hearing or trial.'"
*United States v. Richardson*, 676 F.3d 491, 502–503 (5th Cir.
2012) (quoting *United States v. Howard*, 569 F.2d 1331, 1336
n.9 (5th Cir. 1978)).    And the Eleventh Circuit has
characterized Section 1503 as "employ[ing] the term 'due
administration of justice' to provide a protective cloak over all
judicial proceedings[.]"  *United States v. Brenson*, 104 F.3d
1267, 1280 (11th Cir. 1997).

Similarly, Section 401 of Title 18 empowers federal courts
to punish "[m]isbehavior" of any person in or near the court
that "obstruct[s] the administration of justice[.]"  18 U.S.C.
§ 401(1).  Circuit courts interpreting this power have broadly
stated that "obstruction of the administration of justice requires
* * * some act that will interrupt the orderly process of the
administration of justice, or thwart the judicial process."
*United States v. Warlick*, 742 F.2d 113, 115–116 (4th Cir.
1984); *see American Airlines, Inc. v. Allied Pilots Ass'n*, 968
F.2d 523, 532 (5th Cir. 1992) (similar); *Vaughn v. City of Flint*,
752 F.2d 1160, 1167 (6th Cir. 1985) (similar).

These statutes are not unique—Congress routinely uses
"administration of justice" in contexts involving courts and
court proceedings.  *See, e.g.*, 18 U.S.C. § 1507 (prohibiting

25

"picket[ing] or parad[ing] in or near a building housing a court of the United States" "with the intent of interfering with, obstructing, or impeding the administration of justice"); 22 U.S.C. § 7513(a)(5)(B)(ii) (authorizing the President "to provide assistance for Afghanistan" to support "improvements in the capacity and physical infrastructure of the justice system in Afghanistan, such as for professional training * * * to improve the administration of justice, for programs to enhance prosecutorial and judicial capabilities and to protect participants in judicial cases, for improvements in the instruction of law enforcement personnel (including human rights training), and for the promotion of civilian police roles that support democracy"); 26 U.S.C. § 7456(c)(1) (empowering the Tax Court to punish "misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice"); 28 U.S.C. § 333 (empowering the chief judge of each circuit to hold judicial conferences "for the purpose of * * * advising means of improving the administration of justice within such circuit"); 28 U.S.C. § 620(b)(6) (empowering the Federal Judicial Center "to cooperate with and assist agencies of the Federal Government and other appropriate organizations in providing information and advice to further improvement in the administration of justice in the courts of foreign countries"); *see also* 28 U.S.C. § 453 (setting forth the judicial oath of office, including the affirmation that the justice or judge "will administer justice" fairly and evenhandedly).

**2**

Congress's certification of electoral college votes does not fit the "administration of justice" mold.

26

**a**

To start, the congressional certification of electoral votes must be set in context. Congress's counting of the electoral votes on January 6, 2021, was only one discrete step in a lengthy, multi-stage process that involves state legislatures and officials, as well as prescribed legislative processes within Congress.

The electoral college vote-counting process begins with the appointment of electors on Election Day. *See* 3 U.S.C. § 1; U.S. CONST. Art. II, § 1, cl. 2.[5] All 50 states and the District of Columbia appoint electors through a popular-vote process in which a vote for a party's presidential candidate in the general election is a vote to appoint electors supporting that candidate. *See* STAFF OF H. COMM. ON HOUSE ADMIN., 117TH CONG., REP. ON THE ELECTORAL COUNT ACT OF 1887: PROPOSALS FOR REFORM 2 & n.7 (2022). "[A]s soon as practicable after the conclusion of the appointment of the electors," the governor of each state must send the Archivist of the United States a certificate of the electors appointed. 3 U.S.C. § 6.

The electors of each state meet on "the first Monday after the second Wednesday in December" to vote by ballot for President and Vice-President at a location determined by state law. 3 U.S.C. § 7; *see* U.S. CONST. Art. II., § 1, cl. 3; U.S. CONST. Amend. XII. After the electors have voted within their State, they "make and sign six certificates of all the votes given by them," attaching to each certificate a list of the electors provided to them by the Governor of the State. 3 U.S.C. § 9.

---

[5] Congress amended the Electoral Count Act in 2022. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 5233–5241 (2022). All citations in this opinion are to the pre-amendment statute in force at the time of the events underlying Brock's conviction.

27

The electors then seal the certificates and certify that each certificate contains "all the votes of [the] State" given for President and Vice President. *Id.* § 10. The electors send one certificate to the President of the Senate, two to the secretary of their respective States, two to the Archivist of the United States, and one to the judge of the district in which the electors assembled to give their vote. *Id.* § 11.

States may adopt procedures for resolving disputes regarding the appointment of electors. 3 U.S.C. § 5. Congress has afforded such procedures deference by treating them as a "safe harbor" for election disputes: If, prior to election day, a state passes laws providing for the "final determination of any controversy or contest concerning the appointment of all or any * * * electors[,]" and the process established by those laws yields a "final determination" of a controversy or contest at least six days before the national electors meet, that determination "shall be conclusive" on Congress. *Id.*

Once the States' electoral college votes are submitted, the Senate and House of Representatives meet to count the electoral votes in a joint session on January 6th following the presidential election. 3 U.S.C. § 15. At that meeting, the President of the Senate opens "all the certificates and papers purporting to be certificates of the electoral votes" in alphabetical order by State, and then hands the certificates to four previously appointed tellers to read them aloud in the presence of both Houses. *Id.* The tellers also make a list of the votes received. *Id.*

After each certificate is read, the President of the Senate "call[s] for objections[.]" 3 U.S.C. § 15. When all objections to a State's certificates have been made, the Senate and House of Representatives must withdraw to their chambers to decide upon the objections. *Id.*; *see id.* § 17; CONG. RSCH. SERV.,

28

RL32717, Counting Electoral Votes:  An Overview of
Procedures at the Joint Session, Including Objections
by Members of Congress 6–9 (2020).

Both chambers reconvene "immediately" after they have
voted, and the presiding officer then announces the decision on
the objection(s).  3 U.S.C. § 15.  Congress may not proceed to
consideration of the next State's votes "until the objections
previously made to the votes or papers from any State shall
have been finally disposed of."  *Id.*  Congress does not dissolve
the joint session "until the count of electoral votes [is]
completed and the result declared[.]"  *Id.* § 16.

Considered in context, Congress's counting and
certification of electoral votes is but the last step in a lengthy
electoral certification process involving state legislatures and
officials as well as Congress.  Taken as a whole, the multi-step
process of certifying electoral college votes—as important to
our democratic system of government as it is—bears little
resemblance to the traditional understanding of the
administration of justice as the judicial or quasi-judicial
investigation or determination of individual rights.

The certification process, we note, could be said to involve
"[t]he maintenance of right within a political community"
insofar as Congress ensures that the certified votes are
reviewed and counted in the manner prescribed by the
Constitution and by statute.  *Administration of Justice*,
Black's Law Dictionary 54 (11th ed. 2019).  But that is only
half the definition of administration of justice.  Congress
imposes neither "the physical force of the state" nor "the
sanction of force to the rule of right" in certifying the electoral
votes.  *Id.*  To the extent that law enforcement is present, it is
there to protect the lawmakers and their process, not to
investigate individuals' rights or to enforce Congress's

certification decision.  After all, law enforcement is present for security purposes for a broad variety of governmental proceedings that do not involve the "administration of justice"—presidential inaugurations, for example, and the pardoning of the Thanksgiving Turkey.

Similarly, while Congress could be conceived of as a tribunal deciding the validity of electoral votes, it is not acting in a judicial or quasi-judicial capacity to adjudicate the legal rights of any "parties" before it.  *Due Administration of Justice*, BLACK'S LAW DICTIONARY 54 (11th ed. 2019).  To be sure, Members of Congress consider, review, and act upon evidence in the form of the state certifications.  But, in so doing, Congress does not adjudicate the right of the President-elect to be President, or the right of voters to have their elected candidate declared President.  Its role is limited to resolving disputes regarding the evidence of electoral votes by congressional vote.[6]

**b**

The government does not contend that Congress's certification of electoral college votes fits the normal or dictionary understanding of "administration of justice."

---

[6] In debating the Electoral Count Act as originally enacted, one legislator explained that Congress would need to "judge" the legality of electoral votes and considered "[t]he power to judge of the legality of the votes [to be] a necessary consequent of the power to count." 18 Cong. Rec. 30 (1886) (statement of Rep. Caldwell).  That legislative history, however, underscores that the power exercised here is "to count[,]" not to administer justice to parties.  *Id.* Furthermore, that statement does not speak to the contours or scope of "administration of justice" as used in the sentencing guidelines, and the government has offered no argument based on that legislative history.

30

Instead, the government engages in definitional divide and conquer, dissecting the phrase "administration of justice" and then invoking the most favorable meaning of each word in isolation. *See* Gov't Br. 42–43.

The government starts by defining "justice" as including "'the fair and proper administration of laws,'" and "obstruction of justice" as "'interference with the orderly administration of law and justice.'" Gov't Br. 42–43 (brackets omitted) (quoting BLACK'S LAW DICTIONARY 1033, 1296 (11th ed. 2019)). The government then puts those two definitions together to conclude that "administration of justice" means any and every "performance of acts required by law in the discharge of duties [by government actors.]" Gov't Br. 43 (quoting *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977)). There are multiple problems with that approach.

To start, the government selectively truncates its quotations. The full definition of "obstruction of justice" reads: "Interference with the orderly administration of law and justice, *as by giving false information to or withholding evidence from a police officer or prosecutor, or by harming or intimidating a witness or juror*." *Obstruction of Justice*, BLACK'S LAW DICTIONARY 1296 (11th ed. 2019) (emphasis added). The excluded material contemplates that the interference in question will occur in the context of an investigation or adjudicative proceeding. And the government similarly drops qualifying language from its quotation of *United States v. Partin*, 552 F.2d 621 (5th Cir. 1977). The full quote from *Partin*, which itself was quoting without fully embracing a jury instruction, reads: "The administration of justice it should be pointed out means the performance of acts required by law *in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed*." *Id.* at 641 (emphasis added). That language suggests a more

31

cabined understanding of the term "administration of justice" than the government urges here.

By carving language out of context in that manner, the government effectively rewrites "administration of justice" to mean "administration of laws."  That reading would vastly expand the sentencing enhancement beyond the bounds of its normal textual connotation and interpretive commentary.  It would, for example, make the State of the Union address, which is required by the Constitution, U.S. CONST. Art. II, § 3, the administration of justice.  Likewise, the government's reading would sweep within the "administration of justice" the Social Security Administration's monthly issuance of Social Security checks pursuant to statute, *see* 42 U.S.C. § 402, and the Postal Service's receipt and delivery of mail, *see* 39 U.S.C. § 403(a).

Relatedly, the government's textual argument fails to read the relevant language—"administration of justice"—as a unitary phrase.  *See* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW:  THE INTERPRETATION OF LEGAL TEXTS 356 (2012) ("Adhering to the *fair meaning* of the text * * * does not limit one to the hyperliteral meaning of each word in the text.").  Courts "do not read statutes in little bites."  *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 643 (2006).  That is because "words together may assume a more particular meaning than those words in isolation."  *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011).  Here, "justice" "does not stand alone[,]" *ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619, 628 (2022), and the entire phrase "administration of justice" connotes more than the sum of its verbal parts, *cf. AT&T Inc.*, 562 U.S. at 406.

The government admits as much, acknowledging that "the term 'administration of justice' is more commonly used * * * to refer to 'interference with the pendency of some sort of

32

judicial proceeding.'" Gov't Br. 43 (quoting *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013)).  The government points to nothing in the text of Section 2J1.2(b)(2) or its commentary that suggests the Sentencing Commission chose to depart from that ordinary understanding of "administration of justice" and broadly sweep in the "administration of laws" by all three branches of government.

The government counters that the commentary's list of judicial, quasi-judicial, and investigative activities covered by Section 2J1.2(b)(2) is not exclusive.  Gov't Br. 48, 55–56.  True.  But the Commission made the list illustrative by prefacing it with "includes."  *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (introducing a definition "with the verb 'includes' instead of 'means,' * * * makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive"); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C. Cir. 1997) ("[T]he word 'includes' normally does not introduce an exhaustive list but merely sets out examples of some general principle.") (quotation marks omitted).  Said another way, the illustrative list *illustrates* what type of conduct is encompassed by the definition, and so other unlisted forms of conduct must fit that same mold.  Expanding the phrase "administration of justice" to capture the administration of all governmental actions required by law breaks that mold.

**c**

The government separately points to the list's concluding reference to "the unnecessary expenditure of substantial governmental or court resources."  U.S.S.G. § 2J1.2 cmt. n.1.  "'[G]overnmental' resources," the government argues, "includes congressional resources."  Gov't Br. 48.  That may well be correct in a generic sense.  And congressional resources

33

expended on an adjudicatory or quasi-adjudicatory process like impeachment or contempt proceedings may well fall within Section 2J1.2(b)(2)'s compass (an issue we need not definitively resolve). *Cf. Contempt*, BLACK'S LAW DICTIONARY 313 (7th ed. 1999) (suggesting that contempt of the legislature "interferes with the administration of justice").

But we must read the tail end of the commentary consistently with the rest of the commentary's illustrative references. And those references indicate that the term "governmental resources" is limited to the expenditure of investigative, prosecutorial, or judicial resources in relation to a potential or pending investigation or a judicial or quasi-judicial proceeding. *See, e.g.*, *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997) (applying the Section 2J1.2(b)(2) enhancement to the sentence of a defendant convicted of unlawfully abducting his children from the United States because "th[e] act prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice").

Certainly nothing in the commentary's wrap-up reference to the expenditure of governmental or court resources suggests that it was meant to sweep in all unnecessary expenditures of government resources associated with the routine administration of laws. A cybercriminal who hacks into the State Department's computer system, necessitating the swift and substantial expenditure of governmental funds to protect sensitive diplomatic communications, will no doubt have broken many laws, but that person's conduct, without more, cannot be described as interfering with the administration of justice.

34

**d**

Finally, the government argues that Section 2J1.2's context favors a broad reading of "administration of justice" to cover the administration of all laws.  *See* Gov't Br. 44–45.  The government notes in particular that "Section 2J1.2 applies to an array of obstruction statutes, including many that do *not* involve the 'administration of justice' in the narrow sense[.]" Gov't Br. 44 (citing U.S.S.G. Appendix A).  But each of the statutes the government cites includes a broad range of conduct that sometimes could and sometimes will not include investigations or judicial or quasi-judicial proceedings.  *See* Gov't Br. 44–45 (citing 18 U.S.C. § 551 (prohibiting both concealing or destroying documents relating to imported merchandise *and* concealing or destroying such documents "for the purpose of suppressing any evidence of fraud therein"); *id.* § 665(c) (prohibiting obstructing or impeding an investigation under the Workforce Innovation and Opportunity Act); *id.* § 1505 (prohibiting obstructing congressional investigations); *id.* § 1511 (prohibiting conspiring to obstruct state criminal law to facilitate illegal gambling); *id.* § 1516 (prohibiting obstructing a federal auditor); *id.* § 1519 (prohibiting destroying documents in agency investigations); 26 U.S.C. § 7212 (prohibiting interfering with the administration of internal revenue laws)).  Contrary to the government's reading then, *see* Gov't Br. 44–45, Section 2J1.2(b)(2)'s three-level sentencing enhancement *would* apply to these statutes when the violative conduct implicates the administration of justice.  We hold only that it need not apply to every form of obstruction under the pertinent statutes.

That, after all, is the point of a sentencing *enhancement*. Section 2J1.2's base-offense level already covers all offenses chargeable under the relevant statutes.  The whole purpose of Section 2J1.2(b)(2)'s sentencing-enhancement provision then

35

is to identify those offenses within the broader Section 2J1.2 class that merit greater punishment than those covered by the base-offense level because of their particular circumstances or harm inflicted.  *See* U.S.S.G. § 2J1.2(b) (enhancement applies only to crimes under 2J1.2 having "specific offense characteristics") (capitalization modified).  What matters under the Guidelines is that *some* violations of the covered statutes could trigger the 2J1.2(b)(2) enhancement, not that every violation do so.

Said another way, if we read every conviction punishable under Section 2J1.2 to necessarily involve "interference with the administration of justice," Section 2J1.2(b)(2)'s three-level enhancement would be applicable to *all* Section 2J1.2 offenses so long as the resulting interference is "substantial."  But if that were the Commission's goal, it could have specified that courts should apply a three-level enhancement to all convictions under Section 2J1.2 resulting in serious or substantial harm. There would have been no reason to further specify that the enhancement applies only in cases of interference with the "administration of justice."

The government also notes that Part J of Chapter 2 of the Guidelines is entitled "Offenses *Involving the Administration of Justice.*"  Gov't Br. 42.  The government, though, does not develop this point further.  It apparently reads the title as indicating that all offenses to which Part J applies must involve the administration of justice and reasons that, because Section 2J1.2 applies to convictions under Section 1512(c)(2), convictions under Section 1512(c)(2) must necessarily involve the administration of justice.

That is not how the Sentencing Guidelines work.  While the title of a specific part or guideline may serve as an interpretive tool, *see United States v. Flores*, 945 F.3d 687, 728

36

(2d Cir. 2019); *United States v. Torrealba*, 339 F.3d 1238, 1245 (11th Cir. 2003), it cannot stretch a guideline's reach beyond its textual bounds.

Finally, the government objects that "[t]here is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding." Gov't Br. 46–47. Maybe. But that is a policy argument the government can present to the Commission. It is textually indisputable that the Guidelines confine the Section 2J1.2(b)(2) enhancement to those offenses that interfere with the "administration of justice," not the administration of everything Congress does, or the administration of government, or the administration of all laws broadly. We must apply the Guideline as written, and Brock's interference with one stage of the electoral college vote-counting process—while no doubt endangering our democratic processes and temporarily derailing Congress's constitutional work—did not interfere with the "administration of justice."

\*   \*   \*

Because Section 2J1.2's text, commentary, and context establish that the "administration of justice" does not extend to Congress's counting and certification of electoral college votes, the district court erred in applying Section 2J1.2(b)(2)'s three-level sentencing enhancement to Brock's Section 1512(c)(2) conviction.

## IV

For the foregoing reasons, we affirm Brock's conviction under 18 U.S.C § 1512(c)(2), but we vacate Brock's sentence for his Section 1512(c)(2) conviction and remand to the district

37

court for resentencing without the application of Section 2J1.2(b)(2)'s sentencing enhancement.

*So ordered.*