**SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 27, 2023**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 23-3045

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LARRY RENDALL BROCK,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:21-cr-00140-JDB-1, John D. Bates, U.S. Senior District Judge*

## PUBLIC JOINT APPENDIX
## SEALED MATERIAL IN SEPARATE SUPPLEMENT
## VOLUME I OF II, Pages A1-A607

CHRISELLEN REBECCA KOLB
U.S. ATTORNEY'S OFFICE
601 D Street NW, Room 8104
Washington, DC 20530
(202) 252-6829
chrisellen.r.kolb@usdoj.gov

*Counsel for Plaintiff-Appellee*

CHARLES BURNHAM
BURNHAM & GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

*Counsel for Defendant-Appellant*

July 10, 2023

# TABLE OF CONTENTS

**Page**

**VOLUME I:**

Docket Entries ..................................................................... A1

Indictment, filed June 23, 2021 ......................................... A18

Motion to Dismiss Count 1 or in the Alternative for a Bill of
    Particulars, filed July 1, 2022.................................... A21

Opposition to Defendant's Motion to Dismiss Count 1: Obstruction
    of an Official Proceeding, filed July 22, 2021........................... A27

Memorandum Opinion, filed August 31, 2022 ................................. A38

Transcript of Bench Trial Day 1, filed December 6, 2022 ................. A63

Transcript of Bench Trial Day 2, filed December 6, 2022 ................ A284

Transcript of Bench Trial Day 3, filed December 6, 2022 ................ A450

Government's Sentencing Memorandum, filed March 10, 2023 ....... A482

    Exhibit 1: Cases in Which the Government Recommended a
    Probation Sentence without Home Detention .......................... A520

Sentencing Memorandum, filed March 16, 2023 .............................. A564

    Exhibit 1: Letter dated January 4, 2023 to Judge John D.
    Bates ...................................................................... A584

    Exhibit 2: Portland Federal Courthouse Protest Cases .......... A586

Judgment in a Criminal Case, filed March 20, 2023........................ A598

Notice of Appeal, filed March 28, 2023............................................ A606


**VOLUME II: FILED UNDER SEAL:**

Presentence Investigation Report, filed February 6, 2023................. A608

Transcript of Sentencing Hearing, dated March 17, 2023 ............... A641

APPEAL,CAT A,CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00140-JDB All Defendants

Case title: USA v. BROCK                          Date Filed: 02/19/2021

Magistrate judge case number:  1:21-mj-00023-GMH

---

Assigned to: Judge John D. Bates

Appeals court case number: 23-3045

**Defendant (1)**

**LARRY RENDALL BROCK**                  represented by   **Charles Burnham**
BURNHAM & GOROKHOV PLLC
1424 K St. NW
Suite 500
Washington, DC 20005
202-386-6920
Email: charles@burnhamgorokhov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds (1) | Oral motion by government to dismiss count; heard and GRANTED. |
| 18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting. (1s) | Defendant sentenced to SIX (6) months on Count 1s to run concurrently with Counts 2s, 3s, 4s, 5s and 6s. No period of supervised release imposed. Special Assessement of $10.00. |
| 18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds (2) | Oral motion by government to dismiss count; heard and GRANTED. |
| 18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds. (2s) | Defendant sentenced to TWELVE (12) months on Count 2s to run concurrently with Counts 1s, 3s, 4s,5s and 6s. TWELVE (12) months of Supervised to run concurrently with Counts 1s and 3s. Special Assessement of $25.00. |

A1

18:1752(a)(3), 2; TEMPORARY
RESIDENCE OF THE PRESIDENT;
Impeding Ingress and Egress in a Restricted
Building or Grounds and Aiding and
Abetting
(3)

Oral motion by government to dismiss
count; heard and GRANTED.

18:1752(a)(2); TEMPORARY RESIDENCE
OF THE PRESIDENT; Disorderly and
Disruptive Conduct in a Restricted Building
or Grounds.
(3s)

Defendant sentenced to TWELVE (12)
months on Count 3s to run concurrently
with Counts 1s, 2s, 4s, 5s and 6s. TWELVE
(12) months of Supervised to run
concurrently with Counts 1s and 2s. Special
Assessment of $25.00.

40:5104(e)(2)(A); FEDERAL STATUTES,
OTHER; Entering and Remaining on the
Floor of Congress
(4)

Oral motion by government to dismiss
count; heard and GRANTED.

40:5104(e)(2)(A); VIOLENT ENTRY AND
DISORDERLY CONDUCT ON CAPITOL
GROUNDS; Entering and Remaining on the
Floor of Congress.
(4s)

Defendant sentenced to SIX (6) months on
Count 4s to run concurrently with Counts
1s, 2s, 3s, 5s and 6s. No period of
supervised release imposed. Special
Assessment of $10.00.

40:5104(e)(2)(D); FEDERAL STATUTES,
OTHER; Disorderly Conduct in a Capitol
Building
(5)

Oral motion by government to dismiss
count; heard and GRANTED.

40:5104(e)(2)(D); VIOLENT ENTRY AND
DISORDERLY CONDUCT ON CAPITOL
GROUNDS; Disorderly Conduct in a
Capitol Building.
(5s)

Defendant sentenced to SIX (6) months on
Count 5s to run concurrently with Counts
1s, 2s, 3s, 4s and 6s. No period of
supervised release imposed. Special
Assessment of $10.00.

40:5104(e)(2)(E), 2; FEDERAL
STATUTES, OTHER; Impeding Passage
Through the Capitol Grounds or Buildings
and Aiding and Abetting
(6)

Oral motion by government to dismiss
count; heard and GRANTED.

40:5104(e)(2)(G); VIOLENT ENTRY AND
DISORDERLY CONDUCT ON CAPITOL
GROUNDS; Parading, Demonstrating, or
Picketing in a Capitol Building.
(6s)

Defendant sentenced to SIX (6) months on
Count 4s to run concurrently with Counts
1s, 2s, 3s, 4s, 5s. No period of supervised
release imposed. Special Assessment of
$10.00.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                              **Disposition**

None

**Highest Offense Level (Terminated)**

None

A2

| **Complaints** | **Disposition** |
|---|---|
| COMPLAINT in Violation of 18:1752(a) and 40:5104(e)(2) | |

**Plaintiff**

| **USA** | represented by | **April Holly Ayers-Perez** |
|---|---|---|

represented by **April Holly Ayers-Perez**
DOJ-ATR
Southern District of Texas
450 5th Street NW
Room 11412
Washington, DC 22035
202-894-4237
Email: april.ayersperez@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Barry Kent Disney , I**
DOJ-CRM
1331 F Street NW
Washington, DC 20005
202-305-4367
Email: barry.disney@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Douglas Spencer Meisel**
DOJ-CRM
Narcotic & Dangerous Drug Section
145 N Street NE
Suite 2300
Washington DC, DC 20530
(202) 598-2281
Email: douglas.meisel@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Ahmed Muktadir Baset**
U.S. ATTORNEY'S OFFICE
United States Attorney's Office for the
District of Col
555 Fourth Street, N.W.
Room 4209
Washington, DC 20530
202-252-7097
Email: ahmed.baset@usdoj.gov
*TERMINATED: 02/23/2021*
*Designation: Assistant U.S. Attorney*

A3

**Justin Todd Sher**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
202-353-3909
Email: justin.sher@usdoj.gov
*TERMINATED: 10/12/2022*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/09/2021 | 1 | SEALED COMPLAINT as to LARRY RENDALL BROCK (1). (Attachments: # 1 Affidavit in Support) (zstd) [1:21-mj-00023-GMH] (Entered: 01/11/2021) |
| 01/09/2021 | 3 | MOTION to Seal Case by USA as to LARRY RENDALL BROCK. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21-mj-00023-GMH] (Entered: 01/11/2021) |
| 01/09/2021 | 4 | ORDER granting 3 Motion to Seal Case as to LARRY RENDALL BROCK (1). Signed by Magistrate Judge G. Michael Harvey on 1/9/2021. (zstd) [1:21-mj-00023-GMH] (Entered: 01/11/2021) |
| 01/10/2021 |   | Arrest of LARRY RENDALL BROCK in US District Court Northern District of Texas (Fort Worth). (bb) [1:21-mj-00023-GMH] (Entered: 01/25/2021) |
| 01/10/2021 |   | Case unsealed as to LARRY RENDALL BROCK (zstd) [1:21-mj-00023-GMH] (Entered: 02/19/2021) |
| 01/15/2021 | 5 | Rule 5(c)(3) Documents Received as to LARRY RENDALL BROCK from US District Court Northern District of Texas (Fort Worth) Case Number 4:21-mj-17 (BJ) (bb) [1:21-mj-00023-GMH] (Entered: 01/25/2021) |
| 02/11/2021 | 6 | NOTICE OF ATTORNEY APPEARANCE Justin Todd Sher appearing for USA. (zltp) [1:21-mj-00023-GMH] (Entered: 02/11/2021) |
| 02/19/2021 | 7 | INFORMATION as to LARRY RENDALL BROCK (1) count(s) 1, 2, 3, 4, 5, 6. (zstd) (Entered: 02/19/2021) |
| 02/23/2021 |   | Set/Reset Hearings as to LARRY RENDALL BROCK: Arraignment set for 2/25/2021 at 10:00 AM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 02/23/2021) |
| 02/23/2021 | 9 | NOTICE OF ATTORNEY APPEARANCE: Charles Burnham appearing for LARRY RENDALL BROCK (Burnham, Charles) (Entered: 02/23/2021) |
| 02/23/2021 | 10 | NOTICE OF SUBSTITUTION OF COUNSEL as to USA. Attorney Ayers-Perez, April Holly added. (Ayers-Perez, April) (Entered: 02/23/2021) |
| 02/25/2021 |   | Minute Entry: Arraignment as to LARRY RENDALL BROCK (1) held on 2/25/2021 before Judge John D. Bates on Counts 1,2,3,4,5 and 6: Plea of NOT GUILTY entered by LARRY RENDALL BROCK (1) as to all Counts. Parties discussed discovery. Status Conference set for 4/27/2021 at 10:00 AM in Telephonic/VTC before Judge John D. Bates. The Court finds in the interest of justice (XT) that the time between 02/25/2021 and 04/27/2021 shall be excluded from the speedy trial calculation. Defendant remains on release. Court Reporter: Bryan Wayne; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez. (tb) (Entered: 02/25/2021) |
| 03/15/2021 | 11 | MOTION to Modify Conditions of Release by LARRY RENDALL BROCK. (Attachments: # 1 Exhibit, # 2 Exhibit)(Burnham, Charles) (Entered: 03/15/2021) |

A4

7/6/23, 1:59 PM
District of Columbia live database

| | | |
|---|---|---|
| 03/15/2021 | | MINUTE ORDER as to LARRY RENDALL BROCK:: Upon consideration of 11 defendants Motion to Modify Conditions of Release, and the entire record herein, it is hereby ORDERED that the government shall file any opposition to defendants motion by not later than March 25, 2021. SO ORDERED by Judge John D. Bates on 03/15/2021. (tb) (Entered: 03/15/2021) |
| 03/22/2021 | | NOTICE of Provisional/Government Not Certified Status re 11 MOTION to Modify Conditions of Release . Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Criminal Rule 57.21.1, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-admissions-and-renewal-information.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 3/29/2021. (znmw) (Entered: 03/22/2021) |
| 03/25/2021 | 12 | RESPONSE by USA as to LARRY RENDALL BROCK re 11 MOTION to Modify Conditions of Release (Attachments: # 1 Exhibit Government Exhibit A, # 2 Exhibit Government Exhibit B)(Ayers-Perez, April) (Entered: 03/25/2021) |
| 04/12/2021 | 13 | ORDER Setting Conditions of Release as to LARRY RENDALL BROCK (1) Release. Approved by Judge John D. Bates on 02/25/2021. (tb) (Entered: 04/12/2021) |
| 04/17/2021 | 14 | ORDER: Granting in part and denying in part 11 defendant's Motion to Modify Conditions of Release as to LARRY RENDALL BROCK. See text of Order for details.. Signed by Judge John D. Bates on 04/16/2021. (tb) (Entered: 04/17/2021) |
| 04/27/2021 | | Minute Entry: Status Conference as to LARRY RENDALL BROCK held on 4/27/2021 before Judge John D. Bates: Oral motion by defendant to modify conditions of release; heard and taken under advisement. Parties along with PSA shall submit proposed language regarding adjusting release conditions. Status Conference set for 6/24/2021 at 11:00 AM in Telephonic/VTC before Judge John D. Bates. The Court finds in the interest of justice ( XT) that the time between 04/27/2021 and 06/24/2021 shall be excluded from the speedy trial calculation. Defendant remains on release. Court Reporter: Bryan Wayne; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez; Pretrial Officer: Andre Sidbury. (tb) (Entered: 04/27/2021) |
| 04/27/2021 | 15 | ENTERED IN ERROR.....Unopposed MOTION for Protective Order by USA as to LARRY RENDALL BROCK. (Attachments: # 1 Text of Proposed Order)(Ayers-Perez, April) Modified on 4/28/2021 (zhsj). (Entered: 04/27/2021) |
| 04/27/2021 | | NOTICE OF CORRECTED DOCKET ENTRY: as to LARRY RENDALL BROCK re 15 Unopposed MOTION for Protective Order was entered in error, and however the judge has already signed the order. See Docket Entry 16 . (zhsj) (Entered: 04/28/2021) |
| 04/28/2021 | 16 | PROTECTIVE ORDER setting forth procedures for handling confidential material; allowing designated material to be filed under seal as to LARRY RENDALL BROCK. Signed by Judge John D. Bates on 04/28/2021. (tb) (Entered: 04/28/2021) |
| 05/12/2021 | 17 | ORDER modifying conditions of pretrial release as to LARRY RENDALL BROCK. See text of Order for details. SO ORDERED by Judge John D. Bates on 05/12/2021. (tb) (Entered: 05/13/2021) |
| 06/21/2021 | 20 | NOTICE *of Discovery Letter* by USA as to LARRY RENDALL BROCK (Attachments: # 1 Notice to Counsel/Party Discovery Letter)(Ayers-Perez, April) (Entered: 06/21/2021) |

A5

| 06/23/2021 | 22 | MOTION to Modify Conditions of Release by LARRY RENDALL BROCK. (Attachments: # 1 Exhibit transcript)(Burnham, Charles) (Entered: 06/23/2021) |
|---|---|---|
| 06/23/2021 | 24 | SUPERSEDING INDICTMENT as to LARRY RENDALL BROCK (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s. (zhsj) (Entered: 06/24/2021) |
| 06/23/2021 | 26 | MOTION to Reconsider Electronic Monitoringby LARRY RENDALL BROCK. (See Docket Entry 22 to View Document). (zhsj) (Entered: 06/25/2021) |
| 06/24/2021 | 23 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 06/24/2021) |
| 06/24/2021 | | Minute Entry: Arraignment/Status Hearing as to LARRY RENDALL BROCK (1) held on 6/24/2021 before Judge John D. Bates on Counts 1s,2s,3s,4s,5s and 6s. Plea of NOT GUILTY entered by LARRY RENDALL BROCK as to Counts 1s through 6s. Response to motion to modify conditions of release 22 due by 6/30/2021. Reply due by 7/2/2021. Status Conference set for 8/25/2021 at 04:00 PM in Telephonic/VTC before Judge John D. Bates. The Court finds in the interest of justice (XT) that the time between 06/24/2021 and 08/25/2021 shall be excluded from the speedy trial calculation. Defendant remains on release. Court Reporter: Lisa Moreira; Defense Attorney: Charles Burnham; Pretrial Officer: John Copes. (tb) (Entered: 06/24/2021) |
| 06/30/2021 | 27 | RESPONSE by USA as to LARRY RENDALL BROCK re 22 MOTION to Modify Conditions of Release , 26 MOTION for Reconsideration (Attachments: # 1 Exhibit Gov't Exhibit A, # 2 Exhibit Gov't Exhibit B)(Ayers-Perez, April) (Entered: 06/30/2021) |
| 07/02/2021 | 28 | REPLY TO OPPOSITION to Motion by LARRY RENDALL BROCK re 26 MOTION for Reconsideration (Burnham, Charles) (Entered: 07/02/2021) |
| 07/20/2021 | 29 | SUPPLEMENT by LARRY RENDALL BROCK re 26 MOTION for Reconsideration *of Electronic Monitoring* (Burnham, Charles) (Entered: 07/20/2021) |
| 08/16/2021 | 30 | MEMORANDUM OPINION & ORDER granting 22 Motion to Modify Conditions of Release as to LARRY RENDALL BROCK. See text of Memorandum Opinion & Order for details. Signed by Judge John D. Bates on 08/16/2021. (tb) (Entered: 08/16/2021) |
| 08/24/2021 | 31 | NOTICE *of Discovery Status Memo* by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 08/24/2021) |
| 08/25/2021 | 32 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 08/25/2021) |
| 08/25/2021 | 33 | NOTICE *of Discovery Letter* by USA as to LARRY RENDALL BROCK (Attachments: # 1 Supplement)(Ayers-Perez, April) (Entered: 08/25/2021) |
| 08/25/2021 | | Minute Entry: Status Conference as to LARRY RENDALL BROCK held on 8/25/2021 before Judge John D. Bates: Parties discussed posture of case. Status Conference set for 10/25/2021 at 11:00 AM in Telephonic/VTC before Judge John D. Bates. The Court finds in the interest of justice (XT) that the time between 08/25/2021 and 10/25/2021 shall be excluded from the speedy trial calculation. Defendant remains on release. Court Reporter: Jan Dickman; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez. (tb) (Entered: 08/26/2021) |
| 09/03/2021 | | MINUTE ORDER as to LARRY RENDALL BROCK: In light of 30 the Court's Memorandum Opinion & Order granting 22 defendant's unsealed Motion to Reconsider Electronic Monitoring or in the Alternative to Modify Certain Restrictions on Travel, it is hereby ORDERED that 19 defendant's sealed Motion to Reconsider Electronic |

A6

| | | |
|---|---|---|
| | | Monitoring or in the Alternative to Modify Certain Restrictions on Travel and 18 defendant's accompanying Motion to Seal are TERMINATED. SO ORDERED by Judge John D. Bates on 09/03/2021. (tb) (Entered: 09/03/2021) |
| 09/23/2021 | 34 | NOTICE *of Filing Discovery Status Update* by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 09/23/2021) |
| 10/21/2021 | 35 | Joint MOTION to Continue *October 25, 2021 Status Conference*, Joint MOTION to Exclude *Time under the Speedy Trial Act* by USA as to LARRY RENDALL BROCK. (Attachments: # 1 Text of Proposed Order)(Ayers-Perez, April) (Entered: 10/21/2021) |
| 10/21/2021 | | MINUTE ORDER: Upon consideration of 35 the United States' Joint Motion to Continue October 25, 2021 Status Conference for 60 Days, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the status conference scheduled for October 25, 2021 shall be RESCHEDULED to December 22, 2021 at 11:00 a.m. in Telephonic/VTC; and it is further ORDERED that the time between October 25, 2021 and December 22, 2021 shall be excluded from the speedy trial calculation in the interest of justice. SO ORDERED. Signed by Judge John D. Bates on 10/21/2021. (lcjdb2) (Entered: 10/21/2021) |
| 10/21/2021 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Status Conference Rescheduled to 12/22/2021 at 11:00 AM in Telephonic/VTC before Judge John D. Bates. (jth) (Entered: 10/22/2021) |
| 12/03/2021 | 36 | NOTICE *of Filing Discovery Status Update* by USA as to LARRY RENDALL BROCK (Attachments: # 1 Supplement Attachment A, # 2 Supplement Attachment B)(Ayers-Perez, April) (Entered: 12/03/2021) |
| 12/03/2021 | 37 | NOTICE *of Filing Discovery Status Update* by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 12/03/2021) |
| 12/21/2021 | 38 | MOTION to Continue *status hearing* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 12/21/2021) |
| 12/21/2021 | | MINUTE ORDER: Upon consideration of 38 defendant's Motion to Continue Status, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the status conference scheduled for December 22, 2021 shall be RESCHEDULED to January 27, 2022 at 11:00 AM in Telephonic/VTC; and it is further ORDERED that the time between December 22, 2021 and January 27, 2022 shall be excluded from the speedy trial calculation in the interest of justice as the continuance will afford defendant more time to review discovery and explore a possible plea. SO ORDERED. Signed by Judge John D. Bates on 12/21/2021. (lcjdb2) (Entered: 12/21/2021) |
| 01/18/2022 | 39 | Consent MOTION to Modify Conditions of Release by LARRY RENDALL BROCK. (Attachments: # 1 Text of Proposed Order)(Burnham, Charles) (Entered: 01/18/2022) |
| 01/18/2022 | 40 | Consent MOTION minor change in time of status hearing by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 01/18/2022) |
| 01/18/2022 | | MINUTE ORDER: Upon consideration of 40 defendant's Motion to Change Time of Status, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the status conference scheduled for January 27, 2022 at 11:00 AM shall be RESCHEDULED to January 27, 2022 at 3:00 PM in Telephonic/VTC. SO ORDERED. Signed by Judge John D. Bates on 1/18/2022. (lcjdb2) (Entered: 01/18/2022) |
| 01/18/2022 | 41 | ORDER granting 39 Motion to Modify Conditions of Release as to LARRY RENDALL BROCK. See text of Order for details. Signed by Judge John D. Bates on 1/18/2022. |

A7

| | | |
|---|---|---|
| | | (lcjdb2) (Entered: 01/18/2022) |
| 01/19/2022 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Status Conference reset for 1/27/2022 at 03:00 PM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 01/19/2022) |
| 01/26/2022 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Status Conference reset for 1/28/2022 at 02:30 PM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 01/26/2022) |
| 01/27/2022 | 42 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 01/27/2022) |
| 01/27/2022 | | MINUTE ORDER: It is hereby ORDERED that the status conference scheduled for January 27, 2022 is hereby RESCHEDULED to January 31, 2022 at 10:00 AM via Zoom; and it is further ORDERED that the time between January 27, 2022 and January 31, 2022 shall be excluded from the speedy trial calculation in the interest of justice as the continuance will enable defendant to attend the status conference and participate in his defense. SO ORDERED. Signed by Judge John D. Bates on 1/27/2022. (lcjdb2) (Entered: 01/27/2022) |
| 01/27/2022 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Status Conference set for 1/31/2022 at 10:00 AM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 01/27/2022) |
| 01/31/2022 | | Minute Entry: Status Conference as to LARRY RENDALL BROCK held on 1/31/2022 before Judge John D. Bates: Parties discussed posture of the case, established a motions and trial schedule. Another Video Status Conference is set for 4/8/2022 at 10:30 AM in Telephonic/VTC before Judge John D. Bates. Defense Motions are due by 6/24/2022, Government Responses are due by 7/15/2022, any Replies are due by 7/29/2022, The Court will await receipt of the motions before scheduling a motions hearing. Jury Trial is set for 11/14/2022 at 9:30 AM in Courtroom 30A (In Person) before Judge John D. Bates. The Court finds in the interest of justice (XT) that the time between 1/31/2022 and 11/14/2022 shall be excluded from the speedy trial calculation. Defendant remains on release. Court Reporter: Lisa Moreira; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez. (jth) (Entered: 01/31/2022) |
| 02/10/2022 | 43 | NOTICE *of* Filing United States' Memorandum Regarding Status *of* Discovery as *of* February 9, 2022 by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 02/10/2022) |
| 04/08/2022 | 44 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 04/08/2022) |
| 04/08/2022 | | Minute Entry for Video Status Conference proceeding held before Judge John D. Bates as to LARRY RENDALL BROCK on 4/8/2022. Defendant remains on release. US Attorneys: April Ayers-Perez and Emily Miller; Defense Attorney: Charles Burnham; Court Reporter: Sara Wick. (zgdf) (Entered: 04/08/2022) |
| 06/24/2022 | 45 | Consent MOTION for Extension of Time to *file Pretrial Motions (July 1)* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 06/24/2022) |
| 06/24/2022 | | MINUTE ORDER: Upon consideration of 45 defendant's consent motion for extension of time to file, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that defendant shall file any pre-trial motions by not later than July 1, 2022, the government shall file any responses by not later than July |

A8

| | | |
|---|---|---|
| | | 22, 2022, and defendant shall file any replies by not later than August 5, 2022. SO ORDERED. Signed by Judge John D. Bates on 6/24/2022. (lcjdb2) (Entered: 06/24/2022) |
| 06/28/2022 | | Set/Reset Deadlines as to LARRY RENDALL BROCK: Motion due by 7/1/2022. Response due by 7/22/2022. Reply due by 8/5/2022. (tb) (Entered: 06/28/2022) |
| 07/01/2022 | 46 | MOTION to Dismiss Count *One* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 07/01/2022) |
| 07/01/2022 | 47 | MOTION to Change Venue *and to Adopt Motion in Related Case* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 07/01/2022) |
| 07/01/2022 | 48 | MOTION to Compel *Discovery* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 07/01/2022) |
| 07/01/2022 | 49 | MOTION to Compel *Discovery on Selective Prosecution* by LARRY RENDALL BROCK. (Attachments: # 1 Exhibit)(Burnham, Charles) (Entered: 07/01/2022) |
| 07/01/2022 | 50 | MOTION for Joinder Motion in Related Case by LARRY RENDALL BROCK. (See Docket Entry 47 to View Document). (zhsj) (Entered: 07/05/2022) |
| 07/05/2022 | 51 | MOTION for a Bill of Particulars by LARRY RENDALL BROCK. (See Docket Entry 46 to View Document). (zhsj) (Entered: 07/05/2022) |
| 07/22/2022 | 52 | RESPONSE by USA as to LARRY RENDALL BROCK re 47 MOTION to Change Venue *and to Adopt Motion in Related Case* (Ayers-Perez, April) (Entered: 07/22/2022) |
| 07/22/2022 | 53 | RESPONSE by USA as to LARRY RENDALL BROCK re 48 MOTION to Compel *Discovery* (Ayers-Perez, April) (Entered: 07/22/2022) |
| 07/22/2022 | 54 | RESPONSE by USA as to LARRY RENDALL BROCK re 46 MOTION to Dismiss Count *One* (Ayers-Perez, April) (Entered: 07/22/2022) |
| 07/22/2022 | 55 | RESPONSE by USA as to LARRY RENDALL BROCK re 49 MOTION to Compel *Discovery on Selective Prosecution* (Ayers-Perez, April) (Entered: 07/22/2022) |
| 07/22/2022 | 56 | MOTION to Adopt Related Case in United States v. McHugh, No. 1:21-cr-453 by USA as to LARRY RENDALL BROCK. (See Docket Entry 52 to View Document). (zhsj) (Entered: 07/25/2022) |
| 08/31/2022 | 57 | ORDER denying 46 defendant's motion to dismiss count I; granting in part and denying in part 47 defendant's motion to adopt motion in other case and for change of venue; denying 48 defendant's motion to compel discovery; and denying 49 motion to compel discovery on selective prosecution. See text of Order and accompanying Memorandum Opinion for details. Signed by Judge John D. Bates on 8/31/2022. (lcjdb3) (Entered: 08/31/2022) |
| 08/31/2022 | 58 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 8/31/2022. (lcjdb3) (Entered: 08/31/2022) |
| 08/31/2022 | | MINUTE ORDER: The parties are hereby ORDERED to appear before the Court for a status conference on September 22, 2022 at 12:00 PM in Telephonic/VTC. SO ORDERED. Signed by Judge John D. Bates on 8/31/2022. (lcjdb2) (Entered: 08/31/2022) |
| 09/01/2022 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Status Conference set for 9/22/2022 at 12:00 PM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 09/01/2022) |
| 09/21/2022 | 59 | MOTION to Continue by LARRY RENDALL BROCK. (Attachments: # 1 Exhibit) (Burnham, Charles) (Entered: 09/21/2022) |

A9

| 09/22/2022 | | Minute Entry for Status Conference as to LARRY RENDALL BROCK held on 9/22/2022 before Judge John D. Bates: Status Report due by 10/6/2022. Bond Status of Defendant: Personal Recognizance; Court Reporter: Bryan Wayne; Defense Attorney: Charles Burnham; US Attorney: Arvind Lal. (zjch, ) (Entered: 09/22/2022) |
|---|---|---|
| 10/06/2022 | 60 | Joint STATUS REPORT by LARRY RENDALL BROCK (Burnham, Charles) (Entered: 10/06/2022) |
| 10/11/2022 | | MINUTE ORDER: Upon consideration of 59 defendant's motion to continue, and the entire record herein, and in light of the fact that this case has been pending for 22 months and defendant has not presented sufficient good cause to further delay its resolution, it is hereby ORDERED that the motion is DENIED. The trial in this case remains set to commence on November 14, 2022. Signed by Judge John D. Bates on 10/11/2022. (lcjdb2) (Entered: 10/11/2022) |
| 10/12/2022 | 61 | NOTICE OF SUBSTITUTION OF COUNSEL by USA as to LARRY RENDALL BROCK. (Meisel, Douglas) Modified Text on 10/13/2022 (zhsj). (Entered: 10/12/2022) |
| 10/18/2022 | | MINUTE ORDER: It is hereby ORDERED that the parties shall file any motions in limine by not later October 26, 2022; it is further ORDERED that the parties shall file proposed voir dire questions and jury instructions by not later than October 31, 2022; it is further ORDERED that the parties shall file responses to motions in limine by not later than November 1, 2022; it is further ORDERED that the parties shall file replies in support of motions in limine by not later than November 4, 2022; and it is further ORDERED that a pretrial conference is set for November 7, 2022 at 11:00 AM in Telephonic/VTC. SO ORDERED. Signed by Judge John D. Bates on 10/18/2022. (lcjdb2) (Entered: 10/18/2022) |
| 10/19/2022 | | Set/Reset Deadlines/Hearings as to LARRY RENDALL BROCK: Motion in Limine due by 10/26/2022. Responses due by 11/1/2022. Replies due by 11/4/2022. Pretrial Conference set for 11/7/2022 at 11:00 AM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 10/19/2022) |
| 10/20/2022 | 62 | MOTION to Strike *Portions of the Superseding Indictment* by USA as to LARRY RENDALL BROCK. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Ayers-Perez, April) (Entered: 10/20/2022) |
| 10/21/2022 | | MINUTE ORDER: It is hereby ORDERED that, by not later than October 28, 2022, defendant shall file a response to 62 the government's motion to strike portions of the superseding indictment. Signed by Judge John D. Bates on 10/21/2022. (lcjdb2) (Entered: 10/21/2022) |
| 10/24/2022 | | Set/Reset Deadlines as to LARRY RENDALL BROCK: Response due by 10/28/2022. (tb) (Entered: 10/24/2022) |
| 10/26/2022 | 63 | First MOTION in Limine by USA as to LARRY RENDALL BROCK. (Ayers-Perez, April) (Entered: 10/26/2022) |
| 10/29/2022 | 64 | RESPONSE by LARRY RENDALL BROCK re 62 MOTION to Strike *Portions of the Superseding Indictment* (Burnham, Charles) (Entered: 10/29/2022) |
| 10/31/2022 | | MINUTE ORDER: Upon consideration of the government's 62 unopposed motion to strike portions of the superseding indictment, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that the language referring to the "Vice President-elect" in Counts Two and Three of the superseding indictment is hereby STRICKEN. SO ORDERED. Signed by Judge John D. Bates on 10/31/2022. (lcjdb2) (Entered: 10/31/2022) |

A10

7/6/23, 1:59 PM                                    District of Columbia live database

| 10/31/2022 | 65 | Proposed Jury Instructions by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 10/31/2022) |
|---|---|---|
| 10/31/2022 | 66 | Proposed Voir Dire by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 10/31/2022) |
| 11/07/2022 | 67 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 11/07/2022) |
| 11/07/2022 |  | MINUTE ORDER: Upon consideration of 63 the government's unopposed motion in limine regarding evidence about the specific locations of U.S. Capitol police surveillance cameras, and the entire record herein, it is hereby ORDERED that the motion is GRANTED for the reasons stated in the hearing on this day. Signed by Judge John D. Bates on 11/7/2022. (lcjdb2) (Entered: 11/07/2022) |
| 11/07/2022 |  | MINUTE ORDER: It is hereby ORDERED that the parties shall file a trial brief, a witness list, and an exhibit list by not later than 4:00 p.m. on November 10, 2022; and it is further ORDERED that the government shall produce all Jencks material by not later than 4:00 p.m. on November 10, 2022. SO ORDERED. Signed by Judge John D. Bates on 11/7/2022. (lcjdb2) (Entered: 11/07/2022) |
| 11/07/2022 |  | Minute Entry: Pretrial Conference as to LARRY RENDALL BROCK held on 11/7/2022 before Judge John D. Bates: Parties discussed posture of case and trial. Oral motion by defendant to convert jury trial to a bench trial; heard and GRANTED. Bench Trial set for 11/14/2022 at 09:15 AM in Courtroom 30A- In Person before Judge John D. Bates. Defendant remains on release. Court Reporter: Lisa Moreira; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez, Douglas Meisel and Barry Disney. (tb) (Entered: 11/08/2022) |
| 11/08/2022 |  | Set/Reset Deadlines as to LARRY RENDALL BROCK: Brief due by 11/10/2022. Exhibit List due by 11/10/2022. Witness List due by 11/10/2022. (tb) (Entered: 11/08/2022) |
| 11/08/2022 |  | Set/Reset Hearings as to LARRY RENDALL BROCK:Status Conference reset for 11/21/2022 at 11:00 AM in Telephonic/VTC before Judge John D. Bates. (tb) (Entered: 11/08/2022) |
| 11/10/2022 | 68 | TRIAL BRIEF by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 11/10/2022) |
| 11/10/2022 | 69 | WITNESS LIST by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 11/10/2022) |
| 11/10/2022 | 70 | EXHIBIT LIST by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 11/10/2022) |
| 11/10/2022 | 71 | EXHIBIT LIST by LARRY RENDALL BROCK (Burnham, Charles) (Entered: 11/10/2022) |
| 11/13/2022 | 72 | EXHIBIT LIST by USA as to LARRY RENDALL BROCK (Ayers-Perez, April) (Entered: 11/13/2022) |
| 11/13/2022 | 73 | EXHIBIT LIST by LARRY RENDALL BROCK (Burnham, Charles) (Entered: 11/13/2022) |
| 11/14/2022 | 74 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 11/14/2022) |

A11

7/6/23, 1:59 PM                                District of Columbia live database

| 11/14/2022 | | Minute Entry: Bench Trial begun as to LARRY RENDALL BROCK on 11/14/2022 before Judge John D. Bates: Opening statements; government witnesses: Sean Patton; Elizabeth Glavey; Nairobi Timberlake; Maggie May Humphrey and John Moore. Bench Trial continued to 11/15/2022 at 09:30 AM in Courtroom 30A- In Person before Judge John D. Bates. Defendant remains on release. Court Reporter: Jodie Hibbard; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez, Douglas Meisel and Barry Disney. (tb) (Entered: 11/14/2022) |
|---|---|---|
| 11/14/2022 | [76](#) | WAIVER of Trial by Jury as to LARRY RENDALL BROCK. Signed by Judge John D. Bates on 11/14/2022. (tb) (Entered: 11/15/2022) |
| 11/15/2022 | [75](#) | NOTICE OF ATTORNEY APPEARANCE Barry Kent Disney, I appearing for USA. (Disney, Barry) (Entered: 11/15/2022) |
| 11/15/2022 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Bench Trial (Judge's oral verdict) set for 11/16/2022 at 10:00 AM in Courtroom 30A- In Person before Judge John D. Bates. (tb) (Entered: 11/15/2022) |
| 11/15/2022 | | Minute Entry: Bench Trial resumed as to LARRY RENDALL BROCK held on 11/15/2022 before Judge John D. Bates: Government witness: John Moore; government rested; Defendant's oral Rule 29 motion; heard and taken under advisement. Defendant rested. Closing arguments. Rulings and verdict shall be rendered on 11/16/2022 at 10:00 before Judge John D. Bates in Courtroom 30A. Defendant remains on release. Court Reporter: Jodie Hibbard; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez, Douglas Meisel and Barry Disney. (tb) (Entered: 11/16/2022) |
| 11/16/2022 | | Minute Entry: Bench Trial concluded as to LARRY RENDALL BROCK on 11/16/2022 before Judge John D. Bates: The Court DENIES the defendant's oral Rule 29 motion. The Court rendered a verdict of GUILTY on all counts. Sentencing memoranda due by 2/7/2023. Sentencing set for 2/14/2023 at 10:30 AM in Courtroom 30A- In Person before Judge John D. Bates. REFERRAL TO PROBATION OFFICE for Presentence Investigation as to LARRY RENDALL BROCK. Court Reporter: Jodie Hibbard; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez, Douglas Meisel and Barry Disney. (tb) (Entered: 11/16/2022) |
| 11/16/2022 | [77](#) | ATTORNEYS' ACKNOWLEDGMENT OF TRIAL EXHIBITS as to LARRY RENDALL BROCK. (tb) (Entered: 11/16/2022) |
| 11/16/2022 | [78](#) | EXHIBIT LIST by USA as to LARRY RENDALL BROCK, (tb) (Entered: 11/21/2022) |
| 12/06/2022 | [79](#) | TRANSCRIPT OF BENCH TRIAL - DAY 1 in case as to LARRY RENDALL BROCK before Judge John D. Bates held on November 14, 2022. Page Numbers: 1 - 221. Date of Issuance: December 6, 2022. Court Reporter: Jodi Hibbard. Telephone number: 315-234-8547. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purcha sed from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

A12

|  |  | Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/6/2023. Release of Transcript Restriction set for 3/6/2023.(Hook, Jeff) (Entered: 12/06/2022) |
|---|---|---|
| 12/06/2022 | 80 | TRANSCRIPT OF BENCH TRIAL - DAY 2 in case as to LARRY RENDALL BROCK before Judge John D. Bates held on November 15, 2022. Page Numbers: 222 - 386. Date of Issuance: December 6, 2022. Court Reporter: Jodi Hibbard. Telephone number: 315-234-8547. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purc hased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/6/2023. Release of Transcript Restriction set for 3/6/2023.(Hook, Jeff) (Entered: 12/06/2022) |
| 12/06/2022 | 81 | TRANSCRIPT OF BENCH TRIAL - DAY 3 in case as to LARRY RENDALL BROCK before Judge John D. Bates held on November 16, 2022. Page Numbers: 387 - 417. Date of Issuance: December 6, 2022. Court Reporter: Jodi Hibbard. Telephone number: 315-234-8547. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purc hased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/6/2023. Release of Transcript Restriction set for 3/6/2023.(Hook, Jeff) (Entered: 12/06/2022) |
| 01/17/2023 | 82 | DRAFT PRESENTENCE INVESTIGATION REPORT (prepared by USPO Kelli Willett) as to LARRY RENDALL BROCK(Kraemer-Soares, Kelly) (Entered: 01/17/2023) |
| 02/06/2023 | 84 | FINAL PRESENTENCE INVESTIGATION REPORT (prepared by USPO Kelli Willett) as to LARRY RENDALL BROCK(Kraemer-Soares, Kelly) (Entered: 02/06/2023) |
| 02/06/2023 | 85 | RECOMMENDATION of FINAL PRESENTENCE INVESTIGATION REPORT (prepared by USPO Kelli Willett) as to LARRY RENDALL BROCK(Kraemer-Soares, Kelly) (Entered: 02/06/2023) |
| 02/06/2023 | 86 | MOTION to Continue *Sentencing* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 02/06/2023) |

A13

| | | |
|---|---|---|
| 02/07/2023 | | MINUTE ORDER: Upon consideration of 86 defendant's unopposed motion to continue sentencing, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that sentencing is RESCHEDULED to March 17, 2023 at 11:00 a.m. in Courtroom 30A; and it is further ORDERED that sentencing memoranda are to be filed by not later than the end of the business day on March 10, 2023. SO ORDERED. Signed by Judge John D. Bates on 2/7/2023. (lcjdb2) (Entered: 02/07/2023) |
| 02/14/2023 | | Set/Reset Hearings as to LARRY RENDALL BROCK: Sentencing reset for 3/17/2023 at 11:00 AM in Courtroom 30A- In Person before Judge John D. Bates. (tb) (Entered: 02/14/2023) |
| 03/10/2023 | 87 | MOTION to Continue *Sentencing* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 03/10/2023) |
| 03/10/2023 | 88 | SENTENCING MEMORANDUM by USA as to LARRY RENDALL BROCK (Attachments: # 1 Appendix)(Ayers-Perez, April) (Entered: 03/10/2023) |
| 03/11/2023 | 90 | STRICKEN FROM THE RECORD PURSUANT TO MINUTE ORDER FILED ON 03/16/2023.....SENTENCING MEMORANDUM by LARRY RENDALL BROCK (Attachments: # 1 Exhibit letters, # 2 Exhibit chart)(Burnham, Charles) Modified on 3/17/2023 (tb). (Entered: 03/11/2023) |
| 03/12/2023 | | MINUTE ORDER: Upon consideration of 87 defendant's motion to continue sentencing, and the entire record herein, it is hereby ORDERED that the government shall file a response stating its position by not later than March 13, 2023. Signed by Judge John D. Bates on 3/12/2023. (lcjdb2) (Entered: 03/12/2023) |
| 03/12/2023 | | MINUTE ORDER: Upon consideration of 89 defendant's motion for leave to file his sentencing memorandum under seal, and the entire record herein, it is hereby ORDERED that the motion is DENIED; and it is further ORDERED that defendant shall file a public version of his sentencing memorandum redacting only the addresses and phone numbers of those who wrote letters on his behalf by not later than March 13, 2023. SO ORDERED. Signed by Judge John D. Bates on 3/12/2023. (lcjdb2) (Entered: 03/12/2023) |
| 03/13/2023 | 91 | MOTION for Reconsideration *On Order Regarding Redactions or in the Alternative for One Day Extension to File Revised Sentencing Materials* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 03/13/2023) |
| 03/13/2023 | | MINUTE ORDER: Upon consideration of 91 defendant's motion to reconsider the Court's March 12, 2023 Order denying his motion for leave to file under seal his sentencing memorandum, and the entire record herein, it is hereby ORDERED that the motion is DENIED; and it is further ORDERED that defendant shall file a public version of his sentencing memorandum redacting only the addresses and phone numbers of those who wrote letters of support on his behalf by not later than March 15, 2023. SO ORDERED. Signed by Judge John D. Bates on 3/13/2023. (lcjdb2) (Entered: 03/13/2023) |
| 03/13/2023 | 92 | RESPONSE by USA as to LARRY RENDALL BROCK re 87 MOTION to Continue *Sentencing* (Ayers-Perez, April) (Entered: 03/13/2023) |
| 03/14/2023 | | MINUTE ORDER: Upon consideration of 87 defendant's motion to continue sentencing, and the entire record herein, it is hereby ORDERED that the motion is DENIED. Signed by Judge John D. Bates on 3/14/2023. (lcjdb2) (Entered: 03/14/2023) |
| 03/15/2023 | | Set/Reset Deadlines as to LARRY RENDALL BROCK: Response due by 3/13/2023. (tb) (Entered: 03/15/2023) |

A14

7/6/23, 1:59 PM                    District of Columbia live database

| 03/15/2023 | 93 | REPLY by LARRY RENDALL BROCK re 88 Sentencing Memorandum. (Burnham, Charles) Modified Text on 3/17/2023 (zhsj). (Entered: 03/15/2023) |
| 03/15/2023 | 94 | MOTION for Permission to Withdraw Perviously Filed Sentencing Memorandum and Substitute Amended Sentencing Memorandum by LARRY RENDALL BROCK. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit Amended Sentencing Memo) (Burnham, Charles) Modified Event on 3/16/2023 (zhsj). (Entered: 03/15/2023) |
| 03/16/2023 | 95 | PRETRIAL COMPLIANCE REPORT as to LARRY RENDALL BROCK. This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 03/16/2023) |
| 03/16/2023 | | MINUTE ORDER: Upon consideration of 94 defendant's motion to withdraw 90 his previously filed sentencing memorandum and replace it with [94-1], [94-2], and [94-3], and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that 90 shall be STRICKEN from the docket; and it is further ORDERED that [94-1], [94-2], and [94-3] are deemed filed as defendant's sentencing memorandum and part of the record. SO ORDERED. Signed by Judge John D. Bates on 3/16/2023. (lcjdb2) (Entered: 03/16/2023) |
| 03/16/2023 | 96 | AMENDED SENTENCING MEMORANDUM by LARRY RENDALL BROCK (Attachments: # 1 Exhibit 1 Letter, # 2 Exhibit 2 Portland Federal Courthouse Cases) (zhsj) (Entered: 03/20/2023) |
| 03/17/2023 | | Minute Entry: Sentencing held on 3/17/2023 as to LARRY RENDALL BROCK (1) held before Judge John D. Bates all counts of the Superseding Indictment:Count(s) 1s: Defendant sentenced to TWENTY-FOUR (24) months on Count 1s to run concurrently with Counts 2s, 3s, 4s, 5s and 6s. No period of supervised release imposed. Special Assessement of $10.00; Count(s) 2s: Defendant sentenced to TWELVE (12) months on Count 2s to run concurrently with Counts 1s, 3s, 4s, 5s and 6s. TWELVE (12) months of Supervised to run concurrently with Counts 1s and 3s. Special Assessement of $25.00; Count(s) 3s: Defendant sentenced to TWELVE (12) months on Count 3s to run concurrently with Counts 1s, 2s, 4s, 5s and 6s. TWELVE (12) months of Supervised to run concurrently with Counts 1s and 2s. Special Assessement of $25.00; Count(s) 4s: Defendant sentenced to SIX (6) months on Count 4s to run concurrently with Counts 1s, 2s, 3s, 5s and 6s. No period of supervised release imposed. Special Assessement of $10.00; Count(s) 5s: Defendant sentenced to SIX (6) months on Count 5s to run concurrently with Counts 1s, 2s, 3s, 4s and 6s. No period of supervised release imposed. Special Assessement of $10.00.; Count(s) 6, Oral motion by government to dismiss count; heard and GRANTED; Count(s) 6s: Defendant sentenced to SIX (6) months on Count 4s to run concurrently with Counts 1s, 2s, 3s, 4s, 5s. No period of supervised release imposed. Special Assessement of $10.00. Defendant remains on release. Court Reporter: Elizabeth Saint Loth; Defense Attorney: Charles Burnham; US Attorney: April Ayers-Perez and Douglas Meisel; Probation: Kelli Willett. (tb) Modified on 4/20/2023 (tb). (Entered: 03/21/2023) |
| 03/17/2023 | 97 | Parties Obligation and Response to Presentence Report by LARRY RENDALL BROCK. (tb) (Entered: 03/21/2023) |
| 03/20/2023 | 98 | JUDGMENT as to LARRY RENDALL BROCK. Statement of Reasons Not Included. Signed by Judge John D. Bates on 3/20/2023. (zhsj) (Entered: 03/22/2023) |
| 03/20/2023 | 99 | STATEMENT OF REASONS as to LARRY RENDALL BROCK re 98 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge John D. Bates on 3/20/2023. (zhsj) (Entered: 03/22/2023) |

A15

| 03/28/2023 | [100](#) | NOTICE OF APPEAL - Final Judgment by LARRY RENDALL BROCK Filing fee $ 505, receipt number ADCDC-9958298. Fee Status: Fee Paid. Parties have been notified. (Burnham, Charles) (Entered: 03/28/2023) |
| 03/28/2023 | [101](#) | MOTION for Bond /*Release Pending Appeal* by LARRY RENDALL BROCK. (Attachments: # [1](#) Exhibit Chart of Sentences)(Burnham, Charles) (Entered: 03/28/2023) |
| 03/30/2023 | [102](#) | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to LARRY RENDALL BROCK re [100](#) Notice of Appeal - Final Judgment. (ztnr) (Entered: 03/30/2023) |
| 03/30/2023 | [103](#) | ENTERED IN ERROR.....Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid on 3/17/2023. Sentencing on 3/17/2023 as to LARRY RENDALL BROCK re [100](#) Notice of Appeal - Final Judgment. (zhsj) Modified on 3/30/2023 (zhsj). (Entered: 03/30/2023) |
| 03/30/2023 | | NOTICE OF ERROR as to LARRY RENDALL BROCK regarding [103](#) Transmission of Notice of Appeal and Docket Sheet to USCA as a Duplicate. (zhsj) (Entered: 03/30/2023) |
| 04/13/2023 | [104](#) | MOTION Treat Motion for Release Pending Appeal As Conceded *and Supplement to Original Motion* by LARRY RENDALL BROCK. (Burnham, Charles) (Entered: 04/13/2023) |
| 04/13/2023 | [105](#) | RESPONSE by USA as to LARRY RENDALL BROCK re [104](#) MOTION Treat Motion for Release Pending Appeal As Conceded *and Supplement to Original Motion*, [101](#) MOTION for Bond /*Release Pending Appeal* (Attachments: # [1](#) Motion for Leave)(Ayers-Perez, April) (Entered: 04/13/2023) |
| 04/14/2023 | | MINUTE ORDER: Upon consideration of [104](#) defendant's motion to treat [101](#) his motion for release pending appeal as uncontested, and the entire record herein, is it hereby ORDERED that the motion is denied, and the Court will accordingly consider [105](#) the government's opposition in resolving the motion; and it is further ORDERED that defendant shall file any reply in support of [101](#) his motion for release pending appeal by not later than the close of business on April 17, 2023. SO ORDERED. Signed by Judge John D. Bates on 4/14/2023. (lcjdb2) (Entered: 04/14/2023) |
| 04/14/2023 | | Set/Reset Deadlines as to LARRY RENDALL BROCK: Reply due by 4/17/2023. (tb) (Entered: 04/14/2023) |
| 04/17/2023 | [106](#) | REPLY TO OPPOSITION to Motion by LARRY RENDALL BROCK re [101](#) MOTION for Bond /*Release Pending Appeal* (Burnham, Charles) (Entered: 04/17/2023) |
| 04/20/2023 | [107](#) | ORDER denying [101](#) defendant's motion for release pending appeal. See text of Order for details. Signed by Judge John D. Bates on 4/20/2023. (lcjdb2) (Entered: 04/20/2023) |
| 04/21/2023 | [108](#) | MOTION Extend BOP Surrender Date by LARRY RENDALL BROCK. (Attachments: # [1](#) Text of Proposed Order)(Burnham, Charles) (Entered: 04/21/2023) |
| 04/21/2023 | [109](#) | RESPONSE by USA as to LARRY RENDALL BROCK re [108](#) MOTION Extend BOP Surrender Date (Ayers-Perez, April) (Entered: 04/21/2023) |
| 04/21/2023 | [110](#) | ORDER granting [108](#) defendant's motion to extend self-reporting date. See text of Order for details. Signed by Judge John D. Bates on 4/21/2023. (lcjdb2) (Entered: 04/21/2023) |
| 04/24/2023 | [111](#) | Transmitted Supplemental Record on Appeal and Docket Sheet to USCA Order Denying Defendant's Motion for Release Pending Appeal as to LARRY RENDALL BROCK re [100](#) Notice of Appeal - Final Judgment. (zhsj) (Entered: 04/24/2023) |
| 05/09/2023 | | USCA Case Number as to LARRY RENDALL BROCK 23-3045 for [100](#) Notice of Appeal - Final Judgment filed by LARRY RENDALL BROCK. (zhsj) (Entered: |

A16

| | | |
|---|---|---|
| | | 05/09/2023) |
| 06/30/2023 | [112](#) | TRANSCRIPT OF PROCEEDINGS, in case as to LARRY RENDALL BROCK, before Judge John D. Bates, held on 3-17-2023. Page Numbers: 1 - 99. Date of Issuance: 6-30-2023. Court Reporter: Elizabeth Saint-Loth, Telephone number: 202-354-3242. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/21/2023. Redacted Transcript Deadline set for 7/31/2023. Release of Transcript Restriction set for 9/28/2023.(Saint-Loth, Elizabeth) (Entered: 06/30/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/06/2023 13:59:00 | | |
| **PACER Login:** | cburnham123 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00140-JDB |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

A17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

JUN 2 3 2021

Clerk, U.S. District and
Bankruptcy Courts

Holding a Criminal Term

Grand Jury Sworn in on January 8, 2021

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 21-CR-140 (JDB) |
| | : | |
| v. | : | |
| | : | |
| LARRY BROCK, | : | VIOLATIONS: |
| | : | 18 U.S.C. §§ 1512(c)(2), 2 |
| Defendant. | : | (Obstruction of an Official Proceeding) |
| | : | 18 U.S.C. § 1752(a)(1) |
| | : | (Entering and Remaining in a Restricted |
| | : | Building or Grounds) |
| | : | 18 U.S.C. § 1752(a)(2) |
| | : | (Disorderly and Disruptive Conduct in a |
| | : | Restricted Building or Grounds) |
| | : | 40 U.S.C. § 5104(e)(2)(A) |
| | : | (Entering and Remaining on the Floor of |
| | : | Congress) |
| | : | 40 U.S.C. § 5104(e)(2)(D) |
| | : | (Disorderly Conduct in a Capitol |
| | : | Building) |
| | : | 40 U.S.C. § 5104(e)(2)(G) |
| | : | (Parading, Demonstrating, or Picketing in |
| | : | a Capitol Building) |

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

On or about January 6, 2021, within the District of Columbia and elsewhere, **LARRY BROCK**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College

A18

vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§

15-18.

    (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title
18, United States Code, Sections 1512(c)(2) and 2)

<div align="center">

**COUNT TWO**

</div>

    On or about January 6, 2021, within the District of Columbia, **LARRY BROCK**, did

knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off,

and otherwise restricted area within the United States Capitol and its grounds, where the Vice

President and Vice President-elect were temporarily visiting, without lawful authority to do so.

    (**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18,
United States Code, Section 1752(a)(1))

<div align="center">

**COUNT THREE**

</div>

    On or about January 6, 2021, within the District of Columbia, **LARRY BROCK**, did

knowingly, and with intent to impede and disrupt the orderly conduct of Government business and

official functions, engage in disorderly and disruptive conduct in and within such proximity to, a

restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area

within the United States Capitol and its grounds, where the Vice President and Vice President-

elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the

orderly conduct of Government business and official functions.

    (**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation
of Title 18, United States Code, Section 1752(a)(2))

<div align="center">

2

</div>

<div align="center">

A19

</div>

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia, **LARRY BROCK**, willfully and knowingly entered and remained on the floor of a House of Congress without authorization to do so.

**(Entering and Remaining on the Floor of Congress**, in violation of Title 40, United States Code, Section 5104(e)(2)(A))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia, **LARRY BROCK**, willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of, a committee of Congress or either House of Congress.

**(Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

## COUNT SIX

On or about January 6, 2021, within the District of Columbia, **LARRY BROCK**, willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol Building.

**(Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(G))

A TRUE BILL:


FOREPERSON.


*Channing D. Phillips / Rw #*

Attorney of the United States in
and for the District of Columbia.

3

A20

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|                        |   |                   |
|------------------------|---|-------------------|
| United States          | ) |                   |
|                        | ) |                   |
|             v.         | ) | NO.  1:21cr140    |
|                        | ) |                   |
| Larry Brock            | ) |                   |
|                        | ) |                   |
|                        | ) |                   |
|         Defendant.     | ) |                   |

## MOTION TO DISMISS COUNT I OR IN THE ALTERNATIVE FOR A BILL OF PARTICULARS

### BACKGROUND

Mr. Brock is charged in a six count indictment with Obstruction of an Official Proceeding (18 U.S.C. § 1512), Entering and Remaining in a Restricted Building or grounds (18 U.S.C. § 1752), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, (18 U.S.C. § 1752), Entering and Remaining on the Floor of Congress, (40 5104(e)(2)(A)), Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)), and Parading, Demonstrating or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)).

Mr. Brock traveled to Washington, D.C. to participate in the permitted First Amendment demonstration that took place on January 6.  Based on government discovery productions, there is no allegation that Mr. Brock forcibly entered the capitol or engaged in property destruction or violence.  All video footage shows him behaving in a peaceable manner.

A21

## ARGUMENT

### I.   Count I Should be Dismissed Because § 1512(c) Only Applies to Documents, Records and Other Objects

In *United States v Miller*, Judge Nichols dismissed a § 1512(c) count in a January 6 case, holding that the statute only applied to obstruction with regard to documents, records, and other objections.  2022 WL 823070 (D.D.C. March 7, 2022).  Mr. Brock is aware that this Court reached a different conclusion in *United States v. McHugh*, 21cr453 (D.D.C. May 2, 2022) ECF 64.  Mr. Brock respectfully disagrees with the Court's conclusion in *McHugh* and submits that Count I should be dismissed for the reasons offered in *Miller*.

### II.   § 1512(c) Does Not Apply to the Conduct Alleged Against Mr. Brock

A defendant in a criminal case may move to dismiss the indictment against him on the ground that the it does not apply to the charged conduct.   *United States v. Montgomery*, 2021 WL 6134591, at *1 (D.D.C., Dec 28, 2021).  Here, § 1512(c)(2) criminalizes "obstruct[ing], influenc[ing], or impeding any official proceed[ing], or attempt[ing] to do so."

The official proceeding in question here is "Congress's certification of the Electoral College vote."  The indictment does not allege which acts by Mr. Brock constituted attempts to obstruct this proceeding.  Based on discovery productions, it does not appear that the government is going to allege that Mr. Brock entered the United States Capitol until after this proceeding had adjourned.  The government is not expected to allege that any of his actions were the cause of the proceeding's adjournment.  It would therefore appear that Count I "does not apply to the charged conduct."

To be sure, a district court considering a defense motion to dismiss does not

typically "review the sufficiency of the evidence." *United States v. McHugh*, 2022 WL 296304, at *3 (D.D.C.).  However, where particular facts essential to the motion are not disputed, there would seem to be no obstacle to deciding the matter at the pretrial stage.  Unless the government can proffer some act by Mr. Brock which, if proven, would constitute an attempt to obstruct the joint session, Count I should be dismissed.

### III.    In the Alternative, this Court Should Order the Government to Provide a Bill of Particulars Specifying How Mr. Brock is Alleged to Have Obstructed the Joint Session

If this Court is not prepared to dismiss Count I at this stage, the proper alternative is to order the government to provide a Bill of Particulars.  Under Rule 7(f), "a bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges [and] to prepare a defense." *United States v. Concord Mgmt. & Consulting LLC*, 385 F.Supp. 3d 69, 73 (D.D.C. 2019).

This standard is met here.  Mr. Brock is differently situated from those January 6 defendants accused of having struggled with police or broken windows to gain access to the Capitol grounds.  The evidence will show that he did not arrive on the scene until well after police began allowing people to enter the Capitol, and the Congressmen and Senators had departed.  The indictment makes no allegations as to which of his actions could have been obstructive of a proceeding that had already adjourned.  A bill of particulars is therefore necessary to allow him to prepare his defense.

## CONCLUSION

For the foregoing reasons, the defendant asks this Court dismiss Count I or in the alternative to order the government to provide a Bill of Particulars.

Respectfully Submitted,

By:

/s/ *Charles Burnham*
Charles Burnham VSB # 72781
*Attorney for the Accused*
Burnham & Gorokhov, PLLC
1424 K St. NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 765-2173
charles@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

I have served this filing on the government through the ecf system.

Respectfully Submitted,

By: /s/ *Charles Burnham*
Charles Burnham VSB # 72781
*Attorney for the Accused*
Burnham & Gorokhov, PLLC
1424 K St. NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 765-2173 (fax)
charles@burnhamgorokhov.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-CR-140 (JDB)** |
| v. | : | |
| | : | |
| LARRY BROCK, | : | |
| | : | |
| Defendant. | : | |

----------------------------------------------------------------------------------------------------

### OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT 1:
### OBSTRUCTION OF AN OFFICIAL PROCEEDING

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby respectfully submits this opposition to the defendant's motion to

dismiss Count One: Obstruction of an Official Proceeding. The Defendant's motion should be

denied because 18 U.S.C. § 1512(c)(2) applies to non-evidentiary obstruction, it applies to

Brock's alleged conduct, and a bill of particulars is unwarranted.

### PROCEDURAL POSTURE

Defendant, Larry Brock, is charged with one count in violation of 18 U.S.C. § 1512(c)(2),

2 (Obstruction of an Official Proceeding) (Count One); one count in violation of 18 U.S.C. §

1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) (Count Two); one

count in violation of 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted

Building or Grounds) (Count Three); one count in violation of 40 U.S.C. § 5104(e)(2)(A)

(Entering and Remaining on the Floor of Congress) (Count Four); one count in violation of 40

U.S.C. §5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) (Count Five); and one count

in violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol

Building) (Count Six). On July 1, 2022, Defendant filed a motion to dismiss Count I of the

1

A27

superseding indictment which charges him with violating 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding). *See* Def.'s Mot. To Dismiss, 1-3.

## **LEGAL STANDARD**

### Federal Rule of Criminal Procedure 12(b)(3)(B)(v)

Under Fed. R. Crim. P. 12(b)(3)(B)(v), defendants may move to dismiss an indictment for "failure to state an offense." An indictment may fail to state an offense if the statutory provision at issue does not apply to the charged conduct. *McHugh*, 2022 WL 1302880, at 2* (citing Montgomery, 2021 WL 6134591, at 1*). However, because dismissal encroaches on the grand jury's role, courts must only dismiss indictments under unusual circumstances. *U.S. v. Ballestas*, 795 F.3d 138, 148-49 (D.C. Cir. 2015) (citing *Whitehouse v. U.S. Dist. Court*, 53 F.3d 1349, 1360 (1st Cir. 1995) (internal citations omitted). When considering a motion to dismiss, courts must assume that all factual allegations in the indictment are true and ask whether those allegations, if true, would be legally sufficient to allow a jury to find that the defendant committed the charged crimes. *U.S. v. Bowdoin*, 770 F. Supp.2d 142, 146 (D.D.C. 2011) (citing *U.S. v. Sampson*, 371 U.S. 75, 76 (1962)); *McHugh*, 2022 WL 1302880, at 3*.

### Federal Rule of Criminal Procedure 7(f)

Federal Rule of Criminal Procedure 7(f) says that a court may direct the government to file a bill of particulars. Fed. R. Crim. P. 7(f). "The determination of whether a bill of particulars is necessary 'rests within the sound discretion of the trial court.'" *U.S. v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (quoting *U.S. v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987)). Defendants are not entitled to a bill of particulars, but courts should grant it upon finding it *necessary*. *U.S. v. Mosquera-Murillo*, 153 F. Supp 130, 146 (D.D.C. 2015) (citing Charles Alan Wright & Andrew Leipold, Federal Practice and Procedure: Criminal § 130 (4th ed. 2008)). A bill of particulars is

A28

not required when the indictment is sufficiently specific, or the requested information is available in some other form. *Butler*, 822 F.2d at 1193. A bill of particulars cannot be used as a discovery tool or tactic for previewing the government's case. *U.S. v. Sutton*, No. 21-0598, 2022 WL 1183797, at 2* (D.D.C. Apr. 21, 2022) (citing *Mejia*, 448 F.3d at 445 and *U.S. v. Sanford Ltd.*, 841 F. Supp. 2d 309, 316 (D.D.C. 2012)). Instead, it is solely designed to help defendants understand the charges against them and prepare defenses. *Id.*

## ARGUMENT

**I.    Count I should not be dismissed because § 1512(c)(2) applies to any conduct which obstructs, influences, or impedes an official proceeding.**

      Although Defendant's motion to dismiss characterizes his narrow interpretation of § 1512(c)(2) as one of two opposing views in this district, this characterization is quite misleading. In fact, Defendant's position goes against the heavy weight of authority on the issue in this district.[1] As this Court has already done, it should reject Defendant's crabbed interpretation of § 1512(c)(2) and deny his motion to dismiss.

<p align="center">Plain text</p>

      The text of the § 1512(c) provides that:

        (c) Whoever corruptly-

---

[1] *Compare U.S. v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at 11* (D.D.C. Dec. 20, 2021) (Mehta, J.), *and U.S. v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at 5* (D.D.C. Dec. 10, 2021) (Friedrich, J.), *and U.S. v. Robertson*, No. 21-cr-34, 2022 WL 2438546, at 3* (D.D.C. July 5, 2022) (Cooper, J.), *and U.S. v. Mostofsky*, No. 21-138, 2021 WL 6049891, at 11* (D.D.C. Dec. 21, 2021) (Boasberg, J.), *and U.S. v. Montgomery*, No. 21-46, 2021 WL 6134591, at 10* (D.D.C. Dec. 28. 2021) (Moss, J.), *and U.S. v. Nordean*, No. 21-175, 2021 WL 6134595, at 6* (D.D.C. Dec. 28, 2021) (Kelly, J.), *and U.S. v. Grider*, No. 21-0022, 2022 WL 392307, at 5* (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.), *and U.S. v. McHugh*, No. 21-453, 2022 WL 1302880, at 2* (D.D.C. May 2, 2022) (Bates, J.), *and U.S. v. Bingert*, No. 1:21-cr-91-RCL, 2022 WL 1659163, at 7* (D.D.C. May 25, 2022) (Lamberth, J.), *and U.S. v. Fitzsimons*, No. 21-158, 2022 WL 1698063, at 6* (D.D.C. May 26, 2022) (Contreras, J.), *with U.S. v. Miller*, No. 1:21-cr-00119, 2022 WL 823070, at 6* (D.D.C. Mar. 7, 2022) (Nichols, J.), *appeal docketed*, No. 22-3041 (D.C. Cir. June 28, 2022).

<p align="center">3</p>

<p align="center">A29</p>

1) alters, destroys, mutilates, or conceals a record, document, or other
   object, or attempts to do so, with the intent to impair the object's
   integrity or availability for use in an official proceeding; *or*
2) otherwise obstructs, influences, or impedes any official proceeding, or
   attempts to do so,
   shall be fined under this title or imprisoned not more than 20
   years, or both

18 U.S.C. § 1512(c). As this Court has noted, a plain reading of the statute indicates that conduct

that obstructs, influences, or impedes an official proceeding *in a different way* than the conduct

enumerated in § 1512(c)(1) is covered by (c)(2). *McHugh*, 2022 WL 1302880, at 3* (citing

Oxford English Dictionary (3d ed. 2004)). Section 1512(c)(2) therefore covers conduct aimed at

the proceeding itself, without limitation to conduct listed in (c)(1), comes from the use of the

verbs "obstructs," "influences," and "impedes." *See Montgomery*, 2021 WL 6134591, at 14*

("[T]he Court might ask here: How anyone could . . . "obstruct[], influence[], or impede[]" "a

record, document, or other object"").

Defendant's reliance on *Miller* for a contrary conclusion is unpersuasive. The ejusdem

generis canon of construction, which underlies the *Miller* decision, is inapt for § 1512(c) because

it applies only to enumerations that end in a generic term. *McHugh*, 2022 WL 1302880, at 3*

(citing *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021)). In contrast to

ejusdem generis-appropriate enumerations, § 1512(c) has two separate paragraphs with a

semicolon separating "otherwise" from (c)(1) and with distinct sets of verbs and direct objects.

*Id*. at 4*; *Caldwell*, 2021 WL 6062718, at 18*; *Mostofsky*, 2021 WL 6049891, at 11*.

*Miller*'s reliance on *Begay v. United States*, 553 U.S. 137 (2007), in its reasoning is

similarly misplaced for two main reasons. First, § 1512(c) is readily distinguishable from §

924(e)(2)(b)(ii), the statute at issue in *Begay*. Unlike in § 924(e)(2)(b)(ii), the "otherwise" in §

1512(c) is set off by a semicolon and a line break, and the provision is quite grammatically

4

A30

distinct. 18 U.S.C. § 924(e)(2)(b)(ii); § 1512(c); *see McHugh*, 2022 WL 1302880, at 4* (citing Caldwell 2021 WL 6062718, at 14*); *Montgomery*, 2021 WL 6134591, at 12* (noting that the two provisions in § 1512 do not overlap in the same way they do in § 924(e)(2)(b)(ii) because (c)(2) directly aims at the official proceeding and (c)(1) indirectly aims at it). Second, *Begay* is not dispositive of the word "otherwise" since the issue in the case did not turn on its meaning. *See Bingert*, 2022 WL 1659163, at 8* ("No Justices contend that the term "otherwise," on its own, somehow limits the scope of a statute so that the antecedent clause is limited by what precedes 'otherwise'"); *see also Begay*, 553 U.S. at144  ("[T]he word 'otherwise' can (we do not say must) refer to a crime that is similar to the listed examples in some respects but different in others").

As this Court has noted, a more comprehensive interpretation of § 1512(c) gives effect to the word "otherwise" in a way that the interpretation advanced in *Miller* does not. *McHugh*, 2022 WL 1302880, at 5-6.* If Congress wanted to limit the statute to physical evidence integrity, there would have been no need to include language about *otherwise* obstructing, influencing, or impeding the official proceeding *itsef. See Montgomery*, 2021 WL 6134591, at 12* (pointing out that Congress could have used "engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding" if it wanted to have a catch-all provision limited only to evidence-related conduct). As this Court pointed out, statutes similar to § 1512(c), like 28 U.S.C. § 2466(a) and 18 U.S.C. § 1952(a), have been interpreted as using "otherwise" as a catch-all to capture conduct not specifically enumerated, but plainly envisioned, and this is, in fact, the whole point of a catch-all. *See McHugh*, 2022 WL 1302880, at 5* (*citing Collazos v. U.S.,* 368 F.3d 190, 200 (2d Cir. 2004)).

A31

For all the reasons explained above, the plain text of § 1512(c) indicates that (c)(2) is not limited by the language of (c)(1) to documents, records, and other objects, but instead covers any conduct which obstructs, influences, or impedes the official proceeding itself.[2]

<div align="center">Context and Purpose</div>

In addition to its plain text, § 1512(c)(2)'s context and purpose also militate against dismissal. The statutory context and overlap with other statutes in § 1512 do not provide evidence of an intent to narrow the scope of § 1512(c)(2), as *Miller* suggests. Overlap like the kind in § 1512 is both common in criminal law and not the kind of overlap that the canon against surplusage disfavors. *See McHugh*, 2022 WL 1302880, at 7* ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct" (quoting *Hubbard v. U.S.,* 514 U.S. 695, 714 n.14 (1995))); *Sandlin*, 2021 WL 5865006, at 8* (stating that the canon against surplusage does not favor "substituting of one instance of superfluous language for another" (quoting *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013))). As this Court observed, even *Miller*'s narrow interpretation of § 1512(c)(2) would overlap with seven other § 1512 provisions, undercutting the argument that the canon against surplusage in any way favors Defendant's interpretation. *McHugh*, 2022 WL 1302880, at 7*.

Defendant also draws support from § 1512's historical development and legislative history. As an initial matter, "neither sheds much light" on Section 1512(c)(2)'s scope. *Reffitt*, 2022 WL 1404247, at *9. What illumination historical context and legislative history does offer favors the view that Section 1512(c)(2) "creates direct liability for an individual's obstructive acts beyond those relating to physical evidence." *Id.* For example, the relevant verbs in Section

---

[2] Even if this Court found that § 1512(c) should be limited to obstructing evidentiary material, the statute would still cover Defendant's conduct, as he was found on the Senate floor rifling through Senator's paperwork.

<div align="center">A32</div>

1512(c)(2)—"obstruct[]," "influence[]," and "impede[]"—were "likely adapted" from the

"expansive prohibitions" on obstruction found in 18 U.S.C. § 1503(a) and 18 U.S.C. § 1505. *See*

*McHugh*, 2022 WL 1302880, at *10.  That "broader reading," moreover, finds support in floor

statements of the lawmakers that enacted Section 1512(c)(2). *See id.* at *12.  And to the extent

Congress's enactment of Section 1512(a)(2)(B) just three months after the enactment of Section

1512(c) might tend to undermine the plain-language interpretation of Section 1512(c)(2), *see*

Opp. 20-21,  the fact that Section 1512(a)(2) was "written and first approved" a year earlier than

it was enacted—and therefore nine months before Section 1512(c)(2) was enacted—"somewhat

undermines the inference" based on Section 1512(a)(2) that *Miller* drew about Section

1512(c)(2)'s scope. *McHugh*, 2022 WL 1302880, at *9 n.17.

     Finally, as this Court correctly pointed out, if Congress wanted to draft the narrow catch-

all provision that Defendant insists on, it knew perfectly well how to do so. *See McHugh*, 2022

WL 1302880, at 10* ("Whoever . . . willfully withholds, misrepresents, removes from any place,

conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary

material . . . [s]hall be fined under this title . . ." (quoting 18 U.S.C. § 1505)). The fact that

instead of using language like § 1505, Congress chose to use expansive language demonstrates

that it intended to capture broadly obstructive conduct aimed at the proceedings themselves. *See*

*Sandlin*, 2021 WL 5865006, at 5* (referring to the terms of § 1512(c)(2) as "expansive"). This

Court should give full effect to Congress's clear intent by broadly construing § 1512(c)(2) based

on the broad language Congress intentionally chose to put in it.

     Nothing in § 1512(c)(2)'s context, purpose, or history warrants a departure from the plain

breadth of its text. The language of § 1512 (c)(2) unambiguously covers conduct that obstructs

official proceedings in a way that is different from, and not limited by (c)(1)'s prohibition of

A33

obstructive behavior concerning documents, records, and other objects. Because the statute is clear, there is no need to resort to the rule of lenity to resolve the issue. Therefore, Count I should not be dismissed because it applies to conduct aimed at the official proceeding itself, not simply documents, records, and other objects.

## II.    § 1512(c) squarely applies to Brock's alleged conduct on January 6, 2021.

The facts contained in the Superseding Indictment, if proven, are sufficient to allow a jury to find that Defendant committed Obstruction of an Official Proceeding under § 1512(c)(2). Specifically, the Superseding Indictment alleges that Defendant "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." *See* Superseding Indictment, 1-2.

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here. Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of

A34

civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural

mechanism that resembles a motion for summary judgment in the civil context"); *United States*

*v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020)

(collecting cases explaining that there is no summary judgment procedure in criminal cases or

one that permits pretrial determination of the sufficiency of the evidence). Accordingly,

dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a

criminal defendant may move for dismissal based on a defect in the indictment, such as a failure

to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether

an indictment fails to state an offense because an essential element is absent calls for a legal

determination.

Under these principles, Defendant's speculation that the proof will fail to establish that he

caused the Certification proceeding to adjourn is premature. In any event, whether Defendant

entered the Capitol before the proceeding adjourned is immaterial to the charges against him. A

violation of § 1512(c)(2) requires showing that a defendant corruptly obstructed, influenced, or

impeded an official proceeding. It depends in no way on Defendant's precise geographical

location at some particular time.

**III.      Defendant's motion for a Bill of Particulars should be denied.**

Although Defendant's motion to dismiss claims not to have enough information to

prepare a defense, it simultaneously references the very conduct which obstructed the official

proceeding. Brock Mot. To Dismiss, 3. The superseding indictment and evidence produced in

discovery make abundantly clear what conduct Defendant engaged in, which obstructed the

proceeding. Defendant forcefully entered the Capitol as part of a mob during Congress's

certification of the Electoral College vote. He entered the Senate chamber where the proceeding

A35

had been taking place and appeared to exit from the office of the Speaker of the House. It is irrelevant that he entered after the proceeding had adjourned because the very reason it adjourned was the threat of the collective mob that Defendant was a part of. Defendant cannot extricate himself from the collective threat the mob posed to members of Congress and the Vice President, which was precisely the threat that caused the proceeding to halt. Because it is clear from the evidence produced by the government and the Indictment what conduct forms the basis for the § 1512(c) charge, Defendant's motion for a bill of particulars should be denied.

The case law on this issue makes clear that Defendant's motion for a bill of particulars should be denied. Judge Boasberg denied Mostofsky's motion for a bill of particulars on a § 1512(c) count, rejecting the defendant's contention that he would be deprived of sufficient notice if the government did not answer whether he obstructed a proceeding by virtue of being in the building. *U.S. v. Mostofsky*, No. 21-138, 2021 WL 3168501, at 4* (D.D.C. July 27, 2021) ("While he may wish for more detail on the Government's form of proof at trial or its legal theories, it has sufficiently explained the basis of the charge"). Defendant is similarly not entitled to more information about specifically how the government will carry its burden of proof at trial, given the conduct already revealed in the Superseding Indictment and discovery about him entering the Senate chamber and appearing just outside the House Speaker's office Moreover, through discovery, Defendant has access to pictures of himself in the Senate, outside the Speaker's office, and identifying witness statements. It is not difficult to deduce from that evidence how his conduct obstructed the proceeding on January 6, 2021.

A36

Defendant's motion for a bill of particulars should be denied because the Superseding Indictment and discovery material provide more than enough information to enable him to understand how his conduct obstructed the certification of the electoral votes.

## **CONCLUSION**

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the defendant's motion be denied.


Respectfully submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      _____/s/ *April H. Ayers-Perez*_____
APRIL H. AYERS-PEREZ
Assistant United States Attorney
Detailee
TX Bar No. 24090975
11204 McPherson Road, Suite 100A
Laredo, Texas 78045
April.Ayers-Perez@usdoj.gov
(956) 754-0946

A37

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Action No. 21-140 (JDB)** |
| **LARRY BROCK,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Defendant Larry Brock is charged via indictment with six offenses related to the breach of the United States Capitol on January 6, 2021. See generally Superseding Indictment [ECF No. 24] ("Indictment"). Brock has filed four motions seeking, among other things, dismissal of one count, a transfer of venue, and further discovery. The Court will deny each motion for the reasons explained below.

### Background

On January 6, 2021, the U.S. Congress convened in the Capitol for a joint session to certify the vote count from the November 2020 presidential election. Aff. in Supp. of Criminal Compl. [ECF No. 1-1] ¶ 6. The Capitol was closed to the public, but a large crowd was gathered outside. Id. ¶ 7. Around 2:00 p.m., members of the crowd violently forced their way into the Capitol, past officers of the U.S. Capitol Police and over barricades. Id. ¶ 8. Shortly after, members of the House of Representatives and Senate, as well as then-Vice President Michael Pence, were forced to evacuate and effectively suspend the joint session. Id. ¶ 9; see also United States v. McHugh, Crim. A. No. 21-453 (JDB), 2022 WL 296304, at *1–2 (D.D.C. Feb. 1, 2022) (McHugh I) (further describing the violence and destruction on January 6).

The government alleges that Brock participated in this riot. See Aff. in Supp. of Criminal Compl. ¶¶ 11–16. According to the government, Brock entered the Capitol through the Senate

1

A38

Wing Doors at approximately 2:24 p.m. on January 6th and was inside the Capitol for approximately 38 minutes.  Mem. in Opp'n to Mot. to Compel Disc. [ECF No. 53] ("Opp'n to Disc. Mot.") at 2.  The government alleges that during that time, Brock was outside the office of Speaker of the House Nancy Pelosi and on the Senate floor, and that he carried zip ties throughout. Id.; Gov't's Opp'n to Def.'s Mot. to Transfer Venue [ECF No. 50] ("Opp'n to Venue Mot.") at 2.

A grand jury charged Brock with six offenses via indictment: obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building and grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three); entering and remaining on the floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); disorderly conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).  Indictment at 1–3.  On July 1, 2022, Brock filed the four motions now before the Court: (1) a motion to dismiss Count One—the charge under 18 U.S.C. § 1512—or, in the alternative, for an order requiring the government to provide a bill of particulars, see generally Mot. to Dismiss Count I or in the Alternative for a Bill of Particulars [ECF No. 46] ("Mot. to Dismiss"); (2) a motion to transfer venue, see generally Mot. to Adopt Mot. of Other January 6th Defendant and for Change of Venue [ECF No. 47] ("Venue Mot."); (3) a motion to compel additional discovery from the government, see generally Mot. to Compel Disc. [ECF No. 48] ("Disc. Mot."); and (4) a motion to compel discovery on selective prosecution, see generally Mot. to Compel Disc. on Selective Prosecution [ECF No. 49] ("Selective Prosecution Mot.").  The government timely opposed each motion on July 22, 2022. See generally Opp'n to Def.'s Mot. to Dismiss [ECF No. 54] ("Opp'n to Mot. to Dismiss"); Opp'n to Venue Mot.; Opp'n to Disc. Mot.; Mem. in Opp'n to Selective Prosecution Mot. [ECF No. 55]

2

A39

("Opp'n to Selective Prosecution Mot."). Brock has not filed any replies. The motions are now ripe for decision.

## Analysis

### I.    Motion to Dismiss

Brock's first motion is styled "Motion to Dismiss Count I or in the Alternative for a Bill of Particulars." Mot. to Dismiss at 1. The motion identifies two reasons why the indictment should be dismissed for failure to state an offense. First, relying on United States v. Miller, Crim. A. No. 1:21-CR-00119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022), appeal docketed, No. 22-3041 (D.C. Cir. June 28, 2022), Brock argues that 18 U.S.C. § 1512(c)(2) applies only to obstruction that involves documents or records. Mot. to Dismiss at 2. Second, he argues that the facts he expects the government to present would not "constitute an attempt to obstruct" the certification of the Electoral College vote. Id. at 2–3.

"[A]n indictment's main purpose is 'to inform the defendant of the nature of the accusation against him.'" United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting Russell v. United States, 369 U.S. 749, 767 (1962)). Under the Federal Rules of Criminal Procedure, the indictment need contain only "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1); accord United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015).

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to dismiss the indictment against him for "failure to state an offense." Relevant here, if the statutory provision at issue does not cover the charged offense, the indictment "fail[s] to state an offense." McHugh I, 2022 WL 296304, at *3 (citing United States v. Montgomery, 578 F. Supp. 3d 54, 59 (D.D.C. 2021)). In assessing whether to grant a motion to dismiss under Rule 12(b)(3)(B)(v), a court considers whether the allegations in the indictment, assumed to be true, "would be sufficient

3

A40

to permit a jury to find that the crimes charged were committed." United States v. Bozell, No. 21-CR-216 (JDB), 2022 WL 474144, at *2 (D.D.C. Feb. 16, 2022) (citation omitted).  Courts dismiss indictments "only in unusual circumstances."  Ballestas, 795 F.3d at 148.

    The statute under which Brock is charged in Count One reads:

(c) Whoever corruptly--

    (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

    (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

    Brock first asks that this Court dismiss Count One, charging a violation of 18 U.S.C. § 1512(c)(2), "for the reasons offered in" Miller.  Mot. to Dismiss at 1.  In Miller, Judge Nichols construed § 1512(c)(2) to cover only actions taken "with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."  2022 WL 823070, at *15.  This Court, however, has already considered and declined to adopt the reasoning and holding of Miller.  See United States v. McHugh, Crim. A. No. 21-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) (McHugh II).  McHugh II is in line with previous decisions from this Court, see, e.g., Bozell, 2022 WL 474144, at *5, as well as every other district court to consider the issue addressed in Miller.  See, e.g., United States v. Grider, Crim. A. No. 21-022 (CKK), 2022 WL 3016775, at *3 n.3 (D.D.C. July 29, 2022) (collecting cases).

    The Court's view has not changed.  As explained in McHugh II, § 1512(c)(2) "applies to the 'myriad means that human ingenuity might devise to permit a person to' obstruct an official proceeding," not only to those involving documents or records.  2022 WL 1302880, at *7 (quoting Collazos v. United States, 368 F.3d 190, 200 (2d Cir. 2004)).  This reading is compelled by the

statute's text, id. at *4–7, structure, id. at *7–10, statutory history, id. at *10, and legislative history, id. at *11–12, as well as principles of statutory construction, id. at *8–9, 11.  Particularly given that Brock raises "no substantive argument for reconsideration" of the Court's previous decisions on the issue, Grider, 2022 WL 3016775, at *3, the Court has no trouble rejecting this argument.

Brock also argues that § 1512(c)(2) "does not apply to" his alleged conduct.  Mot. to Dismiss at 2.  By his telling, the government is not "going to allege that [he] entered the United States Capitol until after [the official] proceeding had adjourned," and therefore the government does not assert "that any of his actions were the cause of the proceeding's adjournment."  Id.  In essence, he asks this Court to (a) construe § 1512(c)(2) to cover only actions that happened before a proceeding was first obstructed, influenced, or impeded and (b) in the context of January 6, find that only actions taken within the Capitol Building were a "cause" of the obstruction or impediment of the joint session of Congress.  Brock argues that the government has not alleged these elements and therefore has not alleged conduct that violates the statute.  Id. at 2–3.  This argument fails on all fronts.

First, § 1512(c)(2) is not so temporally limited.  The statute covers anyone who "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so."  18 U.S.C. § 1512(c)(2).  The government may argue that a wide range of actions—including actions that happened after the joint session had been suspended in light of the rioting mob that had entered the Capitol—"obstructed, influenced, or impeded" the joint session.  The joint session continued to be obstructed, influenced, and impeded even after Vice President Pence and Members of Congress had fled, as it continued to remain in limbo as the January 6 mob flooded the Capitol throughout the day.  See Bozell, 2022 WL 474144, at *4 (concluding that the relevant question is whether acts obstructed, influenced, or impeded "the January 6 Certification as a whole" (citing 167 Cong. Rec. H85–H87 (daily ed. Jan. 6, 2021)).

5

A42

Even if the Court construed the statute to require allegations of an action that happened before the initial obstruction—which it does not—Brock's challenge would still fail.  In his motion, Brock focuses on the moment he "entered the United States Capitol."  Mot. to Dismiss at 2.  But again, § 1512(c) is not so geographically limited: the obstruction, influence, or impediment of the joint session, or the attempt to do so, surely could have happened before Brock set foot in the Capitol Building.  See, e.g., United States v. Reffitt, No. 21-CR-32 (DLF), 2022 WL 1404247, at *3 (D.D.C. May 4, 2022) (upholding jury's conviction of January 6 defendant under § 1512(c)(2) despite the fact that the defendant "never entered the Capitol building").

Given the wide scope of § 1512, Brock's argument that the indictment fails to allege action covered by the statute fails.  There is no requirement that the government allege actions taken before the joint session was suspended; nor a requirement that it allege Brock entered the Capitol at any time, let alone before the joint session was suspended.  The indictment alleges that on January 6, 2021, Brock "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding . . . specifically, Congress's certification of the Electoral College vote."  Indictment at 1–2.  There are no additional temporal or geographic details required by § 1512(c)(2) that the government needed to allege.  The indictment sufficiently alleges conduct that, if proven,[1] would violate the statute.

## II.    Bill of Particulars

---

[1] The government spends much of its opposition arguing that the Court cannot review the sufficiency of the evidence against Brock at this stage in the proceedings.  See Opp'n to Mot. to Dismiss at 8–9.  Brock does not appear to dispute this proposition, Mot. to Dismiss at 2–3, but instead argues that the indictment does not allege a violation of § 1512(c).  The Court agrees that a challenge to the sufficiency of the evidence would be premature at this stage.

6

A43

In the alternative, Brock requests that if the Court does not dismiss the charge under § 1512(c), the Court instead should order the government to provide a bill of particulars, as the "indictment makes no allegations as to which of his actions could have been obstructive of a proceeding that had already adjourned." Mot. to Dismiss at 3.

Under the Federal Rules of Criminal Procedure, upon request, a "court may direct the government to file a bill of particulars." United States v. Sutton, Crim. No. 21-0598 (PLF), 2022 WL 1183797, at *2 (D.D.C. Apr. 21, 2022) (quoting Fed. R. Crim. P. 7(f)). "A bill of particulars is a formal written statement by the government that provides details of the charges in the indictment." Id. A defendant may request a bill of particulars "to ensure that the charges brought against [him] are stated with enough precision to allow [him] to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." United States v. Mostofsky, No. CR 21-138 (JEB), 2021 WL 3168501, at *1 (D.D.C. July 27, 2021) (alterations in original) (quoting United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987)). The decision to grant that request and direct the government to provide a bill of particulars falls "within the sound discretion of the trial court." Butler, 822 F.2d at 1194; see also Fed. R. Crim. P. 7(f). Courts rarely direct the government to file a bill of particulars, doing so only when "necessary to allow the defendant[] to adequately prepare for and avoid surprise at trial." Sutton, 2022 WL 1183797, at *2 (citation omitted). A bill of particulars "may not be used by a defendant as a discovery tool or a device to preview the government's evidence or theory of the case." Id. Courts consider "the complexity of the crime charged, the clarity of the indictment, and the degree of discovery and other sources of information otherwise available to the defendants." Id. (quoting 1 Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure § 130 (4th ed. 2021)).

Brock argues that because the evidence the government has provided only shows Brock entering the Capitol after members of the U.S. Senate and U.S. House of Representatives had left,

A44

the government has not provided any evidence of Brock's alleged obstruction of an official proceeding.  Mot. to Dismiss at 3.  Therefore, he claims, a bill of particulars is necessary to give notice of which actions the government will allege obstructed an official proceeding.  Id.

This argument is, at its core, a repackaging of his argument that the indictment does not identify an action that, if proven, would be sufficient to state an offense under § 1512(c)(2).  As discussed above, that argument fails as a matter of statutory interpretation, and it fares no better styled as a request for a bill of particulars.  The government has provided Brock with notice of which proceeding he is alleged to have obstructed, photos and videos of himself performing the acts that the government alleges form the basis of the charge, and witness statements describing his conduct.  Opp'n to Mot. to Dismiss at 10; see also Opp'n to Disc. Mot. at 2–4 (describing breadth of evidence provided to Brock, as well as specific videos of his entry into and exit from the Capitol).  The fact that Brock does not believe that this evidence amounts to a violation of § 1512(c)(2) is "more an issue of statutory interpretation than one of insufficient factual support," Mostofsky, 2021 WL 3168501, at *4, and settling that issue is "not the role of a bill of particulars," id. at *3.  In its opposition, the government does not suggest that there is other, unidentified evidence of Brock's presence at the Capitol earlier than approximately 2:24 p.m., see Opp'n to Disc. Mot. at 2, and any such evidence would be contradicted by the evidence the government has described to this Court and provided to Brock.  Regardless, Brock does not seem to suggest factual ambiguity, only that the government explain how the clearly described conduct falls under the statute.  But that is an argument for reconsideration of this Court's interpretation of the statute, not an argument for a bill of particulars.  See Mostofsky, 2021 WL 3168501, at *3.

## III.    Motion for Change of Venue

The Constitution establishes that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, and the Federal Rules

8

A45

of Criminal Procedure narrow the default venue to "a district where the offense was committed," Fed. R. Crim. P. 18. But if a defendant requests a transfer and demonstrates that "so great a prejudice against the defendant exists in the [original] district that the defendant cannot obtain a fair and impartial trial there," a court must transfer the defendant's trial to a different venue. Fed. R. Crim. P. 21(a); see also Skilling v. United States, 561 U.S. 358, 378 (2010) ("The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial . . . .").

To show prejudice, a defendant must show more than juror familiarity with the case, or even a preliminary opinion of its merits. See Skilling, 561 U.S. at 380 ("[J]uror exposure to . . . news accounts of the crime" does not "alone presumptively deprive[] the defendant of due process." (citation omitted) (first alteration in original)); Irvin v. Dowd, 366 U.S. 717, 723 (1961) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."). A defendant must show that the local population is "so aroused against [the defendant] and so unlikely to be able objectively to judge [the defendant's] guilt or innocence on the basis of the evidence presented at trial that [the defendant's] due process rights [will be] violated" if the case were not transferred. United States v. Haldeman, 559 F.2d 31, 62 (D.C. Cir. 1976) (en banc) (per curiam). This prejudice exists only in "extreme circumstances." Id. at 60 (citation omitted). In almost all circumstances, the proper time to make this determination is after jurors have been given a chance to show whether they can, in fact, be impartial—that is, after voir dire. Id. at 63–64.

Brock, like many other individuals charged with conduct stemming from the January 6 attack on the Capitol, requests a change of venue. He does so by moving to "adopt" the motion of

9

A46

another January 6th defendant made before this Court, [2] Venue Mot. at 1; see also Mot. to Change

Venue, United States v. McHugh, 1:21-cr-453 (JBD) (D.D.C. March 15, 2022), ECF No. 55

("McHugh Venue Mot."), which the Court denied without prejudice, McHugh, 1:21-cr-453 (JBD)

(D.D.C. May 4, 2022), Min. Entry, May 4, 2022 ("May 4 Min. Entry").   The adopted motion

argues that January 6th defendants' rights to a fair and impartial jury would be compromised by a

trial in Washington, D.C.—that the "hostility of the venue community is so severe that it gives rise

to a presumption of juror prejudice," such that the change of venue motion should be granted

before a jury is empaneled.  McHugh Venue Mot. at 2, 18.  The Court denied McHugh's motion

without prejudice on May 4, 2022.  May 4 Min. Entry.  Other courts in this district have similarly

denied motions to transfer venue filed by January 6th defendants, noting that the events of January

6th and the ensuing media coverage do not constitute the "extreme circumstances" necessary to

presume prejudice prior to voir dire.  See, e.g., United States v. Garcia, Crim. A. No. 21-0129

(ABJ), 2022 WL 2904352, at *15 (D.D.C. July 22, 2022); United States v. Rhodes, No. 22-cr-15

(APM), 2022 WL 2315554, at *21–23 (D.D.C. June 28, 2022); United States v. Bochene, Crim.

A. No. 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022).

     Given the in-depth treatment afforded to this issue already, the Court will only briefly

summarize its reasons for denying Brock's motion, which are in line with those of other courts in

similar cases.  As described above, Brock's motion adopts in their entirety the arguments put forth

---

[2] The Court notes that Brock's motion to adopt a motion filed by a defendant in a different case is unusual. Cf. Fed. R. App. P. 28(i) (permitting co-appellants to "adopt by reference a part of another's brief").  The government does not oppose the motion to adopt, but asks the Court for leave to incorporate its opposition to the motion in McHugh.  See Opp'n to Venue Mot. at 2–3.  In light of the government's response and the applicability of the arguments made in the adopted motion to Brock's case, the Court will grant Brock's motion to adopt the filing in McHugh, and will take into consideration the government's arguments made in both the opposition filed here and those made in its opposition in McHugh.  See generally Opp'n to Mot. to Change Venue, McHugh, 1:21-cr-453 (JDB), ECF No. 58 (D.D.C. April 7, 2022).

A47

(and rejected) in the venue motion made in <u>McHugh</u>.[3]  Brock also adds two new facts to bolster those arguments.  <u>See</u> Venue Mot. at 2–3.  But the additional facts do not change the Court's conclusion that, at this stage, there is no reason to believe that voir dire will be ineffective in removing any potential bias or prejudice against Brock.

As relevant here, courts look to three factors in determining whether there is a presumption of prejudice in a given jury pool: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.  <u>Skilling</u>, 561 U.S. at 382–84.  Notably, only <u>once</u> has the Supreme Court found a presumption of prejudice; in <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963), a case where the defendant's taped confession was broadcast to as much as a third of the venire, making his trial a "kangaroo court"—the interrogation and taped confession "in a very real sense was Rideau's trial—at which he pleaded guilty."  373 U.S. at 726; <u>see also</u> <u>id.</u> at 725 (describing the video as showing "Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff").  As several courts have recognized, the facts of <u>Rideau</u> bear little resemblance to the facts of Brock's, McHugh's, and other January 6th defendants' cases.  <u>See, e.g.</u>, <u>Garcia</u>, 2022 WL 2904352, at *8 n.16.

First, Washington, D.C.'s "size and characteristics" weigh against transfer. The Supreme Court has recognized a "reduced likelihood of prejudice where [the] venire was drawn from a pool of over 600,000 individuals."  <u>Skilling</u>, 561 U.S. at 382 (citing <u>Gentile v. State Bar of Nev.</u>, 501 U.S. 1030, 1044 (1991) (plurality opinion)); <u>see also</u> <u>United States v. Taylor</u>, 942 F.3d 205, 223 (4th Cir. 2019) (noting the same with respect to Baltimore's population of 621,000).  Washington,

---

[3] For simplicity, the court will cite the venue motion made in <u>McHugh</u> when discussing arguments first raised there and will cite Brock's motion only when discussing any new arguments Brock raises.

A48

D.C. has over 600,000 residents.  See America Counts Staff, The District of Columbia Gained More Than 87,000 People in 10 Years, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/district-of-columbia-population-change-between-census-decade.html (estimating D.C.'s population as 689,545).  Perhaps recognizing that, McHugh's motion focuses primarily on the "characteristics" of D.C., noting the high proportion of federal workers; the stories of D.C. residents who were "deeply traumatized" by their proximity to the events of January 6th; and the "electoral makeup" of the District.  McHugh Venue Mot. at 4–8.

None of these characteristics suggest a community-wide bias that voir dire is ill-designed to remove.  Employment by the federal government is precisely the type of information that the defendant may elicit from potential jurors during voir dire.  See Bochene, 2022 WL 123893, at *2 (concluding that federal government employment was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").  The motion refers to anecdotes of trauma felt by D.C. residents; however, the Court has no basis to conclude such trauma is felt by a substantial portion of the venire, nor does the motion offer a reason to believe those who were traumatized to the point of bias would fail to report that during voir dire questioning.  Finally, the fact that a majority of Washington, D.C. residents have historically voted for Democrats is not "at all pertinent to venue."  Haldeman, 559 F.2d at 64 n.43 (denying motion to change venue in Watergate-related trial and rejecting evidence of D.C.'s political leanings); see also Order, Apr. 18, 2022, at 6–7, United States v. Alford, No. 21-cr-263 (TSC) (D.D.C. April 18, 2022), ECF No. 46 (concluding that "assumptions concerning party affiliation in the District are not an appropriate

basis for changing venue" and any "impressions or opinions . . . based on [defendant's] presumed political views" could "be assessed during voir dire").[4]

The McHugh motion also attaches the results of a telephone poll conducted by a private polling firm of 400 D.C. residents and 400 Atlanta residents. Ex. 1 to Mot. to Change Venue at 1, McHugh, 1:21-cr-453 (JBD) (D.D.C. Mar. 15, 2022), ECF No. 55-1 ("Select Litigation Survey"). The poll included questions about respondents' familiarity with and attitudes towards January 6th defendants. Id. at 4–5.

As an initial matter, public opinion polling commissioned by one party is often less probative than a "recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." Haldeman, 559 F.2d at 64 n.43; see also United States v. Campa, 459 F.3d 1121, 1129, 1147 (11th Cir. 2006) (en banc) (concluding that voir dire procedures "more thoroughly evaluated the sentiment of the Miami-Dade community" than a survey commissioned showing 69% of respondents were prejudiced against the defendants). Among other issues, surveys suffer from design flaws that can bias the results. The survey included here is illustrative. Many of the questions were drafted using impossibly broad language—"Are you more likely to vote that [a January 6th defendant] is guilty or not guilty of [the] charges?" Select Litigation Survey at 14. To make matters worse, respondents were not given an option to share that they had not yet formed an opinion as to the guilt of every January 6th defendant—the choices offered were "guilty" or "not guilty." Id. Despite that, almost 50% of respondents in Washington, D.C. volunteered that they did not have a fixed opinion, answering

---

[4] Brock adds one new fact in support of his argument that the characteristics of Washington, D.C. support a change in venue: in the recent mayoral primaries, over 120,000 D.C. residents voted in the Democratic primary, and fewer than 2,500 residents voted in the Republican primary. Venue Mot. at 2–3. Not only do these numbers represent a small percentage of D.C.'s population overall, but even assuming they suggest D.C. is overwhelmingly Democratic, they are cumulative of evidence presented in McHugh's motion, and do not sway this Court's opinion.

A50

either "[d]epends" or "[d]on't know/[r]efused" (suggesting that at least half of the venire has no preconception of guilt, let alone an unshakable one).  Id.

To the extent they are credited, the survey's results are mixed.  The results do suggest that Washington, D.C. residents have an unfavorable opinion of those arrested for January 6th-related activities.  Select Litigation Survey at 14 (reporting 84% of D.C. residents have unfavorable opinion of people arrested for participating in January 6th events, as opposed to 54% of Atlanta residents).  But importantly for the question of impartiality, the results also suggest that an overwhelming majority—80%—of D.C. respondents believe that January 6th defendants will receive a fair trial in D.C.  See id.  And as described above, almost half of the respondents refused to say that they were more likely to find a January 6th defendant guilty.  In short, the survey questions are neither reliable enough to act as a substitute for voir dire, nor convincing enough to merit a change in venue at this stage.  See, e.g., Garcia, 2022 WL 2904352, at *11–13 (rejecting the same survey and denying motion to change venue in January 6th case).

Turning to the second factor, the type of information included in the media coverage was not the "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  Skilling, 561 U.S. at 382.  Brock, through adoption, is correct that the events of January 6th received substantial news coverage.  See Select Litigation Survey at 8–10.  But "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  United States v. Childress, 58 F.3d 693, 706 (D.C. Cir. 1995).  If that were the case, then, by defendant's own telling, even Atlanta would be unavailable as a forum, as the Atlanta coverage could similarly be characterized as "intense pretrial publicity."  See, e.g., Select Litigation Survey at 9–10 (citing data showing that the Atlanta Journal-Constitution ran almost 100 articles, and that local broadcasts in Atlanta ran over 4,000 stories, about January 6th in the year following the events); see also United States v.

14

A51

Chapin, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[P]recedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose."). Rather, only pretrial publicity analogous to the "inherently prejudicial" and "unforgettable . . . spectacle of Rideau's dramatically staged and broadcast confession" is inflammatory enough to presume prejudice. Haldeman, 559 F.2d at 61. McHugh, and hence Brock, identify public statements and reports that offer more editorializing than others, see, e.g., McHugh Venue Mot. at 13, but the fact that some coverage may be "hostile in tone and accusatory in content" is not enough to show prejudice when "[t]he overwhelming bulk of the material submitted . . . consists of straightforward, unemotional factual accounts of events," Haldeman, 559 F.2d at 61 (footnote omitted). Indeed, courts have repeatedly denied venue transfers in cases with similar news coverage—in both scope and tone—to this case. See, e.g., Skilling, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part) ("[L]ocal media coverage of the story saturated the community."); Haldeman, 559 F.2d at 61 n.34 ("[T]he pretrial publicity in this case was extraordinarily extensive . . . ."); In re Tsarnaev, 780 F.3d 14, 21–22 (1st Cir. 2015) (per curiam) (noting "there has been extensive publicity in this case," but not "of the grossly prejudicial character that attended Rideau").

In contrast to those cases, Brock identifies no pretrial publicity that mentions him. "[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact." Skilling, 561 U.S. at 384 n.17 (alteration in original) (citation omitted); see also Garcia, 2022 WL 2904352, at *9 (noting that "this particular [January 6th prosecution] has not been subject of attention"). Even in the most high-profile cases, courts reject challenges where the defendant cannot show that members of the venire have knowledge of or an opinion about the defendant himself, even when he was a part of a highly publicized event. See, e.g., United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003) (rejecting World Trade Center bombing suspect's bias

15

A52

claim because "the jurors that were picked had either never heard of Yousef or could not remember any of the details of his alleged involvement"). Absent any publicity about Brock himself, it is difficult to conclude that his case will feature a venire that prejudges his guilt or innocence in particular.

Finally, as the D.C. Circuit has noted, courts should avoid relying too heavily on pre-trial publicity to establish prejudice, as such an inquiry is only an "attempt to determine from [the court's] own reactions how the community would respond to that publicity." Haldeman, 559 F.2d at 62 n.37. "After the voir dire a judge can determine which description of the publicity's impact is accurate; before the voir dire a judge" can only guess. Id. For Brock, any impact pretrial publicity may have on potential jurors can, and should, be probed and rooted out through voir dire. But the Court could only guess at this stage as to what, if any, impact generalized and primarily factual reporting of the events of January 6th will have on a relatively unknown defendant such as Brock; and such publicity does not compel a finding of bias in the venire as a whole.

The final factor is the time period between the arrest and trial. By the time of Brock's trial in November 2022, almost two years will have passed since January 2021. Two years is enough time, in general, for the "decibel level of publicity about the crimes themselves to drop and community passions to diminish." Tsarnaev, 780 F.3d at 22. Brock adds one additional fact in support of his motion: the House Select Committee to Investigate the January 6th Attack on the United States Capitol has continued to hold hearings over the past three months, "reignit[ing] coverage" of January 6th. Venue Mot. at 2. The Court agrees that these hearings make the passage of time somewhat less significant. It does not, however, change the conclusion here—the content and nature of the January 6th coverage, including the Select Committee hearings, are not so inflammatory as to bias the entire Washington, D.C. community. See Rhodes, 2022 WL 2315554, at *22 ("[M]edia coverage has been heavy due to the ongoing public hearings of the Select

16

A53

Committee . . . .  But even if news coverage does not ebb, 'pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial.'" (citation omitted)).  Even if the content were inflammatory, the Select Committee hearings were broadcast nationally, and Brock has offered no evidence demonstrating that Washington, D.C. residents were a disproportionate percentage of the viewership.  See Tsarnaev, 780 F.3d at 22.  Again, a vigorous voir dire should suffice to root out any bias in individual jurors.

## IV.    Motions to Compel Discovery

Brock has filed two motions to compel discovery.  He asks for four categories of discovery: (a) specific information and evidence demonstrating his peaceful behavior, Disc. Mot. at 2; (b) evidence of his entry to the U.S. Capitol and/or restricted areas, id. at 3; (c) evidence of law enforcement's involvement in the attack on the Capitol, id. at 3–4; and (d) evidence of selective prosecution, Selective Prosecution Mot. at 6.

Upon a defendant's request, the government must "permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and, relevant here, "the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  The government also has an affirmative duty under Brady v. Maryland, 373 U.S. 83, 87 (1963), to disclose "evidence in its possession that is favorable to the accused and material either to a defendant's guilt or punishment," United States v. Trie, 21 F. Supp. 2d 7, 23 (D.D.C. 1998).  Evidence is material if there is a "reasonable probability" that it would impact the outcome of the proceeding.  United States v. Bagley, 473 U.S. 667, 682 (1985). Rule 16 applies only to evidence that may influence or impact the outcome of a defendant's trial or sentencing; evidence related to "an independent constitutional bar to the prosecution," not

17

A54

"refutation of the government's case in chief," falls outside of the rule's scope.  United States v. Rashed, 234 F.3d 1280, 1285 (D.C. Cir. 2000).

Relevant here, there are two claims criminal defendants may bring under the Due Process Clause of the Fifth Amendment.  First, the Supreme Court has suggested that it may "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," United States v. Russell, 411 U.S. 423, 431–32 (1973), though the Court "has never actually accepted this defense as grounds for dismissing an indictment," al-Baluchi v. Esper, 392 F. Supp. 3d 46, 65 (D.D.C. 2019).  Defendants making such a claim face an onerous standard: the "requisite level of outrageousness . . . is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police." United States v. Kelly, 707 F.2d 1460, 1476 (D.C. Cir. 1983) (per curiam).  Instead, the defendant much show "coercion, violence, or brutality to the person." Id. (quoting Irvine v. California, 347 U.S. 128, 133 (1954)).  "Whether particular government conduct was sufficiently outrageous to meet this standard is a question of law," United States v. Boone, 437 F.3d 829, 841 (8th Cir. 2006), and if the standard were met, the proper remedy would be dismissal of the indictment, al-Baluchi, 392 F. Supp. 3d at 65.

Second, a defendant may bring a selective prosecution claim under the equal protection component of the Fifth Amendment.  Despite its broad grant of prosecutorial discretion, the government may not base the decision to prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification." United States v. Armstrong, 517 U.S. 456, 464 (1996) (citation omitted).  There is a "presumption that a prosecutor has not violated equal protection," id. at 465, and a defendant must present "clear evidence to the contrary" to succeed on such a claim, id. (citation omitted).  To make out a selective prosecution claim, a defendant must show

18

A55

that the challenged prosecution policy "ha[s] a discriminatory effect and that it was motivated by a discriminatory purpose." Id. at 457.

To show a discriminatory effect in prosecution policies, "a defendant must show that the Government afforded 'different treatment' to persons 'similarly situated' to him." United States v. Judd, Case No. 1:21-cr-00040 (TNM), 2021 WL 6134590, at *2 (D.D.C. Dec. 28, 2021) (quoting Armstrong, 517 U.S. at 470). "When a person's circumstances 'present no distinguishable legitimate prosecutorial factors that might justify' different prosecutorial decisions between him and the defendant, that person is similarly situated to the defendant." Id. at *2 (quoting Branch Ministries v. Rossotti, 211 F.3d 137, 145 (D.C. Cir. 2000)). Courts "'narrowly' interpret the phrase 'similarly situated.'" Id. (quoting United States v. Stone, 394 F. Supp. 3d. 1, 31 (D.D.C. 2019)).

Courts impose a correspondingly "rigorous standard" for discovery in support of a claim of selective prosecution, Armstrong, 517 U.S. at 468; a defendant must present "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent," id. (citation omitted).

Brock first describes video footage of himself "attempt[ing] to break up" a confrontation between "an African American man wearing a blazer" and "a protestor." Disc. Mot. at 2. He requests information related to the video, including "additional video evidence" of the events, and "the name and contact information" for the "African American man." Id. In response, the government notes it has provided Brock with the "location, time, and numbers of cameras" that may have captured the altercation, and instructions on how to locate that footage in its discovery productions. Opp'n to Disc. Mot. at 2. As to the name and contact information for the man, Brock describes him only as an "African American man." Disc. Mot. at 2. The government's response suggests that he may be a member of the United States Capitol Police. See Opp'n to Disc. Mot. at

19

A56

2.  Neither side, then, suggests that this man's identity is either known to the Department of Justice or within its possession, and the government is therefore under no obligation to provide it.  See United States v. Nordean, Crim. A. No. 21-175 (TJK), 2022 WL 2292062, at *2 n.4 (D.D.C. June 24, 2022) ("[T]he Government need not—indeed, it cannot—produce information or materials 'in the possession of Congress' but not in the possession of the Department of Justice or another executive agency." (citation omitted)); see also Cong. Rsch. Serv., The U.S. Capitol Police: Brief Background at 1 (July 29, 2021) (noting the "U.S. Capitol Police is a department within the legislative branch").  It appears, then, that there is no outstanding information Brock requests from this video that the prosecution has an obligation to provide under Brady or Rule 16.

Brock next describes his exit from the Capitol, and notes there may be an officer who "would have observed Mr. Brock persuade another individual who was behaving in a disorderly manner to exit the building with him peacefully."  Disc. Mot. at 2.  He asks for that officer's name, the status of his body camera, and/or any notes taken.  Id. at 3.  The government represents that it has identified "the Agency the officer works for" and provided "CCV footage of the altercation" and the status of body camera footage.  Opp'n to Disc. Mot. at 3.  Brock has not responded to these assertions.

On the record before it, the Court cannot determine whether the exact identity of the officer is within the government's possession such that it could be discoverable under Brady.  Regardless, Brock has not shown how the exact identity of the officer is material to his guilt or punishment.  Evidence is material under Brady "if there is a 'reasonable probability' that its disclosure could affect the outcome of the case."  United States v. Harris, No. CRIM. 06-00124 (ESH), 2006 WL 2882711, at *2 (D.D.C. Oct. 5, 2006) (quoting Bagley, 473 U.S. at 682).  Evidence that is "cumulative of information to which [the defendant] already has access" does not meet this standard.  Id.  Brock requested the identification of the officer because the officer "would have

20

A57

observed" Brock's alleged peaceful behavior, and presumably been able to testify to it.  Disc. Mot. at 2–3.  Even assuming evidence of Brock's peaceful behavior in that moment would have a "reasonable probability" of affecting the outcome of the case, the CCV footage from the government would show Brock's behavior, making a description of the incident from the officer cumulative.

Brock notes that he has been "unable to locate a video alleged to show his entrance to the [C]apitol building and/or any restricted area."  Disc. Mot. at 3.  In its opposition, the government reports it has, as of July 22, 2022 (three weeks after Brock filed his motion), re-uploaded the "case-specific videos" showing Brock's movements.  Opp'n to Discovery Mot. at 3.  Absent a reply from Brock disputing the government's claims, the Court finds the government has satisfied its obligations to provide such video.

Brock's third category of discovery requests seeks "evidence of informants, undercover agents, cooperating sources and other similar persons present at the Capitol on January 6."  Disc. Mot. at 3 (cleaned up).  This evidence, he argues, would be used to show that law enforcement's behavior on January 6th was "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction."  Id. (quoting Russell, 411 U.S. at 431–32).  As an initial matter, to the Court's knowledge, no court has identified the standard the defendant must meet to obtain discovery for this purpose.  The D.C. Circuit has indicated that material sought to establish "an independent constitutional bar to prosecution" is not discoverable under Federal Rule of Criminal Procedure 16, as it is not used to "refut[e] . . . the government's case in chief."  Rashed, 234 F.3d at 1285; see also Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring disclosure of information "material to preparing the defense"); Armstrong, 517 U.S. at 462 (stating that Rule 16 applicable only to "'shield' claims, which refute the Government's arguments that the defendant committed the crime charged").

21

A58

In his motion, Brock requests this information "as Brady information." Disc. Mot. at 4. However, he fails to explain how the requested discovery would qualify as information material to his "guilt or to punishment," as required under Brady. See 373 U.S. at 87. The fact that a court may exercise its supervisory power to dismiss an indictment on the basis of the government's conduct has no bearing on the defendant's actual guilt or innocence. Moreover, Brock does not allege that his actions that day were caused by an informant, undercover agent, or cooperating source, or that he was somehow entrapped by the government's actions. See Disc. Mot. at 3–4. Brock has not shown how the requested material would have any relevance to his guilt or punishment, let alone rise to the level of materiality, and the Court declines to order such wide-sweeping discovery that is, in essence, simply a fishing expedition.[5]

Brock's final motion requests discovery on selective prosecution. He describes protests in Portland, Oregon during the summer of 2020 where protesters damaged federal buildings, in some instances using violent means like Molotov cocktails or arson. Selective Prosecution Mot. at 4–5 (citing Aff. in Supp. of Criminal Compl. ¶¶ 6–8, United States v. Bouchard, No. 20-mj-165 (D. Ore. July 24, 2020), ECF No. 1-1 (describing the Portland protests)). Brock then argues that the difference in charging decisions for the Portland protestors and the January 6th rioters can "only be explained by a bias in DOJ leadership in favor of liberal causes such as police reform and against conservative causes such as election integrity or support for Donald Trump." Selective Prosecution Mot. at 5. Brock's motion, however, does not even attempt to make the "rigorous" showing required to obtain discovery on a selective prosecution motion. See Armstrong, 517 U.S.

---

[5] Discovery requests based on independent constitutional claims, such as selective prosecution, are often evaluated under the framework set forth in Armstrong—the defendant must offer "some evidence tending to show the existence" of the constitutional violation. See, e.g., United States v. Oseguera Gonzalez, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (citation omitted) (extending this framework to vindictive prosecution claims). The Court does not decide here whether such a framework would be appropriate for "outrageous" government conduct claims under the Due Process clause, but notes that Brock has not provided any evidence to suggest the government had informants or undercover agents on January 6th, let alone that their presence constituted outrageous government conduct.

22

A59

at 468.  He must provide "some evidence tending to show the existence" of both elements of a selective prosecution claim: that the prosecutorial policy had a "discriminatory effect" and a "discriminatory intent."[6]  Id. (citation omitted).  Brock's motion provides evidence of neither.

Brock focuses primarily on the Portland protesters, arguing that they are "similarly situated" to January 6th defendants such as himself.  Selective Prosecution Mot. at 3–5.  They are not.  As other courts have found, the mob on January 6th—of which the government alleges Brock was a part—"endangered hundreds of federal officials in the Capitol complex," including Members of Congress and their staffs, Vice President Pence, and the United States Capitol Police.  E.g., Judd, 2021 WL 6134590, at *5.  In contrast, the Portland protests happened at night, when no federal employees were in the buildings to be endangered.  See Aff. in Supp. of Criminal Compl. ¶¶ 5–6, United States v. Bouchard, No. 3:20-mj-165 (D. Ore. July 24, 2020), ECF No. 1-1 (describing "nightly criminal activity" and an altercation that began at "approximately 01:35 a.m.").  The decision to file and pursue more serious charges based on the threat to government officials and employees is certainly a legitimate prosecutorial consideration.  Other factors, such as the alleged purpose of the January 6th defendants' actions—obstructing the certification of the Electoral College vote—would also justify differences in prosecutorial behavior.  See United States v. Rhodes, Crim. No. 22-cr-15 (APM), 2022 WL 3042200, at *5 (D.D.C. Aug. 2, 2022) (concluding that Portland protestors were not alleged to have "engaged in comparable conduct" since defendant did not identify an "official proceeding" they obstructed).

---

[6] Brock asks the Court to order discovery under Brady v. Maryland.  Selective Prosecution Mot. at 2–3.  The Court disagrees that selective prosecution evidence is discoverable under Brady, as it is irrelevant to Brock's guilt or punishment.  See United States v. Blackley, 986 F. Supp. 600, 602 (D.D.C. 1997) ("Brady/Giglio production is only required when the materials are being sought to prove defendant free from blame, and not when the defense seeks to obtain a collateral dismissal," such as a selective prosecution claim.).  Allowing selective prosecution evidence is contrary to the plain meaning of Brady, which is limited to evidence "material either to guilt or to punishment."  373 U.S. at 87.  It would also undermine the rigorous standard for discovery set by Armstrong, which was animated by concerns that an easily surmountable discovery standard would "divert prosecutors' resources" and "disclose the Government's prosecutorial strategy."  517 U.S. at 468.

A60

Brock argues that <u>his</u> case is comparable to Portland protestors as he is "not alleged to have engaged in violence or property destruction." Selective Prosecution Mot. at 5. That argument assumes that the level of <u>actual</u> violence and property destruction is the only difference between the Portland protestors and January 6th defendants, which is not the case. As part of the mob that stormed the Capitol, Brock is alleged to have taken part in the events of January 6th that caused "[m]embers of Congress [to] cower[] under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." <u>Judd</u>, 2021 WL 6134590, at *5. The government alleges Brock was "on the Senate floor"—the very floor from which Members of Congress had fled— "holding flex cuffs in his right hand." Opp'n to Selective Prosecution Mot. at 2. Those allegations alone would be a legitimate factor on which to base more serious charging decisions.

The comparisons to protests connected to Justice Kavanaugh's Supreme Court confirmation, see Selective Prosecution Mot. at 5–6, and the 2019 sit-in at Immigration and Customs Enforcement headquarters, <u>id.</u>, fail for the same reasons—Brock does not describe any similarly situated defendants given the difference in violence, threat to citizen safety, and scope.

Brock's arguments as to discriminatory intent fare no better. He concludes—with no proof or argument—that the motive behind the claimed discrepancies in charging is a "bias in DOJ leadership in favor of liberal causes." Selective Prosecution Mot. at 5. A conclusory statement like this is not "evidence" of anything; at best, it is a "personal conclusion[] based on anecdotal evidence," which is insufficient to form a colorable claim of discriminatory purpose. <u>Armstrong</u>, 517 U.S. at 468, 470. Further, Brock's assertion runs counter to the facts. Initial prosecution decisions in both the Portland cases and the January 6th cases, including charging January 6th protestors and dismissing cases against Portland protestors, were made under Republican

leadership.  See Judd, 2021 WL 6134590, at *6 n.9.[7]  Brock has not offered any evidence suggesting the January 6th prosecution decisions were made with discriminatory effect or discriminatory intent, and his motion for discovery into selective prosecution will be denied.

### Conclusion

For the foregoing reasons, the Court will deny each of Brock's motions.  A separate Order consistent with this opinion will issue.


                                                            /s/
                                                    _____
                                                          JOHN D. BATES
                                                    United States District Judge

Dated: August 31, 2022


---

[7] For Brock specifically, the case against him was commenced in early January 2021, when Acting Attorney General Jeffrey Rosen, appointed by President Donald Trump, was still the leader of the Department of Justice.  See Compl. [ECF No. 1] at 8 (filed January 9, 2021).

25

A62

                              VOLUME I
UNITED STATES  DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                             21-CR-140

LARRY RENDALL BROCK,

                         Defendant.

-------------------------------------------x

        Transcript of a Bench Trial held on

November 14, 2022, at the E. Barrett Prettyman U.S.

Courthouse, 333 Constitution Avenue, N.W.,

Washington, D.C., the HONORABLE JOHN D. BATES,

Senior Judge, Presiding.

                    A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF TEXAS
                    11204 McPherson Road
                    Suite 100a
                    Laredo, Texas  78045
                      BY:  APRIL AYERS-PEREZ, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    1331 F Street, N.W.
                    Washington, D.C.  20005
                      BY:  BARRY KENT DISNEY, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    Narcotic & Dangerous Drug Section
                    145 North Street, N.E., Suite 2300
                    Washington, D.C.  20530
                      BY:  DOUGLAS MEISEL, ESQ.

For Defendant:      BURNHAM & GOROKHOV, PLLC
                    Attorneys at Law
                    1424 K St., N.W.
                    Suite 500
                    Washington, D.C.  20005
                      BY:  CHARLES BURNHAM, ESQ.

A63

2

1

2                    I N D E X   O F   T E S T I M O N Y

3

4    Witnesses              Direct    Cross    Redirect    Recross

5    Elizabeth Glavey          28       47        --          --

6    Sean Patton               53      124        --          --

7    Nairobi Timberlake       147      169        --          --

8    Maggie-May Humphrey      173      185       186          --

9    John Moore               187       --        --          --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A64

1                    (Open Court, 9:35 a.m.)

2              THE CLERK:  Your Honor, we have Criminal Action

3      21-140, United States of America versus Larry Brock.  We have

4      Ms. April Ayers-Perez and Mr. Douglas Meisel representing the

5      Government and Mr. Charles Burnham representing Mr. Brock and

6      all parties are appearing in person.

7              THE COURT:  All right, good morning to everyone.

8      We're ready to go with trial in this matter.  I appreciate

9      the trial brief from the Government, the exhibit lists from

10     both sides, and the witness list from the Government.  And I

11     see I have an exhibit book here from each side and I

12     appreciate those as well.  And my first question is whether

13     there are any questions before we commence.  Anything that we

14     need to discuss before we get going, Mr. Burnham?

15             MR. BURNHAM:  I have a few preliminary issues.

16             THE COURT:  Okay.  For the court reporter, it's

17     usually easier if you use the lectern microphone.

18             MR. DISNEY:  Your Honor, before we get started, my

19     name is Barry Disney and I also appear for the Government.

20             THE COURT:  Good morning.

21             MR. BURNHAM:  Your Honor, the first preliminary

22     issue is very brief.  The Court had requested a written

23     waiver of trial by jury, I've prepared one that has

24     everybody's signatures except for your Honor's so if I can

25     approach, I'll hand it up to Mr. Bradley.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A65

4

1          THE COURT:  Please hand it up to Mr. Bradley.

2          THE CLERK:  Thank you.  All right.  And this is a

3    written waiver of trial by jury, it's with the consent of the

4    United States, and by this document, the defendant is waiving

5    his right to a jury trial as is required under the Federal

6    Rules and I will approve and sign that.  Thank you,

7    Mr. Burnham.

8          MR. BURNHAM:  Thank you, your Honor.

9          THE COURT:  Go right ahead.

10          MR. BURNHAM:  The second issue is, there's an

11   evidentiary issue involving some Facebook records that, based

12   on trial preparation, is likely to come up repeatedly, but I

13   think it's, it admits of consideration in a summary fashion,

14   so I thought it was appropriate to raise it now.  I've

15   discussed this with the Government, they know what it is.

16   I'll summarize it as follows.

17          THE COURT:  Okay.

18          MR. BURNHAM:  The Government intends to introduce

19   in their case in chief a considerable number of Facebook

20   messages that were seized from Mr. Brock's personal cell

21   phone.  Some of those messages, we have no objection to, and

22   I've advised the Government as to which particular ones those

23   are, but to summarize, our position is that if a Facebook

24   message is either on January 6th itself or close to it, or

25   even if it was a few weeks ahead of time, if it specifically

A66

5

1     refers to January 6th or to the Electoral College, it's
2     admissible and that's -- there's a number that fall in that
3     category, we won't be objecting to.  However, there's a
4     considerable number that are both weeks ahead of January 6th
5     and don't specifically refer to the Electoral College itself
6     or to the associated demonstration but rather to just general
7     political discussion about the election.  And there's, you
8     know, there's some heated rhetoric about, oh, the country is
9     being taken over, they're coming for our guns, isn't this
10    terrible.  And our objection to those is really on relevance
11    and 403 grounds, that they don't really speak to any question
12    presented to your Honor.  And I realize this is a bench
13    trial, but even so, it's highly prejudicial to Mr. Brock, and
14    it -- I think it gives the appearance that he's on trial for
15    having wrong political opinions if evidence comes in that is
16    just about the election, or about Joe Biden, or about, you
17    know, it's going to be 1776 all over again, it's -- and
18    there's really not much of a tie-in to much of that material
19    to any of the actual evidence.  So that would be our -- that
20    would be our objection.  We can get into individual ones now
21    or I could just sort of front the issue so --
22          THE COURT:  Well, I think it's good that you've
23    identified the issue, and it is a 403 issue as you explain
24    it, 403 issue really is going to depend on the specifics of
25    the Facebook entry, because I can't assess the prejudice

A67

6

1    really without looking at the particular exhibit.  So

2    probably, given that it's a bench trial, I can wait until the

3    time of introduction of the particular exhibit and hear, if

4    necessary, from each side, at least the first time, to get

5    your full positions in line, and then make that assessment

6    under 403 whenever that objection is made.

7         So I would say that the best way to do it is, the

8    first time you have an objection, make the objection, I'll

9    hear from both sides, we don't have a jury that we have to

10   remove, it's not going to waste much time, and make the

11   ruling on that one.  And then for successive ones that you

12   have objections to, I can assess the prejudice based on the

13   particular exhibit.

14        MR. BURNHAM:  I appreciate that, your Honor, I'll

15   proceed that way.  The only remaining issue is, and I haven't

16   discussed this particular piece of it with the Government so

17   I don't know, is I don't know how particularly prominent

18   those messages were going to be in opening statements.  I

19   know this is a bench trial but if they were the centerpiece,

20   you know, we would invite direction from the Court that

21   perhaps that material ought not to be proffered to the judge

22   before you've had a chance to rule on it.  But that's the

23   only question.

24        THE COURT:  I guess I have to ask the Government

25   with respect -- I would assume it's not going to be central

A68

7

1    to your opening?

2              MR. BURNHAM:  No, your Honor.

3              THE COURT:  I have to ask the Government whether it

4    intends to rely on those specific Facebook entry exhibits in

5    its opening.  And if so, then maybe I will have to deal with

6    that at least in part now, although, again, we don't have a

7    jury.  So if an opening refers to something that doesn't line

8    up in evidence, I could sort that out.

9              MR. BURNHAM:  And we are absolutely confident your

10   Honor can.

11             THE COURT:  Let me hear from --

12             MR. BURNHAM:  Thank you.

13             THE COURT:  -- from the Government just to have at

14   least clearly in mind what, if any, issue there may be with

15   respect to the openings, Ms. Ayers-Perez.

16             MS. AYERS-PEREZ:  Yes, your Honor.  There's only

17   one message that is planned to be used during the opening, it

18   is one that Mr. Burnham plans to object to or he's

19   represented he plans to object to.  I don't know if you want

20   to go over the specifics of the message now.

21             THE COURT:  Well, maybe we can do that message now

22   as sort of setting the table for all of the messages.

23             MS. AYERS-PEREZ:  Okay.

24             THE COURT:  All right.  Are you going to display

25   the message or how do you want to do it?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A69

8

```
 1            MS. AYERS-PEREZ:  We can display the message if --
 2   9N.
 3            THE CLERK:  Are you using your laptop?
 4            THE COURT:  It's coming up.  Give me a second and
 5   I'll read it.  Is it just the one page?
 6            MS. AYERS-PEREZ:  It's two pages, the second page
 7   will pop up if you let me know when you're done, we'll --
 8            THE COURT:  I'll let you know when the second page
 9   should pop up.  Do you have any problem with me reading it,
10   Mr. Burnham?
11            MR. BURNHAM:  No, your Honor, the Court has to read
12   it.
13                 (The Court reviews the document.)
14            THE COURT:  Okay, second page.
15                 (The Court reviews the document.)
16            THE COURT:  All right.  You can go back to the
17   first page while you make your argument.
18            MS. AYERS-PEREZ:  Yes, your Honor.
19            THE COURT:  Well, I guess I'll hear, hear the
20   objection first.  So Mr. Burnham, if you have more to say
21   with respect to supporting your objection.
22            MR. BURNHAM:  Well, I'll address that, your Honor,
23   I think this is a perfect example of the kind of thing we're
24   objecting to.  First of all, it's from Christmas Eve so well
25   in advance of January 6th.
```

A70

9

1          THE COURT:  Two weeks.

2          MR. BURNHAM:  That's right, and secondly, by its

3   own terms, it doesn't refer to January 6 itself, it starts,

4   "If Congress fails to act on January 6th," then all these

5   crazy things are going to happen.  And I'll proffer to the

6   Government that there's not going to be -- proffer to the

7   Court there's not going to be any evidence to lay a

8   foundation that there was seizing of Democratic politicians

9   or, you know, seizing media assets, that's not going to be

10  supported by the evidence at all.  So really the two problems

11  are, by its own terms this does not refer to January 6, it

12  refers to some other time; and secondly, it doesn't tie in to

13  any particular evidence that the Government can proffer, I'm

14  confident, that the Court is going to hear.  And the

15  prejudice, I mean people talking on Facebook, they're

16  friends, military buddies, and it's the prejudice even in a

17  bench trial is, outweighs whatever relevance this

18  communication has.  So this is a good example of the type of

19  objections I'll be raising to your Honor.  There's going to

20  be communications that refer to January 6th I'm not going to

21  object to at all, not trying to keep out relevant evidence.

22  Thank you.

23          THE COURT:  Thank you, Mr. Burnham.

24  Ms. Ayers-Perez.

25          MS. AYERS-PEREZ:  Yes, your Honor.  This post

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A71

10

1    actually specifically refers to January 6th in the beginning.

2            THE COURT:  Well, it doesn't refer to the events of

3    January 6th, it refers to Congress failing to act on

4    January 6th, but you're right, there is a reference to that

5    date.

6            MS. AYERS-PEREZ:  Right, and this goes to the

7    defendant's intent, especially for Count One, the 1512, the

8    obstruction of the official proceeding, the intent aspect of

9    that is that he was intending to obstruct the official

10   proceeding which is counting the Electoral College votes,

11   which is a direct result of the 2020 election on

12   November 3rd.  And this is his plan, his action if that

13   doesn't happen, if Congress doesn't act on January 6th.  It

14   goes to his intent, his knowledge as to what's actually

15   happening on January 6th, about Congress' role in

16   January 6th, and his thought process as to where -- I mean

17   this is only two weeks before January 6th, and his thought

18   process of what will happen if Congress doesn't act on

19   January 6th.  And then of course we have the evidence that I

20   believe will come in, your Honor, of him actually being at

21   Congress on the Senate floor on January 6th.  I think it's

22   directly relevant, I don't think it's more prejudicial than

23   probative.  I think it's more probative because it goes into

24   his state of mind, into his intent which is really one of the

25   main reasons that we're here, that we're fighting about the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A72

11

1    intent for Count One, that objection of the official

2    proceeding, your Honor, and that official proceeding is

3    what's happening in Congress on January 6th that he's

4    referencing, and is the catalyst for this entire message and

5    these tasks and these rules of engagement.

6            THE COURT:  All right.  I have three observations.

7    First observation is that it's a little hard to make a

8    definitive assessment of the, of how relevant this document

9    is, and how important, because I don't know what the other

10   evidence is, and I don't know whether this, in terms of its

11   relevance, is just cumulative of other evidence that will be

12   presented, which it may be, but I would say that the

13   relevance on a 402 assessment is maybe not all that strong,

14   but it seems to me that it is at least marginally relevant,

15   and so we do get to a 403 assessment because otherwise I

16   would believe it's admissible.  If we had a jury here, I

17   might reach a different conclusion with respect to the

18   prejudice, but I think with a bench trial, the prejudice can

19   be taken care of by my assessing it and giving it the weight

20   that it warrants, and understanding that sometimes things are

21   said not at the time of the January 6th events, but earlier

22   on that may be a little extreme.  I would say that some of

23   the things in this Facebook communication are pretty extreme,

24   but I think I can sort through that prejudice assessment

25   under 403.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A73

12

1          So my -- I don't want to make a definitive ruling,

2     because maybe something will change between now and the

3     actual introduction of this document, but if nothing does

4     change, I would be inclined to overrule the objection and

5     allow this document to be admitted, understanding with a 403

6     prejudice assessment I will be looking closely at just how

7     relevant it is and limiting my consideration of it to its

8     relevance, not to other things.

9          MS. AYERS-PEREZ:  Yes, your Honor.

10          THE COURT:  All right.  So you can refer to it in

11     your opening if you so desire.  With that, other things, did

12     you have anything else, Mr. Burnham?

13          MR. BURNHAM:  No, your Honor, thank you.

14          THE COURT:  And for the Government, anything?

15          MS. AYERS-PEREZ:  Yes, your Honor, we have a number

16     of stipulations that we have agreed to, and I have copies for

17     you.  I know typically in a jury trial, I or the witness

18     would read it into the record, I'm not sure how you want us

19     to handle that here in the bench trial.

20          THE COURT:  Does it make sense to do it at the

21     outset or does it make sense to do some of them at different

22     places in the trial if you're trying to keep me just on track

23     in terms of following what's going on?

24          MS. AYERS-PEREZ:  Yes, your Honor, I think we could

25     do some of them at the outset and then others can be done at

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A74

13

1    various points during the trial.

2            THE COURT:  And none of them are very long?

3            MS. AYERS-PEREZ:  A couple of them are, one of them

4    is pretty lengthy.  The rest of them --

5            THE COURT:  What's pretty lengthy mean?

6            MS. AYERS-PEREZ:  Four pages.

7            THE COURT:  Maybe you ought to give me that one so

8    I can read it, so you don't have to read it into the record,

9    but if there's a desire by either side to read anything so

10   it's in the record and in my mind from your reading it, I

11   will allow you to do that.  But for the lengthier ones, I

12   don't think that's necessary, just make sure that you refer

13   to it at the appropriate time and I'll tell you that I have

14   read it or take the time then to read it.

15           MS. AYERS-PEREZ:  Yes, your Honor, thank you.

16           THE COURT:  So are you going to give that whole set

17   or are you going to do it step by step as we come to them?

18           MS. AYERS-PEREZ:  I can give you the whole set,

19   these are the ones that are the originals signed by myself

20   and Mr. Burnham and then we have of course copies that we can

21   read from.

22           THE COURT:  Why don't you give me the whole set and

23   that way I can read in advance what's necessary to read in

24   advance, and have at the moment what I need when you refer to

25   them.  Thank you.

                                                                    14

1              MS. AYERS-PEREZ:  Thank you, your Honor.

2              THE COURT:  Now, these are, Mr. Bradley, all marked

3      as exhibits, so they will all be exhibits that will be

4      introduced as we get to them during the course of the trial.

5      All right.  Anything else, Ms. Ayers-Perez?

6              MS. AYERS-PEREZ:  No other preliminary matters,

7      your Honor, thank you.

8              THE COURT:  All right.  So with that, then we're

9      ready to proceed with opening statements by each side, and

10     then the evidence in the case.  How long does the Government

11     think its opening will be?

12             MR. MEISEL:  Fifteen to twenty minutes, your Honor.

13             THE COURT:  And the defense?

14             MR. BURNHAM:  I think I can do mine in 10, your

15     Honor.

16             THE COURT:  All right.  Well, let's start with the

17     Government.  Please go ahead, Mr. Meisel.

18             MR. MEISEL:  May it please the Court, good morning,

19     your Honor.  Judge, what you're about to see is a short

20     visual presentation of what you'll see in this case.  At the

21     close of the government's case, the only thing the Court will

22     need to decide is whether the defendant Larry Brock had

23     corrupt intent to obstruct an official proceeding to satisfy

24     Title 18 U.S. Code 1512.  It's the government's position the

25     evidence is sufficient that he was a "but for" cause for why

                       JODI L. HIBBARD, RPR, CRR, CSR
                             (315) 234-8547


                                A76

15

1    the Senate was obstructed from performing its constitutional

2    duty under the 12th Amendment on January 6, 2021.  This is a

3    snapshot or a roadmap that you need to decide this case.

4            Larry Brock is a veteran of the Air Force, which he

5    proudly displayed with his unit patch.  He celebrated

6    Christmas of 2020 by buying, by purchasing body armor and a

7    helmet or personal protective equipment in preparation for

8    what he considered an oncoming civil war.  He took an oath to

9    support and defend the Constitution from enemies foreign and

10   domestic, and on January 6, 2021, Larry Brock betrayed that

11   oath.  He betrayed his country and participated in mob

12   violence whose objective it was to disrupt the certification

13   proceedings for the 2020 Presidential election and prevent

14   the peaceful transition of power.  Brock was among a small

15   group that penetrated deep into the heart of the U.S.

16   Capitol, entering one of the most sensitive areas where the

17   Senate was convened to certify the election, the Senate

18   Chamber.

19           As early as November 2020 he contemplated an

20   assault on the U.S. Capitol.  He was preparing for that

21   assault as if it was a military operation, and viewing it

22   through the lens of a highly-trained tactically proficient

23   military officer.

24           I'm not going to -- the Court has already had an

25   opportunity to review this Facebook post, but this is one of

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A77

16

1    the most significant posts, within two weeks of the

2    January 6, 2021 event.  It reads like a military operations

3    order listing out assumptions that the U.S. military is not

4    going to be involved, seizing all Democratic politicians,

5    interrogating them using similar techniques that were used on

6    Al Qaeda, seizing national media assets.  Letting Democratic

7    cities burn, establishing provisional governments in

8    rebellious states, ceasing foreign aid except for key allies

9    as determined by President Trump.  And then rules of

10   engagement, do not kill law enforcement officers unless

11   necessary.  Gas would assist in this if we can get it.

12        Now in the video you're about to see you'll see the

13   defendant on the floor of the Senate.  You'll hear him tell a

14   fellow rioter to get out of the Vice President's chair.  And

15   if nothing else, it demonstrates that Brock, Larry Brock,

16   better than anyone else, understood the significance and the

17   value of the ground that they had just seized and its

18   importance to the disrupted certification proceedings.

19             (Video played.)

20        MR. MEISEL:  Now the key issue in this case is

21   corrupt intent.  The evidence will show that Mr. Brock was

22   prepared for civil war.  He purchased body armor and a helmet

23   just before January 6, he anticipated violence and he came

24   prepared for violence.  He traveled from his home in Texas to

25   D.C. and he wore that equipment on January 6.  He witnessed

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A78

17

1    violence and destruction and kept moving, maneuvering freely

2    and extensively throughout the Capitol Building.  He picked

3    up and retained flex cuffs.  Twenty minutes after the

4    evacuation of the Vice President, Mr. Brock was at the same

5    door with a set of keys trying to access the Senate Chamber.

6    He entered one of the most sensitive spaces, the Senate

7    Chamber, where minutes earlier the Senate was convened with

8    the Vice President presiding to take up objections to the

9    Electoral College vote.  He remained on the Senate floor for

10   approximately seven minutes.  His escalating rhetoric on

11   social media demonstrates that he firmly and erroneously

12   believed that Trump was the rightful winner of the 2020

13   election and that offensive action was required to unwind the

14   election results and that he was doing his patriotic duty to

15   prevent the certification and the transition of power.

16          The evidence will provide a nearly uninterrupted

17   timeline of the defendant's movements starting at the Stop

18   the Steal Rally.  To his walk east down Constitution Avenue

19   toward the U.S. Capitol, and as the mob's protesters with

20   numerical overmatch tossed aside barricades and overwhelmed

21   Capitol Police defensive lines, Brock moved with the mob

22   formed on the West Front.  He ascended the West Plaza stairs

23   to the Upper West Terrace.  He moved with the crowd through

24   the breach at the Senate Wing Doors at 2:24 p.m., and then

25   moved south with the crowd through the memorial doors at

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 82 of 609
Case 1:21-cr-00140-JDB   Document 79   Filed 12/06/22   Page 18 of 221

18

1    2:32 p.m. and ascending the memorial stairs to the second

2    floor.

3            So here's the Senate Wing Doors, and how it

4    appeared as Brock would have seen it at approximately

5    2:24 p.m.  Here is Mr. Brock entering the Senate Wing Doors

6    at 2:24 p.m.

7            After crossing through the memorial doors, he

8    ascends the second floor, he ends up in a location between

9    the Statuary Hall and the Rotunda, goes into the Rotunda

10   briefly, and then into the Rotunda door interior.  He's in

11   this area roughly from 2:35 to 2:39 p.m. before ascending the

12   Gallery stairs to the third floor.  Now it's during this

13   eight-minute window from entry to the memorial doors to the

14   Rotunda that Vice President Pence and his family are removed

15   from the Senate Chamber, the East Front is breached, staffers

16   throughout the building are barricaded and sheltering in

17   place, Capitol Police have established barricades in the

18   House Chamber with lawmakers sheltered in place.  And at

19   2:30 p.m., the Senate evacuation is well underway.

20           So on the third floor, these are additional images

21   of Brock as he -- of Mr. Brock as he moved from the Rotunda

22   to the Rotunda door interior, and this is an image of him

23   ascending the Gallery stairs toward the third floor.  So at

24   the third floor, he arrives at approximately 2:40 p.m. in the

25   east corridor, proceeds north to the Senate Gallery, and

19

1    enters the Senate Chamber balcony at approximately 2:42 p.m.

2            These photos depict Mr. Brock's movements through

3    the east corridor, through the Senate Gallery, the balcony of

4    the Senate Chamber.  And then at 2:47 p.m., Mr. Brock is seen

5    outside the Senate Chamber attempting to access the same door

6    that the Vice President had been removed by Secret Service no

7    less than 20 minutes earlier.

8            THE COURT:  Looked like exactly 21 minutes earlier.

9            MR. MEISEL:  Yes, your Honor.  This is video of the

10   Vice President being removed from the chamber through the

11   very same door that Mr. Brock was attempting to gain access.

12   So at this point, Mr. Brock and a group of rioters maneuvered

13   down to the second floor.  Ultimately, Mr. Brock is able to

14   access the Senate Chamber from approximately 2:48 p.m. to

15   2:55 p.m.  And after leaving the Senate Chamber, he maneuvers

16   down the west stairs and exits the Parliamentarian doors at

17   3:01 p.m.

18           And Judge, at the conclusion of the government's

19   case, after reviewing the government's evidence and the

20   escalating and violent rhetoric on social media and receiving

21   other evidence, physical evidence, my colleagues and I will

22   ask that you find that we've met our burden and we'll ask you

23   to find the defendant guilty of obstructing the official

24   proceeding and each of the lesser charges.  Thank you.

25           THE COURT:  All right, thank you, Mr. Meisel.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A81

20

```
1   Mr. Burnham.

2          MR. BURNHAM:  Thank you, your Honor.  Morning

3   again, your Honor.  Your Honor, I'll start by observing that

4   I agree with the Government to the extent that intent is

5   going to be a central issue in this case.  There's going to

6   be other issues as well, other things we're contesting that

7   we'll get into probably more so at closing, but we maintain

8   absolutely when the evidence is viewed as a whole, there's no

9   evidence of criminal intent here.  In fact, quite the

10  opposite.

11         So what's the Court going to learn?  I'll start

12  with Mr. Brock himself.  As the Government alluded to, the

13  Court will hear that he is a veteran, long-time veteran of

14  the Air Force with combat experience flying the A10 and other

15  military aircraft.  There's not going to be any evidence that

16  he has a history of political activity at all, let alone any

17  kind of rabble rousing.  There's not going to be evidence

18  that he had even tangential connections to any organized

19  group, whether it be a suspect group or indeed any group.

20  The evidence is simply going to be that Mr. Brock was a

21  supporter of the former President, and an assiduous follower

22  of the news who, based on the things that he had read and

23  heard, developed concerns with the 2020 election, fraud,

24  illegality and so forth, and decided for that reason to

25  travel to D.C. on January 6 to support, along with thousands
```

A82

21

1    of other people, to participate in that First Amendment

2    demonstration in support of the former President.  Mr. Brock

3    traveled to Washington, D.C. by himself, no one was with him,

4    there's not going to be any evidence that he was coordinating

5    with anyone he was going to meet there, I mean he was by

6    himself, there to support the President and support

7    Democracy.

8         He was present there at the speech at the Ellipse

9    where the President spoke.  There's already been alluded to

10   his attire.  I think the government's witnesses will probably

11   admit that throughout 2020 and particularly at two pro-Trump

12   protests in December, there had been counter-protesters that

13   engaged with the Trump supporters and there was instances

14   that reported in the news of throwing batteries, throwing

15   frozen water bottles, bricks, and that some of the Trump

16   supporters sustained injury and so the evidence is going to

17   be that not just Mr. Brock by a long shot but many, many

18   people, you've seen some of them already in the videos, wore

19   personal protective equipment of many kinds, vests, helmets,

20   bike helmets, motorcycle helmets, and Mr. Brock had that as

21   well, his helmet and he had on his vest.  So that was his

22   attire.  So he was there for the speech at the Ellipse and he

23   would have heard the President say, let's go to the Capitol.

24   And then, along with hundreds of thousands of other people,

25   there was the walk there down from the Ellipse down

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A83

22

1    Constitution Avenue to the Capitol itself.

2           And so then the important evidence that the Court

3    is going to hear at that point is Mr. Brock was not anywhere

4    towards the front of that group.  He wasn't the first wave as

5    it's sometimes been referred to.  On the contrary.  And those

6    were the people that there might be some evidence that were

7    fighting with police, you know, having standoffs, breaking

8    windows.  It's going to be none of that with respect to him.

9    The evidence, we're confident, is going to be that by the

10   time Mr. Brock approached the west facade of the Capitol, any

11   semblance of a barricade, this gets to the restricted area

12   issue, was removed outside of his presence.  The bike racks

13   were gone, the standoff with police were done, and at that

14   point any police in the area were literally standing aside,

15   the evidence is going to show that.  It's not just that they

16   weren't physically engaging the protesters, they were off to

17   the side making no effort whatsoever to interfere with the

18   movement of the crowd.  And that's not even a verbal effort,

19   there's not going to be evidence that there was say police on

20   loudspeakers saying, disperse, this is an unlawful entry,

21   assembly, disperse, there's not going to be any of that.

22          And then your Honor already saw that at the point

23   where Mr. Brock is on film entering the door to the building

24   itself, there's no police there, it's almost an orderly

25   procession into the Capitol.  There's nobody there putting

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A84

1   him on notice that entry there was prohibited.  And this is,

2   the backdrop to this is the evidence will show this is the

3   U.S. Capitol in the 9/11 era so to speak and the evidence, we

4   submit, is such that a reasonable person could conclude that

5   the persons lawfully in charge of the Capitol made a decision

6   that entry was going to be allowed.  All the evidence

7   tends -- I don't want to get into arguments in opening

8   statement but that's what I think the evidence will show.

9        The evidence will also show one of the cruel twists

10  of fate in this case, a tragic aspect of it is that right,

11  you know, if Mr. Brock had approached just a few minutes

12  before he did, there would have been protesters there

13  breaking windows and kicking the door and I think the

14  evidence is going to be clear that had Mr. Brock approached

15  at that point, he wouldn't have engaged in any of that.  I'll

16  get to why I say that in just a moment.

17       The other cruel fact about this case is the

18  evidence is going to show if he had approached that door just

19  a few minutes later, there would have been a police standoff

20  where police had secured the door and they had shields trying

21  to keep people out.  The evidence is going to be very clear

22  that had Mr. Brock approached just a few minutes later and

23  been presented with that scene, he would have turned around

24  and left.  I think the Court's going to have no trouble

25  concluding that.  The fact that he approached just, just when

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A85

24

1    he did, in the middle of the group is the tragic circumstance

2    that led to this unfortunate case.

3          And I think those observations are only going to be

4    reinforced by Mr. Brock's actions in the Capitol, some of

5    which we've seen already.  Your Honor heard Mr. Brock

6    admonishing the other demonstrator to get out of the Vice

7    President's chair and telling him and the others, we have to

8    be respectful, that's not our chair.  And that's not the only

9    example of that that the Court's going to hear today is of

10   Mr. Brock behaving in that way.  Your Honor probably, could

11   have already observed from the courtroom and from the videos

12   that Mr. Brock is a man of considerable physical stature.  He

13   was in his 50s, is in his 50s, was in his 50s in 2021 which

14   puts him older than probably most of the people that were

15   there that day, certainly not all.  And his long career in

16   the military, you'll see this, has given him a certain

17   ability to issue commands in an authoritative way, he has

18   that training.  And the evidence is all going to show that he

19   used those personal characteristics to exert a moderating

20   influence on anybody that was in his sphere.  If anyone was

21   getting out of hand, behaving disrespectfully, he admonished

22   those people not to do that, which is the very opposite of

23   the intent to obstruct government business, to obstruct

24   Congress, to break the law, to behave wrongfully.  It's

25   completely inconsistent with that.  I'm straying into

A86

1    argument, I'll save further elaboration on that to closing.

2          Finally, though, there's going to be evidence that

3    Mr. Brock left the Capitol voluntarily under the supervision

4    of law enforcement well before the actual clearing out of

5    everybody began, and before the President's, you know, famous

6    tweet about, we love you, you're very special but you have to

7    leave, that all came later.  He voluntarily, after he had

8    walked around, been here and there, as your Honor saw, he

9    left voluntarily.  And even on his way out the door, when

10   another individual was -- there's a video of this, too,

11   getting a little out of hand and being a little

12   confrontational with officers, on his way out the door you

13   can see Mr. Brock patting this gentleman on the shoulder,

14   telling him calm down, escorting him out (indicating).  For

15   the record I'm making the motions that go along with that

16   description, that's, even on his way out the door, he was

17   behaving in that way.

18          And so the government's case, and we've heard this

19   already, is focusing on small parts of the record, I would

20   submit, look at this terrible Facebook message, look at this

21   30-second snippet of video, why is he opening that door,

22   isn't that nefarious?  But we submit when the evidence is

23   considered as a whole, it's a clear-cut case for complete

24   lack of criminal intent.  The Facebook messages, to the

25   extent they're admitted, are absurdly overheated and absurdly

A87

1    inconsistent with the actual evidence of how Mr. Brock

2    behaved that day, who he was and what his actions were

3    intended to accomplish.

4         We submit at the conclusion of the evidence, the

5    Court will have no trouble concluding that Mr. Brock did not

6    have criminal intent and was instead, disagree with him

7    though the Court and other reasonable people might, was doing

8    his best to act in accordance with the best traditions of

9    citizenship, patriotism, and love of country to which he's

10   lived his whole life up to this point.  Thank you.

11        THE COURT:  Thank you, Mr. Burnham.  All right.  I

12   appreciate the opening statements of counsel, and now let's

13   hear and see the evidence in the case.  Government may begin

14   to present witnesses and exhibits.

15        MR. DISNEY:  Thank you, your Honor.  Your Honor,

16   you do have a stipulation, it's Exhibit 702 and it's

17   regarding the stipulation of the Electoral College.

18        THE COURT:  And that's a lengthy stipulation?

19        MR. DISNEY:  It is a lengthy stipulation and we

20   don't have to go through it at this point, but basically, it

21   lays out that the Electoral College was going on, the

22   counting, certification of Electoral College was going on,

23   that it was interrupted and it lays out the times that it was

24   interrupted.

25        THE COURT:  You can give me just a second.  I mean,

Elizabeth Glavey - Direct                    27

 1   I'm familiar with this information generally, just a second.

 2   Sometimes these exhibits are not all clipped together.  I

 3   seem to have --

 4            MR. DISNEY:  It was in the 702, the stipulations

 5   that were just handed to you.

 6            THE COURT:  Just a second.  I need to just make

 7   sure I have everything straight here.  Does it have 18

 8   paragraphs in total?  Fourth page would be the 18th

 9   paragraph?

10            MR. DISNEY:  Yes, your Honor.

11            THE COURT:  All right, I've got it.

12               (The Court reviews Exhibit No. 702.)

13            THE COURT:  All right, I've reviewed it.

14            MR. DISNEY:  We just wanted to have that background

15   for the Court before we call our first witness which will be

16   Elizabeth Glavey.

17            THE COURT:  All right.

18            THE CLERK:  Good morning, ma'am.

19            THE WITNESS:  Good morning, sir.

20            THE CLERK:  Please raise your right hand.

21

22            E L I Z A B E T H   G L A V E Y , called

23   as a witness and being duly sworn, testifies as

24   follows:

25            THE COURT:  Good morning, Ms. Glavey.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A89

Elizabeth Glavey - Direct                              28

1              THE WITNESS:  Good morning, sir.

2              MR. DISNEY:  Your Honor, with permission of defense

3     counsel, I would move to admit State's Exhibits -- I'm sorry,

4     Government Exhibits 205, 206, 207, 208, and 209.  That's 205

5     through 209.

6              THE COURT:  Without objection?

7              MR. BURNHAM:  Yes, your Honor.

8              THE COURT:  All right.  So Government's 205, 206,

9     207, 208, and 209 are admitted, and by the way, Government's

10    70 -- well, I'm sorry, Exhibit 702, a stipulation, is

11    admitted as well.

12             MR. DISNEY:  And then two more exhibits are

13    Government's Exhibits 402 and 403.

14             THE COURT:  Without objection, Mr. Burnham?

15             MR. BURNHAM:  Yes, your Honor.

16             THE COURT:  402 and 403 are admitted.

17             MR. BURNHAM:  Yes, your Honor, no objection.

18    DIRECT EXAMINATION BY MR. DISNEY:

19    Q    Ma'am, would you tell us your name?

20    A    Elizabeth Glavey.

21    Q    And where are you employed?

22    A    The Secret Service.

23    Q    How long have you been with the Secret Service?

24    A    Thirteen years.

25    Q    And what is the mission of the United States Secret

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A90

Elizabeth Glavey - Direct                              29

1   Service?

2   A      It's a dual mission with protection and investigations.

3   Q      Thank you.  And what is the current position you hold

4   with the Secret Service today?

5   A      I'm an instructor at the Secret Service training

6   academy.

7   Q      And back on January 6 of 2021, what position did you

8   hold?

9   A      I was an agent on the Vice President's detail.

10  Q      And who was the Vice President at that time?

11  A      Michael Pence.

12  Q      And how long had you been on that detail?

13  A      At that time, three years.

14  Q      And what was your responsibilities on the Vice

15  President's detail?

16  A      To protect the Vice President and his family and to do

17  security advances.

18  Q      When you say to do security advances, what are you

19  talking about?

20  A      When the Vice President would travel, we would send out

21  a team to that location and we would conduct a security plan

22  for the venues that the Vice President would visit.

23  Q      In protecting the Vice President, is it important to

24  have a perimeter established?

25  A      A security perimeter, yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A91

Elizabeth Glavey - Direct                    30

1    Q    And what purpose does that serve?

2    A    It provides a barrier for where the general public can

3    come in, get screened and enter our facility.

4    Q    And when you say get screened, what do you mean by

5    that?

6    A    To check the individuals for any kind of weapons that

7    could harm the Vice President or his family.

8    Q    And do you feel like that that is an important, the

9    screening is important in protecting the Vice President?

10   A    Yes.

11   Q    Thank you.  Now going back to January 6th, 2021, we

12   have this stipulation of the Electoral College, but it's my

13   understanding that Vice President Pence was slated to go to

14   Congress on that day?

15   A    That's correct.

16   Q    And what was your assignment on that particular day?

17   A    I was the site agent that day.

18   Q    And what does that mean?

19   A    I was responsible for taking the Vice President

20   anywhere he needed to go throughout the Capitol that day, I

21   was the point of contact.

22   Q    Prior to January 6th, 2021, did you and your colleagues

23   work out a plan about the Vice President's visit?

24   A    Yes.

25   Q    And is there a name for the, basically the sheet that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A92

Elizabeth Glavey - Direct                    31

1   you used to develop this plan?

2   A    Yes, with my liaison counterpart, we completed the head

3   of state notification for the Capitol.

4   Q    Okay.  And what is, if you can just tell me what is a

5   head of state notification worksheet?

6   A    It notifies the Capitol who would be visiting, in this

7   sense Vice President Pence and Mrs. Pence and the daughter

8   would be attending the Capitol that day and who the point of

9   contacts were for the Vice President's detail, as well as his

10   itinerary for the day.

11   Q    And if we could pull up Government's 206, please.  And

12   do you see the document that's on the screen?

13   A    I do.

14   Q    Is that the head of state worksheet that you talked

15   about?

16   A    Yes, that's correct.

17   Q    This is -- is this basically the plan for the Vice

18   President's visit?

19   A    Yes.

20   Q    Who all is involved in getting this head of state

21   worksheet?

22   A    Our liaison division coordinates it.

23   Q    Okay, thank you.  And the Vice President, if we can go

24   ahead and keep that up, the Vice President, does it say on

25   the sheet what the function of his visit was?  Under the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A93

Elizabeth Glavey - Direct                     32

```
 1   fifth --
 2   A     Yes, in the itinerary, the Electoral College
 3   certification is listed in the function column.
 4   Q     And who all was this distributed to?
 5   A     It was distributed to the detail and the Capitol Police
 6   and our liaison division.
 7   Q     In general, can you tell us what the plan was for the
 8   Vice President, you know, what time he was going to arrive
 9   and tell me just what was anticipated.
10   A     We expected him to arrive around 12:30 and it was to
11   certify the vote, and we would stay at the Capitol until the
12   conclusion of the certification.
13   Q     What type of movement throughout the Capitol did you
14   anticipate the Vice President would have to make?
15   A     We expected to potentially have to make several
16   movements between the House and Senate side whenever there
17   would be an objection to the vote.
18   Q     Had you basically studied up on what was involved in
19   Electoral College to know what, kind of what was going to go
20   on?
21   A     Yes, I was briefed by our liaison division on the
22   formalities of the process.
23   Q     When the Vice President arrived at the Capitol, where
24   was the first place that he was going to be taken?
25   A     To his office.
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A94

Elizabeth Glavey - Direct                    33

1    Q     And what side of the Senate, what side --

2    A     The Senate side.

3    Q     I'm sorry, got ahead of myself.  And then where did you

4    anticipate him having to go?

5    A     To the House Chamber.

6    Q     Okay.  And then if there was an objection, where would

7    the Vice President -- objection during the certification,

8    where would the Vice President have to go?

9    A     We would return to the Senate Chamber.

10   Q     So your anticipation was there was going to be quite a

11   bit, even in the best circumstance, quite a bit of movement

12   from the Senate to the House side by the Vice President,

13   correct?

14   A     That's correct.

15   Q     Does that -- what issues does that bring up for someone

16   providing protection for the Vice President, this type of

17   movement?

18   A     The issues we did not know how long we would be there,

19   we obviously had to stay until the certification was

20   complete, so we just knew logistically we would be on both

21   sides of the Capitol repeatedly and we could go very late

22   into the evening.

23   Q     Is there someone in the Capitol with the Secret Service

24   that you worked with to maybe get down into the details of

25   the Vice President's movements?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A95

Elizabeth Glavey - Direct                                    34

1   A     We work with our liaison division which -- is Secret

2   Service agents.

3   Q     Okay.  I was looking for a name of someone that you

4   worked with on that particular day.

5   A     Yep, Lanelle Hawa.

6   Q     And tell me, about what time did you get to the

7   Capitol?

8   A     I'd say I arrived around 10 a.m.

9   Q     And what did you do when you arrived?

10  A     I walked through the proceedings with Lanelle Hawa, she

11  again advised me on the formalities that would take place.

12        MR. BURNHAM:  Objection, hearsay.

13        THE COURT:  It is hearsay.  Sustained.  Although

14  the general subject, rather than the specific information,

15  really is not objectionable, that she gave general advice.

16  Q     And would it be fair to say that you and Agent Hawa

17  walked through a game plan of what would occur when the Vice

18  President came that day?

19  A     Yes.

20  Q     Can you explain to us, you said you were on the Vice

21  President's detail but you didn't arrive with the Vice

22  President; how does that work?

23  A     So as the site agent it's my responsibility to be there

24  early in advance of the Vice President and to prepare and

25  make sure everything is ready at the site for the Vice

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A96

Elizabeth Glavey - Direct                    35

1    President to arrive.

2    Q       And I'll show you Exhibit 205 if we could pull that up.

3    Can you tell us what we're looking at with State's --

4    Government Exhibit 205?

5    A       It's the e-mail with the head of state notification.

6    Q       That's the e-mail that attached that head of state

7    notification?

8    A       Correct.

9    Q       And you said that that was -- we can see some of the

10   people that that was sent to but your name's on there and

11   then that's from, that's the Agent Hawa that you spoke of,

12   correct?

13   A       Yes.

14   Q       Did you -- the Government's Exhibit 206 kind of set out

15   the best case scenario, if everything went according to plan,

16   correct?

17   A       That's correct.

18   Q       Did you also go over an emergency action plan?

19   A       I did, with Lanelle Hawa.

20   Q       And what is an emergency action plan?

21   A       It's a plan that we would put in place in the event of

22   an emergency with our protectee.

23   Q       Okay, thank you.  And did Vice President Pence arrive

24   to the Capitol on January 6th, 2021?

25   A       He did.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A97

Elizabeth Glavey - Direct                     36

1    Q    And what time did he arrive?

2    A    Between 12, 12:30.

3    Q    And when did he next leave the Capitol grounds?

4    A    The next day around 3, 4 in the morning.

5    Q    Okay.  So I just want to be clear that when he arrived

6    at 12, 12:20 in the afternoon, he never left the Capitol

7    grounds until 3, 3, 4:00 the next morning?

8              MR. BURNHAM:  Objection, your Honor, leading.

9              THE COURT:  I'm sorry?

10             MR. BURNHAM:  Objection to leading.

11             THE COURT:  No, he's repeating what she already

12    testified to so the objection's overruled.  Did you get an

13    answer to that question?

14    Q    Is that correct, he never left?

15    A    That's correct, he never left.

16    Q    Thank you.  What did you do when the Vice President

17    arrived at the Capitol?

18    A    When the Vice President first arrived, I distributed

19    the visitor passes to the members of the detail that would be

20    entering the Capitol, and then we proceeded to the second

21    floor where the Vice President's office was.

22    Q    And when he arrived, where did his motorcade drop him

23    off at?

24    A    They dropped him off at the Senate Carriage entrance

25    and then they would have relocated at some point.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A98

Elizabeth Glavey - Direct                37

1   Q      Okay, thank you.  And are you then, after Vice

2   President Pence arrived at the Capitol, are you pretty near

3   him if not in the same room, you are at least in his

4   proximity throughout the whole time he's at the Capitol?

5   A      Yes.

6   Q      Thank you.  Where is the Vice President's office in the

7   Senate?

8   A      It's on the second floor.

9   Q      And what -- we have a stipulation but what time,

10  approximately what time did the certification of the

11  Electoral College start?

12  A      I don't recall, I would say maybe 1:00.

13  Q      Okay, it's in the stipulation, so ... if the

14  stipulation says that at approximately 12:56 the members of

15  the Senate proceeded from the Senate Chamber to the House

16  Chamber, would you have any disagreement with that?

17  A      I would not.

18  Q      And Vice President Pence would have then went with the

19  Senate over to the House Chamber?

20  A      Yes.

21  Q      And did you follow along?

22  A      I did.

23  Q      And did the certification of the vote then begin?

24  A      It did.

25  Q      And up to this point, is everything going to plan?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A99

Elizabeth Glavey - Direct                                38

1    A      Yes.

2    Q      And did there come a time then when Vice President

3    Pence needed to go back to the Senate side?

4    A      Yes, there was an objection in the vote so we returned

5    to the Senate side.

6    Q      And again, that's all according to plan, correct?

7    A      Correct.

8    Q      At this point in time when you went from the Senate to

9    the -- I'm sorry, when you went from the House side to the

10   Senate side, were you aware of anything that gave you concern

11   going on on the Capitol grounds?

12   A      Yes.  While I was waiting outside the Chamber, I could

13   hear the crowds coming towards the Capitol and I walked over

14   to the windows and I could see the people coming.

15   Q      And at this time, were you aware of any unauthorized

16   person inside the building?

17   A      I was not aware of anyone at that time.

18   Q      Only on the grounds?

19   A      Only on the grounds.

20   Q      And what impact did the individuals coming onto the

21   grounds have in, on your job of protecting the Vice

22   President?

23   A      At that point, we started to enact our emergency action

24   plan.

25   Q      Okay.  Was there a decision made regarding the

A100

Elizabeth Glavey - Direct                               39

1   President -- Vice President's motorcade?

2   A     Yes, the decision was made to relocate the motorcade.

3   Q     And can you explain that in a little bit more detail?

4   A     The Vice President's motorcade typically is positioned

5   on the plaza, that's at least what I refer it to is the

6   plaza, and there isn't much of a barrier at that location, so

7   the decision was made to relocate the vehicles so that the

8   vehicles would not be stuck on the plaza with all the people.

9   Q     And I'll show you, play for you what we have as

10  Government's Exhibit 402 which will show the movement of that

11  motorcade.

12                (Video playing.)

13           MR. DISNEY:  I'm sorry, that's not the right one.

14           THE COURT:  That's pretty quick.

15           MR. DISNEY:  Could I have just one second?

16           THE COURT:  This is 403, you said 402.

17           MR. DISNEY:  Yes, your Honor, I stand mistaken,

18  this is 403.

19                (Government's Exhibit 403 playing.)

20  Q     Can you tell us what we're looking at here, Agent?

21  A     This is a video of the Vice President's motorcade

22  relocating.

23  Q     This was, would you agree, maybe the start of the

24  emergency plan?

25  A     Correct, it was.


JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547


A101

Elizabeth Glavey - Direct                    40

1    Q     And why did you feel necessary to have that motorcade

2    move?

3    A     Because as you can see in the video, there's the crowds

4    there that have formed in close proximity to the vehicles so

5    we could not have our motorcade compromised by the general

6    public.

7    Q     Thank you.  And we can stop.  Now Agent Glavey, was

8    there a decision made to relocate the Vice President?

9    A     Yes, there was.

10   Q     And why is that?

11   A     Because the Capitol had been breached by the general

12   public so it was no longer secure and we didn't know if there

13   were people in the building with any kind of weapons.

14   Q     Now before you told us that you were aware that the

15   Capitol grounds had been breached.  Are you saying now the

16   Capitol as in the Capitol building was breached?

17   A     Yes.

18   Q     How do you know that?

19   A     When the motorcade was relocated, I broke away from the

20   detail and walked the route that we would take to our

21   relocation area, and when I was returning from that area back

22   to where the detail was, I heard the glass smash and then

23   shortly after I saw the public entering the building.  They

24   were already inside the building, they were crossing the

25   doorway where I was standing in close proximity.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A102

Elizabeth Glavey - Direct                    41

1    Q    Did you have a radio with you at this time?

2    A    I did.

3    Q    And were you able to communicate what you saw to your

4    supervisors?

5    A    Yes, I used my radio and I also was speaking directly

6    to one of my supervisors.

7    Q    Thank you.  And if we could play Exhibit 207.

8              (Government's Exhibit 207 was played.)

9    Q    We'll play that again so you can hear it.

10             (Government's Exhibit 207 was replayed.)

11   Q    I didn't hear it.

12   A    I can hear it.  "They've entered the building, hold,"

13   is what was said.

14   Q    "They've entered the building, hold."  What did you

15   mean by that?

16   A    In that, I was letting the supervisor know that

17   they've -- the public has entered the building and to hold,

18   don't bring the Vice President down.

19   Q    Thank you.  And this was obviously not according to

20   plan, correct?

21   A    Correct.

22   Q    And then I have two more, hopefully we can get them

23   louder, if not just tell me what they say, but Government's

24   Exhibit 208.

25             (Government's Exhibit 208 was played.)

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A103

Elizabeth Glavey - Direct                    42

 1   Q     Can you tell me what that says?

 2   A     That, "They're making access to the second floor."

 3   Q     Who is the "they" that you're talking about?

 4   A     The public.

 5         THE COURT:  Could you get the timeline in line?  I

 6   don't think I know or maybe I missed it, the time of the

 7   first radio communication and the second radio communication.

 8   Q     Do you have those times?  Can you give me an

 9   approximation of the times?

10   A     I can't.

11   Q     Okay.  It was after the motorcade had been moved,

12   correct?

13   A     Correct.

14   Q     And it was before the Vice President had been taken

15   from his office?

16   A     Yes.

17   Q     And we know from the stipulation that he was taken --

18   well, we'll get into that in a minute, so, I'll get -- I'll

19   lay a little bit more foundation?

20         THE COURT:  All right, thank you.

21   Q     If we could play Government's Exhibit 209.

22         (Government's Exhibit 209 was played.)

23   Q     What was it you said there, Agent?

24   A     There were 6 to 10 officers between us and the public

25   that were 5 to 10 feet away from me.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A104

Elizabeth Glavey - Direct                    43

1    Q      And at this point, the Vice President was where?

2    A      He was upstairs in his office.

3    Q      So the -- he had, he was still in the Senate side?

4    A      Correct.

5    Q      Because of the people who had entered the building, was

6    a decision made to relocate the Vice President?

7    A      Yes.

8    Q      And did you observe that happening?

9    A      Yes.

10   Q      And was that part of the emergency action plan?

11   A      Yes.

12   Q      Why did you feel it was necessary to move the Vice

13   President, why didn't you just let the certification keep

14   going and walk through the people and --

15   A      The building was no longer safe for the Vice President

16   or his family.

17   Q      Why?

18   A      Because we had people in there and we did not know if

19   they had weapons or what their intentions were towards the

20   Vice President.

21   Q      Thank you.  And I want to show you Government's

22   Exhibit 403.  Is this -- I'm sorry, your Honor, this is 404,

23   this is where I am confused.

24          THE COURT:  404 is not in evidence.

25          MR. DISNEY:  Your Honor, I -- we've renumbered one,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A105

Elizabeth Glavey - Direct                    44

1    and I said 403, it should have been 404 so I would withdraw

2    403 and ask that 404 be admitted.

3           THE COURT:  So 404, without objection, is in

4    evidence.

5           MR. BURNHAM:  No objection.

6           THE COURT:  And 403 has been removed at this time

7    from evidence.  Go ahead.

8    Q    So let's go ahead and pull that 404 up.  Do you

9    recognize this stairway?

10   A    Yes, I do.

11   Q    What is that stairway?

12   A    It's the stairwell that is right outside the Vice

13   President's office.

14   Q    Do you have a name for it?

15   A    I do not, it's just right there by the Senate Lobby.

16          THE COURT:  The stairway right outside the Vice

17   President's office.

18          MR. DISNEY:  Thank you.  And your Honor, we have a

19   stipulation that the time is accurate.  And what time is

20   that?

21          THE COURT:  Is this a different stipulation or is

22   this in 702?

23          MR. DISNEY:  No, it's a different stipulation that

24   we can get to now.

25          THE COURT:  Just for recordkeeping purposes, as

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A106

Elizabeth Glavey - Direct                    45

```
 1    soon as we refer to a stipulation, I want it admitted into
 2    evidence so we have the record complete.
 3              MR. DISNEY:  Thank you.  Your Honor, we would move
 4    to, if I didn't already move to admit it, I would move to
 5    admit the stipulation regarding the certification of the
 6    Electoral College.
 7              THE COURT:  702 is in evidence.
 8              MR. DISNEY:  And next I would refer the Court to
 9    Exhibit 701.
10              THE COURT:  And that too will be admitted into
11    evidence without objection since it's a stipulation.
12              MR. DISNEY:  And essentially what it says for our
13    purposes, your Honor, is that these videos are true and
14    accurate and that the times reflected are true and accurate.
15              THE COURT:  All right.
16    Q    And Agent, what time does this video have on it?
17    A    2:25.
18    Q    And what are we gonna see here?
19    A    You're going to see the Vice President come out of the
20    lobby.
21    Q    Thank you.  If we could go ahead and play the exhibit.
22              (Government's Exhibit 404 playing.)
23    Q    I'm going to ask you to pause it in just a second.  I
24    mean, no, go ahead, I'll tell you when.  Right here.  Your
25    Honor, may I approach the witness?
```

A107

Elizabeth Glavey - Direct                                 46

 1          THE COURT:  You may.

 2  Q     Would you know, I have an Exhibit 403A, would you write

 3  down the time that is shown on the video, does that -- does

 4  the still that's on the video match the picture that's on the

 5  403A?

 6  A     Yes.

 7  Q     And would you write down the time when, the time that

 8  the Vice President first leaves the office.

 9  A     (Witness complies.)

10  Q     And the witness wrote 2:26 in compliance.  And if we

11  could just go ahead and finish that video.

12               (Government Exhibit 404 played.)

13  Q     Agent, where are you at here?

14  A     I was at the bottom of that stairwell.

15  Q     And is the Vice President then taken to a secure

16  location in the Capitol?

17  A     Yes.

18  Q     Thank you.  And did you remain with the Vice President

19  in that location?

20  A     Yes.

21  Q     Because of moving the Vice President to that secure

22  location, did the certification of the Electoral College have

23  to be suspended?

24  A     Yes, it was delayed.

25          MR. DISNEY:  And, your Honor, that is all the

A108

Elizabeth Glavey - Cross                              47

1    questions I have at this time.

2              THE COURT:  All right.  Mr. Burnham.  And 403A is

3    not in evidence, by the way, at this time.

4              MR. DISNEY:  Right.  Yes, thank you for that.

5    CROSS-EXAMINATION BY MR. BURNHAM:

6    Q    Good morning.

7    A    Morning.

8    Q    I'm Charles Burnham, I have a few questions.  So you

9    testified on direct that you were, for what period of time

10   were you on the Vice President's staff, like from when to

11   when?

12   A    I was on the Vice President's detail a total of four

13   years, but at the time of January 6th, I was three years.

14   Q    And so would I be correct in assuming that as a part of

15   that, as a part of that job, putting January 6th itself aside

16   for a moment, part of your job would be to remain aware of

17   different emergency situations that could arise with respect

18   to the Vice President, right?

19   A    Yes.

20   Q    All right.  And so you would have at least in a general

21   sense been aware that there had been a significant amount of,

22   at times, violence or protest activity in the city during

23   2020, right?

24   A    Protest activity, yes.

25   Q    And I'm talking about the protests surrounding the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A109

Elizabeth Glavey - Cross                          48

1    George Floyd issue, other protests in support of the former

2    President before January 6th, right?

3    A    Yes.

4    Q    And at those protests, did you come to learn that there

5    had been clashes between different sets of protesters of

6    opposing views, BLM versus Trump or Antifa versus Trump, that

7    sort of thing?

8    A    Yes, I haven't worked any events where I had clashes

9    with protesters at my particular sites, but I was --

10   Q    But you were aware that they had taken place?

11   A    Yes.

12   Q    And did you hear either reported at those protests

13   there was bricks thrown, rocks thrown, batteries, punches,

14   you know, that kind of activity in general?

15             MR. DISNEY:  Your Honor, relevancy, personal

16   knowledge.

17             MR. BURNHAM:  Your Honor --

18             THE COURT:  Well, I take personal knowledge to mean

19   a hearsay objection.

20             MR. DISNEY:  Yes.

21             THE COURT:  And I understand your relevance point.

22   Mr. Burnham, you may respond.

23             MR. BURNHAM:  You know, the witness has testified

24   not only about her specific activities on that day but also

25   her general role, her background, what she did for the Vice

A110

Elizabeth Glavey - Cross                      49

1    President so I just ask for a little latitude to probe that

2    area.

3                THE COURT:  I'm going to give latitude to have her

4    make general observations but to testify to specific things

5    that happened at protests, I think you do run into a hearsay

6    objection.  If she wasn't there.

7                MR. BURNHAM:  What if I --

8                THE COURT:  Which is what she said, she wasn't

9    there, so --

10               MR. BURNHAM:  Can I inquire --

11               THE COURT:  -- it is hearsay.

12               MR. BURNHAM:  Can I inquire not for the truth but

13   just to whether she heard there had been violent clashes, is

14   that question permissible?

15               THE COURT:  Not for the truth.

16               MR. BURNHAM:  Not for the truth, whether she had

17   heard it reported or been informed that such a thing --

18               THE COURT:  But you want to use it for the truth

19   ultimately.

20               MR. BURNHAM:  Not necessarily, your Honor, if it

21   had been reported in the news, that's relevant to the

22   argument the Court is anticipating about -- I might make

23   later, if it had been reported that it had taken place,

24   that's all I need.

25               THE COURT:  Well, I can sort it out so I'll allow

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A111

Elizabeth Glavey - Cross                        50

1    you to go ahead and ask the question and the witness to

2    answer it.  I'm not going to allow you to drill very deeply

3    into it, though.

4    Q    I'll try to ask it as bare bones as possible, just as a

5    general matter, had you heard it reported say in the news

6    that there had been clashes between protesters in Washington,

7    D.C. of opposing political viewpoints?

8    A    Yes.

9    Q    Thank you.  Now you testified that in preparing to

10   protect Vice President Pence that day, you had to familiarize

11   yourself to a certain extent with how the Electoral College

12   functioned, is that right?

13   A    Yes, the procedure, as far as the formalities that

14   would take place for the procession of the Vice President

15   from the Senate side to the House side and vice versa.

16   Q    What would trigger that movement would be an objection

17   to say Alaska's votes from a Senator and a Congressman, would

18   that be correct?

19   A    Correct.

20   Q    And were you -- you would have been aware that quite a

21   good number of Senators and Congressmen had in fact announced

22   their intention ahead of time to object to various states, is

23   that right?

24   A    Correct.

25   Q    And that I assume is why you had done the planning you

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A112

Elizabeth Glavey - Cross                          51

1    did to be shuttling back and forth repeatedly and perhaps

2    staying there late into the night, right?

3    A    That's correct.

4    Q    And was it your understanding that if an objection to

5    say, again, we'll take Alaska's votes, was sustained, then

6    that could result in the Alaska votes not being certified, is

7    that right?

8    A    I just knew of the proceedings as far as the Vice

9    President's movements, as far as how the electoral vote took

10   place.  That information I'm not concrete on.

11   Q    Were you aware that there had been talk that one of the

12   options that the Vice President arguably had was to delay the

13   certification; is that something that was on your radar?

14   A    It's something I had heard on the news, not necessarily

15   from a procedural standpoint within the Capitol.

16   Q    Did you have any sort of planning for what you were

17   going to do if the certification was delayed beyond that

18   date?

19   A    For us, we just had to work our event until the

20   conclusion so my responsibility was to stay at the Capitol

21   until the Vice President left.

22   Q    Counsel for the Government showed you a video just a

23   moment ago about, you know, how the Vice President and his

24   staff leaving the doors there, you recall that, right?

25   A    Yes, I do.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A113

Elizabeth Glavey - Cross                    52

1    Q      Those doors, wouldn't it be correct that they just say

2    something like U.S. Senate or I think they said U.S. Senate,

3    that right?

4    A      Correct, I -- honestly have not read it, but if you

5    pulled it up, I could read it.

6    Q      Well, they don't say anything like this is Vice

7    President Pence's office, there's nothing like that, correct?

8    A      No.

9    Q      They don't have a label on the doorframe saying Vice

10   President or anything like that, right?

11   A      Right.

12   Q      As to the radio runs, you recall the first radio run

13   where you said that they've entered the building or something

14   to that effect?

15   A      Yes, I think I said they entered the building, hold.

16   Q      Do you remember where you were located when you made

17   that call?

18   A      I was on the first floor.

19   Q      What part of the first floor?

20   A      I would have been near the stairwell that led up to

21   outside that office in the video.

22   Q      How about when you made the call where you said

23   protesters are in the building; where did you observe

24   protesters entering the building from?

25   A      I was all in that general area so there was another

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A114

Sean Patton - Direct                                        53

1   small stairwell, so I was in that area which was close to a

2   doorway, and the doorway is where I could see the protesters

3   passing by through the hallway.

4              MR. BURNHAM:  Thank you, no further questions.

5              MR. DISNEY:  No redirect, your Honor.

6              THE COURT:  All right.  Thank you very much.

7              THE WITNESS:  Thank you, sir.

8              THE COURT:  You may step down.

9              MR. DISNEY:  May this witness be excused?

10              THE COURT:  She may be.

11                   (The witness was excused.)

12              THE COURT:  Next witness.

13              MR. DISNEY:  Your Honor, we'd call Captain Sean

14   Patton.

15              THE CLERK:  Good morning, sir.  Please raise your

16   right hand.

17

18              S E A N   P A T T O N , called as a

19   witness and being duly sworn, testifies as follows:

20              THE COURT:  Good morning, Captain Patton.

21              THE WITNESS:  Good morning.

22   DIRECT EXAMINATION BY MR. DISNEY:

23   Q    Sir, would you tell us your name?

24   A    Good morning.  My name is Sean Patton.

25   Q    And who are you employed by?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A115

Sean Patton - Direct                54

1    A    I am a captain with the United States Capitol Police.

2    Q    How long have you worked for the Capitol Police?

3    A    I'm in my 24th year.

4    Q    And how many of -- what is your present position?

5    A    I am currently assigned to the assistant commander of

6    the Capitol division since October of 2020.

7    Q    Thank you.  And what is the mission of the United

8    States Capitol Police?

9    A    The mission of the United States Capitol Police is to

10   protect and defend the Congress so that they can complete

11   their legislative duties in a secure and open environment and

12   also protecting the facilities, their staff, visitors from

13   crime or disruption.

14   Q    What about the protection of the Capitol building and

15   grounds itself?

16   A    Correct, and that is also included in our mission to

17   protect the facilities in which the legislative process is

18   being conducted.

19   Q    I want to talk to you about the events of January 6,

20   2021.  What was your -- how would you describe your

21   responsibilities on that day?

22   A    On January 6th, 2021, I was assigned as the assistant

23   commander for routine operations inside the Capitol building

24   and that means I'm responsible for the men and women who work

25   at the Capitol itself, not the office buildings that are on

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A116

Sean Patton - Direct                                    55

1     either side of the building or CDU.

2     Q     Okay.  Would that include protection of the Capitol

3     grounds or just the building itself?

4     A     That would include the Capitol building and the

5     immediate grounds around the Capitol as far as the barricade

6     entrances and the outer areas of the building.  I supervise

7     officers who work outside the Capitol called first responder

8     unit.  Those men and women are outside 24/7, they never come

9     inside and they're there to protect the building exterior.

10    And then I'm also responsible for the men and women who work

11    inside the building as well as the men and women who were

12    working inside the House and Senate Chambers.

13    Q     And in your capacity as a assistant commander at the

14    Capitol, did you work inside the Capitol on a daily basis?

15    A     Yes, sir.

16    Q     And are you familiar with the U.S. Capitol and the

17    grounds?

18    A     Yes, I am.

19    Q     I want to show you -- I'm going to move for admission

20    of Government's Exhibit 101, the map of the Capitol grounds.

21          THE COURT:  All right, you spoke to them, I didn't

22    hear but I think you said 101.

23          MR. DISNEY:  101, I'm just seeing if they have an

24    objection.  Did you have an objection?

25          MR. BURNHAM:  No objection.

A117

Sean Patton - Direct                                    56

1              MR. DISNEY:  I would move to admit 101.

2              THE COURT:  101 is admitted without objection.

3    Q      And if we could bring that up and maybe zoom in just a

4    little bit.  Can you just give us, first of all, where is the

5    United States Capitol located in general, is it in the

6    District of Columbia?

7    A      Yes, it is.

8    Q      I just want to get that jurisdictional issue out.  So

9    can you tell me the streets that surround it?

10   A      The address of the United States Capitol is Number 1

11   First Street, Northwest, and it's surrounded by First Street

12   to the -- surrounded by First Street to the east,

13   Constitution Avenue and Independence Avenue, and First Street

14   in the west.

15   Q      And this Exhibit 101 in the top right-hand corner has a

16   compass that's pointing to the north, is that correct?

17   A      Yes, sir, compass is up in the upper right-hand corner.

18   Q      That's accurate?

19   A      Yes, sir.

20   Q      Tell me, what is the East Plaza area?

21   A      So if you look at the center of this picture, you see a

22   diagram of the United States Capitol, directly to the top of

23   the picture is an area called the East Plaza, or the East

24   Front as we refer to.

25   Q      And what are those areas that say Northeast Lawn and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A118

Sean Patton - Direct                    57

1    Southeast Lawn, what are those areas?

2    A     Those are grassy areas that are within the Capitol

3    perimeter, again that outline that I just told you,

4    surrounded by Constitution, first, Independence and

5    Constitution, we also commonly refer to the area as the

6    Senate egg which is labeled Northeast Lawn and also the House

7    egg which is referred to as the Southeast Lawn on your map.

8    Q     And then I want to talk about the west side of the

9    Capitol, can you take us through the Capitol grounds moving

10   from the reflecting pool up to the Capitol building itself?

11   A     Yes, sir.  So again with the Capitol in the center of

12   the picture, directly to the lower area, you see an area

13   called the West Lawn of the Capitol, and then joining on the

14   West Lawn is a walkway we refer to as the Pennsylvania Avenue

15   Walkway, and that is because it's an extension of

16   Pennsylvania Avenue, the street which is on the left-hand

17   side of the Capitol reflecting pool.  Pennsylvania Avenue has

18   a circle which we refer to as Peace Circle, and then the

19   Capitol ground goes up, walkway taking visitors to the

20   Capitol, on the adjoining side.  Next to the West Lawn, same

21   thing, that walkway is called Maryland Avenue Walkway, which

22   is an extension of Maryland Avenue, and then we have a

23   Garfield Circle is in the center right there, the grassy

24   areas on either side of the West Lawn are also areas that are

25   free speech areas, and then the lawn areas move up to the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A119

Sean Patton - Direct                              58

1    area which we call the Lower West Terrace.

2    Q    And I know that the Court probably knows this but just

3    briefly, if I was at the White House and wanted to walk to

4    the Capitol, what would be the most direct route?

5    A    If you were at the White House, which is located at

6    1600 Pennsylvania Avenue, you could walk straight down

7    Pennsylvania Avenue and it would end at the Capitol.

8    Q    And it would take me right to the Peace Circle?

9    A    Correct, sir.

10   Q    And take me to the northwest side of the Capitol?

11   A    That is correct.

12        MR. DISNEY:  Thank you.  Now I would like to admit

13   Government's Exhibit 201.

14        THE COURT:  Any objection?

15        MR. BURNHAM:  No, your Honor.

16        THE COURT:  All right.  201 is admitted.

17   Q    And I know that this is a stock photo, but can you

18   explain how the West Lawn of the Capitol is terraced?

19   A    Well, the Capitol was constructed on an area called

20   Jenkins Hill, and the terrace, the building itself, you see

21   here, has sloping terraces that make the building flow into

22   the landscape and the picture that you see here is a view of

23   the Senate side because it's showing the -- it's an angle

24   pointing to the Senate Chamber.  The Dome is right behind the

25   Senate Chamber and on the right-hand side is the area we

Sean Patton - Direct                                    59

1    refer to as the Upper West Terrace, you can see through the

2    tree line that there is an embankment that's higher up.  In

3    order to get to that area, you would have to use the

4    staircase.

5              MR. DISNEY:  And I would move to admit Government's

6    202.

7              MR. BURNHAM:  No objection.

8              THE COURT:  Without objection, 202 is admitted.

9    Q    And I know again this is a stock photo but can you

10   explain the different levels of the Capitol and kind of

11   explain what we're looking at here?

12   A    Yes, we're looking at a view of the West Front of the

13   Capitol, again, with the Capitol Dome in the middle of the

14   picture.  On the left-hand side, you see the Senate Chamber,

15   which is the north side of the building.  On the right-hand

16   side of the picture, the end of the building is referred to

17   as the House Chamber.  If you see in the middle of the

18   picture, there is a door with a little opening, we refer to

19   that as the Lower West Terrace door, and there is a line on

20   that Lower West Terrace that goes straight across to both

21   stairways that are the landings for those appropriate

22   stairways, and then right above those stairways is an area

23   referred to as the Upper West Terrace, and that is the top

24   landing area that authorized personnel could walk along and

25   go around the building to the other side.

A121

Sean Patton - Direct                                    60

1   Q     So the grassy area, what's that commonly referred to?

2   A     The grassy area in the center of the picture is

3   referred to as the West Lawn, West Front, or even Area 1.

4   Q     And then if I come up off the grassy area onto the

5   first cement, what's that called?

6   A     Typically call that the Lower West Terrace walkway.

7   Again it allows people to walk from say the Pennsylvania

8   Walkway over to the Maryland Walkway so they can make that

9   loop.

10  Q     And then you referred to the Upper West Terrace, what

11  separates the Upper West Terrace from the Lower West, or

12  Upper Terrace from the Lower Terrace?

13  A     What separates the Upper West Terrace from the Lower

14  West Terrace is the two flights of stairs.  There are, again,

15  behind those doors that you see in the center of the picture,

16  that is an opening to access the Lower West Terrace door, and

17  there's offices on that level as well.

18  Q     Now on January 6th, was there something going on on the

19  West Lawn that changed how the structure of the Lower West

20  Terrace?

21  A     Yes, there was.

22  Q     What's that?

23  A     The Architect of the Capitol who's responsible for the

24  maintenance of the building was constructing the inaugural

25  platform for the Presidential inauguration.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A122

Sean Patton - Direct                    61

1          MR. DISNEY:  I'll move to admit Government's 203.

2          THE COURT:  Without objection?  203.

3          MR. BURNHAM:  No objection.

4          THE COURT:  Thank you, Mr. Burnham.  203's

5    admitted.

6    Q     And what does this red box demonstrate?

7    A     The red box area represents the construction area that

8    is off limits for the construction of the inaugural stage.

9    Q     Okay.  How many stories total is the U.S. Capitol?

10   A     The Capitol has four stories.  As you can imagine as

11   the building comes into the center, those floors become

12   smaller, but there is a fourth floor of the Capitol.

13   Q     Okay.  And then you said the Senate is on the left side

14   and the House is on the right side, correct?

15   A     In this picture, correct.

16   Q     Yes.  And when there's a Joint Session of Congress,

17   where do the Senate and House meet?

18   A     When there's a Joint Session of Congress, they meet in

19   the House Chamber.

20   Q     And are you familiar with the certification of the

21   Electoral College?

22   A     Yes, I am.

23   Q     And is it a Joint Session of Congress?

24   A     Yes, it is.

25   Q     So it would be held on the House side?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A123

Sean Patton - Direct                    62

1    A    Yes, it is.

2    Q    And does that involve the Vice President as the

3    President of the Senate?

4    A    Yes, it does.

5    Q    And is there -- well, I'll strike that.  I want to talk

6    to you about security measures at the Capitol on January 6,

7    2021.  First of all, can we -- I want to focus on the Capitol

8    building itself, was the Capitol building open to visitors on

9    January 26, 2021?

10            THE COURT:  January 6th, you mean?

11   Q    I'm sorry, what did I say?  January 6, 2021.

12   A    No, the Capitol was not open to the public on

13   January 6, 2021 because of COVID.

14   Q    So who then was allowed into the Capitol?

15   A    Members and their staff and invited guests.

16   Q    Okay.  So someone, the Vice President or someone who

17   had official business could go?

18   A    Correct, sir.

19   Q    Is the Capitol building, I think you said this but is

20   it under patrol by the Capitol Police 24/7?

21   A    Yes, it is.

22   Q    And are all the doors of the Capitol manned?

23   A    All of the doors to the Capitol are not staffed and the

24   reason being is some of the doors are fire emergency exits,

25   those are means of egress in the event of an alarm or an

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A124

Sean Patton - Direct                                63

1   emergency.  The only doors that the Capitol Police will staff

2   are doors where members and official business visitors can

3   enter into the building.

4   Q    So if I'm an official visitor and I have business at

5   the Capitol on January 6th, what type of screening would I

6   have to go through?

7   A    You would have to go through a magnetometer, any

8   personal belongings that you may have in your person carrying

9   a bag would have to go through an x-ray machine, and as well

10  as we also have explosive detection swiping we call an

11  itemizer screening so, that also is swabbed, your personal

12  belongings or your keys, some item that belongs to you for

13  explosives.

14  Q    So would it be correct that no one got into the Capitol

15  unless they had their own security detail or unless they went

16  through that screening?

17  A    That is correct, with the exception of members of

18  Congress of course.

19  Q    Okay, thank you.

20       THE COURT:  The way you said that, no one got into

21  the -- you mean no one was supposed to get into the Capitol.

22       MR. DISNEY:  Yeah, no one was authorized to go in.

23  A    Correct, no one was authorized to bypass security

24  screening unless they are a member of Congress, a VIP on a

25  protection detail, or authorized staff.

Sean Patton - Direct                    64

1  Q      Thank you.  Now I want to -- we talked about security

2  at the Capitol building, I want to talk about security at the

3  Capitol grounds.  On a day-to-day basis, is the Capitol

4  grounds open to the public?

5  A      So that is a tricky question because we have to put our

6  minds around are we in COVID, are we not in COVID.

7  Q      Let's say no COVID.

8  A      If it was no COVID and it was just a regular day, the

9  public is welcome to be on the Capitol grounds.

10 Q      Then what about during this COVID plague, were the

11 Capitol grounds open to the general public?

12 A      So during the COVID pandemic, the areas of the Capitol

13 which we call the grassy areas or the public areas, they were

14 under restriction because we were following the D.C.

15 government rules for large gatherings because people were

16 still being restricted, I think groups, no more than groups

17 of 10 were being allowed to congregate in any given area.

18 Q      And then on the days leading up to the January

19 inauguration, was there anything else going on at the Capitol

20 that restricted the grounds further?

21 A      Yes, so on the day of January 6, 2021, in addition to

22 the Joint Session, we were aware of a large pro-Trump

23 demonstration that was going to be occurring at the Capitol.

24 Q      Okay.  And I probably messed that up, but you talked

25 about on this photograph here that they were building a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A126

Sean Patton - Direct                    65

1    stage?

2    A    Yes, they were building a stage for several months for

3    the Presidential inauguration.

4    Q    And did the building of that stage add some other

5    restrictions to the grounds?

6    A    Yes.  The entire West Front -- well, excuse me, the

7    West Front area was closed for construction for several

8    months prior to January of 2021.  During the construction,

9    there are times where we open small portions of the West Lawn

10   to receive the Capitol Christmas tree and then the public

11   could come in, take photos with the tree, but on January 6th,

12   that entire area was closed.

13   Q    So suffice it to say, setting aside the certification

14   of the Electoral College, there were restrictions in place on

15   the grounds to begin with?

16   A    Oh, yes, sir.

17   Q    COVID, the building of the stage, correct?

18   A    Correct, as well as snow fencing and other bike rack

19   along the perimeter of the Capitol that had been there

20   several months because of the ongoing construction.

21   Q    Then specifically as it relates to January 6th, was

22   there a restricted area that was established, specifically

23   for January 6th, and the Vice President coming to the

24   Capitol?

25   A    The question is did we extend the security perimeter

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A127

Sean Patton - Direct                            66

1    because of the January 6 -- excuse me, because of the

2    electoral vote count and the demonstration?

3    Q     Yes.

4    A     The answer is yes.

5            MR. DISNEY:  I'll ask that Government's 103 be

6    admitted.

7            THE COURT:  Without objection?

8            MR. BURNHAM:  I'm sorry, what was the number?

9            MR. DISNEY:  103, it was the perimeter map.

10           MR. BURNHAM:  No objection.

11           THE COURT:  Thank you, Mr. Burnham, no objection

12   and 103 is admitted.

13   Q     And this is a photo of the Capitol grounds, correct?

14   A     Yes, it is, sir.

15   Q     What does the red line represent?

16   A     The red line represents the extended security perimeter

17   on January 6 for the electoral vote count and for the

18   demonstration activity that was scheduled to happen that day.

19   Q     And what was the construction of that perimeter, how

20   was it actually made?

21   A     The majority of that perimeter consisted of bicycle

22   rack, while it also encapsulated natural portions of the

23   Capitol grounds and infrastructure that we have such as

24   kiosks and barricades and retaining walls.

25   Q     And was it all connected in some fashion?

A128

Sean Patton - Direct                    67

1    A    It was, everything was connected in some fashion, so

2    individuals would not be allowed to enter inside that red

3    area that you have outlined.

4    Q    Was there any signage that alerted people that they

5    were not allowed to go into that area?

6    A    Yes, on certain portions of the bike rack, as well as

7    the snow fencing, there were signs that said closed by order

8    of the Capitol Police Board, area closed.

9    Q    I want to talk to you about the events of January 6th,

10   2021, and would it assist you in explaining the events if we

11   could go back to Exhibit 103?

12   A    Yes, sir.

13   Q    If we could then go back to 103.

14        THE COURT:  And at some point this morning we'll

15   need to take a morning break.

16        MR. DISNEY:  This might be a good time.

17        THE COURT:  If this is a good time, why don't we do

18   it now.

19        MR. DISNEY:  Yes, sir.

20        THE COURT:  So by that clock, we'll resume at 11:30

21   which is in 12 minutes.  Thank you.

22        THE CLERK:  This Honorable Court stands in recess

23   until 11:30 a.m.

24             (Court in recess, 11:18 a.m. to 11:33 a.m.)

25             (Open Court.)

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A129

Sean Patton - Direct                          68

1          THE COURT:  All right, Captain Patton, you're still

2     under oath.  Mr. Disney.

3          MR. DISNEY:  Your Honor, I spoke with defense and

4     we can move to admit some exhibits and maybe save a little

5     bit of time.

6          THE COURT:  That's fine.

7          MR. DISNEY:  Move to admit 104, 210, 211, and 212.

8          MR. BURNHAM:  No objection.

9          THE COURT:  210, 211, and 212 are not on my list.

10         MR. DISNEY:  I'm sorry, your Honor, you're right.

11    So I move to admit 104, and then 400 through 419.

12         THE COURT:  Through 419?

13         MR. DISNEY:  Yes.

14         THE COURT:  No objection to those, Mr. Burnham?

15         MR. BURNHAM:  No, your Honor.

16         THE COURT:  So that includes 403 that was not

17    admitted before?

18         MR. DISNEY:  Yes, your Honor.

19         THE COURT:  All right.

20         MR. DISNEY:  And then 501 through 508.

21         MR. BURNHAM:  No objection.

22         THE COURT:  501 through 508 and it includes all the

23    As in that numbering sequence?

24         MR. DISNEY:  Yes, your Honor.

25         THE COURT:  All right.  Thank you.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A130

Sean Patton - Direct                    69

1    Q     So Officer Patton --

2          THE COURT:  He probably likes to be called Captain.

3    Q     Captain Patton, are you familiar with the -- how the

4    Capitol grounds and building were overrun on January 6th?

5    A     Yes, I was.

6    Q     And were you present there on that date?

7    A     Yes, I was, sir.

8    Q     And do you have firsthand knowledge on how this

9    occurred?

10   A     Yes, I do.

11   Q     What time did you get to work on January 6th?

12   A     I arrived to work around 6:00 in the morning.

13   Q     And what was the first thing you did when you got to

14   work?

15   A     When I arrived at work, one of the first things I did

16   was grab another sergeant of mine from the midnight tour and

17   he and I had personally walked that entire perimeter of the

18   Capitol grounds, that same red area that you had outlined, we

19   had walked that to make sure that all of the perimeter was

20   connected and joining and that there were no unauthorized

21   individuals within that area.

22   Q     And was it all joining?

23   A     Yes, sir.

24   Q     And were there any unauthorized individuals inside?

25   A     No -- no.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A131

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 134 of 609
Case 1:21-cr-00140-JDB   Document 79   Filed 12/06/22   Page 70 of 221

70

Sean Patton - Direct

1    Q      Thank you, thank you.

2           THE COURT:  But this was at 6:00 in the morning.

3           THE WITNESS:  6:00 in the morning.

4    Q      Right.

5    A      But it was completely sealed, there was no one inside

6    that perimeter, there may have been a jogger or two on the

7    sidewalk that we had to give some verbal direction to leave

8    and everyone left.

9    Q      And then, so in general for the rest of that morning,

10   what did you do?

11   A      After we checked the perimeter to make sure that it was

12   secure, I had gone back into the building and performed some

13   administrative tasks, assignments that I had, making sure

14   officers were getting the property to get helmets, making

15   sure post assignments were covered and then tracking, you

16   know, what the House and Senate were doing, getting ready to

17   come into session.

18   Q      So why don't we jump to about noon and using the

19   diagram that is 101, can you explain to me what happened

20   around noon?

21   A      So around 12:00, I had come out of the building to go

22   to the East Front to monitor the arrivals of the VIPs coming

23   into the Capitol for the day.  When I was on the East Front,

24   I observed hundreds and hundreds and hundreds of

25   demonstrators that were on the other side of the bicycle

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A132

Sean Patton - Direct                    71

1    rack, the area that was not closed on the East Front,

2    demonstrators were all along the bicycle rack.  They were

3    actively demonstrating which means they were screaming,

4    holding signs, waving flags, and they were, like I said, just

5    lined up, shoulder to shoulder, as far as the eye could see

6    across the East Front demonstrating.

7    Q    And, but staying on the correct side of the perimeter?

8    A    That is correct.

9    Q    Okay.  And then what was going on on the West Front?

10   A    So slightly before, slightly before 1:00 in the

11   afternoon, while I was outside on the East Front, we heard a

12   radio call by our officers that demonstrators had breached

13   the lower Pennsylvania Avenue Walkway and were making their

14   way up to the Capitol.  At that point --

15   Q    Can you show us on the diagram where that is, I don't

16   know if it has a touch on it.

17   A    Can I touch?

18   Q    Yeah.

19   A    So the second green dot is, the green dot areas down

20   here are where we had bicycle rack and we had officers

21   positioned behind the bicycle rack to tell folks that the

22   area is in fact closed.  It was at that point where somewhere

23   between 20 to 75 demonstrators had come to that fence line

24   and started to engage with those officers at that location.

25   At some point folks had grabbed onto the bicycle rack and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A133

Sean Patton - Direct

 1   were able to topple it over and move their way up

 2   Pennsylvania Avenue Walkway.

 3            MR. BURNHAM:  Objection.  Object to foundation, I

 4   didn't hear the witness testify he was personally present for

 5   this.

 6            THE COURT:  Mr. Disney, why don't you get a little

 7   bit of foundation for whether he was personally present or

 8   whether this was what was being reported to him.

 9   Q     Can you give us some insight into that, how do you know

10   this?

11   A     That was -- that information was reported to me, again,

12   I was on the East Front when the call came out over the radio

13   that demonstrators had breached that perimeter point, started

14   making their way.  The very next point I responded around to

15   the West Front and saw hundreds of demonstrators making their

16   way up that area I call Pennsylvania Walkway.

17   Q     So you didn't see the actual breach of that barrier,

18   you came around after it occurred?

19   A     That is correct.

20   Q     Have you since watched Capitol Police video to see that

21   breach?

22   A     Yes, I have.

23            MR. DISNEY:  And your Honor, that's been stipulated

24   as being true and accurate.

25            Does that give you knowledge of how that

A134

Sean Patton - Direct                    73

1    penetration occurred?

2    A     Yes, it does.

3    Q     So with that, I'd like to be able to have it --

4          THE COURT:  It wasn't an objection, he just asked

5    for a foundation, I think there's been a foundation.

6          MR. DISNEY:  I'm sorry.  I'm sorry.

7          So you heard it, came around, it had already

8    occurred, tell us kind of what happened next as far as what

9    was going on on the west side after people had penetrated

10   down by Peace Circle.

11   A     So as the radio call went out for the breach, I ran

12   down the north side of the walkway to get to the West Front

13   and I saw officers running away because they said there's too

14   many of them and I directed these officers to come back, come

15   with me, we're not, you know, you're not turning around, come

16   back and get to this area.  So I had responded down and I

17   walked around, got to the Lower West Terrace area --

18   Q     Go ahead and use your finger to touch.

19   A     Sorry.  So I had come down, got to this Lower West

20   Terrace area right here and then I encountered, like I said,

21   what felt like hundreds of demonstrators coming up to this

22   first landing over here, and at that point we also had other

23   officers that were there and were trying to contain these

24   individuals from approaching the inaugural platform as well

25   as the staircases and the west side of the Capitol.  At that

A135

Sean Patton - Direct                                74

1    point I directed individuals to start forming a perimeter, a

2    new perimeter, a new line, putting out additional bike rack

3    that had been -- that was nearby because of the construction,

4    and start to formulate some kind of line and direction to

5    have -- tell these demonstrators they're in unauthorized area

6    and they need to move back.

7    Q    Would you agree that at some point in time, it was

8    pretty clear that you had lost control of the Capitol

9    grounds, that it had been breached?

10   A    Yes.  I can agree that several -- an hour and a half

11   approximately later, which felt like hours and hours to me

12   personally because I was there, it felt like forever, but I

13   believe, well, I know that at some point around, between 2

14   and 2:30, demonstrators were able to circumvent where we were

15   positioned and come up the west side of the Capitol and get

16   into the building.

17   Q    Let me stop you before you do that.  So if a person

18   comes up to the West Lawn of the Capitol and they're on the

19   West Lawn and the Lower West Terrace, can they get in, can

20   they get into the Capitol building itself?

21   A    No, sir.

22   Q    What's the only way then to get into the Capitol

23   Building itself?

24   A    The only way to get into the Capitol Building is to go

25   through a visitor entrance which is located on the East Front

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A136

Sean Patton - Direct

75

1   of the building.

2   Q    I'm sorry, that was a bad question.  What's the only

3   way from the west, if you can't get into the building from

4   the West Lawn and from the Lower West Terrace, where would

5   you have to go to get entrance from the west side?

6   A    There are no doors that are open to the public or

7   official --

8   Q    I'm not talking about open to the public, I'm just

9   saying in general.

10  A    Well, there are, again, on the west side of the

11  Capitol, there are doors, fire emergency doors, Lower West

12  Terrace door that I described earlier.  These are, again, all

13  secured doors on the West Front and their primary usage is

14  for emergency egress only.

15  Q    So ultimately, when you, when the West Lawn was

16  breached, the police formed a line up on the Lower West

17  Terrace, correct?

18  A    Yes, sir.

19  Q    And then you said that the crowd was able to basically

20  flank that line?

21  A    That is correct.

22  Q    Where did they go?

23  A    So demonstrators, I observed demonstrators go to both

24  sides and start to make their way up the stairs, we call them

25  the House stairs on the west side and then the Senate

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A137

Sean Patton - Direct                    76

1    stairs -- excuse me, the House stairs on the south side and

2    the Senate stairs on the north side, and they had moved

3    around --

4    Q    Can you show us on the diagram?

5    A    Yes, sir.  So they started to come up the stairs which

6    are down here, and then come up here to get to the terrace

7    areas over here and over here, and there's, in between these

8    two green lines, this area right here, again, is the

9    construction of the inaugural platform.  Also saw individuals

10   who climbed into the scaffolding which is located right here,

11   and here, and they climbed their way inside there and make

12   their way up towards the Capitol (indicating).

13   Q    Ultimately, was the Capitol building itself breached?

14   A    Yes, it was, sir.

15   Q    What was the -- what door was the first door to be

16   breached?

17   A    The first door to be breached was the Senate connecting

18   corridor wing door.

19   Q    Thank you.  And is that -- will we discover that's the

20   door that the defendant came in?

21   A    From prior video that I've seen --

22             MR. BURNHAM:  Objection.

23             THE COURT:  I'll sustain that objection.  Let's let

24   the evidence --

25             MR. DISNEY:  Okay, all right.

A138

Sean Patton - Direct

77

1    THE COURT: -- come rather than summarize what he

2    thinks the evidence will be.

3    Q    So the Senate Wing Door was the first door to fall, is

4    that correct?

5    A    Yes, sir.

6    Q    Once people got into the building, what problems did

7    that create for Capitol Police to maintain control or to keep

8    people out of the building?

9    A    If we have an unauthorized person breach our security,

10   the Congress is at significant danger and could no longer

11   legislate.

12   Q    Okay.  So I guess what I was getting at is you were

13   able to keep people outside the building, right?

14   A    Yes, sir.

15   Q    For some time?

16   A    Yes, sir.

17   Q    Once that Senate Wing Door was penetrated and people

18   were inside the building, did that make it more difficult to

19   secure the building?

20   A    Absolutely.

21   Q    How is that?

22   A    That is because the Capitol Police had a significant

23   number of employees, almost all of them were outside either

24   on East Front or the West Front, remember, on the East Front

25   we still had hundreds if not thousands of demonstrators that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A139

Sean Patton - Direct                                78

```
 1    were behind the bicycle rack and that had a significant
 2    amount of Capitol Police tied up with that.  Then with the
 3    pursuing breach on the West Front, we had additional officers
 4    come outside the building, as well as our civil disturbance
 5    unit officers, forming to deal with what appeared to be
 6    hundreds and hundreds of demonstrators who were coming from
 7    the West Front.  So now we had demonstrators on both sides of
 8    the building.  We did have Capitol Police inside the
 9    building, again, as I mentioned, there are Capitol Police
10    inside the House Chamber and Senate Chamber, any time the
11    Congress is in session, as well as officers who are staffing
12    doors that are used as normal entry into the building, and we
13    have building patrols and other officers with the title
14    emergency responders who are available to take calls for
15    police services inside the building.  So when the building is
16    breached, all of our resources have to go to locating that
17    individual or individuals, in order to make sure that they're
18    not a potential danger to the occupants inside the building.
19    At that point, the rest of the entire building would go into
20    a status we call lock down, where we're securing all of the
21    entrances, making sure that no one enters and leaves until we
22    find those individuals.
23    Q    You said that not all the doors inside the Capitol were
24    manned?
25    A    Again, that is correct, in a normal day, we do not
```

A140

Sean Patton - Direct                                    79

1    staff every entrance to the building.

2    Q     And so once the building was penetrated, did that allow

3    people to open up unmanned doors?

4              MR. BURNHAM:  Objection to leading.

5              THE COURT:  Just a second.  Just a second.  You

6    want to say something, Mr. Disney?

7              MR. DISNEY:  I want to say if he knows.

8              THE COURT:  I'll sustain the objection, just be

9    careful about leading questions.  I think there's a lot that

10   can happen with leading questions on preliminary matters and

11   so forth but where we get into actual, significant events,

12   let's not lead the witness, let's let the witness testify to

13   nonleading questions.  So that objection is sustained.

14   Q     You talked about a large crowd forming on the west

15   side, and at this time, I would like to play, your Honor,

16   State's 401.

17             THE COURT:  It's in evidence.

18                (Government's Exhibit 402 playing.)

19             THE COURT:  This is 402.

20             MR. DISNEY:  This is 402, your Honor.  Can we stop

21   it for a second.  Your Honor, I'm sorry, this is 402.

22                (Government's Exhibit 402 playing.)

23   Q     Officer -- I'm sorry, Captain Patton, can you tell us

24   basically what we're seeing here.

25   A     You're seeing hundreds and hundreds of demonstrators

A141

Sean Patton - Direct                              80

1    breach the West Front Lawn area and make their way towards

2    the Capitol.  The area at the bottom of the screen is the top

3    area of the inaugural platform, the lower area is the area we

4    refer to as the Lower West Terrace Walkway, again, that goes

5    between the Pennsylvania Avenue Walkway and the Maryland

6    Walkway on the left-hand side.

7    Q     And is the time at the bottom correct?

8    A     Yes, sir.

9    Q     And this is a time-lapsed video, correct?

10   A     Yes, sir.

11   Q     And so if we could just go ahead and play it.

12             (Government's Exhibit 402 playing.)

13   Q     Thank you.  Now, Captain Patton, do you ... we have a

14   stipulation that the Capitol grounds has cameras, is that

15   correct, CCTV cameras?

16   A     Yes, they do.

17   Q     And they're true and accurate?

18   A     Yes, sir.

19   Q     And have you viewed State -- Government's Exhibit 400

20   which is a compilation of the breaches on the west side of

21   the Capitol?

22   A     I have, sir.

23   Q     And is it true and accurate?

24   A     Yes, it is, sir.

25             MR. DISNEY:  Your Honor, we'd ask that we play

A142

1    Government's 401.

2           THE COURT:  401 or 400?  400 is the compilation I

3    think.

4           MR. DISNEY:  Yeah, say that again, your Honor?

5           THE COURT:  On my exhibit list from you folks, it

6    looks like 400 is the compilation, is that what you're going

7    to play?

8           MR. DISNEY:  Your Honor, we had a misnumbering,

9    it's -- I will, we will get that corrected.

10          THE COURT:  What did we just look at then?  What

11   was that time lapse, what number was that?

12          MS. AYERS-PEREZ:  The time lapse on our list is 402

13   but the first four videos in the 400 series were misnumbered,

14   they were one up so 400 was 401, 401 was 402 just for those

15   first four videos.

16          THE COURT:  So there is no 400?

17          MS. AYERS-PEREZ:  Correct, your Honor.

18          THE COURT:  So 400 is 401?

19          MS. AYERS-PEREZ:  Correct.

20          THE COURT:  401 is 402?

21          MS. AYERS-PEREZ:  Correct.

22          THE COURT:  402 is?

23          MS. AYERS-PEREZ:  403.

24          THE COURT:  403 is?

25          MS. AYERS-PEREZ:  404.  And then what we've done is

A143

Sean Patton - Direct                               82

1    404 is part of our larger exhibit, we just renumbered that

2    421.

3              THE COURT:  So 404 is 421?

4              MS. AYERS-PEREZ:  Yes, everything else is correct.

5    I do apologize for that, your Honor.

6              THE COURT:  All right.  Mr. Burnham, do you

7    understand what the Government has done in terms of

8    renumbering, are you okay with it?

9              MR. BURNHAM:  Yes, I follow, your Honor.

10             THE COURT:  All right, thank you.

11             MS. AYERS-PEREZ:  Thank you.

12   Q    So the compilation that I was talking about on the west

13   side is 401 and have you seen that?

14   A    Yes, sir.

15   Q    And does it true and accurately depict the breaches on

16   the west side of the Capitol?

17   A    Yes, sir.

18   Q    Your Honor, so at this time I'd play 401, it's

19   approximately six minutes.

20             THE COURT:  It's already been admitted into

21   evidence, preadmitted, so you can play it.

22             MR. DISNEY:  Thank you.

23             (Government Exhibit 401 playing.)

24   Q    At the top of the screen, the pinnacle, the white, what

25   is that?

A144

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 147 of 609
Case 1:21-cr-00140-JDB   Document 79   Filed 12/06/22   Page 83 of 221

Sean Patton - Direct                              83

1   A      That's Peace Circle, sir.

2          THE COURT:  And there are officers there trying to

3   maintain the perimeter?

4          THE WITNESS:  Oh, yes, sir, right down there in

5   front of that walkover stage we have officers positioned

6   behind bicycle rack and you can see the demonstrators are

7   coming up from Pennsylvania Avenue to that point and you can

8   see officers running on the grass to go to that location.

9   Q      And in the forefront of the picture, is that

10  construction with equipment from the stage?

11  A      Correct, that's the construction for the stage, those

12  pieces of equipment, and we had seen some construction

13  workers earlier on in the video come through.  Now you're

14  starting to see people breach that point, and at that point a

15  radio call had gone over the radio, that demonstrators had

16  breached the Pennsylvania Avenue bike rack and made their way

17  up the Pennsylvania Avenue Walkway.

18  Q      Is this approximately the time that you came around to

19  the East Front?

20  A      Correct, I started to come down the walkway which would

21  be on the right-hand side to come across this walkway to meet

22  this, you can see officers are coming around to go back up to

23  the top.

24  A      And you can see there that there's people ripping the

25  snow fencing down on the left-hand side by the walkway, it's

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A145

Sean Patton - Direct                              84

1    little hard to see because the grass is green, the snow

2    fencing is green, you can see that walkway, that area.  And

3    then this is --

4    Q    What's the view we see here?

5    A    Pardon me, sir?

6    Q    What's this view?

7    A    This is the view from Pennsylvania as if I was standing

8    on the Peace Memorial and I was looking at the, looking at

9    the bike rack, around the -- so the first lower bike rack

10   seems to be around Peace Circle, then you have the street

11   where all these demonstrators are and then there is a line

12   where our officers are behind those bike rack preventing

13   people from going up this walkway that you see.

14          THE COURT:  This is the same breach, just from a

15   different angle?

16          THE WITNESS:  Yes, sir.

17   Q    Yes.  Down at the forefront we see that, is that the

18   bicycle rack that you're talking about?

19   A    That's an example of bicycle rack that was used and

20   then the white stairs that you see on the other side of those

21   white squares are language that says area closed by order of

22   the Capitol Police Board.

23          (Government's Exhibit 401 continues playing.)

24   A    And then from the video you can start to see the

25   officers are getting pushed back and demonstrators are

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A146

Sean Patton - Direct                                    85

 1  starting to make their way up the Pennsylvania Avenue Walkway

 2  towards the West Front of the Capitol.

 3  Q    We talked about there being a stairway leading up to

 4  the terrace, is this what we're seeing, that stairway?

 5  A    Yes, sir, you're seeing a camera from the Senate side

 6  of the Capitol looking at the stairway and then that white

 7  area with the two doors is an enclosure for a grandstand that

 8  is connected to the inaugural platform.

 9  Q    This is 2:09 p.m.?

10  A    Yes, sir.

11  Q    Looks like things are being thrown?

12  A    Yes, sir, I was personally there on the West Front and

13  that day I was -- people threw batteries, bike rack at me,

14  sprayed me with mace, pepper spray, bear spray.

15         MR. BURNHAM:  Objection, your Honor.  Objection as

16  to relevance, misbehavior by other persons.

17         THE COURT:  Overruled.

18  Q    The stairs have now been overrun in this picture?

19  A    Yes, they have.

20  Q    Now can we pause it just for a second.  You talked

21  about the Senate Wing Door, is that door shown here?

22  A    Yes, it is, it's in the center of the video.

23  Q    And at 2:11, it looks to be intact, is that correct?

24  A    Yes, sir.

25  Q    Okay, thank you, go ahead.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A147

Sean Patton - Direct                    86

1           (Government's Exhibit 401 continues playing.)

2     Q    Can you tell us what we're seeing here now?

3     A    It looks like we're about to have somebody come through

4     a window, we have an officer that comes into the scene right

5     here, I believe he discharges his OC spray at the individual,

6     and then we have demonstrators make their way into this area

7     that we're calling the Senate connecting corridor through the

8     window.  At the same time we have individuals breaking the

9     other window trying to breach the building as well.  The

10    individual in the middle of the screen is trying to release

11    the door.  That door does have fire equipment on it so that

12    red sign says if the door is depressed for 45 seconds it will

13    eventually release but it will sound an alarm.  Those two

14    individuals just kicked open that door and now we have

15    individuals coming into the Capitol.

16    Q    This is the initial breach of the Senate Wing Door?

17    A    Yes, sir.  So again, at this point, you can no longer

18    have legislative business in the Capitol because the

19    Capitol's breached.

20    Q    Describe what's going on at the Senate Wing Door at

21    2:28.

22    A    At 2:28, myself is in the center of the picture, I had

23    come into the building through the south, through the Senate

24    Carriage entrance and I'm directing officers to make sure

25    that individuals are being pushed back out of the Senate

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A148

Sean Patton - Direct                    87

1    Wing, and I have, I had just come from making sure that the

2    Vice President was evacuated.  So we do have a good showing

3    of Capitol Police, we do have demonstrators that are leaving,

4    again, we're pushing them back out the way that they came in,

5    and we're bringing more reinforcements of officers to get

6    people out of the area.  I'm wearing a black jacket and have

7    the discernible oval --

8    Q     What door is this that we're looking at?

9    A     This is another emergency exit on the Senate Wing

10   referred to as the Parliamentarian door because the

11   Parliamentarian's office is nearby.

12   Q     How close is it to the Senate Wing Door?

13   A     It is -- it's around the corner to that Senate wing.

14   Q     Okay.  Thank you.  Now we're going back to the Senate

15   Wing Door?

16   A     Yes, sir, and I had left the area, by the way, at this

17   time.

18   Q     Looks like at 2:46, would you agree that you at least

19   have some control over the door?

20   A     Yes, there does look like some semblance of order at

21   this point.  But again, the windows, you have demonstrators

22   in the windows, the door is still open at this point so you

23   have officers that are engaging people in three different

24   areas.

25   Q     And are there rioters still within the building?

A149

Sean Patton - Direct                    88

1   A     I don't have knowledge of that, specifically, I could

2   not give you a count of how many rioters or demonstrators

3   were still in the building at that point.

4   A     I can tell you from experience that the demonstrators

5   are pleading with the police to let them in the building.

6   The police officers are all telling them that the building is

7   closed and that they cannot enter.

8           MR. BURNHAM:  Objection, no question pending.

9           THE COURT:  Overruled.

10  A     You're seeing demonstrators hit the police with poles

11  and they're pushing their way into the building.

12  Q     And it appears -- am I correct that on the left it

13  appears that there are people in the building?

14  A     Yes, from this viewpoint, I can see that there are

15  people down the hallway there, that goes towards the center

16  of the building which we call the Crypt on the first floor.

17  So here's the challenge.  We have demonstrators trying to get

18  out of the building and demonstrators trying to get into the

19  building.

20          (Government's Exhibit 401 completed.)

21          MR. DISNEY:  Thank you.  Your Honor, we're now

22  going to turn from the general breach of the Capitol to the

23  specific conduct of the defendant.  Would you like to do that

24  now or would you like to break for lunch?  I'm not sure if

25  your --

A150

Sean Patton - Direct                                    89

1              THE COURT:  No, keep going.  We've got another 20

2       minutes before we break.

3              MR. DISNEY:  Your Honor, we have an Exhibit 708

4       which is a stipulation of the parties regarding the

5       defendant's presence in and around the Capitol, and I would

6       ask that 708 be admitted.

7              MR. BURNHAM:  No objection.

8              THE COURT:  Thank you, Mr. Burnham, 708 is

9       admitted.

10             MR. DISNEY:  And your Honor, we have a -- your

11      Honor, what we have is the Exhibit 104 which is a model of

12      the Capitol, and inside that model are the various CCTV and

13      other videos.  All of them will show the defendant, and what

14      I would propose is I simply call out the exhibit number, have

15      it played, and then note the time that the defendant appears

16      on the video.

17             THE COURT:  Sounds acceptable to me, okay with you,

18      Mr. Burnham?

19             MR. BURNHAM:  Fine, your Honor.

20             THE COURT:  Proceed, Mr. Disney.

21             MR. DISNEY:  Thank you.  Is that going to get any

22      larger?  Your Honor, can we see that if you leave it how it

23      is now?

24             THE COURT:  I'm sorry?

25             MR. DISNEY:  Can you see the exhibit how it is now?

A151

Sean Patton - Direct                          90

1           THE COURT:  I can see it.  It's pretty small, but I

2    can see it.

3           MR. DISNEY:  If we can just have the court's

4    patience for a second while we try to get this.

5           THE COURT:  It hasn't grown.

6           MR. DISNEY:  Seems to be getting smaller, your

7    Honor.

8           THE COURT:  It's disappeared.

9           MR. DISNEY:  Your Honor, I do know that this is

10   going to take longer than 20 minutes to go through.  Would

11   the Court entertain --

12          THE COURT:  Well, we can take an earlier break if

13   that's not going to affect the availability of witnesses and

14   you can get everything set up, ready to go when we resume at

15   1:00 p.m.

16          MR. DISNEY:  Thank you.

17          THE COURT:  All right.  So we'll see you at 1:00.

18               (Luncheon recess, 12:17 p.m. to 1:18 p.m.)

19               (Open Court.)

20          THE COURT:  All right.  Captain Patton, good

21   afternoon.  I remind you you're still under oath.

22   Mr. Disney.

23          MR. DISNEY:  Thank you, your Honor.  Your Honor, we

24   had a glitch, we were playing the programs through -- I'm

25   sorry, we were playing the videos through a certain program,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A152

Sean Patton - Direct                    91

1   that program was malfunctioning, we are just going to play

2   the videos themselves, they've already been admitted so I'll

3   just call out the exhibit and then play it as we had

4   discussed.

5              THE COURT:  All right.

6   Q    Captain Patton, I want to go through some videos the

7   defendant has stipulated as to his identity, so we'll go

8   through these videos and stop and have, like we said, I'll

9   mark the time to show the defendant, but if we -- you had

10  talked about a rally at the Ellipse, is that correct?

11  A    You're asking if I know about the rally, the Stop the

12  Steal Rally at the Ellipse of the White House, I know about

13  it, yes, sir.

14  Q    Your Honor, I play 501.

15             (Government's Exhibit 501 played.)

16  Q    Where was that location?

17  A    That area was near the Washington Monument and the

18  African-American Museum across from the White House.

19  Q    And if we could go to 501A.  And your Honor, the

20  defendant, by stipulation, is in the lower left corner where

21  the arrow is showing wearing a stocking cap and a flak

22  jacket.

23             THE COURT:  I see him.

24             MR. DISNEY:  Okay, thank you.

25  Q    Then if we could go to 502.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A153

Sean Patton - Direct                                    92

1              (Government's Exhibit 502 played.)

2      Q     Do you recognize this location?

3      A     Yes, it looks like Constitution Avenue.

4              MR. DISNEY:  And your Honor, if we could just back

5      up for a second?

6              THE COURT:  I saw him pass by, before.

7              MR. DISNEY:  Okay, thank you, your Honor.

8      Q     If we could go to 502A.  We'll go quicker, I got to

9      just get the pace of what we're doing.  That's the defendant

10     in the bottom right?

11     A     It appears to be.

12     Q     Thank you.  And if we could go to Exhibit 503.

13             (Government Exhibit 503 played.)

14     Q     And do you recognize that area?

15     A     I do, sir.

16     Q     And where is that?

17     A     These are the Senate steps going from the Lower West

18     Terrace to the Upper West Terrace immediately to the left of

19     the inaugural riser, that's the scaffolding you see on your

20     right-hand side.

21             MR. DISNEY:  And for the record, your Honor, the

22     defendant is reaching for the scaffolding in 503.  At 38

23     seconds.  If we could go to 411.  I'm sorry?

24             MR. BURNHAM:  I'm sorry, I have an objection.  I

25     think counsel just stated the defendant is reaching for the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A154

Sean Patton - Direct                           93

```
 1    scaffolding -- I'll start over.  My objection is counsel just
 2    stated I guess as a part of a question that the defendant is
 3    reaching for the scaffolding and that's not something we --
 4    first of all, testimony of counsel --
 5              THE COURT:  That's just what he says, that's not
 6    testimony in the record.
 7              MR. BURNHAM:  And that's not part of -- that was
 8    not part of our stipulation, that he was reaching for the
 9    scaffolding, we're not disputing that's his helmet there,
10    but --
11              THE COURT:  He's just trying to identify through
12    his words, I understand it's not evidence.
13              MR. BURNHAM:  Thank you.
14    Q    411.
15              (Government's Exhibit 411 playing.)
16    Q    And Officer, can you see the defendant in this photo --
17    or this video, I'm sorry?
18    A    I do, sir, he's in the center coming through the
19    doorway of the Senate Wing corridor.
20    Q    Thank you.
21              THE COURT:  And the time?
22    Q    The time is -- what time?
23    A    2:24:15 p.m.
24    Q    2:24:15?
25    A    2:24, the video depicts that it's 2:24:15 p.m. on
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A155

Sean Patton - Direct                                    94

1    January the 6th.

2    Q     And that's the Senate Wing Door?

3    A     That's the Senate Wing connecting corridor door.

4    Q     We talked about there being two breaches of the Senate

5    Wing Door; is this the first breach or the second?

6    A     This appears to be the first breach of the door.

7    Q     Thank you.

8    A     The initial breach, excuse me.

9    Q     The initial breach?

10              THE COURT:  When you say breach, this is after the

11   first breach?

12              THE WITNESS:  This is the first breach at 2:24 of

13   those doors.

14              THE COURT:  2:24 was the time of the first breach?

15              MR. DISNEY:  I can clarify that, Judge.

16   Q     What time was the Senate Wing Door initially broken

17   open?

18   A     I think sometime between 2:12 and 2:24.

19              MR. DISNEY:  Your Honor, the video that we showed

20   before lunch showed it at 2:12.

21              THE COURT:  Any disagreement with that?

22              MR. BURNHAM:  No, your Honor, 2:12 is, we agree

23   that was when it was first breached.

24              THE COURT:  That was my recollection as well, thank

25   you.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A156

Sean Patton - Direct                              95

1    Q     And the defendant's coming in then at 2:24?

2    A     Yes, according to the video.

3    Q     Thank you.  If we could go to 420.

4                    (Government's Exhibit 420 playing.)

5              THE COURT:  I'm sorry, what exhibit is this?

6              MR. DISNEY:  420, your Honor.

7              THE COURT:  420 has not been identified as an

8    exhibit in evidence yet.

9              MR. DISNEY:  I'm sorry.

10             THE COURT:  You told me 400 through 419, I believe.

11   I don't think 420 is in evidence.  Do you have it,

12   Mr. Bradley?

13             THE CLERK:  No.

14             MR. DISNEY:  I'll clarify that.

15             THE COURT:  Now the numbers were, everything was

16   renumbered in the beginning of the 400 series, I don't know

17   what's happened there.

18   Q     Let me just, before you play that ... your Honor, we

19   would move to admit the exhibit that's showing which is 420.

20             THE COURT:  This is 420, all right.  Any objection?

21             MR. BURNHAM:  No objection to 420.

22             THE COURT:  420 is admitted, and may be shown.

23   Q     Thank you.  And Officer -- or I'm sorry, Captain

24   Patton, can you tell us what area we're looking at here?

25   A     We're looking at a camera from the Capitol Police

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A157

Sean Patton - Direct                    96

1    that's facing toward the memorial door of the first floor of

2    the Capitol.

3    Q      And go ahead.

4                  (Government's Exhibit 420 playing.)

5                  MR. DISNEY:  And your Honor, the defendant is shown

6    in the bottom left, it's a little dark.

7                  THE COURT:  I see him.

8                  MR. DISNEY:  Thank you.

9    Q      Next could we go to 504.

10                 (Government's Exhibit 504 playing.)

11   Q      And stop it for a second.  Do you recognize this

12   location?

13   A      I do, sir.

14   Q      What is this location?

15   A      This is the stairway from that atrium that goes up from

16   the first floor to the second floor.  At the top of the

17   staircase is the entryway to the Rotunda, the Speaker of the

18   House's private offices, as well as Statuary Hall.

19   Q      Who was the Speaker of the House at the time?

20   A      Representative Nancy Pelosi.

21   Q      Thank you.  And if we could go ahead and play 504.

22                 (Government's Exhibit 504 playing.)

23   Q      And it appears that the -- am I correct that it appears

24   the defendant's shown on screen now at 32 -- 33 seconds?

25   A      It appears to me that the defendant's listed on the

A158

Sean Patton - Direct                                    97

1   right-hand side with the helmet on.

2   Q     And if we could go to 504A which I believe --

3         THE COURT:  Just a second.  Well, go ahead and show

4   me 504A.

5   Q     Do you see the defendant in 504A?

6   A     I do, sir.

7   Q     Where in the photo is he?

8   A     He appears to be in the upper right-hand corner of the

9   photo.

10         THE COURT:  Just for clarification for the record,

11   the exhibit that was 504 was described as the stairs to the

12   Speaker's office, but the depiction of the defendant is in a

13   hallway at the bottom leading to the stairs, not on the

14   stairs, correct?

15         THE WITNESS:  Correct, sir.

16         THE COURT:  Go ahead.

17   Q     We would agree with that, thank you, Judge.  And if we

18   could go to then 505.

19              (Government's Exhibit 505 playing.)

20   Q     And if we could pause this.

21         THE COURT:  Too late.

22   Q     Do you recognize this location?

23   A     Yes, that was the area outside Speaker Pelosi's private

24   offices.

25   Q     And so the stairs that we saw in 504, if you ascended

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A159

Sean Patton - Direct                        98

 1   those, then you would be in this location?

 2   A     Yes, that's like I said earlier, based on when you get

 3   to the top of the stairs, that's an open area that addresses

 4   that hallway.

 5   Q     Thank you.  And then we'll just stop it when we see.

 6   And it's stopped at three seconds into the video.  Do you see

 7   the defendant?

 8   A     I do.

 9   Q     And wearing the helmet?

10   A     Wearing the helmet next to the yellow flag.

11   Q     Let's go ahead and play.

12               (Government's Exhibit 505 played.)

13               THE COURT:  Do we have a time on this, can you see

14   the time in the upper left?

15               MR. DISNEY:  No, your Honor, this is an open source

16   video and we don't know the time.

17               THE COURT:  There's no time.

18   Q     Thank you.  Then if we could play 506.

19               (Government's Exhibit 506 played.)

20   Q     At 22 seconds, do you see the defendant in this video?

21   A     I do, he appears to be behind the individual with an

22   orange hat.

23   Q     Thank you.  Next we'll go to 412.  And can you stop it.

24   First of all, do you recognize the location shown in 412?

25   A     Yes, this is the Rotunda of the United States Capitol.

A160

Sean Patton - Direct                                          99

1    Q      And what time is it now?

2    A      According to the time stamp, it is 2:35 and 09 seconds

3    p.m.

4    Q      The Senate Wing Door is on the first floor of the

5    Capitol?

6    A      That's correct.

7    Q      And then the stairs that we saw would take you to the

8    second floor, correct?

9    A      Correct.

10   Q      And the Rotunda, is it on the first or second floor?

11   A      The Rotunda's on the second floor.

12   Q      And the time is now 2:35, correct?

13   A      Correct.

14   Q      Okay.  Go ahead.  And we'll go ahead and play 412 and

15   just stop it when ...

16                  (Government's Exhibit 412 playing.)

17   Q      Do you see the individual to the bottom left, do you

18   see the defendant in this photo?

19   A      Yeah, if you're referring to the bottom left-hand

20   corner where there's a gentleman touching his hat with a

21   white shirt, I see the defendant standing next to him with

22   the green helmet.

23   Q      Thank you.  We'll just go ahead and play this.

24                  (Government's Exhibit 412 completed.)

25   Q      Thank you.  If we could go to now 413.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A161

Sean Patton - Direct                                          100

1              (Government's Exhibit 413 playing.)

2   Q     And if we could stop it.  Can you tell me the location?

3   A     So this is a camera view of the area looking at the

4   Rotunda doors to the Capitol, Rotunda doors, if you go out

5   those doors you'll be on the East Front of the Capitol, and

6   this is on the second floor level.

7   Q     And --

8   A     Right outside the Rotunda.

9   Q     And the view that we're seeing are people inside the

10  Capitol, correct?

11  A     That is correct.

12  Q     But there also appears to be people outside?

13  A     That's correct.

14  Q     And you said it was on the second floor, can you just

15  explain how those people are on the second floor and still on

16  the outside?

17  A     So, on the outside of the doors that you see at the top

18  of the screen are steps, we call those the Rotunda steps that

19  take you down to the plaza.  Those steps are also restricted

20  to members of Congress and only authorized individuals.

21  Q     Thank you.  We'll just go ahead and play this and stop

22  it.

23             (Government's Exhibit 413 playing.)

24  Q     Can we stop it.  Do you see the defendant enter the

25  picture from the bottom?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A162

Sean Patton - Direct                                              101

1    A      If you look at the bottom of the picture, there's a

2    gentleman with a red hat and then in front of him there's a

3    camouflaged hat individual and then there's a gentleman to

4    the left-hand side with a green helmet, that looks like the

5    defendant.

6    Q      Thank you.

7                  (Government's Exhibit 413 completed.)

8    Q      And if we could go to 418.  And what's this view here?

9    A      So this view is the opposite of what you just saw,

10   right below, it's not in the screen, are the Rotunda doors

11   that just came open, so this door is looking back into the

12   Rotunda of the Capitol, and that is the area now at the top

13   of the screen, and on the left-hand side are stairs that will

14   take you up to the third floor of the Capitol which is a

15   connecting corridor between the two chambers, the House

16   Chamber and the Senate Chambers.

17   Q      And if we could, you see the defendant shown in this

18   picture?

19   A      On the right-hand side of the screen, there are two

20   people with red hats, right above the one gentleman with the

21   red hat is a gentleman with a green helmet and that appears

22   to be the defendant.

23   Q      Thank you.  Can we go to 510 now.

24                 (Government's Exhibit 510 playing.)

25   Q      And stop it for a second.  What's this location?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A163

Sean Patton - Direct                                  102

1          THE COURT:  What number is this?

2          MR. DISNEY:  510.

3          THE COURT:  510 is not in evidence.

4          MR. DISNEY:  I'm sorry, Judge.  We'll skip this

5     one, Judge.  If we could go to 416.

6          THE COURT:  415?

7          MR. DISNEY:  16.

8               (Government's Exhibit 416 playing.)

9     Q     If we could pause it for a second.  Can you tell me

10    what area of the Capitol this is?

11    A     Okay.  So again, this is not a Capitol Police video,

12    looks like an open source video viewing the Rotunda doors and

13    those doors are on the -- you could see them on the left-hand

14    side of the screen.

15         THE COURT:  Make sure we're on the right exhibit.

16    416 on the Government's exhibit list is described as gallery

17    stairs.  Would that be a correct description of this video?

18         THE WITNESS:  On the right-hand side, your Honor,

19    is stairs going up to the galleries on the third floor.

20         MR. DISNEY:  I'm sorry, your Honor, so this is 510.

21         THE COURT:  This is 5 what?

22         MR. DISNEY:  10.

23         THE COURT:  510.  510 which is not yet in evidence

24    is described as Rotunda door interior video.

25         MR. DISNEY:  We would move to admit 510.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A164

Sean Patton - Direct                           103

1           MR. BURNHAM:  No objection to 510.

2           THE COURT:  510 is admitted without objection.

3                (Government's Exhibit 510 playing.)

4    Q    At 2:17, do you see the defendant in this video?

5    A    I do, I see the individual in the bottom of the screen

6    coming up the stairs with the green helmet.

7    Q    And what are those stairs called?

8    A    Those stairs are stairs that lead you to the third

9    floor gallery, they're Rotunda stairs, interior stairs near

10   the Rotunda that take you to the third floor gallery.

11   Q    When you say gallery, what are you talking about?

12   A    This is new area, this is new construction, this is

13   called -- this is part of the Capitol Visitors Center.  When

14   you go up to the landing now, when you get to the top of

15   these stairs, there will be a connecting corridor because we

16   are essentially in the center of the building, correct, so

17   you'll be in a corridor that will allow you to either go to

18   the House Gallery or the Senate Gallery.

19   Q    So the gallery meaning whichever way you go, you can

20   view the Senate or the House?

21   A    Correct, sir.

22                (Government's Exhibit 510 completed.)

23           MR. DISNEY:  Your Honor, the next exhibit we have

24   is 511 and it was not admitted and we would move to admit it.

25           THE COURT:  Any objection to 511, Mr. Burnham?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A165

Sean Patton - Direct                    104

1              MR. BURNHAM:  No, your Honor.

2              THE COURT:  Thank you.  511 is admitted.

3                   (Government's Exhibit 511 playing.)

4    Q     Can you tell us what we're looking at here?

5    A     Now, at this point, that video before it shut off was

6    showing the Rotunda doors had been opened on the right-hand

7    side, and then on the left-hand side would be a walkway to go

8    back to the Rotunda, that view appeared to be from someone

9    standing on the steps.

10   Q     Thank you.

11                  (Government's Exhibit 511 completed.)

12   Q     If we could now go to 416, and if we could pause that.

13   Do you recognize this location?

14   A     Yes, I do.

15   Q     What is this?

16   A     This is a view from the third floor to the middle

17   landing of the previous video that showed the staircase going

18   up from the Rotunda, that Rotunda foyer area that takes you

19   to the third floor.

20   Q     And can you note the time for us?

21   A     It's 2:35:13 p.m.

22   Q     Okay, thank you.  Do you see the individual going to

23   the left?

24   A     I do.

25   Q     Is that the defendant?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A166

Sean Patton - Direct                          105

1    A     That appears to be the defendant with the green helmet

2    on.

3    Q     If we can now go to 415.

4              (Government's Exhibit 415 playing.)

5    Q     And stop that.

6              THE COURT:  What are we looking at now?

7              MR. DISNEY:  415, your Honor.

8              THE COURT:  415?

9    Q     I'm sorry.  So if we can play 415, do you recognize

10   this area?

11   A     I do, sir.

12   Q     And what is it?

13   A     This is another connecting corridor that takes you

14   from -- takes you to the Senate Galleries on the third floor,

15   on the right-hand side is the old Senate Chamber, you see the

16   shutters across the hallway.

17   Q     I'm sorry, you talked about those gallery steps,

18   there's a corridor that could go either way?

19   A     Correct.

20   Q     And this, it appears, is that the defendant shown in

21   the picture in 2:40:52?

22   A     That is correct, in front of the person with the USA

23   sweatshirt.

24   Q     And is your testimony is that he's going towards the

25   direction of the Senate Gallery?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A167

Sean Patton - Direct                           106

1    A      That is correct.

2    Q      Thank you.

3           THE COURT:  On the exhibit list, this is described

4    as east corridor, would that be an accurate description?

5           THE WITNESS:  Yes, sir, that corridor is on the

6    East Front of the building.

7           THE COURT:  Thank you.

8           THE WITNESS:  Yes, sir.

9    Q      Then if we could go to 414.

10          (Government's Exhibit 414 playing.)

11   Q      And stop it.  What are we looking at here?

12   A      So this camera is over the -- what we call the press

13   gallery so that's behind us on the left-hand side is the

14   office of the Secretary of the Senate and then straight ahead

15   is an elevator, Senators only elevator and that there appears

16   to be a person who's getting ready to come in from the

17   previous hallway coming down this corridor so this is a third

18   floor corridor directly outside the Senate Gallery.

19   Q      So if I -- if that door that says gallery door

20   number 1, if you go into it, what would you see?

21   A      You would be inside the Senate Chamber.

22   Q      On the upper level?

23   A      On the upper level, so the Senate Chamber has two

24   levels, the main level where the Senators sit that is on the

25   second floor, the upper area is referred to as the Senate

A168

Sean Patton - Direct

107

1    Galleries that's on the third floor, and again, the

2    galleries, that's where members and their invited guests, the

3    public would be allowed to come view a Senate session, but

4    again, at this time, the galleries are secured and closed.

5    Q    Thank you.  And the individual that just walked across,

6    was that the defendant?

7    A    I can't tell from this vantage point, sir.

8    Q    Okay.

9    A    That individual does appear to be the defendant because

10   I can tell that he has flex cuffs in his hand.

11   Q    Thank you.  Now if we could go to 421.  And please tell

12   us what area of the Capitol this is.

13   A    So again --

14            THE COURT:  What -- 421?

15            MR. DISNEY:  Yes, sir.

16            THE COURT:  Not only is it not in evidence, it's

17   not on my exhibit list.

18            THE CLERK:  Nor mine.

19            MR. DISNEY:  All right, we'll skip that one.  If we

20   could go to 419.

21            (Government's Exhibit 419 playing.)

22   Q    And pause.  So what area are we looking at here?

23   A    So we are looking at the area right outside the Senate

24   Galleries, right at the top right-hand of the screen is an

25   enhanced security portal, that's a body scanner that all

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A169

Sean Patton - Direct                          108

1    individuals would go into the galleries would go through

2    prior to going into the galleries.

3    Q    Even after going through the security at the --

4    A    At the main door, sir, yes, sir, that's secondary

5    screening.

6    Q    And the defendant is right in front of that scanner?

7    A    That is correct.

8    Q    If we could go ahead and play.

9               (Government's Exhibit 419 playing.)

10   Q    If we could stop.  That door that the defendant is in

11   front of now, what does that lead to?

12   A    That also leads to the Senate Gallery on the third

13   floor.

14   Q    Thank you.

15              (Government's Exhibit 419 completed.)

16   Q    And this is at approximately 2:43?

17   A    That is correct, sir.

18   Q    Does that appear to be the defendant who's now exited

19   the Senate Gallery?

20   A    Yes, right next to the individual with the American

21   flag, I can see that the individual with the green helmet and

22   the flex cuffs in his right hand appear to be the defendant.

23   Q    Thank you.  If you go to 507.  And can you tell us, we

24   saw video earlier of Secretary -- I'm sorry, Vice President

25   Pence leaving a door.  Can you tell us what we're seeing in

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A170

Sean Patton - Direct                               109

1    this picture?

2    A     So on the right-hand side, first of all we're back on

3    the second floor, and we're right outside the Senate Lobby,

4    those doors on your right-hand side are also referred to as

5    the Vice President doors because immediately on the inside of

6    that door to your right hand is the Vice President's

7    ceremonial office.

8    Q     Is that -- I'm sorry.

9    A     I'm sorry.

10   Q     Is that the door that Vice President Pence was escorted

11   out of earlier?

12   A     That is correct.

13          THE COURT:  And on the exhibit list, 507, which I

14   think is what you believe we're on?  Is listed as inside

15   Senate Gallery video.  Would that be accurate?

16          THE WITNESS:  No, not for this video, sir.

17          THE COURT:  So what exhibit is this?

18          MR. DISNEY:  I'll ... all right.  I'm sorry, it's

19   417.

20          THE COURT:  417, Senate Chamber?

21   A     If you're -- if I'm following your curser, 417 looks to

22   say Senate Lobby CCTV and that is directly outside the Senate

23   Lobby, there's no cameras inside the Senate Lobby so that

24   would be accurate, outside the Senate Lobby if that's --

25          THE COURT:  So this is 417?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A171

Sean Patton - Direct                              110

1          MR. DISNEY:  Yes, your Honor.

2          THE COURT:  All right.

3              (Government's Exhibit 417 playing.)

4    Q    And if we could pause.  Excuse me.  Can you describe

5    the actions of what appears to be the defendant in 417?

6          THE COURT:  Well, first of all, is that the

7    defendant?

8          THE WITNESS:  So to me that appears to be the

9    defendant wearing the green helmet and wearing the flex cuffs

10   now in his appears left hand and he appears to have some set

11   of keys and is trying to unlock the secured lobby doors that

12   are, if you were to go through those doors, would give him

13   access to the Senate floor.

14   Q    And what time is this?

15   A    This is at 2:47:14 p.m.

16         MR. DISNEY:  Your Honor, may I approach the

17   witness?

18         THE COURT:  You may.  You said give him access to

19   the Senate floor, does it also give him access to what we've

20   called the Vice President's office?

21         MR. DISNEY:  Yes, so the Senate Lobby is connecting

22   behind the Senate Chamber, which we call that area the Senate

23   floor too, so once you go through those doors, the Vice

24   President's office is on the right-hand side and the entrance

25   to the floor is on the left-hand side, so, yes, sir, both

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A172

Sean Patton - Direct                          111

1   doors.

2              THE COURT:  All right.  You may approach the

3   witness.

4   Q    I'm going to show you what's been marked as 403A and we

5   had a witness write on it earlier, I'm just wonder -- I'd ask

6   you just to denote the time the defendant is at the door as

7   shown in the exhibit on the screen.

8              THE COURT:  The exhibit on the screen?

9              MR. DISNEY:  Yes, sir, and that's 417.

10             THE COURT:  Captain Patton, the exhibit on the

11  screen, what's the time shown?

12             THE WITNESS:  So the -- the time on the screen is

13  2:47:14 p.m.

14             THE COURT:  Thank you.

15             THE WITNESS:  And I've just written that underneath

16  the picture, on top of the picture that is -- appears to be a

17  screenshot of this video.

18             THE COURT:  Okay.  What number exhibit is this?

19             MR. DISNEY:  403A, I haven't admitted it yet.

20             THE COURT:  I didn't think 403A was the screenshot

21  that showed the defendant at the door.

22             MR. DISNEY:  Can I show it to counsel now?

23             THE COURT:  And you had a time marked on it

24  earlier.

25             MR. DISNEY:  I did, I do.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A173

Sean Patton - Direct                    112

1          THE COURT:  And now this is -- you have two times

2     marked on this?

3          MR. DISNEY:  Well, the first one shows, what I'm

4     trying to demonstrate is the time the Vice --

5          THE COURT:  Oh, there are two different -- see,

6     I've never seen the exhibit, you're using the exhibit and I

7     haven't seen it.

8          MR. DISNEY:  I haven't admitted it yet.

9          THE COURT:  Well, that's why, but I haven't seen it

10    so it's actually two different pictures and now you're

11    putting two different times on, one for one picture and one

12    for the other picture.

13         MR. DISNEY:  Yes.

14         THE COURT:  Now I understand, but that was never

15    explained.

16         MR. DISNEY:  Thank you.

17         THE COURT:  Thank you.

18         MR. DISNEY:  Your Honor, I move to admit 403A which

19    is both of them on the -- shows the Senate Lobby door, the

20    left-hand picture shows the Vice President leaving at 2:26 as

21    noted by the witness, the right-hand side shows the defendant

22    trying to enter the door at 2:47 p.m.

23         THE COURT:  Any objection, Mr. Burnham?

24         MR. BURNHAM:  No, your Honor.

25         THE COURT:  All right.  And the times given, the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A174

Sean Patton - Direct                           113

1    second time was supplied by Captain Patton, the first time

2    was supplied by Agent Glavey.

3              MR. DISNEY:  Yes.  Thank you.

4              THE COURT:  You should -- that's the original

5    exhibit, you should hold it.

6              MR. DISNEY:  Your Honor, if we could next go to

7    507.

8                   (Government's Exhibit 507 playing.)

9    Q    What is the location in the Capitol that we're seeing

10   here?

11   A    That individual's inside the Senate Gallery on the

12   third floor.  I can tell this because in the backdrop I can

13   see the Senate floor, I can see the presiding officer's chair

14   on the left-hand side of that individual.

15   Q    Thank you.  And if we could continue on.

16                  (Government's Exhibit 507 playing.)

17   Q    Do you see the defendant in this exhibit?

18   A    I do see the defendant behind the American flag wearing

19   the green helmet right below the light.

20   Q    The smaller American flag?

21   A    The smaller American flag.

22   Q    Thank you.

23                  (Government's Exhibit 507 completed.)

24             MR. DISNEY:  Your Honor, if we could next go to

25   611.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A175

Sean Patton - Direct                    114

1          THE COURT:  What number?

2          MR. DISNEY:  611.

3          THE COURT:  It's not yet in evidence.

4          MR. DISNEY:  I would ask that 611 be admitted in

5    evidence.  I'm sorry, Judge, we just have a little trouble

6    with the program, but --

7          THE COURT:  I'm observing that.

8          MR. DISNEY:  -- I would ask that 509 --

9          THE COURT:  511?

10          MR. DISNEY:  509.

11          THE COURT:  I'm sorry, what?

12          MR. DISNEY:  509.

13          THE COURT:  509.  That is not yet in evidence.

14          MR. DISNEY:  We would ask that 509 and 611 be

15    admitted in evidence.

16          MR. BURNHAM:  No objection, your Honor.

17          THE COURT:  509 and 611 are admitted.

18          THE COURT:  And this is 509?

19          MR. DISNEY:  Yes, your Honor.

20              (Government's Exhibit 509 playing.)

21    Q    Can you stop it.  The person speaking, can you identify

22    him?

23    A    Yes, that appears to be the defendant again with the

24    green helmet and the flex cuffs in his left hand.

25              (Government's Exhibit 509 completed.)

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A176

Sean Patton - Direct                    115

1    Q     And now 611, your Honor.

2                (Government's Exhibit 611 playing.)

3    Q     And can you tell me the location we're looking at here?

4    A     So now somebody is looking with a camera facing the

5    Senate floor, demonstrators and the witness, excuse me, the

6    defendant is in the center of the screen with the flex cuffs

7    on the Senate floor.

8    Q     Thank you.

9                (Government's Exhibit 611 completed.)

10   Q     Now if we could go to 611A.  And is the defendant

11   depicted in 611A?

12   A     Yes, I notice the defendant is standing on top of the

13   gentleman with the black book bag and black shirt and he has

14   the green helmet on.

15   Q     And then 611B?

16          THE COURT:  Before we do, we're going in reverse

17   order, this is not in evidence.  If you want 611A in evidence

18   in order for him to identify, you should get it in evidence

19   before he identifies it.

20          MR. DISNEY:  I understand, your Honor.  Your Honor,

21   I'd move to admit 611A, 611B, and 611C.

22          THE COURT:  A, B and C of 611.  Mr. Burnham?

23          MR. BURNHAM:  Court's indulgence.  No objection.

24          THE COURT:  Thank you, Mr. Burnham.  611A, 611B,

25   and 611C are admitted.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A177

Sean Patton - Direct                    116

1    Q      If we could go to 611B.

2           THE COURT:  We already had testimony about 611A and

3    I'll allow that before it was admitted.  Now we're on 611C?

4           MR. DISNEY:  This is B, your Honor.

5           THE COURT:  B, I'm sorry.

6    Q      Is the defendant shown in this photo as well?

7    A      Yes, I notice the defendant is standing on top of the

8    individual with black book bag, black shirt and he's got a

9    green helmet on.

10   Q      And finally, 611C?

11   A      I could tell that the defendant is in the picture, he's

12   got the green helmet and he's got the flex cuffs in now his

13   right hand.

14          MR. DISNEY:  And your Honor, next I would move to

15   admit 612 and 613.

16          THE COURT:  612 and 613, any objection?

17          MR. BURNHAM:  No, your Honor.

18          THE COURT:  Thank you.  612 and 613 are admitted.

19   Q      And if we could go to 612.  And can you tell us what

20   we're looking at here.

21               (Government's Exhibit 612 playing.)

22   A      We're looking at video of demonstrators on the Senate

23   floor.

24   Q      And if we could stop it at 14 seconds.  First of all,

25   can you tell me what time this is now?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A178

Sean Patton - Direct                    117

1    A     The time at the bottom of the video is 14:52 and 28

2    seconds.

3    Q     And can you identify the defendant in this video?

4    A     The defendant is on the left-hand side wearing the

5    green helmet and carrying flex cuffs in his left hand.

6    Q     Thank you.

7              (Government's Exhibit 612 playing.)

8    Q     Who had normally sat at these desks?

9    A     Senators.  This is a highly restricted area and the

10   audience for this room is Senators and officers of the Senate

11   and invited guests and staff.

12             MR. DISNEY:  And your Honor, this is 613.

13             (Government's Exhibit 613 playing.)

14   Q     If we could pause it.  Can you identify the defendant

15   for the record?

16   A     Yes, the defendant appears to be on the right-hand side

17   of the individual with the red hat, excuse me, in between the

18   two individuals with red hats wearing the green helmet.

19   Q     Thank you.

20             MR. DISNEY:  And Judge, your Honor, we would like

21   to just move to the -- he's shown once more at the end of

22   this, we'd like to move forward.

23             THE COURT:  Okay.

24             (Government's Exhibit 613 playing.)

25   Q     If we could stop it.  At 14:55, do you see the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A179

Sean Patton - Direct                              118

1    individual that looks like he's exiting the door?

2    A      Yes, I do.

3    Q      Does that appear to be the defendant?

4    A      That appears to be the defendant with the green helmet

5    on.

6    Q      And where would that take -- where would you be if you

7    went through that door?

8    A      If you go through that door you'll come out onto the

9    second floor and that is the main Senate, that is the main

10   door to the Senate Chamber.

11   Q      Okay.  The main, you're in a hallway?

12   A      Yes, sir, you'll be in the hallway on the second floor

13   right outside an area we call the Ohio Clock Corridor.

14   Q      Thank you.  Then if we could go to 405.

15                 (Government's Exhibit 405 playing.)

16   Q      And Officer -- sorry, Captain Patton, can you tell me

17   what this area is?

18   A      So this is another view of the third floor outside the

19   Senate Gallery, you'll notice in the right-hand side is a --

20   another screening portal and as well on the cabinet on the

21   right-hand side is a list of prohibited items for that

22   entrance into the gallery.

23   Q      And what time is this?

24   A      This appears to be 2:56:46 p.m.

25   Q      And can you identify that person who's walking through

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A180

Sean Patton - Direct                                    119

1    the picture?

2    A      The individual in the center of the screen appears to

3    be the defendant with the green helmet on.

4    Q      Thank you.

5                   (Government's Exhibit 405 completed.)

6    Q      Next if we could go to 405.

7             THE COURT:  We were just on 405.

8             MR. DISNEY:  I'm sorry.  I'm sorry, it's 408 then,

9    your Honor.

10            THE COURT:  408, okay.

11                 (Government's Exhibit 408 playing.)

12   Q      And while it plays, can you tell us the location?

13   A      I'm sorry, the location right now?  This is outside

14   the -- again, third floor area, this is the, outside the

15   Senate gallery, there's a staircase on the left-hand side

16   with an individual that appears to be the defendant because

17   he's wearing a green helmet going down the -- what we call

18   the West Grand Staircase that leads you --

19   Q      At what time?

20   A      At 2:56:54 p.m.

21   Q      Thank you.  Then next if we could go to 401.

22                 Your Honor, this is still 408, I'm sorry.

23            THE COURT:  This is still 408.

24                 (Government's Exhibit 408 completed.)

25   Q      Now, if we could play 407.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A181

Sean Patton - Direct                                    120

1           Your Honor, I'll skip that -- I'm sorry, do
2     you have it?   407.
3                (Government's Exhibit 407 playing.)
4     Q     Do you recognize this area, Officer -- or Captain?
5     A     Yes.  So this is a view of the second floor of the
6     Senate and appears to be two Metropolitan Police officers
7     running down a corridor to address an individual who just
8     came off the stairs, those stairs, again, go to the third
9     floor that we were just at.
10                MR. DISNEY:  And then next, your Honor, I'd like to
11    move to admit Exhibit 800.
12                THE COURT:  800.  This is being admitted through
13    this witness, and there's no objection to that?
14                MR. BURNHAM:  No, your Honor.
15                THE COURT:  All right.  800 will be admitted.  And
16    once admitted, it can be shown.
17                (Government's Exhibit 800 playing.)
18    Q     Can you pause it.  So what area are we looking at now?
19    A     So again, different view, it looks like the
20    individuals, defendant with the green hat -- helmet is coming
21    down the West Grand Staircase and is about to head back
22    towards the Senate, towards the President's room, going to go
23    down that hallway which is outside the Senate Chamber on the
24    second floor.
25    Q     This is the second floor?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A182

Sean Patton - Direct                    121

1    A       Yes, sir.

2    Q       Okay.  If we can continue playing this.

3                   (Government's Exhibit 800 completed.)

4    Q       And next, if we could show 409.  And I just have a

5    couple more.

6                   (Government's Exhibit 409 playing.)

7    Q       And pause that.  Can you tell me what we're looking at

8    here?

9    A       So you're looking at the main hallway on the second

10   floor, that's the hallway that I referred to as the Ohio

11   Clock Corridor, that is that center area where it appears to

12   be the defendant just came out wearing a green helmet from

13   the Senate main doors to the Senate Chamber.

14   Q       And the time?

15   A       The time is 2:55:26 p.m.

16                  THE COURT:  And this is Exhibit 409?

17                  MR. DISNEY:  Yes, sir.

18                  THE COURT:  Described as west stairs.

19                  THE WITNESS:  There's no staircase in this photo.

20   This is --

21                  MR. DISNEY:  That is the name of the camera, that's

22   what we named it.

23                  THE COURT:  That's the designation on the camera?

24                  MR. DISNEY:  Yes.

25                  THE COURT:  All right.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A183

Sean Patton - Direct                              122

1                (Government's Exhibit 409 completed.)

2    Q     And next if we could go to 410.

3                (Government's Exhibit 410 playing.)

4    Q     And if we could pause that.  What are we -- what's the

5    location here?

6    A     So this appears to be, we're back at the first floor, I

7    believe, and then these individuals are coming out the

8    Parliamentarian door that we looked at earlier, and so what I

9    see here is police officers at the top of the screen and it

10   looks like they're directing people out of the building

11   coming towards me.

12   Q     And you said that the Parliamentarian door was just

13   around the corner from the Senate Wing Door?

14   A     Correct, sir.

15   Q     And if we could go ahead and play 410.

16               (Government's Exhibit 410 playing.)

17   Q     So these individuals are being moved outside, is that

18   correct?

19   A     Correct.

20   Q     And do you see the defendant in this photo?

21   A     Yes, I see the defendant, he is touching a man with no

22   shirt and has a green helmet on in the center of the screen.

23   Q     So you see the guy down at the bottom with the red

24   stocking cap?

25   A     Yes, sir, the red stocking cap with the American stars,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A184

Sean Patton - Direct                                    123

1    blue stars on the left-hand side of that.

2    Q    So once you get past that individual, would you be

3    outside?

4    A    Yes, you should be outside after that point.

5    Q    Thank you.

6              (Government's Exhibit 410 playing.)

7    Q    So if we can stop, stop the video here.  Would you note

8    the time that the defendant then went outside?

9    A    It is approximately 3:02 p.m.

10   Q    Thank you.  And lastly, 508.

11             (Government's Exhibit 508 playing.)

12   Q    Where is this location?

13   A    This is directly outside on the Upper West Terrace area

14   outside the Senate connecting corridor and outside the

15   Parliamentarian door.

16   Q    This is basically the outside of the area we just saw

17   everybody being pushed out to?

18   A    Yes, sir.

19   Q    Okay.  Do you see the defendant in this video?

20   A    I do, I see the defendant in the middle of the screen

21   and he's wearing a green helmet.

22   Q    Thank you.

23             (Government's Exhibit 508 completed.)

24        MR. DISNEY:  Your Honor, I have no other questions

25   at this time.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A185

Sean Patton - Cross                          124

1          THE COURT:  All right.  Mr. Burnham.

2          MR. BURNHAM:  Thank you, your Honor.

3    CROSS-EXAMINATION BY MR. BURNHAM:

4    Q     Good afternoon, Captain.

5    A     Good afternoon, sir.

6    Q     Charles Burnham, I have a few questions.

7    A     Yes, sir.

8    Q     So to start with, Captain, early on in your testimony,

9    when you were describing to counsel the various parts of the

10   landscape around the Capitol, you referred to free speech

11   areas, do you recall that?

12   A     Yes, sir.

13   Q     Why are they called that?

14   A     There are grassy areas located around the Capitol

15   complex that are demonstration permitted areas, so

16   individuals coming to Capitol Hill who wish to demonstrate

17   have to apply for a permit in order to ensure that space is

18   available and that we try to manage so we don't have opposing

19   groups in the same geographical area.

20         THE COURT:  These are areas that were within the

21   perimeter on that day, though?

22         THE WITNESS:  That grassy area, there are grassy

23   areas, all the grassy areas on the Capitol complex have

24   permit numbers so for example I referred to Area 1 which is

25   the West Front grassy area, however, they are closed,

                    JODI L. HIBBARD, RPR, CRR, CSR
                         (315) 234-8547


A186

Sean Patton - Cross                              125

1   demonstration areas were closed because of COVID, gathering

2   restrictions and as well as, depending on where they were

3   within our perimeter, they were closed.

4   Q    So let's say if it was another day before COVID, there

5   was another type of demonstration, it's entirely possible

6   that the demonstrators could have been allowed to get closer

7   to the Capitol than they theoretically were allowed to get on

8   January 6th, is that right?

9   A    That is correct, we have -- if it was not COVID, and we

10  had not been closed for approximately nine months, that

11  individuals could have access to the West Lawn of the

12  Capitol, for example, Area 1, and demonstrate.  However, that

13  area had been closed I think since September, early October

14  for construction of the inaugural platform, I'm sorry.

15          THE COURT:  I'm confused so I need to ask a

16  question.  The perimeter that in one shot was shown as a red

17  perimeter.

18          THE WITNESS:  Yes, sir, the red line.

19          THE COURT:  Was that true because of COVID or was

20  that just the perimeter for January 6th or for the

21  inauguration?

22          THE WITNESS:  That was the perimeter for

23  January 6th and that red line perimeter was extended because

24  of the demonstration activity, as well as the construction of

25  the inaugural platform as well.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A187

Sean Patton - Cross                                126

1    Q      And there had been -- well, strike that.  That sort of

2    gets to what I assume would be another -- would it be correct

3    to say that it's a goal of the Capitol Police to facilitate

4    First Amendment activity, citizens, you know, petitioning

5    their elected representatives insofar as it's consistent with

6    your security imperatives; would that be fair as a general

7    matter?

8    A      Yes, part of our duties are to make sure that people

9    can exercise their First Amendment rights in a safe and open

10   environment.

11   Q      Thank you.  So speaking of that, in late of 2020, there

12   were I think at least two prior to January 6th demonstrations

13   in support of the former President, is that right, one in

14   November, one in December?

15   A      That is correct.

16   Q      And as a high ranking officer in the Capitol Police,

17   without getting into details, I assume you would have been

18   involved in preparing for those and making sure security was

19   as it should be during those demonstrations; would that be

20   right?

21   A      Yes, I was working at the Capitol at that time for both

22   those demonstrations and part of our responsibility is to

23   make sure that we have officers working to make sure, you

24   know, the event happens without any physical harm or injury

25   to the buildings or to the people.


JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547


A188

Sean Patton - Cross                                              127

1    Q    And during those demonstrations, the two that I

2    referenced in November and December, I forget the exact days,

3    there were confrontations between people who were apparently

4    Trump supporters and other groups of opposite political

5    views, is that right?

6    A    There were a couple skirmishes between demonstrators

7    and counter-demonstrators, again, I don't know the specifics

8    of which groups were out there.

9    Q    As a general matter, there was pushing, shoving,

10   throwing hard objects, some injuries, would that be accurate?

11   A    For the demonstrations that happened in November and

12   December, they were of significant amount of demonstrators,

13   and I'm sure there were some injuries.

14   Q    You referred several times in your direct testimony to

15   the construction that was, scaffolding and whatnot that was

16   present on January 6th, you recall that, right?

17   A    Yes, sir.

18   Q    And I think you referred to there were bike racks that

19   were used to sort of demarcate that construction area from

20   the rest of the grounds, is that right?

21   A    Yes, sir, there's a couple things, that red line that I

22   had shown earlier, that was an extended perimeter for the

23   January 6th events.  The construction of the inaugural

24   platform had a perimeter around it as well, there was video

25   footage showing of another ornamental bike -- ornamental rack

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A189

Sean Patton - Cross                                    128

1  that went across the front of the Lower West Terrace and then

2  there was an additional snow fencing that was in place around

3  the grassy areas with appropriate signage indicating that the

4  area had been closed by the order of the Capitol Police

5  Board.

6  Q    So the bike racks that were around the construction of

7  the inaugural platform, your testimony on direct was that

8  your officers, in an ad hoc manner I take it, commandeered

9  those bike racks to try and set up another fallback position

10 once the demonstrators began to approach closer than they

11 should have to the Capitol, is that right?

12 A    Yes.  So when demonstrators breached the security

13 perimeter that was established on the West Front, those

14 demonstrators started to move their way up Pennsylvania

15 Avenue Walkway, and as they were doing that, they were coming

16 into the construction area that had additional barricades.  I

17 was personally there, I had come down and I had directed

18 additional bike rack because demonstrators had breached that

19 area, and everyone in that area, everyone in that area was

20 not authorized to be there.  And typically if somebody goes

21 over that fence when that area's closed, it's an arrestable

22 offense, immediately.  I directed the bike rack to be set up,

23 as you saw in the video, additional layer of bike rack was

24 coming up to start to give ground for our officers to push

25 people back from the stage.

A190

Sean Patton - Cross                                    129

1    Q     So my specific question is, just to make sure I focus

2    in on what I wanted to know is, it is true that your police

3    officers moved bike racks from the construction to set up a

4    counter-demonstrator position, correct?

5    A     Yes, sir.

6    Q     You mentioned the Capitol was off limits on that day,

7    you mentioned that, you mentioned invited guests were allowed

8    to come in if -- that would include journalists, wouldn't it?

9    A     So no, it doesn't, sir.  Only media that are allowed

10   inside the building are credentialed media and that has to be

11   credentialed through the House and Senate press galleries.

12   So journalists reporting for a local agency trying to get in

13   the building cannot get in the building.

14   Q     But as point of fact there were journalists inside the

15   Capitol on January 6, a good number, correct?

16   A     I'm sorry, you said, the question was?

17   Q     The question was, there were, as a matter of fact,

18   journalists inside the Capitol on January 6th covering the

19   Electoral College, correct?

20   A     Yes, sir.

21   Q     And they were allowed to be there?

22   A     Yes, if they were credentialed, they were allowed to be

23   there.

24   Q     So as to the perimeter you described the red line on

25   one of the Government's exhibits, you mentioned that was

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A191

Sean Patton - Cross

130

1    largely composed of bike racks but then there were also

2    natural features of the landscape and certain kind of

3    fencing, that's an accurate summary, correct?

4    A    Yes, sir.

5    Q    Would it be correct to say the greater part of that

6    perimeter was bike racks?

7    A    I would say so, that's a good -- the red perimeter,

8    yes, sir.

9    Q    All right.  And so isn't it a fact that at various

10   locations in the bike rack perimeter, the racks were moved by

11   law enforcement personnel, whether that was strategic

12   fallback or some other reason, the fact is there were several

13   occasions where law enforcement moved the bike racks from

14   where they were, is that right?

15   A    No, sir, there's no reason for the police to move the

16   bike racks that made that outer red perimeter.  What is

17   different than what I said earlier was there were extra bike

18   rack up at the construction area up at the Lower West Terrace

19   area, that was just stacked to the side and so that bike rack

20   had been moved, but the red perimeter, officers didn't have a

21   reason to take down that perimeter if that's what you're

22   asking.

23   Q    I'm not asking whether they had a reason to, I'm asking

24   did they.  It's true that some of those bike racks in the

25   outer perimeter got moved by law enforcement, right?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A192

Sean Patton - Cross                    131

1    A      I'm sure the officers would move the bike rack to allow

2    themselves to go from one side to the other and then move the

3    bike rack back.

4    Q      Isn't it true the inner bike racks within the outer

5    perimeter, some of those were moved by law enforcement as

6    well, isn't that right?

7    A      Yes, sir.

8    Q      Why doesn't Capitol CCTV have sound?

9    A      It's just not designed that way, sir.

10   Q      Okay.  Let's focus on the Peace Circle.  We saw a video

11   where there was a breach of the perimeter into the -- from

12   the Peace Circle into the green area and then beyond that;

13   you recall that video, correct?

14   A      Yes, sir.

15   Q      And it's my understanding that at that point, yourself

16   and your officers were improvising as best you could to

17   respond to that security situation, is that right?

18   A      When you said improvise?

19   Q      Yeah, improvising as best you could to respond to that

20   situation.

21   A      Yes, when the area was breached, officers and officials

22   responded to that area.

23   Q      And there were -- we saw video, a directive, officers

24   literally sprinting across that section of the Capitol to get

25   where they needed to be; you recall that, right?

A193

Sean Patton - Cross                                    132

1    A    Yes, sir.

2    Q    All right.  So I take it it wasn't a priority of law

3    enforcement to reassemble the outer perimeter to the extent

4    it was dislodged by protesters, is that right?

5    A    That's an accurate statement.

6    Q    All right.  Just an issue of manpower, it wasn't the

7    biggest problem you had?

8    A    Exactly.

9    Q    Okay.  Do you recall the time-lapsed video that the

10   Government showed you where it's sort of fast forward of the

11   crowd assembling and growing and growing and then ultimately

12   approaching the building; you recall that, right?

13   A    Yes, sir.

14   Q    Do you recall, I'm going to ask you some questions

15   starting I guess now and then there will be more where I ask

16   you about videos, and I won't replay all of them but if you

17   ever need your recollection refreshed in response to one of

18   my questions, I'm sure the Government will be good enough to

19   replay the video.  So having said that, going back to the

20   time-lapsed video, if you recall, the crowd there literally

21   went out of the frame of the video, you couldn't see the end

22   of the crowd, is that right?

23   A    Yeah, the crowd spilled to, if you're looking at the

24   video, to the left and to the right and as well as coming to

25   the center.

A194

Sean Patton - Cross                          133

1   Q    And so if you had to estimate the distance from, again,

2   I guess we'll start, focus on the Peace Circle let's say and

3   you had to estimate the distance from the front line meaning

4   where you have a policeman and a demonstrator eyeball to

5   eyeball, from that line to the back of the crowd, I mean we

6   might be talking several hundred yards, would that be fair?

7   A    Yeah, when you say -- so when you said the officer at

8   the eyeball to eyeball, that's the first officer at the

9   Pennsylvania Walkway and then a hundred yards back in the

10  Peace Circle, Pennsylvania Avenue roadway, is that what you

11  mean like hundreds of people?

12  Q    I'm just asking how far did the crowd go back?  Hundred

13  yards maybe, could be more?

14  A    The crowd went all the way back to the White House,

15  sir.

16  Q    Government's Exhibit 401, and again, I'm sure the

17  Government will play this if you need to, if you recall that

18  part of 401, was the different breaches that took place there

19  at the East Wing doors, breaking of the window and then --

20  you recall that?

21  A    Yes, breaking of the windows first and then kicking the

22  door out.

23  Q    Yes, sir.  So if you recall the initial breach which I

24  think we all agreed took place around 2:12 consisted of, just

25  to summarize, got two windows on either side of the door and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A195

Sean Patton - Cross                                      134

1    protesters that were there kind of cooperated to break out

2    those two windows; is that a summary of how they got in?

3    A    Sure, yes, sir.

4    Q    And do you recall that once the protesters started

5    going in through those windows there was -- on the inside of

6    the windows there was almost like historical markers right

7    there inside the window; do you recall that?

8    A    When you say historical markers, you mean the display

9    cases?

10   Q    That's what they looked like to me, little pieces of

11   furniture that I thought were historical markers, perhaps

12   they're something else; you recall what I'm talking about,

13   though?

14   A    Yeah, I think you're talking about those wooden display

15   cases that are right below the windows that got stepped on.

16   Q    Sort of knock -- get knocked over there, you recall

17   that?

18   A    Yes.

19   Q    So at a certain point your officers cleared those out

20   of the way, you recall that?  The next video and those

21   historical markers are gone, do you recall that?

22   A    Yes, they fell over, got moved out of the way.

23   Q    Do you recall where they -- were they put in a closet

24   or off down the hall, do you recall?

25   A    No, I don't know where they wound up.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A196

Sean Patton - Cross                                    135

1    Q      So at a certain point over the course of the events

2    there at that door, the glass from the windows on either side

3    of the door, it appeared to have been completely smashed out

4    at a certain point; by that I mean there weren't shards left

5    after awhile, would you agree with that?

6    A      Yes, sir.

7    Q      So as you're approaching the -- step back for a minute.

8    The Government showed a video that had sort of the approach

9    from ground level up the stairs to those doors, you recall

10   that?

11   A      Yeah, on the Upper West Terrace.

12   Q      And wouldn't you agree that from, we'll call the ground

13   level before ascending the stairs, if I was, you know, trying

14   to retrace the steps, you can't see those doors from when you

15   first start up the stairs, would that be right?

16   A      Correct, there was -- yes, you cannot see that top

17   landing from the bottom of the stairs.

18   Q      You mentioned a fire alarm.  Do you recall hearing that

19   fire alarm during the time period you were present there by

20   the door?

21   A      So the door, all of our doors have a fire package on

22   them so doors that are typically closed like the Senate

23   connecting corridor wing door, that door has a push bar on it

24   so in the event of a fire, emergency, and someone had to

25   leave the building, they could depress that push bar, wait 45

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A197

Sean Patton - Cross                                    136

1    seconds and the Mag lock will automatically release that

2    door.  If you come by and touch that door, push the push bar

3    in, it will beep at you.  If that bar is depressed for a

4    significant amount of time, then that -- that door will go

5    into alarm mode and then you'll hear that audible alarm and

6    those are specific to those different doors.

7    Q    But the alarm was not actually sounding at the time you

8    approached the door, isn't that right?

9    A    No, the door -- when the door gets kicked out, the

10   alarm just goes off indefinitely, it's not -- that's not the

11   fire alarm for the building, that's just an individual, what

12   we call a local alarm for that door.

13   Q    So is it your testimony that alarm was sounding at the

14   time you were present by that door?

15   A    Oh, I heard the alarm, the alarm was going off on all

16   the doors there were breached.  You heard the same thing at

17   the Rotunda door when the Rotunda door was breached, you

18   could hear the audible alarm in the video.  So it's a common

19   noise to go off.

20   Q    You recall the -- do you recall the video where

21   Mr. Brock can be seen entering the building, correct?

22   A    Yes, sir.

23   Q    Isn't it correct there's no police there at the time?

24   A    Yes, sir.

25   Q    Do you recall that there's a video where the

Sean Patton - Cross                    137

1    demonstrators, where they're going up the stairs and there's

2    a chant that can be heard, saying Nancy, Nancy, Nancy, do you

3    recall that video?

4    A    Yes, sir.

5    Q    Do you recall identifying Mr. Brock in that video and

6    his lips don't appear to be moving during that video, if you

7    recall?

8    A    I don't recall if his lips were moving.

9    Q    Do you recall him like appearing to look down at his

10   phone during that section of it?

11   A    That seems very reasonable.

12   Q    Not only does it seem reasonable but do you recall what

13   I'm talking about where you can see him looking at his phone?

14   A    I'd have to look at the video, but again, that seems

15   like a very realistic thing that he could have been doing at

16   that time.

17   Q    Government's 505 was a video that had, depicted

18   Mr. Brock and then there was a sign above it that said

19   Speaker Pelosi's office or something like that; you recall

20   that, right?

21   A    Yes, sir.

22   Q    I think you made this clear in your direct testimony

23   but I just want to make it absolutely certain for the record,

24   that's not part of her office, that was the outer area

25   outside the office, correct?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A199

Sean Patton - Cross                                    138

```
 1    A     That is correct.

 2    Q     All right.  And so based on all the video we've seen

 3    today, Mr. Brock did not enter that office, correct?

 4    A     I think there was a video of him coming out of that

 5    corridor, and again, when you go down that corridor, you are

 6    exposed to the Speaker's office suites.  Again, there's

 7    adjoining offices off that hallway and I think one of the

 8    exhibits had Mr. Brock coming out, meaning you saw him

 9    walking from the corridor with the sign that says Speaker

10    Pelosi over it.

11    Q     I want to be very clear here, there is not a video that

12    shows Larry Brock in Nancy Pelosi's office, that's not a

13    thing --

14    A     You are correct.

15    Q     Thank you.

16    A     There is not a video of him in her office, correct.

17    Q     And isn't it correct that --

18    A     That I've seen today.

19    Q     -- other individuals gained access to that office

20    throughout the course of the day, at least one, right?

21    A     I remember seeing some videos of some folks sitting in

22    a chair with their legs up on a desk in the Speaker's suite.

23    There were several of those offices in the Speaker's suite

24    that were locked and there were individuals from her staff

25    barricaded in those offices and there's many offices in that
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A200

Sean Patton - Cross                                    139

1   hallway where the Speaker is.

2   Q    Government's 412 was the video of the Rotunda where

3   Mr. Brock was kind of the bottom left-hand corner, do you

4   recall that video?

5   A    Yes, sir.

6   Q    You'd agree that in that video he seems to be taking

7   pictures of the paintings, the statues, all the other,

8   whatever else is in that part of the Rotunda, that be an

9   accurate description?

10  A    Yes, sir.

11  Q    All right.  And that is a spectacular part of the

12  Capitol if you haven't seen it in a while, you would agree

13  with that?

14  A    The Rotunda is very spectacular and it's underneath the

15  Dome which is the single largest symbol of Democracy in the

16  free world.

17             MR. BURNHAM:  Can I just have a moment to --

18             THE COURT:  Say that again?

19             MR. BURNHAM:  Could I have a moment to consult with

20  counsel for the Government?

21             THE COURT:  Absolutely.

22             MR. BURNHAM:  Thank you.

23             (A discussion was held off the record between

24             counsel.)

25  Q    I'm going to ask the Government to bring back up, as

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A201

Sean Patton - Cross                                    140

1    you see there, this is Government's Exhibit 412 in evidence

2    if they'd be good enough to play that video, I'll have a

3    question when we get to a certain part of it.

4                    (Government's Exhibit 412 playing.)

5    Q    Sir, as it's playing now, Captain, in the sort of the

6    top right there, can you see what looks like a bag of flex

7    cuffs that looks like maybe it spilled and there's some flex

8    cuffs on the floor there; do you see what I'm talking about?

9    A    Yeah, the black bag right there, that individual just

10   walked up to?

11   A    Yes.

12   Q    Yeah, I can see that black back, I see it spilled.

13   But ...

14   Q    And in a minute, Mr. Brock, if you can look at him on

15   the left, he's going to walk over there.

16                    Can I consult with counsel for a moment?

17             THE COURT:  You may.

18                    (A discussion was held off the record between

19                    counsel.)

20             THE COURT:  Maybe I can cut through this, if I can

21   guess what you're trying to show.  There are videos up until

22   this video that show Mr. Brock and he's been identified in

23   where he did not have flex cuffs in his hand.  This video,

24   Captain Patton, has already identified some flex cuffs

25   sitting on the floor at the time of this video, and then

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A202

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 205 of 609
Case 1:21-cr-00140-JDB   Document 79   Filed 12/06/22   Page 141 of 221

Sean Patton - Cross

141

1   there are later videos that show Mr. Brock with the flex

2   cuffs.

3          MR. BURNHAM:  I'll just proffer, this video --

4          THE COURT:  If the Government will stipulate that

5   that's accurate, you can make your argument from that.

6          MR. BURNHAM:  Well, can I just ask through the

7   Court, this video that we're looking at, if, there's a little

8   bit more to it and it shows Mr. Brock picking up those very

9   flex cuffs I just identified.

10         THE COURT:  I know, that you're having trouble

11  finding.

12         MR. BURNHAM:  Perhaps the Government would just

13  stipulate that that's what it would show.

14         THE COURT:  If they could stipulate to that.

15         MR. DISNEY:  We will stipulate.

16         THE COURT:  It's a stipulation that in the later

17  part of that video, which was 412 I think, that Mr. Brock

18  actually picks up the flex cuffs from the floor.

19         MR. BURNHAM:  Thank you.  Can we take a look at

20  Government's 419, please.

21             (Government's Exhibit 419 playing.)

22  Q    Can we stop it there, please, if you would.  Let's --

23  so here, you see in this video, you've seen this before, you

24  see Mr. Brock there and then you see a gentleman near him,

25  looks like he's wearing like a black hat of some kind or a

Sean Patton - Cross                                    142

 1   black helmet, do you see who I'm talking about?

 2   A     Yes, sir, in front of the guy with the cane, green

 3   shirt?

 4   Q     That's correct.  Can we go ahead and play it, please.

 5               (Government's Exhibit 419 playing.)

 6   Q     We're going to have to come back to that one.  You

 7   recall seeing a video where -- well, strike that.  Can we see

 8   Government's 409, please.  I don't think that's 409.

 9               (A discussion was held off the record with

10                counsel.)

11   Q     Yeah, that's it.  So take a look at this video as it

12   plays.

13               (Government's Exhibit 409 playing.)

14         THE COURT:  Is this 409?

15         MR. BURNHAM:  409.  Can you pause it there for a

16   second, please.

17         So here in this video, what we just saw was

18   Mr. Brock, he comes out of the door and passes at least a

19   half a dozen policemen and then continues walking, is that a

20   fair summary?

21   A     Yes, sir.

22   Q     And he's got the flex cuffs there in his hand, you see

23   that, right?

24   A     Yes, sir.

25   Q     And you didn't see him make any kind of gesture to

A204

Sean Patton - Cross                    143

1    shove them in his jacket or hide them from police or anything

2    like that, correct?

3    A     Correct, sir.

4    Q     All right.  Can we play it, please.

5                (Government's Exhibit 409 playing.)

6    Q     Now at this part there's a policeman, looks like maybe

7    an MPD officer that appears to be redirecting him from the

8    direction he was going to go back the other direction, does

9    that appear to be what it is?

10   A     Yes, sir.

11   Q     And he's complying there with whatever that officer's

12   saying seemingly, correct?

13   A     Yes, sir.

14   Q     And finally, I think this is the last video I need to

15   play is 410, please.

16                (Government's Exhibit 410 playing.)

17   Q     You recall this video, right?

18   A     Yes, sir.

19   Q     And this, if you watch the man there in the shirt, he

20   appears to be, you can't tell but he appears to be kind of

21   maybe giving some lip to those officers there?

22   A     You said shirt, you mean the guy with no shirt?

23   Q     No shirt.  He looks like he might be giving a hard time

24   to the officers there if you had to interpret his body

25   language, would that be fair?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A205

Sean Patton - Cross                                144

1    A      That's fair.

2    Q      And one might even think you would wonder if he's

3    intoxicated just from the look of him, would that be

4    unreasonable?

5    A      I think he's been sprayed with pepper spray, his face

6    is all red, but yeah, you could say something like that.

7    Q      And now does the defendant appear to be trying to calm

8    him down and encourage him to leave the premises?

9    A      Yes, that's what it appears to be.

10            MR. BURNHAM:  Can I have a moment, court's

11   indulgence.

12            THE COURT:  Certainly.

13                 (Pause in proceedings.)

14            MR. BURNHAM:  Thank you, Captain, no further

15   questions.

16            MR. DISNEY:  No redirect, your Honor.

17            THE COURT:  Captain Patton.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  You may step down.

20            THE WITNESS:  Thank you, your Honor.

21            MR. DISNEY:  May the captain be excused?

22            THE COURT:  Yes, he may be.

23                 (The witness was excused.)

24            THE COURT:  Maybe it makes the most sense for us to

25   take our afternoon break now before you begin your next

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A206

145

```
 1   witness.  The next witness will be who?
 2            MS. AYERS-PEREZ:  Sergeant Timberlake, your Honor.
 3            THE COURT:  Let's start again -- oh, let's make it
 4   exactly, let's do it at ten after by that clock, ten after 3.
 5                    (Court in recess, 3:00 p.m. to 3:12 p.m.)
 6            THE COURT:  Before we put the next witness on the
 7   stand, no one's raised this but let me make sure where we are
 8   on it.  With respect to the excluding witnesses, under Rule
 9   615, it requires a party's request for the Court to order
10   that witnesses not hear other witnesses' testimony but that's
11   how we're proceeding, we don't have witnesses.  Before you
12   bring that witness in, could you just keep the witness out
13   for a second.  We're proceeding by not having witnesses in
14   the courtroom, so is someone invoking Rule 615?
15            MR. BURNHAM:  I invoke the rule, your Honor, thank
16   you.
17            THE COURT:  All right.
18            MS. AYERS-PEREZ:  And the only thing I would point
19   out, though, is one of our agents is in here sitting at
20   counsel table who is --
21            THE COURT:  One of your agents, meaning an agent
22   who's going to be a witness?
23            MS. AYERS-PEREZ:  Yes, your Honor.
24            THE COURT:  You can designate one person to be a
25   representative, I don't allow more than one person.  The rule
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A207

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 210 of 609
Case 1:21-cr-00140-JDB   Document 79   Filed 12/06/22   Page 146 of 221

146

1    doesn't really clarify whether it can be more than one and

2    some judges allow more than one for an organization to bounce

3    in and out, I don't allow that and indeed the rule won't

4    always say that, I can guarantee you.

5                But the next question is the rule is not clear on

6    what excluding witnesses means, whether it just means that

7    witnesses are not in the courtroom or whether it also means

8    that witnesses cannot read transcripts or talk to other

9    witnesses, so if you want the latter, you have to request

10   that.

11               MR. BURNHAM:  To be honest, your Honor, I've always

12   understood it to mean that the witnesses are not to be

13   informed of the substance of testimony.

14               THE COURT:  It varies from judge to judge.  And to

15   be safe, I always say request it if you want it.

16               MR. BURNHAM:  I request that, the most fulsome

17   imposition of a rule on witnesses.

18               THE COURT:  So the rule that will be invoked here

19   is that witnesses will be excluded; in other words a witness

20   can't be in the courtroom, a future witness, but also that

21   the witnesses cannot discuss the case among themselves and

22   learn of another witness' testimony or read transcripts of

23   the proceedings.  Okay?

24               MS. AYERS-PEREZ:  Yes, and your Honor, just for the

25   record, I had informed all the witnesses prior to today that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A208

Nairobi Timberlake - Direct                          147

1    they are not to be discussing the testimony or anything about

2    that, even if they're in the same witness room, they're not

3    to discuss the case.

4            THE COURT:  I had not anticipated that there was a

5    problem with it, but I'm just raising it because it was not

6    invoked by anyone but I assumed that someone probably wanted

7    that to be the case.

8            MS. AYERS-PEREZ:  Right, your Honor, and although

9    we do have two agents, only one is going to testify, and he

10   is the one we're designating, he is here at counsel table.

11           THE COURT:  All right.  Let's have Officer

12   Timberlake.

13           THE CLERK:  Good afternoon, sir, please raise your

14   right hand.

15

16           N A I R O B I   T I M B E R L A K E ,

17   called as a witness and being duly sworn, testifies

18   as follows:

19           THE COURT:  Good afternoon, Officer Timberlake.

20   Ms. Ayers-Perez, please.

21           MS. AYERS-PEREZ:  Thank you, your Honor.

22   DIRECT EXAMINATION BY MS. AYERS-PEREZ:

23   Q    Good afternoon.

24   A    Good afternoon.

25   Q    Can you please state and spell your name for the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A209

Nairobi Timberlake - Direct                              148

1    record?

2    A       Sergeant Nairobi Timberlake, N-a-i-r-o-b-i, last name

3    Timberlake, T-i-m-b-e-r-l-a-k-e.

4    Q       Thank you.  Sergeant Timberlake, where do you work?

5    A       U.S. Capitol Police.

6    Q       And how long have you worked with the Capitol Police?

7    A       Twenty-six years.

8    Q       You said your rank is as a sergeant?

9    A       Yes.

10   Q       When did you first get hired by Capitol Police?

11   A       February 5th, 1997.

12   Q       And when did you get promoted to sergeant?

13   A       November 2003.

14   Q       When you were first hired by Capitol Police, what was

15   your rank at that point?

16   A       Private with training.

17           THE COURT:  All right, let's, Mr. Bradley, let's

18   make sure the microphone is in front of the witness so the

19   court reporter can hear clearly.  Thank you all.

20   Q       What were your day-to-day responsibilities when you

21   first began with Capitol Police?

22   A       After training I was assigned to the Capitol division

23   midnight shift, 11 to 7, 11 p.m. to 7 a.m., duties were

24   responsible for inside patrols and outside patrols.

25   Q       Okay.  And when you were promoted to sergeant, what

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A210

Nairobi Timberlake - Direct                           149

1    were your day-to-day job responsibilities at that point?

2    A    Once promoted, I was sent over to the Senate division

3    for approximately a year and a half, I worked midnight shift

4    and did 3-to-11 shift.

5    Q    What is the Senate division?

6    A    Senate division is responsible for all Senate office

7    buildings, Dirksen, Hart, and Russell.

8           MS. AYERS-PEREZ:  Your Honor, at this point I would

9    move to admit Government's 102, I do not show that it's in

10   evidence yet.

11          THE COURT:  102 is not in yet, any objection?

12          MR. BURNHAM:  Court's indulgence.

13          THE COURT:  Certainly.

14          MR. BURNHAM:  No objection.

15          THE COURT:  Without objection, 102 is admitted.

16   Q    And Sergeant Timberlake, can you see that on your

17   screen there?

18   A    Yes.

19   Q    Okay.  So after you worked at the Senate division,

20   where did you move on from there?

21   A    I was reassigned back to the Capitol division, day

22   work, power shift.

23   Q    What's the Capitol division?

24   A    Capitol division is responsible for the Capitol

25   building itself, the Capitol grounds, what we call the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A211

Nairobi Timberlake - Direct                              150

1    square.

2    Q      Where were you, what division were you working on

3    January 6, 2021?

4    A      Senate Chambers.

5    Q      Okay.  And what is the Senate Chambers division?

6    A      Senate Chambers section is within the Capitol division

7    which is in uniform services, we're responsible for the

8    Senate Chamber second floor, third floor, second floor is

9    mainly the Senate Chamber and the Senate wing, third floor is

10   the galleries.

11   Q      How long had you been in the Senate Chamber division?

12   A      Senate Chambers, approximately eight years.

13   Q      Okay.  Are you still in that division now?

14   A      Yes.

15   Q      And were you working on January 6, 2021?

16   A      Yes.

17   Q      And throughout the rest of this time we're here today,

18   if I just say January 6th, will you understand that to mean

19   January 6th, 2021?

20   A      Yes.

21   Q      Okay.  Were you scheduled to work that day?

22   A      Yes, I was.

23   Q      What time were you supposed to arrive?

24   A      8:30.

25   Q      And did you arrive by that time?

A212

Nairobi Timberlake - Direct                              151

1    A    Yes.

2    Q    Take me through briefly what your morning was like that

3    day.

4    A    So briefly, 8:30 is our roll call start time for the

5    officers and supervisors, there's a roll call supervisor that

6    comes in at 0700 hours, he preps for the day as far as

7    assignments, make sure the duty roster is correct from

8    checking the sick book, making sure that all officers are

9    accounted for so when we have roll call at 8:30 we do a roll,

10   generally goes by post assignments and officers are given

11   their assignment for the day.

12   Q    Great.  And so were you expecting anything out of the

13   ordinary that day?

14   A    No, ma'am.

15   Q    All right.  Where did you expect to spend most of your

16   day that day?

17   A    Approximately on the second floor, Senate floor

18   escorting members, Senators back and forth from the House

19   Chamber to the Senate Chamber.

20   Q    Was there anything going on that day that you thought

21   would necessitate escorting members back and forth?

22   A    Yes, ma'am, we were certifying the election.

23   Q    Had you been a part of that before while working in the

24   Senate Chamber?

25   A    Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A213

Nairobi Timberlake - Direct                              152

1   Q    Okay.  Were you aware of any protests or rallies that

2   were going to be happening that day?

3   A    Yes.

4   Q    Okay.  Did you think that would affect you?

5   A    No, ma'am.

6   Q    And why not?

7   A    From my understanding from our briefings that the

8   protesters were mainly going to be at the White House and

9   that at some point some of the protesters might come over to

10  Capitol grounds but that they would be outside the perimeter.

11  Q    Okay.  Did you have any security concerns that day with

12  the going back and forth between the different chambers?

13  A    No, ma'am.

14  Q    Can you show us on the map here, and you're able to

15  touch on your screen and I'll clear it when you're done, but

16  can you show us what you mean by going back and forth between

17  the chambers and what you were anticipating that day?

18  A    So from this, so from the Senate Chamber at the Ohio

19  Clock area, the main entrance right here, Senators would

20  gather from inside the chamber, would walk across the second

21  floor of the U.S. Capitol led by the President of the Senate

22  Mr. Pence, and they would come through here, we would have

23  uniform officers on either side of the entry points and then

24  they would enter through the House main door.

25  Q    And were you anticipating that to happen frequently?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A214

Nairobi Timberlake - Direct
153

1    A      We weren't aware how it was going to go down but it was

2    our understanding that there was a lot of objections per

3    state for the ratification so we were going back and forth

4    periodically that morning, and afternoon.

5    Q      Did that day end up going normally?

6    A      Yes, for the morn -- yes.

7    Q      That morning.  Is there any point on January 6th where

8    things started to get abnormal?

9    A      In the early part of the afternoon, approximately

10   2 p.m.

11   Q      Okay.  Tell us what happened at 2 p.m.

12   A      Just prior to that, we saw some demonstrators in the

13   Upper West Terrace of the Capitol in this area here

14   (indicating), if you're looking from the second floor by the

15   Senate door balcony, you can see there were individuals up in

16   the secured area of the Upper West Terrace.

17   Q      And did you personally see that?

18   A      Yes.

19   Q      Where were you located when you saw that?

20   A      Second floor main hallway off of the Ohio Clock, right

21   here (indicating).

22   Q      Okay.  And what did you do when you saw that?

23   A      At that point we were just doing normal operations.  I

24   then went around to the Republican door which is over here by

25   the bank of six so the six elevator banks there, that's

Nairobi Timberlake - Direct                                   154

1   called the Republican door right off the Senate floor, at

2   that point we heard a bang, couple of loud noises on the

3   first floor.  I was then advised by one of the officers we

4   think we have a breach on the first floor.  That's when I --

5   I'm sorry.

6   Q    I'm sorry, I'm sorry, I did not mean to cut you off.

7   Going back to when you first observed people outside, were

8   you concerned for security at that point?

9   A    Yes, ma'am.  The Upper West Terrace was supposed to be

10  secured for the inauguration so that's a restricted area,

11  that's police officers and AOC staff only.

12  Q    When you say AOC staff, what does that stand for?

13  A    I'm sorry, Architect of the Capitol.

14  Q    Were you concerned inside the Senate at that point?

15  A    It raised our security level up as far as people being

16  that close to the skin of the building, but at that point we

17  didn't, we didn't have any breach or anybody that wasn't

18  supposed to be inside the building at that time, so we were I

19  guess concerned but it didn't reach the high level yet.

20  Q    So tell me about what happened next.

21  A    So I'm at the Republican door, we hear, like I said, a

22  big bang, we believe there's a breach, and that's when I gave

23  the order to secure the chamber.

24  Q    Can you give us approximately, if you remember, what

25  time that was?

A216

Nairobi Timberlake - Direct                    155

1    A    I couldn't, ma'am, I just knew it was after 2:00, I'm

2    not sure of the specific time.

3    Q    So when you give an order to secure the chamber, what

4    does that mean?

5    A    So the order is to shelter in place so that means the

6    uniform officers, they're at each one of the entry points

7    around the second floor and third floor of the chamber and

8    the plain clothes officers are to come inside the chamber,

9    secure the doors, and then start accountability check.

10   Q    So we've talked about going back and forth between the

11   chambers; was anybody in the Senate Chamber at that point?

12   A    At that time, we had the President of the Senate and

13   approximately, I don't have the final count but it was

14   probably about 88 Senators in that chamber at the time.

15   Q    When you say the -- when you say the President of the

16   Senate, are you talking about Vice President Michael Pence?

17   A    Correct.

18   Q    So tell me about what the accountability checks looked

19   like.

20   A    So once the chamber is secured, the cloak room,

21   Republican cloak room, the Democrat cloak room and the door

22   keepers which are controlled by the Senate Sergeant of Arms

23   are supposed to do accountability list.  So the Republican

24   cloak room supposed to give me a list of all the Republican

25   Senators that they have present, so same with the Democratic

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A217

Nairobi Timberlake - Direct                                    156

1    cloak room, they're supposed to give me all the list of

2    Senators that are present and then the Sergeant of Arms staff

3    supposed to give me a list of staff, their staff

4    accountability, and if there's anybody inside the gallery,

5    supposed to give me a list of how many people were in the

6    galleries.

7    Q    Okay.  And did that happen?

8    A    Yes.

9    Q    How long did that take to happen?

10   A    Approximately five minutes.

11   Q    And how were people inside the chamber, did they

12   understand what was happening at that point?

13            MR. BURNHAM:  Objection, foundation.  Sorry, object

14   to foundation.  His testimony about what other people

15   understood.

16            THE COURT:  Maybe you could ask a question or two

17   before you ask that question.

18   Q    So there were a number of people still in the Senate

19   Chamber at that point, right?

20   A    Yes, ma'am.

21   Q    How many Senators did you estimate earlier?

22   A    I believe the count was 88.

23   Q    And were there staffers as well?

24   A    Yes.

25   Q    Okay.  Could you see their expressions?

A218

Nairobi Timberlake - Direct                          157

1    A     Yes.

2    Q     Did they -- what did they seem like at that point?

3    A     They didn't fully understand what was going on, when

4    you give an order like that, we secure the chamber, one of my

5    officers approaches the main chair and then has a

6    predetermined announcement to give so depending on the

7    situation, depends on the card that they read.

8    Q     Do you remember what the announcement was that day?

9    A     That Capitol Police had a situation, we have secured

10   the chamber, please stand by, Senators, please take your

11   seats, we will update you as soon as we get clarification.

12   Q     And prior to that announcement, what was happening

13   inside the Senate Chamber?

14   A     The Senators had just come back from the House side so

15   we had VP Pence there and also had majority of the leadership

16   inside the chamber at the time.

17   Q     Okay.  Were they actually doing legislative activities

18   at that point?

19   A     Yes, we were in session.

20   Q     Okay.  What happens after that announcement?

21   A     After that announcement we cut the feed, the TV feed to

22   the chamber, and then with the Sergeant of Arms we had to

23   make a determination of what we were going to do next.

24   Q     What about the legislative activities that had been

25   happening, are they still happening at that point?

A219

Nairobi Timberlake - Direct                           158

1    A    No, ma'am, everything was shut off at that time.

2    Q    Is that part of the Electoral College count?

3    A    Yes.

4    Q    So what happened then?

5    A    Once we secured the chamber, we were accountability,

6    find out how many people we have with us in the chamber and

7    then we were just standing by to make a determination as far

8    as where we were going to go next or what we were going to do

9    next.

10   Q    Are you aware of what's happening outside the Senate

11   Chamber at that point?

12   A    At that point, no, ma'am, I had sent an officer on the

13   East Side Wing to give me a heads up to do some recon on the

14   second and first floor.

15   Q    When you say recon, what do you mean by that?

16   A    Determine exactly what kind of breach do we have, how

17   many people do we have inside the building, intruders.

18   Q    And at what point did you learn that there had been a

19   breach?

20   A    We kind of figured it was -- it was something major

21   going on after we had locked and secured the chamber, then

22   when the officer got back to me to let me know how bad it

23   was, we figured we had a short amount of time before we had

24   to leave.

25   Q    What was your understanding on how bad it was at that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A220

Nairobi Timberlake - Direct                                159

1    point?

2    A    From what I understood he told me there was multiple

3    individuals on the first floor, protesters.

4              MR. BURNHAM:  I object to hearsay at least insofar

5    as it's coming in for the truth.

6              THE COURT:  Can you do this without hearsay,

7    please?

8    Q    Okay.  So Sergeant Timberlake, at that point, did you

9    become aware that -- or were you aware at that point that

10   there might have been a breach or there had been a breach?

11   A    Yes.

12   Q    What do you do at that point?

13   A    We doubled up on the exter -- sorry, we doubled up on

14   the wing doors, the other doors were secure, and then we

15   waited for the Senate Sergeant of Arms to get in

16   communication with the command center to make determination

17   what we were going to do next.

18   Q    And how long did that take?

19   A    That took about approximately another five to ten

20   minutes.

21   Q    What did you do next?

22   A    At that point, when the decision was made to move the

23   Senators to another location, the first thing we did was

24   leadership left first, we then got Mr., sorry, got Vice

25   President Pence together with his group, I believe his

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A221

Nairobi Timberlake - Direct                          160

1   brother was in the gallery on the third floor at that time,

2   we brought his brother and his sister -- sorry, brother and

3   wife down to the second floor, put them in a package and took

4   them over to another location.

5   Q     Okay.  And what about everybody else who was in the

6   Senate Chamber?

7   A     We kept them in the chamber momentarily.  Once I got

8   back from dropping off the VP, we got the senators ready and

9   escorted them out of the chamber to another location, secured

10  the second floor doors, then I proceeded up to, up the East

11  Grand Staircase to the third floor where I had an officer

12  already assigned, he was waiting for the keys from me to

13  open -- I'm sorry, to secure the third floor gallery doors.

14  Q     Okay.  And before you go up to the third floor, do you

15  have any sort of radio on you that day?

16  A     Yes, ma'am.

17  Q     Okay.  And does the radio, does it connect to other

18  officers who are there?

19  A     My radio, it was different channels on the radio.  My

20  radio is assigned to the Senate Chamber or chamber channel

21  which is a designated channel for both Senate and House

22  Chamber officers, but my radio at that time was on scan, so I

23  was able to not only monitor my channel, I was also able to

24  monitor the inside channel and the outside channel.

25  Q     Did you in fact monitor the inside and outside channel

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A222

Nairobi Timberlake - Direct                           161

1    that day?

2    A      Yes, ma'am.

3    Q      What did it sound like, without going into what anybody

4    said?

5    A      It was hectic, it was a lot of radio communication

6    going on, a lot of officers requiring or requesting

7    additional assistance.

8    Q      And you've been with Capitol Police quite a long time,

9    had you ever heard the radio like that?

10   A      No, not like that.

11   Q      I'm going to clear this out.

12          THE COURT:  I thought that was very meaningful.

13   Q      So you go up to the third floor and you mentioned the

14   gallery; what is it you're trying to do up there?

15   A      The officer doesn't have keys to secure the gallery

16   doors, so I am -- I'm the only one that has the master keys

17   at that time, so I get up to -- after I secured the second

18   floor, the Senators are on their way to the next location

19   with another supervisor and approximately five other

20   officers, so me and another officer responded to the third

21   floor.  There's an officer already assigned up there waiting

22   for the keys, I hand them the keys so he can start securing

23   the gallery doors.

24   Q      How many Senate Gallery doors are there?

25   A      There's approximately nine.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A223

Nairobi Timberlake - Direct                      162

1    Q    And had any of the doors been secured or were all nine

2    unsecured?

3    A    Approximately only four more doors had to be secured.

4    Q    Okay.  And when you say secured do you just mean

5    they're open?

6    A    They're unsecured -- so they need to be locked and

7    secured, it's two doors, there's an end door, inner door

8    which is wooden doors and then there's an outer door, so each

9    gallery has a set of two doors.

10   Q    Why do you need to lock those doors?

11   A    To secure the chamber so that make sure there's no

12   vandalism nobody's bringing in or doing anything.

13   Q    Okay.  And can you get into the Senate Chamber from

14   those doors up there?

15   A    Yes.

16   Q    So tell me what happens when you go upstairs?

17   A    I see a couple of protesters as I get up to the third

18   floor landing as I go around from the east side to the main

19   center hallway, I give officer the keys, the master keys, he

20   then proceeds to try to secure the remaining doors.

21   Q    And was he able to?

22   A    No.

23   Q    Why not?

24   A    At that point he was confronted with several

25   protesters.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A224

Nairobi Timberlake - Direct                                    163

1    Q      Could you see this?

2    A      Yes.

3    Q      So tell me what you saw.

4    A      At that point we were I believe at gallery number

5    three, we get into a shoving match with a couple of the

6    protesters shoving back and forth, he's trying to lock the

7    door, I get hit in the back of my head by at least one or two

8    of the protesters and then it's -- at that point it's three

9    against maybe 20 people.

10   Q      Okay.  So what do you do at that point?

11   A      Um, I just made a determination to cut our losses

12   there.  We could have pushed the fact but I guess it was

13   just, to me after calculating, it was just better to get back

14   with the rest of the group, secure the Senators, and then

15   come back with more manpower.

16   Q      Okay.  Can you show us on the map where exactly you

17   were during this?

18   A      Okay.  So I ran into the large group here.  So

19   protesters were coming down this main hallway here

20   (indicating).

21   Q      Sergeant Timberlake, I apologize, can you move your

22   microphone a little bit closer to you?

23   A      Sure.  So I'm by the Senate Chamber by Gallery 3 and 4,

24   officers trying to secure the chamber and then more

25   individuals are coming down the east hallway on the third

A225

1    floor from the center of the building.

2    Q    Okay.  And is that what you just showed us on the map

3    here?

4    A    Yes.

5    Q    All right.  I'm going to clear that out, if we can pull

6    up Government's 419.  And I show that this is in evidence,

7    your Honor?

8              THE COURT:  It is in evidence.  As long as it's

9    419.

10   Q    Can you expand that.  Okay.  And don't play yet.

11   Sergeant Timberlake, do you recognize this area we're looking

12   at?

13   A    Yes, ma'am.

14   Q    Is that the area you were just speaking about?

15   A    Yes.

16   Q    What are these doors that we're seeing here?

17   A    So the doors on your right would be the gallery doors

18   where the general public will come and visit the Senate

19   Chamber.

20   Q    So I'm going to draw a couple circles here.  And I've

21   drawn four circles and my circles show up in red.  Are those

22   the doors we're talking about?

23   A    Yes, ma'am.

24   Q    So when you say they're unsecured is that what we're

25   looking at here?

A226

Nairobi Timberlake - Direct                    165

1    A    The first door here was secured (indicating), the other

2    two doors down the hallway are the ones that needed to be

3    locked and secured.

4    Q    Okay.  I'm going to clear this out.  All right.  If we

5    could play Government's 419.

6              (Government's Exhibit 419 playing.)

7    Q    We can pause right there.  I'm pausing at the 11-second

8    mark.  I'm going to make a circle around one person.  This is

9    an individual wearing a helmet, vest, jacket, do you remember

10   him?

11   A    Yes, ma'am.

12   Q    How do you remember him?

13   A    He was one of the most vocal -- well, he and the

14   gentleman in black were very vocal, the gentleman with the

15   green helmet was telling the other gentleman to calm down,

16   that's not what we're here for, and ... sorry.  That was

17   pretty much it.

18   Q    Okay.  Can you draw on the screen where the gentleman

19   in the black is that you're referring to.

20   A    (Witness complies.)

21   Q    So when the guy in the helmet, when he's saying this,

22   are people listening to him?

23   A    Yes.

24   Q    And what do you observe that makes you believe people

25   are listening to him?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A227

1    A     He had a command presence about him, he was, like I

2    said, tell everybody, when he told everybody to calm down,

3    that's not what we're here for, that's not what we're about,

4    the gentleman in the black kind of took it down a notch, and

5    I believe the gentleman in the red hat was also one, right

6    here is the one who attacked me (indicating).

7    Q     So what happens after he does that?

8    A     That's when we fell back and tried to catch up with the

9    rest of our group.

10   Q     Okay.  And did this gentleman, did he help you shut the

11   gallery doors at any point?

12   A     I'm sorry?

13   Q     Did he help you shut the gallery doors?

14   A     No.

15   Q     Did you see any flex cuffs on him?

16   A     Not at that time, no.

17   Q     And when I say flex cuffs, do you know what I'm talking

18   about?

19   A     Yes, we have what we call arrest kit up there on the

20   third floor, and we use plastic cuffs to secure prisoners.

21   Q     Okay.  Were you pretty close to the guy in the helmet?

22   A     Yes.

23   Q     Did he try to hand you any flex cuffs at any point?

24   A     No.

25   Q     If he had, would you have taken them from him?

Nairobi Timberlake - Direct                    167

1    A    Yes.

2    Q    Okay.  I'm going to clear out these circles.  If we

3    could finish playing Government's 419.

4              THE COURT:  Back on 419?

5              MS. AYERS-PEREZ:  Yes, your Honor, back on 419.

6              (Government's Exhibit 419 playing.)

7    Q    While this plays, Sergeant Timberlake, was there

8    anything about what people were wearing that day that

9    concerned you?

10   A    Well, besides it was cold, some of the protesters were

11   wearing what appeared to be military gear.

12   Q    As a Capitol Police officer did that concern you in any

13   way?

14   A    Yes.

15   Q    Why?

16   A    That's something we've never seen or I've never seen on

17   Capitol grounds, that kind of gear.  My understanding when we

18   had our intell was supposed to just be peaceful protesters,

19   there might have been ... that's it.

20   Q    What did you do after you left the third floor?

21   A    Retreated back down to catch up with the rest of the

22   group.

23   Q    Where did you go from there?

24   A    Over to the Hart Senate building.

25   Q    Did you stay there for the rest of the afternoon?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A229

Nairobi Timberlake - Direct                          168

1   A      No, so at that point, Captain Patton took over incident

2   command for Senate Chambers, then put my officers in small

3   groups of two and three and then we retreated back over to

4   the Capitol building through police lines and started

5   retrieving staff that were sheltering in place.

6   Q      So there was still staff sheltering in place inside the

7   Capitol at that point?

8   A      Yes, we have -- I'm sorry, leadership staff still in

9   the building and we also had what we call some support staff.

10  So Secretary of the Senate, legislative staff on the first

11  floor, Senate wing, and then also had leadership in their

12  particular offices, we still had staff that didn't make it to

13  the Senate floor in time were in their offices.

14  Q      Okay.  And when you say Captain Patton, are you talking

15  about Sean Patton?

16  A      Yes, ma'am.

17  Q      What time were you supposed to leave that day?

18  A      We were hoping to wrap up by 7 p.m.

19  Q      What time did you actually leave that day?

20  A      More like midnight.

21  Q      And you mentioned you'd been a Capitol Police officer

22  for quite some time now, have you ever seen anything like

23  this?

24  A      No, ma'am.

25          MS. AYERS-PEREZ:  Your Honor, I pass the witness.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A230

Nairobi Timberlake - Cross                                    169

1              THE COURT:  All right, Mr. Burnham.  You can

2   probably take the exhibit down unless Mr. Burnham wants it

3   up.

4              MR. BURNHAM:  I may ask a question or two about it

5   so if you don't mind leaving it up.

6              THE COURT:  If it's okay with you, we can leave it

7   up.

8              MR. BURNHAM:  Thank you.

9   CROSS-EXAMINATION BY MR. BURNHAM:

10  Q      Good afternoon, Officer.  Charles Burnham, I've got a

11  couple questions for you.

12  A      Okay.

13  Q      I notice that you and your colleagues there appear to

14  be wearing civilian clothes, is that right?

15  A      Correct.

16  Q      It looks like a blue blazer and slacks I guess you

17  would say?

18  A      Blue suit, yes.

19  Q      Do you have a tie?  I can't even tell, do you have ties

20  on?

21  A      Yes.

22  Q      You do.  Is that your normal attire for working, is

23  that normally what you wear to work, civilian?

24  A      Yes.

25  Q      Were you carrying a firearm?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A231

Nairobi Timberlake - Cross

170

1    A    Yes.

2    Q    At the, I think at -- during your direct testimony you

3    refer to the situation with yourself and your colleagues

4    being, you know, 20 against 2, is that how you described it?

5    Or 20 against 3 I guess it would be, is that correct?

6    A    The crowd kept increasing.

7    Q    So that's -- would I be correct in saying that's a

8    dangerous situation to be in with just that few officers

9    having to handle that many people you didn't know who they

10   were, would that be correct?

11   A    Yes.

12   Q    All right.  And the hostile actions from the men in

13   black and the others that make the situation that much more

14   concerning, would that be correct, that they were acting that

15   way?

16   A    Yes, that and the fact that we didn't know if they were

17   armed or not.

18   Q    Yeah.  So it's -- I take it it was a welcome thing that

19   the man in the helmet exerted the influence he did to try and

20   defuse the situation, is that fair?

21   A    No.

22   Q    Not a welcome thing?

23   A    I'm sorry.

24   Q    I'm asking whether it was a welcome thing from your

25   perspective that the man in the helmet tried to calm people

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A232

Nairobi Timberlake - Cross

171

1    down; is that something you were glad he did that?

2    A    He wasn't trying to calm people down, he was trying to

3    calm down that guy in black telling him calm down, that's not

4    what we're here for, that's not what we're about.

5    Q    That helped to defuse the situation seemingly, is that

6    correct?

7    A    Yes.

8    Q    Thank you.  Could -- would the Government be kind

9    enough to move the video till it's about 23 seconds

10   remaining.  So 23 seconds, I think it was.  Thank you.  You

11   can just let it play, thank you.

12              (Government's Exhibit 419 playing.)

13              THE COURT:  This is going to take a minute and a

14   half to get there at this rate.

15              MR. BURNHAM:  If you can just pause it there.

16              Right there, you see the woman there in the Trump

17   flag in the bottom right?

18   A    With the bicycle helmet, yes.

19   Q    That was my question, she appears to have I guess a

20   green bicycle helmet or turquoise bicycle helmet, would you

21   agree with that?

22   A    I'm sorry.

23   Q    Do you agree she appears to be wearing what appears to

24   be a turquoise bicycle helmet?

25   A    Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A233

Nairobi Timberlake - Cross

172

1    Q     And the person standing immediately in front of her has
2    some kind of helmet as well, would you agree with that?
3    A     Yes.
4    Q     Looks like it might be, I don't know, a rock climbing
5    helmet or something, that's my best guess, would you agree
6    with that or disagree?
7    A     I agree with you.
8    Q     Can we just play maybe 10 more seconds.
9                  (Government's Exhibit 419 playing.)
10   Q     All right, you can stop there, thank you.  Can I have
11   the court's indulgence?
12                THE COURT:  Certainly.
13                MR. BURNHAM:  Thank you, Officer, that's all my
14   questions.  No further questions.
15                MS. AYERS-PEREZ:  No redirect, your Honor.
16                THE COURT:  All right.  Thank you very much for
17   coming, Sergeant.  And you may be excused.
18                (The witness was excused.)
19                MS. AYERS-PEREZ:  We call Maggie-May Humphrey.
20                (Pause in proceedings.)
21                THE CLERK:  Good afternoon, ma'am.
22                THE WITNESS:  Good afternoon.
23                THE CLERK:  Please raise your right hand.
24
25                M A G G I E - M A Y   H U M P H R E Y ,

Maggie-May Humphrey - Direct                       173

1    called as a witness and being duly sworn, testifies

2    as follows:

3            THE COURT:  Good afternoon, Officer Humphrey.

4    Mr. Meisel.

5            MR. MEISEL:  Thank you, Judge.

6    DIRECT EXAMINATION BY MR. MEISEL:

7    Q    Officer Humphrey, could you please state your name and

8    spell it for the record?

9    A    Sure, first name is Maggie-May, M-a-g-g-i-e, hyphen,

10   M-a-y, H-u-m-p-h-r-e-y.

11   Q    By whom are you employed?

12   A    Metropolitan Police Department.

13   Q    What is your title or position within MPD?

14   A    I'm an officer.

15   Q    How long have you been employed by the Metro Police

16   Department?

17   A    Since August of 2019, so three years and a couple

18   months.

19   Q    Okay.  So as of January 6, 2021, would it be fair to

20   say you had been an officer for approximately two years?

21   A    Approximately, over a year at that point.

22   Q    Okay.  Prior to your employment with MPD, did you have

23   any sort of previous training, experience in either military

24   or law enforcement?

25   A    Yes, I was in the Army.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A235

Maggie-May Humphrey - Direct                        174

1    Q    How long were you in the Army?

2    A    So I joined in July of 2015, I had medically separated

3    in 2016.

4    Q    I'm going to direct your attention to January 6, 2021.

5    Were you working in your capacity as an officer with the

6    Metro Police Department on that day?

7    A    Yes.

8    Q    Was this a regularly scheduled tour for you?

9    A    No.  So my regularly scheduled tour of duty is midnight

10   tour, just working patrol on this day, I was working on a

11   civil disturbance unit.

12   Q    Okay.  So this was a special assignment that you were

13   detailed to, for that date?

14   A    Different than my usual assignment, yes.

15   Q    Gotcha.  And so do you recall what tour of duty you

16   were working that day?

17   A    It would have been like similar to the evening tour,

18   early afternoon, until late at night.

19   Q    Gotcha.  When you reported for duty, did you go through

20   normal routines like roll call?

21   A    Yes.

22   Q    Was there anything unusual about roll call when you

23   reported for duty on January 6, 2021?

24   A    Just that we were expecting a lot of people, it was

25   supposed to be somewhat of a big event, but I don't think

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A236

Maggie-May Humphrey - Direct                    175

1    anybody was expecting anything too out of hand.

2    Q    Okay.  And your unit, what is the -- what is the

3    strength or composition of the unit?

4    A    So I was working civil disturbance unit 51 or CDU

5    platoon 51.  A platoon is made up of four squads, each squad

6    has seven officers and one sergeant and then there is a

7    lieutenant so 28 officers, four sergeants, one lieutenant

8    makes 33 people make up the platoon.

9    Q    Okay.  And after roll call, where did your unit deploy

10   to?

11   A    So our entire platoon was supposed to be in the area of

12   Black Lives Matter Plaza, I believe it's 16th and I, so all

13   four squads went down, parked somewhat nearby, and then we

14   walked and lined up in the vicinity of BLM Plaza.

15   Q    How long would you say that you were posted at BLM

16   Plaza from the time that you arrived there to the time that

17   you left?

18   A    It was very brief.  Our time down there.  I think by

19   the time we had walked down, lined up, I took a phone call

20   for a couple minutes and then we were leaving.

21   Q    Okay.  And do you recall the approximate time that you

22   arrived at BLM Plaza?

23   A    I believe it was sometime -- I'd say between like noon

24   and 2:00.  I think around 1:00 but I'm not certain.

25   Q    Okay.  Were you aware of what it was that triggered a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A237

Maggie-May Humphrey - Direct                           176

 1   movement away from that assigned post?

 2   A      So like I had said, I took a phone call, so I turned my

 3   radio down to hear the phone conversation.  By the time I had

 4   gotten off the phone, I didn't have my radio turned back up,

 5   the volume, so when something came out over the radio, it was

 6   very obvious that something came out and we needed to leave

 7   quickly, but I didn't hear that transmission.

 8   Q      What made it obvious to you?

 9   A      Just kind of the look of, I don't know if I want to say

10   shock but there was definitely a look on the officers' faces

11   around me like they were not expecting to hear what they were

12   hearing.

13   Q      And after you saw those expressions, what did the

14   officers start doing?

15   A      So pretty much everybody turned to their right, facing

16   towards where our vans were parked and actually started

17   running.

18   Q      Okay.  What did you do?

19   A      Followed along, ran with them.

20   Q      All right.  And from there, I'm assuming everybody

21   loaded up in the vans?

22   A      Yes.

23   Q      Where did you proceed from there?

24   A      So we actually ended up parking within the vicinity of

25   the Capitol building.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A238

Maggie-May Humphrey - Direct                    177

1    Q    Okay.  And can you describe your initial observations

2    when you arrived at the Capitol building?

3    A    Sure.  So when we parked, the building was kind of in

4    front of me and to the left.  There was a lot of people out,

5    a lot of people in the street, in the lawn, just a lot of

6    people around the Capitol building.

7    Q    And what happened when you guys got out of your vans?

8    A    So as we started exiting the vans, we were told to put

9    on our full CDU equipment including our helmet, our gas

10   masks, and grab the, you know, riot batons that we carry with

11   us.  So everyone immediately got out and started donning all

12   of this equipment.

13   Q    So until that point, no one was fully prepared or armed

14   with any of that equipment?

15   A    No.  So it's typical to leave your helmet and that kind

16   of stuff in the van.

17   Q    Is it typical to go out on patrol with that equipment?

18   A    No.

19   Q    So on this particular day, all the officers that were

20   part of the CDU left their precinct or their headquarters

21   with that equipment with them?

22   A    Everyone assigned to the civil disturbance unit, yes.

23   Q    Now had you had occasion to go into full gear set, I'll

24   call it, prior to that, at any point during your employment

25   as an officer?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A239

Maggie-May Humphrey - Direct                              178

1    A      Aside from training, no.

2    Q      Okay.  And so the full equipment that includes helmet,

3    gas mask, baton?

4    A      Mm-hmm.

5    Q      Any other equipment I'm leaving out?

6    A      Our gloves, we typically wear gloves that we're given

7    with our CDU equipment that you wouldn't typically wear on

8    patrol.

9    Q      Gotcha.  And other than your CDU equipment, gear set,

10   are you equipped with body worn camera on that day?

11   A      Yes.

12   Q      Okay.  Was it functioning properly?

13   A      Yes.

14   Q      And did you at some point activate your body cam?

15   A      Yes.

16   Q      Do you recall roughly when you activated your body cam

17   in relation to your arrival at the Capitol?

18   A      Sometime after we got there, I'm not sure if I did

19   before entering the building or once inside the building.

20   Q      Okay.  Now, when you arrived at the Capitol and gear

21   up, what happens then?

22   A      So after putting on all of our equipment, we were

23   pretty much told to line up single file and march towards the

24   building, so we proceeded kind of through the lawn, kind of

25   up to what I think was a side door.  We might have stood

A240

Maggie-May Humphrey - Direct                      179

1    outside on the steps for a couple seconds, but then we were

2    led into the building.

3    Q    And when you were led into the building, where was the

4    sort of first area where you were posted?

5    A    So once inside the building, we kind of proceeded in

6    from that door and down a hallway to the left which I later

7    in that day learned that that was a hallway towards the

8    Rotunda room.

9    Q    And when you arrived there, I'm assuming the rest of

10   your civil disturbance unit is with you?

11   A    Yes.

12   Q    And what was, what was your assignment once you arrived

13   in that hallway connecting to the Rotunda?

14   A    So very quickly, once inside that hallway, we began to

15   like make our first push of the day where we were pushing

16   people through this hallway down the hallway.  Again, I

17   wasn't sure where we were pushing them at this time, but

18   everyone just started pushing, so we just pushed.

19   Q    Okay.  Could you describe just what was happening in

20   that hallway, who were they pushing?

21   A    So I'm pretty sure there was some taller people in

22   front of me, I couldn't exactly see the people that we were

23   pushing, but just kind of realizing what was going on around

24   me, the biggest thing that stands out was like all of the

25   flags that decorated the Capitol building were knocked over,

A241

1    falling on the ground.  In between pushing, myself and other

2    officers were trying to stand these flags up, and to me, that

3    was pretty important, that we at least make that right.

4    There was OC spray being deployed in the hallway, and again,

5    just pushing.

6    Q    Okay.  And we're talking about a line of MPD officers

7    pushing against protesters, just to be clear?

8    A    Yes.

9    Q    And I assume that these, based on the fact that you

10   were pushing, that the protesters are not willingly moving in

11   the direction that you're trying to get them to go to?

12   A    No, we, I mean I know I was pushing with all of my

13   strength, so it was definitely not moving willing people

14   around that building.

15   Q    And as you're pushing with several other officers, are

16   you, are you moving freely or are you pretty much sort of

17   dead in your tracks?

18   A    There was a lot of resistance, I know we did make some

19   movement, but there was a lot of resistance.

20   Q    Okay.  At some point do you get reassigned from that

21   position?

22   A    Yes.

23   Q    How long would you say that you were pushing before you

24   were retasked?

25   A    Time moved weird that day.  I don't know that I was in

Maggie-May Humphrey - Direct                    181

1    that hallway for more than 15 minutes before being
2    reassigned.  In my head that's how long it felt.
3    Q    Okay.  And can you describe what happened that you were
4    retasked?
5    A    So there was another officer, there might have been
6    more than one, but somebody who wasn't dressed in an MPD
7    patrol uniform or CDU uniform had come up and was speaking
8    with our lieutenant, Lieutenant Sheldon, and he very quickly
9    just looking around picked out a couple of us and said, you
10   know, you're going with whoever that was, and he said
11   something to them along the lines of, you know, you're in
12   charge, tell them what you need them to do.
13   Q    And so this was a Capitol Police officer that you were
14   being transferred over to?
15   A    It could have been.  There was definitely Capitol
16   Police officers around at that time.
17   Q    Okay.  And from your platoon or your civil disturbance
18   unit, was it just you or were there other officers from your
19   unit that were being retasked?
20   A    I believe there was three other officers off the top of
21   my head, I know Officer Cynthia Rios was there, a male
22   officer, Officer Singh was there, and then another female
23   officer, Officer Daniels was there also.
24   Q    Okay.  Where were you led to at this point?
25   A    So outside of this hallway, it was pretty much a short

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A243

Maggie-May Humphrey - Direct                              182

1    walk to another hallway in between a staircase, standing
2    there there was a staircase that went up and a staircase that
3    went down.  To the left of me there was a big window where I
4    could see all of these people gathering up on the lawn.  I
5    could hear the yelling from outside and to the right of me it
6    looked like, kind of like offices or rooms down the hallway.
7    Q    Okay.  And at some point were you sort of assigned to a
8    fixed location?
9    A    Yes.
10   Q    Okay.  And that location, do you recall what level of
11   the building you were on?
12   A    I'm not exactly sure of the layout of the building, but
13   I felt like either there was a basement below us, or another
14   floor down one level that led to outside, I could hear
15   protesters, people outside pounding on the door, and then
16   there was a floor above us so I would guess ground level or
17   the middle floor of the building.
18   Q    Okay.  Were you near a window?
19   A    Yes.
20   Q    And did you have an opportunity to look out that
21   window?
22   A    Yes.
23   Q    Okay.  And so, and when you looked out that window,
24   were you looking at the ground or were you above --
25   A    I was above the ground.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A244

Maggie-May Humphrey - Direct                              183

1    Q     And could you describe the area around you?

2    A     Yeah.  So the stairs that went up to some kind of

3    doorway, I wasn't sure what kind of room was up there, I

4    think I was under the impression that that's where, you know,

5    Senators or important people in my mind were up --

6                MR. BURNHAM:  Object to speculation.

7                THE COURT:  I'm sorry.

8                MR. BURNHAM:  I take the witness' answer to be

9    speculating, there might have been Senators.

10               THE COURT:  I'll allow her to speculate on what she

11   believed.

12               MR. BURNHAM:  Thank you.

13   A     Below, again, there was another door that, to me I

14   thought led outside, I heard protesters out there.  Again to

15   the left, the window, from the window, I could see the lawn

16   and to the right a lot of doors down the hallway.

17   Q     Okay.  So you mentioned there were a set of stairs?

18   A     Mm-hmm, yes.

19   Q     So, and coming down these stairs, did you see other

20   officers, protesters?

21   A     Yes.  There was officers kind of at different times

22   walking through different areas, Capitol police officers, and

23   then at some point, what looked like a protester person

24   dressed in plain clothing came down from the stairs.

25   Q     Okay.  Have you had an opportunity to review a clip of

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A245

Maggie-May Humphrey - Direct                    184

1   body cam that we showed you during preparation for this

2   trial?

3   A     Yes.

4   Q     Okay.  When you viewed it, did you recognize it as

5   being from your body cam video?

6   A     Yes.

7           MR. MEISEL:  Okay.  This is already received in

8   evidence, your Honor, as Exhibit 800, I'd like to publish it

9   to the witness.

10          THE COURT:  You may.

11              (Government's Exhibit 800 played.)

12  Q     Is that video that we just played, that was a clip from

13  your body cam?

14  A     Yes.

15  Q     It appeared to fairly and accurately show what you

16  observed while posted somewhere inside the U.S. Capitol on

17  January 6, 2021?

18  A     Yes.

19  Q     Give me one moment, Officer Humphrey.

20          Officer Humphrey, thank you for your time,

21  Mr. Burnham might have some questions for you.

22          THE WITNESS:  Sure.

23          THE COURT:  Mr. Burnham, if you have any questions.

24          MR. BURNHAM:  Yes, your Honor, thank you.

25  CROSS-EXAMINATION BY MR. BURNHAM:

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A246

Maggie-May Humphrey - Cross                              185

1    Q      Good afternoon, Officer, I'm Charles Burnham.

2    A      Good afternoon.

3    Q      So this video we just saw, you could hear there some

4    noise in the background that didn't appear to be coming from

5    yourself or the officers?

6    A      Yes.

7    Q      You agree with that?  And depending on what part of the

8    Capitol you were in, it can produce a, sort of an echoing

9    effect, would that be right?

10   A      That could be right.

11   Q      And so the individual that walked down, I don't think

12   it's -- it's not you that goes down the hall, it's another

13   officer, is that right, and you're there as well?

14   A      You can see in my camera that's Officer Daniels, I know

15   I started running down the hallway.

16   Q      And so at a certain point yourself and Officer Daniels

17   just stop and don't go any farther, maybe when you're about

18   halfway down that hallway, is that right?

19   A      Yes.

20   Q      And then you go back to wherever your post was?

21   A      Yes.

22   Q      Okay.  And I take it that you didn't get on the radio,

23   I didn't see it, and say we've got someone going down this

24   hallway, send in people to chase him or anything like that,

25   correct?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A247

Maggie-May Humphrey - Redirect                    186

1  A    No.

2  Q    And the individual walking down there, he didn't appear

3  to change his pace at all, he continued walking more or less

4  consistent speed, would that be right?

5  A    I don't recall if he sped up or how quickly he was

6  going, there was a lot of confusion, but he definitely

7  continued down the hallway throughout the building.

8  Q    Well, at any rate he didn't break into a run, you agree

9  with that I'm sure?

10  A    Sure.

11          MR. BURNHAM:  Thank you.

12          THE COURT:  Mr. Meisel?

13          MR. MEISEL:  Just have one question for redirect.

14  REDIRECT EXAMINATION BY MR. MEISEL:

15  Q    Officer, you have any reason to question the accuracy

16  of the date/time stamp on your video?  Can you see it?

17  A    January 6 at 14:57 -- no.

18          MR. MEISEL:  Thank you.

19          THE COURT:  Thank you for coming, Officer Humphrey,

20  you may step down.

21             (The witness was excused.).

22          MS. AYERS-PEREZ:  We call John Moore.

23          THE COURT:  All right.

24          THE CLERK:  Good afternoon, sir, please raise your

25  right hand.

A248

John Moore - Direct

```
1              J O H N   M O O R E , called as a witness
2    and being duly sworn, testifies as follows:
3              THE COURT:  Good afternoon, Special Agent Moore.
4              THE WITNESS:  Good afternoon, your Honor.
5              THE COURT:  Ms. Ayers-Perez.
6              MS. AYERS-PEREZ:  Thank you, your Honor.
7    DIRECT EXAMINATION BY MS. AYERS-PEREZ:
8    Q    Good afternoon.  Can you please state and spell your
9    name for the record?
10   A    My name's John Moore, spelled J-o-h-n, M-o-o-r-e.
11   Q    Where do you work?
12   A    For the Federal Bureau of Investigation.
13   Q    What do you do for the Federal Bureau of Investigation?
14   A    I'm a special agent.
15   Q    How long you been a special agent with the FBI?
16   A    For little over six years.
17   Q    What did you do before that?
18   A    I was an active duty Army officer for six years after
19   college, and then I had a brief private sector manufacturing
20   career about four years while I was processing in the Bureau.
21   Q    What was your rank when you were in the Army?
22   A    I'm currently serving the Army Reserve and I'm a
23   lieutenant colonel.
24   Q    Okay.  And before the Army, what, did you go to
25   college?
```

John Moore - Direct                                    188

1    A    I did.

2    Q    Did you get a degree?

3    A    I did.  I completed my undergrad in 2004, it was ROTC

4    so that's what I was doing immediately before the Bureau and

5    since got a master's degree in political science.

6    Q    Okay.  Are there any particular type of cases you work

7    on with the FBI?

8    A    I started out working white collar investigations my

9    first couple years and I've been working domestic terrorism

10   for the last -- since 2020.

11   Q    Okay.  And were you working with the FBI on January 6,

12   2021?

13   A    I was.

14   Q    And if I just call it January 6th from here on out

15   you'll know what that means?

16   A    Yes, ma'am.

17   Q    Okay.  Which FBI office did you work at?

18   A    The Dallas field office.

19   Q    Have you worked there for the entirety of your time

20   with the FBI?

21   A    I have.

22   Q    Do you still work at the Dallas field office?

23   A    I do.

24   Q    And that's Dallas, Texas, right?

25   A    That's correct.

A250

John Moore - Direct                                    189

1    Q      All right.  Were you aware of what happened in

2    Washington, D.C. on January 6?

3    A      I'm aware.

4    Q      Were you aware back on January 6th and the days

5    afterwards?

6    A      I was aware immediately that day.

7    Q      Did the FBI in Dallas investigate any cases arising out

8    of what happened on January 6th at the Capitol?

9    A      We did.

10   Q      Did you get assigned any cases?

11   A      I did.

12   Q      Did you get assigned any cases involving a Larry Brock?

13   A      I did.

14   Q      When was that?

15   A      On the morning of January 9th, 2021.

16   Q      And had you identified Mr. Brock at that point?

17   A      I had.

18   Q      How did you do that?

19   A      Multiple ways.  So that January 9th was a Saturday, was

20   a very interesting time for the FBI.  We had taken in

21   numerous complaints from the public identifying Mr. Brock as

22   being the person depicted on the Senate floor in the Capitol

23   on January 6, 2021.

24   Q      So would it be fair to say people were calling in tips

25   identifying Mr. Brock?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A251

John Moore - Direct                                    190

```
 1    A      That's correct.

 2    Q      There was more than one of those?

 3    A      Yes, ma'am.

 4    Q      If you had to guess, if you could estimate, a lot or a

 5    little?

 6    A      There were at least five.

 7    Q      Okay.  So what do you do at this point?

 8    A      So we have to open a case, so we, or I reviewed the

 9    multiple complaints and open source information available and

10    then put that into an FBI case and opened a case on

11    Mr. Brock.

12    Q      As part of opening a case on Mr. Brock, did you become

13    aware of his background or education or occupation at this

14    time?

15    A      I did.

16    Q      What did you become aware of?

17    A      I became aware of the fact that he had attended the

18    United States Air Force Academy, I believe graduated in the

19    class of 1989 and that he held the rank of lieutenant colonel

20    in the Air Force.

21    Q      Okay.  Was he a current, was he currently in the Air

22    Force at that time or had he retired?

23    A      He had since retired.

24    Q      Do you know if he was employed at that time?

25    A      I did, I believed he was employed at Hillwood Airways
```

A252

John Moore - Direct                                                      191

1    and I also believed that day I spoke with Hillwood Airways

2    and they informed me that he was no longer employed.

3    Q     What did you do at that point?  Actually strike that,

4    let me ask you this.  Was Mr. Brock charged at any point?

5    A     He was.  By the end of the day on January 9th we had a

6    complaint out of this district in Washington, D.C. with an

7    arrest warrant for Mr. Brock.

8    Q     Who was to execute that arrest warrant?

9    A     The Dallas FBI.

10   Q     And so did you execute that arrest warrant?

11   A     I did.

12   Q     When was this?

13   A     On Sunday, January 10th, 2021.

14   Q     Okay.  And tell me about that.

15   A     Because of the exigency of the circumstances having,

16   Mr. Brock having partaken in a riot at the U.S. Capitol, it

17   was our office's judgment that he needed to be arrested

18   quickly, so we had a -- referred to as a ping warrant on his

19   phone.  The ping warrant was only giving us marginally

20   accurate data in that it was, ping warrants come with

21   different degrees of certainty basically down to the meter as

22   to how close the ping is in time and space to where the phone

23   or the person actually is, so we didn't know exactly where

24   Mr. Brock was.  We knew he was pinging in Tarrant County and

25   we eventually called him to make the arrest.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A253

USCA Case #23-3045    Document #2007100       Filed: 07/10/2023    Page 256 of 609

1    Q      And as a fellow Texan myself, just to clarify, Tarrant

2    County is not in Dallas, right?

3    A      That's correct, it's adjacent, it's the county -- well,

4    it's where Fort Worth is so it's just west of Dallas County.

5    Q      Got it.  Did you eventually make contact with Mr. Brock

6    that day?

7    A      I did.

8    Q      Tell us about that.

9    A      We didn't -- I called Mr. Brock on his cell phone.  I

10   initially got a call from his civil attorney, I spoke to that

11   attorney, as did a United States Attorney, or AUSA in Texas

12   in the Northern District of Texas, so we had three-way call.

13   I also spoke to a former girlfriend of Brock's.  I believe I

14   also spoke to Mr. Brock at some point that day so it was a

15   very fluid situation.  I explained what was going on to the

16   attorney, the AUSA explained what was going on to the

17   attorney, and we eventually compelled Mr. Brock to

18   self-surrender at the Grapevine, Texas Police Department.

19   Q      Okay.  Did you go to the Grapevine, Texas Police

20   Department?

21   A      I did.

22   Q      Tell me what happened there.

23   A      I was -- I believe I was speaking directly to Mr. Brock

24   on the phone, I said, hey, come in and park on, you know, one

25   side of the parking lot.  He did that.  He was approached by

A254

John Moore - Direct                                    193

1    our SWAT team, he was compliant and was taken into custody.

2    Q    Did Mr. Brock have anything on him at that point?

3    A    He had his mobile telephone.

4    Q    And did that come into your custody?

5    A    It did.

6    Q    And how was that?

7    A    He handed it over to the arresting agents.

8    Q    Was that arrest warrant the only warrant you had that

9    day?

10   A    No.

11   Q    What else did you have?

12   A    We had a ping warrant for his phone that I previously

13   described and we had a search warrant for his residence.

14   Q    Okay.  Did you execute that search warrant?

15   A    I did.

16   Q    And did you find anything -- what were you looking for

17   there?

18   A    We were looking for, I mean first and foremost, weapons

19   of any kind that can be used to carry out additional attacks

20   against the Government or others, as well as evidence linking

21   him to the crime at hand.

22           MR. BURNHAM:  Your Honor, I object to that answer,

23   move to strike the answer of additional attacks against the

24   government with weapons --

25           THE COURT:  Well, that's what he was looking for,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A255

John Moore - Direct                                    194

1    so overruled.

2    Q    What else were you looking for, Agent Moore?

3    A    Other electronic devices, computers, telephones, other

4    things that may have had communications on them and then the

5    items that he was depicted wearing at the Capitol on

6    January 6th.

7    Q    Did you seize any items related to January 6th at his

8    residence?

9    A    Yes, ma'am.

10   Q    Did you bring any items that you seized here to court

11   today?

12   A    I did.

13   Q    And what were those items?

14   A    Excuse me.  I believe it was two mobile telephones,

15   cell phones that we found, some notebooks, the jacket that

16   Mr. Brock wore at the Capitol that day, hiking boots that

17   Mr. Brock wore -- hiking boots that we recovered, I'm not

18   certain if they were worn at the Capitol or not.  One of the

19   patches from his body armor that he's depicted wearing at the

20   Capitol, and some airline tickets, as well as I believe a

21   luggage receipt from his trip to and from Washington, D.C.

22   Q    And what were those airline tickets for?

23   A    I believe they were tickets reflecting a flight out on

24   January 5th and then returning to DFW on January 7th, 2021.

25          MS. AYERS-PEREZ:  Your Honor, we have a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A256

John Moore - Direct                                    195

 1   stipulation, it's Government's Exhibit Number 707, this is in

 2   regards to the physical items obtained in the search of

 3   Mr. Brock's house, just stipulating that they've been in the

 4   custody of the FBI from the time of their seizure and that we

 5   stipulate to the chain of custody.

 6            THE COURT:  All right.  Without objection, because

 7   there's a stipulation, Government, the Joint Exhibit 707 will

 8   be admitted.

 9   Q    Agent Moore, you've been in the courtroom the whole day

10   today, right, you've seen all the videos and everything we've

11   introduced here?

12   A    That's correct.

13   Q    Okay.  Did you remember the video of Mr. Brock at the

14   door to the Senate Lobby with what appeared to be some keys

15   in his hand?

16   A    I do.

17   Q    And were you aware of that video pretty early on in

18   your investigation?

19   A    I was.

20   Q    Did y'all recover those keys at his residence?

21   A    No.

22   Q    What about the helmet he was wearing?

23   A    No, we did not.

24   Q    And what about the vest he was wearing?

25   A    We did not recover that either.

John Moore - Direct                                          196

1   Q      There appeared to be three patches on his vest, what
2   about the other two patches?
3   A      We did not recover those patches.
4          MS. AYERS-PEREZ:  Okay.  Your Honor, may I approach
5   the witness?
6          THE COURT:  You may.
7   Q      And Agent Moore, did you bring the blue bin right over
8   there with you today?
9   A      Yes, ma'am.
10  Q      And does that bin contain the -- a few of the items we
11  just spoke about?
12  A      Yes, it does.
13         MS. AYERS-PEREZ:  Now may I approach the witness.
14  Thank you, your Honor.
15         All right, Agent Moore, if I could borrow your
16  microphone as well, make sure everybody can hear me.  I'm
17  going to show you what we marked as Government's
18  Exhibit Number 1, do you recognize this?
19  A      I do.
20  Q      What is this?
21  A      This is a black-and-white jacket that Mr. Brock was
22  depicted wearing at the Capitol on January 6th.
23  Q      Where did you recover this from?
24  A      In his apartment.
25  Q      Okay.  And when was that?

John Moore - Direct                                    197

 1   A      On January 10th, 2021.

 2   Q      Will you open this and show it to us.

 3   A      (Witness complies.)

 4          MS. AYERS-PEREZ:  Your Honor, I move to admit

 5   Government's Exhibit 1 into evidence.

 6          THE COURT:  Any objection?

 7          MR. BURNHAM:  No, your Honor.

 8          THE COURT:  Government 1 is admitted.  Without

 9   objection.

10   Q      All right, Agent Moore, I'm going to show you this bag

11   has been marked as Government's 2 through 5, do you recognize

12   this bag?

13   A      I do.

14   Q      What's inside that bag?

15   A      It's labeled trash contents, boarding pass, camouflage

16   neck gaiter and bag tag and patch so it's all those items.

17   Q      Why is it labeled trash contents?

18   A      Because at least some of the contents were found in the

19   trash.

20   Q      Okay.  Can you go ahead and open that for us.

21   A      (Witness complies.)

22   Q      So here we're looking at -- what is this?

23   A      This is, excuse me, this is a Velcro patch that's a

24   Punisher logo set to the Texas flag.

25   Q      And then here?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A259

John Moore - Direct                              198

1    A      This is a airline ticket from Washington Reagan Airport

2    to Dallas Forth Worth Airport on January 7th.

3    Q      Okay.  And what else?

4    A      This is a luggage tag from American Airlines from what

5    I believe to be the same flight on January 7th.

6    Q      And lastly?

7    A      A neck gaiter that was depicted on Mr. Brock at the

8    Capitol.

9           MS. AYERS-PEREZ:  Your Honor, at this time I move

10   to admit Government 2 through 5 in evidence.

11          THE COURT:  Without objection, Government 2 through

12   5 are admitted.

13   Q      Thank you, Agent Moore.  Moving back to the phone we

14   had talked about.  What happened to that phone after you

15   collected it from Mr. Brock on January 10th?

16   A      I took it to the North Texas Regional Computer

17   Forensics Laboratory which is where our phone examiners work

18   and they made an extraction of that phone to be used as, a

19   review by us.

20   Q      Okay.  When you say extraction of the phone, what does

21   that typically show us?

22   A      It can vary depending on how successful the extraction

23   is but if, you know, if it's a smart phone, in this case it

24   was, it can have text messages and e-mails and pictures and

25   videos and contents of any app that a person has in their

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A260

John Moore - Direct                                    199

1    phone.

2    Q      Were they able to successfully extract the phone that

3    Mr. Brock had with him?

4    A      They were.

5    Q      And did you go through the extraction of that phone?

6    A      I did.

7    Q      Do you have reason to believe the extraction, that

8    the -- that that phone belongs to Mr. Brock?

9    A      I believe it belongs to him.

10   Q      Was there anything on the phone that made you believe

11   that this phone belonged to Mr. Brock?

12   A      Yes.

13   Q      What was that?

14   A      E-mails, e-mails signed by him, pictures of him, and

15   communications that appeared to be sent from him.

16          MS. AYERS-PEREZ:  Okay.  Your Honor, at this time,

17   to make it easier, I would move to admit Government's 306

18   through 326.

19          THE COURT:  All right, so Government's 306 through

20   326.

21          MR. BURNHAM:  Could I have a moment, your Honor?

22          THE COURT:  Certainly.

23          MR. BURNHAM:  No objection to those.

24          THE COURT:  306 through 326 are admitted.

25   Q      All right, Agent Moore.  I'm going to show you what's

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A261

John Moore - Direct                                    200

 1   marked as Government's 306.  Do you recognize this?

 2   A     I do.

 3   Q     What are we looking at here?

 4   A     It's a picture of demonstrators on January 6th.

 5   Q     Where was this recovered from?

 6   A     I believe it was recovered from Mr. Brock's phone.

 7   Q     Okay.  Were there other photos and/or videos recovered

 8   from his phone?

 9   A     Yes.

10   Q     All right.  I'm going to show you what's been marked as

11   Government's 307.  What are we looking at here?

12   A     That's a picture of a helmet, a military style helmet

13   and body armor in a suitcase.

14   Q     Does that look familiar to what Mr. Brock is wearing on

15   January 6th?

16   A     It does.

17   Q     Okay.  And where was this recovered from?

18   A     His phone.

19   Q     And that's Mr. Brock's phone?

20   A     That's correct.

21   Q     I'm going to show you what's been marked as

22   Government's 308.  Do you recognize this?

23   A     I do.

24   Q     And what is this?

25   A     That is a picture of him wearing the body armor with

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A262

John Moore - Direct                                    201

1    the three patches we've described previously, taking a

2    picture with his own phone.

3    Q    Is that something we would commonly refer to as a

4    selfie?

5    A    Yes.

6    Q    And when you say him, you mean Mr. Brock?

7    A    That's correct.

8    Q    Where was this recovered from?

9    A    From his phone.

10   Q    Mr. Brock's phone?

11   A    Yes.

12   Q    Okay.  I'm going to show you Government's Exhibit 309.

13   What are we looking at here, Agent Moore?

14   A    It appears to be the January 6th rally in Washington,

15   D.C.

16   Q    And where was this recovered from?

17   A    From his phone, Mr. Brock's phone.

18   Q    Okay.  I'm going to show you what's been marked as

19   Government's Exhibit 310.  And here, Agent Moore?

20   A    That is a picture of people on the street in I believe

21   Washington, D.C.

22   Q    Where was this recovered from?

23   A    From Mr. Brock's phone.

24   Q    I'm going to show you what's been marked Government's

25   311.  What are we looking at here, Agent Moore?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A263

John Moore - Direct                                      202

1    A      People outside the United States Capitol.

2    Q      And where was this recovered from?

3    A      Excuse me, Mr. Brock's phone.

4    Q      I'm going to show you what's been marked as

5    Government's 312.  What are we looking at here, Agent Moore?

6    A      It is a -- looks like a screenshot of a flight that was

7    booked on American Airlines to Dulles Airport on January 5th,

8    2021.

9    Q      Is Dulles Airport in the Washington, D.C. area?

10   A      It is.

11   Q      Okay.  And where was this recovered from?

12   A      Mr. Brock's phone.

13   Q      Okay.  And is that Mr. Brock's name there at the top?

14   A      Yes.

15   Q      I'm going to show you what's been marked as

16   Government's Exhibit 313.  What am I looking at here, Agent

17   Moore?

18   A      That's a selfie of Mr. Brock at the rally on

19   January 6th, 2021.

20   Q      Okay.  And is he wearing -- is that the vest I see?

21   A      Yes, it's the vest and the jacket that we have just

22   previously discussed.

23   Q      Okay.  And I'm going to mark here on the screen, my

24   circle will come up in red.  What is that that I circled

25   there on his vest?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A264

John Moore - Direct

203

1    A      That's the Punisher patch that we just introduced into

2    evidence.

3    Q      Okay.  So that's identical to what you found there in

4    his apartment?

5    A      That's correct.

6    Q      Where was this photo recovered from?

7    A      His phone.

8    Q      Mr. Brock's phone?

9    A      That's correct.

10   Q      I'm going to clear the screen and I'm going to pull up

11   what's marked as Government's Exhibit Number 314.  What are

12   we looking at here, Agent Moore?

13   A      It's a picture from the January 6th, 2021 rally in

14   Washington, D.C.

15   Q      And who's that on the screen that we see?

16   A      Former President Trump.

17   Q      And where was this recovered from?

18   A      Mr. Brock's phone.

19   Q      Okay.  I'm going to show you what's been marked as

20   Government's Exhibit 315.  What are we looking at here, Agent

21   Moore?

22   A      It's a picture of riot police outside the Capitol on

23   January 6th, 2021.

24   Q      And where was this, where was this picture recovered

25   from?

A265

John Moore - Direct

204

1    A    Mr. Brock's phone.

2    Q    All right.  I'm going to show you what's been marked as

3    Government's Exhibit 316.  What are we looking at here, Agent

4    Moore?

5    A    Another picture of President Trump on a television

6    screen January 6th, Stop the Steal Rally, January 6th, 2021.

7    Q    Where was this recovered from?

8    A    Mr. Brock's phone.

9    Q    All right.  I'm going to show you what's been marked as

10   Government's Exhibit 317.  And what are we looking at here,

11   Agent Moore?

12   A    It's another picture of Mr. Trump -- or correction,

13   President Trump speaking at the January 6 rally from

14   Mr. Brock's phone.

15   Q    Okay.  I'm going to show you what's been marked as

16   Government's Exhibit 318.  And what is this?

17   A    That is a picture of Mr. Brock on the Senate floor.

18   Q    And where was this recovered from?

19   A    From -- I believe it was recovered from Mr. Brock's

20   phone.

21   Q    Okay.  I'm going to show you what's been marked as

22   Government 319.  And what is this?

23   A    That's a picture of the U.S. Capitol building.

24   Q    Okay.  And there are a number of protesters or rioters

25   there in that picture, is that right?

John Moore - Direct                    205

1    A     That's correct, it's from the January 6th riot at the

2    Capitol, 2021.

3    Q     Does this appear to be taken from the inside or outside

4    of the Capitol building?

5    A     It appears to be taken from inside the Capitol

6    building.

7    Q     Can you see the window frame there on the right side of

8    the picture?

9    A     Yes.

10   Q     And where was this recovered from?

11   A     Mr. Brock's phone.

12   Q     I'm going to show you what's been marked as Government

13   320.  Can you tell us what we're looking at here, Agent

14   Moore?

15   A     It's another picture of demonstrators at the

16   January 6th, 2021 rally.

17   Q     And where was this picture recovered from?

18   A     Mr. Brock's phone.

19   Q     Okay.  I'm going to show you what's been marked as

20   Government's Exhibit 321.  And what are we looking at here,

21   Agent Moore?

22   A     A picture of demonstrators somewhere on a street in

23   Washington, D.C. on January 6, 2021.

24   Q     And where was this recovered from, Agent Moore?

25   A     Mr. Brock's phone.

A267

John Moore - Direct                                    206

1    Q    Okay.  I'm going to show you what's been marked as

2    Government Exhibit 322.

3              THE COURT:  Maybe.

4                   (Government's Exhibit 322 played.)

5    Q    What was that a video of, Agent Moore?

6    A    That was a video of President Trump speaking at the

7    January 6 Stop the Steal Rally, 2021.

8    Q    And where was that video recovered from?

9    A    From Mr. Brock's phone.

10   Q    I'm going to show you what's been marked as Government

11   Exhibit 323.

12                  (Government's Exhibit 323 played.)

13   Q    What was that a video of, Agent Moore?

14   A    That was a video of protesters on January 6th, 2021.

15   Q    Was that at that Stop the Steal Rally?

16   A    It appeared to be so.

17   Q    Where did you recover that video from?

18   A    Mr. Brock's phone.

19   Q    I'm going to show you Government's Exhibit 324.

20                  (Government's Exhibit 324 played.)

21   Q    What were we looking at there, Agent Moore?

22   A    Demonstrators at the January 6, 2021 Stop the Steal

23   Rally.

24   Q    Where was that recovered from?

25   A    Mr. Brock's phone.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A268

John Moore - Direct                              207

1    Q      Show you Government's 325.

2                 (Government's Exhibit 325 played.)

3    Q      Where was that recovered from, Agent Moore?

4    A      Mr. Brock's phone.

5    Q      And what was that a picture or or a video of?

6    A      It was a video of Mr. Brock wearing body armor.

7    Q      Short video, pausing it there at the one-second mark.

8    What is Mr. Brock wearing there in that video?

9    A      He's wearing headphones, sweatshirt, and body armor.

10   Q      Okay.  Does that look similar to the body armor he was

11   wearing on January 6th?

12   A      It looks similar but the color is off.  I don't know if

13   it's the lighting but this looks kind of coyote tan and his

14   other body armor was green.

15   Q      Then I'm going to show you what's been marked as

16   Government's Exhibit 326.

17                (Government's Exhibit 326 played.)

18   Q      That was a quick one, Agent Moore.  Do you -- what are

19   we looking at here, Agent Moore?

20   A      It's a video of President Trump speaking at the

21   January 6th, 2021 Stop the Steal Rally.

22   Q      And where was this recovered from?

23   A      Mr. Brock's phone.

24   Q      And I'm not sure I asked that but for 325, was that

25   also recovered from Mr. Brock's phone?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A269

John Moore - Direct                                    208

```
1    A     Which one was 325?

2    Q     The one with the sweatshirt and the body armor.

3    A     Yes.

4    Q     Okay.  At any point in your investigation of Mr. Brock

5    did you become aware of any social media usage by Mr. Brock?

6    A     Yes.

7    Q     What was that?

8    A     Became aware pretty quickly that he used Facebook.

9    Q     And how did you become aware of that?

10   A     Some of the people that made tips or complaints to the

11   FBI stated that they were Facebook friends of his and that he

12   used some pretty heated rhetoric on Facebook.

13   Q     Okay.  And did you receive any sort of information to

14   help you identify Mr. Brock's Facebook?

15   A     Yes.

16   Q     What did you receive?

17   A     Multiple people told us that his Facebook --

18              MR. BURNHAM:  Object to hearsay.

19              MS. AYERS-PEREZ:  Your Honor, it doesn't --

20              THE COURT:  It's overruled.

21   Q     Go ahead, Agent Moore.

22   A     Well, multiple people told me that his Facebook user

23   name was Torch Flyer.

24   Q     Okay.  And what did you do with that information?

25   A     We submitted a search warrant to Facebook for the
```

A270

John Moore - Direct                        209

1    contents of that account.

2    Q     And that's the account with the user name, was is Torch

3    Flyer or Torch Flyer 10 or --

4    A     It's just Torch Flyer but it's also associated with his

5    phone number.

6    Q     Okay.  And so what did you get back from Facebook?

7    A     We got back content of numerous posts, direct messages,

8    and the various chat functions that are present on the

9    Facebook application.

10   Q     Did you review that information you received from

11   Facebook?

12   A     I did.

13   Q     Was it a lot or a little bit that came back?

14   A     I mean, not as much as other people I've dealt with,

15   more than others.

16   Q     Okay.  Was there any information that you reviewed that

17   helped you determine that this account belonged to Mr. Brock?

18   A     There was.

19   Q     And what was that?

20   A     The phone number associated with it was the phone

21   number we knew to be Mr. Brock's.  The user name associated

22   with the account was a user name that multiple witnesses had

23   said was Mr. Brock's and then some of the witnesses who had

24   spoken about their conversations with him, we could find

25   those conversations to back them up.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A271

John Moore - Direct                               210

1   Q      Okay.  Were there any other phone numbers other than

2   that one associated with the account?

3   A      Not that I know of.

4          MS. AYERS-PEREZ:  Your Honor, we have a

5   stipulation, Government's Exhibit Number 706, it includes the

6   handle, e-mail address and phone number of Mr. Brock, and the

7   stipulation is that the Facebook returns includes direct

8   messages, content posts, pictures, and videos produced by

9   Facebook for the time period November 1st, 2020 through

10  January 13, 2021 are authentic, accurate, and exact copies

11  from his account.

12         THE COURT:  All right.  That is stipulation number

13  706 and as such, it is admitted into evidence.

14         MS. AYERS-PEREZ:  And your Honor, we're going to

15  get into 900 series at this point I know this is the series

16  that Mr. Burnham has some objections to all but four of them.

17         THE COURT:  I think you're going to have to do them

18  one by one rather than try to preadmit all of them unless

19  there are some that you know there is no objection to.

20         MS. AYERS-PEREZ:  There are four but they're at the

21  very end so I'll go one by one until we hit them.

22         THE COURT:  All right.

23  Q      So I'm going to start with Government's Exhibit 900.

24         THE COURT:  Mr. Burnham, I'm going to allow the

25  exhibit to be shown to me in order for me to make any ruling

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A272

John Moore - Direct                                    211

 1    on any objection.  Normally the fact finder would not see the

 2    exhibit but in this instance, I need to see it in order to

 3    rule on the objection.

 4            MR. BURNHAM:  I understand, your Honor.  We have an

 5    objection to 900.

 6            THE COURT:  Thank you.

 7    Q    All right, Agent Moore.  Do you see what's been marked

 8    as Government's Exhibit 900?

 9    A    I do.

10    Q    Do you know that to be part of the Facebook search

11    warrant return you received from Mr. Brock's Facebook

12    account?

13    A    I do.

14            MS. AYERS-PEREZ:  Your Honor, I would --

15            MR. BURNHAM:  So I object to this again on 403

16    grounds.  It's, it appears to be in quotation marks, "A

17    revolution every now and then is a good thing," sort of

18    reminds me of a Thomas Jefferson quote we learned about in

19    elementary school and so I think it's just general political

20    back and forth on Facebook.  It doesn't refer to January 6th

21    and even taking the worst possible view of the evidence we've

22    seen so far, it wasn't revolutionary activity, so --

23            THE COURT:  All right, just a second.

24            All right.  Seems to me, consistent with something

25    that you just said, that the relevance of this particular

John Moore - Direct                                    212

 1    communication from the Facebook account is pretty low, pretty

 2    minimal, but also, the prejudice is pretty low, and I think

 3    when you weigh all of that, first of all, even minimal

 4    relevance is sufficient to get into evidence, and when you

 5    then assess the prejudice versus the relevance, the test is

 6    really weighted in favor of admission and I think while both

 7    the relevance and the prejudice are pretty low, I think

 8    because of the way the 403 test is structured, the evidence

 9    can be admitted and I overrule the objection.

10           MS. AYERS-PEREZ:  Your Honor, I move to admit

11    Government's 900.

12           THE COURT:  And I overruled the objection and

13    therefore it is admitted.

14           MS. AYERS-PEREZ:  Thank you, your Honor.

15    Q     Agent Moore, do you see what we see there on the

16    screen?

17    A     I do.

18    Q     All right.  What date is this?

19    A     November 7th, 2020.

20    Q     And is this a comment or a message or what is it that

21    we're looking at?

22    A     It is a comment that Mr. Brock made on that date.

23    Q     And how do you know it's Mr. Brock?

24    A     Because it says Torch Flyer commented on a post

25    November 7th, 2020.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A274

John Moore - Direct

213

1   Q      And do you know Torch Flyer to be Mr. Brock?

2   A      I do.

3   Q      Okay.  And what does it say after what you just read?

4   A      "A revolution every now and then is a good thing; it is

5   time."

6   Q      Okay.  Moving on to Government's Exhibit Number 901.

7          THE COURT:  Will there be an objection to 901?

8          MR. BURNHAM:  Yes, on generally the same basis as

9   900, it's similar material.

10         THE COURT:  All right.  Let me read it.

11         (The Court reviewing the exhibit.)

12         THE COURT:  The same assessment.  The relevance is

13  pretty low, it's a full two months before the January 6th

14  events, it doesn't refer to the January 6th, but it has

15  marginal relevance with respect to intent, and the prejudice

16  is not very high, and I can certainly take account of what is

17  said here and view it through a proper filter, and I think

18  for that reason, I don't think that the probative value is

19  substantially outweighed by prejudice under 403 and therefore

20  the objection is overruled, and 901 is admitted.

21  Q      What are we looking at here, Agent Moore?

22  A      We're looking at a series of posts made by Mr. Brock on

23  November 8th, 2020.

24  Q      Okay.  With the first post, can you read it to us?

25  A      Yes, it says, "Fakebook doesn't want you to see this as

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A275

John Moore - Direct                                              214

 1  they continue to aid the Demonrats in election theft."

 2  Q     What do you know Fakebook to be?

 3  A     I believe it's a derogatory term for Facebook.

 4  Q     What about Demonrats?

 5  A     I believe it's a derogatory term for Democrats.

 6  Q     What about the next message?

 7  A     Also sent on November 8th, 2020, "Why would the general

 8  lie?  This election is being stolen."

 9  Q     And the last message?

10  A     Also sent on November 8th, 2020, "Biden outperformed

11  Obama?  Right.  I have said it before and I will say it

12  again.  If the President calls, I will answer #oathkeeper."

13  Q     What is a hashtag?

14  A     Hashtag is kind of a way of showing support or linking

15  yourself to a thing or group or something.

16  Q     And what is Oath Keeper?

17  A     Oath Keepers is a militia group made up primarily of

18  law enforcement and military personnel, both currently

19  serving or who have served in the past, and the foundation of

20  the group is that this group of individuals at one time took

21  an oath to defend the Constitution against enemies foreign

22  and domestic and they have formed a little militia to

23  continue to stand ready to defend their beliefs against who

24  they perceive to be enemies of the Constitution, foreign and

25  domestic.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A276

John Moore - Direct                                    215

1   Q     Okay.  I'm going to pull up what's been marked as

2   Government's 902.

3               THE COURT:  That's 901 again.

4               MR. BURNHAM:  Same objection to 902, it's general

5   political speech, fairly remote in time.

6               THE COURT:  Thank you, Mr. Burnham.  Once it's

7   enlarged, I will read it so I can rule.  But it's

8   disappeared.

9               MS. AYERS-PEREZ:  Can you zoom in?  Can you just

10  zoom in from here because this is the right one.

11              THE COURT:  Let me read it, please.

12              (The Court reviewing the exhibit.)

13              THE COURT:  I have to say, as to this one, the

14  first message is not really tagged to anything specific to

15  January 6th or what the conspiracy being asserted is, and the

16  second message outside the context of events on January 6th,

17  this is again two months beforehand, just talks about fraud

18  and relates what's happening in vote counts so the relevance

19  here is really quite minimal.  I'll allow the Government to

20  tell me why they think this is particularly relevant.

21              MS. AYERS-PEREZ:  Well, your Honor, the reason, and

22  we would surmise the reason that Larry Brock was there on

23  January 6th and so many people were there is because they

24  believed the election was stolen.  January 6th is when

25  Congress is certifying the votes of the election, and I

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A277

John Moore - Direct                                216

1    realize this is almost two months before January 6th, but

2    it's only six days after the election.  That's the basis of

3    January 6th and the basis of the counting of the Electoral

4    College votes and it's this election that's the reason why

5    Larry Brock is so upset and why Larry Brock is there at the

6    Capitol on January 6th.  And his thoughts about the election

7    as they progressed between November 3rd and January 6th are

8    showing an increasing amount of intent, and what you will see

9    through these messages is he has various thought processes as

10   to what's going to happen with this election between outright

11   believing it's not real to believing the Supreme Court is

12   going to overturn it, to landing it at, well, Congress has to

13   stop it on January 6th.

14           THE COURT:  All right.  Mr. Burnham, you want to

15   say anything in response to that?

16           MR. BURNHAM:  Yes, your Honor.  I think the

17   position we've always maintained is that just general talk

18   about the election, was it stolen, was it not, without some

19   link is not enough to even have the marginal relevance your

20   Honor has been looking for, so I think the court's

21   observations are right on about this one.

22           THE COURT:  I'm going to conditionally admit it.

23   I'll have to see what the track of these messages is, and if

24   it fits within a showing that is relevant to intent in this

25   case.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A278

John Moore - Direct                                    217

```
 1              MS. AYERS-PEREZ:  Yes, your Honor.

 2              THE COURT:  So conditionally admit it.

 3              THE COURT:  Which means I'm permitting the witness

 4     to testify with respect to it subject to further decision by

 5     me.

 6              MS. AYERS-PEREZ:  Yes, your Honor.

 7     Q    Agent Moore, can you tell us what we're looking at

 8     here?

 9     A    We're looking at two posts made by Mr. Brock on

10     November 9th, 2020.

11     Q    Okay.  And can you read the first post to us.

12     A    "When we get to the bottom of this conspiracy, we need

13     to execute the traitors that are trying to steal the

14     election, and that includes the leaders of the media and

15     social media aiding and abetting the coup plotters."

16     Q    And the second message, Agent Moore?

17     A    "Every day the fraud grows.  Every day the Arizona lead

18     shrinks.  GOP and RINOs stand with the President now or be

19     lost forever.  We will win this."

20     Q    What is RINOs?

21     A    It's a acronym for Republicans in Name Only.

22     Q    All right.  I'm going to pull up --

23              THE COURT:  Do one more and then we'll probably

24     break for the day.

25              MS. AYERS-PEREZ:  Okay, your Honor.  I'm going to
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A279

John Moore - Direct                                    218

1    pull up what's been marked as Government's Exhibit 903.

2                THE COURT:  This is 90 --

3                MS. AYERS-PEREZ:  3.

4                THE COURT:  Yes, 903, I'm sorry.  Same objection?

5                MR. BURNHAM:  Yes, same objection, your Honor.

6                THE COURT:  All right.  Didn't get blown up much

7    but I think I can read it as long as we move it over so it's

8    not blocked on the right-hand side by these icons.

9                MS. AYERS-PEREZ:  Might be easier to do it in two

10   parts, the top half and the bottom half and they're two

11   different things as well.

12               THE COURT:  You can do whatever you want, I can

13   read it as is, but this is all right.

14                    (The Court reviewing the exhibit.)

15               THE COURT:  The references at the bottom are just

16   references to future events?

17               MS. AYERS-PEREZ:  They are, your Honor.

18               THE COURT:  They're not the date of any

19   communication?

20               MS. AYERS-PEREZ:  It's not the date of any

21   communication.  I would point out that there's an RSVP that

22   he put that he's attending the Stop the Steal Rally on

23   January 6th in Washington, D.C.

24               THE COURT:  Right, but it's just referencing that

25   future event.

John Moore - Direct                                219

1          MS. AYERS-PEREZ:  Correct, it's not a message from

2    him.

3          THE COURT:  The only message other than the

4    reference, if you will, to that future event is right at the

5    top in the post -- oh, I guess there's a message to Senator

6    Hawley as well.

7          MS. AYERS-PEREZ:  And right above that, it looks

8    like a post 6 January 2021, "Storm the Castle."

9          THE COURT:  All right.  I understand the same

10   objection, this one is more directly tied to the January 6th

11   by the reference to the future event and on two occasions,

12   the first of which is, includes the label "Storm the Castle,"

13   and indicates an apparent willingness to take action.  And I

14   will admit it on that basis, not conditionally, I will admit

15   this one.

16         And with that, we're past 5 p.m., so you're

17   barreling right along in your testimony, I am assuming that

18   you're going to finish the government's case tomorrow

19   morning.

20         MS. AYERS-PEREZ:  I -- that is correct, your Honor,

21   Agent Moore is our final witness.

22         THE COURT:  So we'll go ahead and break for the

23   day.  The defense should obviously be prepared with its case

24   tomorrow because we will reach your case tomorrow unless

25   there's a motion that I rule on that keeps us from reaching

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A281

1    the case, but let's be ready to go at 9:30, and we'll

2    continue with Special Agent Moore at that time.  Thank you,

3    sir.  Thank you all.  Anything further that we need to talk

4    about before we break?

5            MS. AYERS-PEREZ:  Nothing from the Government.

6            MR. BURNHAM:  No, your Honor.

7            THE COURT:  All right.  Thank you all, see you

8    then.

9            (Court Adjourned, 5:02 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A282

1                  CERTIFICATE OF OFFICIAL REPORTER

2

3

4         I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5    Official Realtime Court Reporter, in and for the

6    United States District Court for the Northern

7    District of New York, DO HEREBY CERTIFY that

8    pursuant to Section 753, Title 28, United States

9    Code, that the foregoing is a true and correct

10   transcript of the stenographically reported

11   proceedings held in the above-entitled matter and

12   that the transcript page format is in conformance

13   with the regulations of the Judicial Conference of

14   the United States.

15

16                      Dated this 25th day of November, 2022

17

18

19                      /S/ JODI L. HIBBARD
                        _____

20                      JODI L. HIBBARD, RPR, CRR, CSR
                        Official U.S. Court Reporter
21

22

23

24

25

                    JODI L. HIBBARD, RPR, CRR, CSR
                        (315) 234-8547

A283

                        VOLUME II
UNITED STATES  DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                           21-CR-140

LARRY RENDALL BROCK,

                        Defendant.

-------------------------------------------x

        Transcript of a Bench Trial held on

November 15, 2022, at the E. Barrett Prettyman U.S.

Courthouse, 333 Constitution Avenue, N.W.,

Washington, D.C., the HONORABLE JOHN D. BATES,

Senior Judge, Presiding.

                    A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF TEXAS
                    11204 McPherson Road
                    Suite 100a
                    Laredo, Texas  78045
                      BY:  APRIL AYERS-PEREZ, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    1331 F Street, N.W.
                    Washington, D.C.  20005
                      BY:  BARRY KENT DISNEY, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    Narcotic & Dangerous Drug Section
                    145 North Street, N.E., Suite 2300
                    Washington, D.C.  20530
                      BY:  DOUGLAS MEISEL, ESQ.

For Defendant:      BURNHAM & GOROKHOV, PLLC
                    Attorneys at Law
                    1424 K St., N.W.
                    Suite 500
                    Washington, D.C.  20005
                      BY:  CHARLES BURNHAM, ESQ.

A284

222

1

2                    I N D E X   O F   T E S T I M O N Y

3

4   Witnesses              Direct    Cross    Redirect    Recross

5   John Moore, cont'd     224       265      293         --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A285

223

```
 1                    (Open Court, 9:37 a.m.)
 2              THE CLERK:  Your Honor, we have criminal action
 3    21-140, United States of America versus Larry Brock and all
 4    counsel are present.
 5              THE COURT:  All right, good morning to all counsel
 6    and everyone else.  And let me ask an initial question.
 7    Since things are moving a little faster than perhaps I had
 8    anticipated, I will ask you, Mr. Burnham, whether you have
 9    informed the Government of your potential witnesses if the
10    defense puts on a case.
11              MR. BURNHAM:  Your Honor, the only -- the only
12    witness we might call would be the defendant.  I don't
13    believe I have --
14              THE COURT:  As long as they're aware of that.
15              MR. BURNHAM:  I don't know if I explicitly informed
16    them of that, we didn't submit a witness list but that was
17    the implication I think from that.
18              THE COURT:  All right.  With that, are we ready to
19    resume with Special Agent Moore?
20              MS. AYERS-PEREZ:  Yes, your Honor.
21              THE COURT:  All right.  Special Agent Moore,
22    please.  All right.  I remind you you're still under oath.
23              THE WITNESS:  Yes, sir.
24
25              J O H N   M O O R E , called as a witness
```

A286

John Moore - Direct                                          224

1    and being previously duly sworn, testifies as

2    follows:

3              THE COURT:  Let's continue, Ms. Ayers-Perez.

4              MS. AYERS-PEREZ:  Thank you, your Honor.

5    CONTINUED DIRECT EXAMINATION BY MS. AYERS-PEREZ:

6    Q    Good morning, Agent Moore.

7    A    Good morning, ma'am.

8    Q    I show we left off on Exhibit 903 last time.  So we can

9    pull up Government's Exhibit 904.

10             THE COURT:  Is there an objection?

11             MR. BURNHAM:  Yes, your Honor, the same basic

12   objection.  It refers to the Insurrection Act, Supreme Court,

13   to patriots from Athens, doesn't refer to January 6th,

14   Electoral College, certification, anything like that.

15             THE COURT:  All right.  And it's a communication

16   from November -- I'm sorry, December 4th.  Anything you want

17   to say, Ms. Ayers-Perez?

18             MS. AYERS-PEREZ:  A couple things, your Honor.

19   First, this is the first mention of IO war and if you

20   remember from Government's Exhibit 509, the defendant uses

21   the term IO war multiple times while he's on the Senate floor

22   on January 6th.  This is again about the election, the

23   Supreme Court stopping the steal, he attends the Stop the

24   Steal Rally on January 6th, and the "steal" of course is in

25   reference to the election from November which is the basis of

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A287

John Moore - Direct                                225

1    the January 6th Capitol riot that the defendant was at, and

2    in further messages, you'll see more communication about

3    insurrection, and this is the first time we see mention of

4    the Insurrection Act so I do think this is relevant.  I do

5    not think it's more prejudicial than probative in this

6    instance, your Honor.

7              THE COURT:  All right.  I think it is, in context

8    and the context being other Facebook messages, it is relevant

9    as being more -- making a fact in issue, the intent question,

10   addressing that and making it more probable than not that the

11   intent that the Government asserts was present with

12   Mr. Brock, and then when we get to a -- and therefore it's

13   admissible.  And then when we get to Rule 403 -- admissible

14   under 401 and 402.  When we get to Rule 403, again, in

15   context, I think the relevance is more than minimal, and the

16   prejudice, I understand the argument for prejudice.  It

17   doesn't seem to me that once the other Facebook

18   communications that I've admitted are in evidence that the

19   prejudice from this document is very significant and I find

20   that it, prejudice does not substantially outweigh the

21   relevance here, and that's especially true with a bench trial

22   and the ability of the judge to filter and limit any

23   potential prejudice.  So the objection is overruled and 904

24   is admitted.

25   Q    Agent Moore, can you tell us what we're looking at here

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A288

John Moore - Direct

226

1    with Government's 904?

2    A     Yes.  This is a Facebook -- excuse me, a reply on

3    Facebook to a post made by somebody named Jeff Ciaccio and

4    the reply was made on December 4th, 2020.

5    Q     And can you read to us what the reply was?

6    A     "No dude, you will not win the IO war, nor will I cede

7    that territory to you.  I have been trying to refrain but if

8    you are too stupid to see the fraud even with video evidence

9    you are not smart enough to truly understand the oath.  I

10   will reveal no more.  It is pointless.  Either SCOTUS stops

11   the steal or we must emulate the patriots from Athens in

12   1946.  Plans need to be made.  The Insurrection Act must be

13   used and those like you that swore to a higher oath will be

14   held accountable to a higher standard."

15   Q     And do you believe this post to be made by Mr. Brock?

16   A     I do.

17   Q     And why is that?

18   A     Because it comes from his Torch Flyer Facebook account.

19   Q     You mentioned yesterday, Agent Moore, that you have a

20   military background?

21   A     That's correct.

22   Q     Do you know what IO war means?

23   A     It means information operations.

24   Q     What is information operations?

25   A     Information operations is a broad term in concept,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A289

John Moore - Direct                              227

 1   referring to the use of information to shape the battlefield
 2   both using information to shape what enemy conventional
 3   military units do as well as unconventional enemy forces as
 4   well as the civilian populous where, in this case, the United
 5   States would be fighting using a multitude of things from
 6   information, shaping the news media, doing events that are
 7   deemed to be friendly to the local populous, doing a
 8   multitude of things to shape the information that your enemy
 9   or the civilians take in with the intent of ultimately
10   influencing their actions.
11            MR. BURNHAM:  Your Honor, I have a partial
12   objection to that answer.  I don't think it was a bad
13   question, just ask what's the definition, but then -- because
14   he is a veteran, I acknowledge that, but then about the
15   remaining 75 percent of it I think got into speculation at
16   least as it applies to how it's used in this context, so I
17   move to strike everything after the basic definition of what
18   IO means.
19            THE COURT:  I'm going to limit what the testimony
20   was just by not considering part of it.  Also verged on being
21   expert testimony and of course Special Agent Moore has not
22   been qualified as an expert, but I will accept the general
23   contours of the explanation of what IO war is.
24   Q    Agent Moore, what is SCOTUS, if you know?
25   A    It's an acronym for Supreme Court of the United States.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A290

John Moore - Direct                                    228

1    Q      Okay.  And are you familiar with what patriots from

2    Athens in 1946 means, just a general idea?

3    A      I am.

4    Q      And can you tell us what that is?

5    A      It was when a group of World War II veterans broke into

6    a National Guard armory in Athens, Tennessee, took weapons

7    and used them to fire on election authorities to seize ballot

8    boxes in what was perceived as an illegitimate election.

9    Q      If we can pull up Government's Exhibit 905.

10            THE COURT:  This is the same one, isn't it?

11            MS. AYERS-PEREZ:  Yes, this is.  There we go.

12            MR. BURNHAM:  Your Honor, same basic objection,

13   again, as I've been objecting to messages that don't refer to

14   anything surrounding the certification of the votes and, you

15   know, the prejudice here would be particularly if the

16   Government argues that it should be taken literally, you

17   know, the prejudice of them arguing this shows he was trying

18   to start a civil war.  To the extent that they are going to

19   take that position would be significant prejudice.

20            THE COURT:  All right.  I understand that, but of

21   course I can accept or reject the Government's argument if it

22   does choose to argue that.  Same ruling in essence,

23   particularly in context, particularly because the standard,

24   once we reach 403, the standard is whether in this instance,

25   the unfair prejudice, which is the term in Rule 403,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A291

John Moore - Direct                                    229

1    substantially outweighs the probative value, and I find that

2    it does not.

3              MS. AYERS-PEREZ:  Yes, your Honor.

4              THE COURT:  Therefore, 905 is admitted.

5              MS. AYERS-PEREZ:  Thank you.

6    Q      Agent Moore, what are we looking at here in

7    Government's 905?

8    A      Post made by Mr. Brock on Facebook from December 4th,

9    2020.

10   Q      Okay.  And are there a number of posts in this exhibit?

11   A      There are.

12   Q      Are they all from December 4, 2020?

13   A      Sorry, the first two are from December 4th and the last

14   three are from December 5th.

15   Q      Will you read these posts to us?

16   A      The first one says, "Trump won the election.  If

17   necessary I aim to misbehave."

18   Q      The second one?

19   A      "Prove me wrong.  The FBI is the equivalent of the KGB

20   for the Democratic party."

21   Q      Those are both from December 4th?

22   A      "Game is high drama.  I mean I am not sure if we can

23   break 100."

24   Q      And those first two posts, those were from

25   December 4th?

A292

John Moore - Direct                                    230

 1   A      That's correct.

 2   Q      And what are the dates, what's the date of the last

 3   three posts?

 4   A      December 5th, 2020.

 5   Q      Okay.  And if you could start with the fourth one.

 6   A      The fourth one is, "#resist Government overreach must

 7   be stopped in even red state Texas.  Tell them to eat a bag."

 8   Q      And the last one?

 9   A      "If SCOTUS doesn't act we have two choices.  We can

10   either live in a Communist country or we can rebel, keep the

11   rightful President in power and demand free and fair

12   elections #civilwar2021."

13   Q      I'm pulling up Government's 906.

14          THE COURT:  Same objection?

15          MR. BURNHAM:  Same objection.  I would just add

16   that this one is even a much more, much higher level of

17   generality than even some of the ones your Honor has admitted

18   in the series.

19          THE COURT:  I make the same ruling, make the same

20   observation that certainly in my consideration of this

21   evidence, I will consider its level of generality and how

22   specifically it is tied to January 6th, but in the context of

23   the Facebook messages and the question of intent, I find that

24   it's both relevant and not inadmissible under Rule 403.

25   Q      Agent Moore, what are we looking at here in

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A293

John Moore - Direct                    231

1    Government's 906?

2    A    This is a post made by Mr. Brock on Facebook on

3    December 6, 2020.

4    Q    Okay.  And can you tell us what it says?

5    A    "Going to get a lot scarier if SCOTUS doesn't act.  No

6    way in hell we should accept this rigged election.  We need

7    to restore the Constitution and the best and shortest way is

8    to go offensive on the Communists that stole it, aka the

9    Democratic party."

10   Q    All right.  I'm pulling up what is labeled as

11   Government's Exhibit 907.  And just as way of context for

12   your Honor, this one is a conversation between Mr. Brock and

13   another individual, and it takes the entire length of the

14   page.  If it's easier we can highlight the top half and then

15   go to the bottom half.

16        THE COURT:  We're having trouble finding it.  You

17   can scroll.  Scroll again, please.  Is there more on the next

18   page?

19        MS. AYERS-PEREZ:  This is the only page.

20        THE COURT:  And any objection?

21        MR. BURNHAM:  Same basic objection.

22        THE COURT:  Same ruling.  Understanding, of course,

23   that it's what comes from Torch Flyer that I'm looking at in

24   terms of the relevance to this case, and while initially some

25   of the communications from Torch Flyer were pretty mundane

A294

John Moore - Direct                                    232

1    and probably irrelevant, ultimately, the context of the whole

2    series of communications with some specific references later

3    in them, I find that the relevance under 401 and 402 is

4    satisfied and the outcome of the 403 assessment is the same,

5    that any unfair prejudice is not -- does not substantially

6    outweigh the probative value.  And therefore, 907 is

7    admitted.

8    Q    Agent Moore, what are we looking at here in

9    Government's 907?

10   A    It's a direct message conversation between Mr. Brock

11   and someone whose Facebook screen name is Beaf Supreame.

12   Q    Do you happen to know who Beaf Supreame is outside of

13   social media?

14   A    I do.

15   Q    Okay.  Without going into anything he's ever said to

16   you, do you know what his occupation was?

17   A    He had worked at the same company as Mr. Brock,

18   Hillwood Airways.

19   Q    Did he have any military background?

20   A    He did.

21   Q    And what was that?

22   A    I believe he was a Special Forces NCO in the Army and

23   then became a aviator, Army aviator as a warrant officer and

24   retired.

25   Q    Okay.  So what are we looking at here in 907?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A295

John Moore - Direct                               233

1    A      The conversation between the two of them on Facebook.

2    Q      And what date did it occur?

3    A      December 7th, 2020.

4    Q      And if you could read that conversation for us.

5    A      The first message, Beaf Supreme says, "Need to

6    establish a network prior to anything.  Need event driven IO

7    wins to garner support.  Need hierarchy of command for

8    operational cells and auxiliary support.  Need psyops,

9    leaflets, et cetera.  Then organize civil disturbance without

10   our involvement.  Lots of planning and organizing."

11   Q      Agent Moore, what is psyops, if you know?

12   A      Psychological operations.

13   Q      Okay.  If you could continue.

14   A      To that Mr. Brock responds, "If not you then who?"

15   Q      Keep going.

16   A      And to that Beaf Supreme responds, "Well I'm currently

17   getting my shit mixed at work.  I have very little support

18   from others in the office and just got more thrown on me."

19   Q      You can continue, Mr. Moore -- Agent Moore.

20   A      To that Mr. Brock replies, "Roger."  Then goes on to

21   say, "You know people that should be doing this."

22              To that, Beaf Supreme replies, "But I am

23   playing this by ear and have a lot of people that are like

24   minded."

25              To that Mr. Brock replies, "Same."

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A296

John Moore - Direct

1          To that, Beaf Supreme says, "Never want to be

2     the guy that runs over the protester or blasts a bunch of

3     people in self-defense after putting out a dumpster fire.  It

4     will take an event like someone getting schwacked on a gun

5     grab raid ... then all hell breaks loose."

6          To that Mr. Brock responded, "Probably but I

7     think we could also peacefully occupy legislatures in these

8     fake states and demand action."  He goes on to post, "I think

9     SCOTUS needs to see if they don't act that there will be

10    blood."

11    Q     And Agent, I apologize, Agent Moore, you say "he goes

12    on to post," is that Mr. Brock?

13    A     Yes, two consecutive posts.

14    Q     Thank you.  Please continue with the last one.

15    A     Finally, Beaf Supreme responds, "I'm pretty sure that

16    I cannot get time off to go to another state.  Gonna keep

17    working until it is at the point when it is time to defend."

18    Q     Thank you.  I'm pulling up what's been marked as

19    Government Exhibit 908.

20          THE COURT:  All right.

21          MS. AYERS-PEREZ:  And there's some more at the

22    bottom of the page, if you can scroll down, please.

23          MR. BURNHAM:  Your Honor.

24          THE COURT:  Mr. Burnham.

25          MR. BURNHAM:  Same objection.  We're confident your

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A297

John Moore - Direct                                    235

```
 1   Honor can sort this out, but as a purely legal matter,
 2   there's not much relevance here.  It appears to be a lengthy
 3   quote and there's references to AR-15s and a master target
 4   list and, you know, scary-sounding things that have no
 5   connection to the rest of the evidence, so I think it should
 6   be excluded on 403 grounds.
 7            MS. AYERS-PEREZ:  Your Honor, I believe when we
 8   look at the first message --
 9            THE COURT:  Just scroll back to the first message.
10            MS. AYERS-PEREZ:  Yes.  This is just a continuation
11   of what we've seen in the Government exhibits in the 900
12   series that have come before this, that the defendant is very
13   concerned about the Supreme Court when it comes to the
14   election, that's the basis of the January 6th riots that he
15   took part in.  He's talking about restoring the republic
16   through force of arms and once again talking about the same
17   election that's the basis of the counting of these Electoral
18   College votes.  Then if we scroll to the bottom, at this
19   point it appears Mr. Brock is aware the Supreme Court is not
20   going to do what he's hoping they're going to do when it
21   comes to the election results and now he's talking about
22   rules of engagement, clear chain of command which is going to
23   be emulated in other exhibits that we see after this,
24   including one that your Honor's already seen as part of the
25   opening statement.  But this is all in the context and the
```

A298

John Moore - Direct                                        236

1   lead up to January 6th and the defendant's continued concern

2   about the election, belief that the election was stolen and

3   the basis of why he's there on January 6th and the intent to

4   stop counting of the Electoral College votes on January 6th,

5   which is the basis of the intent for Count One of the

6   indictment.

7           THE COURT:  All right.  Same ruling.  Certainly the

8   long quote from speeches by others is not directly of great

9   relevance but the context of the entire chain of

10  communications is consistent with the other Facebook

11  communications that have been admitted into evidence and does

12  bear certainly a relationship to the question of intent and

13  therefore I find it is relevant.  And again, in a bench trial

14  in particular, I find that the Rule 403 analysis leads to the

15  exhibit being admitted and I will admit it.  So that's 908

16  that is admitted.

17  Q    All right, Agent Moore, what are we looking at here?

18  A    Post made by Mr. Brock on December 11th, 2020.

19  Q    Is it multiple posts or just one?

20  A    Yes, sorry, multiple posts.

21  Q    Okay.  And if you could read for us.

22  A    The first says, "If SCOTUS doesn't act, Trump must

23  emulate Lincoln and we must restore the republic through

24  force of arms."  Second post says --

25          THE COURT:  Do we need to read the whole of the

A299

John Moore - Direct

237

1    second post?

2          MS. AYERS-PEREZ:  We don't.  Your Honor, if you're

3    okay with that, if we could just read the last sentence of

4    the first --

5          THE COURT:  Maybe the first sentence and the last

6    sentence.

7    A    The first sentence is, "True in 1776 and true today if

8    SCOTUS doesn't act."  And the last sentence says, "But when a

9    long train of abuses and usurpations, pursuing invariably the

10   same object evinces a design to reduce them under absolute

11   despotism, it is their right, it is their duty, to throw off

12   such government, and to provide new guards for their future

13   security."

14   Q    Okay, Agent Moore.  If you go on to the last two posts.

15   A    Okay.  The next post says, "It appears as if SCOTUS is

16   going to duck.  If so then it will be game on soon.  We need

17   ROE, a clear chain of command ending with President Trump and

18   a master target list."

19   Q    Agent Moore, do you know what ROE stands for?

20   A    Rules of engagement.

21   Q    Continue with the last post, please.

22   A    "It is a good weekend to make sure your AR-15s are

23   sighted.  Your clips are loaded.  Your body armor checked."

24   Q    Agent Moore, what is an AR-15 if you know?

25   A    It is a semiautomatic rifle.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A300

John Moore - Direct                    238

```
 1   Q     Going to pull up what's been marked as
 2   Government's 909.
 3                    (The Court reviewing the exhibit.)
 4              THE COURT:  Scroll, please.  All right.  That's it?
 5              MS. AYERS-PEREZ:  It's four pages long, your Honor.
 6              THE COURT:  Oh.  All right.  Keep scrolling.
 7              Scroll again, please.
 8              And again.  Woops, I'm sorry.  Well, yeah, stop.
 9   Okay.
10              Scroll, please.
11              And again.
12              And again.
13              And that's it?
14              MS. AYERS-PEREZ:  That is it.
15              THE COURT:  Thank you.
16              MR. BURNHAM:  Your Honor, we're getting close to
17   the part I believe is relevant but I'm going to continue
18   objecting for a couple more.  Now it's in evidence that this
19   is a military buddy, this post in particular is sort of out
20   there theorizing, so same objection.
21              THE COURT:  All right.  You know, some of this has
22   marginal relevance, but I don't think in the context of the
23   entire set of Facebook communications the prejudice,
24   particularly with me, is all that great, and indeed I don't
25   think it outweighs the probative value of this set of
```

A301

John Moore - Direct                                239

1    communications in the context of the other communications,

2    and it's really just setting out a full context.  This one's

3    probably a little closer, but I will go ahead and admit it,

4    and under both the 401, 402 analysis, and a 403 prejudice

5    analysis.

6    Q    All right, Agent Moore, what are we looking at here in

7    Government's Exhibit 909?

8    A    This is another Facebook direct message conversation

9    between Mr. Brock and the friend Beaf Supreame that we

10   referenced earlier.

11   Q    And when does this conversation take place?

12   A    December 18th, 2020.

13   Q    Okay.  If you could read what Mr. Brock says, please.

14   A    First post says, "If Biden steals it, I do not

15   recognize the USG as being legitimate."

16   Q    Do you know what the USG stands for?

17   A    United States Government.

18   Q    If you could continue, please.

19   A    "I want to actively rebel."

20   Q    What does Beaf Supreame say?

21   A    "I think there is so much swilling right now with

22   commie china ties and hunter business deals ... all the MSM

23   networks are suppressing the story.  There will be some

24   blowback coming, timed with a coming sham inauguration that

25   may be the IO victory that we can leverage."

A302

John Moore - Direct                                    240

1    Q    Do you know what MSM stands for?

2    A    Mainstream media.

3    Q    You can continue, please.

4    A    Beaf Supreme goes on to say, "Do you have body armor

5    or plate carrier?"  To this Mr. Brock replies, "Yep."

6    Q    What does Mr. Brock do at that point?

7    A    He sends a photo to Beaf Supreme.

8    Q    And what is this photo of?

9    A    A plate carrier.

10   Q    Does that look familiar to you in any of the evidence

11   you've seen so far?

12   A    It does, looks like the plate carrier Mr. Brock was

13   wearing on January 6th, 2021.

14   Q    And by plate carrier, does it look like a vest

15   basically?

16   A    Yes, body armor or vest.

17   Q    We can continue.  All right, Agent Moore, what happens

18   from here?

19   A    Mr. Brock posts, "Gets here 28 December."

20   Q    From there?

21   A    Beaf Supreame responds, "Nice.  I am trying to get some

22   new plates from a buddy."  Beaf Supreame goes on to post,

23   "Mine are moldy and delaminating."  To this, Mr. Brock

24   replies, "Can you imagine if several hundred thousand

25   patriots descended on D.C. refusing to let Biden be

John Moore - Direct                                241

1    inaugurated."  And he goes on to say, "I do not believe the
2    U.S. military will fire on us."
3              To that, Beaf Supreame posts, "Yeah.
4    Inauguration would be canceled or moved to a secure
5    location."  Beaf Supreame goes on to post, "But would be more
6    of a spectacle to delay."  And again posts, Beaf Supreame
7    again posts, "And a possible IO loss if a cop got hurt."
8              To that Mr. Brock responded, "Look dude I am
9    pretty sure I am ready to go at it.  I just need numbers with
10   me."
11   Q    And from there?
12   A    Beaf Supreame responds, "It would be branded as a right
13   wing militia extremist organization that hates LEO."
14   Q    From there?
15   A    Mr. Brock responds, "Yep but we will be branded that
16   way regardless."
17   Q    Keep going.
18   A    Beaf Supreame responds, "Disagree, the left are doing a
19   great job of branding themselves."  Beaf Supreame goes on to
20   post --
21   Q    Agent Moore, sorry to cut you off there, but I think
22   that message has one final word there at the top of the next
23   page.
24   A    Yes, I left out a word.  So Beaf Supreame's last post
25   said, "Disagree, the left are doing a great job of branding

A304

John Moore - Direct                     242

1    themselves extremists."

2    Q    Okay.  Go on from there, please.

3    A    Beaf Supreme goes on to post, "We need to be rational,

4    organized, strength to back the defense of the Constitution.

5    Can't blow the load early or we are just a bunch of Proud

6    Boys, et cetera."

7    Q    And Agent Moore, are you familiar with the term Proud

8    Boys?

9    A    I am.

10   Q    And what is that?

11   A    They are a -- consider themselves to be western

12   chauvinists, I don't want to tie that to any sort of ideology

13   but they're western chauvinists, organization that is often

14   protesting and threatening to use violence against people

15   that they oppose.

16   Q    If you can continue from there.

17   A    To that, Beaf Supreame goes on to post, "I'm don't

18   agree with armed protesting, nothing good comes from it.

19   Just bad press.  I haven't seen a line in the sand where I

20   quit my job and go to war."

21              To that Mr. Brock responds, "Dude, if theft of

22   the Presidency isn't enough, why do you think gun

23   confiscation will be?"

24              To that Beaf Supreme says, "Okay, so load up

25   our trucks and go to D.C. and hope we don't get arrested?"

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A305

John Moore - Direct                               243

1          Mr. Brock responds, "Nope.  We need a plan.  I
2    am hoping Trump provides it."
3              To that, Beaf Supreame says, "the Presidency
4    was stolen.  It's time for damage control starting in
5    Georgia.  The ATF signaled their softball answer to Biden's
6    call.  I am waiting for the situation to develop.  A lot of
7    people are waiting for that as well."
8    Q    Agent Moore, this is just to make sure the record is
9    clear, in that last post you just read, is it Georgia or did
10   it say GA?
11   A    GA.
12   Q    Do you know that to stand for Georgia?
13   A    I do.
14   Q    Okay.  If you could continue, please.
15   A    So to that post, Mr. Brock responds, "You know how to
16   boil a frog?"
17              And to that, Beaf Supreame posts, "Well a frog
18   is just a dumb amphibian without the ability to adapt to its
19   situation.  It acts only with animal instincts and can be
20   controlled because those instincts are predictable and basic.
21   The mistake can be made by someone that reaches for the frog
22   and is met by a predator that may look like a frog to the
23   boiler."
24              To that Mr. Brock responds, "LOL."  And
25   Mr. Brock goes on to post, "Drew, I don't believe Americans

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A306

John Moore - Direct                    244

1   will act."

2   Q      Do you know who Drew is?

3   A      Yes, Drew is the first name of the person with the Beaf

4   Supreame Facebook name.

5   Q      Okay.  And then the last message?

6   A      Beaf Supreame responds, "I disagree.  I've seen

7   firsthand what 12 guys can do to recruit, train, equip and

8   advise lesser motivated people."

9   Q      All right.  I'm going to pull up what's been marked as

10  Government's Exhibit 910.

11             Your Honor, this begins with what you're

12  familiar with from opening statement; however it is actually

13  three pages long.

14             THE COURT:  Did I admit the document when we

15  discussed it or just indicated an inclination to admit it?

16             MS. AYERS-PEREZ:  You did not actually admit it,

17  you just said that you wanted to see where the evidence takes

18  us because you don't know if it's relevant until you heard

19  the rest of the evidence.

20             THE COURT:  All right.  Well, let me read it over.

21             (The Court reviewing the exhibit.)

22             THE COURT:  Scroll again, please.

23             And again.

24             And again.  Is that it?

25             MS. AYERS-PEREZ:  That is it, your Honor.

A307

John Moore - Direct                              245

1          THE COURT:  Thank you.

2          MR. BURNHAM:  Same objection, your Honor.  Now with

3     the benefit of all the evidence, our position would be that

4     the yawning gap between the content here and the actual rest

5     of the case evidence is starting to get absurd.  We're

6     talking about setting up provisional governments and, you

7     know, all sorts of stuff, so same objection on those grounds.

8          THE COURT:  All right.  Go to the top of the

9     document, please.  Scroll back.  So in context, I think this,

10    continue to think that this exhibit is admissible.  With

11    respect to relevance, it specifically outlines a, to quote

12    it, "plan of action if Congress fails to act on 6 January,"

13    and then among the list of main tasks are seizure or, is

14    seizure of certain members of Congress.  So it seems to me

15    that this does have some real connection to what is being

16    charged with respect to Mr. Brock and therefore I find that

17    the test of relevance has been met, it is relevant and

18    therefore admissible.

19         With respect to prejudice, standing alone, maybe

20    I'd think that there was some prejudice but put in the

21    context of all the other documents that have been admitted,

22    it seems to me that the prejudice here is not significant and

23    not unfair, and does not substantially outweigh the probative

24    value or relevance of the document and therefore 910 is

25    admitted.


                    JODI L. HIBBARD, RPR, CRR, CSR
                          (315) 234-8547


                              A308

John Moore - Direct                                    246

1  Q     Agent Moore, what are we looking at here with

2  Government's Exhibit 910?

3  A     This is a continuation of the conversation between

4  Mr. Brock and Beaf Supreame.

5  Q     What is the date of this conversation?

6  A     December 24th, 2020.

7  Q     Okay.  And who starts the conversation?

8  A     Mr. Brock.

9  Q     Can you tell us what Mr. Brock says?

10  A     "Initial thoughts if we could do it.  Assumptions:

11  U.S. military isn't involved.  Objective:  Restore the rule

12  of law in the rebellious states, hold a free and fair

13  election in one year.  Plan of action if Congress fails to

14  act on 6 January."

15  Q     And just for the record, that was -- it says Jan,

16  right?

17  A     That's correct, it says 6 Jan.

18  Q     And do you know that to be a short form of the word

19  January?

20  A     Yes, ma'am.

21  Q     If you could continue, please.

22  A     "Main tasks.  1.  Seize all Democratic politicians and

23  Biden key staff and select Republicans (Thune and McConnell).

24  Begin interrogations using measures we used on Al Qaeda to

25  gain evidence on the coup.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A309

John Moore - Direct                            247

1              "Number 2.  Have General Flynn get in touch

2      with President Trump and have him declare a state of

3      Insurrection exists to provide color of law to our actions.

4              "3.   Seize national media assets and key

5      personnel.  Zuck, Jack, CNN lead and talking heads, seize

6      WAPO, seize NYT editors.  Eliminate them.  Media silence

7      except for White House communications."

8      Q    Agent Moore, do you know who Zuck is?

9      A    I believe it's a reference to former Twitter CEO -- or

10     correction, Zuck is a reference to Mark Zuckerberg, the

11     current founder and CEO of Facebook.

12     Q    And Jack?

13     A    Jack I believe is a reference to former Twitter CEO

14     Jack Dorsey.

15     Q    And WAPO, do you know what that stands for?

16     A    The *Washington Post*.

17     Q    Do you know what NYT stands for?

18     A    *New York Times*.

19     Q    If you can continue, Agent Moore, please.

20          THE COURT:  Interesting observation that now in

21     your view, CNN doesn't require explanation but the print

22     media, *Washington Post* and *New York Times* do.

23          MS. AYERS-PEREZ:  That's true.

24          THE COURT:  Maybe a comment on our society.

25     Q    Agent Moore, do you know what CNN stands for?

A310

1   A      The Cable News Network.

2   Q      There we go, thank you.  If we can continue.

3   A      "Number 4.  Present slate for clean elections to

4   existing Congress and make sure they sign.

5              "Number 5.  Let the Democratic cities burn.

6   Cut off power and food to all who oppose us.

7              "Number 6.  Establish provisional government

8   in rebellious states and representatives we can count on.

9              "Number 7.  Seize all foreign aid except for

10  key allies as determined by Trump.

11             "Number 8.  General pardon for all crimes up

12  to and including murder of those restoring the Constitution

13  and putting down the Democratic Insurrection.

14             "ROE."

15  Q      What does that stand for again, Agent Moore?

16  A      Rules of engagement.

17  Q      If you can continue, please.

18  A      "1, do not kill LEO unless necessary.  Gas would assist

19  in this if we can get it."

20  Q      Agent Moore, do you know what LEO stands for?

21  A      Law enforcement officer.

22  Q      If you can continue, please.

23  A      "2.  Attempt to capture Democrats with knowledge of

24  coup.

25             "3.  Shoot and destroy enemy communication

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A311

John Moore - Direct                         249

1    nodes and key personnel.

2              "4.  So many subtasks I can't even imagine

3    them."

4    Q    And what's the response to this, Agent Moore?

5    A    To this Beaf Supreame responds, "So what's the

6    paragraph III meat and potatoes?  Concept of the operations,

7    tasks to subordinate units, coordinating instructions and

8    actions on the objective."

9    Q    And that's just a shortened version of the word

10   objective?

11   A    That's correct.

12   Q    Okay.  And what else does he say?

13   A    He goes on to say, "Who is providing secure comms, who

14   is in command, what is the order of battle with tasks and

15   purpose of maneuver units?  Locations of command elements and

16   next higher, and paragraph V stuff, who is providing funding,

17   medical care and facilities, weapons, ammo, demo, equipment,

18   meals, billeting, DETFACs, et cetera?"

19   Q    What does comms mean, Agent Moore?

20   A    Communications.

21   Q    And what is DETFACs?

22   A    I believe it's a -- not an acronym but shorter version

23   of detention facilities.

24   Q    Okay.  And what happens from there?

25   A    Beaf Supreame goes on to say, "And going back to

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A312

John Moore - Direct

250

 1    mission prep and IPB, what is the enemy situation, COO/MCOO,

 2    comp, disp capabilities, air, fires, known and assessed

 3    locations for targeting, MLCOA/MDCOA."

 4    Q     All right, there's a lot in this one, Agent Moore.

 5    What does IPB stand for?

 6    A     Information preparation of the battlefield.

 7    Q     Do you know what COO/MCOO stands for?

 8    A     MCOO is modified combined obstacle overlay and I

 9    believe which is basically a piece of acetate you put over a

10    map when you're planning a military operation to depict

11    certain obstacles.  I believe COO is a similar thing but I in

12    the Army have not seen COO.

13    Q     What about MLCOA?

14    A     Most likely course of action.

15    Q     MDCOA?

16    A     Most dangerous course of action.

17    Q     And going up a little, do you know what comp is short

18    for?

19    A     Composition.

20    Q     And Disp?

21    A     Disposition.

22    Q     Okay.  If you can continue from there.

23    A     To that, Mr. Brock responds, "Totally agree and it all

24    starts with a chain of command."

25    Q     And from there?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A313

John Moore - Direct                                    251

1    A      Goes on to say, "It needs to stretch to Trump ideally."

2    Q      Was that Mr. Brock who says that?

3    A      Yes.

4    Q      Okay.  And what happens from there?

5    A      Beaf Supreame replies, "So unified command at strategic

6    level is not entirely necessary.  But field commanders and

7    order of battle for maneuver elements jas," I think he means

8    has, "to be defined."

9    Q      Okay.

10   A      To that Mr. Brock responds, "No question."  And then

11   goes on to respond again, "Surely someone has planned for

12   this with experience."  Goes on to post again.  "This isn't

13   what I was trained to plan."

14          And Beaf Supreame says, "This is like an

15   invasion versus UW, punching and running in support of larger

16   operations.  So in occupied, nonpermissive/semipermissive

17   battle space, the UW operation is supported by an area

18   command, with subordinate overt and covert elements.  We

19   called them the auxiliary, logistical support network and

20   guerrilla force.  I am trained to act as a Co-BN," which I

21   believe means company or battalion, "commander for indigenous

22   forces if necessary, lead small teams or train larger

23   elements, usually brigade staff to plan for and carry out

24   operation."

25   Q      What does UW stand for, if you know?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A314

John Moore - Direct                    252

 1  A      Unconventional warfare.

 2  Q      What does nonpermissive/semi-permissive battle space

 3  mean, if you know?

 4  A      Refers to level of threat that exists in the battle

 5  space.

 6  Q      Okay.  And then you said Co/BN stood for battalion?

 7  A      CO stands for company which is military formation and

 8  then BN stands for battalion which is the larger parent

 9  military formation.

10  Q      And what did you say BDE stands for?

11  A      Brigade which is the even larger parent military

12  formation to a battalion.

13  Q      Understood.  If you could continue, please, Agent

14  Moore.

15  A      Beaf Supreame goes on to say, "The root SF, UW/FID

16  mission still has the backing of the U.S. military, so not

17  necessarily a unilateral op."

18  Q      What does SF stand for?

19  A      Special forces.

20  Q      What does UW/FID stand for?

21  A      UW stands for unconventional warfare, FID stands for

22  foreign internal defense.

23  Q      Okay, if you could continue, please.

24  A      Mr. Brock responds, "Yes, but you know people trained

25  to do larger stuff.  My prediction is occupation of Capitol

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A315

John Moore - Direct                              253

```
 1   abs capture of some assets is easy.  If Trump didn't back the
 2   peaceful protest of veterans to restore the republic, we
 3   lose."  Mr. Brock goes on to say, "I think we would covertly.
 4   They have to have cover and denial."
 5   Q     And from there?
 6   A     Mr. Brock says, "Okay, hopping in the shower.  Think
 7   more."
 8                 To that Beaf Supreame responds, "Okay.  First
 9   thing to figure out is who is the source for op funds."
10                 To that Mr. Brock responds, "Makes you wonder
11   how our revolution got off the ground."  Mr. Brock goes on to
12   say, "We need someone with $$$$ to back it."
13   Q     And lastly?
14   A     To that Beaf Supreame responds, "Revolution had funding
15   from France and seized property.  But for every conventional
16   in ranks battle there were 10 guerilla style operations like
17   the most famous Christmas Day raid.  The Brits never had a
18   chance.  That is why we spend billions every year to sustain
19   combat operations in AFG against the sand people."
20   Q     What do you -- or do you know what AFG stands for?
21   A     I believe it's short for Afghanistan.
22   Q     If we can go up to the top of page 2, I'm going to
23   bring you back to one that we had talked about a little bit
24   earlier, where Beaf Supreame says, "So what's the paragraph
25   III meat and potatoes," do you know what paragraph III is in
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A316

John Moore - Direct                              254

1   reference to?

2   A    I do.  It's the execution paragraph of a military

3   operations order.

4   Q    Okay.  And below that it says, "and paragraph V stuff,"

5   do you know what that is in reference to?

6   A    That's the command and signal paragraph of a military

7   operations order.

8   Q    Thank you.  I'm going to pull up what's been marked as

9   Government's Exhibit 911.

10          MR. BURNHAM:  Happy to say, we have no objection to

11   this one.

12          THE COURT:  Thank you, Mr. Burnham.  Without

13   objection, 911 may be admitted.

14   Q    All right, Agent Moore, what are we looking at here?

15   A    This is a Facebook conversation between Mr. Brock and

16   someone with the user name Bettina Steinhold.

17   Q    And when is this from?

18   A    December 26, 2020.

19   Q    Who is writing the first message?

20   A    The first one is from Bettina Steinhold.

21   Q    And can you read that for us?

22   A    "I'm not thinking that.  At all.  I just believe that a

23   Civil War is the last resource, and no one should wish for

24   it.  I'm sure there are more civilized ways to fight."

25   Q    And the response?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A317

John Moore - Direct                    255

```
 1   A     Mr. Brock responds, "Agree.  Congress can stop it on
 2   the 6th of January."
 3   Q     And from there?
 4   A     Goes on to say, "The Supreme Court is staying out of
 5   it."  And again posts, "Those are the last two peaceful
 6   options."
 7   Q     So those last three posts starting with the, "Agree.
 8   Congress can stop it on the 6th of January," ending with,
 9   "The last two peaceful options," those came from Mr. Brock?
10   A     That's correct.
11   Q     If you could continue from there?
12   A     Bettina Steinhold posts, "Okay."
13         THE COURT:  Are we on another date now?
14   Q     Yes, Agent Moore, are we on a new date now?
15   A     Yes, ma'am, this is December 27th, 2020.
16   Q     And what's the response to that?
17   A     Mr. Brock responds, "I don't want it to be this way but
18   communism isn't coming to Texas."
19   Q     I'm going to pull up what's been marked as Government's
20   Exhibit 912.
21         MR. BURNHAM:  No objection to this one either.
22         THE COURT:  Without objection, 912 is admitted.
23   Q     All right, Agent Moore, what are we looking at here?
24   A     This is a continuation of the Facebook conversation
25   between Mr. Brock and Beaf Supreame.
```

John Moore - Direct                              256

1    Q     Okay.  And if you could start with that second message

2    and tell us who it is from.

3    A     That's from Mr. Brock.

4    Q     And what is the date of these messages?

5    A     December 27th, 2020.

6    Q     Could you read that message, please?

7    A     "I don't think they will do it when the Dems come for

8    the guns."

9    Q     Is that, "I don't even think they will do it"?

10   A     "I don't even think they will do it when the Dems come

11   for the guns."

12   Q     That's from Mr. Brock?

13   A     That's correct.

14   Q     If you could continue from there, please, Agent Moore?

15   A     Beaf Supreame responds, "Hope not.  Riots are for

16   chimps."

17   Q     Keep going, Agent Moore, please.

18   A     Mr. Brock responds, "I prefer outright Insurrection at

19   this point."  Mr. Brock goes on to say, "Booked the hotel.

20   Now need to book flights."

21            Beaf Supreame responds, "Where?"  And

22   Mr. Brock responds, "D.C. on the 5th through the 7th."  Then

23   Mr. Brock goes on to say, "I have a feeling history will turn

24   there."  And Mr. Brock posts again, "Not sure how."

25   Mr. Brock goes on to post, "Hopefully Congress doing what is

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A319

John Moore - Direct

257

1    right." Mr. Brock goes on to post, "Or could be a clown show

2    and an IO loss or an outright rebellion." Mr. Brock goes on

3    to post, "Not knowing how it will go."

4    Q    Is that not knowing or no knowing how it will go?

5    A    Sorry, "No knowing how it will go."

6    Q    What happens from there?

7    A    Beaf Supreme posts, "Probably not the best way to go

8    into something. And I seriously doubt it would pay off if

9    you get wrapped up in a riot." Beaf Supreme goes on to

10   post, "There won't be a revolution in D.C. There may be some

11   people getting rolled up. Let the situation develop."

12   Q    Okay. I'm going to pull up what's been marked as

13   Government's Exhibit 913.

14            THE COURT: Mr. Burnham?

15            MR. BURNHAM: No objection.

16            THE COURT: Without objection, 913 is admitted.

17   Q    All right, Agent Moore, what are we looking at here?

18   A    This is a series of Facebook posts by Mr. Brock.

19   Q    And what is the date of these?

20   A    December 28th, 2020.

21   Q    Well, for the first two, what about the last two?

22   A    The last -- sorry, the third post is from

23   December 29th, 2020 and the last one is from December 31st,

24   2020.

25   Q    Okay. And can you read these for us?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A320

John Moore - Direct                    258

1        THE COURT:  Could you tell me how you know these

2    are from Mr. Brock?

3        THE WITNESS:  I would need you to scroll up.  I

4    reviewed the Facebook search warrant return with the

5    redactions here, I can't speak intelligently to what is above

6    these postings.

7        MS. AYERS-PEREZ:  I'm not the witness, your Honor,

8    but I can answer as to what the record looks like.  There are

9    portions of it where it speaks or you have Torch Flyer and

10   then you have a series of posts or messages.  They don't

11   always have his name there but they are under there and you

12   have the date and the time and what the message is.  And this

13   would be some of those that are within that.

14       THE COURT:  All right.  I will allow the Government

15   to provide me something that establishes that it's from

16   Mr. Brock, unless Mr. Burnham has no objection to -- or

17   stipulate basically to the fact that these are messages from

18   Mr. Brock's Facebook account.

19       MR. BURNHAM:  Your Honor, it's tempting to take

20   this opportunity but they probably could come up with

21   something, so we'll agree they can come in.

22       THE COURT:  All right.  So you may proceed.

23   Q    Thank you.  Agent Moore, what are we looking at here?

24   A    Posts made by Mr. Brock on Facebook in late

25   December 2020.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A321

John Moore - Direct

1    Q    Okay.  And if you could read us the first one and let

2    us know the date, please.

3    A    First one is December 28th, 2020, "Want to see some

4    panic.  Start playing the Purge siren outside the Capitol on

5    6 January 2021.  Watch Nancy flee."

6    Q    And it's, Jan was the abbreviated form of January?

7    A    That's right.

8    Q    And who is Nancy, if you know?

9    A    I would speculate.

10         THE COURT:  It's speculation.  We can all do the

11    same speculation.

12    Q    The next message, please, Agent Moore, and the date?

13    A    Next message, December 28th, 2020.  "I need all people

14    that voted Democrat to wear a piece of cloth identifying you

15    as a nonfunctioning member of society.  You need to do this

16    to flatten the curve.  It is for our collective health.  If

17    you refuse I will need to close your business and destroy

18    your livelihoods.  Trust the science, if you vote Democratic

19    you are a moron and usually a leech on the body politic, so

20    please wear your cloth.  I prefer the cloth to be a series of

21    concentric red circles over the heart.  This will show you

22    care."

23    Q    And the next post along with the date of that post?

24    A    The next post is December 29th, 2020.  "Expect Fakebook

25    to fact check it as they have deep admiration for Goebbels."

A322

John Moore - Direct                              260

1    Q     And the last post and the date, please.

2    A     The last post is December 31st, 2020, "'We are now

3    under occupation by a hostile governing force.  That may seem

4    ludicrous to some, but I see no distinction between a group

5    of Americans seizing power and governing with complete

6    disregard for the Constitution and an invading force of

7    Chinese Communists accomplishing the same objective.'

8    Against all enemies foreign and domestic #oathkeeper #2A

9    #III percent."

10   Q     Agent Moore, with the exception of the last sentence,

11   "against all enemies foreign and domestic," along with

12   hashtags, are the rest -- is the rest of that in quotes?

13   A     It is.

14   Q     Okay.  Moving on to what's been marked as Government's

15   Exhibit 914.

16            MR. BURNHAM:  No objection.

17            THE COURT:  Thank you, Mr. Burnham, and without

18   objection, 914 will be admitted.

19   Q     All right, Agent Moore, what are we looking at here?

20   A     This is a comment that Mr. Brock made from his Torch

21   Flyer Facebook account on January 1st, 2021.

22   Q     And what did it say?

23   A     "Help is on the way.  6 Jan 2021 #MAGA

24   #Stormthecastle."

25   Q     Do you know what MAGA stands for?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A323

John Moore - Direct                    261

1    A      Make America Great Again.

2    Q      Okay.  Moving on to Government's Exhibit 915.

3           MR. BURNHAM:  No objection.

4           THE COURT:  Without objection, Government's 915

5    will be admitted.

6    Q      All right.  What are we looking at here, Agent Moore?

7    A      It's a post made by Mr. Brock's Torch Flyer Facebook

8    account on January 5th, 2021.  And he says, "Our second

9    American Revolution begins in less than two days."

10   Q      Okay.  And scrolling down --

11          THE COURT:  Again, is that in quotation marks, or

12   appears to be?

13          THE WITNESS:  Yes, your Honor.

14   Q      And what is -- is there another message here, Agent

15   Moore?

16   A      There is.  It's another message from Mr. Brock's Torch

17   Flyer Facebook account, on January 3rd, 2021, also in quotes,

18   it says, "Irrelevant.  Biden won't be inaugurated.  We will

19   ensure that on the 6th."

20   Q      Okay.  And pulling up Government's Exhibit 916.

21          MR. BURNHAM:  No objection.

22          THE COURT:  Without objection, 916 is admitted.

23   Q      All right, Agent Moore, what are we looking at here?

24   A      A series of posts from Mr. Brock's Torch Flyer Facebook

25   account, starting on January 5th, 2021.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A324

John Moore - Direct                          262

1   Q     Okay.  And what does it say?

2   A     "Plane is packed with people going to Stop the Steal."

3   Q     And from there?

4   A     Goes on to post, "AA bought four people off the plane

5   at a thousand dollars each."

6   Q     And scrolling down.  What's the date and the post on

7   this one?

8   A     This date is January 6, 2021.

9   Q     What does he say?

10  A     "Here we go again."

11  Q     And the next?

12        THE COURT:  Perhaps you should for the record give

13  not only the date of something on January 6th but also the

14  time.

15  Q     Okay.  And what is the time here?

16  A     The time here is 3:23 UTC which is five hours ahead of

17  Eastern Standard Time so this post was likely 10:23 p.m. on

18  January 5th.

19  Q     Okay.  And the next post, with the date and time as

20  well, please.

21  A     Okay.  Again, this is UTC time so this would have been

22  10:23 p.m. on January 5th, 2021, "Men with guns need to shoot

23  their way in."

24  Q     Okay.  And from there, what did Mr. Brock do?

25  A     He posted ... on January 5th, 2021 at 10:57 p.m., he

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A325

John Moore - Direct

1    sent a message with an attachment and says, "Police in D.C.

2    are currently pepper spraying Trump supporters who are

3    outside rallying for Trump.  Guess they forgot who was

4    backing the blue when BLM supporters aka Democrat voters were

5    killing."

6    Q    Okay.  And from there scrolling down.  Okay.  Is

7    Mr. Brock involved in a conversation with someone else?

8    A    Yes, with someone named Shelley.

9    Q    Okay.  And what's the date on these and the time?

10   A    This appears to be 11:33 p.m. on January 5th, 2021,

11   someone named HRM Shelley says, "Freaking Georgia."

12   Q    And from there?

13   A    Goes on to post, "I won't fly through ATL until they

14   get their crap together."

15   Q    And from there?

16   A    Mr. Brock responds, "What did you expect?  There will

17   never be a free and fair election again."

18   Q    And what was said from there?

19   A    "As long as they can keep the fraud machine cranked."

20   Q    And from there, Agent Moore?

21   A    Mr. Brock goes on to write, "One man one vote.  No

22   absentee unless military.  Period."  And he goes on to post,

23   "Seriously, did you expect them not to run the same play

24   again and again until we stop it?"

25   Q    Okay.  Agent Moore, I want to take you back to one

A326

John Moore - Direct

264

1   thing we had discussed yesterday when you executed the search

2   warrant at Mr. Brock's residence.

3   A       Yes, ma'am.

4   Q       Did you find a gun safe there?

5   A       We did.

6   Q       Was there anything unusual about it?

7   A       The code to the gun safe was left on the gun safe but

8   there were no guns in the safe.

9   Q       Okay.

10          MS. AYERS-PEREZ:  I pass the witness, your Honor.

11          THE COURT:  Mr. Burnham?

12          MR. BURNHAM:  Would this be a good time, even if

13   it's perhaps a little early, to take just a five-minute break

14   before we start cross?

15          THE COURT:  The request is for our morning break

16   now, and I'm happy to honor that request, we'll take a

17   10-minute break.

18          MR. BURNHAM:  Thank you, your Honor.

19          THE COURT:  All right.  So see you back -- well, it

20   will be 12 minutes to make it easy, I'll see you back at

21   11:00 by the clock on the back of the court.

22          MR. BURNHAM:  Thank you.

23              (Court in recess, 10:48 a.m. to 11:05 a.m.)

24          THE COURT:  All right, sorry for the delay, I hope

25   you made good use of the time, Mr. Burnham.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A327

John Moore - Cross                                265

1           MR. BURNHAM:  Thank you, your Honor.

2           THE COURT:  We need the witness.  Special Agent

3    Moore.  I remind you you're still under oath.

4           THE WITNESS:  Yes, sir.

5           THE COURT:  And Mr. Burnham.

6           MR. BURNHAM:  Thank you, your Honor.

7    CROSS-EXAMINATION BY MR. BURNHAM:

8    Q     Good morning, Agent Moore.

9    A     Morning, sir.

10   Q     So it came out a couple times in your testimony that

11   you were in the Army for six years; that's correct, right?

12   A     That's correct.

13   Q     And am I correct in understanding you were in the

14   artillery was your part of it, is that right?

15   A     That's correct.

16   Q     All right.  And that's shooting large guns in layman's

17   terms?

18   A     That's correct.

19   Q     And in your experience, did you learn that soldiers

20   that are in that branch for extended period of time might

21   suffer hearing loss?

22   A     Yes.

23   Q     All right.  Because guns are extremely loud?

24   A     That's right.

25   Q     And aircraft engines are also very loud, would you

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A328

John Moore - Cross

266

1    agree with that?

2    A    Yes.

3    Q    Especially jet engines?

4    A    I don't have direct experience but I'm sure they're

5    loud.

6    Q    Thank you.  Do you agree that the Punisher comic book

7    character is sort of an object of fascination in the military

8    these days?

9    A    Yes.

10   Q    You see it on Humvees and you see people with tattoos

11   and that kind of thing?

12   A    Yes.

13   Q    The famous soldier Chris Kyle, who you may know, the

14   Punisher was sort of his symbol, do you recall that, if

15   you're aware?

16   A    I do.

17   Q    Thank you.  Would you agree that Larry Brock was

18   approximately 54 years old on January 6th, 2021?

19   A    I actually don't recall his birthday, but if -- is that

20   how old he was?

21   Q    Does that sound roughly correct?

22   A    Yes.

23   Q    Mid 50s I guess let's say?

24   A    Yes, sir.

25   Q    And you testified about some knowledge you gained about

A329

John Moore - Cross                                    267

 1    Mr. Brock's military career on direct, you recall that,

 2    right?

 3    A     Yes.

 4    Q     And did you learn that he flew several hundred combat

 5    missions?

 6    A     Yes.

 7    Q     And that's largely flying the A10?

 8    A     Correct.

 9    Q     You were assigned this case on the morning of

10    January 9th, is that right?

11    A     That's correct.

12    Q     And that was January 9th, that was a pretty hectic time

13    for law enforcement, would that be correct?

14    A     Yes, sir.

15    Q     And it sounds like you acted pretty fast to get the

16    information you needed to find out what the story with

17    Mr. Brock was, is that right?

18    A     That's correct.

19    Q     And I assume toward the top of that list of things you

20    had to do would be to get the CCTV feed footage and review

21    that?

22    A     At that time, I didn't even know what CCTV was.

23    Q     I understand, but I assume once you got assigned this

24    case involving the Capitol, one of first things you would

25    have done is call the Capitol and say do you guys have

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A330

John Moore - Cross                                  268

1    cameras, is that right?

2    A    I mean, it wasn't one of the first things since there

3    was already overwhelming video evidence available, but that

4    was, you know, kind of further down the list of things we

5    did.

6    Q    Okay.  So it wasn't a priority for you to get the

7    cameras from inside the Capitol itself as soon as you could?

8    A    My top priority was locating Mr. Brock and safely

9    arresting him --

10   Q    I don't mean to cut you off, my question is

11   specifically not what was your top priority, my question was,

12   was it not a top priority to get the Capitol video footage in

13   the early part of the case?

14   A    Yes, in the early part of the case as in, within the

15   first week, yes, that was a priority.

16   Q    Approximately when did you receive the CCTV footage?

17   A    I don't recall.

18   Q    Can you give me a month?

19   A    I believe it was in -- first, I don't recall.

20   Q    You can't even give me a month?

21   A    I can tell you it was in the winter or spring of 2021.

22   Q    And spring meaning until May, could have been as late

23   as May or as early as January, is that the best we can do?

24   A    Yes.

25   Q    There were several videos introduced through your

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A331

John Moore - Cross                                                269

1    testimony from Mr. Brock's phone.  You recall that, right?

2    A     Yes, sir.

3    Q     And two or three of them were short snippets of the

4    speech by former President Trump at the Ellipse, you recall

5    that?

6    A     Yes, sir.

7    Q     And whether or not it was captured on those videos, did

8    you learn that part of the remarks that the President made

9    was, we want to go to the Capitol, addressing the protesters?

10   A     Yes.

11   Q     And I think he said, I'll be there with you, is that

12   part of his remarks, to your knowledge?

13   A     I don't recall the speech in that kind of detail.

14   Q     Do you recall a video of the President that's in

15   evidence that says, I think this is pretty close to exact

16   quote, all Vice President Pence has to do is send it back to

17   the states and recertify.  Do you recall that statement in

18   evidence?

19   A     I do.

20   Q     And do you understand the President, by using the word

21   it to be referring to the election results basically?

22   A     Yes.

23   Q     And what he was saying there was that he, according to

24   him anyway, the Vice President could refer the matter back to

25   the states and they could consider whatever issues had been

A332

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 335 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 50 of 166

John Moore - Cross                                                 270

1    raised involving fraud, illegality, whatever?

2    A    Yes.

3    Q    Were you -- you become aware as part of your

4    investigation that not everybody in the crowd but there were

5    a considerable number of people who made derogatory comments

6    about the Vice President that day?

7    A    Yes.

8    Q    Thank you.  If the Government would be good enough to

9    help us, can we actually take a look at Number 325.  And

10   while they're pulling that up, that video, I'll represent to

11   you is the one with the defendant wearing a vest and I think

12   your testimony on direct was that you thought it was -- it

13   could be the same vest as was shown in the January 6th

14   photograph but in different lighting; is that your testimony

15   about that?

16   A    Yeah, I -- it appears to be a different color so it

17   could be -- it appears to be similar in design but I don't

18   know if it's lighting or whatnot but that looks like a

19   different color and it could be a different vest.

20   Q    It appears to be tan, would that be --

21   A    Yes.

22   Q    What color military gear is typically worn in middle

23   eastern countries?

24   A    I mean there's different shades, this is what I would

25   call coyote tan and I believe the vest he had on on

A333

John Moore - Cross                                    271

1   January 6th was green.  Like I said yesterday, I don't know

2   if that's a function of the lighting in this picture or if

3   they're different vests.

4   Q    Well, you're aware that Mr. Brock, if you are aware,

5   has been to the Middle East as a military officer and as a

6   civilian many, many times, is that correct?

7   A    That's correct.

8   Q    And the standard, let's say the standard BDU in fatigue

9   uniform in the Middle East is largely tan in color, not

10  green, correct?

11  A    I -- having been there myself, there are -- I've seen

12  many people wearing green body armor in Iraq and Afghanistan,

13  so it's ... I've seen both.

14  Q    Okay.  You can take it down, thank you.  There was

15  another piece of social media evidence that had -- 901, we

16  don't have to pull it up, that said #oathkeeper, you recall

17  that, right?

18  A    Yes.

19  Q    To be absolutely clear, there's no evidence that

20  Mr. Brock was a member of the Oath Keepers?

21  A    No, there's not.

22  Q    There's no evidence that he has ties to anyone in the

23  Oath Keepers?

24  A    No, there's not.

25  Q    Oath Keepers are not then and are not now an illegal

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A334

John Moore - Cross                          272

1    organization, however disreputable certain people may think

2    they are, correct?

3    A    Could you repeat -- do you say legal?

4    Q    Illegal.  The Oath Keepers were not then, nor are they

5    today, an illegal organization?

6    A    That's correct.

7    Q    And a hashtag on -- do you use social media, Facebook,

8    Twitter, whatever it is?

9    A    A little bit, I'm not great with hashtags.

10   Q    Hashtags, one of the uses of a hashtag is to facilitate

11   searching, is that right?

12   A    I believe so.

13   Q    If I wanted to, you know, find out the latest news on

14   the FBI, I might enter in #FBI and that would help me find

15   FBI news, is that your understanding?

16   A    Yes.

17            MR. BURNHAM:  Court's indulgence.

18            I'd like to turn on the document camera here.

19            THE COURT:  I'm sorry, do you want to use the ELMO?

20            MR. BURNHAM:  Yes, please.

21            THE COURT:  Mr. Bradley can help you.

22            THE CLERK:  It's not powering.

23            THE COURT:  Well, I thought Mr. Bradley could help

24   you.

25            MR. BURNHAM:  I just have two documents to show the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A335

John Moore - Cross

273

1    witness, I can do it by -- and I'm just going to identify

2    them and I'll move it in with my case, I'll just do it with

3    the documents so we can --

4                THE COURT:  If you're comfortable doing that.

5                MR. BURNHAM:  I've shown it to the Government, I

6    can just do it that way.  Can I approach the witness?

7                THE COURT:  You may.

8    Q    I'm going to show you a picture and you just tell me

9    whether or not you recognize the individual on the right.

10   It's marked for identification, your Honor has the same

11   binder, Defense 3.  Tell me if it looks like Mr. Brock on the

12   right-hand side.

13               THE COURT:  This is Defense 3?

14               MR. BURNHAM:  Yes, your Honor, for identification.

15   A    Yes, it does appear to be Mr. Brock on the right-hand

16   side.

17   Q    And does that appear to be the -- I'll speak loud.

18   Does that appear to be the same jacket you later recovered

19   from his house?

20   A    It does appear to be the same or at least a very

21   similarly patterned jacket.

22   Q    I'll take it back.  Thank you.  I'm sorry, one more

23   question.  That appears to be a ski lift of some sort in that

24   picture?

25   A    Yes.

John Moore - Cross

274

1          THE CLERK:  He said hold down on it.

2          MR. BURNHAM:  It's all right, that's all I needed

3    to do for now, thank you.  I'll move on, for now.

4          Again, going back to social media here, would you

5    agree that as a general matter, social media these days has

6    become famous for making people mad and making people get

7    into spats with one another; that's one of the criticisms of

8    it, is that right?

9    A     I've heard that criticism, yes.

10   Q     Can we take out -- can we pull up 904, please, one of

11   the Facebook messages.  Can we scroll all the way to the top

12   of 904, very top of the page, even if it's blacked out.

13   Okay.  Scroll down slowly if you would, and you can stop

14   there.  You recall this exhibit, correct?

15   A     I do.

16   Q     So there looks to be a page worth of content blacked

17   out, and I'm not alleging that's improper, I'm just observing

18   it's blacked out, right?

19   A     Mm-hmm.

20   Q     And then below that --

21   A     Yes, sir.

22   Q     Sorry, didn't let you answer.  Below that, it begins

23   with, "Torch Flyer replied to your comment," and then it goes

24   on, did I read that correctly?

25   A     That's correct.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A337

John Moore - Cross                                          275

1   Q    So Torch Flyer is replying to a comment from Jeff

2   Ciaccio, is that right?

3   A    That's correct.

4   Q    And then the comment starts with, "No dude," and he

5   goes on to question whether Jeff Ciaccio was smart enough to

6   understand certain things.  Is that some of the content of

7   this message here?

8   A    Yes, it is.

9   Q    So it would appear that Jeff and Torch Flyer,

10  Mr. Brock, are engaged in a sort of back and forth that's

11  getting a little personal; would that be a description you

12  could agree with?

13  A    Yes.

14  Q    All right, thank you.  Have you ever been in an

15  internet argument where you said something you wished later

16  you could take back?

17  A    No.

18  Q    This same exhibit, we don't have to scroll to it, it's

19  already up there, refers to patriots in Athens in 1946; did I

20  read that correctly?

21  A    Yes.

22  Q    And you testified on direct that that refers to a

23  historical episode where World War II veterans stormed

24  National Guard armory to retrieve guns that were later used

25  to confront officials that they believed had committed

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A338

John Moore - Cross

276

1    election fraud.  Is that a summary of that historical

2    episode?

3    A    That's correct.

4    Q    Washington, D.C. has a National Guard armory in

5    addition to other military installations, is that right?

6    A    I would imagine they do.

7    Q    And that National Guard armory presumably has guns?

8    A    Yes.

9    Q    And Larry Brock did not attempt to storm that National

10   Guard armory to your knowledge?

11   A    Not to my knowledge.

12   Q    The next -- we can take that down, thanks.  Government

13   905, we don't have to bring it up unless you have trouble

14   recalling, has the statement from Torch Flyer where he says,

15   "If necessary I aim to misbehave."  Do you remember that?

16   A    Yes.

17   Q    Does that sound a little funny to you, little perhaps

18   out of context for him?

19   A    No.

20   Q    All right.  Have you seen the 2005 film *Serenity*

21   starring Nathan Fillion?

22   A    I have not.

23   Q    Are you aware that people that are good friends,

24   perhaps especially men with the risk of sounding gender

25   essentialist, sometimes speak to each other in movie quotes;

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A339

John Moore - Cross                                277

1    is that something you're familiar with?

2    A    I am familiar with that.

3    Q    Thank you.  That same exhibit has #resist, if you

4    recall that in there somewhere?

5    A    It sounds familiar but I'd have to see the exhibit to

6    definitively say what was said by whom and when.

7    Q    There it is.  Do you see that there?

8    A    I do.

9    Q    Are you aware that #resist was actually a popular

10   hashtag throughout the Trump Presidency in what's called

11   liberal circles?

12   A    No, I'm not familiar with that.

13   Q    All right, that's fine.  Are you aware of where the

14   term Beaf Supreme might have come from?

15   A    I don't know where it came from.

16   Q    All right, one more silly question.  I'm not going to

17   belabor this but have you ever seen the film *Idiocracy*?

18   A    No.

19   Q    So I guess you wouldn't know whether or not *Idiocracy*

20   has a prominent character that goes by Beaf Supreame?

21   A    I don't know.

22   Q    All right.  Does the film *Idiocracy* sound like a

23   serious film about geopolitics to you, just going by the

24   title?

25   A    No.

A340

John Moore - Cross

278

1    Q    Are you aware of -- well, strike that.  Can we pull up

2    907, actually.  Can we scroll down just a little bit, please.

3    All right, we can stop there.  Do you recall this exhibit?

4    A    I do.

5    Q    All right.  And here is an example of Beaf Supreame and

6    Mr. Brock talking about various things they might do such as

7    peacefully occupying legislatures to combat election issues,

8    is that a good summary?

9    A    That's correct.

10   Q    All right.  And here at the end, Beaf Supreame says,

11   "I'm pretty sure that I cannot get time off to go to another

12   state."  Did I read that correctly?

13   A    That's correct, that's the first sentence.

14   Q    Would you agree it's nothing but good sense that if

15   you're going to occupy a state legislature, you should

16   probably square it with your boss ahead of time?

17   A    As far as square the time off or the active occupying

18   the legislature?

19   Q    I'm sorry, I didn't hear you.

20   A    Are you saying would you square getting time off or

21   occupying the legislature with your boss?

22   Q    Getting time off.

23   A    You probably should, yes, square getting time off.

24   Q    We can move on, thank you.  Could we look at 909,

25   please.  Court's indulgence.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A341

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 344 of 609
Case 1:21-cr-00140-JDB    Document 80    Filed 12/06/22    Page 59 of 166

John Moore - Cross

279

1          THE COURT:  Is this where you want to be or are you

2    trying to get to another --

3    Q    Just trying to center myself here, there was a passage

4    from this but I thought I could find it quicker than that, so

5    I don't have to trouble the Government to scroll for me.

6    Sir, can we look at the message, there's a message at

7    12/18/20, 16:32:19, that's the one I'm trying to look at.

8    There we go.  All right.  You see the message there,

9    16:32:19, do you see where I'm looking here?

10   A    I do.

11   Q    That message says, "Can you imagine if several hundred

12   thousand patriots descended on D.C. refusing to let Biden be

13   inaugurated," did I read that correctly?

14   A    You did.

15   Q    So the inauguration was not on January 6, is that

16   right?

17   A    That's correct.

18   Q    That was scheduled to take place on January the 20th, I

19   think, is that right?

20   A    That's right.

21   Q    Can we look at Number 910, please, the next one.

22   Before we get to this message, you're aware and I think we

23   even had some testimony about it, is that the Congress

24   reconvened on January 6th later that evening.  I can't

25   remember the time but it was late in the evening, do you

A342

John Moore - Cross

280

1    recall that?  Or do you know that?

2    A    I do know that, yes, they did.

3    Q    And once they reconvened, excuse me, they sort of

4    picked up where they had left off around 2:00, is that right?

5    A    They finished, they finished what they were doing in

6    the early hours of January 7th.

7    Q    So early -- on January 6th in the morning they had made

8    it through a certain number of states and then there was the

9    interruption and then they picked up with the rest of the

10   states that evening; is that all correct based on your

11   knowledge?

12   A    Yes.

13   Q    And so the ultimate decision of whether or not the

14   results of the election were going to be certified didn't

15   take place until after the Capitol had been cleared and the

16   legislature had reconvened, correct?

17   A    Only because the Capitol had to be cleared, yes.

18   Q    So in other words, the answer is yes, the certification

19   didn't happen until later on, right?

20   A    That -- yes, that's correct.

21   Q    Because the Vice President and the legislature were not

22   going to be deterred from following the Electoral Count Act

23   as it was set forth, right?

24   A    That's correct.

25   Q    They didn't throw it out the window because of the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A343

John Moore - Cross                                281

1    interruption, right?

2    A    That's correct.

3    Q    All right.  So we've got 910 up here.  You recall this,

4    this is -- this is the, I guess we'll call it a

5    point-by-point plan that seems to be presented here, you

6    recall this, correct?

7    A    I do.

8    Q    All right.  And so in response to the messages from

9    Mr. Brock, Beaf Supreame raises a number of seemingly

10   sensible responses to what you would need to do if you wanted

11   to take over the government; would that be generally what

12   he's doing here?

13   A    Yes.

14   Q    He points out, for example, that you would need, it

15   would probably be a good idea to have a chain of command and

16   secure communications if you were going to pull off something

17   like that; is that part of what he says here?

18   A    That's correct.

19   Q    And you agree that Mr. Brock seems to agree that you

20   probably ought to have a chain of command and some

21   communication if you're going to have a revolution, is that

22   basically his response?

23   A    Yes.

24   Q    And at a certain point, feel free to refresh your

25   recollection, Mr. Brock says that this really isn't his area

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A344

John Moore - Cross

282

1    of expertise being a pilot or something to that effect,

2    correct?

3    A    I believe he said this wasn't what he was trained for

4    but if you can scroll down on the exhibit, I just can't see

5    that part right now.  Yes.

6         THE COURT:  I think you're going past it now.

7    Q    It's right there if you want to read it.  I can ask it

8    more directly.  At 23:43:06 UTC time he says, "This isn't

9    what I was trained to plan," that's what Mr. Brock says, did

10   I read that correctly?

11   A    You did.

12   Q    Towards the end of this discussion, Beaf Supreame again

13   raises the sensible point that, an enterprise like this is

14   probably going to be pretty expensive, is that one of the

15   points he makes?  Feel free to ask, we can scroll down.

16   A    Yeah, could you scroll down, please.

17   Q    You can stop there, I'll ask the question directly.  At

18   12 -- 23:52:43 Beaf Supreame says, "Okay, first thing to

19   figure out is who is the source for op funds," did I read

20   that correctly?

21   A    You did.

22   Q    This exchange came after the plans had to be put on

23   hold for Mr. Brock to go take a shower, is that also correct?

24   A    That's correct.

25   Q    And eventually down there, Mr. Brock seems to agree

A345

John Moore - Cross                                    283

1    that you ought to have some money to pull off a plan of this

2    nature; is that a good paraphrasing of what he says?

3    A     Yes.

4    Q     At any point in this conversation does either Beaf

5    Supreame or Mr. Brock come up with any ideas of where to get

6    billions of dollars or where it would come from?

7    A     I mean not with a concrete plan, just that they need to

8    find someone with the money.

9    Q     And what time -- I guess what time in Texas time would

10   be 00:29:52, the last message there?

11   A     It would be six hours ahead of that message so

12   6:29 p.m. on Christmas Eve.

13   Q     Well, this conversation begins on Christmas Eve, looks

14   like it ends on Christmas Day or at least Christmas Day in

15   certain time zones, would that be generally right?

16   A     Yes.

17         THE COURT:  Wait a minute, the time of 00:29:52 on

18   Christmas Day UTC is what time you're indicating?

19         THE WITNESS:  Your Honor, that would be 6:29 p.m.

20   on Christmas Eve.

21   Q     In Texas?

22   A     In Texas central time.

23   Q     Can we look at 916, please.  And can we scroll down a

24   little bit here until it gets to the messages from user

25   Shelley.  Okay, can we stop there.  Actually scroll up just a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A346

USCA Case #23-3045   Document #2007100   Filed: 07/10/2023   Page 349 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 64 of 166

John Moore - Cross                                   284

1   little bit to the "Shoot their way in" messages if you would,

2   thank you.  Little bit more.  Right there, thank you.  You

3   introduce this message here, part of which says from

4   Mr. Brock, "Men with guns need to shoot their way in."  Did I

5   read that correctly?

6   A    You did.

7   Q    And then Mr. Brock sends an attachment that refers to

8   police in D.C. in the next entry, do you see that?

9   A    I do.

10  Q    And then HRM Shelley responds, "Freaking Georgia."  Did

11  I read that correctly?

12  A    You did.

13  Q    Does a reference to Georgia seem a little out of

14  context in view of Mr. Brock's two previous messages?

15  A    No, I believe they're talking about the Georgia

16  election results which were being decided at that time.

17  Q    That's right, and men with guns need to shoot their way

18  in is referring actually to the counting of the ballots and

19  interference with Republican watchers alleged in Georgia,

20  right?

21  A    It could be, I'm not certain.

22  Q    Well, let me refresh your recollection on that.  If I

23  can just pull up the ... court's indulgence, I thought I had

24  it right here.

25            THE COURT:  Certainly.


JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547


A347

John Moore - Cross                              285

```
 1              MR. BURNHAM:  I think I can find it pretty quickly.
 2                   (Pause in Proceedings.)
 3    Q    All right, I think I've got it here, sorry for the
 4    delay.  I'm just going to do this with my laptop, I'm
 5    afraid -- I'm just refreshing recollection, what I'm -- for
 6    everybody's -- I'm going to show the witness the unredacted
 7    version of this and see if it refreshes his recollection, if
 8    I can approach.
 9              THE COURT:  You're going to show him on your
10    laptop?
11              MR. BURNHAM:  I don't have -- I have to, it's a
12    little sloppy.
13              THE COURT:  Is this the transcript?
14              MR. BURNHAM:  No, this is this very same exhibit,
15    just unredacted, that's all it is.
16              THE COURT:  Okay.
17              MR. BURNHAM:  I'm just going to show him on my
18    laptop --
19              THE COURT:  Check with the Government, make sure
20    the Government is comfortable.  If they have an objection,
21    they'll make it.
22              MR. BURNHAM:  Can I approach, your Honor.
23              THE COURT:  You may.
24    Q    Agent Moore, I'm going to hand you my laptop here and
25    feel free to take as much time as you want but if you start
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A348

John Moore - Cross

286

```
 1   with the highlighted portion that refers to pointing to here
 2   and then just read down as much as you need.
 3   A    Okay.
 4   Q    Let me know when you've finished.
 5   A    I'm finished.
 6   Q    Thank you.  So now would you agree with me that the
 7   statement meant -- well, first of all, did that refresh your
 8   recollection?
 9   A    It did.
10   Q    All right.  So now you would agree with me, wouldn't
11   you, that the, "Men with guns need to shoot their way in,"
12   post pretty clearly refers to a situation in Fulton County
13   involving Republican poll monitors allegedly being blocked?
14         MS. AYERS-PEREZ:  Your Honor, I'm going to object
15   to that, I mean he can certainly testify as to what messages
16   were around there but what it actually references, I think
17   that's something that would be speculation for him.
18         THE COURT:  Well, we'll let the witness respond to
19   the question as asked.  Go ahead and respond.  So the
20   objection, to the extent that was an objection, is overruled.
21   You may respond to the question.
22   A    The Facebook post that preceded that post about
23   shooting your way in was a post about election results in
24   Georgia.
25   Q    And specifically it was about, whether or not it
```

A349

John Moore - Cross                                          287

1    happened is another question, but it was about Republican

2    poll monitors being blocked from overseeing the count,

3    correct?

4    A    I guess I -- I would need to see that again.

5    Q    You want --

6    A    Something about Fulton county, Georgia.

7    Q    I'll just let you take a quick look, if I can approach.

8    A    Sorry about that.  Yes, that's correct, it's about

9    Republican poll watchers.

10   Q    Thank you.  Would you agree that given the charges in

11   this case, that was some pretty important context for the

12   "men with guns" statement?

13   A    I don't believe it was left out to deny context, I

14   think it was left out out of -- redacted for anonymity for

15   other Facebook users.

16   Q    Do you recall testifying at a prior proceeding in this

17   case in Texas?

18   A    I do.

19   Q    All right.  And during -- that was a detention hearing

20   for Mr. Brock, correct?

21   A    Yes, I recall, yes.

22   Q    And feel free if you need to look at your testimony

23   I'll ask you just a couple questions about that.  You

24   didn't -- you make several references to the flex cuffs

25   pursuant to a government attempt to detain Mr. Brock pending

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A350

John Moore - Cross

288

1    trial, correct?

2    A    That's correct.

3    Q    All right.  And at no point did anybody, yourself or

4    the U.S. Attorney, inform the judge in Texas that there was

5    evidence that Mr. Brock had found those flex cuffs in the

6    Capitol, correct?

7    A    I would need to take a look at that transcript.

8    Q    Sure.  And I'll ask ... well, I'll ask one other

9    question and you can refresh your recollection as to both if

10   you'd like.

11   A    Okay.

12   Q    There was a statement not from you but from the U.S.

13   Attorney that perhaps he had those flex cuffs there to take

14   hostages, took them with him to take hostages, do you recall

15   that being part of the case for detention?

16       MS. AYERS-PEREZ:  Objection, your Honor, this has

17   no bearing on our actual case, what happened at a detention

18   hearing in Texas almost two years ago.  We haven't made that

19   allegation here, and we see video evidence and we've

20   stipulated actually to video evidence we stipulated that he

21   did pick up the flex cuffs later inside the Capitol.  We have

22   that footage now so I'm not sure what relevance this hearing

23   two years ago almost has on this.

24       THE COURT:  Well, I'm going to overrule the

25   objection, the Government's case did at several points have

A351

1    witnesses point out that he had, that Mr. Brock had flex

2    cuffs.  Now there was later clarification as to when he may

3    have acquired or how he may have acquired them, but it did

4    seem important to the Government witnesses to point out that

5    Mr. Brock had the flex cuffs so I'm not going to prohibit

6    questioning with respect to the reason the Government might

7    have at some point, and I understand that we're talking about

8    back at that time of the detention hearing, have thought

9    something in particular with respect to the flex cuffs.  So

10   you can go ahead, and first I'll say, Mr. Burnham, you can

11   ask the question, and then, Agent Moore, you can answer it.

12   Q    All right.  The first question is, just to recenter us

13   is, I'm asking you isn't it true that you participated in a

14   Government attempt to detain Mr. Brock during which the

15   allegation was made that he was carrying flex cuffs to

16   restrain hostages, and this was by the U.S. Attorney, not

17   yourself, and so I will let you look at the transcript and

18   I've got it on a page I think is the relevant page but if

19   you'd like to look around, you certainly can.

20          THE COURT:  So, so we're trying to put before me a

21   statement made by the U.S. Attorney in the detention hearing

22   that Mr. Moore was present at?

23          MR. BURNHAM:  And then there's going to be, that's

24   going to be the first question, then the second question is

25   going to be during his testimony did he ever let the judge

A352

John Moore - Cross                                290

1   know Mr. Brock found those cuffs there.  And I'll let the

2   witness answer, but I have an answer that I'm expecting and I

3   think it goes to the overall credibility of the investigation

4   and it ties in with other aspects of the Government's case

5   that we think --

6              THE COURT:  I'll let you do it, go ahead.

7              MR. BURNHAM:  Thank you.

8   A    Thank you.  (Witness reviewing transcript.)  So I've

9   read through the conversation by the AUSA about flex cuffs.

10  Q    All right.  Did that refresh your recollection?

11             THE COURT:  Well, why don't you take back the

12  document.

13  Q    Yeah, I'll take that.  Did that refresh your

14  recollection about that hearing?

15  A    Yes.

16  Q    All right.  So isn't it true that the AUSA made the

17  allegation that perhaps the flex cuffs were something

18  Mr. Brock brought with him perhaps to take hostages, as part

19  of the case, correct?

20  A    He also said, whether or not they were a fortuitous

21  find, it doesn't matter and he still walked around with them

22  for a significant amount of time, so I don't think that was

23  disingenuous.

24  Q    And in fact it's absolutely the case that they were

25  found there, that wasn't a whether or not, that's what

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A353

John Moore - Cross                                    291

1    happened; you'd agree with that, correct?

2    A      I agree that they were found, I can't agree to his

3    intent --

4    Q      And at no point -- I'm sorry, finish your answer.

5    A      He didn't immediately throw them in the trash, he

6    walked around in the Senate Chamber with a pair of flex cuffs

7    in his hand, so just like AUSA Jay Weimer said, whether

8    they're a fortuitous find or not, it's a concerning thing.

9    Q      And at no point in your testimony did you inform the

10   judge that in fact there was video evidence that he found the

11   flex cuffs there at the Capitol?

12   A      No, I did not.

13   Q      And being detained pending trial can absolutely destroy

14   a person's life, correct?

15              That's all right, you don't have to answer,

16   can I have -- I withdraw the question.  Can I have a moment,

17   your Honor?

18              THE COURT:  Certainly.

19              (Pause in Proceedings.)

20              MR. BURNHAM:  Thank you, your Honor, just a couple

21   more.

22   Q      Just a couple of housekeeping things I guess you would

23   say.  I think this is in evidence but you would agree that

24   the electoral session of Congress adjourned around 2:13 p.m.

25   in response to the first entrance into the Capitol?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A354

John Moore - Cross                                    292

1   A     I'm not sure of the exact time but somewhere in that

2   neighborhood.

3   Q     Let me show you another document here that I've

4   previously shared with the Government, I'll remind them now.

5   I'm going to show you a document, and again, I'm just going

6   to have the witness identify it and then I'll move it in

7   later.

8             THE COURT:  Is it marked?

9             MR. BURNHAM:  Yes, it's marked for identification

10  in your Honor's binder as Number 5.

11            THE COURT:  Number 5, okay.

12  Q     I'm going to show you a document, ask you to read --

13  you can read as much as you want but I ask that you read the

14  second paragraph, please.  Let me know when you're done.

15  A     I've read the second paragraph.

16  Q     So first of all, does that appear to be an article

17  about politics from the internet?

18  A     It -- it does.

19  Q     Are you familiar with *American Thinker*?

20  A     I am not.

21  Q     Do you recognize that second paragraph as being quoted

22  in one of the exhibits from Facebook that we've put, that the

23  Government's put into evidence?

24  A     I mean, it sounds familiar to a lot of the rhetoric but

25  I would need to see the exhibit to make a direct link.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A355

John Moore - Redirect                    293

1          MR. BURNHAM:  Court's indulgence.  You know, I

2     don't want to waste the Court's time, I don't have that

3     exhibit number right at my fingertips, I don't know how --

4     I'll make the connection in my case if I need to.  Our

5     contention is it's a direct quote, I'll let your Honor look

6     at the two as soon as I can, I wasn't going to move it now

7     anyway so I'll withdraw the question for now.

8          THE COURT:  All right.  Sounds fine to me,

9     Mr. Burnham.

10          MR. BURNHAM:  I can -- can I approach the witness?

11          THE COURT:  Yes.

12          MR. BURNHAM:  All right, thank you, no further

13     questions.

14          THE COURT:  Redirect?  Ms. Ayers-Perez?

15          MS. AYERS-PEREZ:  Briefly, your Honor.

16     <u>REDIRECT EXAMINATION BY MS. AYERS-PEREZ:</u>

17     Q    Agent Moore, I just have a couple of questions for you.

18     Do you remember the month that that detention hearing took

19     place in Texas?

20     A    January of 2021.

21     Q    Was it pretty soon after you had arrested Mr. Brock?

22     A    It was.

23     Q    Did you collect evidence on a continuing basis after

24     that?

25     A    Yes.

A356

John Moore - Redirect                     294

1    Q     Did that include things like videos and things of that

2    nature?

3    A     Yes, it did.

4    Q     Would it be fair to say you learned a lot about the

5    case since then?

6    A     Since -- yes.

7    Q     Okay.

8          MS. AYERS-PEREZ:  Okay.  That's all I have, your

9    Honor.

10         THE COURT:  All right.  Agent Moore, you may step

11   down.  I won't excuse you since you're permitted to stay in

12   the courtroom.

13              (The witness was excused.)

14         THE COURT:  Ms. Ayers-Perez, further evidence from

15   the Government?

16         MS. AYERS-PEREZ:  Your Honor, Agent Moore's our

17   final witness.  We have a couple of housekeeping matters with

18   some exhibits prior to resting.

19         THE COURT:  First question I have is, are all the

20   stipulations in?  I don't think I've actually at least marked

21   a couple of them so I'm not sure that they've been

22   introduced, and should they be introduced?

23         MS. AYERS-PEREZ:  Yes, your Honor.  And so that

24   was -- I haven't marked, three of them have not been

25   introduced.

A357

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 360 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 75 of 166

295

```
 1              THE COURT:  703, 704, and 705?

 2              MS. AYERS-PEREZ:  That's correct, your Honor,

 3    that's what I have been marked as not being introduced so I

 4    would move to admit 703, 704, and 705 marked for the

 5    Government at this time.

 6              THE COURT:  And they are stipulations so there's no

 7    objection to them so I will go ahead and admit 703, 704, 705.

 8    Any problem with that, Mr. Burnham?

 9              MR. BURNHAM:  Fine, your Honor.

10              THE COURT:  Thank you.  703, 704, and 705 are

11    admitted.

12              MS. AYERS-PEREZ:  And also there are some exhibits

13    in the 600 series we would move to admit.  These are just the

14    legal background as to the Electoral College and they go hand

15    in hand with the stipulations 702 that's already been

16    admitted at Government's Exhibit 702 and this is just to

17    complete the record, your Honor, and that would be 600, 601,

18    I'll just do 600 through 610.  And I also show that 613A, B,

19    C, D, and E as well as 614 did not get admitted and I would

20    move to admit those exhibits at this time.

21              THE COURT:  So 600 through 610 are actually to some

22    extent legal documents but you say that they're referenced in

23    the stipulation which is 702 did you say?

24              MS. AYERS-PEREZ:  Yes, 601 through 610 are the

25    legal documents and that goes hand in hand with Government's
```

296

1    Exhibit 702 which is the stipulation regarding the Electoral

2    College proceedings and 600 is a video regarding what

3    happened in Congress that day which goes hand in hand with

4    Government stipulation, Government's Exhibit 703 which is the

5    stipulation to the authenticity of the House and Senate

6    recordings, and so I would move to admit 600 through 610

7    right now.

8            THE COURT:  Any problem, Mr. Burnham, with 600

9    through 610 being admitted?

10           MR. BURNHAM:  No, your Honor.

11           THE COURT:  All right.  I will therefore admit 600,

12    601, 602, 603, 604, 605, 606, 607, 608, 609, and 610.

13           MS. AYERS-PEREZ:  And then also 613A, 613B, 613C,

14    613D, 613E, and 614, those are the CSPAN videos, 614 is CSPAN

15    video, 613A through E are just still shots from 613, 613 I

16    show was admitted yesterday at 2:00.  I would move to admit

17    those now as well to complete the record.

18           THE COURT:  All right.  So the description is 613A

19    through E are still shots from the 613 video that is in

20    evidence already; any problem with those, Mr. Burnham?

21           MR. BURNHAM:  No, your Honor.

22           THE COURT:  And then 614 is another video?

23           MS. AYERS-PEREZ:  Yes, your Honor, that's just a

24    continuation of 611, 612, and 613.

25           THE COURT:  Any objection to 614, Mr. Burnham?

A359

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 362 of 609
Case 1:21-cr-00140-JDB    Document 80    Filed 12/06/22    Page 77 of 166

297

1          MR. BURNHAM:  No, your Honor.

2          THE COURT:  All right.  So 613A through E and 614

3     are admitted.

4          MS. AYERS-PEREZ:  Okay.  All right.  That, your

5     Honor, at this time the Government would rest.

6          THE COURT:  The only things not admitted would be

7     the beginning of the 300 series, 300 through 305.

8          MS. AYERS-PEREZ:  Yes, your Honor.

9          THE COURT:  And that one document earlier, I think

10    204 was never admitted.

11         MS. AYERS-PEREZ:  That's correct, your Honor, those

12    are correct.

13         THE COURT:  All right.  With that, the Government

14    has rested.  Mr. Burnham, I will turn to you.

15         MR. BURNHAM:  Thank you, your Honor.  Make a motion

16    to dismiss under Rule 29.  I'll make the motion as to every

17    element of every charge technically but I'll focus on the

18    ones that I think are most important and I'll take the counts

19    in order.

20         I think there's really two issues that present

21    themselves with respect to Count One which is the 1512

22    obstruction count.  One is, it's an undisputed fact of this

23    case, even taking the evidence in the light most favorable to

24    the Government, that Congress had already adjourned by the

25    time Mr. Brock entered the building, and I think it can be

1  pretty clearly inferred that it adjourned before he got even,

2  even at all close to the building.

3          THE COURT:  He entered at 2:24.

4          MR. BURNHAM:  2:24, and Congress adjourned at 2:13.

5  So even with taking all the inferences most favorable to the

6  Government, I think the court should conclude that at 2:13,

7  Mr. Brock was probably at least several hundred yards from

8  the building.  And so by the time he got there, there was no

9  proceeding left to attempt to corruptly influence, impede and

10 so on and so forth.  Unless the Government can make a case

11 that he could somehow attempt to impede the proceeding in the

12 future, there's no crime here.  Perhaps we'll hear when the

13 Government has a chance to respond, the argument may be,

14 well, the fact that there was so many people there meant they

15 couldn't reconvene as quick as they wanted to because they

16 had to get all those people out.  But then the question

17 before the Court becomes, does one more person being in the

18 Capitol constitute anything other than a de minimus

19 obstruction.  We suggest even at the Rule 29 stage it

20 doesn't.  That's one problem.

21          The second problem is, is that there's the question

22 of intent that was previewed to the Court in opening

23 statements.  And you know, here, we get into the Facebook

24 messages that are in evidence.  Well, I guess there was one

25 that was conditionally admitted, perhaps I should ask for the

1    Court's ruling.

2          THE COURT:  I need to go back to that and I will go

3    back to that perhaps just to clarify it.  Based on -- I

4    conditionally admitted 902 and that was to see what the rest

5    of the Facebook-related exhibits would be and having reviewed

6    and decided on them, I will remove the conditional aspect of

7    that admission of 902 and it is admitted unconditionally.

8          MR. BURNHAM:  So that's I guess the most direct

9    evidence of intent that we have.  The court can of course

10   infer and all those inferences go in favor of the Government

11   at this stage but let's take the direct evidence that we

12   have, and I think that the thought process at Rule 29 is,

13   let's take all of those messages as literally true, not

14   hyperbole, not blowing smoke, like really true, which is the

15   view most favorable to the Government.  Even then, what's set

16   forth is that we really, really hope Congress acts, and if it

17   doesn't act, maybe we'll take over the government.  But the

18   hope expressed in those messages was that the Congress would

19   have the opportunity to correct the fraud that Mr. Brock

20   seems to have believed occurred, and then revolution, if they

21   didn't do that.  So all of the talk about revolution and so

22   on and so forth is sort of plan B if Congress doesn't act

23   which means it's not relevant to the question of is there

24   intent here to obstruct the electoral count, and so I would

25   argue even at the Rule 29 stage that Facebook posts are

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A362

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 365 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 80 of 166

300

1    highly exculpatory even when taken in the light most

2    favorable to the Government.  So really two problems with

3    Count One.  No obstruction and no corrupt intent.

4           Count Two and Three, I'll start with -- Count Two

5    and Three to a certain extent can be taken together because

6    they both are 1752 charges that have some common elements.

7    So with respect to both of those, our contention is that at

8    least by the point that Mr. Brock arrived on the scene, the

9    Capitol grounds were not legally restricted.  Certainly they

10   were restricted in a platonic sense and that that was the

11   intent of law enforcement that day, we saw a diagram.

12          THE COURT:  You're talking about the grounds.

13          MR. BURNHAM:  The grounds, the grounds.  There was

14   the perimeter, I don't dispute that it was the intent of the

15   Capitol Police and others to restrict the grounds both

16   practically and legally.  But the way the cases treat that

17   element, and this is the individual being prosecuted has to

18   be on notice of the restriction.  And there's not a ton of

19   cases on this but the one that I think is helpful is *McCabe*

20   *v. Macaulay*, 51 F.Supp.2d 944, and that -- there's a case

21   before that, *Bursey*, which was a Fourth Circuit case that's

22   persuasive but I think it makes sense that basically says

23   even if there's not a fence, if officers tell you you have to

24   leave, that's a restriction even though might not seem like

25   one, and then *McCabe v. Macaulay* is sort of the logical

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A363

USCA Case #23-3045    Document #2007100        Filed: 07/10/2023    Page 366 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 81 of 166

301

1    consequence of that is, if there's not a fence or something

2    and the defendants aren't on notice, then it's not legally

3    restricted and sort of a weird procedural posture in that

4    case but the ultimate holding was there was no probable cause

5    to arrest for 1752 because the defendants didn't know it was

6    restricted and then when the officer said it was restricted,

7    they left so that's the takeaway there.  So the question even

8    at Rule 29 is, where's the evidence that Mr. Brock was on

9    notice that he was entering a legally restricted area?  And

10   so there's --

11            THE COURT:  And you're still talking about the

12   grounds at the moment.

13            MR. BURNHAM:  The grounds and the building.

14            THE COURT:  Or talking about the building as well?

15            MR. BURNHAM:  I guess in theory the restriction

16   could be anywhere as long as police communicated to Mr. Brock

17   that he wasn't supposed to be there, either on the grounds or

18   as he was coming up or at the door.  Taken in the light most

19   favorable to the Government, they don't need to do it at a

20   specific time, there just has to be something, and we don't

21   have any evidence that Mr. Brock would have seen the

22   barriers, let alone participated in removing them.  There's

23   no evidence that any officer, whether, whether when he was

24   entering the grounds or whether when he was entering the

25   building said, you're not supposed to be here, it's

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A364

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 367 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 82 of 166

302

1    restricted, you have to leave.  Just didn't happen.  In fact

2    the evidence is he happened to walk through the door at the

3    little five-minute interval where there weren't any officers

4    there to tell him that.

5            And so then for 90 percent of the video that has

6    him walking around the Capitol, there's no officers there,

7    and then towards the end, he encounters some and there's no

8    sound so we don't know what they said but the conduct of

9    Mr. Brock and the officers, I think even in the light most

10   favorable to the Government, shows that he did leave

11   voluntarily well before the building was ultimately cleared

12   and without offering resistance to the officers, you can see

13   that especially in the final video where he walks out under

14   the supervision of officers.  So the question is where is the

15   restriction.  I just don't see it anywhere here.

16           THE COURT:  So would there be a restriction for the

17   fifth person in line who was standing behind the first four

18   people who broke windows and pushed open the door to enter

19   the Capitol?  So what about that fifth person, would that

20   fifth person have a restriction relevant to them?

21           MR. BURNHAM:  If the fifth person had seen the

22   windows being broken, I think there would still be --

23           THE COURT:  How about seeing glass on the floor?

24           MR. BURNHAM:  Well, if there's evidence to permit

25   the Court to find that there was glass on the floor, that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A365

303

1    might support a restriction but I think even at the Rule 29

2    phase, it doesn't get you all the way there, if that's all

3    you have.  I mean the case -- what we're looking for is a

4    sign, a fence, an officer saying get out of here.  Glass on

5    the floor is not a -- I would argue that even that doesn't

6    get you anywhere close to a legal restriction.  There's

7    certainly no case that would support a restriction based on

8    glass on the floor, especially since --

9           THE COURT:  What about someone who's in the mob,

10   shall we say, who saw from behind them, not the front rank,

11   the barricades being breached, police lines being parted,

12   pushed aside, and then going up to the Capitol and going into

13   what had been a closed building?  Are you excusing everyone

14   who's in the large gathering because when they actually got

15   to the Capitol doors, others had already breached them?

16          MR. BURNHAM:  If someone witnessed other protesters

17   fighting with police or physically against police will

18   removing the barricades, that would be legally restriction,

19   there's no question about it, I would agree with that, but I

20   don't think that's the case here.  There's no evidence for

21   the Court, from which the Court can infer that Mr. Brock

22   witnessed that; in fact the evidence is opposite.  He was

23   probably pretty far back.  I mean you could sort of infer

24   that from when he entered, the time, and secondly, the one

25   little snippet -- we only have one little snippet of his

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A366

 1    approach, that's it, that's the video where you can see the

 2    back of his helmet for like very briefly is the only evidence

 3    we have of how he got from -- we have him walking down

 4    Constitution, and then the record goes dark and then you see

 5    his helmet very briefly so we got to look at that video of

 6    the back of his helmet and see what, if anything, does that

 7    tell us and I think it's exculpatory because he's very far

 8    back at that point from the entrance.  You can watch the

 9    video, there's no view of the barricade, in fact one of the

10    officers even admitted you can't see that portion, it was

11    Officer Patton who admitted you can't see that portion from

12    downstairs which is where that video was shot and you can see

13    how thick the crowd is and how loud they were.  There's every

14    reason to infer from that video that Mr. Brock would not have

15    had any opportunity to witness the destruction of those

16    barriers.  So that's, I think that's the correct finding even

17    at Rule 29 there.

18         Now, the fallback that your Honor has already

19    telegraphed, maybe we'll hear this from the Government, was,

20    well, he had to have seen the broken glass or he had to have

21    seen a broken window, there's no way he didn't, and I think

22    even in Rule 29 that argument doesn't wash because you can

23    see when he walks in, he's not looking from side to side, it

24    doesn't happen.  And even if he had looked from side to side,

25    the glass panes are completely removed at that point, there's

1    no shards, there's no like partial windows, certainly there's

2    no one there still trying to take him out, so it's not

3    something the court can conclude he would have legally been

4    on notice of.  The broken windows and the glass is hard to

5    see, I even had to watch the video several times to notice

6    it, it's off to the side.  Obviously glass is opaque, it's on

7    the floor --

8              THE COURT:  We see more than he saw because we see

9    it actually at one point large plates of glass being cleared

10   by an officer pushing it aside with his foot.

11             MR. BURNHAM:  Before and after the fact, that's

12   right.  So I think if there was even a glance to the side,

13   you know, by Mr. Brock towards the direction of the glass, I

14   might have a much harder time but we don't have that, so

15   there's nothing even at this stage to conclude that he would

16   have seen the glass.  I think that's the situation here.

17             So that would be, if the court agrees with that

18   argument, doesn't need to go any farther on Counts Two and

19   Count Three but just for the record, specifically as to, I

20   think this really applies more to Count Three, I'm not seeing

21   the disorderly conduct here.  There's no yelling, you know,

22   there's no -- he's not participating in chants.  Obviously

23   we've emphasized when he tries to maintain order, that

24   happened four times, there's no pushing and shoving, he's not

25   carrying a sign, he's not acting crazy the way some of the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A368

1    people were.  It's not simply enough to enter a restricted

2    area to be guilty of Count Three, you have to then do

3    something that's likely to cause a disruption and I don't see

4    that with Mr. Brock at all, in fact quite the contrary.

5            THE COURT:  Well, the term is disorderly or

6    disruptive conduct.

7            MR. BURNHAM:  That's right.

8            THE COURT:  Disruptive conduct as defined in the

9    relevant provisions is disturbance that interrupts an event

10   or activity or the normal course of a process.  So you're

11   saying that that wasn't the case.

12           MR. BURNHAM:  Simply entering can't be enough

13   because it can't be coextensive with entering the restricted

14   area.

15           THE COURT:  Well, he didn't enter alone, he entered

16   with a vast number of other people.

17           MR. BURNHAM:  Yes, your Honor.  It's not a

18   conspiracy case, and if the allegation is aiding and

19   abetting --

20           THE COURT:  But it's not irrelevant that he was one

21   of many.

22           MR. BURNHAM:  Well, if inherently entering is one

23   of many, I think even under the definitions your Honor cited

24   which are correct is he would have to be aiding them in some

25   way or approving of their conduct or assisting to have him be

307

1    culpable for himself engaging in disorderly conduct.  If the

2    allegation is merely entering itself with a large number of

3    people is disorderly conduct, there's not a case on this but

4    just based on the plain language of the cases we do have --

5              THE COURT:  Not disorderly, disruptive.

6              MR. BURNHAM:  Disruptive conduct, we're looking for

7    something -- it doesn't have to be a lot, I'm not saying he

8    had to be smashing things but something to disrupt the

9    function of government business other than just walking

10   around which is the same thing the journalists were doing.

11   We know journalists were there that day, some people were

12   manifestly journalists in the video, they were walking

13   around, they contributed to the number.  There were invited

14   guests, that contributed to the number of people but they

15   obviously wouldn't be included, and so unless the Government

16   can point to something saying this is an action Mr. Brock

17   took that was disruptive and went beyond merely entering,

18   even under Rule 29 is a problem with that count too, I would

19   maintain.

20             THE COURT:  What else?

21             MR. BURNHAM:  Count Four, willfully entering the

22   floor of Congress, that has to be done willfully and we don't

23   have any communication to him that that was unauthorized for

24   him to be there.  He did not participate in the, you know,

25   there was, the testimony from Officer Timberlake --

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A370

308

 1          THE COURT:  Your problem is that he didn't know

 2     that it was without authorization?

 3          MR. BURNHAM:  That's right, that's right.  There's

 4     testimony from, I guess the closest thing to that would be

 5     the testimony from Officer Timberlake and he testified that,

 6     you know, he's there, he's trying to secure the doors and

 7     then he gets into the confrontation so obviously those people

 8     would have been on notice that they weren't supposed to go in

 9     there because the officer -- I mean, he was in plain clothes

10     and it could be an issue if it needed to be but I don't think

11     it needs to be, is the officer was physically trying to stop

12     those people from going in.  And then there's the scuffle and

13     you can see Mr. Brock coming in from a different section, he

14     walks into the side of the video from some other part of the

15     Capitol, not adjacent to where the scuffle had taken place,

16     and by the time he comes in the video, it wouldn't have been

17     apparent what the subject of the dispute was because both the

18     officers and their antagonists had moved down the hall

19     significantly away from the door there.  And there's no -- I

20     mean Officer Timberlake didn't testify he told Mr. Brock, you

21     guys can't go in there or those guys, I was trying to keep

22     them out and they tried to force their way in or anything

23     like that, he didn't have those statements so that's the

24     problem with number four.

25          Count Five is a different version of disorderly

                 JODI L. HIBBARD, RPR, CRR, CSR
                       (315) 234-8547

A371

1     conduct, very similar under 5104, and then finally, Count

2     Six, parading, demonstrating, or picketing.  This is another

3     one where there's not a ton of case law that I was able to

4     find to help with that but just the plain meaning of those

5     words, I would submit we're looking for waving banners, we're

6     looking for participating in chants, we're looking, guy with

7     the horns on the bull horn, he would clearly qualify, but I

8     didn't see any footage where --

9              THE COURT:  So if there are ten people, it's the

10    two with the banner that could be convicted under that

11    provision but not the eight who aren't holding the banner?

12             MR. BURNHAM:  Not if they don't appear to be acting

13    in concert.  If there's one guy with a banner and eight

14    people following along behind, certainly that's parading, but

15    if there's a guy with a banner over here and Mr. Brock is

16    just doing his own thing looking at his phone, taking

17    pictures, doing whatever, he's not answerable for the guy

18    with the banner unless there's some sort of concertive action

19    there would be our position.

20             Thank you, your Honor, ask for brief response if

21    appropriate.  Thank you.

22             THE COURT:  Thank you, Mr. Burnham.  Let me hear

23    briefly from the Government.

24             MS. AYERS-PEREZ:  Yes, your Honor.  As to Count

25    One, the obstruction of the official proceeding, Brock was

A372

310

1    part of a mob that, and it was, we've heard from Agent

2    Glavey, we've heard from Captain Patton, it was that mob

3    breaching the Capitol that caused the official proceedings to

4    both recess, and I would point out that although the Senate

5    recessed at 2:12 --

6          THE COURT:  Well, it wasn't the mob outside that

7    caused the recess, it was --

8          MS. AYERS-PEREZ:  It was the breach.

9          THE COURT:  -- when there was a breach.

10          MS. AYERS-PEREZ:  Right.  And Larry Brock is part

11    of a breach in the sense that he did breach the Capitol at

12    2:24 p.m.  The House did not recess until 2:29 p.m. when

13    Brock had been inside the Capitol for five minutes at that

14    point.  And there's also an aiding --

15          THE COURT:  Is that what this turns on, my finding

16    the time that there was a recess by either the House or the

17    Senate --

18          MS. AYERS-PEREZ:  I don't believe -- I'm sorry.

19          THE COURT:  Let me finish.

20          -- and if Mr. Brock entered the Capitol before that

21    time, then the obstruction charge may survive, but if he

22    entered after that time, it cannot?

23          MS. AYERS-PEREZ:  No, I don't believe so --

24          THE COURT:  That's their argument basically.

25          MS. AYERS-PEREZ:  I understand that.  I think in

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A373

1    this case that's just another thing that I'm pointing out to

2    your Honor, that the House didn't even recess until he'd been

3    inside the Capitol for five minutes.  Even if that wasn't the

4    case, and it's the case here, but even if it wasn't, he's

5    part of this violent mob that's breached the Capitol

6    building.  And under the aiding and abetting provision of

7    Count One, he's responsible for what's happening in this mob.

8    I understand that he entered 12 minutes after the initial

9    breach of the Senate Wing Doors, but he's still part of that

10   mob pushing through, and as we saw from that time lapse

11   video, this is a significant group of people with a

12   significant police line in front of them, between them and

13   the Capitol, and there's obviously just a huge ton of people

14   there, including Brock, and so it does take people time to

15   get through, and so yes, he's 12 minutes later, but he's

16   still responsible for what the mob did because he's part of a

17   mob.  That's how a mob works.  It exists because of the

18   numbers.  And you know, we've heard from officers about how

19   outnumbered they were, well, that's because it's a mob.  Not

20   everybody has the same role in that mob, not everybody's

21   smashing the glass with a flagpole, not everybody's holding a

22   sign, but those people can do that because the mob exists and

23   they provide them cover in the number of people and Brock is

24   a part of that.  And he's responsible.

25           THE COURT:  I'm surprised that this issue hasn't

312

1    been addressed by some judge on this court over the past

2    couple of months, is this an unaddressed issue?  Has this not

3    been argued in some other case that someone who just came in

4    isn't individually responsible for obstructing?  Or to employ

5    Mr. Burnham's argument, if you came in after a recess of the

6    proceedings, then you can't be charged with obstructing the

7    proceedings.

8            MS. AYERS-PEREZ:  And your Honor, this is a quote

9    from Judge Kollar-Kotelly and it's actually a metaphor about

10   the mob that, "Just as heavy rains cause flood in a field,

11   each individual raindrop itself contributes to that flood.

12   Only when all of the floodwaters subside is order restored to

13   the field.  The same idea applies in these circumstances.

14   Many rioters collectively disrupted Congressional proceedings

15   and each individual rioter contributed to that disruption."

16   And in this case, the defendant's name is Rivera.  "Because

17   Rivera's presence and conduct in part caused the continued

18   interruption of Congressional proceedings, this court

19   concludes that Rivera in fact impeded and disrupted the

20   orderly conduct of government business or official

21   functions."  And I think that --

22           THE COURT:  And how about the term "continued

23   disruption" meaning that it doesn't matter, I take it, from

24   Judge Kollar-Kotelly that the exact timing of one's conduct,

25   if it continued to interfere with Congress from completing

A375

313

 1 | its proceedings?

 2 |         MS. AYERS-PEREZ:  Right, your Honor.  I mean this

 3 | is -- this is a continuous course of action that began from

 4 | the first or even before the first breach when the restricted

 5 | area was breached into the first breach of the Capitol until

 6 | they were finally able to clear them out as we've heard from

 7 | our witnesses, and begin the Congressional proceedings again

 8 | and that was late into the evening to the point where of

 9 | course they finished the next morning.

10 |         THE COURT:  Okay.

11 |         MS. AYERS-PEREZ:  And so that's in response to

12 | defendant's argument as to Count One.  Because of the aiding

13 | and abetting provision and because of what we just discussed,

14 | I do think we've reached the standard to get past this Rule

15 | 29 when it comes to Counts two and Three in the restricted

16 | area.  We've heard from Captain Patton, there were signs,

17 | there was snow fencing, there were bike racks, and the

18 | evidence we've seen of the defendant, there are people

19 | climbing a scaffolding next to him when he enters through the

20 | Senate Wing Doors, the windows are broken out.  Even if, even

21 | if, and I'm not conceding this but even if you believe that

22 | he didn't see the glass, there are people climbing through

23 | the windows next to him.  When he enters in, there's not a

24 | ton of people right there, but you can see people climbing in

25 | the windows right next to him, and he knows that people are

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A376

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 379 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 94 of 166

314

1    not supposed to be climbing in the windows next to him.  When

2    he's next to the east Rotunda door before he picks up the

3    flex cuffs and heads up to the third floor where the Senate

4    Gallery is, there are officers standing in front of the door

5    trying to stop more people from coming in.  There is a broken

6    window on that east Rotunda door that he's standing two feet

7    away from.  He then turns around, grabs flex cuffs and walks

8    up the stairs to the Senate Gallery.  He knows --

9            THE COURT:  But we've merged two things here, we've

10   merged the building and the grounds.

11           MS. AYERS-PEREZ:  Right.

12           THE COURT:  Stay with grounds for just a second.

13           MS. AYERS-PEREZ:  We've heard from Capitol Patton

14   all of the signs that were along those grounds.  We've seen

15   the actual signs there, and the bike rack, and the snow

16   fencing behind it, and he's part of the group that pushed

17   through all of these blockades around this perimeter that we

18   know were in place because Captain Patton walked the

19   perimeter that morning for the entirety of that perimeter.

20   And so he would have to walk past this stuff, even if a bike

21   rack is on the ground when he walks past it, it's still

22   there, you still see it, even if a sign is on the ground,

23   it's still there, it's still says area closed.  These signs

24   weren't there every once in a while, they were there every

25   other bike rack, and he walked past those, he walked past

1   every single one of those perimeters there on the west side.

2   He had to of to get to where he ended up.

3          THE COURT:  All right, back to the building.

4          MS. AYERS-PEREZ:  And back to the building, your

5   Honor, once inside, you're seeing people climb through a

6   window next to you on the left side and on the right side,

7   you're next to the east Rotunda doors which are broken out on

8   the window that's closest to the defendant, is broken, there

9   are multiple officers standing by the doors trying to stop

10  the mob from getting in, and he still continues on.  At this

11  point he hasn't gone on the Senate floor yet, he ends up in

12  the Senate Gallery.  Sergeant Timberlake tells us he's

13  involved in an altercation with other rioters.  Larry Brock

14  saw this because he breaks it up, and he doesn't break it up

15  and leave, he breaks it up and then goes out onto the Senate

16  Gallery.  He leaves there, he grabs a set of keys to try to

17  open the Senate floor doors, the doors say U.S. Senate on

18  them so he knows where he is.  He's also been up above that,

19  so he's looking down and knows where he's at.  He goes

20  directly down there to the Senate floor.  We're getting into

21  Count Four -- or Count Four at that point.  But there are

22  sign after sign after sign.

23         THE COURT:  By the way, you've offered something

24  that I don't think is in evidence, at least I don't recall

25  it, which is what the items that he was using to try to open

A378

1    that door were.  You just said he grabbed the Senate keys.

2            MS. AYERS-PEREZ:  Or I said he grabbed some keys.

3            THE COURT:  Is there evidence that says what it

4    was, where he got it?

5            MS. AYERS-PEREZ:  We had a witness who said that

6    he -- it looked like a set of keys, we don't have the keys,

7    as Agent Moore testified they didn't find them there in the

8    execution of the search warrant, but we did have when the

9    witness --

10            THE COURT:  Which witness, just so I can find it

11    again because I didn't recall that, which witness says that

12    it looked like the Senate keys?

13            MS. AYERS-PEREZ:  It was Captain Patton.

14            THE COURT:  All right, I'll check that.

15            MS. AYERS-PEREZ:  That's as we were going through

16    the video footage with him.  But yes, and at that point he's

17    trying to get into a locked door, it says U.S. Senate on it.

18    I mean there's sign after sign after sign that you're not

19    supposed to be inside this building, besides the obvious that

20    you're part of a mob that's overtaken a building.  You

21    understand what a public building is, that you have to go

22    through security.  He had no issue going through security

23    today, you understand that that's a process you go through.

24    He went through a broken door, with people climbing windows

25    next to him.  He sees officers in multiple locations, either

A379

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 382 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 97 of 166

317

1    in altercations with rioters or trying to keep rioters out

2    and he continues his path through the Capitol on to the

3    Senate floor after seeing all of this.  It's clear that this

4    is a restricted building and he's not supposed to be inside

5    of it.  That's after going through all the signage on the

6    restricted grounds that he's not supposed to be on, and he

7    continues on throughout it.

8            THE COURT:  All right.  Go ahead.

9            MS. AYERS-PEREZ:  And then when it comes to Count

10   Four and the Senate floor, first he's trying to get into a

11   locked door that says United States Senate on it, and then he

12   turns around and goes through another door and ends up there

13   in the Senate Chamber.  He had previously, just about five

14   minutes prior, been in the Senate Gallery looking down

15   directly onto the Senate floor and goes directly down there,

16   as soon as he realizes what's below him and where he's at and

17   he has oriented himself with the Capitol, and he stays on the

18   Senate floor going through desks, walking through the Senate

19   floor for about eight minutes, I believe.  It wasn't walking

20   in realizing, oh, no, and walking back out, no.  He spent, he

21   spent a good chunk of time in there.  And then once he was on

22   the Senate floor, he left the building, because that was his

23   intention in being there.  So he knows that's the Senate

24   floor, he knows that he had tried to get into a locked door,

25   was unable to and goes around to another door that's

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 383 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 98 of 166

318

1    unlocked, and then stays there for a period of time while

2    proclaiming this is an IO war and things of that nature.  He

3    knows to the point that the President of the Senate is Vice

4    President Pence and where his chair is so he can tell other

5    rioters what it is they're sitting in or looking at.  So this

6    isn't -- he didn't just stumble there and not understand

7    where he's at.  Larry Brock knows exactly where he was.

8           And when it comes to the disorderly or disruptive

9    conduct, he and the rest of the mob disrupted the proceedings

10   that were happening there by being there, by marching

11   through.  He was on the Senate floor where the proceeding was

12   supposed to be taking place, and wasn't, because they were in

13   the building, not just on the Senate floor, and then he's

14   standing there where it's supposed to be happening.

15          THE COURT:  Well, so here's my question on that.

16   There are two different charges, one is entering and

17   remaining on the floor of Congress, or entering or remaining

18   in a restricted building and grounds, and the other is

19   disorderly or disruptive conduct in restricted building or

20   grounds or in a Capitol building, those are four of the

21   counts, two for each.  What's the difference between the

22   disorderly conduct counts and the entering counts?  Is anyone

23   who entered the Capitol building also guilty of disorderly or

24   disruptive conduct on that date in the Capitol building?

25          MS. AYERS-PEREZ:  When you enter as part of a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A381

 1    violent mob, then yes.

 2         THE COURT:  So your answer is yes, everyone who

 3    entered the Capitol on that date is guilty not just of

 4    entering but also of disorderly or disruptive conduct in the

 5    building.

 6         MS. AYERS-PEREZ:  The mere, and we've heard this

 7    from our witnesses, the mere fact that the Capitol was

 8    breached and people were inside is what disrupted the

 9    proceeding, and part of the disruptive definition is that it

10    disrupts the orderly course of business or official business.

11    And in this case, it disrupted the counting of the Electoral

12    College votes.  Certainly the way Larry Brock entered with

13    the violent mob of people and the way he went through the

14    Capitol building certainly disrupted the proceedings and to

15    add to that, of course he's standing where the proceedings

16    were supposed to be taking place.  So certainly with Larry

17    Brock, he would have violated both the entering and the

18    disruptive conduct as he's inside which is as part of this

19    mob that's stopped the official proceeding.

20         THE COURT:  So just -- so someone who entered let's

21    say not when Mr. Brock entered but 15 minutes later, at 2:39,

22    and came in and was there for about 90 seconds, looked

23    around, then said to him or herself, Jeez, maybe I shouldn't

24    be here and turned around and walked out, in your view, they

25    would be guilty not just on the entering concept, but also on

320

1    the disorderly or disruptive conduct because of what was

2    happening around them by the rest of the mob?

3              MS. AYERS-PEREZ:  In -- every case is different,

4    there are facts and circumstances for every case, I don't

5    want to tie the Government to --

6              THE COURT:  But judges like to ask hypotheticals of

7    counsel and I'm asking you that hypothetical.

8              MS. AYERS-PEREZ:  Yes, your Honor.  And I would

9    believe in that case, yes, that he would be responsible for

10   disruptive conduct within the building.

11             THE COURT:  Which I think is returning to the point

12   that no one who entered the Capitol on that date is not

13   guilty of the disorderly and disruptive charges as well as

14   the entering and remaining charges.

15             MS. AYERS-PEREZ:  For people who entered the

16   Capitol on that date, just the mere entrance of the mob

17   caused the disruption, so if you're part of the mob, you're

18   part of that disruptive conduct.  And not just entering, but

19   also then disrupting the proceeding that took place because

20   it wasn't just one person, it was everybody, and you're a

21   part of everybody.

22             THE COURT:  And do you think the evidence shows

23   that Mr. Brock was unreasonably loud or disruptive or

24   interfered with another person by jostling against or

25   unnecessarily crowding that person?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A383

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 386 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 101 of 166

321

1          MS. AYERS-PEREZ:  He was part of a crowd and group

2     that's going through the Capitol, went through about every

3     area you could get through, he's screaming on the Senate

4     floor, he's screaming in the Senate Gallery.

5          THE COURT:  He's screaming?

6          MS. AYERS-PEREZ:  He's yelling at other rioters and

7     in the Senate Gallery he's yelling at them about not to --

8     not to damage anything and on the Senate floor he starts by

9     saying this is our house, he then says that this is an IO

10    war, to get out of the Vice President's chair but he's --

11         THE COURT:  So two out of the three things you just

12    said were basically telling other rioters not to do bad

13    things.

14         MS. AYERS-PEREZ:  It's true, but he's still causing

15    a disruption as he does it.  And we've already seen from his

16    Facebook post why he's telling them that.

17         THE COURT:  Yeah, my guess is that the language,

18    the definitional language for disorderly conduct, the

19    unreasonably loud and disruptive was written having in mind

20    someone who was doing something during a Congressional

21    proceeding and interfering with that Congressional

22    proceeding, but I understand your argument.

23         MS. AYERS-PEREZ:  Yes, your Honor, and I think, I

24    think I've responded to all of the defendant's points on

25    Counts One through Six, or the entirety of the indictment.


JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547


A384

Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 102 of 166

322

1          THE COURT:  All right.  Mr. Burnham, anything you

2    want to say in response?

3          MR. BURNHAM:  Yes, just a few specific things.  As

4    to Count One, certainly other judges, you know, have denied

5    motions similar to mine to Count One but there's absolutely

6    no controlling authority on that question and I think it's

7    only natural with the unorthodox use of heretofore kind of a

8    sleepy statute, that the members of this court might come

9    down differently.  And I have great difficulties with the

10   reasoning of, well, there was a mob, and whoever joined the

11   mob is answerable for all of the consequences that ensued

12   when evidence in this case even shows this "mob" was composed

13   of discrete groups of people doing very discrete types of

14   things.  There was everything from out-and-out miscreants

15   behaving abominably to people who seemed to be befuddled and

16   a little confused by their situation.  So I think the

17   reasoning of, well, there was a mob, and he was in the mob so

18   he's answerable is overly simplistic and not the intent of

19   the statute.

20          THE COURT:  But that may be right although the

21   response, it would seem to me, is that the mob had at least

22   seemed to have a common purpose, and that was to prevent the

23   certification of the election, to interfere with that

24   process, and they took a common action to try to accomplish

25   that, which was entering the Capitol grounds and then

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A385

323

1    entering the Capitol building.

2        MR. BURNHAM:  I don't agree at all, your Honor, I

3    think you could see even in the evidence in this case, try to

4    put out of our minds everything else, we know there was a

5    disparity of purposes.  There were people who were just

6    trashing things that I suppose were just interfering --

7        THE COURT:  That doesn't speak to their purpose,

8    because their purpose wasn't to trash things, their purpose

9    was to stop a proceeding and they were trashing in order --

10   along the way to accomplish that.

11       MR. BURNHAM:  But there was another group of people

12   of whom Mr. Brock was a member that wanted the proceeding to

13   function effectively and to achieve the right result.

14   Mr. Brock wanted the Electoral College proceeding to proceed,

15   he was in support of that.  The Government's witnesses all

16   testified there's a process for making objections, they're

17   debated, and slates of electors can be rejected.  Some people

18   thought it could be sent back to the states and Mr. Brock and

19   many others manifestly were supporting that process.  They

20   were there to support the Senators, the Congressmen making

21   those objections and they wanted an ultimate legal result of,

22   in many cases, rejecting the purported Biden victory in favor

23   of at least investigating the fraud.  So they were there

24   supporting the Electoral College.  So I distinguish those

25   people from the riffraff, breaking things, acting crazy, you

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A386

324

 1    know, fighting with law enforcement, who knows what was in

 2    their minds but those people were criminals.  There was

 3    another group of people that was not that at all, at all.

 4    And that's why I think that, well, was he in the mob is not

 5    the right analytical framework at all for Count One.

 6          Technical point, but I would argue that once the

 7    Senate, Mr. Brock is charged with obstructing the Electoral

 8    College and I guess the House proceeded a little farther but

 9    once the Senate adjourned, it's not the Electoral College

10    anymore, it's just the House by itself which is a different

11    proceeding, not charged in this case.  It's undisputed that

12    the Electoral College ceased to function prior to Mr. Brock's

13    entry, I think that's an important point.

14          And that's sort of the same arguments I'm making if

15    the Government -- the Government hasn't exactly elected a

16    theory as to Count One, whether it's aiding or abetting or

17    whether it's not but to the extent it is relying on aiding

18    and abetting and Ms. Ayers-Perez did use that term, they have

19    to show that Mr. Brock's intent was to assist, I forget the

20    exact terminology but to assist, encourage, you know, all the

21    terms the statute uses, Section 2, the individuals who were

22    responsible for obstructing the proceeding, again, as

23    distinct from encouraging the proceedings to arrive at what

24    they viewed as the correct results.  And the witnesses even

25    added support to this, the Government's witnesses testify, we

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A387

325

1    heard people breaking the windows so we adjourned.  People

2    were smashing the doors so we adjourned.  In order to convict

3    on an aiding-and-abetting theory, there needs to be evidence

4    to find that Mr. Brock supported that, which is what

5    triggered the adjournment and we don't have evidence of that.

6         As to the -- as to the restricted area, I basically

7    gave the Government in the opening, point to some evidence

8    that shows him being put on notice of the restriction and

9    they pointed to I guess three things the way I understood the

10   argument.  One is the people climbing the scaffold, which is

11   the restriction has to come from the persons lawfully in

12   charge of the property, and people climbing a scaffold don't

13   indicate any intention one way or the other on the part of

14   the people lawfully in charge of the premises, there's just

15   some knuckleheads climbing a scaffold, you'd find that at a

16   football game, a rock concert, any large gathering of people

17   there's going to be some knuckleheads so that doesn't

18   communicate anything one way or the other.

19        The window, there's been arguments from the

20   Government that Mr. Brock was put on notice from people

21   jumping through the window and I'd urge the court to go back

22   and take another look at the video.  There are a couple of

23   people that come in through the window which would have been

24   on Mr. Brock's left, I think there was two, maybe three, but

25   if the court reviews the video or perhaps recalls better than

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A388

1    I do, there's a piece of the wall there, it's like a piece

2    that sticks out that would have obscured the view from where

3    Mr. Brock was entering to that window, and so that combined

4    with the fact that Mr. Brock doesn't look to his left,

5    doesn't allow the court to find that the --

6           THE COURT:  Don't you think it would require me to

7    blink reality to conclude that Mr. Brock in the few moments

8    before he actually entered the building and as he was

9    entering the building didn't see anyone going through the

10   windows?  That sounds pretty amazing for you to suggest that

11   that would be the case.

12          MR. BURNHAM:  I don't think it's amazing at all

13   because we saw that by that point the door was open, there

14   was no need to go --

15          THE COURT:  We also see people still coming through

16   the windows.

17          MR. BURNHAM:  I think it was approximately two out

18   of maybe 30 that entered during that --

19          THE COURT:  You say two while he was immediately

20   walking through?

21          MR. BURNHAM:  That's right.

22          THE COURT:  That doesn't mean while he was

23   approaching that there weren't others, indeed I think there

24   were others because we've seen some video before he actually

25   came through the door.

327

1          MR. BURNHAM:  When the windows are actually being

2     broken, certainly we did but by the time Mr. Brock arrived on

3     the scene, the door was open so the reasonable finding would

4     be that most of the people are just going to walk through the

5     door because there's no reason to go through the window at

6     that point.

7          THE COURT:  But there were people coming through

8     the windows.

9          MR. BURNHAM:  I think there were two, for whatever

10    reason, they went through the window, I don't know, but the

11    vast majority of people at that point were going through the

12    door and only stands to reason that that's what most people

13    would do with the exception of, again, the few just

14    miscreants that were just misbehaving for its own sake but

15    that would have been very few of number, and there's no

16    evidence Mr. Brock would have been on notice of because it

17    would have been, as he's walking through unless he looked

18    over and watched it, would have been indistinguishable

19    someone coming through the window and then someone that was

20    just walking from that part of the hallway, he wouldn't have

21    known the difference.

22         THE COURT:  I'm talking about the moments before he

23    reached the door and came through.  He must have seen people

24    going through the windows then.

25         MR. BURNHAM:  Well, there's no evidence of that and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A390

328

1    I would argue that there's not even an inference of Rule 29

2    that he would have had to have seen that.  I think if there's

3    any inference it would have been that few people would have

4    gone that way, and he seemed pretty intent on looking ahead

5    at the time, at least when he comes on the video and wouldn't

6    have been in a position --

7            THE COURT:  I'll have to look at the video again to

8    see whether it only captures Mr. Brock coming through the

9    door or whether it also captures moments before he came

10   through the door and whether there were people coming through

11   the windows at that time.

12           MR. BURNHAM:  Thank you, your Honor.  And final

13   point the Government raised is the situation at the Rotunda

14   doors and the first observation there is this is a triple

15   fallback position, I guess the argument is that if the

16   grounds weren't legally restricted and the outside of the

17   building was, perhaps he was then on notice well after

18   entering, but even there, you don't have those officers

19   communicating to him that he wasn't allowed to be there.

20   There was some seemingly crazy people outside the door

21   banging which only makes sense that the police weren't going

22   to let those guys in because they were acting crazy, didn't

23   communicate anything to Mr. Brock and with respect to the

24   remainder, I'd rest on my initial arguments.

25           THE COURT:  All right, thank you, Mr. Burnham.  And

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A391

329

1    those are the arguments that are good food for thought but

2    I'm going to keep them as thought.  I'm going to reserve a

3    decision on the motion consistent with Rule 29(b) and let the

4    remainder of the evidence in the case come in.  And I'll rule

5    after that, before I, or in conjunction with, if necessary,

6    any ruling on the defendant's guilt as to the various

7    charges.  But at this point, I'll reserve a decision on the

8    Rule 29 motion as Rule 29(b) permits.

9             So we're going to break for lunch now, and I'll

10   give you time to think further, Mr. Burnham, and Mr. Brock,

11   but we'll resume at -- oh, let's make it 1:50, and we'll

12   proceed with a decision from the defendant with respect to

13   its case, and what lies thereafter.  Okay.  Anything else we

14   need to talk about before you have your lunch break?

15             MS. AYERS-PEREZ:  Nothing from the Government.

16             MR. BURNHAM:  No, your Honor.

17             THE COURT:  All right.  Thank you, all.

18                  (Luncheon recess, 12:45 p.m. to 1:53 p.m.)

19             THE COURT:  All right.  Welcome back, everyone, and

20   turn to you, Mr. Burnham, for the defense case.

21             MR. BURNHAM:  Thank you, your Honor.  I'll approach

22   the podium.

23             THE COURT:  Use whichever mic you want.

24             MR. BURNHAM:  I'd like to move in the exhibits

25   previously identified, that's Exhibit 3, Defense Exhibit 3

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A392

330

1    was a photo that --

2              THE COURT:  I haven't seen -- well, it may be in

3    the book, is it in your book?

4              MR. BURNHAM:  Yes, it is, under those tabs, tab 3

5    is the photo, that's identified by Agent Moore, I'll go ahead

6    and ask the court to receive it now.

7              THE COURT:  All right.  Any objection to moving

8    Defense Exhibit 3 into evidence?

9              MS. AYERS-PEREZ:  No objection, your Honor.

10             THE COURT:  All right.  And I will include with

11   your representation, Mr. Burnham, that the date of the photo

12   is February 7th, 2020.

13             MS. AYERS-PEREZ:  Yes, your Honor.

14             THE COURT:  So Defense Exhibit 3 is admitted.

15             MR. BURNHAM:  And then the other exhibit is Defense

16   Exhibit 5, under tab 5, which was the article that, you know,

17   I had the agent review but the basis for why that's

18   admissible is the second paragraph is the agent testified is

19   a quote and now that I've recovered the number, it matches up

20   pretty much word for word, I think word for word with

21   Government's 913, and so, you know, the odds of that being a

22   coincidence are vanishingly small so we would offer that as

23   proper authentication with that exhibit combined with the

24   agent's testimony.

25             THE COURT:  All right, that's the representation

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A393

1    made with respect to admissibility of the article and it

2    would be admitted only for that purpose, to show that a

3    quoted portion of Government Exhibit 913 is the same as a

4    paragraph of Exhibit 5.  Defense Exhibit 5.  Any objection?

5           MS. AYERS-PEREZ:  I have no objection to that

6    limited purpose, your Honor.

7           THE COURT:  All right.  And it will be admitted for

8    that purpose.  That is Defense Exhibit 5.

9           MR. BURNHAM:  And with that, we rest.  If your

10   Honor needs to do a colloquy with Mr. Brock, he's prepared

11   but if not --

12          THE COURT:  Yes, I would like, would you like to

13   ask him anything, or want me to do the colloquy?

14          MR. BURNHAM:  However the court's norm -- I can

15   represent our discussions.

16          THE COURT:  I usually do the colloquy so I will do

17   that so I'll just ask Mr. Brock to come up to the microphone,

18   you can stay there with him, Mr. Burnham.  Good afternoon,

19   Mr. Brock.

20          THE DEFENDANT:  Yes.

21          THE COURT:  The -- your counsel has indicated that

22   the defense is resting, which would mean that you have

23   decided not to testify, and I just wanted to confirm that

24   that is your free and voluntary choice and so I will ask you,

25   have you consulted with Mr. Burnham about whether you should

332

1    or should not testify in this matter?

2                THE DEFENDANT:  Yes, sir.

3                THE COURT:  And have you taken into account his

4    advice to you?

5                THE DEFENDANT:  Yes, sir.

6                THE COURT:  And is it your decision that you will

7    not testify in this case, which is Criminal Case 21-140 in

8    this court?

9                THE DEFENDANT:  Yes, sir.

10               THE COURT:  All right.  And that is a decision made

11   by you upon advice of counsel, but freely, voluntarily, and

12   intelligently?

13               THE DEFENDANT:  Yes, sir.

14               THE COURT:  All right.  Thank you.

15               MR. BURNHAM:  Thank you, your Honor.

16               THE COURT:  With that, the record is complete.  And

17   now the only thing I have yet to receive from you all is

18   argument.  And we're about 2:00 in the afternoon, I'm

19   prepared to give you a little time if you want a little time

20   to compose your thoughts and so I can give you half an hour,

21   45 minutes, and then we can come back for argument.  Would

22   that be your request and in your interest?

23               MS. AYERS-PEREZ:  Yes, your Honor.

24               THE COURT:  One yes.  Mr. Burnham?

25               MR. BURNHAM:  Yes, your Honor.


                    JODI L. HIBBARD, RPR, CRR, CSR
                         (315) 234-8547


A395

333

 1              THE COURT:  All right.  And now --

 2              MR. BURNHAM:  Yes, your Honor.

 3              THE COURT:  And now timing, how long would the

 4    Government expect to need?

 5              MS. AYERS-PEREZ:  I think 45 minutes is fine, your

 6    Honor.

 7              THE COURT:  That's 45 minutes total?

 8              MS. AYERS-PEREZ:  Yes, your Honor, I think that

 9    would take us to about 2:40 -- oh, I'm sorry, I'm sorry, I

10    was not on the same page, I'm so sorry.  No, I would need at

11    max 30 minutes total, so probably 20 and 10.

12              THE COURT:  And Mr. Burnham?

13              MR. BURNHAM:  I'll ask for 30 minutes, it might be

14    a little under that.

15              THE COURT:  So 30 minutes or so.  So we'll resume

16    at -- I'll give you the full 45 minutes, resume at 2:45 and

17    hear argument at that time.  And once I hear argument, I will

18    either rule then or it's possible that I will decide to bring

19    you back first thing in the morning to rule.  We'll see how

20    things go with respect to your arguments, how convincing they

21    are on each side.  All right?  See you in 45 minutes.  Thank

22    you.

23              (Court in recess, 1:59 p.m. to 2:49 p.m.)

24              THE COURT:  All right.  Anything before we start

25    with the arguments?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A396

1              MS. AYERS-PEREZ:  Not for the Government, your

2    Honor.

3              MR. BURNHAM:  No, your Honor.

4              THE COURT:  Fine.  Ms. Ayers-Perez, we'll start

5    with the Government.

6              MS. AYERS-PEREZ:  Thank you, your Honor.  Your

7    Honor, in the days and weeks leading up to January 6th, 2021,

8    the defendant ... I apologize.

9              THE COURT:  That's quite all right.  Your gesturing

10   was quite amusing.

11             MS. AYERS-PEREZ:  In the days and weeks leading up

12   to January 6th, 2021, Larry Brock was obsessed with the

13   election.  He was saying things such as, "Biden won't be

14   inaugurated and we will ensure that on the 6th."  Things such

15   as, "the Supreme Court is staying out of it.  Those are the

16   last two peaceful options."  Talking about, "Congress can

17   stop it on the 6th of January."  Saying things such as, "Help

18   is on the way, 6 January #MAGA #Stormthecastle."  On

19   July 5th, "our second American Revolution begins in less than

20   two days."

21             THE COURT:  It's January 5th, not July, right?

22             MS. AYERS-PEREZ:  January 5th, your Honor, thank

23   you.  And then in December, "I prefer outright Insurrection

24   at this point."  He prepared for January 6th, he bought

25   tactical gear, he bought a helmet, and he showed up there and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A397

335

1    the first thing he did is he went to the Stop the Steal Rally

2    with so many others.

3         And then he began his march to the Capitol.  He

4    marched down Constitution Avenue, we can see him here,

5    wearing his combat vest, wearing his jacket, and he enters

6    into the restricted area.  We heard from Captain Patton what

7    that restricted area looked like.  He personally walked it

8    that morning.  Signs every other bike rack, area closed by

9    Capitol Police.  Bike rack all around, snow fencing, all

10   around, and Larry Brock walked through all of this, with

11   everybody else, and he walks up --

12        THE COURT:  Is there any evidence as to whether all

13   of that was in place or not in place when Mr. Brock entered

14   that area?

15        MS. AYERS-PEREZ:  Well, Captain Patton saw it that

16   morning and I haven't heard any evidence that Mr. Brock

17   didn't see it that day.  Here we are next to the scaffolding

18   on the west side of the Capitol.  We've heard from Captain

19   Patton, we're already in the restricted area at that point.

20   People are climbing scaffolding outside the United States

21   Capitol building, and there's Larry Brock.  Helmet on, part

22   of the group, part of the mob, making his way towards the

23   Capitol building.  And at 2:24 p.m., he enters into the

24   Capitol building.  You see the broken windows next to him,

25   people have entered through those windows, he's walking into

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A398

USCA Case #23-3045     Document #2007100     Filed: 07/10/2023     Page 401 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 116 of 166

336

1    the Capitol building a mere 12 minutes after the initial

2    breach on the west side of the Capitol.

3                THE COURT:  That's a still photo from a video.

4                MS. AYERS-PEREZ:  It is, your Honor, yes.

5                THE COURT:  I haven't gone back and looked at the

6    video, I will.  Does the Government represent whether the

7    video shows the time before Mr. Brock entering?

8                MS. AYERS-PEREZ:  I'm not sure, I don't believe it

9    shows too much time before he enters.  I can tell you this

10   window here on the right side of the screen, there is

11   somebody who does climb through that window in close

12   proximity to when Larry Brock enters into the Capitol

13   building.

14               THE COURT:  Well, I guess I'll look at the video.

15               MS. AYERS-PEREZ:  Larry Brock then ends up outside

16   the Rotunda at 2:35 p.m., and these are those east Rotunda

17   doors, right outside the Rotunda after Larry Brock has

18   already gone into the area marked Speaker of the House, Nancy

19   Pelosi, and here is Larry Brock.  Mere feet from that east

20   Rotunda door.  And what you'll notice about that door is the

21   window has already been smashed out.  And there are law

22   enforcement, Capitol Police right there and right there

23   (indicating).  Despite all of this, despite Larry Brock being

24   within feet of all of this, he continues on his mission

25   throughout the Capitol Building.  He grabs flex cuffs off the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A399

337

1      ground and proceeds to head upstairs to the third floor.

2           Here he is going down the corridor one minute later

3      towards the Senate Gallery.  And here he is two minutes later

4      outside the Senate Gallery, and this is where Sergeant

5      Timberlake talked about.  As he's trying desperately to close

6      these gallery doors, he's been assaulted by Capitol rioters,

7      not by Larry Brock.  Larry Brock stops the assault per

8      Sergeant Timberlake, calms things down.  To calm it down

9      means that Larry Brock saw it.  He saw Sergeant Timberlake

10     assaulted by fellow rioters and he continues on again.

11          And we see this post.  The conversation Larry Brock

12     is having with Beaf Supreme.  "A possible IO loss if a cop

13     got hurt."  And Brock, "look dude, I am pretty sure I am

14     ready to go at it.  I just need numbers with me."  This is

15     the mindset that Larry Brock had that day, and I --

16          THE COURT:  Wait a minute, wait a minute, Beaf

17     Supreame is saying, it would be bad if a cop got hurt.

18          MS. AYERS-PEREZ:  Yes, yes.

19          THE COURT:  And Mr. Brock is responding that he's

20     ready to go at it.  He just needs numbers.

21          MS. AYERS-PEREZ:  Right.  He's ready to go at it

22     that day, and then what you see is that Larry Brock stops a

23     cop from being hurt that day, Sergeant Timberlake.  And what

24     we will see in a few minutes is when Larry Brock is on the

25     Senate floor, he's still talking about that IO war.  He's

A400

338

1    stopping, the reason that Sergeant Timberlake is being

2    stopped from being assaulted by Larry Brock and why Larry

3    Brock is trying to defuse a situation, calm it down, is

4    because he's worried about this IO loss.  This IO war is at

5    the front of Larry Brock's thought process that day, which we

6    hear when he gets on the Senate floor.

7            Just one minute later, here he is on the Senate

8    balcony, and you'll notice that here he is shouting at fellow

9    rioters and they're turning and looking at him.  He has a

10   commanding presence.  He's making his voice heard.  He's

11   telling them, do not destroy anything and they're listening.

12   People around him.

13           THE COURT:  We would all prefer that he's saying

14   that rather than the opposite, don't we?

15           MS. AYERS-PEREZ:  I prefer he wasn't at the Capitol

16   that day.

17           THE COURT:  Different issue, different issue.

18           MS. AYERS-PEREZ:  But yes, it is great that he said

19   that.  But the fact that his actions then take him down onto

20   the Senate floor is different than if he had said that and

21   left.

22           And then four minutes later, he goes directly

23   downstairs to the second floor.  He knows where he is now.

24   He has oriented himself because he was there in the gallery

25   and understands that the Senate floor is below him.  And here

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A401

339

1    he is at the door, we heard from Captain Patton it looked

2    like he had a set of keys in his hand, and that door says

3    United States Senate on it.  And we know that door 21 minutes

4    earlier had Vice President Michael Pence leaving from that

5    door, just 21 minutes prior to Larry Brock standing outside

6    trying to get inside.  And we heard from Captain Patton, what

7    that door leads to.  It leads to the Senate floor and it

8    leads to Vice President Pence's ceremonial office.

9              THE COURT:  It's not really that important what's

10   behind that door because there's no evidence that Mr. Brock

11   knew what was behind that door.

12             MS. AYERS-PEREZ:  Well, the door says United States

13   Senate on it.

14             THE COURT:  That's right.  It is obviously a closed

15   locked door giving access to some part of United States

16   Senate.

17             MS. AYERS-PEREZ:  It is.

18             THE COURT:  The fact that the Vice President came

19   through it 20 minutes earlier is dramatic, but it doesn't

20   seem to me to be that significant because Mr. Brock didn't

21   know that.  There's no evidence that he knew that.

22             MS. AYERS-PEREZ:  Right.  But Mr. Brock has found

23   himself in an area that's extremely sensitive, so much so

24   that the Vice President had just come out of there 21 minutes

25   prior and he's trying to get into a locked door inside a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A402

1    building he was never supposed to be in in the first place.

2           And just two minutes later, here he is on the

3    Senate floor, and you'll see in his left hand, he now has his

4    flex cuffs out.  The interesting thing about those flex cuffs

5    is that Sergeant Timberlake never saw them, and he was right

6    next to Larry Brock and he never saw the flex cuffs.  When

7    Larry Brock is right next to Sergeant Timberlake he doesn't

8    have them displayed, he doesn't hand them to an officer to

9    get rid of them, he has them wherever he has them, we don't

10   know, but now he's brought them out again, now that he's on

11   the Senate floor.  And once again, we find Larry Brock in the

12   Senate Chamber shouting at fellow rioters saying things such

13   as get out of the Vice President's chair.  This is our house.

14   This is an IO war.  We can't lose the IO war.

15          And he's back to his mindset that led up to all of

16   this, which is the IO war, which is what we see message after

17   message after message on Facebook that Larry Brock has in the

18   days and weeks leading up to January 6th.  We saw the

19   progression of furor from Larry Brock, first in November,

20   that Donald Trump had lost the election, in December, so he

21   has convinced himself the Supreme Court will handle the loss,

22   that Donald Trump will still be President, and now his final

23   piece is January 6th and Congress and now he's on the floor

24   of the Senate where just less than an hour before, they had

25   been debating Arizona and the objection to Arizona, the Vice

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A403

341

1    President had been in his chair, and now Larry Brock is in

2    combat gear standing on the floor of the Senate.  He's

3    walking around not just in the middle of the Senate, you can

4    see him here in the back walking around the desks there in

5    the Senate.

6             THE COURT:  Now those keys that you referenced a

7    moment ago at that door, we don't know where those keys came

8    from.

9             MS. AYERS-PEREZ:  We don't, as Agent Moore

10   testified, they didn't find them when they executed that

11   search warrant, we have no idea where those keys came from,

12   where he got them from, what they were to.

13            THE COURT:  Does that matter?

14            MS. AYERS-PEREZ:  It matters in the sense that we

15   would like to know what those keys are to if they're

16   actually --

17            THE COURT:  We would like to know but it doesn't

18   matter in terms of his culpability on any of the charges?

19            MS. AYERS-PEREZ:  It matters in the sense that he

20   was deep inside the Capitol in a very sensitive area and he

21   at some point, whether inside the Capitol or before he got to

22   the Capitol, had found a set of keys that it appeared he

23   believed could open the door to the Senate Chamber, and you

24   know it's the Senate because it says so on the door.  And

25   so --

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A404

```
1              THE COURT:  I'm not sure you're understanding my
2    question.  My question is this:  If A, he brought the keys
3    with him; or B, he found the keys on the table outside the
4    door and they were unlabeled; or C, he found the keys there,
5    and they were labeled Senate keys, is there a different
6    result from those three possibilities or is the result at the
7    end of the day the same?
8              MS. AYERS-PEREZ:  Well, the result is the same
9    because he didn't get in through the keys, but him even
10   trying with the keys, whether or not they were A, B, or C,
11   whichever way he obtained the keys, goes to his corrupt
12   intent and his unlawful intent that day to get onto the floor
13   of the Senate where the official proceeding was taking place.
14             THE COURT:  I think you're saying it doesn't matter
15   because whether it's A, B, or C, it's still corrupt intent.
16             MS. AYERS-PEREZ:  It is.  And we --
17             THE COURT:  That's your answer to my question, I
18   think.
19             MS. AYERS-PEREZ:  Yes, your Honor.  It is still
20   corrupt intent, whether it's A, B, or C, the fact that he's
21   using the keys, obtained however he obtained them, is showing
22   his corrupt intent that day and his unlawful intent to get to
23   the heart of the Capitol to get onto the Senate floor, where
24   the official proceeding that's the basis for Count One of the
25   indictment was in the process of taking place.  The objection
```

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 408 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 123 of 166

343

1    to Arizona was being debated in the Senate at that moment in

2    time.  So it does go to his corrupt intent that day.

3            And we see his corrupt intent throughout the course

4    of this.  We see it beginning in his Facebook posts, leading

5    up to January 6th, as he gets more and more angry and his

6    rhetoric gets more and more intense.  When he says things

7    such as storm the castle, when he says things such as that

8    the American Revolution begins in less than two days, on

9    January 5th, that's showing his intent on what he's going to

10   do when he gets to Washington, D.C. on January 6th.

11           What is so unique about Larry Brock is that he

12   doesn't talk very much about going to the Stop the Steal

13   Rally, that wasn't his purpose behind being in Washington,

14   D.C. on January 6th.  His conversations leading up to

15   January 6th are about Congress.  They're about the vote,

16   they're about January 6th itself.  And he is acutely aware of

17   what is happening inside that Capitol building on

18   January 6th.  It's not just the end result of a Stop the

19   Steal Rally that he attends, it is the Capitol and Congress

20   that is the reason why he's there in the first place.  He

21   very, very infrequently talks about the Stop the Steal Rally.

22   It's Congress, it's the counting of the Electoral College

23   votes, it's the peaceful transfer of power on January 6th

24   that brought Larry Brock to Washington, D.C., in combat gear

25   at that.

344

1          THE COURT:  One could read the evidence, I'm not

2     saying that I do, but one could read the evidence in a way

3     that supports the conclusion that Mr. Brock wanted to stop

4     the inauguration, because that's referenced a couple of

5     times, as opposed to specifically stopping the certification

6     of the election.  Why shouldn't the evidence be read that

7     way?  And would that matter?

8          MS. AYERS-PEREZ:  He wasn't there on January 20th,

9     he was there on January 6th, and one way to stop the

10    inauguration of a new President is to be there on January 6th

11    and stop the peaceful transfer of power.  It's that day that

12    he bought plane tickets for to go to Washington, D.C.  He

13    didn't buy plane tickets to go to Washington, D.C. on

14    January 19th to stop the eventual inauguration on

15    January 20th.

16         THE COURT:  Is there anything in the evidence --

17    there are a lot of references to January 6th, and some of

18    those references, not many of them but some of them might

19    have been tagged to the Stop the Steal Rally on January 6th,

20    is there any evidence in any of his communications

21    beforehand, the Facebook communications mainly, that he

22    intended to go to the Capitol on January 6th?

23         MS. AYERS-PEREZ:  He talks multiple times about

24    Congress on January 6th, and Congress is there inside the

25    Capitol building, and he ends up there at the Capitol

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A407

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 410 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 125 of 166

345

1     building.

2               THE COURT:  I know where he wound up, but is there

3     anything that actually says, that indicates there are things

4     that indicate I'm going to the Stop the Steal Rally, is there

5     anything that indicates I'm going to the Capitol?

6               MS. AYERS-PEREZ:  It's not, there's nothing in

7     there that says I'm going to the Capitol.  There are a number

8     of messages that says Congress on January 6th and what

9     Congress is doing on January 6th.  Larry Brock is a smart

10    guy, he's a graduate of the United States Air Force Academy,

11    former lieutenant colonel in the Air Force, he understands

12    where Congress is and he understands what's happening on

13    January 6th, in Congress, and I think he's made his knowledge

14    of what's happening on January 6th and Congress' role in

15    that, he discusses that plenty of times throughout his

16    messages leading up to January 6th, and he very infrequently

17    discusses the actual rally that Donald Trump is having that

18    day, and prior to going to the Capitol.

19              THE COURT:  Okay.

20              MS. AYERS-PEREZ:  And all of this leads to this

21    chilling post on December 24th that reads as a military

22    operation that Larry Brock sends in a private message to a

23    fellow military man where he lists what he wants to happen if

24    Congress fails to act on January 6th, and it is egregious and

25    severe, but it also shows just how strongly Larry Brock feels

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A408

346

1    about January 6th and that January 6th is the end point for

2    him.  Not the inauguration, it's January 6th, and what's

3    happening in Congress at the Capitol that is the end point

4    for Larry Brock.  Thank you, your Honor.

5                THE COURT:  Well, wait a minute.  I have a question

6    or two.  So if I decide that there has to be something more

7    than just being in the Capitol in order to find disorderly or

8    disruptive conduct, what evidence would you point me to that

9    is more than just being in the Capitol?

10               MS. AYERS-PEREZ:  Well, the disruptive conduct was

11   disrupting the proceeding, or any course of business that

12   day, and more than just being in the Capitol, he is

13   throughout the Capitol.  He starts on the first floor, second

14   floor, third floor, Rotunda, east Rotunda stairs, Senate Wing

15   Doors, Senate Gallery, Senate floor, Parliamentarian doors,

16   he makes quite a bit of headway and goes through the Capitol

17   a lot.  He didn't walk in -- and I know your Honor had the

18   hypothetical earlier of somebody walking in and walking out

19   almost immediately.  He spent about 38 minutes inside the

20   Capitol, but during that time, he went on to the Senate

21   floor, where less than an hour before, they're debating

22   Arizona on the Senate floor, where he is now at and they

23   can't continue their order of business, the normal

24   proceedings because not just people are inside the Capitol of

25   course, but he's not leaving immediately like you said, he is

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A409

347

1  going through the Capitol for a lengthy period of time and

2  he's going to one of the most sensitive areas within a

3  sensitive building within the United States.

4           THE COURT:  So you would point to the duration and

5  scope of his time in the Capitol?

6           MS. AYERS-PEREZ:  Duration and scope and, yes, and

7  the location, yes, as part of his subset of scope.

8           THE COURT:  What about in the last charge, the

9  parading, picketing, demonstrating, which of those do you

10  assert Mr. Brock engaged in?

11           MS. AYERS-PEREZ:  The demonstrating, as part of a

12  group that's demonstrating throughout as somebody who's

13  shouting commands and as part of a group in the Senate

14  Gallery.

15           THE COURT:  So not picketing.

16           MS. AYERS-PEREZ:  Picketed, too, he really did.  I

17  mean Larry Brock's conduct on January 6th covers a wide range

18  of conduct.  I think demonstrating is the one that most

19  closely fits, but it doesn't mean the others don't fit.

20           THE COURT:  So the only one of those three terms

21  that's defined, specially defined for purposes of the

22  provisions is demonstrate, which is defined as conduct that

23  would disrupt the orderly business of Congress by, for

24  example, impeding or obstructing passageways, hearings or

25  meetings but does not include activities such as quiet

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A410

348

```
 1   praying, and so with that definition of demonstrate, what is

 2   it you feel that he did that constitutes demonstrating?

 3          MS. AYERS-PEREZ:  Merely being inside the Capitol

 4   and going throughout the Capitol, especially with the scope

 5   of what he did, it disrupted the order of Congress and what

 6   Congress is doing, but in addition to that, going inside the

 7   Senate Chamber twice, once at the gallery, once on the Senate

 8   floor, absolutely disrupted normal course of Congress because

 9   he's inside the chamber where Congress is supposed to be

10   convened at that moment in time.

11          THE COURT:  Well, is it odd that someone going into

12   the chamber who wasn't a Senator or a staff person for the

13   Senator or into the gallery, unless they do something more,

14   probably would not be disrupting the orderly business of

15   Congress, but someone going in when Congress isn't even there

16   would be disrupting the orderly business of Congress?  It

17   seems a little odd.

18          MS. AYERS-PEREZ:  Well, I take it from the first

19   example that that's somebody who's already lawfully inside

20   the building.  Larry Brock and the --

21          THE COURT:  That's my hypothetical, yes.

22          MS. AYERS-PEREZ:  -- and the fellow rioters are not

23   lawfully inside the building.  We've heard from multiple law

24   enforcement officers that they didn't go through the

25   security, they didn't put their bags in the x-ray machine,
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A411

349

1    they didn't go through the metal detector, they don't know

2    what's on them, and that's what makes the conduct of the mob

3    and how they broke into the Capitol so dangerous, is because

4    you don't know what anybody has, and Larry Brock was part of

5    that.  He's not the person who came into the building

6    lawfully and went through security and is lawfully inside the

7    building and then makes a disruption up in the gallery.  He's

8    not lawfully there, he hasn't gone through security and he's

9    on the Senate floor which nobody would be allowed to do short

10   of staffers or members, and they're supposed to be there

11   right then but they're not because of what the rioters have

12   done.

13        THE COURT:  So, my last question is, is related to

14   entry into restricted grounds as opposed to building.  Does

15   that provision 1752 require that an individual, Mr. Brock in

16   this instance, know that the grounds are restricted?

17        MS. AYERS-PEREZ:  He has to knowingly violate it,

18   but --

19        THE COURT:  Has to knowingly but not knowingly and

20   willingly which is the language in other provisions but not

21   in this provision.

22        MS. AYERS-PEREZ:  Right, he does have to knowingly

23   do it, and this case --

24        THE COURT:  Not just that he's entering in the area

25   but he has to know the area he's entering is restricted.

A412

350

1          MS. AYERS-PEREZ:  Right, which is why Capitol

2     Police did all they could or did all they did with the

3     restricted perimeter, with the area closed by Capitol Police

4     signs every other bike rack, with the bike racks with the

5     snow fencing, the fact that there were more than one set of

6     those and Captain Patton told us they were all up there that

7     morning, and we haven't heard any evidence that Larry Brock

8     didn't see that stuff that day.  I mean it was -- we have

9     evidence that it was there, and that, it wasn't just a sign

10    stapled to a tree that you hope somebody sees that says no

11    trespassing.  I mean we're talking about a actual barrier

12    around the Capitol building with multiple sources of barrier

13    with bike racks and snow fencing and signs.  It wasn't just

14    one, it was around the entirety of the Capitol in a really, a

15    large restricted area that he had to have gone through to end

16    up where he ended up.

17          THE COURT:  All right.  Thank you.

18          MS. AYERS-PEREZ:  Thank you.

19          THE COURT:  I'll give you some time in rebuttal.

20          MS. AYERS-PEREZ:  Thank you.

21          THE COURT:  Mr. Burnham.

22          MR. BURNHAM:  Thank you, your Honor.

23          Your Honor, I'll welcome questions from the bench

24    but failing that, I'll try to go through more or less

25    chronologically what the evidence was which means that I'll

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A413

USCA Case #23-3045    Document #2007100        Filed: 07/10/2023      Page 416 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 131 of 166

351

1  start with the social media record because that's the first

2  thing in time.  And as already previewed to the court in the

3  arguments surrounding the admissibility of those, it's a

4  little hard, I submit, to tell exactly how much weight to

5  give to some of that stuff.  There's hashtags, we presented

6  one article that shows some of it is quotes, sometimes he's

7  responding to other things that are blacked out, but I submit

8  that there are --

9          THE COURT:  Just because he's got a quote from some

10  other source doesn't mean he's not advocating what's in that

11  quote, he's copying it and putting it in his communication.

12          MR. BURNHAM:  Well, I think there's other

13  evidence --

14          THE COURT:  It may not be his original language,

15  but he seems to be in line with it, right?

16          MR. BURNHAM:  I think the remainder of the evidence

17  in the case would show quite clearly whether that was a

18  serious suggestion or not.  I introduced the article more to

19  show the tenor of those discussions, it was passing around

20  things on the internet, it was hashtags, it was little

21  sayings like storm the castle.  If there was evidence tending

22  to show that the quote from the *American Thinker* article was

23  indeed presented as a real plan to be put into practice, then

24  yes, it would be highly significant evidence, but I

25  absolutely think the court should compare it against what we

A414

352

1    know about the conduct that followed.

2            But I think there are -- I do agree that there are

3    two significant things we can take away from the social media

4    record and the first is that Mr. Brock's concern about the

5    2020 election was genuine.  This was not just something he

6    drummed up because he didn't want to see Trump lose.  He was

7    genuinely concerned about what he had read on the internet

8    about alleged fraud, about illegality.  We all have our

9    different opinions about that but I think it's manifest from

10   the record where his head was, that's one thing.

11           The second thing is, is related, is he trusted the

12   United States Congress to fix that problem.  He says that

13   multiple times, Government's Exhibit 911, Congress can stop

14   on January 6th; Government's Exhibit 912, hopefully Congress

15   will do what is right, that's referring to the Electoral

16   College.  That's where Mr. Brock placed his faith and I'll

17   come back to that.

18           THE COURT:  Well, why does that matter that much?

19   Let's say he came to Washington with the hope that Congress

20   was going to fix the problem, but with the firm belief that

21   if Congress didn't, he was gonna be a participant in conduct

22   to fix it because Congress hadn't?

23           MR. BURNHAM:  That would be -- that would be highly

24   illegal and problematic but that's not what we have here,

25   neither in the social media evidence nor in his behavior he

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A415

1    doesn't say --

2            THE COURT:  He's got a specific plan that he sets

3    out if Congress didn't fix it on January 6th.

4            MR. BURNHAM:  I have two things to say about the

5    plan.  One about the face of the plan and one in comparing --

6    I submit to the court it's absurd on its face.  I started

7    referring to it in my head as the Christmas Eve plan because

8    when you read it, one wonders if Beaf Supreme and Mr. Brock

9    hadn't gotten into the eggnog a little early.  Maybe the

10   court shares that view; maybe it doesn't.

11           THE COURT:  I love it when counsel take those views

12   of their client.  That happens sometimes and I know it's not

13   a serious view of your client, but I understand it.

14           MR. BURNHAM:  They're military buddies, obviously

15   they know each other very well, they're talking about cutting

16   off the power to Democratic cities, arresting Mark

17   Zuckerberg, it's so over the top.

18           THE COURT:  But isn't it, isn't it at least a

19   reflection of, I'm willing to support serious efforts to stop

20   this election from being certified?

21           MR. BURNHAM:  It's absolutely --

22           THE COURT:  To stop the Congressional certification

23   of the election?

24           MR. BURNHAM:  It's absolutely not, and we can tell

25   that it's not by just looking at -- that's Exhibit 910, if we

354

1    just skip forward to Exhibit 912, it makes clear as day it's

2    not a serious plan.  912 is, if your Honor recalls, that's

3    where Mr. Brock tells Beaf Supreame/Drew, I'm going to D.C.,

4    I bought my tickets and Beaf Supreame doesn't say, oh, great,

5    we're going to go arrest Mitch McConnell like we planned just

6    a couple of days ago, he says, why are you going there?  And

7    Mr. Brock doesn't say, well, don't you remember we planned

8    out we're going to take over the government?  He says, I

9    don't know, I think it's going to be a significant day, I

10   want to be there, and he repeats again, hopefully Congress

11   will do what's right.  He says that in that very message.

12   And so without even getting into his conduct on January 6th,

13   just based on the social media record itself, there's enough

14   evidence to find that Exhibit 910 is not a serious statement

15   of intent.

16             THE COURT:  Go ahead.

17             MR. BURNHAM:  I have one more thing.

18             THE COURT:  Just reading those exhibits.

19             MR. BURNHAM:  I think it's a useful other way to

20   think about this is, if Exhibit 910 was serious, you know,

21   what would we have expected to see?  We would have expected

22   to see Mr. Brock making, you know, contact with other people

23   that could help him, we would have expected to see him

24   assembling some kind of assault force, making plans to go

25   arrest Mark Zuckerberg, making plans to cut off the power to

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A417

355

1    Dem cities.  I mean, if it was a serious thing you'd expect

2    some followup and there's none of that, there's absolutely

3    none, it's two military buddies getting out of hand getting a

4    little too angry about an election that didn't go their way

5    and it stopped there and that's as far as it went.

6              THE COURT:  So what do you think, what's your

7    explanation for a Facebook communication on the 1st of

8    January, "Help is on the way, 6 January 2021, storm the

9    castle."

10             MR. BURNHAM:  Well, storm the castle is a hashtag,

11   you can see that's in there, means it was something sort of

12   circulating on social media and so to ask what he meant by

13   it --

14             THE COURT:  So what's it mean for him to put that

15   in there?

16             MR. BURNHAM:  Well, we can tell what it means from

17   his conduct, from his conduct that day, I'll go through it

18   just the way the Government did, is if he went in there and

19   was one of the ones that was breaking the windows, that was,

20   you know, screaming we're going to hang Mike Pence, well,

21   then maybe you'd say storm the castle meant something

22   sinister, but given the way he did that, storm the castle was

23   just a reference to the January 6th rally, that's all it is.

24             THE COURT:  So, wasn't he committed to take action

25   on January 6th to keep President Biden ultimately from

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A418

1    becoming President?

2         MR. BURNHAM:  Action by supporting the Congressmen

3    and Senators in objecting to the count, that was the action

4    that he intended.

5         THE COURT:  By supporting Congress.

6         MR. BURNHAM:  Yes, the Stop the Steal Rally was a

7    rally in support, and the President, you know, his comments

8    dovetail with this exactly, it's a rally in support of the

9    Senators and Congressmen that intended to object to the

10   certification.  And Agent Glavey acknowledged that that was

11   well known leading up, Congressmen and Senators were saying

12   there are problems with the vote, we have meritorious

13   objections to these states and Secret Service planned out

14   exactly how they were going to accommodate the extensive

15   debate that they knew was going to have to take place.

16        THE COURT:  And supporting Congress was what he

17   meant by the second American Revolution?

18        MR. BURNHAM:  Well, I think that's something that

19   your Honor can conclude was overheated rhetoric.  I think

20   it's not being, trying to have it both ways to draw a

21   distinction between when he seems to be being serious, when

22   he's saying, I hope Congress can fix this, I've read about

23   fraud and when he's saying, oh, hey, it's going to be 1776,

24   we're all patriots, we're going to have a resolution, I don't

25   think he's trying have it both ways to make a distinction

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A419

1   between venting on Facebook about how much you think, you

2   know, how disappointed you are in the election versus serious

3   statements that have some plausible connection to his later

4   actions, that's the distinction that I would make.  If

5   there's a statement on social media that has some reasonable

6   relation to his later action, it was meant as a serious

7   statement; if there's a statement that's both a little crazy

8   on its face and has no reasonable relation to his later

9   actions, I think the court can conclude it's just venting on

10  Facebook.  That's the distinction that I've tried to make

11  throughout this.

12          And we sort of, we sort of, I got into this a

13  little bit in response to your Honor's questions but I did

14  want to draw the Court's attention to the evidence that's in

15  the record about how the Electoral College was supposed to

16  function because that becomes important.  And this came from

17  a couple sources but the Secret Service agent was one, is

18  that, as I already alluded to, there was a process there.

19  Congress and senators were supposed to object to states, that

20  wasn't a nefarious thing, that's, happens every four years,

21  it's the way it's supposed to work.  Having opinions that

22  there was fraud in 2020 is not per se corrupt, I mean we can

23  get into the basis for it but it's not a per se corrupt

24  opinion to have.  And every witness that I questioned about

25  this confirms that objections to the vote were anticipated,

358

 1    they were perfectly normal, and even the Secret Service agent

 2    said there had been suggestions that perhaps the matter could

 3    be remanded to the states.  Obviously it was different

 4    opinions about whether that's even legally possible but she

 5    acknowledged that that was something that had been raised and

 6    that's something that the President explicitly raised at the

 7    rally.  President of the United States said that it could be

 8    sent back.  So these were all things that were in the

 9    atmosphere that were informing the words and actions of the

10    different demonstrators.

11          And that becomes important because I continue to

12    insist that the appropriate analysis does not proceed using

13    analytical category of the mob.  There was not one mob, there

14    was -- it's apparent from the video, there were many

15    different types of people there and many different

16    situations.  Some people looked like your grandfather in a

17    MAGA hat, some people were terrifying, and some people just

18    looked lost, some people were in certain situations at the

19    Capitol where there was violence and confrontations, others

20    were not.  We have to analyze the specific slice of geography

21    and time in which Larry Brock's actions unfolded to come to

22    the right legal result.  And the most significant thing is

23    there is a world of difference legally between an individual

24    who entered the Capitol at 2:12 and an individual like Larry

25    Brock that entered the Capitol at 2:24.  It sounds like a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A421

```
 1    small fact, it's not a lot of time, but in terms of legality

 2    and the situation on the ground, it makes all the difference

 3    in the world.

 4            THE COURT:  There might be a difference but does it

 5    ultimately make a difference in terms of criminal

 6    culpability?

 7            MR. BURNHAM:  I think it does, your Honor,

 8    because -- well, let me talk about the -- if it's okay with

 9    the Court I'll talk about the restricted area issue and then

10    move forward to the door, I think is what we're --

11            THE COURT:  It's your argument, as you wish.

12            MR. BURNHAM:  Just want to tee it up.

13            THE COURT:  I may divert you from time to time with

14    questions, but go ahead.

15            MR. BURNHAM:  I think your Honor asked the exact

16    right question about the restricted area.  Was there any

17    evidence that Mr. Brock -- the law absolutely does require

18    him to be on notice, there's no such thing as a secretly

19    restricted area that you could get prosecuted for violating.

20    They have to be on notice, that's clear in the cases that I

21    cited.  Not a lot of cases but the ones that exist make that

22    clear.  Secondly, in response to your Honor's question, was

23    he on notice of this, the Government couldn't point to any

24    evidence because there isn't any.  The statement from the

25    Government is there's no evidence that Mr. Brock didn't see
```

A422

360

1    the barriers and that's sort of not how this is supposed to

2    work.  The restricted area is an element they have to prove,

3    it's not something we have to disprove, but we actually did

4    do our best to disprove it in our questioning with Captain

5    Patton if your Honor recalls.  I asked him, you know, was

6    it -- did the police attempt to rebuild the barriers after

7    the demonstrators moved them out of the way and he candidly

8    admitted, no, we didn't have the manpower for that, we had

9    bigger problems we didn't do it.  And we know that Mr. Brock

10   was -- we don't know exactly how far back but we know he was

11   not anywhere close to the front of the crowd.  So even if

12   we -- even if through some burden-shifting argument we had to

13   prove --

14          THE COURT:  We know that he wasn't at the front of

15   the crowd?

16          MR. BURNHAM:  Yes.

17          THE COURT:  We don't actually know that.  It

18   depends when you identify the crowd.  We see videos of the

19   crowd moving up to the Capitol, moving up to the lower

20   terrace, and delaying there for a while with the line of

21   police, we don't know where Mr. Brock is in that group, do

22   we?

23          MR. BURNHAM:  All the evidence supports an

24   inference that he was somewhere towards the middle.  We know

25   that for several reasons.  One, the time that he entered,

A423

361

1    that's one; two, the video, the very brief video where you

2    can see his helmet, he's -- bunch of people in front of him,

3    and --

4            THE COURT:  You mean with the hand next to the

5    scaffold?

6            MR. BURNHAM:  I think that's somebody else's hand

7    but that's the video, and he's clearly towards the back and

8    so the evidence we do have supports an inference, I would

9    urge the Court, that he wasn't in a position to see the

10   initial confrontations between police or the movement of the

11   bike racks.  Certainly there's no direct evidence that he did

12   see any, all the evidence supports an inference the other

13   direction.

14           THE COURT:  Well, but where does that take one?

15   Let's say he was in the middle of a group that was pressing

16   against a police line that was trying to keep them from

17   moving forward to the Capitol, and that ultimately, that

18   group, a large group, called a mob by many, broke the police

19   line and breached it and went up to the Capitol.  Why is that

20   not clear evidence that he knew he wasn't authorized to go up

21   to and then into the Capitol?  He only got there by being

22   part of a large group that overwhelmed the police line

23   keeping them from moving forward.

24           MR. BURNHAM:  In your Honor's hypothetical --

25           THE COURT:  That's not a hypothetical.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A424

362

1          MR. BURNHAM:  Okay, well --

2          THE COURT:  What's hypothetical about what I just

3    said?

4          MR. BURNHAM:  Well, the crucial question was, was

5    he in a position to see how the crowd moved forward,

6    that's -- everything depends on that.  If there was evidence

7    that he was in a position, even if he wasn't involved, he

8    could see the confrontation, then yes, I have a serious

9    problem, but there's no evidence --

10          THE COURT:  A lot of your argument depends on

11   Mr. Brock not seeing anything that's going on around him.

12          MR. BURNHAM:  I understand that but --

13          THE COURT:  That's part of your argument about him

14   entering the Capitol, and that's now part of your argument

15   about breaching the police line preventing people from

16   getting to the Capitol.

17          MR. BURNHAM:  I'm just going from the Government's

18   evidence but I think it's only natural that the people that

19   entered at a certain period of time would, naturally that

20   would be their experience, after the initial incurgence

21   (phonetic) took place but before the police kind of got their

22   act together, it's not surprising that there was a group of

23   people who were able to enter without having any particular

24   indication of exactly what the status of the restrictions or

25   the police intent was, that shouldn't be surprising.  If he

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A425

1    came in later after the police had secured the door or after

2    they started trying to get people out, that would be a

3    different situation.  If he was in the first wave, obviously

4    that's different.  He's in the middle, so it's not surprising

5    at all that that was his experience.  I'm not surprised the

6    evidence unfolded that way.

7           THE COURT:  Go ahead.

8           MR. BURNHAM:  And so I think we analyzed the video

9    of him entering pretty thoroughly in the Rule 29 arguments

10   and I incorporate that now but I just --

11          THE COURT:  I'll go back and look at it.  I have

12   not gone back and looked at it because I don't have access to

13   it back in my chambers but I will be, at the conclusion of

14   this argument, I will be asking that that exhibit be played

15   again.

16          MR. BURNHAM:  Absolutely, yes, absolutely reviewing

17   it is something we're happy to hear the Court's going to do

18   and the facts I think that are crucial are the large number

19   of people proceeding through the door compared to the

20   relative handful that go through the window and the relative

21   orderly manner in which the individuals entering through the

22   door go through.  Mr. Brock's body language and expression

23   don't indicate that, you know, he's not sitting there looking

24   around, what's that guy doing, what's that guy doing.  For

25   whatever reason, he's straight ahead, and then he turns and

364

1    he leaves.  We think that's highly significant.  As an aside,

2    I don't know that it particularly makes the area restricted.

3    We maintain there's no evidence he saw the people going

4    through the window but I don't know if it converts it to a

5    restriction if he did.  It just means certain people there

6    were breaking the law that aren't Larry Brock.  Maybe that's

7    relevant to Count One when I get to it but it's not a

8    restricted area if that happens, but again, I absolutely

9    think the evidence supports an inference that he had no

10   opportunity to see those people and he was at that point

11   proceeding in an orderly manner through the door with many

12   others.

13           THE COURT:  So let me go back to something that you

14   said earlier, that's sort of part of your theme that the

15   reason Mr. Brock went to the Capitol, I take it that this is

16   your theme that the reason why Mr. Brock went to the Capitol

17   was to support Congressional action to deny certification of

18   the election, right?

19           MR. BURNHAM:  Yes.

20           THE COURT:  So why did he go into the Capitol?  How

21   is that actually helping Congress to certify or not certify

22   the election?  How was his going into the Capitol and

23   wandering around in the Capitol helping Congress to do that?

24           MR. BURNHAM:  As a show of support to the objecting

25   Senators and Congressmen.  I mean, that was the point of Stop

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A427

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 430 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 145 of 166

365

1    the Steal in a way if, based on what we've seen in the

2    evidence is the Stop the Steal, the very name evokes the

3    intention to remedy fraud.  The President's remarks, to the

4    extent they've been in the record, very much are along with

5    that theme.  It was a show of political support for the

6    Congressmen and Senators who might be on the fence as to

7    whether to object or support objections.

8             THE COURT:  That's true of attending the Stop the

9    Steal Rally, of marching to the Capitol, even demonstrating

10   in vast numbers around and outside the Capitol.  But why is

11   that true of entering and wandering through the Capitol

12   including going to all these closed areas in the Capitol?

13            MR. BURNHAM:  Because --

14            THE COURT:  Why is that supporting Congress?

15            MR. BURNHAM:  I mean, I'll answer your question,

16   putting aside questions about was it smart, was it well

17   advised, what was he thinking.

18            THE COURT:  We don't prosecute, have people

19   prosecuted and convicted of crime because they're not smart,

20   although there's an element of criminal stupidity sometimes,

21   but I'm not saying that's true here.

22            MR. BURNHAM:  I mean a thousand times he should

23   have just turned around and left, however pure his

24   intentions, but I think it's only natural that if the object

25   of the protest centered on Congress, the demonstration, the

                    JODI L. HIBBARD, RPR, CRR, CSR
                         (315) 234-8547

A428

366

1    protest, the show of support, it's only natural if the doors

2    are open, that some of the protest activity would take place

3    inside the building.  The captain testified that that's, to

4    the extent possible, consistent with security, that Congress

5    is not the NSA, it's supposed to be somewhere where

6    individuals can to a certain extent petition their elected

7    representatives, designated First Amendment areas right

8    there, it's not outlandish that the demonstration and the

9    show of support might take place inside the building.

10            THE COURT:  So I take it that your argument is not

11   that there's evidence that supports the proposition that

12   Mr. Brock thought he had authority to enter the Capitol.

13   It's just that your argument is that it's the government's

14   burden to prove that he knew he didn't have authority.

15            MR. BURNHAM:  That's right.  I mean, the record is

16   silent on, you know, his, exactly what he was thinking, the

17   Government's burden to prove his intent, the Government's

18   burden to prove the restrictions.  I think the reasonable

19   inferences about his behavior was that he was there to

20   support the President and he seems to have been engaged in

21   political activity inside the Capitol in absolutely the most

22   respectful manner he possibly could for reasons I'll get

23   into.  I think that's what we can say about his behavior.  As

24   to whether, you know, exactly what he thought about why there

25   weren't metal detectors or exactly why the door was left

A429

```
 1   open, the record is silent on those, but the reasonable
 2   inferences that can be drawn are that whatever he was
 3   thinking, it wasn't wrongful, it wasn't corrupt, it wasn't,
 4   I'm going against the police, it wasn't, I want to obstruct
 5   and interfere with government business.  Those are really the
 6   crucial questions, is there evidence that he had those bad
 7   thoughts in his head that criminal offenses require.
 8            THE COURT:  It also requires to a certain extent a
 9   belief that he wore what he wore in order to protect himself
10   against counter-demonstrators.  Right?
11            MR. BURNHAM:  That's right.  And I hope that the
12   Government's witnesses who largely agreed with me on that --
13            THE COURT:  No, no, didn't agree with you on why he
14   wore what he wore, they agreed with you on the fact that
15   there had been some clashes in other circumstances between --
16            MR. BURNHAM:  That's right.
17            THE COURT:  -- pro- and anti-Trump demonstrators.
18            MR. BURNHAM:  I mean Sergeant Timberlake, for
19   example, agreed, okay, there's someone in a bike helmet,
20   there's someone in some other kind of helmet, several
21   witnesses agreed there had been such clashes where hard
22   objects were thrown.  It supports an inference that that
23   likely was why he was dressed in that manner.  Now if he was
24   jousting with police, well, maybe we could say, well, no, I
25   think he had that because he was ready to rumble, but the
```

368

1    evidence is the opposite way.  So I think the best evidence

2    is it had been a rough year for protests and he wore personal

3    protective equipment appropriate to those risks.

4            THE COURT:  I'll have to review the Facebook

5    communications to see whether they support the view that he

6    was going to be wearing this kind of gear only to protect

7    himself from counter-demonstrators.

8            MR. BURNHAM:  One last thing on the entry video is,

9    we think the video, upon careful review, supports our

10   position but to the extent there's any doubt in your Honor's

11   mind about, well, maybe he saw that glass there, I think

12   maybe he, if you -- anything like that, it has to be

13   considered not only in the four corners of the video but in

14   light of the whole picture including the conduct I'm about to

15   evaluate once he gets into the building, that's the way I

16   look at it.

17           And specifically what I'm referring to there is the

18   question is, I guess the Government's contention is he would

19   have had to have seen people going through the window and he

20   said, oh, I guess that means the building is restricted, but

21   you know what, I'm not only not going to pay any attention to

22   the guys going through the window, I'm just charging in

23   myself, no matter what.  And so the question that poses for

24   the court is, is that consistent or inconsistent with the

25   rest of his behavior in the building.  And really the first,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A431

369

1    the first opportunity that he would have had to manifest a
2    wrongful or contrary intention, corrupt intention, intention
3    to be against law enforcement restrictions or anything like
4    that was the situation in the hall with Officer Timberlake.
5    And we take a different view from the Government on that.
6    The Government presented it as inculpatory situation, we
7    think it's exculpatory for obvious reasons and one less
8    obvious.  The less obvious one is if you watch the video
9    again or you'll recall it, Mr. Brock wouldn't have been in a
10   position to see the initial confrontation, the assault, the
11   officer said he was hit in the back of the head.  And that
12   took place, as you can see in the video, by the door, you
13   know, 10 or 20 yards from the metal detector.  At the time
14   when Mr. Brock enters the scene, that confrontation has
15   already kind of stopped and the combatant, so to speak, not
16   Officer Timberlake but his colleague had moved down toward
17   the metal detector and when Mr. Brock comes in, it's from
18   another part of the Capitol and what, the first thing he sees
19   is the other officer whose name I forget with fists raised
20   and then he sees the guy wearing the weird uniform, he's got
21   his fists raised, and that's the first thing he sees.  So he
22   doesn't know what led up to it and he doesn't even really
23   know that the individual, the officer there was in fact an
24   officer.  They, your Honor recalls, they were wearing blazers
25   and slacks and I think the officer said he had on a tie and I

A432

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 435 of 609
Case 1:21-cr-00140-JDB    Document 80    Filed 12/06/22    Page 150 of 166

370

1    didn't specifically ask him this but I didn't even see a
2    badge, at least not any kind of prominent badge.  So those
3    individuals, I guess you could say they probably weren't
4    demonstrators just based on their attire, maybe, who knows
5    but they could easily have been congressional staffers, some
6    kind of non-law enforcement security personnel, maybe even
7    politicians, based on what the video shows.  So at any rate
8    all we can show from the video is that some official-looking
9    person was squared off with a person that looked like he
10   probably was a protester, perhaps even one of the malefactors
11   in the crowd.  And Mr. Brock immediately, without even
12   thinking about it, comes in and defuses the situation, calms
13   them down, says that's not what we're here for, you know,
14   that's the way he reacted.  And if, and if -- that's
15   completely inconsistent with the Government's contention that
16   he saw people going through the windows and said, you know
17   what, I don't care, I'm charging in, you know, broken
18   windows, who cares?  It's totally inconsistent, and that's
19   just the first example.
20           THE COURT:  I'm not so sure it's totally
21   inconsistent.  I think avoiding confrontation, physical
22   confrontations with the police, with law enforcement is
23   consistent with what the Facebook communications indicate was
24   part of his thinking and plan all along.  That those kinds of
25   confrontations and injuries to law enforcement would

A433

1    interfere with the IO war that he was trying to successfully

2    complete.  So trying to avoid, excuse me, physical

3    confrontation with law enforcement could be perfectly

4    consistent with his effort to enter the Capitol in order to

5    prevent Congress from certifying the election.  There's no

6    inconsistency there at all.

7         MR. BURNHAM:  Well, I guess it depends on exactly

8    what interpretation one gives the Facebook messages, if we're

9    taking Exhibit 910 literally and he's there to take hostages

10   of Mitch McConnell, then he absolutely would have been.

11        THE COURT:  I'm not saying that.  But just on the

12   IO, wouldn't you agree that part of his messaging in the

13   Facebook communications was, particularly in the

14   conversations with Beaf Supreame, was to avoid physical

15   confrontation and injury to law enforcement?

16        MR. BURNHAM:  I think --

17        THE COURT:  To have injuries to law enforcement

18   would interfere with and detract from their IO war.

19        MR. BURNHAM:  Well, I think it was genuine but I

20   think that was a secondary purpose.  Certainly when he

21   explicitly says that this is an IO war, he says that later on

22   the floor of the Senate, that's right, but that's all the

23   more reason he wouldn't have approved of people charging

24   through broken windows.  That's, if anything, worse than

25   having words with a police officer.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A434

372

 1          THE COURT:  Well, that's not, that's not -- having

 2     words is not the same as injuring the police officers.  But

 3     having words leads to possible confrontation, but anyway,

 4     we're probably digging too deeply into that.

 5          MR. BURNHAM:  Well, one final point because I think

 6     it is a relevant question is if part of his mentality there

 7     is I want to win the IO war, meaning I don't want Trump

 8     supporters, patriots looking bad, he absolutely would not

 9     have approved of people coming in through the window.  That

10     would be absolutely opposite of what winning the IO war would

11     be.  That's terrible and that's exactly how it's played out,

12     is those footages are now iconic of everything that was wrong

13     with January 6th.  And that's exactly what he explicitly

14     was -- any kind of property destruction, this is what he

15     specifically says on the balcony of the Senate, nobody breaks

16     anything, we're patriots, be respectful.  So all the evidence

17     is that, even taking IO war comments into account, that

18     breaking windows, going through windows was anything he would

19     have approved of.

20          THE COURT:  All right.

21          MR. BURNHAM:  Court's indulgence.

22          THE COURT:  Certainly.

23          MR. BURNHAM:  As to the -- as to the statement on

24     the floor of the Senate, the Government is presenting his

25     comments to the man in the chair as aggravating.  Maybe the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A435

Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 153 of 166

373

1    quotes that they pulled out were sort of out of context from

2    that video.  The video speaks for itself.  The Government is,

3    you know, they're making their case and so they're casting

4    Mr. Brock's actions a certain way.  Instead of walking to the

5    Capitol, they say he's marching to the Capitol; instead of

6    walking around the Capitol, they say he's maneuvering around

7    the Capitol, that's their theme of their case.  But the full

8    quote of the Senate floor is, if I can, I think I can quote

9    it from memory at this point, is, get out of that chair,

10   that's not our chair, that belongs to the Vice President of

11   the United States.  I love you guys, we're brothers, but we

12   can't be disrespectful.  That was the full quote.  Not the

13   parts the Government pulled out.

14           And I'll do a little digression here is that, Agent

15   Moore offered some testimony on this, is if there was anybody

16   that was gonna be in a bad odor that day with some segments

17   of the demonstrators, it was the Vice President Pence for

18   political reasons.  So if there was a time when any kind of

19   ill will towards politicians was gonna come out, it was going

20   to have to do with the Vice President, and you saw the

21   absolute opposite reaction from Mr. Brock.  We have to show

22   respect to the Vice President.  And I think your Honor asked

23   the exact right questions on the key issue.  I mean, if there

24   was a reason to believe that someone told him the Vice

25   President was in there, that would be a totally different

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A436

374

1    case but that's not what we have.  It might have been a

2    boneheaded move to try to go in a locked door, but it's not

3    indicative of any particular purpose.  I mean it said U.S.

4    Senate, it didn't say secret office, didn't say hiding place

5    or anything.  It was an ill-advised thing for him to do.

6            And so what is the role of law enforcement here?

7    If we can step back, it's a fact that can kind of get hidden

8    in all these videos that sort of have to be pieced together,

9    is based on my review of the evidence, from about 2:37 p.m.

10   which was the scene at the Rotunda door where there were

11   three officers there, till around 2:55, if you don't count

12   Sergeant Timberlake and his colleagues who were dressed in

13   plain clothes, even they -- I'll come back to that.  If you

14   don't count those gentlemen, Mr. Brock didn't encounter any

15   law enforcement at all for that entire time period.  And even

16   if, even if the supposition is maybe he would have known

17   Officer Timberlake and his colleagues were law enforcement,

18   the officer didn't testify to giving any particular

19   directives to Mr. Brock.  He didn't testify he said this is

20   an unlawful assembly, you guys need to get out or anything

21   like that.  So there was no law enforcement interaction for

22   almost 20 minutes, and the one possible exception to that

23   didn't involve any particular directives, and this is -- the

24   case is on 1752 and this is relevant to 1512 as well.  It's a

25   total game changer if an officer tells you you're not

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A437

1   supposed to be here, get out, that would be a totally

2   different situation, and we don't have that.

3          And the first significant law enforcement

4   interactions we have come towards the end, and there are two

5   of them, one of which has no sound, but actions, you know,

6   speak louder than words sometimes.  And what I'm referring to

7   is first there's the -- I think the Government presented in

8   the opposite way but I think this one comes first is there's

9   a video where Mr. Brock is walking down a long hallway and

10  there's probably about ten or a dozen members of the police

11  walking around.  He's got his flex cuffs and as came out in

12  questioning, he's not trying to hide them, he's not like

13  trying to, you know, put them in his jacket or anything, so

14  he walks by the police and at first police don't pay him any

15  mind at all, you can't even see a police officer even

16  noticing him.  He's not a police officer, that's obvious.  He

17  just walks right by and then ultimately an officer comes out

18  and you can't hear what he says but he seems to be giving

19  Mr. Brock directives.  You can see him moving and Mr. Brock

20  turns directions, goes back the other way.  So I think the

21  reasonable inference is that police officer said, no, you got

22  to go this way, probably to get out of the building.  And I

23  say that in part because of the final vignette when he does

24  exit just a few minutes later.

25          But before I get to that I'll make a brief comment

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A438

1    on the Officer Humphrey video which is around this time, I

2    think it's like one minute later, and that actually does have

3    sound because there's -- it's the body worn camera.  And so

4    there you see him walking down and, you know, he didn't

5    testify so this isn't presented great in the record, but

6    Agent Moore agreed certain aspects of the military can cause

7    hearing loss in older men, and aviation, I think our common

8    experience tells us that could be it.  So to the extent

9    that's in the record, that's something the court can think

10   about, but then even added to that is Mr. Brock's body

11   language there.  He's looking down, it looks like he's

12   looking at his phone, he never looks at the officers even

13   once and he continues walking down the hallway.  The officer

14   agreed he didn't run and I would suggest, I didn't even see a

15   change in pace after the officers called out to him.  You

16   know, it was a noisy situation in there, you can even hear

17   that a little bit in the body worn camera and the officer,

18   two of the officers start to go down the hall after him but

19   when they're still about 20, 30 feet away in my estimation,

20   they just stop and leave.

21          So I don't think there's any inference there that

22   he was disregarding law enforcement, especially not for the

23   video just a couple minutes later has him exiting, seemingly

24   under the supervision of multiple law enforcement officers in

25   an orderly way.  And as I've already commented upon, he sort

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A439

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 442 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 157 of 166

377

1    of calms down the guy that seems like he was, if at least not

2    physically interacting with law enforcement, not leaving and

3    he seemed like he was giving them some lip.  And Mr. Brock,

4    using his size, his command presence as has been commented

5    upon, pats that guy on the shoulder, turns him around and

6    they go out together peacefully.  This was before the

7    President told everybody to leave, this was before the

8    Electoral College result had been decided.  There's no

9    evidence that he had to be forced out, and so I think that

10   voluntary departure before the issue had been settled speaks

11   volumes, especially in connection with everything else about

12   his -- about his actual intent there that day combined with

13   everything else.

14            So I keep repeating that all the evidence has to be

15   viewed together because I sound like a broken record perhaps

16   but I truly, strenuously contend that if you look at the arc

17   of the whole story, starting with the Facebook messages

18   through his whole conduct, his true intent emerges,

19   especially when you add in the one thing I haven't mentioned,

20   which is his personal -- his history and personal

21   characteristics.  Now we're not in a sentencing hearing, this

22   is a criminal case but 1512, Count One, has an elevated mens

23   rea from most other criminal offenses and we can understand

24   why that would be.  It criminalizes attempting to influence

25   official proceedings.  If there wasn't some kind of elevated

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 443 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 158 of 166

378

1    mens rea, that would be an extremely problematic statute for

2    our civic life.  Mr. Brock had to know that his conduct was

3    corrupt, meaning wrongful.  So he doesn't have to know he was

4    violating 1512, but he had to have the specific intent to act

5    in a wrongful way and we submit that all the evidence shows

6    that, misguided though other people may think he was, he

7    absolutely believed that he was acting in an upright way in

8    accordance with the law and in accordance with patriotism,

9    out of respect for law enforcement.  And I absolutely think

10   it's appropriate for your Honor to take into account what's

11   come into evidence about his military record and ask, is it

12   the best view of the evidence, is there proof beyond a

13   reasonable doubt that this individual who, throughout the

14   late '80s, '90s, throughout the whole war on terror, through

15   multiple combat deployments, chose to serve this country in

16   defense of Democracy as he understood it in defense of our

17   institutions, he clearly took great pride in his service,

18   even to the point where he still had, even as a 50-year-old

19   man, the patch from his old unit there, I think that's highly

20   relevant and should be taken into account when asking the

21   question of, is this someone who was acting wrongfully, who

22   knowingly was doing the wrong thing.

23            THE COURT:  To take it into account and lead to the

24   conclusion you wish me to reach does require that I also give

25   the Facebook communications the interpretation that you urge

379

1    that I employ.

2            MR. BURNHAM:  Yes, your Honor.

3            THE COURT:  And not take many of them seriously.

4            MR. BURNHAM:  Yes, your Honor.  I can only repeat

5    what I think is the most sensible view is look at the

6    Facebook communications and in light of, both on their face,

7    is this something that's kind of absurd, and is it consistent

8    or inconsistent with later conduct.  That's the way to

9    separate what's significant in the Facebook record from

10   what's not.

11           THE COURT:  All right.  Anything else?

12           MR. BURNHAM:  Thank you, no, that's all I have.

13   Thank you, your Honor.

14           THE COURT:  Thank you, Mr. Burnham.

15   Ms. Ayers-Perez, I'll hear from you in rebuttal, briefly.

16           MS. AYERS-PEREZ:  Thank you, your Honor.  In

17   response to a few of the points Mr. Burnham makes, the first

18   being about the restricted area and the grounds, once again,

19   we heard from Captain Patton what that looked like, and even

20   though people have gone through and of course breached that

21   perimeter in some areas, certainly bike racks on the ground,

22   snow fencing on the ground, signs on the ground as people

23   have gone past them are still there, but it's not in all

24   areas.  But what is really noting -- or that I've taken note

25   of about what Larry Brock is wearing on January 6th is that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A442

USCA Case #23-3045   Document #2007100   Filed: 07/10/2023   Page 445 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 160 of 166

380

1    Mr. Burnham speaks about counter-protesters and Larry Brock

2    was at the Stop the Steal Rally and he was there and he had

3    bought his combat gear, his helmet, he bought the tactical

4    vest prior to coming up there, but he's not wearing the

5    helmet when he's at the Stop the Steal Rally, which is where

6    you would encounter counter-protesters such as, I believe

7    Mr. Burnham mentioned Antifa or Black Lives Matter mentioned

8    earlier.  He's not wearing his helmet and in fact when you

9    see the still shot in the video of him walking down

10   Constitution Avenue towards the Capitol, he's still not

11   wearing his helmet.  It's when he's next to the scaffolding

12   already on the Capitol, on the west side of the Capitol that

13   he's now put his helmet on.  And so that tactical gear, the

14   combat gear that he brought to Washington, D.C., he didn't

15   wear it to the protest, the helmet, he wears it to go inside

16   the Capitol building, which was his whole purpose for being

17   there that day.

18          And Mr. Burnham mentions the defendant was

19   supporting Congress.  Well, Congress is trying to do a job

20   that day.  If the defendant is supporting Congress, Congress

21   has to stop because the defendant and others are entering

22   into the Capitol building illegally without any sort of

23   making sure there's any sort of security concerns or that

24   he's gone through any sort of security measures to get in.

25   Congress can't do their job which -- because the defendant is

1    inside of there.  And if you're trying to help Congress,

2    you're not going to go into Congress in combat gear and think

3    that you're going to make a difference.  Larry Brock doesn't

4    actually think that.  He's on the Senate floor where the Vice

5    President should be conducting business and he knows that,

6    because, as we've seen in the video, he's telling people this

7    is the Vice President's chair right there.  He knows that the

8    Vice President is supposed to be there that day.

9            And so much of Larry Brock's Facebook rhetoric,

10   much of which we see actually come to fruition on January 6th

11   when he says, I want to actively rebel, I'm going to buy this

12   combat gear, storm the castle.  What else could that mean on

13   January 6th other than go into the Capitol building which is

14   what he did?  All of that comes to fruition, the Facebook

15   post at 9:10, the one from the Christmas Eve where he's

16   talking about the list of what he wants to have happen is

17   supposed to take place if nothing happens on January 6th.  If

18   Congress certifies the vote on January 6th.  He was arrested

19   four days later afterwards.  We don't know what else he would

20   have done, but that message was not for what was going to

21   happen on January 6th, it says at the top, this is what

22   happens if Congress fails to act on January 6th.

23            And you know, to Mr. Burnham's point, to not

24   understand that there's a restricted perimeter, he would have

25   had to miss all the signs, the snow fencing, the bike racks,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A444

 1    had to have missed people going into windows, had to have

 2    missed the broken door, had to have missed the broken glass

 3    on the ground, had to have missed the fact that the entire

 4    mob is with him, had to have missed the fact that he wasn't

 5    going through security, it doesn't make sense.

 6            THE COURT:  And have to miss the police lines that

 7    were holding the mob back.

 8            MS. AYERS-PEREZ:  Yes, and in one of the photos

 9    taken from the defendant's phone in the 300 series and I can

10    give you the exact number, your Honor, I believe it's 315 --

11    yes, okay, 315, the defendant takes a photo on January 6th on

12    the west side of the Capitol near the Senate Wing Doors while

13    still outside the Capitol and there are two police officers

14    standing outside one of the doors in his photo.  He has the

15    photo right there on his phone and it shows officers standing

16    outside another door while he's still outside the Capitol and

17    hasn't entered yet.  So he would have had to miss the photo

18    that he took himself as well.  This was a clearly restricted

19    area that he went into, the building, he shouldn't have been

20    in there, there's sign after sign inside the building in the

21    sense that there's officers at the door, there are doors

22    broken, windows broken, there's Sergeant Timberlake being

23    assaulted by fellow rioters, and still he continues on and

24    continues on to the Senate floor.  And he only left after he

25    achieved his mission of going on the Senate floor, being

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A445

USCA Case #23-3045     Document #2007100          Filed: 07/10/2023     Page 448 of 609
Case 1:21-cr-00140-JDB   Document 80   Filed 12/06/22   Page 163 of 166

383

1    there, walking around, looking at desks of what Senators have

2    on the Senate floor and paperwork that's there on the Senate

3    floor and it's only after all of that that he finally leaves

4    the Capitol building.

5              And lastly, your Honor, Mr. Burnham mentioned that

6    Larry Brock had the most respectful manner he could when he

7    went into the Capitol and there on the Senate floor and I

8    would surmise that that's absolutely not true.  He broke into

9    the Capitol building, he went into -- onto the Senate floor,

10   and although he did tell people on the Senate floor to be

11   respectful, the fact that he was there, the actions that he

12   took to get there are not respectful at all to Congress, to

13   the Vice President, to this country, and to what he did.

14   That's all I have, your Honor.

15             THE COURT:  All right.  Thank you.  Okay.  It's

16   4:00.  The one thing I would like to do before we adjourn for

17   the day -- we're going to come back tomorrow morning, I'm not

18   going to try to pack in resolution of the case here this

19   afternoon.  We'll reconvene tomorrow morning, but the one

20   thing I would like to do is I'd like to look at the evidence,

21   that video of the entire video that's in evidence of his

22   entry into the Capitol.  I don't want just the still shot or

23   a portion of it, I want to see the whole thing.

24             MS. AYERS-PEREZ:  We can play it right now if you

25   want.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A446

384

 1              THE COURT:  That's what I want.  Yeah.

 2              MS. AYERS-PEREZ:  Okay.

 3              THE COURT:  Thank you.  I wasn't asking to take it

 4     back there.  And refresh me, what exhibit number is it?

 5     You're going to have to figure that out to pull it up.

 6              MS. AYERS-PEREZ:  It's 411.

 7              THE COURT:  411, okay, thank you.

 8                   (Government's Exhibit 411 playing.)

 9              THE COURT:  All right, that's at 2:24:27.  Would

10     you also pull up the video of the actual breaking of the

11     windows.  There's another exhibit that covers those and I'd

12     like to see the time.

13              MS. AYERS-PEREZ:  Your Honor, this is 401, and I'm

14     sorry, starting at 6 minutes 28 seconds.

15                   (Government's Exhibit 401 playing.)

16              MS. AYERS-PEREZ:  Your Honor, this is the second.

17              THE COURT:  This is after Mr. Brock's already in?

18              MS. AYERS-PEREZ:  Correct, this is four minutes

19     later.

20                   (Government's Exhibit 401 playing.)

21              THE COURT:  All right.  Okay.  Thank you.  We can

22     start at 10:00 if you'd rather start at 10:00, give

23     yourselves a little extra shuteye.  So let's be back at 10:00

24     and I think you'll be hearing from me at 10:00 tomorrow

25     morning rather than me hearing from you.  Thank you very much

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A447

385

1    for the presentation.  You should make sure in checking with

2    Mr. Bradley with respect to all the exhibits that we have all

3    the exhibits straight and in the record so that we have a

4    complete record to consider.  And with that, I will see you

5    all in the morning.  Thank you.  Do you have the originals of

6    the stipulations?

7              THE CLERK:  I think you have them.

8              THE COURT:  I have them.  I'll hold them for now.

9              THE CLERK:  Okay.

10                   (Court Adjourned, 4:09 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A448

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5   Official Realtime Court Reporter, in and for the

6   United States District Court for the Northern

7   District of New York, DO HEREBY CERTIFY that

8   pursuant to Section 753, Title 28, United States

9   Code, that the foregoing is a true and correct

10  transcript of the stenographically reported

11  proceedings held in the above-entitled matter and

12  that the transcript page format is in conformance

13  with the regulations of the Judicial Conference of

14  the United States.

15

16                   Dated this 27th day of November, 2022.

17

18

19                        /S/ JODI L. HIBBARD

20                        JODI L. HIBBARD, RPR, CRR, CSR
                          Official U.S. Court Reporter
21

22

23

24

25
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A449

                        VOLUME III
UNITED STATES  DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                          21-CR-140

LARRY RENDALL BROCK,

                        Defendant.

-------------------------------------------x

     Transcript of a Bench Trial held on

November 16, 2022, at the E. Barrett Prettyman U.S.

Courthouse, 333 Constitution Avenue, N.W.,

Washington, D.C., the HONORABLE JOHN D. BATES,

Senior Judge, Presiding.

               A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF TEXAS
                    11204 McPherson Road
                    Suite 100a
                    Laredo, Texas  78045
                      BY:  APRIL AYERS-PEREZ, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    1331 F Street, N.W.
                    Washington, D.C.  20005
                      BY:  BARRY KENT DISNEY, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    Narcotic & Dangerous Drug Section
                    145 North Street, N.E., Suite 2300
                    Washington, D.C.  20530
                      BY:  DOUGLAS MEISEL, ESQ.

For Defendant:      BURNHAM & GOROKHOV, PLLC
                    Attorneys at Law
                    1424 K St., N.W.
                    Suite 500
                    Washington, D.C.  20005
                      BY:  CHARLES BURNHAM, ESQ.

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 453 of 609
Case 1:21-cr-00140-JDB   Document 81   Filed 12/06/22   Page 2 of 32

387

```
 1                (Open Court, 10:03 a.m.)
 2            THE CLERK:  Your Honor, we have criminal action
 3   21-140, United States of America versus Larry Brock, and all
 4   counsel are present.
 5                THE COURT:  All right.  Good morning to everybody.
 6                MR. BURNHAM:  Good morning, your Honor.
 7                THE COURT:  It's now my responsibility to rule on
 8   certain things.  Under Criminal Rule 23, specifically 23(c)
 9   for a nonjury trial, I'm obliged to find whether defendant is
10   guilty or not guilty on each of the charged offenses.  That
11   rule also provides that, if a party requests, then the Court
12   must state its specific findings of fact in open court or in
13   a written decision or opinion.  No one's requested it, but
14   I'm going to do it anyway and give you a fairly fulsome
15   review of the case in ruling on what is my responsibility to
16   rule on, which is resolution of the Rule 29 motion and, if
17   that is denied, then addressing the defendant's guilt or
18   innocence on each of the charges.
19                Now many motions and cases turn on resolution of
20   factual issues.  This case does not.  There's little dispute
21   as to what Mr. Brock said and what he did on January 6th,
22   2021.  The question is more what his statements and conduct
23   mean and did his conduct on January 6th violate the law.
24   These are largely questions of his intent and whether he
25   acted knowingly in certain contexts.
```

1          I will say as I begin that for the most part, I

2     reject the, what I'll call the innocent interpretations

3     offered by the defense with little evidence in the record to

4     support those positions.

5          So first with respect to Rule 29, Rule 29(a) of the

6     Federal Rules of Criminal Procedure provides that "[a]fter

7     the government closes its evidence or after the close of all

8     the evidence, the Court on the defendant's motion must enter

9     a judgment of acquittal of any offense for which the evidence

10    is insufficient to sustain a conviction."  Now I will treat

11    the Rule 29 motion as it was made, which was at the close of

12    the government's case, and as renewed at the close of the

13    defense case, which consisted only of the introduction of a

14    couple of exhibits.  When ruling on a motion for judgment of

15    acquittal, the Court must "consider[] the evidence in the

16    light most favorable to the government and determin[e]

17    whether, so read, it is sufficient to permit a rational trier

18    of fact to find all of the essential elements of the crime

19    beyond a reasonable doubt."  And that's a quote from *United*

20    *States v. Kayode*, 254 F.3d 204, jump cite 212-13, D.C.

21    Circuit 2001, which itself is quoting *United States v.*

22    *Harrington*, 108 F.3d 1460, jump cite 1464, D.C. Circuit 1997.

23    The Court must "accord[] the government the benefit of all

24    legitimate inferences" and deny the motion if "any rational

25    trier of fact could have found the essential elements of the

A452

389

1    crime beyond a reasonable doubt." *United States v. Jabr*,

2    Criminal Number 18-0105, 2019 WL 13110682, at *3, D.D.C.

3    case, May 16, 2019.  That itself quotes *United States v.*

4    *Weisz*, 718 F.2d 413, jump cite 437, D.C. Circuit 1983, and

5    *United States v. Arrington*, 309 F.3d 40, jump cite 48, D.C.

6    Circuit 2002.

7            "The same standard guides a district court in

8    resolving a Rule 29 motion whether in the context of a bench

9    or jury trial." *Jabr*, at *4.  At the moment of deciding a

10   motion for judgment of acquittal, "this Court is not the

11   trier of fact," *United States v. Recognition Equipment, Inc.*,

12   725 F.Supp. 587, jump cite 588, n.1, D.D.C. 1989.

13   Accordingly, the Court is not yet stepping into the jury's

14   shoes to assess the defendant's guilt or to make any findings

15   about witness credibility but, rather, is "simply applying a

16   legal standard to the government's evidence." *United States*

17   *v. Recognition Equipment*, 725 F.Supp. at 588, n.1, that same

18   citation.

19           The Court will deny Brock's motion for judgment of

20   acquittal.  I conclude that the Government presented

21   sufficient evidence such that a rational fact finder could

22   find beyond a reasonable doubt that all elements of each of

23   the charges against Brock have been met.  For the sake of

24   brevity, however, the reasons for the Court's denial of the

25   Rule 29(a) motion for judgment of acquittal are the same as

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A453

390

1    the reasons the Court will give in its findings and

2    conclusions in deciding the case and the guilt or innocence

3    of Mr. Brock.  And that's consistent with the approach in

4    *United States v. Rivera*, Criminal Case Number 21-060, ECF

5    Number 63, taking the same approach in denying a Rule 29(a)

6    motion in another January 6th case.

7            Here, in early January 2021, Mr. Brock traveled

8    from Texas to Washington, D.C. where he participated in the

9    riot at the United States Capitol on January 6th.  And I'm

10   now proceeding to address the case itself and the charged

11   offenses and Mr. Brock's guilt or innocence on each of those

12   charged offenses.  The details of his participation were

13   described by witnesses and through evidence presented in this

14   trial over two days.  Specifically, the Government alleges

15   that his conduct on January 6th violated a number of federal

16   statutes, as set out in the six counts in the superseding

17   indictment:  Count One, obstruction of an official proceeding

18   and aiding and abetting in violation of Title 18 of the U.S.

19   Code, Sections 1512(c)(2) and Section 2; Count Two, entering

20   and remaining in a restricted building and grounds in

21   violation of 18 U.S.C. Section 1752(a)(1); Count Three,

22   disorderly and disruptive conduct in a restricted building or

23   grounds in violation of 18 U.S.C. Section 1752(a)(2); Count

24   Four, entering and remaining on the floor of Congress in

25   violation of 40 U.S.C. Section 5104(e)(2)(A); Count Five,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A454

1    disorderly conduct in a Capitol building in violation of 40

2    U.S.C. Section 5104(e)(2)(D); and finally, Count Six,

3    parading, demonstrating, or picketing in a Capitol building

4    in violation of 40 U.S.C. Section 5104(e)(2)(G).

5            So over the last two days, the Government called

6    five witnesses:  Sean Patton, a United States Capitol Police

7    Captain; Elizabeth Glavey, a Secret Service agent who was

8    assigned to then-Vice President Pence's detail; Nairobi

9    Timberlake, a Capitol Police Sergeant, present on duty in the

10   Capitol on January 6th; Maggie-May Humphrey, an MPD officer,

11   also there on that day; and John Moore, a special agent with

12   the FBI, the only one of the five witnesses who was not

13   present at the Capitol on January 6th.  The defense did not

14   call any witnesses.  Special Agent John Moore testified about

15   Facebook messages that he recovered from Mr. Brock's account

16   showing Mr. Brock's reaction to the November 2020 election,

17   which he believed was a "fraud."  Testimony from the other

18   witnesses and videos illustrated the breach of the Capitol

19   that occurred and tracked Mr. Brock's movements throughout

20   the Capitol on the afternoon of January 6th, 2021.  After

21   considering all of this evidence and the arguments of counsel

22   as well, for the reasons that I am now going to explain, I

23   find Mr. Brock guilty on each of the six counts.

24           First with respect to Count One, obstruction of an

25   official proceeding.  Count One of the indictment charges

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A455

1    Mr. Brock with corruptly obstructing an official proceeding.

2    To find him guilty of this offense, I must find the following

3    four elements beyond a reasonable doubt:

4            First, that he attempted to or did obstruct or

5    impede an official proceeding;

6            Second, that he acted with the intent to obstruct

7    or impede the official proceeding;

8            Third, that he acted knowingly, with awareness that

9    the natural and probable effect of his conduct would be to

10   obstruct or impede the official proceeding; and

11           Fourth, that he acted corruptly.

12           First, Mr. Brock obstructed Congress' election

13   certification.  He was part of the large crowd of

14   demonstrators who breached the Capitol on January 6th during

15   the election certification proceedings.  That's set out in

16   Government's Exhibit 708.  And I'm going to give citations to

17   exhibits on occasion throughout this.  As we heard from Agent

18   Glavey, this breach caused Congress to adjourn its session

19   because it was no longer safe for members of Congress to be

20   in the Capitol.  Glavey transcript at 37-41.  And although

21   Mr. Brock entered the Capitol after Congress had at least in

22   part adjourned, he was part of the greater mob that breached

23   the Capitol, which caused the proceedings to be adjourned and

24   not to be continued in the short term.  Government's

25   Exhibit 708.  Moreover, after breaching the Capitol,

1    Mr. Brock remained in the building for approximately 37

2    minutes, during which time his presence, along with the

3    presence of many others, continued to obstruct the proceeding

4    by preventing Congress from reconvening.  Government's

5    Exhibit 708.  In fact, Mr. Brock was on the floor of the

6    Senate where the proceedings should have been occurring had

7    the crowd not breached and entered the Capitol.

8           Other cases in this district have found that

9    actions like that of Mr. Brock's constituted obstruction of

10   an official proceeding.  Examples, in *United States v.*

11   *Reffitt*, Criminal Case Number 21-32, at 2022 WL 1404247, the

12   Court upheld a jury's verdict that a defendant who did not

13   even enter the Capitol building could nonetheless be found

14   guilty under Section 1512(c)(2) because "by leading a crowd

15   to breach the police line, [the defendant] helped to halt,

16   and thus obstruct, Congress' Joint Session."  In *United*

17   *States v. Rivera*, Criminal Case Number 21-060, citation 2022

18   WL 2187851, June 17th, 2022 decision, the Court rejected the

19   defendant's arguments that he did not in fact obstruct

20   congressional proceedings because both Houses of Congress had

21   recessed by the time that he entered the Capitol.  The Court

22   found this argument failed because "proceedings could not

23   recommence until the entire building was secured and cleared

24   of rioters.  Indeed, even the presence of one unauthorized

25   person in the Capitol is reason to suspend Congressional

1    proceedings."  That's jump cite in the *Rivera* case at *6.

2    The Court continued to explain that "[m]any rioters

3    collectively disrupted Congressional proceedings, and each

4    individual rioter contributed to that disruption."  Id.,

5    that's a citation to the same page in *Rivera*.

6            Moreover, in my earlier decision in this case,

7    August 31st memorandum opinion denying various defense

8    motions, I explained that "[t]he joint session continued to

9    be obstructed, influenced, and impeded even after Vice

10   President Pence and Members of Congress had fled, as it

11   continued to remain in limbo as the January 6 mob flooded the

12   Capitol throughout the day."  *United States v. Brock*,

13   Criminal Case Number 21-140, the citation 2022 WL 3910549.

14           Now second, Mr. Brock acted with the intent to

15   obstruct or impede the election certification when he

16   breached the Capitol building.  His Facebook messages show

17   that he intended to obstruct proceedings at the Capitol on

18   January 6th.  Some of the more probative messages include the

19   following:

20           December 6, 2020, "We need to restore the

21   Constitution and the best and shortest way is to go offensive

22   on the Communists that stole it, aka the Democratic Party."

23   That's Government's Exhibit 906.

24           December 18, 2020, "I want to actively rebel," in

25   response, this was in response to his friend's message

A458

1      regarding Biden "steal[ing] the election."  Government's

2      Exhibit 909.

3              Third, December 24th, 2020.  Outlining a "Plan of

4      Action if Congress fails to act on January 6th:  Seize all

5      democratic politicians and Biden and key staff."... "Do not

6      kill LEO unless necessary."  And LEO stands for law

7      enforcement officers.  So I'll repeat that.  "Do not kill law

8      enforcement officers unless necessary.  Gas would assist in

9      this if we can get it."  Another quote, "Attempt to capture

10     Democrats with knowledge of coup."  And that's from

11     Government's Exhibit 910.

12             Next, December 26, 2020, we're moving up towards

13     January 6th, we're now about two weeks from January 6th.

14     Little less than two weeks.  "Those are the last two peaceful

15     options," referring to Congress or the Supreme Court acting

16     to overturn the election results.  Government's Exhibit 911.

17             Next, December 27th, 2020.  "I prefer outright

18     insurrection at this point," in response to his friend saying

19     that "[r]iots are for chimps."  Mr. Brock then said that he

20     "[b]ooked the hotel.  Now need to book flights" to "DC on the

21     5th-7th."  That's Government's Exhibit 913.

22             Next, December 28, 2020, "Want to see some panic.

23     Start playing the Purge Siren outside the Capitol on 6

24     January 2021.  Watch Nancy flee."  That's Government's

25     Exhibit 913 as well.

1          January 1st, 2021.  "Help is on the way.  6

2    January 2021.  #MAGA, #StormtheCastle."  That's Government's

3    Exhibit 914.

4          And on January 5th, 2021, "Our second American

5    Revolution begins in less than 2 days."

6          Going further, "Biden won't be inaugurated.  We

7    will ensure that on the 6th."  Those are both from

8    Government's Exhibit 915.

9          Taken together, these messages indicate that

10   Mr. Brock came to the Capitol on January 6th with the intent

11   to obstruct Congress' certification of the 2020 election

12   results.

13         In addition, Mr. Brock's choice to outfit himself

14   in tactical gear and a helmet shows that he expected that

15   events might get violent inside or outside the Capitol on

16   January 6th -- there is no evidence in the record that

17   Mr. Brock wore this gear to protect himself from

18   counter-protesters.  There may be some evidence that there

19   were occasional clashes in other contexts between protesters

20   on one side and another but there's no evidence that that's

21   why he wore this tactical gear, and I reject the unsupported

22   view of defense counsel that that's the explanation for why

23   he wore the tactical gear.

24         Further, it is implausible that Mr. Brock's intent

25   was simply to support Congress members in objecting to the

1    election results.  That is not consistent with his

2    communications in advance of January 6th.  And Mr. Brock's

3    actions of breaching the Capitol building, which caused the

4    proceedings to stop, meaning no Congress members could object

5    because the proceeding had ceased, cannot reasonably be

6    construed to be just in aid of Congress.  Excuse me.

7         In any event, "[t]he law permits the factfinder to

8    infer that a person intends the natural and probable

9    consequences of their actions."  That's from *United States v.*

10   *Mejia*, 597 F.3d 1329, jump cite 1341, D.C. Circuit 2010, and

11   it is reasonable that Mr. Brock would have expected that

12   breaching the Capitol building during the election

13   certification proceedings would cause those proceedings to

14   halt during the period in which there were unauthorized

15   people, many people, including himself, within the Capitol

16   building roaming the halls of the Capitol and at the

17   locations of events that were to take place in the Capitol in

18   the context of certification of the election proceedings.

19        Third, Mr. Brock acted knowingly, with awareness

20   that the natural and probable effect of his conduct would be

21   to obstruct or impede the official proceeding.  A person acts

22   "knowingly" if he realizes what he is doing and is aware of

23   the nature of his conduct, and does not act through

24   ignorance, mistake, or accident.  As discussed already in the

25   second element, it is reasonable to conclude that Mr. Brock

A461

398

1    was aware that his actions in entering the Capitol would have

2    the probable effect of obstructing the election certification

3    that day.

4            Fourth, I find that Mr. Brock acted corruptly.

5    "[Courts] in this district have construed 'corruptly' to

6    require a showing of dishonesty, an improper purpose, [or]

7    consciousness of wrongdoing."  And that's a quote from *United

8    States v. Puma*, Criminal Case 21-0454, citation is 2022 WL

9    823079, at *10, a D.D.C. case decision, March 19, 2022.  And

10   that quotation was cleaned up a little bit.  As discussed in

11   the second element, Mr. Brock's Facebook messages support

12   that he knew obstructing the election certification on

13   January 6th was improper.  Mr. Brock's Facebook posts leading

14   up to January 6th suggest that he was prepared to break the

15   law to achieve his goals -- saying, for example, "If

16   necessary I aim to misbehave," that's Government's

17   Exhibit 905, or that he thinks it may be necessary to

18   "restore the Republic through force of arms," that's

19   Government's Exhibit 908.  Mr. Brock knew that some actions

20   he contemplated were illegal -- describing a plan to have

21   "several hundred[] thousand Patriots descend[] on dc refusing

22   to let Biden be inaugurated," which his friend acknowledged

23   would amount to "load[ing] up our trucks and go[ing] to DC

24   and hop[ing] we don't get arrested."  That's from

25   Government's Exhibit 909.  Specifically, in reference to

A462

399

1    January 6th, he used the hashtag #StormtheCastle, indicating

2    that he knew any attempts to enter the Capitol would require

3    "storming" it, which would, of course, be illegal.

4    Government's Exhibit 914.  The messages also refer to

5    Mr. Brock's desire to engage in "insurrection" and

6    rebel[lion]," and also allude to taking violent action, such

7    as "going offensive" on Democrats, "seiz[ing]" Democratic

8    politicians, and even killing law enforcement officers "if

9    necessary."  Mr. Brock also refers to action by Congress or

10   the Supreme Court as the "last two peaceful options" in

11   response to what he perceived to be fraudulent election

12   results.  Moreover, as discussed above, Mr. Brock's outfit of

13   tactical gear tends to show that he believed violence was a

14   possibility at the Capitol on January 6th.

15          Now I don't necessarily believe that Mr. Brock

16   intended to do everything that he said in his Facebook posts.

17   I think it's unlikely that he did.  Indeed, that would be a

18   stretch to believe that he did.  But there's enough in there

19   to indicate that he clearly intended to take very purposeful

20   actions to interfere with any certification of the election,

21   and even to take actions that bordered on violent conduct and

22   improper steps to impede the Congressional action of

23   certification of the election.

24          Hence, for all these reasons, I find that Mr. -- I

25   find Mr. Brock guilty on Count One, obstruction of an

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A463

400

 1 | official proceeding, and I find that beyond a reasonable
 2 | doubt.
 3 |         Count Two, which is entering or remaining in a
 4 | restricted building or grounds.  That's Title 18 of the U.S.
 5 | Code Section 1752(a)(1).  That count charges Mr. Brock with
 6 | entering or remaining in a restricted building or grounds.
 7 | To find him guilty, I must find the following elements beyond
 8 | a reasonable doubt:  That he entered or remained in a
 9 | restricted building or grounds without lawful authority to do
10 | so; and that he did so knowingly.
11 |         First, Mr. Brock entered or remained in a
12 | restricted building or grounds without lawful authority to do
13 | so.  A "restricted building or grounds" is defined as any
14 | posted, cordoned-off, or otherwise restricted area of a
15 | building or grounds where a person protected by the Secret
16 | Service is temporarily visiting.  It is undisputed that
17 | Mr. Brock entered the Capitol building at 2:24 p.m. on
18 | January 6th and remained in the Capitol building for
19 | approximately 37 minutes.  Government's Exhibit 708.  And the
20 | evidence at large in this case establishes that.  The parties
21 | do not, and could not, reasonably dispute that the Capitol
22 | building and parts of the Capitol grounds were restricted on
23 | January 6.  Testimony from United States Capitol Police
24 | Captain Sean Patton showed that the innermost parts of the
25 | Capitol grounds were barricaded with snow fences, bike racks,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A464

1   and at points with police lines on January 6th.  And the
2   Capitol building itself is restricted to unauthorized -- is
3   restricted from entry by unauthorized persons, and
4   unauthorized members of the public must go through security
5   before entering the building.  Mr. Brock was not authorized
6   to enter the U.S. Capitol building on January 6th.
7           Second, Mr. Brock did so knowingly.  It is
8   reasonable that he would have observed the toppled
9   barricades, including snow fences, bike racks, and the broken
10  police lines that were protecting the perimeter of the
11  Capitol grounds on January 6th as he approached the building.
12  Those were in place early on the morning of January 6th.
13  Ultimately, they were breached by the thousands of rioters
14  who came to the Capitol.  Mr. Brock was part of that mob and
15  as he proceeded to the Capitol, there's no question that he
16  would have observed those breached perimeters, including snow
17  fences, bike racks, and the like.  And indeed, he was then
18  part of the mob that was stopped for several minutes by a
19  police line at the Lower West Terrace, before that mob broke
20  through and continued to the Capitol building.  Moreover,
21  once Mr. Brock reached the Capitol building, he entered
22  through doors that had been forced open, that were flanked by
23  windows that had been broken, broken out completely in some
24  instances, and there were other demonstrators entering
25  through the broken glass windows on either side of him as he

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A465

402

1    entered through the door that had also been broken open.  The

2    evidence shows that he would have observed rioters entering

3    through those broken glass windows as he ascended to the

4    Senate Wing Doors, since rioters first broke the windows

5    approximately 11 minutes before Mr. Brock entered the

6    building, and rioters are shown to have come through those

7    windows shortly before and as Mr. Brock entered the building.

8    Mr. Brock then remained in the Capitol for some time after

9    seeing officers guarding the East Rotunda doors, this is in a

10   later video exhibit, and those doors were flanked or included

11   broken windows and he observed rioters attempting to break

12   through to enter with police standing there to try to prevent

13   them from doing so at those East Rotunda doors.  So all of

14   this evidence, taken together, is sufficient to prove that

15   Mr. Brock knowingly, and without authority, entered the

16   Capitol grounds and building which were restricted.

17          Hence, I find Mr. Brock guilty on Count Two,

18   entering or remaining in a restricted building or grounds,

19   beyond a reasonable doubt.

20          Count Three.  Disorderly or disruptive conduct in a

21   restricted building.  This is Title 18 of the U.S. Code

22   1752(a)(2).  Count Three charges Mr. Brock with disorderly or

23   disruptive conduct in a restricted building or grounds.  To

24   find him guilty, the Government must prove each of the

25   following elements beyond a reasonable doubt:

A466

403

1          First, that he engaged in disorderly or disruptive

2     conduct in, or in proximity to, any restricted building;

3          Second, that he did so knowingly, and with the

4     intent to impede or disrupt the orderly conduct of Government

5     business or official functions; and

6          Third, that his conduct in fact impeded or

7     disrupted the orderly conduct of government business or

8     official functions.

9          First, Mr. Brock engaged in disorderly or

10    disruptive conduct in, or in proximity to, any restricted

11    building.  For the reasons discussed with respect to Count

12    Two, the Government has proved that the defendant's actions

13    in the Capitol took place in a "restricted building or

14    grounds."  The terms "disorderly" and "disruptive" are not

15    defined in the statute and are given their plain meanings.

16    "Disorderly" conduct is that which "tends to disturb the

17    public peace, offend public morals, or undermine public

18    safety."  That comes from the definition of disorderly in

19    *Black's Law Dictionary*, 9th Edition, 2009.  Examples of this

20    conduct that have been included in jury instructions in other

21    January 6th cases include when a person acts in such a manner

22    as to cause another person to be in reasonable fear of harm,

23    uses words likely to produce violence on the part of others,

24    is unreasonably loud and disruptive under the circumstances,

25    or interferes with another person by jostling against or

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A467

USCA Case #23-3045    Document #2007100        Filed: 07/10/2023    Page 470 of 609
Case 1:21-cr-00140-JDB   Document 81   Filed 12/06/22   Page 19 of 32

404

1    unnecessarily crowding that person.  Conduct is "disruptive"

2    if it interrupts an event, activity, or the normal course of

3    process.  That's the *Redbook*, Instruction 6.643.

4           "Disruptive" is thus a pretty low bar --

5    particularly in the context of January 6th, when, in fact,

6    there was a huge amount of disruption to the proceedings of

7    Congress.  In fact, one judge in this District has found

8    that, "[e]ven mere presence in an unlawful mob or riot is

9    both (1) 'disorderly' in the sense that it furthers the mob's

10   'disturb[ing] the public peace' and (2) 'disruptive' insofar

11   as it disturbs the normal and peaceful condition of the

12   Capitol grounds and buildings, its official proceedings, and

13   the safety of its lawful occupants."  That comes from *United

14   States v. Rivera*, which I think I've cited before, the

15   specific jump cite is *5.

16          This conclusion -- that mere presence in a mob

17   rises to the level of disorderly or disruptive -- makes sense

18   because of the nature of a mob, particularly the mob we're

19   considering with respect to January 6th, 2021.  A mob, like

20   the one on January 6th, is made up of individual members, and

21   each individual member increases its power and its disruptive

22   force.  As Judge Kollar-Kotelly explained in the *Rivera* case,

23   "Just as heavy rains cause a flood in a field, each

24   individual raindrop itself contributes to that flood.  Only

25   when all of the floodwaters subside is order restored to the

1    field."  That's from the same jump cite at *5.

2           Even if mere presence wasn't enough, Mr. Brock

3    actually did more than just be present in the Capitol.  He

4    traveled throughout the Capitol to many different locations,

5    wandering about, including going to some sensitive areas, one

6    of which was the Senate floor itself.  And that in itself

7    would disrupt the proceedings.  His presence on the Senate

8    floor ensured that the certification continued to be

9    disrupted because certain parts of the proceedings had to

10    take place on the Senate floor.  He also carried flex cuffs,

11    he yelled, which would be construed and considered as

12    unreasonably loud, one way that behavior may be disorderly,

13    and that took place on the Senate floor, adding a further

14    element of chaos and disruption to the events in the Capitol.

15           Mr. Brock engaged in disorderly and disruptive

16    conduct knowingly, and with the intent to impede or disrupt

17    the orderly conduct of government business or official

18    functions.  As to "knowingly," Mr. Brock could look around

19    and realize that he was part of a mob.  The evidence shows

20    that he knew that Congress was certifying the election that

21    day, a proceeding which would not be open to the public, and

22    that he was not allowed on the Senate floor -- for example,

23    at one point he tried to use keys, we don't know where the

24    keys came from, but he tried to use keys to open a locked

25    door labeled "United States Senate."  Although he didn't know

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A469

1    it, people will be familiar with that door because the video

2    that has been shown not only during this trial but frequently

3    in the public media is the door through which the Vice

4    President was escorted downstairs as he fled from the Senate

5    Chamber.  At one point, Mr. Brock observed Sergeant

6    Timberlake in an altercation with other rioters.  Although he

7    was not involved in that altercation -- and in fact the

8    evidence shows that he tried to calm the protesters -- he

9    nevertheless continued to walk through the Capitol with full

10   knowledge that law enforcement and the protesters were

11   clashing at various points.  Thus, I find that he acted

12   knowingly and with full awareness of the consequences of his

13   decisions.

14          For many of the same reasons, I also find that

15   Mr. Brock acted "with the intent to impede or disrupt the

16   orderly conduct of government business or official

17   functions."  While the language is not identical, that

18   language coming from this provision of the 1752(a)(2), it's

19   not identical to the language relevant to Count One, a

20   finding that Mr. Brock acted with "intent to obstruct or

21   impede an official proceeding" as required in Count One under

22   Section 1512(c) would, in this case, necessarily mean that he

23   also had intent to disrupt orderly government business for

24   purposes of Count Three.  The certification was both an

25   "official proceeding" -- as required by Section 1512 -- and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A470

1    an instance of "orderly conduct of government business or

2    official functions," as required by Count Three.  I

3    accordingly find that the Government has proven this element

4    beyond a reasonable doubt.

5            Finally, Mr. Brock's conduct in fact impeded or

6    disrupted the orderly conduct of government business or

7    official functions.  As discussed in the discussion of Count

8    One, the certification -- an official government function --

9    was in fact impeded or disrupted.  Simply by being in the

10   mob, Mr. Brock's conduct assisted in disrupting the

11   certification.  But even further, his presence on the Senate

12   floor necessarily disrupted the certification -- had the

13   protesters, Mr. Brock included, cleared the Senate floor and

14   the Capitol building, the certification would have continued.

15   Which it did, but only much, much later in the day on

16   January 6th; indeed, late in the evening.  Hence, I find that

17   his conduct did in fact impede or disrupt the orderly conduct

18   of government business or official functions on that day.

19           Hence, I find Mr. Brock guilty on Count Three,

20   disorderly or disruptive conduct in a restricted building,

21   and I find that beyond a reasonable doubt.

22           Count Four, which charges Mr. Brock with entering

23   and remaining on the floor of Congress in violation of Title

24   40 of the U.S. Code, Section 5104(e)(2)(A).  To find him

25   guilty on this count, the Government must prove two elements

A471

1    beyond a reasonable doubt:

2              First, that he entered or remained on the floor of

3    a House of Congress without authorization to do so; and

4              Second, that he acted willfully and knowingly.

5              First, Mr. Brock entered or remained on the floor

6    of a House of Congress without authorization to do so.  The

7    Government has proven this beyond a reasonable doubt -- video

8    evidence shows him on the Senate floor, and he was not

9    authorized to be there.

10             Second, Mr. Brock acted willfully and knowingly.

11   As discussed earlier, Mr. Brock certainly knew that he was on

12   the Senate floor.  Indeed, he identifies the Vice President's

13   chair which is where the Vice President sits when he is

14   presiding over the certification in the Senate, and at one

15   point, he sees a sign on a door to the floor labeled United

16   States Senate.

17             The evidence also supports a finding Mr. Brock

18   acted "willfully."  "Willfully" requires the intent to do

19   something that the law forbids, that is, to disobey or

20   disregard the law.  As discussed at length in Count One, his

21   Facebook posts leading up to the January 6th events suggest

22   that he was prepared to break the law to achieve his goals.

23   While those messages were all hypotheticals, Mr. Brock's

24   conduct on January 6th confirms that he knew he was not

25   authorized to be on the Senate floor.  He passed by police

1    while walking through the Capitol, including police guarding

2    broken windows in the East Rotunda doors, and on the Senate

3    floor, he yelled about the group's mission in coming to the

4    Capitol:  To stop the alleged stealing of the 2020 election,

5    a mission he indicated in his Facebook messages he knew may

6    have to happen with force and illegally.  At one point, he

7    uses keys to try to gain entry to a locked door clearly

8    leading to the Senate floor.  Given the context of

9    January 6th and the scenes he walked by on his way into and

10   around the Capitol, it is unfathomable that Brock believed

11   that he was authorized to be on the Senate floor.  Thus, I

12   find that Mr. Brock entered and remained on the Senate floor

13   willfully.

14          Hence, I find him guilty on Count Four, entering

15   and remaining on the floor of Congress, beyond a reasonable

16   doubt.

17          Count Five charges Mr. Brock with disorderly or

18   disruptive conduct in a Capitol building, that's in violation

19   of Title 40 of the U.S. Code, Section 5104(e)(2)(D).  To find

20   him guilty of this offense, the Government must prove three

21   elements beyond a reasonable doubt:

22          Number one, that he engaged in disorderly or

23   disruptive conduct in any of the United States Capitol

24   buildings;

25          Number two, that he did so with the intent to

1    impede, disrupt, or disturb the orderly conduct of a session

2    of Congress or either House of Congress;

3            And number three, that he acted willfully and

4    knowingly.

5            For the reasons already discussed, Mr. Brock's

6    "mere presence in an unlawful mob or riot," and specifically

7    the mob at and in the Capitol on January 6th, was disorderly

8    and disruptive.  And that's consistent with the *United States*

9    *v. Rivera* and I've cited before.  Further, I've already

10   concluded that his specific actions once inside the Capitol

11   building were disruptive.

12           Second, Mr. Brock did so with the intent to impede,

13   disrupt, or disturb the orderly conduct of a session of

14   Congress or either House of Congress.  According to a

15   stipulation of the parties, on January 6th, "a joint session

16   of Congress was convened to fulfill its constitutional and

17   statutory responsibilities to count the Electoral College

18   votes" and declare the winner of the 2020 Presidential

19   election.  That's Government's Exhibit 702, paragraph 4.  In

20   relation to Counts One and Three, I've concluded that

21   Mr. Brock acted with intent to obstruct or impede an official

22   proceeding, and with the intent to impede or disrupt the

23   orderly conduct of government business or official functions.

24   Again, that was his clear purpose as indicated in both his

25   pre-January 6th statements and his conduct on January 6th.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A474

USCA Case #23-3045    Document #2007100    Filed: 07/10/2023    Page 477 of 609
Case 1:21-cr-00140-JDB   Document 81   Filed 12/06/22   Page 26 of 32

411

1    For the reasons addressed in relation to those counts, I find

2    that Mr. Brock's conduct assisted in the mob's disruption of

3    the joint session of Congress convened to certify Electoral

4    College votes.  Accordingly, I conclude that Mr. Brock acted

5    with the intent to disrupt the orderly conduct of a session

6    of Congress.

7             Third, Mr. Brock acted willfully and knowingly.

8    For the reasons given in relation to Count One, I have

9    concluded that Mr. Brock obstructed an official proceeding --

10   the certification of Electoral College votes in a Joint

11   Session of Congress -- and that he did so "knowingly" and

12   "corruptly."  Courts in this district have defined the term

13   "corruptly" to include acting with "consciousness of

14   wrongdoing" or "improper purpose."  One such case is *United*

15   *States v. Puma* that I have cited before, and that's a jump

16   cite at *10.  As discussed in reference to Count Four, a

17   person acts "willfully" if he acts with the intent to do

18   something that the law forbids, that is, to disobey or

19   disregard the law.  For the same reasons that I already

20   determined that Mr. Brock obstructed the proceeding

21   "knowingly" and "corruptly" because he acted with an

22   understanding or awareness that what he was doing was wrong,

23   I similarly conclude that he acted "knowingly" and

24   "willfully" with the intent to do something the law forbids.

25             Hence, I find Mr. Brock guilty on Count Five of the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A475

412

1    indictment, disorderly conduct in a Capitol building, beyond

2    a reasonable doubt.

3              Lastly, Count Six, which charges the defendant with

4    parading, demonstrating, or picketing in the -- in a Capitol

5    building.  To find Mr. Brock guilty of this offense, the

6    Government must prove two elements beyond a reasonable doubt:

7              First, that Mr. Brock paraded, demonstrated or

8    picketed in any of the United States Capitol buildings; and

9              Second, that he acted willfully and knowingly.

10             First, Mr. Brock demonstrated in the U.S. Capitol.

11   The term "demonstrate" in the statute encompasses conduct

12   that would disrupt the orderly business of Congress.  *See*

13   *Bynum v. United States Capitol Police Board*, 93 F.Supp.2d 50,

14   jump cite 58, D.D.C. case from 2000.  I've already concluded

15   that Mr. Brock's actions while in the Capitol building

16   obstructed an ongoing Congressional proceeding.

17             Moreover, Mr. Brock's arguments effectively concede

18   that he was "demonstrating" in any colloquial sense of the

19   term.  He entered the U.S. Capitol building with a large

20   crowd of individuals who had marched there from a political

21   rally.  They were at the Capitol protesting and attempting to

22   stop the certification of Electoral College votes for

23   President Biden, or then President-Elect Biden, or -- as

24   Mr. Brock described in his Facebook posts -- to "stop the

25   steal."  Not only as they approached the Capitol, but as many

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A476

413

 1   of them entered the Capitol, including Mr. Brock, they were

 2   engaged in a demonstration, both around and in the Capitol

 3   building that sought to, and in fact did, disrupt the orderly

 4   business of Congress.  This was a demonstration in any common

 5   understanding of that term.

 6          Second, Mr. Brock acted willfully and knowingly.

 7   For the reasons already discussed in relation to the prior

 8   counts, I conclude that Mr. Brock engaged in this

 9   demonstration "knowingly" and "willfully."

10          Hence, I find him guilty on Count Six of the

11   indictment, which is parading, demonstrating, and picketing

12   in a Capitol building, and I find that beyond a reasonable

13   doubt.

14          With that, I have addressed all six of the counts

15   and have found Mr. Brock guilty on each of those counts.  And

16   those findings are all based on the evidence of record in

17   this case and on conclusions that I have reached beyond a

18   reasonable doubt.

19          With that, anything from counsel before we set a

20   sentencing date?  Anything from the Government?

21          MS. AYERS-PEREZ:  No, your Honor.

22          THE COURT:  From the defense?

23          MR. BURNHAM:  No, your Honor.

24          THE COURT:  All right.  We need to set a sentencing

25   date, and in this jurisdiction, that's usually about three

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A477

414

1   months these days because of the number of cases that the

2   probation office is dealing with.  So if we go out three

3   months from now, we'll be in February, a month that I have

4   some obligations not only in this building but outside of

5   this building.  But Mr. Bradley, what do you see as a

6   possibility?

7          THE CLERK:  Judge, if my calculation is right, that

8   falls on February 14th, 2023, February 14th.

9          THE COURT:  I think I will be here on that date.

10  It's a double holiday in my family, not only Valentine's Day,

11  and I have another proceeding at 2:00.

12         THE CLERK:  That's right.

13         THE COURT:  So how's the morning of February 14th

14  sound, first for the Government?

15         MS. AYERS-PEREZ:  That works for the Government,

16  your Honor.

17         THE COURT:  And Mr. Burnham, for the defense?

18         MR. BURNHAM:  Fine, your Honor.

19         THE COURT:  All right.  Let's do it at -- how about

20  10:30?

21         MR. BURNHAM:  Good for the defense.

22         THE COURT:  February 14th, 10:30, and we'll need

23  sentencing memos then in advance of that date and if I have

24  them one week in advance on February 7th, that should be

25  sufficient, so sentencing memos are due by February 7th,

A478

415

1    2023.  All right.

2            The only remaining question for me is then just to

3    address the question of the defendant's status pending

4    sentencing.  Is there any request by the Government to change

5    his status; in other words, to change from release under

6    certain conditions?

7            MS. AYERS-PEREZ:  There is not, your Honor.

8            THE COURT:  All right.  Any request from the

9    defense to change any of those conditions?

10           MR. BURNHAM:  No, your Honor.  I just note for the

11   record that he's done very well and your Honor has stepped

12   him down several times, so --

13           THE COURT:  Yes, he has done fine.  I think there's

14   been no problems of any consequence under the conditions that

15   he's been subjected to, and I will continue him in that

16   release under conditions and expect him to continue to comply

17   with those conditions and I won't even give all the

18   admonitions that I've given before because I know Mr. Brock

19   will bear those in mind.  And you now have a sentencing date

20   on February 14th, it's at 10:30 in the morning, it will be in

21   this courtroom, and you need to be present for that

22   sentencing at that time.  All right.  With that, anything

23   further today from the Government?

24           MS. AYERS-PEREZ:  No, your Honor.

25           THE COURT:  And from the defense?

A479

416

```
 1              MR. BURNHAM:  No, your Honor.

 2              THE COURT:  All right.  I will say to all counsel,

 3    thank you for the very excellent presentations.  The evidence

 4    was presented fully and fairly, the arguments made

 5    conscientiously and creatively, and I appreciate that,

 6    commend you all for a job well done in presenting the case.

 7    Thank you all.

 8              MR. BURNHAM:  Thank you, your Honor.

 9                  (Court Adjourned, 10:56 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A480

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

 5   Official Realtime Court Reporter, in and for the

 6   United States District Court for the Northern

 7   District of New York, DO HEREBY CERTIFY that

 8   pursuant to Section 753, Title 28, United States

 9   Code, that the foregoing is a true and correct

10   transcript of the stenographically reported

11   proceedings held in the above-entitled matter and

12   that the transcript page format is in conformance

13   with the regulations of the Judicial Conference of

14   the United States.

15

16                    Dated this 28th day of November, 2022.

17

18

19                    /S/ JODI L. HIBBARD
                      _____

20                    JODI L. HIBBARD, RPR, CRR, CSR
                      Official U.S. Court Reporter
21

22

23

24

25
```

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

A481

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-140-JDB** |
| **LARRY BROCK,** | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Larry Brock to 60 months' incarceration, 36 months' supervised release, $2,000 restitution, and the mandatory special assessments ($100 for Count One, $25 each for Counts Two and Three, and $10 each for Counts Four through Six). The calculated guideline range is 57 to 71 months' incarceration, and the 60-month recommendation is at the low end of that range.

## I.      INTRODUCTION

The defendant, Larry Brock, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in

1

A482

losses.[1]

Larry Brock, a retired Lieutenant Colonel in the Air Force, stormed the United States Capitol building on January 6, dressed in tactical gear, and on a mission.   In the days and weeks leading up to January 6, Brock grew increasingly angry about the 2020 Presidential Election. Brock proclaimed on Facebook that the election was stolen, and that then President-Elect Joe Biden would not be inaugurated in January 2021.   Brock expressed an acute awareness of what was happening on January 6, stating at one point "Congress can stop it on the 6th of January". Brock bragged to his friends about the tactical gear he was buying in anticipation of January 6, even saying he "preferred outright insurrection at this point."   On January 6, Larry Brock, dressed in combat gear, made his way into one of the most sensitive areas in all of Government – onto the Senate Floor that the Vice President, Senators, and staff had fearfully evacuated minutes earlier – and showcased his leadership skills therein.   Brock loudly proclaimed, "THIS IS OUR HOUSE!", and during a dispute with a fellow rioter sitting in the Vice President's chair, Brock lectured his fellow rioters that this was an "IO war."[2]   Brock was part of the mob that halted certification and the peaceful transfer of power on January 6.

The government recommends that the Court sentence Brock to 60 months' incarceration

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] FBI Special Agent John Moore, a lieutenant colonel in the U.S. Army reserve component, explained that "Information operations is a broad term in concept referring to the use of information to shape the battlefield both using information to shape what enemy conventional military units do…"." Tr. 11/15/22, 226: 25, 227:1-10.

2

A483

for his violations of 18 U.S.C. § 1512(c)(2) and 2, 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(A), (D), and (G), which is within the low end of the advisory Guidelines' range of 57 to 71 months, which the government submits is the correct Guidelines calculation. A 60-month sentence reflects the gravity of Brock's conduct, but also acknowledges that, despite his planned violence and threatening conduct, he did not directly engage in violent conduct within the Capitol building.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Complaint and attached Affidavit filed in this case, ECF No. 1 at ¶¶4-10, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Larry Brock's Role in the January 6, 2021 Attack on the Capitol

Larry Brock, a retired Lieutenant Colonel in the United States Air Force, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos including body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol, as well as numerous incendiary and violent statements on Facebook in the days and weeks leading up to January 6.

### *Brock's Statements through Facebook Leading Up to January 6*

Brock grew increasingly angry about the results of the 2020 Presidential Election, and believed the election had been stolen from then-President Donald Trump.   Brock believed that the

3

Supreme Court would be overturning the election, and when that did not happen, Brock set his sights on the Electoral College certification on January 6 at the U.S. Capitol.

On November 7, 2020, the day most mainstream media outlets called the election for President Biden, Brock posted on Facebook: "A revolution every now and then is a good thing."

The following day, on November 8, 2020, Brock posted on Facebook: "Biden outperformed Obama?  Right!  I have said it before and I will say it again.  If the President calls, I will answer. #OathKeeper."  On November 9, Brock posted on Facebook: "When we get to the bottom of this conspiracy we need to execute the traitors that are trying to steal the election, and that includes the leaders of the media and social media aiding and abetting the coup plotters."
On November 13, 2020, Brock posted on Facebook: "I believe the courts will act, but if they don't, are we willing to see the will of the American people be thwarted? What exactly constitutes supporting and defending the Constitution … against all enemies, foreign and domestic. Does stealing an election through fraud make one a domestic enemy? If so, what are we prepared to do?"

On December 5, 2020, Brock posted on Facebook: "If SCOTUS[3] doesn't act we have two choices.  We can either live in a Communist Country or we can rebel, keep the rightful President in power and demand free and fair elections. #civilwar2021."

On December 6, 2020, Brock posted the following on Facebook: "Going to get a lot scarier if SCOTUS doesn't act. No way in hell we should accept this rigged election. We need to restore

---

[3] FBI Agent Moore testified at trial that SCOTUS referred to the Supreme Court of the United States.

4

the Constitution and the best and shortest way is to go offensive on the Communists that stole it, aka the Democratic Party."

On December 7, 2020, Brock sent a message to another Facebook user with the screenname Beaf Supreame[4] stating that "I think SCOTUS needs to see if they don't act that there will be blood."

On December 11, 2020, Brock posted the following on Facebook: "It appears as if SCOTUS is going to duck. If so then it will be game on soon. We need ROE, a clear chain of Command ending with President Trump and a master target list." [5]

On December 18, 2020, Brock engaged in a conversation with Beaf Supreame about the 2020 election, referencing the upcoming Inauguration on January 20, 2021, with Brock saying that he was "ready to go at it". Beaf Supreame brought up the possibility of an "IO[6] loss if a cop got hurt." *See* Images 1 and 2.

---

[4] The FBI is aware of the identity of the friend. He was identified at trial as "Drew" and by his Facebook screenname of "Beaf Supreame". FBI Agent John Moore testified that "Beaf Supreame" was former special forces in the military.

[5] Agent Moore testified at trial he believed ROE to be rules of engagement.

[6] FBI Agent Moore testified at trial as to what an IO war is. He stated that IO means Information Operations, and that Information Operations is a broad concept that is used in the military to denote using information to shape what the enemy does.

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-18 16:32:19 UTC
**Body** Can you imagine if several hundreds thousand Patriots descended on dc refusing to let Biden be inaugurated

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-18 16:33:14 UTC
**Body** I do not believe the US military will fire on us

**Author** Beaf Supreame (Facebook: 725043739)
**Sent** 2020-12-18 16:33:28 UTC
**Body** Yeah. Inauguration would be canceled or moved to a secure location

**Author** Beaf Supreame (Facebook: 725043739)
**Sent** 2020-12-18 16:33:57 UTC
**Body** But would be more of a spectacle to delay.

*Image 1*

**Author** Beaf Supreame (Facebook: 725043739)
**Sent** 2020-12-18 16:34:28 UTC
**Body** And a possible IO loss if a cop got hurt.

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-18 16:35:29 UTC
**Body** Look dude I am pretty sure I am ready to go at it. I just need numbers with me

*Image 2*

On December 24, 2020, Brock sent the Facebook message, "I bought myself body armor and a helmet for the civil war that is coming."   That same day, on December 24, 2020, Brock sent the following Facebook message to user Beaf Supreame regarding the election:

6

A487

Assumption: US Military isn't involved

Objection: Restore the rule of law in the rebellious states, hold a free and fair election in 1 year

Plan of Action if Congress fails to act on 6 January

Main Tasks:

1. Seize all democratic politicians and Biden key staff and select Republicans (Thune and McConnell). Begin interrogations using measures we used on Al Queda to gain evidence on  the coup
2. Have General Flynn get in touch with President Trump and have him declare a State of Insurrection exists to provide color of law to our actions
3. Seize national media assets and key personnel.  Zuck[7], Jack[8], CNN[9] lead and talking heads, seize WAPO[10] and NYT[11] editors.  Eliminate them.  Media silence except for White House communications
4. Present slate for clean elections to existing congress and make sure they sign.
5. Let the Democratic cities burn.   Cut off power and food to all who oppose us.
6. Establish provisional government in rebellious states and representatives we can count on.
7. Cease all foreign aid except for key allies as determined by Trump
8. General pardon for all crimes up to and including murder of those restoring the Constitution and putting down the Democratic Insurrection.
   ROE:
   1. Do not kill LEO[12] unless necessary.   Gas would assist in this if we can get it.
   2. Attempt to capture Democrats with knowledge of coup
   3. Shoot and destroy enemy communication nodes and key personnel
   4. So many sub tasks I can't even imagine them


Later that same day, Brock sent the following message predicting "occupation of the capital (sic)." *See* Image 3.

---

[7] Agent Moore testified at trial he believed Zuck to be Mark Zuckerberg, the CEO of Facebook
[8] Agent Moore testified at trial he believed Jack to be Jack Dorsey, then CEO of Twitter
[9] Agent Moore testified at trial he believed CNN to be the Cable News Network
[10] Agent Moore testified at trial he believed WAPO to be the Washington Post
[11] Agent Moore testified at trial he believed NYT to be the New York Times
[12] Agent Moore testified at trial he believed LEO to be law enforcement officers.

A488

Author Torch Flyer (Facebook: 100015060977787)
Sent 2020-12-24 23:51:06 UTC
Body Yes but you know people trained to do larger stuff. My prediction is occupation of capital abs capture of some assets is easy. If trump didn't back the "peaceful protest" of veterans to restore the Republic we lose

*Image 3*

On December 26, 2020, Brock messaged another Facebook user with the initials B.S. and noted, "…Congress can stop it on the 6th of January[.] The Supreme Court is staying out of it[.] Those are the last two peaceful options." *See* Image 4.

Author
B███ S██████ (Facebook: 618738863)
Sent 2020-12-26 16:07:45 UTC
Body I'm not thinking that. At all.
I just believe that a civil war is the last resource, and no one should wish for it.
I'm sure there are more civilized ways to fight.

Author Torch Flyer (Facebook: 100015060977787)
Sent 2020-12-26 16:11:01 UTC
Body Agree. Congress can stop it on the 6th of January

Author Torch Flyer (Facebook: 100015060977787)
Sent 2020-12-26 16:11:15 UTC
Body The Supreme Court is staying out of it

Author Torch Flyer (Facebook: 100015060977787)
Sent 2020-12-26 16:11:29 UTC
Body Those are the last two peaceful options

*Image 4*

8

A489

On December 27, Brock again messaged "Beaf Supreame", this time discussing booking a flight to Washington, D.C. on January 5, and whether people would riot.   Brock stated to "Beaf Supreame": "I prefer outright insurrection at this point".

 On January 1, 2021, Brock wrote on Facebook, "Help is on the way. 6 Jan 2021. #MAGA #StormtheCastle.

On January 3, Brock wrote on Facebook, "Biden won't be inaugurated. We will ensure that on the 6th".

On January 5, Brock wrote on Facebook, "Our second American Revolution begins in less than 2 days".

### *Approach to the Capitol*

Brock traveled to Washington, D.C. from his home near Dallas, Texas on January 5, 2021. On January 6, he first went to the "Stop the Steal" rally in Washington, D.C. where he was amongst a crowd of people while wearing a tactical vest.   *See* Image 5 below.

A490



*Image 5*

Brock then walked down Pennsylvania Avenue, still wearing his tactical vest, with a helmet attached to his vest. *See* Image 6. Despite Brock claiming to the Probation Officer during the interview for his Presentence Report ("PSR") that he brought the helmet and tactical vest due to threats from Antifa, Brock does not wear his helmet during the Stop the Steal rally or in the march to the Capitol. *See* Images 5 and 6

10

A491



*Image 6*

Brock then approached the U.S. Capitol building and climbed the stairs next to the scaffolding on the west side of the building. *See* Image 7.   The scaffolding was located at the western face of the Capitol building.   Brock is circled in red.   Brock has donned his helmet at this point, while climbing the overrun stairs outside the Capitol building, preparing to go inside. Surrounding Brock were other rioters, climbing scaffolding that was present as construction crews prepared a temporary stage for the Presidential Inauguration, which was scheduled to take place on January 20.   *See* Image 7.

11

A492



*Image 7*

After making his way up the steps on the west side of the Capitol, Brock eventually made his way through the Senate Wing Doors at approximately 2:24 p.m. on January 6, approximately 12 minutes after the Senate Wing Doors were initially breached.   *See* Image 8.

12

A493



*Image 8*

Brock made his way outside the East Rotunda Doors, where he witnessed overrun U.S. Capitol Police Officers trying to keep the door closed from the impending mob outside. The windows in the East Rotunda Doors were shattered, which was visible from where Brock was standing. Despite this, Brock continued on throughout the Capitol building. *See* Image 9.

13



***Image 9***

   Brock then headed towards the East Rotunda stairs, where he would eventually make his

way up to the third floor of the Capitol building.   On the ground near the stairs Brock discovered

a pair of flex-cuffs that had been discarded.   Brock picked up the flex-cuffs, and headed upstairs

while carrying the flex-cuffs.   *See* Image 10.

14



*Image 10*

Brock, while still holding the flex-cuffs, walked up the East Rotunda stairs, where he made his way outside the Senate Gallery.  While outside the Senate Gallery, Brock witnessed other rioters engaging in violence with U.S. Capitol Police Officers who were trying to shut the doors to the Gallery.   Although Brock intervened in the violence, he then went into the Senate Gallery along with numerous other rioters.   One of the officers present, Sergeant Nairobi Timberlake, stated that Brock had a "command presence" in the group and described how Brock was vocal with those around him. Tr. 11/14/2022, 166:1-6.   Sgt. Timberlake also stated that Brock did not have the flex-cuffs out where he could see them, nor did Brock give the flex-cuffs to him. Tr. 11/14/2022, 166:15-23 *See* Image 11.

15



*Image 11*

While in the Senate Gallery, Brock again displayed his command presence and leadership.

Brock shouted at the other rioters, and gave orders not to destroy anything.   Brock had

commanded the attention of many other rioters, who stopped what they were doing to listen to

Brock.   Once Brock was not in the presence of law enforcement, he took the flex cuffs back out

and held them in his right hand.   *See* Image 12.

16



*Image 12*

     After leaving the Senate Gallery, Brock went downstairs and attempted to enter the Senate

Floor.  This was the same door that Vice President Pence had exited from 21 minutes prior.

Brock approached the door with what appeared to be a set of keys and attempted to unlock the

door.  *See* Images 13 (Vice President Pence circled in blue) and 14.

17



*Image 13*



*Image 14*

After he failed to unlock the door, Brock went around to the other side of the Senate,

18

A499

where he then entered onto the Senate Floor.   Brock was let on to the Senate Floor by another

rioter opening the locked door from the inside.   Once on the Senate Floor, Brock shouted at his

fellow rioters saying, "THIS IS OUR HOUSE" and "This is an IO War.   We can't lose the IO

War."   *See* Image 15.



*Image 15*

Brock spent approximately 8 minutes on the Senate Floor, in which time he rifled through

paperwork on Senator's desks.   At one point, Brock shouted to other rioters to get out of the Vice

President's chair. This was consistent with Brock's stated overall mission on January 6, which was

intelligence gathering to stop the certification and the transfer of power. After leaving the Senate

Floor, Brock was encountered by a Metropolitan Police Department (MPD) Officer.   The Officer,

Maggie-May Humphrey, was equipped with a Wearable Video System (WVS) or bodycam, which

captured Brock ignoring the officers attempting to direct him out of the building and their brief

19

A500

pursuit of Brock before returning to their post.   Brock eventually exited the U.S. Capitol via the

Parliamentarian Doors at 3:02 p.m. Before exiting, Brock briefly breaks up a confrontation

between another rioter and a law enforcement officer.

## POST-JANUARY 6 STATEMENTS

On January 8, 2021 the New Yorker published an article about Brock's involvement on

January 6. Ronan Farrow, An Air Force Combat Veteran Breached the Senate, The New Yorker

(Jan.    8    2021)    https://www.newyorker.com/news/news-desk/an-air-force-combat-veteran-

breached-the-senatePer the article, Brock claimed that he saw no violence on January 6, and

assumed he was welcome to enter the building. Id.   Brock is quoted in the article in reference to

the flex cuffs he picked up outside of the Rotunda: "I wish I had not picked those up… my thought

process there was I would pick them up and give them to an officer when I see one…I didn't do

that because I had put them in my coat, and I honestly forgot about them."[13] Id.

## THE CHARGES AND TRIAL

On June 23, 2021, a federal grand jury returned a superseding indictment charging Larry

Brock with six counts, including, Obstruction of an Official Proceeding in violation of 18 U.S.C.

§§ 1512(c)(2) and 2 (Count One), Entering and Remaining in a Restricted Building or Grounds in

violation of 18 U.S.C. § 1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a

Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three), Entering and

Remaining on the Floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four),

---

[13] Brock is observed via U.S. Capitol Police CCTV recovering the discarded flex cuffs from the
floor of the Rotunda Interior at approximately 2:39 pm, and can be seen holding them almost
continuously after that point. (Tr. Ex. 418)

A501

Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five), and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). On, November 16, 2022, Larry Brock was convicted of those offenses following a three-day bench trial.

## III.    STATUTORY PENALTIES

Larry Brock now faces sentencing on Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One), Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three), Entering and Remaining on the Floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five), and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count One; up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25 for each of Counts Two and Three; and up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10 for each of Counts Four through Six.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

A502

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the Sentencing Guidelines calculation set forth in the Pre-Sentence Report (PSR) and the calculated guidelines range of 57 – 71 months.  PSR ¶ 117.  However, the PSR mistakenly fails to include a full Guidelines analysis for all three Counts to which the Guidelines apply—Counts One, Two, and Three.[14]  *See* PSR ¶¶ 46-60.  Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments.  Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."  Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.  The PSR does not follow these steps.  It concludes (*see* PSR ¶ 49) that Counts One, Two, and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).  That Guidelines analysis is as follows:

Count One: 18 U.S.C. § 1512(c)(2) and (2)[15]

---

[14] As the PSR properly notes, pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to counts of conviction that are Class B misdemeanors, and so do not apply to Counts Four, Five, or Six here. PSR ¶ 48.

[15] For the aiding and abetting charge (18 U.S.C. § 2), the offense level would be the same as that for the underlying offense. *See* U.S.S.G. § 2X2.1(a).  Accordingly, that analysis mirrors the

22

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening to Cause Physical Injury or Property Damage[16] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[17] | +3 |

---

analysis for 18 U.S.C. § 1512(c)(2) here.

[16] The enhancement in U.S.S.G. § 2J1.2(b)(1)(B) applies where "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).

There are multiple theories for application of this offense characteristic based on U.S.S.G. § 1B1.3 which encompasses both Brock's own acts or omissions and those whom he aided, abetted, counseled, commanded, induced, procured, or willfully caused. U.S.S.G. § 1B1.3(a)(1)(A). It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. U.S.S.G. § 1B1.3(a)(1)(B). As discussed above, Brock used extremely dangerous and violent rhetoric in the days and weeks leading up to January 6. In November 2020, Brock posted on Facebook "When we get to the bottom of this conspiracy we need to execute the traitors…." In December 2020, he posted to Facebook using the hashtag, "#civilwar 2021." Also in December 2020, Brock sent a Facebook message to a friend, which showed that he viewed January 6 to be a military-style operation, listing "Task[s]" that included "Seiz[ing] all Democratic politicians and Biden key staff and select Republicans (Thune and McConnell). Begin interrogations using measures we used on Al Queda….'. The message also listed "ROE," or rules of engagement, including "Do not kill LEO (law enforcement officers) *unless necessary*" (emphasis added), and "Attempt to capture Democrats with knowledge of the coup." Although Brock did not engage in violent acts while inside the Capitol building (to the government's knowledge, and in fact stopped some violence from occurring inside the Capitol, he still went to one of the most secure areas inside the Capitol building – the Senate Floor –minutes after Vice President Pence had been ushered out of the Senate. Multiple people followed Brock inside the Senate. Brock marched inside the Capitol building to various locations, while holding flex cuffs, dressed in a helmet and military style tactical vest. This was extremely threatening behavior meriting application of the § 2J1.2(b)(1)(B) enhancement, as also noted by Probation. PSR ¶ 52.

[17] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Brock was found guilty of corruptly obstructing and impeding an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

A504

|  |  |  | **Total** | 25 |
|---|---|---|---|---|

Count Two: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3 (a) | Base Offense Level | | | 4 |
|---|---|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass occurred at any restricted building or grounds[18] | | | +2 |

*Cross Reference*

| U.S.S.G. § 2B2.3(c)(1)/2X1.1 | Intent to Commit a Felony[19] | | | **17** |
|---|---|---|---|---|
|  |  |  | **Total** | **17** |

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | | | 10 |
|---|---|---|---|---|
|  |  |  | **Total** | **10** |

| **Combined Offense Level** | | | | **25** |
|---|---|---|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1)[20] | | | | <u>0</u> |
| **Total Offense Level:** | | | | **25** |

---

[18] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. § 1752. U.S.S.G. § 2B2.3 cmt. n.1.

[19] Since the Section 1752(a)(1) offense was committed with an intent to commit another felony (18 US.C. § 1512), the base offense level of that felony applies to the 1752(a)(1) charge, pursuant to U.S.S.G. § 2B2.3(c)(1) and § 2X1.

[20] Brock contested essential factual elements of guilt at trial, such as denying that he went to the Capitol to stop the certification; denying that he dressed in tactical gear to support his mission to storm the Capitol and stop the certification; and denying that he picked up and held on to the flex-cuffs in case he needed them for a member of Congress, or to otherwise support his goal of stopping the certification. Accordingly, the adjustments for acceptance of responsibility in U.S.S.G. §§ 3E1.1(a) and (b) should not apply. U.S.S.G. §§ 3E1.1 Application Note 2; U.S.S.G. § 3E1.1(b).

A505

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(a) and (b).   The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).   Since Counts One and Two have the highest offense levels for any count in the group (both are 25), the combined offense level for the group is 25.   And because acceptance of responsibility points are not available in the instant case, the total offense level remains 25.   This is the same as the Probation Officer's estimated total offense level of 25.   PSR ¶ 60.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.   PSR ¶ 63.   Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 25, Brock's Guidelines imprisonment range is 57 to 71 months' imprisonment.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Larry Brock's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   The nature and circumstances of Larry Brock's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 60 months' incarceration, 36 months' supervised release, and $2,000 restitution,.

25

A506

**B.  The History and Characteristics of the Defendant**

Brock is a former Lieutenant Colonel in the United States Air Force.   PSR ¶ 25.   Engaged in a significant amount of violent rhetoric leading up to January 6.   On May 18, 2018, Brock was terminated from his employment as a sales leader at CAE in Fort Worth, Texas. PSR ¶ 100.   In a termination letter from May 18, 2018, it was stated that Brock was terminated because he had stated to other employees that he "had not killed anyone for a while" and because of comments by Brock regarding shooting members of a particular religion and/or race.   CAE noted that Brock had already received three verbal warnings and two written warnings prior to termination about this kind of rhetoric.

On January 13, 2015, Brock received six months of deferred adjudication probation for a misdemeanor disorderly conduct charge out of Montana.   PSR ¶ 62.

The defendant's history and characteristics, including his history of violent rhetoric and disorderly conduct, weigh in favor of a lengthy term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Larry Brock's criminal conduct, on January 6 was extreme and dangerous.   Brock had disturbing and violent rhetoric leading up to January 6, and he acted on that rhetoric by buying tactical gear, flying to Washington, D.C., storming the U.S. Capitol building, making his way into the Senate Chamber twice, rifling through paperwork belonging to Senators, and ignoring law enforcement commands to leave.   His behavior helped to delay the certification and interfere with the peaceful transition of power, as was his intent.   This was the epitome of disrespect for the law.

26

A507

D.    **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[21] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Brock has a criminal history category of I, his prior offense of disorderly conduct, as well as violent and dangerous rhetoric, shows a clear pattern of dangerous behavior. *See* Section VI(B) *supra*.    Second, Brock has yet to express remorse for his actions.    Brock stated in his PSR interview that he lost his job over a "peaceful protest". PSR ¶ 37.    Brock stated this after having walked through broken doors, around broken windows, seeing the Senate Chamber broken into, witnessing rioters chanting "Nancy, Nancy" over and over again, and hearing from law enforcement officers about the horrors of that day.    Third, Brock's behavior was disturbingly premeditated.    Weeks after sending messages about "[s]eiz[ing]" and "interrogat[ing]" politicians, including Senators Thune and McConnell, Brock showed up on the Senate floor in tactical gear with flex-cuffs (which he made sure to pick up off the floor on his way upstairs to the Senate

---

[21] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Gallery), rifling through Senator's papers.  Had the Senate Gallery not been emptied minutes before, Brock could have come face-to-face with the politicians he had fantasized about seizing and interrogating.  Even the seemingly more altruistic parts of Brock's behavior fit into his professed plans.  As noted above, he asserted "Do not kill LEO *unless necessary*" (emphasis added), and during an exchange with a friend, during which Brock asked "Can you imagine if several hundred thousand Patriots descended on dc refusing to let Biden be inaugurated[?]", his friend warned that it could be "a possible IO loss if a cop got hurt."  Accordingly, even those moments where Brock avoided or discouraged direct physical confrontation with police (whom he did not have to engage with because they were so vastly outnumbered) served the goals of Brock's planned IO war, which was focused on preventing the certification and peaceful transfer of presidential power.

> **E.     The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

A509

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

29

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when

warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[22]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail

'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on

January 6, 2021, many salient differences explain the differing recommendations and sentences.

While no previously sentenced case contains the same balance of aggravating and mitigating

---

[22] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

30

A511

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Joshua Pruitt (21-CR-23-TJK) was a January 6 case where, like Brock, Pruitt had a lot of violent rhetoric in the lead up to January 6.   Pruitt was a member of the Proud Boys and was communicating with other Proud Boys members, whereas Brock did not have an official affiliation to any specific group[23].   Like Brock[24], Pruitt wore a Punisher logo on his clothing.   Pruitt entered the Capitol earlier than Brock did; additionally, Pruitt had a close encounter with then House Majority Leader Chuck Schumer, as well as law enforcement officers.   Pruitt did not go into the Senate Chamber, which Brock did twice.   Pruitt also accepted responsibility for his criminal conduct on January 6 and pleaded guilty to obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2).   Pruitt was eventually sentenced to 55 months' incarceration.

Jerod Hughes (21-CR-106-TJK) is another January 6 case with some analogies to the Brock case.   Like Brock, Hughes also went onto the Senate Floor and rifled through paperwork on Senator's desks.   Hughes yelled violent rhetoric on January 6, though not of the intensity of the violent rhetoric that Brock displayed online in the days and weeks leading up to January 6. Hughes was involved in property destruction and chasing U.S. Capitol Police Officer Goodman,

---

[23] In a December 31, 2020 post on Facebook, Brock discussed his view of the 2020 electronic and used hashtags referencing the Oath Keepers and the Three Percenters (as well as the Second Amendment):

> 'we are now under occupation by a hostile governing force.   That may seem ludicrous to some, but I see no distinction between a group of Americans seizing power and governing with complete disregard for the Constitution and an invading force of Chinese communists accomplishing the same objective.' Against all enemies foreign and domestic #OathKeeper #2A #III%

[24] Brock wore a Punisher patch on his tactical vest.

whereas Brock is not alleged to have done either of those things.   Hughes accepted responsibility for his actions on January 6 and pleaded guilty to obstruction of an official proceeded in violation of 18 U.S.C. § 1512(c)(2).   The Government asked for 46 months incarceration for Hughes, and Hughes was eventually sentenced to 38 months incarceration.

Matthew Bledsoe (21-CR-204-BAH) is another January 6 case with similarities to the Brock case.   Bledsoe, like Brock, entered through the Senate Wing Doors within 15 minutes of the initial breach of those doors.   Bledsoe also had social media rhetoric before January 6. Bledsoe paraded through the Capitol with a flag, while Brock had a pair of flex cuffs.   Bledsoe went near the House Chamber, while Brock went onto the Senate Gallery, and onto the Senate Floor.   Bledsoe spent a total of 22 minutes inside the Capitol, while Brock spent 38 minutes inside the Capitol.   Like Brock, Bledsoe also was convicted after a trial.   The Government asked for 70 months in Bledsoe, and Bledsoe was eventually sentenced to 48 months incarceration.

### G.      Brock's Objections to the PSR

Brock objected to paragraph 31 of the PSR, which states that Sgt. Timberlake referred to Brock as "the leader".   The Government agrees that Sgt. Timberlake did not refer to Brock as "the leader" during trial, instead he spoke about Brock having a "commanding presence". Tr. 11/14/2022 166:1

Brock objected to paragraph 33 of the PSR, which stated that Brock's participation "in the riot contributed to the mob's ability to delay the certification proceedings for hours."   The Government concurs with probation that Brock, as a part of the mob on January 6, is responsible for the delay to the certification proceedings.   It was the mob of people, of which Brock was a

A513

part, that caused the certification to be delayed on January 6.   As Cpt. Patton testified to, any time one person bypasses security the Capitol Police have to go into lockdown to secure the threat. Tr. 11/14/2022, 78:15-22.   Brock was part of the mob of people who entered the Capitol on January 6, while not going through any security screenings.   Brock made his way into the Senate Chamber, where earlier in the afternoon Senators had been debating the certification of the State of Arizona. The certification of the vote was delayed, and could not continue for hours, because of the mob of people inside the Capitol of which Brock was a part of.

Brock objected to paragraph 37 of the PSR, which denies a reduction of levels for acceptance of responsibility.   The Government has addressed that objection on page 24, footnote 20 of this memo.

Brock objected to paragraph 52 of the PSR, which assesses an additional eight levels for causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice.   The Government has addressed that objection on page 23, footnote 16 of this memo.

Lastly, Brock objected to paragraph 53 of the PSR, which assesses an addition three levels for an offense which resulted in the substantial interference in the administration of justice.   The Government has addressed that objection on page 23, footnote 17 of this memo.

## VI.     RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," _United States v. Fair_, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

33

A514

restitution only when authorized by statute, _United States v. Papagno_, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." _Papagno_, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. _Papagno_, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. _See_ 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." _Hughey v. United States_, 495 U.S. 411, 418 (1990) (interpreting the VWPA); _see United States v. Clark_, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under _Hughey_).[25] Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[26] _See_ 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

---

[25] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. _See_ 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); _see also United States v. Zerba_, 983 F.3d 983, 986 (8th Cir. 2020); _United States v. Giudice_, 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020). The defendant in this case did not enter into a plea agreement.

[26] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. _See United States v. Emor_, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§ 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[27] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that

---

[27] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Brock's conduct in entering the Capitol building as part of a mob caused damage to that building.

35

A516

"absolute precision is not required") (citation omitted); _United States v. Burdi_, 414 F.3d 216, 221 (1st Cir. 2005) (same); _see also Paroline v. United States_, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." _United States v. Williams_, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" _Fair_, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[28]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued

---

[28] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. _See_ 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

36

and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Brock to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Brock's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months' incarceration, 36 months' supervised release, $2,000 restitution, and the mandatory special assessments ($100 for Count One, $25 each for Counts Two and Three, and

A518

$10 each for Counts Four through Six).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      _/s/ April Ayers-Perez_
April Ayers-Perez
Douglas Meisel
Barry Disney
Trial Attorneys (detailees)
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20001
202-894-4237
April.AyersPerez@usdoj.gov

38

A519

Table 1: Cases in which the government recommended a probation sentence without home detention[1]

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Morgan-Lloyd, Anna | 1:21-CR-00164-RCL | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>40 hours' community service<br>$500 restitution | 36 months' probation<br>120 hours' community service<br>$500 restitution |
| Ehrke, Valerie | 1:21-CR-00097-PLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>40 hours' community service<br>$500 restitution | 36 months' probation<br>120 hours' community service<br>$500 restitution |
| Bissey, Donna | 1:21-CR-00165-TSC | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>40 hours' community service<br>$500 restitution | 14 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Hiles, Jacob | 1:21-CR-00155-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Wangler, Douglas | 1:21-CR-00365-DLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>40 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Harrison, Bruce | 1:21-CR-00365-DLF | 40 U.S.C. § 5104(e)(2)(G) | 48 months' probation<br>40 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' of community service<br>$500 restitution |

[1] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

1

A520

Table 2: Cases in which the government recommended a probation sentence with home detention

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Bustle, Jessica | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>40 hours' community service<br>$500 restitution | 2 months' home detention<br>24 months' probation<br>40 hours' community service<br>$500 restitution |
| Bustle, Joshua | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>40 hours' community service<br>$500 restitution | 30 days' home detention<br>24 months' probation<br>40 hours' community service<br>$500 restitution |
| Doyle, Danielle | 1:21-CR-00324-TNM | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' probation<br>$3,000 fine<br>$500 restitution |
| Bennett, Andrew | 1:21-CR-00227-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 3 months' home detention<br>24 months' probation<br>80 hours' community service<br>$500 restitution |
| Mazzocco, Matthew | 1:21-CR-00054-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Rosa, Eliel | 1:21-CR-00068-TNM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>100 hours' community service<br>$500 restitution |

2

A521

| | | | |
|---|---|---|---|
| Gallagher, Thomas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>Fine<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Vinson, Thomas | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>3 years' probation<br>60 hours' community service<br>$500 restitution | 5 years' probation<br>$5,000 fine<br>120 hours' community service<br>$500 restitution |
| Dillon, Brittiany | 1:21-CR-00360-DLF | 40 U.S.C. § 5104(e)(2)(D) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>$500 restitution |
| Sanders, Jonathan | 1:21-CR-00384-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>60 hours' community service<br>$500 restitution |
| Fitchett, Cindy | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Sweet, Douglas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Cordon, Sean | 1:21-CR-00269-TNM | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' probation<br>$4000 fine<br>$500 restitution |

3

A522

| Wilkerson, John IV | 1:21-CR-00302-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$2500 fine<br>60 hours' community service<br>$500 restitution |
|---|---|---|---|---|
| Jones, Caleb | 1:21-CR-00321-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>24 months' probation<br>100 hours' community service<br>$500 restitution |
| Brown, Terry | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Wrigley, Andrew | 1:21-CR-00042-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 18 months' probation<br>$2000 fine<br>60 hours' community service<br>$500 restitution |
| Parks, Jennifer | 1:21-CR-00363-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Reimler, Nicholas | 1:21-CR-00239-RDM | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Miller, Brandon | 1:21-CR-00266-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 20 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Miller, Stephanie | 1:21-CR-00266-TSC | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Hatley, Andrew | 1:21-CR-00098-TFH | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$500 restitution |

4

A523

| Pert, Rachael | 1:21-CR-00139-TNM | 18 U.S.C. § 1752(a)(1) | 3 months' home detention<br>24 months' probation<br>40 hours' community service<br>$500 restitution | 24 months' probation<br>100 hours' community service<br>$500 restitution |
|---|---|---|---|---|
| Winn, Dana | 1:21-CR-00139-TNM | 18 U.S.C. § 1752(a)(1) | 3 months' home detention<br>24 months' probation<br>40 hours' community service<br>$500 restitution | 10 days' incarceration (weekends)<br>12 months' probation<br>100 hours' community service<br>$500 restitution |
| Wickersham, Gary | 1:21-CR-00606-RCL | 40 U.S.C. § 5104(e)(2)(G) | 4 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>$2000 fine<br>$500 restitution |
| Schwemmer, Esther | 1:21-CR-00364-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Kelly, Kenneth | 1:21-CR-00331-CKK | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>12 months' probation<br>$500 restitution |
| Straka, Brandon | 1:21-cr-00579-DLF | 40 U.S.C. § 5104(e)(2)(D) | 4 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>$5000 fine<br>60 hours' community service<br>$500 restitution |
| Sizer, Julia | 1:21-CR-00621-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>$2,000 fine<br>$500 restitution |
| Blauser, William | 1:21-CR-00386-TNM | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | $500 fine<br>$500 restitution |

5

A524

| Barnard, Richard | 1:21-CR-00235-RC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>12 months' probation<br>60 hours' community service<br>$500 restitution |
|---|---|---|---|---|
| Witcher, Jeffrey | 1:21-CR-00235-RC | 18 U.S.C. § 1752(a)(1) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| McAlanis, Edward | 1:21-CR-00516-DLF | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Lollis, James | 1:21-CR-00671-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>100 hours' community service<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>100 hours' community service<br>$500 restitution |
| Schubert, Amy | 1:21-CR-00588-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 18 months' probation<br>$2000 fine<br>100 hours' community service<br>$500 restitution |
| Schubert, John | 1:21-CR-00587-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 18 months' probation<br>$1500 fine<br>100 hours' community service<br>$500 restitution |
| Orangias, Michael | 1:21-CR-00265-CKK | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>$500 restitution |
| Quick, Michael | 1:21-CR-00201-DLF | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>$500 restitution | 36 months' probation<br>$1000 fine<br>60 hours' community service<br>$500 restitution |
| Quick, Stephen | 1:21-CR-00201-DLF | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>$500 restitution | 24 months' probation<br>$1000 fine<br>60 hours' community service<br>$500 restitution |

6

A525

| Reda, Kenneth | 1:21-CR-00452-TFH | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
|---|---|---|---|---|
| McCreary, Brian | 1:21-CR-00125-BAH | 18 U.S.C. § 1752(a)(1) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 42 days' intermittent incarceration (condition of probation)<br>2 months' home detention<br>36 months' probation<br>$2,500 fine<br>$500 restitution |
| Colbath, Paul | 1:21-CR-00650-RDM | 40 U.S.C. § 5104(e)(2)(G) | 3 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 day's home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Lewis, Jacob | 1:21-CR-00100-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>$3000 fine<br>60 hours' community service<br>$500 restitution |
| Lentz, Nicholes | 1:22-CR-00053-RDM | 18 U.S.C. § 1752(a)(1) | 2 months' home detention<br>36 months' probation | 1 month home detention<br>36 months' probation<br>100 hours' community service<br>$500 restitution |
| Daughtry, Michael | 1:21-CR00141-RDM | 18 U.S.C. § 1752(a)(1) | 4 month's home detention<br>36 months' probation<br>$500 restitution | 60 days' home detention<br>36 months' probation<br>$500 restitution |
| Juran, John | 1:21-CR-00419-TFH | 40 U.S.C. § 5104(e)(2)(G) | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>$500 fine<br>$500 restitution |
| Genco, Raechel | 1:22-CR-00062 - JMC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Macrae, Douglas Farquhar | 1:22-CR-00181 - JEB | 40 U.S.C. § 5104(e)(2)(G) | 4 months' home detention as part of a 36 month term of probation<br>60 hours' community service | 12 months' probation<br>150 hours' community service<br>$500 restitution |

A526

| | | | $500 restitution | |
|---|---|---|---|---|
| Seymour, Paul SR. | 1:22-CR-00041-APM | 40 U.S.C. § 5104(e)(2)(G) | 90 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Seymour, Paul Jr. | 1:22-CR-00041-APM | 40 U.S.C. § 5104(e)(2)(G) | 90 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Ferguson, Jamie | 1:22-CR-00194-APM | 40 U.S.C. § 5104(e)(2)(G) | 24 months' probation<br>30 days' home detention<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |

Table 3: Cases in which the government recommended a sentence of incarceration

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Curzio, Michael | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 6 months' incarceration (time served) | 6 months' incarceration (time served)<br>$500 restitution |
| Hodgkins, Paul | 1:21-CR-00188-RDM | 18 U.S.C. § 1512(c)(2) | 18 months' incarceration | 8 months' incarceration<br>24 months' supervised release<br>$2000 restitution |
| Dresch, Karl | 1:21-CR-00071-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 6 months' incarceration (time served)<br>$1000 fine<br>$500 restitution | 6 months' incarceration (time served)<br>$500 restitution |
| Jancart, Derek | 1:21-CR-00148-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months' incarceration<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
| Rau, Erik | 1:21-CR-00467-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months' incarceration<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
| Hemenway, Edward | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 45 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Reeder, Robert | 1:21-CR-00166-TFH | 40 U.S.C. § 5104(e)(2)(G) | 6 months' incarceration | 3 months' incarceration |

A527

| | | | $500 restitution | $500 restitution |
|---|---|---|---|---|
| Bauer, Robert | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 45 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Smocks, Troy | 1:21-CR-00198-TSC | 18 U.S.C. § 875(c) | Low end of sentencing guidelines<br>36 months' supervised release<br>$500 restitution | 14 months' incarceration<br>36 months' supervised release |
| Vinson, Lori | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 60 months' probation<br>$5,000 fine<br>120 hours' community service<br>$500 restitution |
| Griffith, Jack | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>$500 restitution |
| Torrens, Eric | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>$500 restitution |
| Gruppo, Leonard | 1:21-CR-00391-BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 3 months' home detention<br>24 months' probation<br>$3,000 fine<br>$500 restitution |
| Ryan, Jennifer | 1:21-CR-00050-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>$500 restitution | 2 months' incarceration<br>$1000 fine<br>$500 restitution |
| Croy, Glenn | 1:21-CR-00162-BAH | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>$500 restitution | 14 days' community correctional facility<br>3 months' home detention<br>36 months' probation<br>$500 restitution |
| Stotts, Jordan | 1:21-CR-00272-TJK | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>$500 restitution | 2 months' home detention<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Fairlamb, Scott | 1:21-CR-00120-RCL | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 44 months' incarceration<br>36 months' supervised release<br>$2000 fine | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |

A528

A529

| Name | Case Number | Statute | Sentence |
|---|---|---|---|
| Camper, Boyd | 1:21-CR-00325-CKK | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>60 hours' community service<br>$500 restitution |
| Rukstales, Bradley | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Cordon, Kevin | 1:21-CR-00277-TNM | 18 U.S.C. § 1752(a)(1) | 30 days' incarceration<br>12 months' supervised release<br>$500 restitution | 12 months' probation<br>$4000 fine<br>100 hours' community service<br>$500 restitution |
| Chansley, Jacob | 1:21-CR-00003-RCL | 18 U.S.C. § 1512(c)(2) | 51 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| Mish, David | 1:21-CR-00112-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Lolos, John | 1:21-CR-00243-APM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 14 days' incarceration<br>$500 restitution |
| Scavo, Frank | 1:21-CR-00254-RCL | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>$500 restitution | 2 months' incarceration<br>$5000 fine<br>$500 restitution |
| Abual-Ragheb, Rasha | 1:21-CR-00043-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Peterson, Russell | 1:21-CR-00309-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Simon, Mark | 1:21-CR-00067-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>$500 restitution | 35 days' incarceration<br>$500 restitution |
| Ericson, Andrew | 1:21-CR-00506-TNM | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>$500 restitution | 20 days' incarceration (consecutive weekends)<br>24 months' probation<br>$500 restitution |
| Pham, Tam Dinh | 1:21-CR-00109-TJK | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>$500 restitution | 45 days' incarceration<br>$1000 fine<br>$500 restitution |
| Nelson, Brandon | 1:21-CR-00344-JDB | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>$500 restitution | 24 months' probation<br>$2500 fine |

| | | | | 50 hours' community service $500 restitution |
|---|---|---|---|---|
| Markofski, Abram | 1:21-CR-00344-JDB | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration $500 restitution | 24 months' probation $1000 fine 50 hours' community service $500 restitution |
| Marquez, Felipe | 1:21-CR-00136-RC | 18 U.S.C. § 1752(a)(2) | 4 months' incarceration 12 months' supervised release $500 restitution | 3 month's home detention 18 months' probation $500 restitution |
| Meredith, Cleveland | 1:21-CR-00159-ABJ | 18 U.S.C. § 875(c) | Midrange of 37-46 months' incarceration 36 months' supervised release | 28 months' incarceration 36 months' supervised release |
| Sorvisto, Jeremy | 1:21-CR-00320-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration $500 restitution | 30 days' incarceration $500 restitution |
| Mariotto, Anthony | 1:21-CR-00094-RBW | 40 U.S.C. § 5104(e)(2)(G) | 4 months' incarceration 36 months' probation $500 restitution | 36 months' probation $5000 fine 250 hours' community service $500 restitution |

11

A530

| Courtright, Gracyn | 1:21-CR-00072-CRC | 18 U.S.C. § 1752(a)(1) | 6 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution |
|---|---|---|---|---|
| Palmer, Robert | 1:21-CR-00328-TSC | 18 U.S.C. § 111(a) and (b) | 63 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 63 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| Thompson, Devlyn | 1:21-CR-00461-RCL | 18 U.S.C. § 111(a) and (b) | 48 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 46 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| Edwards, Gary | 1:21-CR-00366-JEB | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>24 months' probation<br>$500 restitution | 12 months' probation<br>$2500 fine<br>200 hours' of community service<br>$500 restitution |
| Tutrow, Israel | 1:21-CR-00310-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>$500 restitution |
| Ridge IV, Leonard | 1:21-CR-00406-JEB | 18 U.S.C. § 1752(a)(1) | 45 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 14 days' consecutive incarceration<br>12 months' supervised release<br>$1000 fine<br>100 hours' community service<br>$500 restitution |
| Perretta, Nicholas | 1:21-CR-00539-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Vukich, Mitchell | 1:21-CR-00539-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Spencer, Virginia | 1:21-CR-00147-CKK | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>$500 restitution | 3 months' incarceration<br>$500 restitution |
| Kostolsky, Jackson | 1:21-CR-00197-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>$500 restitution |

12

A531

| Rusyn, Michael | 1:21-CR-00303-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>$500 restitution | 2 months' home detention<br>24 months' probation<br>$2000 fine<br>$500 restitution |
| Tryon, William | 1:21-CR-00420-RBW | 18 U.S.C. § 1752(a)(1) | 30 days' incarceration<br>12 months' supervised release<br>$500 restitution | 50 days' incarceration<br>12 months' supervised release<br>$1000 fine<br>$500 restitution |
| Sells, Tanner | 1:21-CR-00549-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 3 months' home detention<br>24 months' probation<br>$1500 fine<br>50 hours' community service<br>$500 restitution |
| Walden, Jon | 1:21-CR-00548-DLF | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Prado, Nicole | 1:21-CR-00403-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' 12-hour curfew<br>12 months' probation<br>$742 fine<br>60 hours' community service<br>$500 restitution |
| Williams, Vic | 1:21-CR-00388-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>12 months' probation<br>$1500 fine<br>60 hours' community service<br>$500 restitution |
| Wiedrich, Jacob | 1:21-CR-00581-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>$500 restitution | 3 months' home detention<br>36 months' probation<br>100 hours' community service<br>$500 restitution |
| Stepakoff, Michael | 1:21-CR-00096-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>12 months' probation<br>$742 fine<br>60 hours' community service<br>$500 restitution |

13

A532

| | | | | |
|---|---|---|---|---|
| Scirica, Anthony | 1:21-CR-00457-CRC | 40 U.S.C. § 5104(e)(2)(G) | 15 days' incarceration<br>$500 restitution | 15 days' incarceration<br>$500 fine<br>$500 restitution |
| Crase, Dalton | 1:21-CR-00082-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 15 days' intermittent incarceration<br>(condition of probation)<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Williams, Troy | 1:21-CR-00082-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 15 days' intermittent incarceration<br>(condition of probation)<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Languerand, Nicholas | 1:21-CR-00353-JDB | 18 U.S.C. § 111 (a) and (b) | 51 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 44 months' incarceration<br>24 months' supervised release<br>60 hours' community service<br>$2000 restitution |
| Wilson, Zachary | 1:21-CR-00578-APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 45 days' home detention<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Wilson, Kelsey | 1:21-CR-00578-APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 30 days' home detention<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| McAuliffe, Justin | 1:21-CR-00608-RCL | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>$500 restitution |
| Williams, Andrew | 1:21-CR-00045-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>24 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Leffingwell, Mark | 1:21-CR-00005-ABJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 6 months' incarceration<br>24 months' supervised release<br>200 hours' community service<br>$2,000 restitution |

14

A533

| | | | | |
|---|---|---|---|---|
| Wagner, Joshua | 1:21-CR-00310-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Stenz, Brian | 1:21-CR-00456-BAH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' incarceration as a condition of probation<br>2 months' home detention<br>36 months' probation<br>$2500 fine<br>$500 restitution |
| Schornak, Robert | 1:21-CR-00278-BAH | 18 U.S.C. § 1752(a)(1) | 4-6 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 28 days' intermittent incarceration (2 14-day intervals)<br>2 months' home detention<br>36 months' probation<br>$500 restitution |
| Castro, Mariposa | 1:21-CR-00299-RBW | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>$500 restitution | 45 days' incarceration<br>$5000 fine |
| Sunstrum, Traci | 1:21-CR-00652-CRC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>$500 restitution |
| Register, Jeffrey | 1:21-CR-00349-TJK | 40 U.S.C. § 5104(e)(2)(G) | 5 months' incarceration<br>$500 restitution | 75 days' incarceration<br>$500 restitution |
| Johnson, Adam | 1:21-CR-00648-RBW | 18 U.S.C. § 1752(a)(1) | 90 days' incarceration<br>12 month's supervised release<br>$5000 fine | 75 days' incarceration<br>12 months' supervised release<br>$5000 fine<br>200 hours' community service<br>$500 restitution |
| Howell, Annie | 1:21-CR-00217-TFH | 18 U.S.C. § 1752(a)(1) | 60 days' incarceration<br>12 month's supervised release<br>$500 restitution | 60 days' intermittent incarceration, to be served in 10-day installments, as a condition of probation<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Gonzalez, Eduardo | 1:21-CR-00115-CRC | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>$500 restitution | 24 months' probation<br>$1000 fine<br>$500 restitution |
| Wilson, Duke | 1:21-CR-00345-RCL | 18 U.S.C. § 1512(c)(2) | 46 months' incarceration | 51 months' incarceration |

15

A534

| | | 18 U.S.C. § 111(a)(1) | $2000 + TBD restitution for injured officer | 36 months' supervised release<br>TBD restitution |
|---|---|---|---|---|
| Strong, Kevin | 1:21-CR-00114-TJK | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 30 days' home detention<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Bonet, James | 1:21-CR-00121-EGS | 18 U.S.C. § 1752(a)(1) | 45 days' incarceration<br>12 months' probation<br>$500 restitution | 3 months' incarceration<br>12 months' probation<br>200 hours' community service<br>$500 restitution |
| Nalley, Verden | 1:21-CR-00016-DLF | 18 U.S.C. § 1752(a)(1) | 14 days' incarceration<br>12 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Carico, Michael | 1:21-CR-00696-TJK | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 2 months' home detention<br>24 months' probation<br>$500 fine<br>60 hours' community service<br>$500 restitution |
| Little, James | 1:21-CR-00315-RCL | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 60 days' incarceration<br>36 months' probation<br>$500 restitution |
| Loftus, Kevin | 1:21-CR-00081-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation | 36 months' probation<br>60 hours' community service<br>$500 restitution |
| Smith, Jeffrey | 1:21-CR-00290-RBW | 40 U.S.C. § 5104(e)(2)(G) | 5 months' incarceration<br>$500 restitution | 90 days' incarceration<br>24 months' probation<br>200 hours' community service<br>$500 restitution |
| Kelley, Kari | 1:21-CR-00201-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 36 months' probation<br>$500 restitution |
| Martin, Zachary | 1:21-CR-00201-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 36 months' probation<br>$1000 fine<br>60 hours' community service<br>$500 restitution |

16

A535

| | | | | |
|---|---|---|---|---|
| Cudd, Jenny | 1:21-CR-00068-TNM | 18 U.S.C. § 1752(a)(1) | 75 days' incarceration<br>12 months' supervised release<br>$500 restitution | 2 months' probation<br>$5000 fine<br>$500 restitution |
| Jackson, Micajah | 1:21-CR-00484-RDM | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>36 months' supervised release<br>$500 restitution | 36 months' probation with 90 days' in residential half-way house<br>$1,000 fine<br>$500 restitution |
| Petrosh, Robert | 1:21-CR-00347-TNM | 18 U.S.C. § 641 | 4 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$938 restitution | 10 days' incarceration<br>12 months' supervised release<br>$1,000 fine<br>$938 restitution |
| Ivey, Bryan | 1:21-CR-00267-CRC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 60 days' home detention<br>36 months' probation<br>$500 restitution<br>60 hours' community service |
| Burress, Gabriel | 1:21-CR-00744-TJK | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 45 days' home confinement<br>18 months' probation<br>$500 restitution<br>60 hours' community service |
| Pettit, Madison | 1:21-CR-00744-TJK | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 45 days' home confinement<br>18 months' probation<br>$500 restitution<br>60 hours' community service |
| Coffman, Lonnie | 1:21-CR-00004-CKK | 26 U.S.C. § 5861(d)<br>22 D.C. Code § 4504(a) | Middle of SGR<br>36 months' probation | 46 months' incarceration<br>36 months' supervised release |
| Fee, Thomas | 1:21-CR-00133-JDB | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 24 months' probation<br>$500 fine<br>$500 restitution<br>50 hours' community service |
| Herendeen, Daniel | 1:21-CR-00278-BAH | 18 U.S.C. § 1752(a)(1) | 28 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 14 days' incarceration<br>2 months' home detention<br>36 months' probation<br>$500 restitution |

17

A536

| Zlab, Joseph | 1:21-CR-00389-RBW | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 36 months' probation<br>$500 fine<br>$500 restitution<br>200 hours' community service |
| Riddle, Jason | 1:21-CR-00304-DLF | 18 U.S.C. § 641<br>40 U.S.C. § 5104(e)(2)(G) | 90 days' incarceration<br>12 months' supervised release<br>$754 restitution | 90 days' incarceration for the § 641 offense<br>36 months' probation for the § 5104(e)(2)(G) offense<br>$754 restitution<br>60 days' community service |
| Fox, Samuel | 1:21-CR-00435-BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>$2,500 fine<br>$500 restitution |
| O'Brien, Kelly | 1:21-CR-00633-RCL | 18 U.S.C. § 1752(a)(1) | 5 months' incarceration<br>12 months' supervised release<br>$500 restitution | 90 days' incarceration<br>12 months' supervised release<br>$1,000 fine<br>$500 restitution |
| Hardin, Michael | 1:21-CR-00280-TJK | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>$500 restitution<br>60 hours' community service | 30 day's home confinement<br>18 months' probation<br>$500 restitution<br>60 hours' community service |
| Hernandez, Emily | 1:21-CR-00747-JEB | 18 U.S.C. § 1752(a)(1) | 45 days' incarceration<br>12 months' supervised release<br>$500 restitution<br>60 hours' community service | 30 days' incarceration<br>12 months' supervised release<br>$500 restitution<br>80 hours' community service |
| Merry, William | 1:21-CR-00748-JEB | 18 U.S.C. § 641 | 4 months' incarceration<br>12 months' supervised release<br>$500 restitution<br>60 hours' community service | 45 days' incarceration<br>9 months' supervised release<br>80 hours' community service |
| Westover, Paul | 1:21-CR-00697-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
| O'Malley, Timothy | 1:21-CR-00704-CRC | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>20 hours' community service<br>$500 restitution |

18

A537

| | | | |
|---|---|---|---|
| Reed, Blake | 1:21-CR-00204-BAH | 18 U.S.C. § 1752(a)(1) | 3 months' incarceration<br>12 months' supervised release<br>$500 restitution | 42 days' intermittent confinement<br>3 months' home detention<br>36 months' probation<br>$2500 fine<br>$500 restitution |
| Rebegila, Mark | 1:21-CR-00283-APM | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>36 months' probation<br>$500 restitution | 30 days' home detention<br>24 months' probation<br>$2000 fine<br>60 hours' community service<br>$500 restitution |
| Watrous, Richard | 1:21-CR-00627-BAH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' intermittent confinement<br>2 months' home detention<br>36 months' probation<br>$2500 fine<br>$500 restitution |
| Meteer, Clifford | 1:21-CR-00630-CJN | 40 U.S.C. § 5104(e)(2)(G) | 75 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Conover, Thomas | 1:21-CR-00743-FYP | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' residential reentry center<br>36 months' probation<br>$2500 fine<br>60 hours' community service<br>$500 restitution |
| Lavin, Jean | 1:21-CR-00596-BAH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 10 days' intermittent confinement (5 weekends)<br>2 months' home detention<br>36 months' probation<br>$2500 fine<br>$500 restitution |
| Krzywicki, Carla | 1:21-CR-00596-BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 36 months' probation<br>3 months' home detention<br>$500 restitution |
| Kulas, Christian | 1:21-CR-00397-TFH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service | 6 months' probation<br>2 months' home detention<br>$500 restitution |

19

A538

USCA Case #23-3045   Case 1:21-cr-00104-RBW   Document 88-1   Filed 03/07/24   Page 541 of 609

| | | | $500 restitution | |
|---|---|---|---|---|
| Kulas, Mark | 1:21-CR-00693-TFH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 6 months' probation<br>2 months' home detention<br>$500 restitution |
| Von Bernewitz, Eric | 1:21-CR-00307-CRC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 days' home detention<br>24 months' probation<br>$1000 fine<br>$500 restitution |
| Von Bernewitz, Paul | 1:21-CR-00307-CRC | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Ballesteros, Robert | 1:21-CR-00580-DLF | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>24 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>40 hours' community service<br>$500 restitution |
| Sarko, Oliver | 1:21-CR-00591-CKK | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>36 months' probation<br>$500 restitution |
| Vuksanaj, Anthony | 1:21-CR-00620-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 42 days' intermittent confinement (3, 14-day periods)<br>3 months' home detention<br>36 months' probation<br>$2000 fine<br>$500 restitution |
| Creek, Kevin | 1:21-CR-00645-DLF | 18 U.S.C. § 111(a)(1) | 27 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 27 months' incarceration<br>12 months' supervised release<br>$2000 restitution |
| Peart, Willard | 1:21-CR-00662-PLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 2 months' home detention<br>36 months' probation<br>240 hours' community service<br>$500 fine<br>$500 restitution |

20

A539

| Webler, Matthew | 1:21-CR-00741-DLF | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
|---|---|---|---|---|
| Mostofsky, Aaron | 1:21-CR-00138-JEB | 18 U.S.C. § 641<br>18 U.S.C. § 231<br>(a)(3)<br>18 U.S.C. § 1752(a)(1) | 15 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 8 months' incarceration<br>12 months' supervised release on<br>each count to run concurrently<br>200 hours' community service<br>$2000 restitution |
| Entrekin, Nathan | 1:21-CR-00686-FYP | 40 U.S.C. § 5104(e)(2)(G) | 105 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Kidd, Nolan | 1:21-CR-00429-CRC | 40 U.S.C. § 5104(e)(2)(G) | 90 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
| Baker, Stephen | 1:21-CR-00273-TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>$500 restitution | 9 days' intermittent confinement<br>24 months' probation<br>$500 restitution |
| McDonald, Savannah | 1:21-CR-00429-CRC | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 21 days' incarceration<br>$500 restitution |
| Honeycutt, Adam | 1:22-CR-00050-CJN | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 3 months' incarceration<br>$500 restitution |
| Spain, Jr., Edward | 1:21-CR-00651-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>60 hours' community service<br>$500 restitution |
| Kramer, Philip | 1:21-CR-00413-EGS | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>$2500 fine<br>100 hours' community service<br>$500 restitution |
| Ehmke, Hunter | 1:21-CR-00029-TSC | 18 U.S.C. § 1361 | 4 months' incarceration<br>36 months' supervised release | 4 months' incarceration<br>36 months' supervised release |

21

A540

| | | | $2,181 restitution | $2,181 restitution |
|---|---|---|---|---|
| Chapman, Robert | 1:21-CR-00676-RC | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' | 3 month's home detention<br>18 month's probation<br>$742 fine<br>60 hours' community service<br>$500 restitution |
| Timbrook, Michael | 1:21-CR-00361-TNM | 40 U.S.C. § 5104(e)(2)(G) | 90 days' incarceration<br>36 months' probation | 14 days' intermittent incarceration to be served on 7 consecutive weekends, as a condition of 12 months' probation<br>$500 restitution |
| Miller, Matthew | 1:21-CR-00075-RDM | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 51 months' incarceration<br>36 month's supervised release | 33 months' incarceration<br>24 months' probation<br>$2000 restitution<br>100 hours' community service |
| Hemphill, Pamela | 1:21-CR-00555-RCL | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>36 month's probation | 2 months' incarceration<br>36 month's probation<br>$500 restitution |
| Rubenacker, Greg | 1:21-CR-00193-BAH | 18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>18 U.S.C. § 1752(a)(4)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(E)<br>40 U.S.C. § 5104(e)(2)(F)<br>40 U.S.C. § 5104(e)(2)(G) | 46 months' incarceration<br>36 months' supervised release | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| Johnson, Daniel | 1:21-CR-00407-DLF | 18 U.S.C. § 231(a)(3) | 6 months' incarceration<br>12 months' supervised release | 4 months' incarceration<br>12 months' supervised release<br>$2000 restitution |
| Johnson, Daryl | 1:21-CR-00407-DLF | 18 U.S.C. § 231(a)(3) | 90 days' incarceration<br>12 months' supervised release | 30 days' incarceration<br>12 months' supervised release<br>$2000 fine<br>$2000 restitution |
| Buhler, Janet | 1:21-CR-00510-CKK | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration | 30 days' incarceration |

22

A541

| | | | 36 months' supervised release $500 restitution | 36 months' supervised release $500 restitution |
|---|---|---|---|---|
| Tagaris, Jody | 1:21-CR-00368-JDB | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration 36 months' probation $500 restitution | 24 months' probation $2000 fine $500 restitution 60 hours' community service |
| Heinl, Jennifer | 1:21-CR-00370-EGS | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration 36 months' probation $500 restitution | 14 days' incarceration 24 months' probation $500 restitution |
| Sywak, William Jason | 1:21-CR-00494-RC | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration 36 months' probation 60 hours' community service $500 restitution | 2 months' home detention 12 months' probation 60 hours' community service $500 restitution |
| Sywak, William Michael | 1:21-CR-00494-RC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration 36 months' probation $500 restitution | 4 month's home detention 24 months' probation 60 hours' community service $500 restitution |
| Laurens, Jonathan | 1:21-CR-00450-RC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration 36 months' probation $500 restitution | 60 days' home detention 12 months' probation $742 fine $500 restitution 60 hours' community service |
| Cooke, Nolan | 1:22-CR-00052-RCL | 18 U.S.C. § 231(a)(3) | 11 months' incarceration 36 months' supervised release $2000 restitution | 366 days' incarceration 36 months' supervised release $2000 restitution |
| Barber, Eric | 1:21-cr-00228-CRC | 40 U.S.C. § 5104(e)(2)(G) 22 D.C. Code 3212 | 4 months' incarceration 36 months' probation $552.95 restitution | 45 days' incarceration 24 months' probation $552.95 restitution |
| Gold, Simone | 1:21-CR-00085-CRC | 18 U.S.C. § 1752(a)(1) | 3 months' incarceration 12 month's supervised release $500 restitution 60 hours' community service | 60 days' incarceration 12 months' supervised release $9,500 fine $500 restitution |
| Griffin, Cuoy | 1:21-CR-00092-TNM | 18 U.S.C. § 1752(a)(1) | 60 days' incarceration 12 months' supervised release | 14 days' incarceration 12 months' supervised release |
| Stackhouse, Lawrence | 1:21-CR-00240-BAH | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration 36 months' probation | 14 days' intermittent incarceration as a condition of 36 months' probation |

23

| | | | $500 restitution | $500 restitution |
|---|---|---|---|---|
| Baranyi, Lawrence | 1:21-CR-00062-JEB | 18 U.S.C. § 1752 (a)(1) | 4 months' incarceration<br>12 months' supervised release<br>$500 restitution | 90 days' incarceration<br>12 months' year supervised release<br>$500 restitution |
| Evans, Derrick | 1:21-CR-00337-RCL | 18 U.S.C. § 231(a)(3) | 3 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 3 months' incarceration<br>36 months' supervised release<br>$2000 restitution<br>$2000 fine |
| Lucard, Carson | 1:22-CR-00087-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>$500 restitution | 21 days' intermittent confinement as a condition of 36 months' probation<br>60 days' home detention<br>$500 restitution |
| Cunningham, Christopher | 1:21-CR-00603-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 3 months' home detention<br>12 months' probation<br>$1,113 fine<br>$500 restitution |
| Prezlin, Brandon | 1:21-CR-00694-TNM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 10 months' probation<br>$2,500 fine<br>120 hours' community service<br>$500 restitution |
| Weisbecker, Philip | 1:21-CR-00682-TFH | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration<br>36 months' probation<br>$500 restitution | 30 days' intermittent confinement as a condition of 24 months' probation<br>$2,000 fine<br>$500 restitution |
| Sidorski, Dennis | 1:21-CR-00048-ABJ | 18 U.S.C. § 1752 (a)(2) | 12 months' incarceration<br>12 months' supervised release<br>$500 restitution | 100 days' incarceration<br>12 months' supervised release<br>50 hours' community service<br>$500 restitution |
| Bromley, Phillip | 1:21-CR-00250-PLF | 18 U.S.C. § 1752(a)(2) | 12 months' incarceration<br>12 months' supervised release<br>$500 restitution | 90 days' incarceration<br>12 months' supervised release<br>$4,000 fine<br>$2,000 restitution |
| Revlett, Jordan | 1:21-CR-00281-JEB | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 14 days' incarceration<br>12 months' probation<br>80 hours' community service<br>$500 restitution |

24

A543

| Snow, Robert | 1:22-CR-00030-TJK | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Torre, Benjamin | 1:21-CR-00143-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 12 months' probation<br>$1,113 fine<br>60 hours' community service<br>$500 restitution |
| Grace, Jeremey | 1:21-CR-00492-JDM | 18 U.S.C. § 1752 (a)(1) | 60 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 21 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution |
| Getsinger, John | 1:21-CR-00607-EGS | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>$500 restitution | 60 days' incarceration<br>36 months' probation<br>100 hours' community service<br>$500 restitution |
| Getsinger, Stacie | 1:21-CR-00607-EGS | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>$500 restitution | 60 days' incarceration<br>36 months' probation<br>100 hours' community service<br>$500 restitution |
| Suarez, Marissa | 1:21-CR-00205-DLF | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 36 months' probation<br>60 hours' community service<br>$2000 fine<br>$500 restitution |
| Todisco, Patricia | 1:21-CR-00205-DLF | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 36 months' probation<br>60 hours' community service<br>$2000 fine<br>$500 restitution |
| Blair, David | 1:21-CR-00186-CRC | 18 U.S.C. § 231(a)(3) | 8 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 5 months' incarceration<br>18 months' supervised release<br>$2,000 restitution |
| Griswold, Andrew | 1:21-CR-00459-CRC | 18 U.S.C. § 231(a)(3) | 5 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 75 days' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| Blakely, Kevin | 1:21-CR-00356-EGS | 40 U.S.C. § 5104(e)(2)(G) | 4 months' incarceration<br>36 months' probation<br>$500 restitution | 120 days' incarceration<br>18 months' probation<br>100 hours' supervised release |

25

A544

A545

| | | | | $500 restitution |
|---|---|---|---|---|
| Persick, Kerry | 1:21-CR-00485-BAH | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>$500 restitution | 36 months' probation<br>90 days' supervised release<br>$5,000 fine<br>$500 restitution |
| Ticas, David | 1:21-CR-00601-JDB | 40 U.S.C. § 5104(e)(2)G | 3 months' incarceration<br>36 months' probation<br>60 hours' community serivce<br>$500 restitution | 14 days' incarceration<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Lindsey, Terry | 1:21-CR-00162-BAH | 18 U.S.C. § 1752(a)(1)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 12 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 5 months' incarceration on the<br>§ 5104 counts to be served<br>concurrently<br>36 months' probation on the § 1752<br>count<br>$500 restitution |
| Mattice, Cody | 1:21-CR-00657-BAH | 18 U.S.C. § 111(a)(1) | 44 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 44 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Mault, James | 1:21-CR-00657-BAH | 18 U.S.C. § 111(a)(1) | 44 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 44 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Bancroft, Dawn | 1:21-CR-00271-ESG | 40 U.S.C. § 5104(e)(2)(G) | 60 day's incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 day's incarceration<br>36 months' probation<br>$500 restitution |
| Santos-Smith,<br>Diana | 1:21-CR-00271-ESG | 40 U.S.C. § 5104(e)(2)(G) | 14 day's incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitition | 20 day's incarceration<br>36 months' probation<br>$500 restitution |
| Buckler,<br>Matthew | 1:22-CR-00162-TNM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' home detention<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Romero, Moises | 1:21-CR-00677-TSC | 18 U.S.C. § 231(a)(3) | 11 months' incarceration<br>36 months' supervised release<br>$2000 restitution | One year and one day incarceration<br>12 months' supervised release<br>$2,000 restitution |

26

| Ponder, Mark | 1:21-CR-00259-TSC | 18 U.S.C. § 111(a)(1) and (b) | 60 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 63 months' incarceration<br>36 months' supervised release<br>$2000 restitution<br>Mental health treatment |
|---|---|---|---|---|
| Bishai, Elliot | 1:21-CR-00282-TSC | 18 U.S.C. § 1752(a)(1) | 30 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 14 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution |
| Reffitt, Guy | 1:21-CR-00032-DLF | 18 U.S.C. § 231(a)(2)<br>18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1512(a)(2)(C) | 180 months' incarceration<br>3 years supervised release<br>$2000 restitution | 87 months' incarceration<br>3 years supervised release<br>$2000 restitution |
| Caplinger, Jeremiah | 1:21-CR-00342-PLF | 40 U.S.C. § 5104(d) | 90 days' incarceration<br>36 months' probation<br>$500 restitution | 35 days' incarceration<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Cavanaugh, Andrew | 1:21-CR-00362-APM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Baggott, Matthew | 1:21-CR-00411-APM | 18 U.S.C. § 1752(a)(2) | middle of sentencing guidelines range<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 3 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution |
| Willden, Ricky | 1:21-CR-00423-RC | 18 U.S.C. § 111(a)(1) | 30 months' incarceration<br>36 months' supervised release<br>$2000 restitution | 24 months' incarceration<br>36 months' release<br>$2000 restitution |
| Hyland, Jason | 1:21-CR-00050-CRC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 7 days' incarceration<br>$500 restitution<br>$4,000 fine |
| Ortiz, Christopher | 1:22-CR-00082-JMC | 40 U.S.C. § 5104(e)(2)(G) | 5 months' incarceration<br>36 months' probation<br>$500 restitution | 12 months' probation<br>2 months' Home Detention<br>100 hours' community service<br>$500 Restitution |

27

| | | | | |
|---|---|---|---|---|
| Homer, Lisa | 1:22-CR-00238-TNM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$5,000 fine<br>60 hours' community service<br>$500 restitution |
| Betancur, Bryan | 1:21-CR-00051-TJK | 18 U.S.C. § 1752(a)(1) | 6 months' incarceration<br>12 months' supervised release<br>$500 restitution | 4 months' incarceration<br>12 months' supervised release<br>$500 restitution |
| Larocca, Benjamin | 1:21-CR-00317-TSC | 18 U.S.C. § 1752(a)(2) | 3 months' incarceration<br>12 months' supervised release<br>$500 restitution | 60 days' incarceration<br>12 months' supervised release<br>$5,000 fine<br>60 hours' community service<br>$500 restitution |
| Robertson, Thomas | 1:21-CR-00034-CRC | 18 U.S.C. § 1512(c)(2) and 2<br>18 U.S.C. § 231(a)(3) and 2<br>18 U.S.C. § 1752(a)(1) and (b)(1)(A)<br>18 U.S.C. § 1752(a)(2) and (b)(1)(A)<br>40 U.S.C. § 5104(e)(2)(D) | 96 months' incarceration<br>3 years' supervised release<br>$2,000 restitution<br>$100 special assessment for each count of conviction | 87 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Simon, Glen Mitchell | 1:21-CR-00346-BAH | 18 U.S.C. § 1752(a)(2) | 10 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 8 months' incarceration<br>12 months' supervised release<br>$1,000 fine<br>$500 restitution |
| Cameron, John | 1:22-CR-00017-TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' imprisonment as an intermittent confinement condition of probation<br>36 months' probation<br>$1,000 fine<br>$500 restitution |
| Fracker, Jacob | 1:21-CR-00034-CRC | 18 U.S.C. § 371 | 6 months' probation consistent with Zone B<br>3 years' supervised release<br>$100 special assessment<br>$2,000 restitution | 12 months' probation<br>59 days' home confinement<br>120 hours' community service<br>$2,000 restitution |

28

A547

| Name | Case Number | Statute | Sentence |
|---|---|---|---|
| Morrissey, Daniel | 1:21-CR-00660-RBW | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>90 days' home confinement<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>36 months' probation<br>$2,500 fine<br>$500 restitution |


| Name | Case Number | Statute | Sentence Requested | Sentence Imposed |
|---|---|---|---|---|
| Morrissey, Daniel | 1:21-CR-00660-RBW | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>90 days' home confinement<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>36 months' probation<br>$2,500 fine<br>$500 restitution |
| Lazo, Kene | 1:21-CR-00425-CRC | 40 U.S.C. § 5104(e)(2)(G) | 90 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
| Knutson, Billy | 1:22-CR-00031-FYP | 18 U.S.C. § 1752(a)(1) | 6 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 6 months' incarceration<br>12 months' supervised release<br>$500 restitution |
| Carlton, Daniel Jonathan | 1:21-CR-00247-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' supervised release<br>$500 restitution |
| Richardson, Howard | 1:21-CR-00721-CKK | 18 U.S.C. § 111(a)(1) | 46 months' incarceration<br>3 years supervised release<br>$2,000 restitution | 46 months' incarceration<br>36 months' probation<br>$2,000 restitution |
| Pruitt, Joshua | 1:21-CR-00023 – TJK | 18 U.S.C. § 1512(c)(2) and (2) | 60 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 55 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Thurlow, Steven | 1:21-CR-00615 – DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>80 hours' community service<br>$500 restitution |
| Cortez, Christian Glen | 1:21-CR-00317 – TSC | 18 U.S.C. § 231(a)(3) | 4 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 4 months' incarceration<br>36 months' supervised release<br>60 hours' community service<br>$2,000 restitution |
| Webster, Thomas | 1:21-CR-00208 – APM | 18 U.S.C. § 111(a)(1), (b);<br>18 U.S.C. § 231(a)(3);<br>18 U.S.C. § 1752(a)(1), (b)(1)(A), | 210 months' incarceration<br>36 months' supervised release<br>$2,060 restitution | 120 months' incarceration<br>36 months' supervised release<br>$2,060 restitution |

29

A548

| | | 18 U.S.C. § 1752(a)(2), (b)(1)(A); 18 U.S.C. § 1752(a)(4), (b)(1)(A); 40 U.S.C. § 5104(e)(2)(F) | | |
|---|---|---|---|---|
| Michetti, Richard | 1:21-cr-00232 – CRC | 18 U.S.C. § 1512(c)(2) | 18 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 9 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| Watson, Sean | 1:21-CR-00422 – APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probations<br>60 hours' community service<br>$500 restitution | 7 days' incarceration<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| McNicoll, Lois Lynn | 1:21-CR-00468 – DLF | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>80 hours' community service<br>$500 restitution |
| Schwartzberg, Dovid | 1:21-CR-00338 – TFH | 40 U.S.C. § 5104(e)(2)(G) | 120 days' incarceration<br>36 months' probations<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>$500 restitution |
| Youngers, Darrell | 1:21-CR-00640 – TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$1,000 fine<br>$500 restitution |
| Vollan, Cody | 1:22-CR-00044-APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Carollo, Anthoy | 1:22-CR-00044-APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Carollo, Jeremiah | 1:22-CR-00044-APM | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 21 days' incarceration<br>12 months' probation<br>60 hours' community service<br>$500 restitution |

30

A549

| Bratjan, Frank | 1:22-CR-00285-TNM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 days' community service<br>$500 restitution | 6 months' probation<br>$1500 fine<br>$500 restitution |
|---|---|---|---|---|
| Ferreira, Leticia | 1:22-CR-00210-THC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 3 months' home detention<br>12 months' probation<br>$371 fine<br>60 hours' community service<br>$500 restitution |
| Connor, Francis | 1:21-CR-00586-RC | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>$500 probation | 12 months' probation<br>$371 fine<br>60 hours' community service<br>$500 probation |
| Ferrigno, Antonio | 1:21-CR-00586-RC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 12 months' probation<br>$371 fine |
| Lunyk, Anton | 1:21-CR-00586-RC | 40 U.S.C. § 5104(e)(2)(G) | 20 days' incarceration<br>36 months' probation<br>$500 restitution | 12 months' probation<br>$742 fine<br>60 hours' community service<br>$500 restitution |
| Packer, Robert | 1:21-CR-00103-CJN | 40 U.S.C. § 5104(e)(2)(G) | 75 days' incarceration<br>36 months' probation<br>$500 restitution | 75 days' incarceration<br>$500 restitution |
| Williams, Anthony | 1:21-CR-00377-BAH | 18 U.S.C. § 1512(c)(2)<br>40 U.S.C. § 5104(e)(2)(D) and (G)<br>18 U.S.C. § 1752(a)(1) and (2) | 64 month's incarceration<br>36 months' supervised release<br>$2000 restitution | 60 month's incarceration<br>36 months' supervised release<br>$5000 fine<br>$2000 restitution |
| Vincent, Reva | 1:22-CR-00051-TNM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$1,500 fine<br>$500 restitution |
| Lyon, Robert | 1:21-CR-00161-RBW | 18 U.S.C. § 1752(a)(2)<br>18 U.S.C. § 641 | 90 days' incarceration<br>12 months' supervised release<br>$2,000 restitution | 40 days' incarceration<br>12 months' supervised release<br>$1,000 fine<br>$2,000 restitution |

31

A550

| Ayres, Stephen | 1:21-CR-00156 - JDB | 18 U.S.C. § 1752(a)(2) | 60 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>100 hours' community service<br>$500 restitution |
| Hale-Cusanelli, Tim | 1:21-CR-00037 - TNM | 18 U.S.C. § 1512(c)(2)<br>and 2<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D | 78 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 48 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Hanner, Thomas | 1:21-CR-00689 - ABJ | 40 U.S.C. § 5104(e)(2)(G)<br>18 U.S.C. § 231(a)(3) and 2 | 60 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 30 months' incarceration<br>36 months' supervised release<br>200 hours' community service<br>$2,000 restitution |
| Santillan, Blas | 1:22-CR-00032 - FYP | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Neefe, Marshall | 1:21-CR-00567 - RCL | 18 U.S.C. § 1512(k)<br>18 U.S.C. § 111(a)(1) | 46 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 41 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Smith, Charles Bradford | 1:21-CR-00567 – RCL | 18 U.S.C. § 1512(k)<br>18 U.S.C. § 111(a)(1, 2) | 44 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 41 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Brannan, Cory | 1:21-CR-00637 – TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>24 months' supervised release<br>$500 restitution |
| Warmus, Daniel | 1:21-CR-00417 - PLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Young, Kyle | 1:21-CR-00291 - ABJ | 18 U.S.C. § 111(a)(1) | 86 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 86 months' incarceration<br>36 months' supervised release<br>100 hours' community service |

32

A551

| | | | | $2,000 restitution |
|---|---|---|---|---|
| Denney, Lucas | 1:22-CR-00070 - RDM | 18 U.S.C. § 111b | A term of incarceration in the middle of the guideline range<br>36 months' supervised release | 52 months' incarceration<br>36 months' supervised release |
| Rader, Kenneth | 1:22-CR-00057 - RCL | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 90 days' incarceration<br>36 months' probation<br>$500 restitution |
| Hentschel, Cara | 1:21-CR-00667 – FYP | 40 U.S.C. § 5104(e)(2)(G) | 3 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$500 restitution |
| Pryer, Mahailya | 1:21-CR-00667 – FYP | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 45 days' incarceration<br>36 months' probation<br>$500 restitution |
| Mazzio, Anthony | 1:22-CR-00214 - RCL | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 days' incarceration<br>36 months' probation<br>$500 restitution |
| Ferreira, Leticia | 1:22-CR-00210 - TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Dropkin, Lawrence | 1:21-CR-00734 – JEB | 18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>12 months' supervised release<br>$500 restitution |
| Fisher, Samuel | 1:21-CR-00142 – CJN | 18 U.S.C. § 1752(a)(1) | 120 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 120 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution |
| Galloway, Andrew | 1:22-CR-00012 – CRC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 30 days' incarceration<br>$1,000 fine<br>$500 restitution |

33

A552

| Munn, Dawn | 1:21-CR-00474 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation with conditions that include 90 days' home confinement and 14 days' intermittent confinement<br>60 hours' community service<br>$500 restitution |
| Munn, Joshua | 1:21-CR-00474 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 21 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>60 hours' community service<br>$500 restitution |
| Munn, Kayli | 1:21-CR-00474 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 21 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>60 hours' community service<br>$500 restitution |
| Munn, Kristi | 1:21-CR-00474 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 21 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 90 days' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution |
| Munn, Thomas | 1:21-CR-00474 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 36 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation with conditions that include 90 days' home confinement and 14 days' intermittent confinement<br>60 hours' community service<br>$500 restitution |
| Suleski, Ryan | 1:21-CR-00376 - RDM | 18 U.S.C. § 1752(a)(1)<br>18: U.S.C § 641 | 90 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 60 days' incarceration<br>60 hours' community service<br>$500 restitution |
| Valadez, Rafael | 1:21-CR-00695 - JEB | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>$500 restitution |
| Ryals, Jerry | 1:21-CR-00244 – CKK | 18 U.S.C. § 231(a)(3) | 6 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 9 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

34

A553

| Secor, Christian | 1:21-CR-00157 - TNM | 18 U.S.C. § 1512(c)(2) | 57 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 42 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
|---|---|---|---|---|
| Fairchild, Jr., Robert | 1:21-CR-00551 - TFH | 18 U.S.C. § 231(a)(3) | 11 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 6 months' incarceration<br>$2,000 restitution |
| Munger, Jeffrey | 1:22-CR-00123 - RDM | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>4 months' home detention<br>60 hours' community service<br>$500 restitution | 30 months' probation<br>Curfew Restriction of 7 a.m. to 7 p.m.<br>90 days' location monitoring<br>60 hours' community service<br>$500 restitution |
| Byerly, Alan | 1:21-CR-00527 – RDM | 18 U.S.C. § 111(a)(1)<br>18 U.S.C. § 113(a)(4); | 46 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 34 months' incarceration<br>36 months supervised release<br>$2,000 restitution |
| Bledsoe, Matthew | 1:21-CR-00204 – BAH | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 70 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 48 months' incarceration<br>36 months' supervised release<br>$2,000 fine<br>$2,000 restitution |
| Mazza, Andrew Mark | 1:21-CR-00736 – JEB | 18 U.S.C. § 111(a)(1) and (b);<br>22 D.C. Code § 4504 | 78 months' incarceration<br>36 months' supervised release<br>$2,150 restitution | 60 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Seefried, Hunter | 1:21-CR-00287 – TNM | 18 U.S.C. § 1512(c)(2) and 2<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 64 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 24 months' incarceration<br>12 months' supervised release<br>$2,000 restitution |
| Rodean, Nicholas | 1:21-CR-00057 - TNM | 18 U.S.C. § 1361;<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>18 U.S.C. § 1752(a)(4);<br>40 U.S.C. § 5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(F); | 57 months' incarceration<br>36 months' supervised release<br>$2,048 restitution | 5 years' probation, including 240 days' of home detention and location monitoring with internet use restrictions. |

35

A554

| Name | Case Number | Statute | | |
|---|---|---|---|---|
| Head, Albuquerque Cosper | 1:21-CR-00291 – ABJ | 40 U.S.C. § 5104(e)(2)(G) | 96 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 90 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Priola, Christine | 1:22-CR-00242 - TSC | 18 U.S.C. § 1512(c)(2) | 18 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 15 months' incarceration<br>12 months' supervised release<br>$2,000 restitution |
| Mels, James Allen | 1:21-CR-00184 – BAH | 18 U.S.C. § 1752(a)(1) | 30 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 36 months' probation, with a 90-day home confinement condition<br>60 hours' community service<br>$500 restitution |
| Clark, Christy | 1:21-CR-00218 – APM | 40 U.S.C. § 5104(e)(2)(G) | 4 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Clark, Matthew | 1:21-CR-00218 – APM | 40 U.S.C. § 5104(e)(2)(G) | 4 months' home detention<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>60 hours' community service<br>$500 restitution |
| Spigelmyer, Paul | 1:21-CR-00218 - APM | 18 U.S.C. § 5104 (e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>45 days' home detention imposed as condition of probation<br>60 hours' community service<br>$500 restitution |
| Logsdon, Christopher | 1:22-CR-00023 - TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' intermittent incarceration<br>36 months' probation<br>$500 restitution |
| Logsdon, Tina | 1:22-CR-00023 - TFH | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' intermittent incarceration<br>36 months' probation<br>$500 restitution |
| Uptmore, Chance | 1:21-CR-00149 - RCL | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>36 months' probation<br>$500 restitution |

36

A555

| Uptmore, James | 1:21-CR-00149 – RCL | 40 U.S.C. § 5104(e)(2)(G) | 21 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 21 days' home detention as a<br>condition of 36 months' probation<br>$500 restitution |
|---|---|---|---|---|
| Brooks, James | 1:22-CR-00018 – JMC | 18 U.S.C. § 1752(a)(1) | 3 months' incarceration<br>12 months' supervised release<br>$500 restitution | 12 months' probation<br>60 hours' community service<br>$500 restitution |
| Rivera, Jesus | 1:21-CR-00060 - CKK | 18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>40 U.S.C. §<br>5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(G) | 9 months' incarceration<br>12 months' supervised release<br>$500 restitution | 8 months' incarceration<br>12 months' supervised release<br>$500 restitution |
| Horvath, Jennifer | 1:22-CR-00192 – BAH | 40 U.S.C. § 5104(e)(2)(G) | 2 months' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' Probation with special<br>conditions of confinement at a<br>residential reentry center and home<br>detention<br>90 days' home confinement<br>$500 restitution |
| Faulkner, Troy Elbert | 1:21-CR-00126 – BAH | 18 U.S.C. § 1361 | 5 months' incarceration<br>36 months' supervised release<br>$10,560 restitution | 5 months' incarceration<br>36 months' supervised release<br>$10,560 restitution |
| Yazdani-Isfehani, Loammi | 1:21-CR-00543 – CRC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 14 days' incarceration<br>24 months' probation<br>100 hours' community service<br>$500 restitution |
| Yazdani-Isfehani, Abigail | 1:21-CR-00543 – CRC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>100 hours' community service<br>$500 restitution |
| Yazdani-Isfehani, Loruhamah | 1:21-CR-00543 – CRC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>100 hours' community service<br>$500 restitution |
| Kelly, Kash Lee | 1:22-CR-00208 - JEB | 40 U.S.C. § 5104(e)(2)(G) | 6 months' incarceration<br>$500 restitution | 60 days' incarceration<br>$500 restitution |

37

A556

| Defendant | Case No. | Statute | | |
|---|---|---|---|---|
| Ashlock, Ryan | 1:21-CR-00160 – CKK | 18 U.S.C. § 1752(a)(1), (b)(1)(A) | 135 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 70 days' incarceration<br>12 months' supervised release<br>100 hours' community service<br>$500 restitution |
| Comeau, Jason | 1:21-CR-00629 - EGS | 40 U.S.C. § 5104(e)(2)(G) | 20 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation including 2 months' home confinement<br>60 hours' community service<br>$371 fine<br>$500 restitution |
| Schaefer, Jeffrey | 1:22-CR-00069 - TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>60 hours' community service<br>$2,000 fine<br>$500 restitution | 30 days' incarceration<br>$2,000 fine<br>$500 restitution |
| Thompson, Dustin | 1:21-CR-00161 - RBW | 18 U.S.C. § 1512(c)(2) and 2;<br>18 U.S.C. § 641 and 2;<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>40 U.S.C. § 5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(G) | 70 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 36 months' incarceration<br>36 months' supervised release<br>$2,000 fine<br>$2,000 restitution |
| Evans III, Treniss | 1:21-CR-00225 - DLF | 18 U.S.C. § 1752(a)(1) | 60 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 36 months' probation with a condition of 20 days' intermittent confinement<br>$5,000 fine<br>$500 restitution |
| Castle, Trudy | 1:22-CR-00261 – CRC | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>30 days' incarceration<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$2,000 fine<br>$500 restitution |
| DiFrancesco, Kimberly | 1:22-CR-00261 - CRC | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation<br>30 days' incarceration<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>$2,000 fine<br>$500 restitution |
| Hughes, Joshua | 1:21-CR-00106 – CKK | 18 U.S.C. § 1512(c)(2) and 2 | 46 months' incarceration<br>36 months' supervised release | 38 months' incarceration<br>36 months' supervised release |

A557

| | | | $2,000 restitution | $2,000 restitution |
|---|---|---|---|---|
| Wood, Matthew | 1:21-CR-00223 - APM | 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(C); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(G) | 57 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 12 months' home confinement<br>36 months' probation<br>100 hours' community service<br>$2,000 restitution |
| Manwaring, Landon | 1:22-CR-00270 - CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>35 months' probation<br>$500 restitution |
| Panayiotou, Marcos | 1:22-CR-00055 - DLF | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>$500 restitution | 14 days' intermittent incarceration<br>36 months' probation<br>$1,500 fine<br>$500 restitution |
| Wiersma, David | 1:21-CR-00592 - ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 18 months' probation<br>$1,500 fine<br>$500 restitution |
| Presley, Ronnie | 1:21-CR-257 - RDM | 18 U.S.C. § 231(a)(3) | 16 months' incarceration<br>12 months' supervised release<br>$2,000 restitution | 12 months' incarceration<br>26 months' supervised release<br>$2,000 restitution |
| Frankowski, Dawn | 1:21-CR-00592 - ABJ | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 18 months' probation<br>100 hours' community service<br>$750 fine<br>$500 restitution |
| Buxton, Jonas | 1:21-CR-00739 - JDB | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 18 months' probation<br>40 hours' community service<br>$500 fine<br>$500 restitution |
| Ianni, Suzanne | 1:21-CR-00451 - CJN | 40 U.S.C. § 5104(e)(2)(D) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 15 days' incarceration<br>30 months' probation<br>60 hours' community service<br>$500 restitution |

39

A558

| | | | | |
|---|---|---|---|---|
| Tenney, George | 1:21-CR-00640 - TFH | 18 U.S.C. § 231(a)(3) 18 U.S.C. § 1512(c)(2) and 2 | 48 months' incarceration 36 months' supervised release $2,000 restitution | 36 months' incarceration 36 months' supervised release $2,000 restitution |
| Billingsley, Steven | 1:21-CR-00519 - TFH | 18 U.S.C. § 1752(a)(2) | 6 months' incarceration 12 months' supervised release 60 hours' community service $500 restitution | 24 months' probation 60 hours' community service $500 restitution |
| Cantwell, Lewis Easton | 1:21-CR-00089 - EGS | 18 U.S.C. § 231(a)(3) and 2 | 5 months' incarceration Term of supervised release $2,000 restitution | 5 months' incarceration 36 months' supervised release $2,000 restitution |
| Reid, William | 1:21-CR-00316 - DLF | 18 U.S.C. § 1512(c)(1); 18 U.S.C. § 1752(a)(1) and (2); 40 U.S.C. § 5104(e)(2)(D) and (G) | 78 months' incarceration 36 months' supervised release $2,443 restitution | 37 months' incarceration 36 months' supervised release $2,443 restitution |
| Allan, Tommy Frederick | 1:21-CR-00064 - CKK | 18 U.S.C. § 1512(c)(2) and 2 | 24 months' incarceration 36 months' supervised release $2,000 restitution | 21 months' incarceration 36 months' supervised release $2,000 restitution |
| Decarlo, Nicholas | 1:21-CR-00073 - BAH | 18 U.S.C. § 1512(c)(2) and 2 | 48 months' incarceration 36 months' supervised release $2,000 restitution | 48 months' incarceration 36 months' supervised release $2,500 fine $2,000 restitution |
| Ochs, Nicholas | 1:21-CR-00073 - BAH | 18 U.S.C. § 1512(c)(2) and 2 | 51 months' incarceration 36 months' supervised release $2,000 restitution | 48 months' incarceration 36 months' supervised release $5,000 fine $2,000 restitution |
| Gross, Juliano | 1:22-CR-00056 - APM | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration 36 months' probation 60 hours' community service $500 restitution | 24 months' probation, including 45 days' home detention 100 hours' community service $500 restitution |
| Sandlin, Ronald | 1:21-CR-00088 - DLF | 18 U.S.C. § 1512(k) 18 U.S.C. § 111(a)(1) and 2 | 63 months' incarceration 36 months' supervised release $20,000 fine $2,000 restitution | 63 months' incarceration 36 months' supervised release $20,000 $2,000 restitution |
| Fassell, Marilyn | 1:21-CR-00692 - CKK | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration 36 months' probation | 30 days' incarceration 36 months' supervised release |

A559

| | | | 60 hours' community service<br>$500 restitution | $500 restitution |
|---|---|---|---|---|
| Fassell, Thomas | 1:21-CR-00692 - CKK | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 7 days' incarceration (intermittent)<br>24 months' probation<br>$500 restitution |
| Rossman, Devin | 1:22-CR-00280 –<br>BAH | 40 U.S.C. § 5104(e)(2)(G) | 90 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 32 days' intermittent confinement<br>36 months' probation<br>60 hours' community service<br>$2,000 fine<br>$500 restitution |
| Lattanzi,<br>Nicholas | 1:22-CR-00028 - TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>$500 restitution | 14 days' incarceration<br>$500 fine<br>$500 restitution |
| Sargent, Troy | 1:21-CR-00258 - TFH | 18 U.S.C. § 231(a)(3);<br>18 U.S.C. § 111(a)(1);<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>18 U.S.C. § 1752(a)(4);<br>40 U.S.C. § 5104(e)(2)(F) | 27 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 14 months' incarceration<br>24 months' supervised release<br>$500 restitution |
| Council,<br>Matthew | 1:21-CR-00207 -<br>TNM | 18 U.S.C. § 231(a)(3);<br>18 U.S.C. § 111(a)(1);<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>40 U.S.C. §<br>5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(G) | 30 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 60 months' probation including 180<br>days' home incarceration<br>100 hours community service<br>$2,000 restitution |
| Hendrix,<br>Nicholas | 1:21-CR-00426 - CKK | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 30 days' incarceration<br>36 months' probation |
| Jensen, Douglas | 1:21-CR-00006 - TJK | 18 U.S.C. § 231(a)(3);<br>18 U.S.C. § 1512(c)(2)and<br>2;<br>18 U.S.C. § 111(a)(1);<br>18 U.S.C. § 1752(a)(1)<br>and (b)(1)(A); | 64 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 60 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

41

A560

| | | 18 U.S.C. § 1752(a)(2) and (b)(1)(A); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(G) | | |
|---|---|---|---|---|
| Johnston, David | 1:22-CR-00182 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 42 days' incarceration<br>36 months' probation<br>$500 restitution | 21 days' intermittent incarceration<br>90 days' home confinement<br>36 months' probation<br>$2,500 fine<br>$500 restitution |
| Capsel, Matthew | 1:22-CR-00107 - TSC | 18 U.S.C. § 231(a)(3) | 31 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 18 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| Brodnax, Antionne | 1:21-CR-00350 - DLF | 18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(E) | 18 months' incarceration<br>12 months' supervised release<br>$500 restitution | 5 months' incarceration<br>12 months' supervised release<br>$500 restitution |
| Johnson Jr, Thaddis | 1:22-CR-00228 - JDB | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 days' home confinement<br>24 months' probation<br>60 hours' community service<br>$500 restitution |
| Grayson, Kenneth | 1:21-CR-00224 - TSC | 18 U.S.C. § 231(a)(3) | 3 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 2 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| McCormick, Michael G | 1:21-CR-00710 - TSC | 18 U.S.C. § 1752(a)(1) | 21 days' incarceration<br>36 months' probation<br>$500 restitution | 14 days' incarceration<br>$1,000 fine<br>$500 restitution |
| Bronsburg, Tammy | 1:21-CR-00144 - RBW | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 20 days' incarceration<br>24 months' probation<br>$500 restitution |
| Bond, Stacy Lee | 1:22-CR-00171 - JMC | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 20 days' home detention<br>18 months' probation<br>50 hours' community service<br>$500 restitution |

42

A561

| Name | Case | Statute | Sentence | Sentence (cont.) |
|---|---|---|---|---|
| Conlon, Paula | 1:22-CR-00171 - JMC | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 12 months' probation<br>$500 restitution |
| Hughes, Jerod | 1:21-CR-00106 - TJK | 18 U.S.C. § 1512(c)(2) and 2 | 51 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 46 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Holdridge, Brent | 1:21-CR-00729 - RBW | 40 U.S.C. § 5104(e)(2)(G) | 60 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 days' incarceration<br>36 months' probation<br>$500 restitution |
| Gionet, Anthime | 1:22-CR-00132 - TNM | 40 U.S.C. 5104(e)(2)(G) | 75 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 60 days' incarceration<br>24 months' probation<br>$2,000 fine<br>$500 restitution |
| Witzemann, Shawn | 1:21-CR-00314 - TFH | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>7 days of continuous prison<br>60 hours' community service<br>$500 restitution |
| Hand, Charles III | 1:22-CR-111 - JEB | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 20 days' incarceration<br>6 months' probation<br>$500 restitution |
| Robinson-Hand, Mandy | 1:22-CR-111 - JEB | 40 U.S.C. § 5104(e)(2)(G) | 45 days' incarceration<br>36 months' probation<br>60 hours community service<br>$500 restitution | 20 days' incarceration<br>6 months' probation<br>$500 restitution |
| Clifton, Chadwick Gordon | 1:22-CR-00182 - BAH | 40 U.S.C. § 5104(e)(2)(G) | 21 days' incarceration<br>36 months' probation<br>$500 restitution | 21 days' intermittent confinement<br>36 months' probation<br>90 days' home confinement<br>$500 restitution |
| Slaeker, Tyler | 1:21-CR-00604 - DLF | 18 U.S.C. § 1752(a)(1) | 3 months' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 30 days' home detention<br>36 months' probation<br>240 hours' community service<br>$500 restitution |

43

A562

| | | | | |
|---|---|---|---|---|
| Herrera, Erik | 1:21-CR-619 - BAH | 18 U.S.C. § 1512(c)(2) and 2;<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>40 U.S.C. § 5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(G) | 78 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 48 months' incarceration<br>36 months' supervised release<br>$1,000 restitution |
| Montalvo, Matthew | 1:22-CR-00146 - RDM | 40 U.S.C. § 5104(e)(2)(G) | 30 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 36 months' probation<br>90 days' home detention<br>$5,000 fine<br>$500 restitution |
| Gable, Levi | 1:22-CR-00189 - JMC | 18 U.S.C. § 1752(a)(1) | 90 days' incarceration<br>12 months' supervised release<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>45 days' home detention<br>50 hours' community service<br>$1,000 fine<br>$25 restitution |
| Faulkner, Luke | 1:21-CR-00725 - RDM | 40 U.S.C. § 5104(e)(2)(G) | 14 days' incarceration<br>36 months' probation<br>60 hours' community service<br>$500 restitution | 24 months' probation<br>30 days' home detention<br>60 hours' community service<br>$500 restitution |
| Andries, John | 1:21-CR-00093 - RC | 18 U.S.C. § 1512(c)(2) | 24 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 12 months' and one day<br>36 months' supervised release<br>$2,000 restitution |
| Rahm, James Jr | 1:21-CR-00150 - TFH | 18 U.S.C. § 1512(c)(2) and 2;<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>40 U.S.C. § 5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(G) | 21 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 12 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| McGrew, James | 1:21-CR-00398 - BAH | 18 U.S.C. § 111(a)(1) | 78 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 78 months' incarceration<br>36 months' supervised release<br>$5,000 fine<br>$2,000 restitution |

44

A563

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  1:21cr140** |
| | : | |
| LARRY BROCK | : | |
| | : | |
| Defendant. | : | |

**SENTENCING MEMORANDUM**

**I.      Introduction**

Mr. Brock is before the Court following his conviction at a bench trial for Obstruction of

an Official Proceeding under 18 U.S.C. § 1512(c) and related misdemeanors.  As set forth below,

Mr. Brock is a man of outstanding character with a remarkable military record and no criminal

history.  Several of Mr. Brock's fellow veterans have written to the Court to praise Mr. Brock's

heroism and integrity, including a retired Major General.

It is undisputed that Mr. Brock did no violent acts on January 6th and in fact acted to

restrain disorderly protesters on multiple occasions.  In one particularly dramatic episode, Mr.

Brock physically intervened to protect two plain clothes Capitol policemen from a group of

aggressive protesters.

In many other § 1512 cases, this Court has seen fit to depart downward from the harsh

guidelines for this offense, including non-incarceration sentences in some cases.  The defense

respectfully submits the Mr. Brock's outstanding personal history and actions on January 6th

place him firmly among those § 1512 defendants most deserving of lenient treatment for their

charges stemming from this unique historical episode.

1

A564

## II.     Law of Sentencing

The law requires this Court to impose a sentence sufficient but no greater than necessary to achieve the goals of sentencing in 18 U.S.C. § 3553. The sentencing guidelines must be considered but are not binding on the Court. *United States v. Booker*, 542 U.S. 220 (2005).

## III.     Sentencing Factors

### a.  Sentencing Guidelines

The PSR has given Mr. Brock guidelines of 25/I which is a range of 57-71 months. Mr. Brock disagrees with several aspects of this calculation and maintains that the proper guideline should be 12/I which is 10-16 months. The particular objections are addressed as follows:

#### i.  Acceptance of Responsibility

Mr. Brock has objected to probation's decision to award him no points for acceptance of responsibility. Although this is common for trial cases, this case is an exception. As the Court observed at sentencing, few facts were in dispute and the main issue for decision was how the law applied to the facts. This is therefore a case where acceptance of responsibility (or a roughly equivalent variance) is appropriate.

USSG § 3E1.1. n. 2, the acceptance guideline, provides that:

> "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that such a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."

This exception applies here. Mr. Brock filed several pretrial motions including a Motion to Dismiss Count I (ECF 46), a Motion to Change Venue (ECF 47) and a Motion to Compel

2

A565

Discovery on Selective Prosecution (ECF49).  The Court denied these motions.  Had the Motion to Compel Discovery on Selective Prosecution been granted, it may have led to a Motion to Dismiss based on Selective Prosecution.  Mr. Brock proceeded to trial to preserve his right to appeal these issues.

Mr. Brock's pretrial statements show that he did not deny the basic facts of the case, even if he did not necessarily agree with the federal government's legal theories.  Shortly after January 6, Mr. Brock made public admissions to Ronan Farrow of the New Yorker[1].  Mr. Brock's pretrial filings implicitly conceded that he was present in the Capitol and indeed even conceded his presence on the Senate floor itself.  For example, Mr. Brock argued in ECF 22 that his statements while on the Senate floor that another individual should show respect and not sit in the Vice President's chair was a fact supporting less stringent conditions of release.

Mr. Brock's posture at trial also showed acceptance of responsibility for the essential facts of his case (again, as distinct from the government's legal theories).  As the Court will recall, Mr. Brock stipulated to the vast majority of the government's case.  Mr. Brock's pretrial motions, pretrial statements, and posture at trial support assessing him 2 points for acceptance of responsibility.

If the Court should conclude that, as a technical matter, Mr. Brock does not qualify for the two points, this Court should impose a comparable variance to reflect that Mr. Brock did not deny the essential facts of his case.

---

[1] https://www.newyorker.com/news/news-desk/an-air-force-combat-veteran-breached-the-senate

3

A566

**ii. The PSR's Enhancements for Property Damage and Substantial Interference Should Not be Assessed**

The PSR gives Mr. Brock an 8-level enhancement for causing or threatening to cause physical injury to a person or property damage under § 2J1.2(b)(1) and an additional three levels for "substantial interference" under (b)(2). PSR ¶ 52-53. However, neither enhancement is implicated unless the conduct interferes with "the administration of justice." The phrase "administration of justice" refers to judicial proceedings. *See, e.g., United States v. Richardson*, 676 F.3d 491, 502-502 (5th Cir. 2012)("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."). The electoral count before Congress does not constitute a "judicial hearing or trial" so these enhancements do not apply. This Court adopted this interpretation of the enhancements in *United States v. Hale-Cusanelli*, 21-cr-37-TNM.

Moreover, the PSR incorrectly bases the 8-level enhancement on social media posts. PSR 52. By the enhancement's very terms the "offense" must "involve[]" threatening to cause physical injury to a person, or property damage." The posts in question were made before the offense and were not directed at any specific person. The PSR acknowledges the messages in question were from Mr. Brock to "a friend." On January 6th itself, Mr. Brock did not make threats. As the PSR states, "Mr. Brock did not engage in violent acts while inside the Capitol, and in fact stopped violence from occurring inside the Capitol." *Id*. Thus, even if this offense had involved the "administration of justice", the 8-level enhancement would not apply.

**b. History and Personal Characteristics**

**i. Early Life and Education**

Mr. Brock is a native of Texas and comes from a family with a strong military tradition. ECF 68. After graduating from high school as salutatorian (2nd highest GPA out of 612

4

A567

graduates) Mr. Brock attended the Air Force Academy and graduated in 1989.  Even as a cadet,

Mr. Brock already possessed the strong sense of integrity that would allow him to be successful

in the Air Force.  We proffer that a classmate of Mr. Brock's has written the following:

> Larry lived the Cadet Honor Code at the Air Force Academy…I recall a time
> when he was just a couple minutes late for sign-in at the dormitory.  No one else
> was around.  He easily could have written down that he had been on time, but he
> didn't.  He put his actual arrival time knowing it would result in the loss of some
> free time privileged on the next weekend. That, to me is integrity – doing the right
> thing even when no one is watching.

Mr. Brock would go on to spend the bulk of the next thirty years serving his country in

military and civilian capacities.

### ii.  Mr. Brock's Military Service

After graduating the Academy, Larry Brock served in the Air Force in some capacity for

the next 25 years.  He served on active duty from 1989 until 1998.  PSR ¶ 89.  He served in the

reserves until 2014.  PSR ¶ 91.  He was honorably discharged at the rank of Lt. Colonel.  *Id*.  He

flew the A-10 Warthog and served as recruiter for the Academy.  *Id.*

Mr. Brock made many deployments including as a reservist.  Between 1998 and 2007 he

was deployed at least once per year.  *Id*.  He flew 350 combat hours and 1500 hours piloting a

King Air military aircraft and reconnaissance missions.  PSR ¶ 93.  Mr. Brock received the

following decorations for his service:

- Air Medal with four devices;

- Air Force Achievement Medal;

- Aerial Achievement Medal with three devices;

- Air Force Longevity Service Award with two devices;

- Air Force Training ribbon;

- Southwest Asia Service Medal with two devices;

5

A568

- Air Force Overseas Long Tour Ribbon;

- National Defense Service Medal;

- Humanitarian Medal;

- Small Arms Expert Marksmanship Ribbon with device;

- Kuwait Liberation Medal;

- Air Force Outstanding Unit Award with two devices.

Mr. Brock's five Air Medals merit some additional comment. The Air Force sets forth
the criteria for this award as follows:

> The Air Medal is awarded to U.S. and civilian personnel for single acts of
> heroism or meritorious achievements while participating in aerial flight and
> foreign military personnel in actual combat in support of operations.
>
> Required achievement is less than that required for the Distinguished Flying
> Cross, but must be accomplished with distinction above and beyond that expected
> of professional airmen. It is not awarded for peace time sustained operational
> activities and flights.[2]

Several of Mr. Brock's fellow veterans have written to the Court to praise his character
and describe some of the missions which led to these awards. We proffer that a fellow officer
recalls Mr. Brock's service as follows: "[Mr. Brock]'s flying capabilities far exceeded the
performance of other pilots in his peer group." For example:

> On likely the most complex mission I flew in my 28 year Air Force career, [Mr.
> Brock] calmly and methodically led a large aircraft package night combat search
> and rescue training mission with over 40 aircraft in support for a "downed
> airman"…Larry pushed me to fly better and pushed others to be better people,
> pilots and officers.

We proffer that a retired flag officer recalls Mr. Brock's service in Afghanistan as
follows:

---

[2] https://www.afpc.af.mil/Fact-Sheets/Display/Article/421927/air-medal/

A569

As the unit prepared for a combat deployment in 2004, Larry's expertise was evident, and he quickly rose to the top of my pilot list. On that deployment, Larry risked his life to protect US forces under attack from Taliban elements. At night, in challenging mountainous terrain, he flew below mountain peaks into a valley saturated with enemy forces and successfully employed ordinance. The result thwarted enemy advances on US personnel, saved US lives and defused an ever-escalating situation for the forces at that remote base in Afghanistan. For his actions, Larry was eventually awarded an Air Medal in part for that mission and promoted to the rank of Lieutenant Colonel.

Mr. Brock's decorations and the praise of those he served with and under make clear that his military record should be judged exceptional. It is an important mitigating factor in this case.

### iii. Mr. Brock's Character and Other Good Works

While Mr. Brock's wartime heroics are certainly significant, the way he treats other people in everyday situations when no one is looking is equally so. Several individuals have written to the Court to describe works of charity and kindness by Mr. Brock. For example, we proffer that one acquaintance recalls the following:

This Fall I witnessed Larry being approached in a Wal-Mart by an expectant mother with children that shared she was homeless and in need of food. Without hesitation, he bought the mother and children a mean, groceries for later, as well as some money. When I asked, "What if she was lying to you? What if she was just trying to take advantage of you?" He responded, "I have to do the right thing."

A former service member recalls that:

On another deployment, I recall a junior enlisted member…pleading for his help with a military pay issue. Military pay had incorrectly misplaced a decimal on his pay statement by two decimal positions. The enlisted member was paid less than $10.00 on his mid-month pay statement. I remember Larry getting involved in this pay issue that actually affected several other members as well, even offering to help one of them financially without hesitation because the military pay office was slow to help. Larry's persistence was a key element in effectively resolving this young airman's pay issue.

An acquaintance also recalls an episode where Mr. Brock went above and beyond in his new profession of home inspector:

7

A570

This personal moral compass stemming from his sacred beliefs guides Larry not only as he gives back through charity but also throughout his business dealings…I have been present for a few customer exchanges where he has gone above for the best customer services. Larry has allowed his business to absorb losses to remove even the shadow of a doubt that a customer may have had. On one occasion, a customer believed Larry had overlooked a certain quality check in his work. He took as many phone calls as needed to walk the customer, as well as the customer's relatives, through the quality control process, explaining each requirement.

These seemingly minor anecdotes about how Mr. Brock treats others are in fact not minor at all. They show the Court that Mr. Brock is a man of high character and a love for his fellow man. Mr. Brock would never have appeared in a criminal Court were it not for the extraordinarily unique confluence of events that led to January 6th.

### iv. Mr. Brock's Family Responsibilities

In the post-*Booker* era, district courts have developed an established practice of varying downward from the guidelines where the effect of the defendant's incarceration on innocent third parties would be extreme and the defendant would not pose an ongoing threat to society. *See, e.g. United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005)(on remand of bank fraud case, district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care existed); *United States v. Lehman*, 513 F.3d 805 (8th Cir. 2008)(sentence of probation affirmed where justified by atypical nature and circumstances of the felon in possession case and by the defendant's need to care for her nine-year-old developmentally disabled son); *United States v. Crawford*, 2007 WL 2436746 (E.D. Ws. 2007)(variance granted in part due to impact incarceration would have on defendant's five children); *United States v. Bortnick*, 2006 WL 680544 (E.D. Pa. 2006)(seven day sentence despite 51-63 guidelines in part based on defendant's responsibility for severely handicapped son).

These precedents apply in this case because Mr. Brock has above average family responsibilities.   As set forth in the PSR, Mr. Brock's parents divorced when he was very young and remarried.  PSR ¶ 68.  Both parents' second marriages proved lasting and Mr. Brock is close with both "sets" of parents.  Mr. Brock's parents and stepparents are now of advanced age and Mr. Brock is heavily involved in caring for them.  We proffer that an acquaintance would state as follows:

> Larry cares for not one but two sets of elderly parents in frail health as well.  He is the only child that lives locally for both his mother and stepfather as well as his father and stepmother.  He takes this responsibility very seriously with several calls and visits to each parent each week.  Just this last week, Larry assisted with taking down Christmas decorations and hauling them up to the attic for his father and stepmother as they are unable to lift boxes.  Larry's father is confined to a wheelchair so also requires additional support from Larry as well as his stepmother.  The week prior, he spent an afternoon shopping for quality ingredients from a nice grocery store and a day cooking chili to bring to his mother and stepfather for a Christmas Day meal.

If Mr. Brock is incarcerated, 4 innocent senior citizens will be deprived of their most important source of companionship and care.  It is completely appropriate for the Court to take this fact into account when deciding Mr. Brock's sentence.

### c.  Facts and Circumstances of the Offense

### i.  Issues Surrounding the 2020 Election

The January 6th rally occurred in response to allegations of fraud and illegality in the 2020 Presidential election.  As is well known, the President of the United States, the former Mayor of New York during 9/11, a retired four-star Army general and other luminaries publicly shared their belief that the purported result of the 2020 election was called into question by evidence of potentially material fraud and/or illegality.  Sitting congressmen and senators publicly announced in the weeks leading up to January 6 that they shared these concerns.  It should not be a matter of surprise that many Americans of good faith took these concerns

9

A572

seriously.  As of September 2022 nearly a third of Americans stated in a poll outcome determinative fraud took place in the 2020 election.[3]

It is of course not necessary for this Court to decide the extent to which fraud and illegality existed in the 2020 election in order to impose a sentence.  However, it is necessary for the Court to make some assessment as to whether Mr. Brock's actions were motived by a genuine concern over this issue or whether he participated in the rally for some other reason.  If Mr. Brock was sincerely motivated by high ideals, it significantly reduces his culpability even if the Court should privately disagree with his view.  It distinguishes him from rabble rousers, violent actors, and other truly criminal elements in the January 6th disturbances.

Based on all the information in the record of this case, it should not be difficult for this Court to conclude that Mr. Brock traveled to DC on January 6 out of a genuine concern that something terrible happened in the 2020 election that called for vigorous exercise of the First Amendment right to protest.  One after another, his character references describe Mr. Brock's honesty and patriotism.  It is inconceivable that he was motivated by anything other than genuine concern for democracy.

### ii.  Mr. Brock's Role on January 6th

This Court will well recall the evidence in Mr. Brock's case from his bench trial.  It was undisputed that Mr. Brock was not a member of any suspect group (or any group) that participated in the January 6 rally.  He traveled from his home to Washington, DC alone.

The government's evidence showed Mr. Brock attending President Trump's speech at the ellipse and then walking peacefully to the Capitol in the midst of a crowd of thousands.  Mr.

---

[3] https://www.nbcnews.com/meet-the-press/meetthepressblog/poll-61-republicans-still-believe-biden-didnt-win-fair-square-2020-rcna49630

10

A573

Brock walked by several law enforcement officers on his way to the Capitol building who did not attempt to forestall him or the other persons in the crowd.  He entered the Capitol without force through one of the doors on the West side.

While in the building, evidence showed Mr. Brock proceeding peacefully through the hallways, stopping briefly to admire the Rotunda.  He can be seen retrieving the police "flex cuffs" he would later be photographed carrying from the floor by a doorway on the side of the rotunda.  Mr. Brock then proceeded up some stairs.

As the Court will recall, Officer Nairobi Timberlake of the Capitol Police testified that while working the Capitol in plain clothes, he encountered Mr. Brock near one of the doorways to the Senate chamber.  The officer testified that when some particularly aggressive protesters attempted to fight him and one of his fellow officers, Larry Brock intervened to protect the police.  Had it not been for Mr. Brock's decisive action and willingness to put himself at risk, the officers may have been harmed.

Mr. Brock continued to use his imposing physical stature and military command presence to maintain order in the Capitol whenever anyone got out of hand.  On multiple occasions Mr. Brock can be seen on video imploring fellow demonstrators to be respectful of the Capitol. While Mr. Brock walked through the vacant Senate Gallery, another individual ascended the rostrum and seated himself in the President of the Senate's chair.  Mr. Brock addressed the man as follows: "get out of that chair…it belongs to the Vice President of the United States, it's not our chair.  Look, I love you guys, we're brothers, but we can't be disrespectful."  When another individual protested that "they stole an election" Mr. Brock insisted that they must maintain respect.  Although they were not all caught on video, Mr. Brock admonished others to respect the Senate Gallery on several occasions.

11

A574

After exiting the Senate Gallery peacefully, Mr. Brock eventually found his way to a law enforcement officer and asked to be escorted out of the building. The officer obliged and accompanied Mr. Brock to an exit where he willingly left the Capitol. On his way out, Mr. Brock encountered a shirtless man behaving aggressively towards a line of police. On CCTV footage, Mr. Brock can be seen placing his arm around the man and gently escorting him away from his confrontation with the police and out the Capitol door.

To be sure, Mr. Brock made many ill-advised statements on social media about the 2020 election. As multiple character references attest, Mr. Brock is a man of passionate convictions. As a combat aviator, he is not immune from the machismo culture that decades in the military can inculcate. And, he is far from the only individual who unburdened themselves on social during that stressful period in our nation's history. However, Mr. Brock respectfully submits that his actions on January 6th should carry more weight than any social media activity.

**d. Avoid Unwarranted Sentencing Disparities**

While those who assaulted law enforcement or committed other violent acts on January 6th have rightly received serious sentences, this Court has seen fit to treat other types of defendants more leniently. The following comparator cases should place Mr. Brock's case in the proper context:

**i.** ***United Stats v. Matthew Wood*, 21-CR-223-APM- Home Confinement for Defendant Convicted of Felony**

Mr. Wood entered a straight plea (no agreement) to Obstruction of an Official Proceeding under 18 U.S.C. § 1512 (c) in addition to all of the routinely charged January 6th misdemeanors. ECF 55 at 66. Like Mr. Brock, Mr. Wood left a digital trail of incendiary comments leading up to January 6th. *Id*. at 2. Unlike Mr. Brock, he was one of the first persons to enter the capitol and one of the last to leave (80 minutes inside). *Id*. at 2, 5. Mr. Wood and others chased Capitol

12

A575

police through the building.  *Id*. at 3.  He "directly pushed against MPD officers attempting to clear the Rotunda."  *Id*. at 4.

Mr. Wood argued for a sentence of home confinement based on, among other things, his lack of violence in the Capitol, humble origins, and strong work history.  ECF 56.  The Court gave Mr. Wood concurrent terms of 36 months' probation with the first 12 months to be served on home confinement.

### ii.  *United States v. Nicholas Rodean*, 1:21cr57 – TNM – Home Confinement for Defendant Convicted of Felony

Mr. Rodean entered the Capitol by smashing a window with a flagpole and a metal object.  ECF 67.  He was one of the first to enter the Capitol. He was convicted of felony destruction of property and a collection of misdemeanors following a bench trial.  The Court sentenced him to 6 months of home confinement.  ECF 75.  To be sure, Mr. Rodean had personal mitigating factors which Mr. Brock does not have.[4]  However, Mr. Brock destroyed no property and has his own unique mitigating factors most notably his extraordinary military record.  Taking all these factors into account, the § 3553 calculus for the two men comes out roughly the same.

### iii.  January 6th Misdemeanor Cases Where the Government Could Have Charged Obstruction But Did Not

The government's charging decisions in the January 6th cases themselves create unwarranted disparities between defendants with similar conduct and criminal histories.  For the most part, the government did not bring felony charges against persons who entered the Capitol building but did not assault police or destroy property.  Many of these defendants did not receive

---

[4] https://www.politico.com/news/2022/10/26/jan-6-rioter-gets-probation-not-prison-after-judge-finds-autism-played-a-role-00063588

13

A576

any jail or prison.  However, under the obstruction theory the government advanced in this Court and is currently defending before the Circuit Court, such persons could certainly have been charged with Obstruction of an Official Proceeding, triggering sentencing guidelines of years in prison.  After all, they were part of the group of persons whose entry of the Capitol interrupted the "official proceeding" of the vote certification.

It is undisputed that Mr. Brock did not destroy property or assault police, yet he has received a felony obstruction charge.  The government's reasoning for this decision was that Mr. Brock entered the Senate gallery, which the government views as a significant aggravating factor.  The government does not dispute that Mr. Brock entered the gallery after the proceedings had already adjourned or that he did not damage property in the gallery.  In the government's view, his mere presence in that section of the Capitol justifies charging him differently than those who occupied other parts of the Capitol.

Mr. Brock submits that giving persons who entered other parts of the Capitol misdemeanors with no jail while those who nonviolently entered the Senate Chamber get felonies and (if the government has its way) years in jail is an unwarranted disparity.  Assessing a downward variance in favor of Mr. Brock would bring his case into more of a rational relation with misdemeanor defendants whose culpability is not all that much less than his and whose personal mitigating factors may be much less weighty.

### iv.  Other Protest Activity in 2020/21

As the Court will recall, substantial protest activity occurred in the United States throughout 2020 involving participants from across the political spectrum.  Many observers have noted that the January 6th defendants seem to have been prosecuted more harshly than protestors motivated by "liberal" causes more closely associated with the current Presidential administration such as

police reform.  The most comparable cases are the prosecutions (or lack thereof) stemming from

riots at the Hatfield Federal Courthouse in Portland Oregon in 2020.  Portland's federal courthouse

was the focus of intense protest activity for more than 90 consecutive nights[5] following the death

of George Floyd during a police encounter in Minnesota.  In one court filing, the government

described the protests as follows:

> [The protests] [w]ere followed by nightly criminal activity in the form of
> vandalism, destruction of property, looting, arson, and assault. One violent event
> impacting federal property occurred on May 28, 2020, when the Portland Field
> Office for the Immigration and Customs Enforcement (ICE) was targeted by a
> Molotov cocktail. The Mark O Hatfield Courthouse has experienced significant
> damage to the façade, glass, and building fixtures during the weeks following this
> incident. Additionally, mounted building security cameras and access control
> devices have been vandalized or stolen. The most recent repair estimate for the
> damage at the Mark O. Hatfield Courthouse is in excess of $50,000. Other federal
> properties in the area routinely being vandalized include the historic Pioneer
> Federal Courthouse, the Gus Solomon Courthouse, and the Edith Green Wendall
> Wyatt Federal Office Building. FPS law enforcement officers, U.S. Marshal
> Service Deputies and other federal law enforcement officers working in the
> protection of the Mark O. Hatfield Courthouse have been subjected to assault,
> threats, aerial fireworks including mortars, high intensity lasers targeting officer's
> eyes, thrown rocks, bottles and balloons filled with paint, and vulgar language
> from demonstrators while performing their duties.

*United States v. Bouchard*, 3:20-mj-165 (D.Ore. July 24, 2020), ECF 1-1 at 4-5.  The protests

involved thousands gathering on a nightly basis.  *United States v. Judd*, 579 F.Supp.3d 1, 8, *10

(D.D.C. December 28, 2021).  Despite these enormous numbers, federal prosecutors limited

themselves to charges against a few dozen persons, mostly involving property destruction or

assaulting law enforcement.[6]  Many of these cases were later dismissed or resolved with

extremely favorable plea bargains.[7]  A handful of Portland protesters were charged with lesser

---

[5] https://www.justice.gov/usao-or/pr/74-people-facing-federal-charges-crimes-committed-during-portland-demonstrations

[6] *Id*.

[7] https://www.kgw.com/article/news/investigations/portland-protest-cases-dismissed-feds/283-002f01d2-3217-4b12-8725-3fda2cad119f;

A578

offenses. *See, e.g. United States v. Ian Wo,f*, 3:20-cr-286, ECF 1 (D. Ore.)(Information charging Creating a Hazard on Federal Property under 41 C.F.R. § 102.74.380(d) and Failing to Obey a Lawful Order under 41 C.F.R. § 102.74.385). The overwhelming majority of the persons involved in the Portland protests were not charged with any offenses. This Court described the federal response to the Portland protests in *Judd* as follows:

> Therein lies a troubling theme that emerges from a wholesale analysis of the Government's decisions in Portland. The Government dismissed 27 cases brought against Portland defendants, including five felony cases. *See generally* Appendix to Def's Mot. Dismissal of one felony case is unusual. Dismissal of five is downright rare and potentially suspicious. Rarely has the Government shown so little interest in vigorously prosecuting those who attack federal officers.

*Judd*, 579 F.Supp.3d at 7. The "appendix" referred to in this passage is attached as Exhibit 2. It is a charge of the various Portland cases and their dispositions.

The extraordinarily lenient treatment afforded to the Portland rioters supports a downward variance for Mr. Brock to avoid an unwarranted disparity. This is particularly necessary because the disparity could reasonably be interpreted to have been created by political bias in the Department of Justice, which is especially odious.

### e. Collateral Consequences of this Case

This case is not only Mr. Brock's first felony conviction but his first criminal conviction of any kind.[8] As a convicted felon, Mr. Brock will suffer immense social stigma and be prevented from voting or owning firearms. Mr. Brock has long history of civic engagement and responsible use of firearms, so these are significant consequences.

But there are collateral consequences in this case that exceed the normal felony case. As of January 6, 2021, Mr. Brock was working as a commercial airline pilot. PSR ¶ 98. The FAA

---

[8] A disorderly conduct misdemeanor in 2014 was deferred and then dismissed.

16

A579

revoked all his licenses in March 2021 as a result of this case, stating that Mr. Brock "pose[d], or are suspected of posing, a risk of air piracy or terrorism, or a threat to airline or passenger safety." *Id*. Mr. Brock was therefore forced to abandon a career that he loved and was uniquely qualified for.

At age 53 Mr. Brock went back to school to start a new career as a home inspector. Despite the unfortunate circumstances, Mr. Brock threw himself into his new trade with characteristic aplomb.  As his stepfather has written to the Court:

> Despite the trauma of the past two years Larry has done a remarkable job of building a new business.  He started a real estate inspection company and has worked very hard in establishing himself in that market with the intent of being able to support himself and his son.

Ex. 1.

Although Mr. Brock has made a success of his new calling, his income and standard of living have taken an unavoidable hit.  His income has dropped from $14,000 per month as a commercial airline pilot (PRS ¶ 100) to just over $5,000 per month as a home inspector (PSR ¶ 97).  Most unfortunately, Mr. Brock's vast experience as an aviator is going to waste.

In addition to losing his career as a pilot, the Air Force Academy's Association of Graduates "AOG" has revoked Mr. Brock's membership.  He will be unable to attend any future AOG functions commemorating the service academy which held such a special place in his life and career.

Finally, Mr. Brock has already been forced to endure conditions of pretrial supervision far beyond what was warranted.  At the start of the case, the government sought to have Mr. Brock detained.  An out-of-district judge refused detention but put Mr. Brock on house arrest. Mr. Brock remained on house arrest status for seven months before this Court agreed to relax his conditions (Mr. Brock has subsequently shown that this Court's trust in him was not misplaced).

17

A580

Thus, before even getting to sentencing, Mr. Brock has served a term of home confinement comparable to some post-sentencing felony defendants such as the *Wood* and *Rodean* cases discussed above.

In sum, the collateral consequences to Mr. Brock have been far above the typical felony case and support a downward variant sentence.

### f.  General Deterrence

As has been widely reported, over 800 people have been prosecuted for their roles on January 6th.  Their sentences have ranged from probation to years in prison.  Their cases have been widely reported in the media, as have judges' comments about the seriousness of the cases. Such a large lumber of related cases gives this Court more flexibility to show measured leniency in cases with significant mitigation without sacrificing much in the way of general deterrence.

### g.  Specific Deterrence

As mentioned above, January 6th was a unique historical event stemming from a confluence of unique factors unlikely to be repeated.  Most of the January 6th defendants likely had little or no criminal history and Mr. Brock in particular is notable for his long history of respect for the law.   We submit that specific deterrence need not be a driving factor in this sentencing.

### IV.    Conclusion

For the foregoing reasons, Mr. Brock requests a sentence home incarceration for an appropriate period of time.

18

A581

Respectfully submitted,
By: */s/ Charles Burnham*
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
charles@burnhamgorokhov.com

'

19

A582

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this filing has been served on opposing counsel by email.

By: /s/ Charles Burnham
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
Charles@burnhamgorokhov.com

20

January 4, 2023

The Honorable John D. Bates

United States District Court Judge
U.S. District Court for the District of Columbia
333 Constitution Avenue, Northwest
Washington, DC 20001

RE:  CASE NO. 21-CR-140 (JDB)

      Defendant: Larry Brock

Dear Judge Bates,

As the step-father of Larry Brock, and have been since he was twelve (12) years of age, I have watched him excel in school, sports, and in the achievement of one of his goals in graduating from the Air Force Academy and becoming a United States Air Force pilot.  Larry has always been respectful of those in authority, and he worked hard at any goal he has wanted to achieve.  His mother Lynda and I have been married since 1980 and we raised a blended family with Larry being the oldest of our four children.

I can attest to the fact that in high school Larry was academically a top student, he participated in track and field events, he was on the honor roll, active in our church, and upon graduation he was accepted at and attended the Air Force Academy.  After graduation Larry began pilot training where he served in the United States Air Force rising to the rank of Lieutenant Colonel.  He continued his service as a reserve officer for several years. During his time with the Air Force he was deployed multiple times to both Iraq and Afghanistan flying the A-10 jet in the protection our ground forces.  He received commendations from the Air Force for his service.

Our service men and women are trained to defend and protect these United States, and from that training and service Larry develop a strong sense of love and devotion to our country and the principles upon which this nation was founded. From this devotion we find true patriots; including those who perhaps stepped over the line, as asserted by the assistant U.S. Attorney but, in Larry's situation I know him and believe his motives were pure and without any preconceived plan or notion of violating federal law.

As testified to at the trial, Larry demonstrated a desire to preserve the respect due the congressional environment, he was respectful to the police, and absolutely did no harm to property or persons.

Although Larry's case resulted in a conviction, he was not accused of membership in any suspect group, possession of weapons, destruction of property, assaulting law enforcement or any violent act. To the contrary, the U.S. Attorney's Office and FBI all acknowledged that Larry acted on multiple occasions to restrain other demonstrators who were acting in a disorderly manner. It is my understanding Larry can be seen on video admonishing other protesters against disorderly behavior and using his physical presence to restrain them. Officer Nairobi Timberlake of the Capitol Police testified that when he and two other officers were assaulted by a large group of aggressive protesters, Larry intervened to defuse the situation and protect the police.

A584

This is Larry's first offence and it is for entering our Capitol building for a short time.

Larry has sustained emotional and economic repercussions stemming from the January 6 events.  He not only lost a job flying for a corporate employer, he also lost his primary income source when the FAA revoked his license to fly.

Despite the trauma of the past two years Larry has done a remarkable job of building a new business. He started a real estate inspection company and has worked very hard in establishing himself in that market with the intent of being able to support himself and his son.

We respectfully ask that your decision be tempered in light of Larry's good character, his respectful conduct on January 6th in our Congressional building, his service to our country, and his desire and need to be home where he can work to support his eight (8) year old son.  Benjamin, Larry's son, is very close to his dad and if Larry is required to serve any time Benjamin will also suffer.

Your Honor, I practiced law here in Texas for fifty (50) year before retirement. I do respect the position you hold and the responsibility such service entails.  During my years of practice, one of my observations has been that folks of good character can and do make mistakes resulting in criminal filings. However, non-violent first offenders, when given a second chance by our court system, respond positively.  The lesson is learned, they repent and move on as good citizens.

Larry's mom and I know our son, he is a good man, he has learned the lesson, and we respectfully ask that your decision is one that does not include incarceration.


Sincerely


Lowry H Davison


A585

# PORTLAND FEDERAL COURTHOUSE PROTEST CASES

*Protestors gathered beginning on May 26, 2020, in various public areas in Portland to protest including the Lownsdale Square, Chapman Square and Terry Schrunk Plaza. The Portland Justice Center, which houses Portland Police Bureau's Central Precinct and the Multnomah County Detention Center borders these parks, as does the Mark O. Hatfield United States Federal Courthouse (hereinafter "Courthouse'). The entire city block occupied by the Courthouse is owned by the USA. The Courthouse was a target of violent protestors and experienced significant damage to the façade, glass and building fixtures in the weeks following the initial protests. Some 74 people were charged by the U.S. Attorney's Office for the District of Oregon.*

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | **Completed Cases** | | |
| Evan Kriechbaum | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00178 | Dismissed without prejudice | Picked up a recently launched tear gas canister. Officers moved to detain him (affidavit says there was no intent to arrest him) for officer safety. No indication that Kriechbaum tried to throw the canister, but he resisted the officers and tried to escape by swinging his arms and wriggling. Swung his elbow back and hit an officer in the face. Kriechbaum stated that he didn't realize they were police at the time and that he complied once he realized they were police. The officers were wearing protective gear marked "POLICE", but it was the early morning hours. |
| Gretchen Margaret Blank | 18:111(a)(1)[1] - Assaulting a Federal Officer | Yes | 3:20-cr-00224 | Dismissed with prejudice (DRA[2]) | Blank pushed an officer in the back with a "flimsy" plastic shield when he was attempting to arrest another protestor. The |

---

[1] Felony
[2] Deferred resolution agreement.

A586

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | officer "los[t] his balance." The shield was recovered (pictures in the affidavit). |
| Brodie Storey | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00330 | Dismissed with prejudice (DRA) | Officers declared an unlawful assembly and tried to disperse a line of protestors. The affiant alleges that Storey attempted to tackle a deputy U.S. Marshal. The Marshal then tried to arrest Storey, who violently resisted until he was tased. |
| Caleb Wills | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00296 | Dismissed with prejudice (DRA) | The alleged victim, a Deputy United States Marshal was assisting another officer with an arrest when he was allegedly attacked by three individuals, including Wills. The assailants grabbed and punched the victim and attempted to take off his mask. Two of the assailants escaped, but Wills was arrested.<br><br>Wills has a criminal history (absence without leave from the TN National Guard, probation violation, drug manufacture, delivery and sale, possession of drug paraphernalia and failure to appear) and has active warrants for burglary and felony breaking and entering. |
| Christopher Fellini[3] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00212 | Dismissed without prejudice | Fellini allegedly shined a green laser at officers. Fellini was tackled and arrested and an officer was hurt in the process (he fell when trying to grab Fellini). Fellini was |

---

3 https://www.justice.gov/usao-or/pr/seven-arrested-facing-federal-charges-after-weekend-riots-hatfield-federal-courthouse

2

A587

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | carrying Mace-brand "Pepper Gel" and a small knife. |
| David Michael Bouchard | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00165 | Dismissed without prejudice | Bouchard was told to leave an area. A CBP officer placed a hand on Bouchard's shoulder to move him, when Bouchard put the officer in a headlock. A second officer attempted to remove Bouchard's arm from the first officer and the group ended up in a pile on the ground. Bouchard was arrested. Bouchard admitted that he placed his right arm around the neck and shoulders of the officer, but stated that his intent was not to hurt anyone and was just to "stand his ground." |
| Jeffree Cheyenne Cary | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00329 | Dismissed with prejudice (DRA) | Cary used a shield to knock an officer in the back. Cary was then detained and arrested. |
| Jordan Matthew Johnson | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00179 | Dismissed without prejudice | Johnson allegedly tried to pick up a smoke grenade that had been activated by law enforcement. Officers tried to stop him with rubber bullets, but eventually tackled him to the ground and placed him under arrest for failing to disperse. While he was being arrested, Johnson allegedly struck an officer in the neck, another in the head and resisted arrest.<br><br>Johnson was subsequently interviewed and denied being aware that the people he was tackled by were police officers. He saw |

3

A588

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | camouflage uniforms and denied attacking anyone. Once he was handcuffed, he stopped resisting.<br><br>Johnson has a criminal history from 2007 to 2013 in Oregon, which includes DUI, failure to appear and probation violations. |
| Joshua Webb | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00169 | Dismissed without prejudice | Webb allegedly struck an officer in the face with a shield and then punched him in the face with a closed fist. Webb was then arrested and pulled his arms away in resistance. Webb stated that he did not hear any warnings given by FPS and PPB to leave the area and that he was tackled and arrested when he was starting to back up.<br><br>Webb was wearing tactical equipment (tactical vest, shin guards, gloves). |
| Patrick Stafford | 18:111(a)(1)[4] - Assaulting a Federal Officer | Yes | 3:20-cr-00295 | Dismissed with prejudice (DRA) | Stafford allegedly slammed into an officer with a shield while another protestor (Storey) was being arrested to help him get away. Once on the ground, Stafford was compliant and obeyed all commands. |
| Stephen O'Donnell | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00166 | Dismissed without prejudice | O'Donnell was allegedly shining a flashlight at a CBP agent. The agent identified himself as a "Border Patrol Agent" and told O'Donnell to show him his hands. O'Donnell threw something at the agent's |

4

[4] Felony

A589

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | face. The agent wasn't sure what the object was, but said it was hard (no injuries). O'Donnell was then arrested. |
| Taylor Charles Lemons | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00374 | Dismissed without prejudice | Lemons allegedly charged at a USMS tactical team carrying a home-made shield. He was repelled with a marshal's arm, which Lemons then struck with the shield. Lemons violently resisted arrest ("twisting, turning, and fighting"). Lemons was arrested while enforcement and while officers were trying to secure the courthouse.  Lemons was arrested and searched. He was carrying a Luger LCP pistol with 6 rounds loaded. Lemons had a valid CCW permit. |
| Thomas Johnson | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00170 | Dismissed without prejudice | Johnson allegedly struck an officer in the face with a homemade shield. Johnson was carrying an ASP baton, OC spray, steel-plated body armor, a helmet, shin guards, gas mask, goggles. |
| Travis Williams | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00331 | Dismissed with prejudice (DRA) | Williams was allegedly yelling: "Take your mask off! Let's go." Williams lunged towards the neck and face of an officer and another officer attempted to arrest Williams. Williams violently resisted and pulled the officers over a park bench, ripped off "communication sets" from both officers' vests and ripped part of one officer's ballistic |

5

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | vest partially off his body. Williams was tased to no effect and continued to fight. Williams went limp while the officers were leading him away and screamed that they would need to carry him if he was going to be arrested. Williams continued resisting after being transported to the courthouse. He tried to whip deputies with his hair and tried to break a deputy's arm with his elbow and to break a deputy's arm with his elbow and body weight. Williams said: "I almost ripped your buddy's arm off. I'm a state wrestler." |
| Jennifer Lynn Kristiansen | 18:111(a)(1) - Assaulting a Federal Officer (1)<br><br>40:1315 and 41 C.F.R. 102-74.385 Failing to Obey a Lawful Order (2) | Unknown | 3:20-cr-00245 | Count 1 dismissed with prejudice<br><br>Count 2 dismissed without prejudice | A 37-year-old Portland family law attorney. She claims she was protesting with the "Wall of Moms" when she was separated from the group and groped and assaulted by officers. |
| Giovanni Terrence Bondurant | 18:111(a)(1)[5] - Assaulting a Federal Officer | Yes | 3:2020cr00302 | Dismissed with prejudice (DRA) | A Border Patrol Agent approached Bondurant who was equipped with a shield and had been throwing rocks and bottles with another protestor. The agent told the pair to put down their shields. They refused and tried to leave, when they were grabbed by |

---
[5] Felony

A591

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | officers. Bondurant struck an officer trying to free the other person, Yarnell.

Bondurant told officers that he was in the park with his friend when they were approached by officers. He said that they had found the shields on the ground. Bondurant claimed he didn't throw anything and that he had merely tried to help his friend when he was being arrested. Bondurant denied striking the officer and said the officers were dressed in camouflage. |
| Taimane Jame Teo | 18:111(a)(1) - Assaulting a Federal Officer | | 3:2020cr00205 | Dismissed without prejudice | Teo was accused of assaulting officers with a laser.

Known as "Zouk" in the BLM community. A GoFundMe was created for him and had raised $4,050 as of July 7, 2020. |
| Benjamin Wood-Pavich | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00209 | Dismissed without prejudice | No details available. |
| Gabriel Huston | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00252 | Dismissed without prejudice | No details available. It looks like he's a philosophy major at Portland State University.[6] |

A592

---

[6] https://www.facebook.com/PDXCLAS/posts/3257374180953442:0

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| Pablo Avvacato | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00278 | Dismissed without prejudice | No details available. Avvacato was previously arrested at a reservoir protest. [7] |
| Douglas Dean | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00279 | Dismissed without prejudice | No details available. |
| Rebecca Mota Gonzalez | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:2020mj00168 | Dismissed with prejudice | Gonzalez stood in front of officers and refused to comply with orders to disperse. As an officer reached for Gonzalez, she struck him with a closed fist and then was handcuffed and arrested after minor resistance. |
| Joshua Webb | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00169 | Dismissed with prejudice | Webb was ordered to disperse, but refused and struck an officer in the face with a shield and punched the officer with a closed fist when approached. Webb resisted arrest, but was eventually handcuffed. Webb stated that he did not hear any warnings to leave the area and was backing up to leave when he was tackled and arrested. Webb was wearing a black tactical vest and shin guards. |
| Jerusalem A. Callan | 40:1315 and 41 CFR, Section 102-74.380(b) - Willfully Damaging or | Unknown | 3:2020cr00247 | Dismissed without prejudice | No details available. |

8

---

[7] https://www.oregonlive.com/portland/2013/07/four_arrested_in_mount_tabor_r.html

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | Destroying Property | | | | |
| Isaiah Jason Maza, Jr.[8] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-CR-00343 | Dismissed (Maza is deceased) | Maza and a group of protestors began removing plywood protection on the front of the Courthouse. Once uncovered, Maza tried to kick in the window, struck it with a metal object that appeared to be a hammer. Someone else eventually broke the window ad Maza placed a lit object into the broken window which exploded. A U.S. Marshal suffered injuries to both of his legs as a result of the blast. Maza was chased from the scene and arrested. |
| Dakota Kurtis Means | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:2020cr00392 | Plead guilty  Sentenced to time served (60 days) with 1 year of supervised release | Means threatened a federal contract employee with a paintball gun outside the Courthouse.[9] |
| Josslynn Kreutz | 40:1315 and 41 C.F.R. 102- 74.385 Failing to Obey a | Unknown | 3:2020cr00271 | Dismissed with prejudice | No details available. |

---

[8] https://www.justice.gov/usao-or/pr/portland-man-charged-assaulting-deputy-us-marshal-explosive-device-during-courthouse

[9] https://www.oregonlive.com/crime/2021/01/portland-man-who-threatened-federal-contract-worker-with-paintball-gun-sentenced-to-time-served-year-of-supervision.html?utm_medium=social&utm_campaign=theoregonian_sf&utm_source=facebook&fbclid=IwAR2SkRzHLQjW8VJ_SZV4oqq5qmUVD1miIuvy3CXH6xygyks5Ps_v-TcYU

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | Lawful Order (1)[10] | | | | |
| Brodie Storey | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00330 | Dismissed with prejudice (DRA) | Storey attempted to tackle an officer. Storey was then arrested while he continued to resist and refused to comply with orders. Another protestor assaulted the officer restraining Storey to try and help him. |
| Carly Anne Ballard | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20mj00163 | Pending arraignment | Ballard was spotted near a breach in the fence surrounding the courthouse and was ordered to move away by officers. She refused and began to approach the officers. She was then placed under arrest for not complying and escorted into the courthouse for processing. There, she allegedly yelled profanities and kicked one of the arresting officers in the leg. |
| Andrew Steven Faulkner[11] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20cr00203 | Plead guilty, sentenced to three years of probation and home confinement. Government agreed to recommend probation. | Assaulted officers by pointing a high-powered laser at police officers. Possessed a sheathed machete. |

---

[10] **Note**: There were other other failing to obey a lawful order cases, but they are not reflected here. Refer to this DOJ list of federal defendants.
[11] https://www.justice.gov/usao-or/pr/seven-arrested-facing-federal-charges-after-weekend-riots-hatfield-federal-courthouse

A595

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| Cody Beau Porter | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20cr00211 | Information dismissed | Porter shot a laser at officers. Blank tried to stop officers from arrested Porter. Porter was also carrying a satchel containing 14 "commercial-grade" fireworks (pictures in complaint). |
| Jacob Michael Gaines[12] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20cr00223 | Guilty to plea to felony, government agreed to recommend low-end of the guidelines | Gaines was observed damaging a barricaded entrance at the Courthouse with a 4 lb DeWalt construction hammer. Officers moved to detain him when Gaines struck one of the deputies with a hammer three times. |
| Lillith Grin | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00290 | Information dismissed | No details available. |
| Benjamin Bolen | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00216 | Guilty plea to misdemeanor assault on a police office, | No details available. |

---

[12] https://www.justice.gov/usao-or/pr/texas-man-charged-assaulting-deputy-us-marshal-hammer-during-weekend-protests-portland

11

A596

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | parties jointly recommended probation | |
| Tyler John Gabriel | 18:111(a)(1) - Assaulting a Federal Officer (1-5) | Unknown | 3:20cr00280 | Charged with misdemeanor, pending trial | No details available. |
| Noelle Angelina Mandolfo | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00282 | Information dismissed without prejudice | No details available. |
| Sabastian Dubar | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00289 | Charged with misdemeanor, pending trial | No details available. |
| Dakotah Ray Horton | 18:111(a)(1) and (b) - Assault on a Federal Officer with a Dangerous Weapon, Resulting in Bodily Injury (1) | No | 3:20cr00419 | Plea to felony, per plea agreement government agrees to recommend 24 months | Horton assaulted an officer that was arrested striking him several times from behind. He was identified through photos and videos from the events. At the time of arrest, Horton was carrying a HiPoint 9mm semi-automatic firearm in a holster. |
| Ty John Fox | 18:231(a)(3) - Civil Disorder | Yes | 3:2020cr00501 | Charged with civil disorder, pending trial | Fox used a torch lighter to ignite a large, cylindrical firework, which he threw at officers. An explosion and flash was observed near the officers. |

12

A597

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

### District of Columbia

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| | ) | Case Number:  21-140  (JDB) |
| LARRY RENDALL BROCK | ) | USM Number:  24991-509 |
| | ) | Charles Burnham |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☑ was found guilty on count(s)    1 through 6 of the Superseding Indictment filed on June 23, 2021.
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1512(c)(2) and 2 | Obstruction of an Official Proceeding and Aiding and Abetting.. | 1/6/2021 | 1s |
| | CONT'D NEXT PAGE | | |

    The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

                           3/17/2023
Date of Imposition of Judgment

**John D. Bates**    Digitally signed by John D. Bates
Date: 2023.03.20 08:56:12 -04'00'

Signature of Judge

        John D. Bates               U.S. District Judge
Name and Title of Judge

_____
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

| | Judgment—Page | 2 | of | 8 |

DEFENDANT:    LARRY RENDALL BROCK
CASE NUMBER:  21-140  (JDB)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1752(a)(1) | Entering and Remaining in a Restricted Building or Grounds. | 1/6/2021 | 2s |
| 18:1752(a)(2) | Disorderly and Disruptive Conduct in a Restricted Building or Grounds. | 1/6/2021 | 3s |
| 40:5104(e)(2)(A) | Entering and Remaining on the Floor of Congress. | 1/6/2021 | 4s |
| 40:5104(e)(2)(D) | Disorderly Conduct in a Capitol Building. | 1/6/2021 | 5s |
| 40:5104(e)(2)(G) | Parading, Demonstrating, or Picketing in a Capitol Building. | 1/6/2021 | 6s |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___8___

DEFENDANT:      LARRY RENDALL BROCK
CASE NUMBER:   21-140  (JDB)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

TWENTY-FOUR (24) MONTHS ON COUNT ONE (1), TWELVE (12) MONTHS ON COUNTS TWO (2) AND THREE (3), AND SIX (6) MONTHS ON COUNTS FOUR (4), FIVE (5) AND SIX (6), ALL TO RUN CONCURRENTLY.

☑ The court makes the following recommendations to the Bureau of Prisons:

   That the defendant be incarcerated at a Bureau of Prisons' facility close to Grapevine, TX.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m.  on  _____ .

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☑ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A600

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    4    of    8

DEFENDANT:    LARRY RENDALL BROCK
CASE NUMBER:    21-140  (JDB)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

TWENTY-FOUR (24) MONTHS ON COUNT ONE (1) AND TWELVE (12) MONTHS ON COUNTS TWO (2) AND THREE (3), ALL TO RUN CONCURRENTLY.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
     ☐ The above drug testing condition is suspended, based on the court's determination that you
        pose a low risk of future substance abuse. *(check if applicable)*
4.   ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
        restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
        directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
        reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

A601

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  |  | Judgment—Page | 5 | of | 8 |

DEFENDANT: LARRY RENDALL BROCK
CASE NUMBER: 21-140 (JDB)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____  Date _____

A602

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page   6   of   8

DEFENDANT:   LARRY RENDALL BROCK
CASE NUMBER:   21-140  (JDB)

## ADDITIONAL SUPERVISED RELEASE TERMS

1.  The defendant must complete 100 hours of community service within 18 months of supervision. The probation officer will supervise the participation in the program by approving the program. The defendant must provide written verification of completed hours to the probation officer.

2.  The defendant must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the United States Attorney's Office.

3.  Within sixty (60) days of release from incarceration or placement on supervision, the defendant will appear before the Court for a re-entry progress hearing. Prior to the hearing, the probation officer will submit a report summarizing his status and compliance with release conditions. If he is supervised by a district outside of the Washington, DC metropolitan area, the United States Probation Office in that district will submit a progress report to the court within sixty (60) days of the commencement of supervision; upon receipt of the progress report, the Court will determine if his appearance is required.

4.  The defendant must pay the balance of any restitution at a rate of no less than $100 per month.


The Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the United States Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the Probation Office upon the defendant's completion or termination from treatment.

A603

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
            Sheet 5 — Criminal Monetary Penalties

Judgment — Page __7__ of __8__

DEFENDANT:  LARRY RENDALL BROCK
CASE NUMBER: 21-140  (JDB)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 180.00 | $ 2,000.00 | $ | $ | $ |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Architect of the Capitol |  | $2,000.00 |  |
| Office of the Chief Financial Officer |  |  |  |
| Attn.: Kathy Sherrill, CPA |  |  |  |
| Ford House Office Building, Room H2-205 |  |  |  |
| Washington, DC 20515 |  |  |  |
| **TOTALS** | $            0.00 | $         2,000.00 |  |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑   the interest requirement is waived for the    ☐   fine   ☑   restitution.

    ☐   the interest requirement for the    ☐   fine   ☐   restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __8__ of __8__

DEFENDANT:   LARRY RENDALL BROCK
CASE NUMBER:  21-140 (JDB)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __180.00__ due immediately, balance due

     ☐ not later than _____ , or
     ☑ in accordance with ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
     The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333
     Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, the defendant shall notify
     the Clerk of the Court of the change until such time as the financial obligation is paid in full.  Restitution payments
     shall be made to the Clerk of the Court for the United States District Court, District of Columbia, for disbursement
     to the victim

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A605

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 1:21cr140** |
| | : | |
| **LARRY BROCK,** | : | |
| | : | |
| **Defendant.** | : | |

---

### NOTICE OF APPEAL

Please take notice that the defendant Larry Brock hereby appeals the final order entered in this case on March 22, 2023 (ECF 98).

Respectfully submitted,

By: */s/ Charles Burnham*
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
Charles@burnhamgorokhov.com

1

A606

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF

system, which will send a notification (NEF) to all counsel of record.

Respectfully submitted,

By: */s/ Charles Burnham*
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
Charles@burnhamgorokhov.com

A607